UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                      :

UNITED STATES OF AMERICA       :
                      :

    - v. -                  :           S1 16 Cr. 776 (VEC)
                      :

JOSEPH PERCOCO,          :
  a/k/a "Herb,"            :
ALAIN KALOYEROS,        :
  a/k/a "Dr. K,"           :
PETER GALBRAITH KELLY, JR.,  :
  a/k/a "Braith,"         :
STEVEN AIELLO,           :
JOSEPH GERARDI,         :
LOUIS CIMINELLI,        :
MICHAEL LAIPPLE, and      :
KEVIN SCHULER,          :
                      :
            Defendants.    :
                      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

 

# GOVERNMENT'S OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' PRETRIAL MOTIONS

JOON H. KIM
Acting United States Attorney
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Janis Echenberg
Robert Boone
David Zhou
Matthew Podolsky
Assistant United States Attorneys
- Of Counsel -

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND ...................................................................................................... 2

   I.  Factual Background ....................................................................................... 2

     A.  Introduction ............................................................................................ 2

     B.  The Buffalo Billion Fraud and Bribery Scheme .................................... 7

     C.  The Percoco Bribery Scheme................................................................ 10

   II.  Procedural Background................................................................................ 16

ARGUMENT .......................................................................................................... 20

   I.  Motions to Dismiss Pursuant to Rules 7 and 12 ......................................... 20

     A.  Legal Standard for Dismissal, Generally .............................................. 21

     B.  Section 666 Is Constitutional (Percoco, Kelly)..................................... 23

        1.  Applicable Law ............................................................................... 23

          a.  Facial Overbreadth ................................................................... 23

          b.  Section 666................................................................................ 25

        2.  Discussion ....................................................................................... 27

          a.  Section 666 Is Not Facially Overbroad...................................... 27

          b.  Section 666 Is Not Vague as Applied to Percoco and Kelly .......... 36

     C.  *McDonnell* Did Not Invalidate the "As Opportunities Arise" Theory of Bribery (Kelly) ................................................................................... 38

     D.  The Superseding Indictment Properly Alleges a Gratuity (Percoco, Kelly).............. 43

     E.  The Superseding Indictment Properly Alleges Wire Fraud (Kaloyeros, Buffalo Defendants) ....................................................................................... 46

        1.  Applicable Law ............................................................................... 46

        2.  Discussion ....................................................................................... 47

          a.  The Superseding Indictment Sufficiently Alleges a Scheme to Defraud ....... 49

          b.  The Superseding Indictment Sufficiently Alleges Money or Property........... 55

          c.  The Superseding Indictment Sufficiently Alleges Use of Wires ................... 58

     F.  The Superseding Indictment Properly Alleges Bribery (Percoco, Kelly, Syracuse Defendants, Buffalo Defendants).................................................................... 60

        1.  Applicable Law ............................................................................... 60

  a. Section 666.................................................................................................... 60

  b. Hobbs Act Extortion and Honest Services Fraud ......................................... 61

 2. Discussion ................................................................................................................ 63

  a. The Buffalo Defendants' Motion to Dismiss Should Be Denied .................. 63

  b. Percoco's Motion to Dismiss Should Be Denied........................................... 70

 G. Grand Jury Minutes Should Not Be Disclosed (Buffalo Defendants)...................... 77

II. Motion to Dismiss Count One as "Duplicitous".............................................................. 78

 A. Applicable Law ................................................................................................................ 79

 B. Discussion ........................................................................................................................ 80

III. Motions to Sever ................................................................................................................... 82

 A. Applicable Law ................................................................................................................ 83

 1. Rule 8(b) .................................................................................................................. 84

 2. Rule 14 ..................................................................................................................... 85

 B. Discussion ........................................................................................................................ 87

 1. The Buffalo Billion Defendants Should Be Tried Together ................................. 87

 2. The Percoco Scheme Defendants Should Be Tried Together.............................. 94

 3. All Defendants Are Properly Joined, But Discretionary Severance Is Appropriate Under Rule 14 ...................................................................................... 98

IV. Motion for Change of Venue ............................................................................................. 103

 A. Applicable Law .............................................................................................................. 103

 B. Discussion ...................................................................................................................... 105

 1. Venue Is Properly Alleged in the Superseding Indictment................................. 105

 2. Discretionary Transfer of Venue Is Not Warranted........................................... 108

V. Motions to Suppress Evidence .......................................................................................... 111

 A. Relevant Facts ............................................................................................................... 112

 1. Email Search Warrant for Kaloyeros and Ciminelli's Personal Accounts ........ 112

 2. Follow-up Email Search Warrant for Kaloyeros's Personal Account ............... 116

 B. Applicable Law .............................................................................................................. 117

 1. Particularity and Overbreadth .............................................................................. 118

 2. The Good Faith Exception .................................................................................... 120

 3. Claims of Material Misstatements or Omissions ............................................... 121

    C.  Discussion ........................................................................................................ 122

        1.  The Email Search Warrants Were Supported by Probable Cause ..................... 122

        2.  The Email Warrants Were Not Overbroad ....................................................... 127

        3.  The Email Warrants Were Relied Upon in Good Faith ..................................... 133

VI. Motions for Bills of Particulars ..................................................................... 136

    A.  Applicable Law ............................................................................................. 136

    B.  Discussion .................................................................................................... 139

VII. Motions to Compel Disclosure of *Brady* Material ....................................... 147

    A.  Applicable Law ............................................................................................. 148

    B.  Kelly and Percoco's *Brady* Requests ......................................................... 150

        1.  Altered Emails ................................................................................................. 150

        2.  Ethics Opinion ................................................................................................. 152

        3.  Other State Officials ........................................................................................ 153

    C.  Kaloyeros and the Buffalo Defendants' *Brady* Requests ........................... 154

VIII. Motion to Dismiss for "Preindictment Prejudice" ........................................ 159

    A.  Relevant Facts .............................................................................................. 159

    B.  Applicable Law ............................................................................................. 161

    C.  Discussion .................................................................................................... 163

IX. Motion to Dismiss for "Prosecutorial Misconduct" ...................................... 168

    A.  Relevant Facts .............................................................................................. 168

    B.  Discussion .................................................................................................... 170

CONCLUSION ........................................................................................................ 175

**<u>TABLE OF BRIEFS</u>**

| <u>Dkt. No.</u> | <u>Defendant</u> | <u>Brief</u> | <u>Abbreviation</u> |
|---|---|---|---|
| 94 | Buffalo Defs. | Motion to Dismiss for Venue | Buffalo Defs.' Venue Mot. |
| 97 | Schuler | Motion to Transfer Venue | Schuler Venue Mot. |
| 172 | Kaloyeros | Motion to Suppress Email Search Warrant | Kaloyeros MTSW |
| 177 | Kaloyeros | Motion to Dismiss Under Rule 12 | Kaloyeros MTD |
| 181 | Kaloyeros | Motion for a Bill of Particulars | Kaloyeros BOP Mot. |
| 187 | Percoco | Motion to Dismiss Under Rule 12 | Percoco MTD |
| 188 | Kaloyeros | Motion to Dismiss Count One | Kaloyeros Duplicity Mot. |
| 193 | Percoco | Motion to Compel *Brady* Materials | Percoco *Brady* Mot. |
| 195 | Kaloyeros | Motion for Severance | Kaloyeros MTSE |
| 199 | Percoco | Motion for Bill of Particulars | Percoco BOP Mot. |
| 201 | Kaloyeros | Motion to Compel *Brady* Materials | Kaloyeros *Brady* Mot. |
| 206 | Kaloyeros | Motion to Dismiss for Venue | Kaloyeros Venue Mot. |
| 208 | Buffalo Defs. | Supplemental Venue Motion | Buffalo Defs.' Supp. Venue Mot. |
| 211 | Ciminelli | Motion to Suppress GPS SW | Ciminelli GPS MTSW |
| 213 | Buffalo Defs. | Motion to Dismiss Count One | Buffalo Defs.' Duplicity Mot. |
| 215 | Buffalo Defs. | Motion to Compel *Brady* Materials | Buffalo Defs.' *Brady* Mot. |
| 217 | Buffalo Defs. | Motion to Strike Surplusage | Buffalo Defs.' Surplusage Mot. |
| 220 | Buffalo Defs. | Motion to Dismiss Under Rule 12 | Buffalo Defs.' MTD |
| 222 | Buffalo Defs. | Motion for Severance | Buffalo Defs.' MTSE |
| 224 | Buffalo Defs. | Motion to Compel Grand Jury Materials | Buffalo Defs.' GJ Mot. |
| 226 | Ciminelli | Motion to Suppress Email Search Warrant | Ciminelli Email MTSW |
| 230 | Kelly | Motion to Dismiss Under Rule 12 | Kelly MTD |
| 232 | Kelly | Motion for Bill of Particulars and *Brady* | Kelly Disc. Mot. |
| 234 | Kelly | Motion for Severance | Kelly MTSE |
| 237 | Syracuse Defs. | Omnibus Motion | Syracuse Defs.' Mot. |
| 240 | Percoco | Motion for Severance | Percoco MTSE |

## PRELIMINARY STATEMENT

In an effort to escape the fraud and corruption charges laid out in a detailed 79-page complaint and 38-page superseding indictment, the defendants have filed 24 pretrial motions challenging the indictment on various grounds and seeking to move the trial out of the Southern District of New York.  Although, as set forth below, the Government consents to discretionary severance so that the Kaloyeros-related fraud and bribery charges are tried separately from the Percoco-related bribery charges, none of the defendants' remaining motions has merit.

Specifically:

- The defendants' arguments that various counts should be dismissed for legal or factual insufficiency should be rejected because the fifteen counts contained in the Superseding Indictment are properly alleged;

- For much the same reason, and because the defendants have demonstrated no cause—let alone grossly prejudicial irregularity or some particularized need or compelling necessity as they must—the defendants' motions to disclose grand jury minutes should be denied;

- The defendants' motion to dismiss Count One as "duplicitous" should be denied because Count One properly alleges a single conspiracy;

- Although trial on the Buffalo Billion fraud and bribery charges should proceed separately from trial on the Percoco-related bribery charges, motions for further severance should be denied;

- The defendants' motion to dismiss or change venue should be denied because venue is proper in the Southern District of New York, and there is no valid basis for transfer to the Western District of New York;

- The defendants' motions to suppress should be denied because the relevant evidence was properly obtained pursuant to valid search warrants;

- The defendants' various discovery motions should be rejected because the Government has properly produced discovery pursuant to the Federal Rules of Criminal Procedure and relevant caselaw;

- The Syracuse defendants' motion to dismiss the Superseding Indictment due to media-related "preindictment prejudice" should be rejected because they have shown no such prejudice, nor would dismissal be a proper remedy; and

- The Syracuse defendants' motion to dismiss Count Fifteen or the entire Superseding Indictment for purported "prosecutorial misconduct" has no basis in fact or law.

## BACKGROUND

### I.    Factual Background

#### A.    Introduction

This case concerns the corrupt abuse of power by two senior officials in the administration of Governor Andrew Cuomo (the "Governor"), and the willingness of high-level executives at an energy company and two real estate development companies to pay bribes in order to obtain official State action to their companies' benefit.  As set forth in the Complaint (Dkt. No. 1) and Superseding Indictment (Dkt. No. 162), from at least 2010 through 2016, defendants Joseph Percoco and Alain Kaloyeros (the "State Official Defendants") worked with Todd Howe, a State agent and close confidant of Percoco and Kaloyeros, to obtain bribe payments from defendants

Peter Galbraith Kelly, Jr., Steven Aiello, Joseph Gerardi, Louis Ciminelli, Michael Laipple, and Kevin Schuler (the "Executive Defendants") in exchange for official actions by Percoco and Howe for the benefit of the Executive Defendants' companies.

More specifically, the Kaloyeros-related charges concern efforts by Kaloyeros and Howe to rig the bidding process for large State-funded projects associated with the State University of New York ("SUNY") Polytechnic Institute ("SUNY Poly"),[1] a public university headed by Kaloyeros and of which Howe was an agent and representative, for the benefit of companies controlled by Aiello and Gerardi and by Ciminelli, Laipple, and Schuler, in exchange for hundreds of thousands of dollars in payments from those companies to Howe. (*See* Superseding Indictment ¶¶ 22-27.) The Percoco-related charges concern efforts by Howe and Percoco, who served as the Executive Deputy Secretary to the Governor, to solicit bribes for Percoco from Howe's clients, including Kelly, Aiello, and Gerardi, in exchange for the performance of official actions by Percoco on behalf of those clients as opportunities arose. (*See* Superseding Indictment ¶¶ 30-35.)

At the center of both schemes was Howe, who is cooperating with the Government and has pled guilty to (a) taking bribes from Aiello, Gerardi, Ciminelli, Laipple, and Schuler in exchange for using his official position to rig the bidding for State-funded projects in their favor, (b) conspiring with Kaloyeros to defraud Fort Schuyler Management Corporation ("Fort Schuyler"),

---

[1] Although SUNY Poly was known as the College of Nanoscale Science and Engineering during part of the relevant time period, it is referred to throughout as "SUNY Poly" for ease of reference.

a non-profit real estate corporation affiliated with SUNY Poly, by secretly rigging the bids for those projects, and (c) conspiring with Kelly, Aiello, and Gerardi to bribe Percoco in exchange for official actions by Percoco, among other crimes. The Government expects that the evidence at trial will establish that the Governor's election in 2010 transformed Howe, then primarily a federal lobbyist based in Washington, D.C., into a key contact for individuals seeking public funds and other official action from New York State, due to Howe's longstanding personal and professional relationships with the Governor and other senior officials in the Governor's administration.

Howe's relationship with the Governor, Percoco, and others close to the Governor was cemented in the mid- to late-1990s during the Governor's term as the Secretary of the United States Department of Housing and Urban Development ("HUD"). (*See* Superseding Indictment ¶ 9; Compl. ¶ 28(a).) At HUD, Howe served as Assistant Chief of Staff and worked closely with several people who later would become key members of the Governor's executive staff, including Percoco, whom Howe hired at HUD and with whom he subsequently developed a close relationship. (*See* Superseding Indictment ¶ 9; Compl. ¶ 28(a).) In 2011, Percoco became the Governor's Executive Deputy Secretary, which was one of the most senior positions in the Governor's administration, and was thereafter generally viewed as the Governor's "right-hand man." (Compl. ¶¶ 26(a), 28(a).) Capitalizing on his newfound access to the highest levels of State government, Howe conspired with certain of his highest-paying clients—specifically, the Executive Defendants—to help them gain improper advantages within State government in exchange for payments to him and to Percoco.

The election of the Governor in 2010 also was significant for Kaloyeros, then a college president and the highest paid state employee in New York, who initially clashed with the Governor. (*See* Compl. ¶ 69.) In order to keep his job and expand his authority, Kaloyeros sought to strengthen his relationship with the Governor's office by retaining Howe as a consultant for SUNY Poly. (Compl. ¶ 69.) Kaloyeros thereafter, and without proper authorization, caused the SUNY Research Foundation (the "Research Foundation")—a non-profit organization that supports the mission of the various schools within the SUNY system, including Kaloyeros's—to retain Howe. (Compl. ¶ 70.) Kaloyeros then delegated to Howe substantial authority over large State-funded development projects overseen by Kaloyeros, and together Kaloyeros and Howe sought to channel taxpayer dollars to particular large contributors to the Governor's campaigns— thereby raising Kaloyeros's status with and demonstrating his loyalty to the Governor, and helping Howe obtain bribe payments from those donors.

Howe's representation of the Executive Defendants began in the lead up to or after the Governor's election in 2010. Once connected with Howe, all of the Executive Defendants paid Howe to obtain improper advantages, which Howe provided by using Percoco's and/or Kaloyeros's influence within State government. Soon after the Governor took office, Aiello and Gerardi—principals of a large real estate development company based in Syracuse, New York (the "Syracuse Developer")—sought to obtain contracts for State-funded development projects,[2] and,

---

[2] Before it started bribing Howe, and prior to 2013, the Syracuse Developer's business focused primarily on private development opportunities such as strip malls. (Compl. ¶ 30(a).)

to achieve that goal, began paying Howe (through his government relations firm, which was a subsidiary of an Albany-based law firm (the "Law Firm")). (*See* Compl. ¶¶ 30, 71.) Later, Ciminelli (who was already a major political donor in New York State but was being cultivated by the Governor's campaign to support the Governor), Laipple, and Schuler, executives at a large real estate development company based in Buffalo, New York (the "Buffalo Developer"), also began paying Howe (through the Law Firm) to secure certain large State-funded projects. (Compl. ¶¶ 31, 72.) In exchange for the payments to Howe and in order to increase his own stature by assisting significant political contributors to the Governor, Kaloyeros and Howe used their official positions to reward Aiello, Gerardi, Ciminelli, Laipple, and Schuler by fraudulently directing large State-funded projects to the Syracuse Developer and Buffalo Developer. (*See* Superseding Indictment ¶ 22; Compl. ¶¶ 67-87.)

Also after the Governor took office, Kelly caused his employer, a large energy company with significant business before New York State (the "Energy Company"), to pay Howe hundreds of thousands of dollars. (Compl. ¶ 35.) In exchange, Howe cleared the path for Kelly to deal directly with Percoco. Percoco, who, like Howe, sought to capitalize on his new power, solicited bribe payments directly from Kelly—in the form of a low-show job for Percoco's wife—in exchange for taking steps in his official capacity to benefit Kelly's employer. (*See* Compl. ¶¶ 36-64; Superseding Indictment ¶¶ 29-31.) Unsatisfied, however, with the hundreds of thousands of dollars he obtained through Kelly's bribe payments, Percoco sought to further capitalize on his senior leadership role in the Governor's administration by soliciting additional bribes from Aiello

and Gerardi to take official action for the benefit of the Syracuse Developer. (*See* Superseding Indictment ¶¶ 33-35; Compl. ¶¶ 57-66.)

**B. The Buffalo Billion Fraud and Bribery Scheme**

At least as early as 2012, the Governor began a series of State-funded development efforts in various areas of upstate New York, including Buffalo and Syracuse, referred to generally as the "Buffalo Billion." (*See* Compl. ¶¶ 21-22, 25(b).) The funding for these projects came from the Empire State Development Corporation ("ESD"), New York State's main economic development agency, whose Manhattan-based employees were involved in administering its funds. (*See* Superseding Indictment ¶ 26.)

Many of the projects funded under the umbrella of the Buffalo Billion were operated by and on behalf of SUNY Poly and its related non-profit development corporation, Fort Schuyler. The design of these projects, as well as the bidding process for contracts to build them, was under the control of Kaloyeros, who served as President of SUNY Poly, and Howe, who, as noted above, Kaloyeros had caused to be hired as a consultant to SUNY Poly and who served as an agent of SUNY Poly with respect to, among other things, SUNY Poly's development projects. (*See* Superseding Indictment ¶¶ 8, 11; Compl. ¶¶ 25, 27-28, 67.)

Kaloyeros and Howe directed Buffalo Billion-related funds to the Syracuse and Buffalo Developers, whose executives—Aiello and Gerardi and Ciminelli, Laipple, and Schuler, respectively—were both financially supportive of the Governor and directed their companies to pay bribes to Howe in exchange for Howe's use of his official position as an agent of SUNY Poly

to, among other things, influence the bidding process.  (*See* Superseding Indictment ¶ 22; Compl. ¶¶ 69-73.)  With respect to the Syracuse Developer, which, as directed by Aiello and Gerardi, paid bribes to Howe through a sham consultancy arrangement, Kaloyeros and Howe worked to award them development projects in Syracuse, New York.  (*See* Compl. ¶¶ 30, 68, 71.)  Likewise, Kaloyeros and Howe took actions to ensure that development projects in Buffalo, New York were awarded to the Buffalo Developer, whose executives Ciminelli, Laipple, and Schuler caused the Buffalo Developer to pay Howe bribes in the guise of a consultancy arrangement.  (*See* Compl. ¶¶ 31, 68, 72.)

Kaloyeros and Howe were not able simply to offer contracts to the Syracuse Developer or Buffalo Developer in exchange for the bribes due to strict rules governing SUNY institutions that prevented SUNY Poly from easily engaging in partnerships with private companies.  Accordingly, Fort Schuyler—a separate non-profit corporation—was created to manage development and construction projects associated with SUNY Poly.  (Compl. ¶ 25(c).)  Fort Schuyler was governed by a Board of Directors, which was charged with, among other things, awarding contracts to developers, including projects in Buffalo and Syracuse.  (Compl. ¶ 25(c).)  The Board applied the procurement policies of the Research Foundation, which is a non-profit corporation that supports the SUNY system, under which contracts are to be awarded on the basis of open and free competition.  The Board of Directors further understood that both the bidding documents created for the particular projects, as well as the work of SUNY Poly officials involved in the bidding process, abided by the same guidelines.  (*See* Compl. ¶ 76.)  Thus, because Buffalo Billion funds

only would be provided by ESD to the developers selected by Fort Schuyler's Board of Directors to develop and build projects for SUNY Poly, Kaloyeros and Howe had to obtain the approval of that Board in order to direct Buffalo Billion funds to the Syracuse and Buffalo Developers.

To carry out their scheme, Kaloyeros and Howe deceived the Board of Directors by creating what appeared to the Board to be a competitive bidding process to select "preferred developers" for Syracuse and for Buffalo. Once the Board selected a "preferred developer," no further competition would be held to select the best developer for any particular development project, because the "preferred developer" would be prequalified to receive the contract. (*See* Compl. ¶¶ 74, 77.) In order to ensure that the Syracuse Developer and Buffalo Developer were selected as preferred developers in Syracuse and Buffalo, respectively, Kaloyeros and Howe, along with Aiello, Gerardi, Ciminelli, Schuler, and Laipple, drafted requests for proposal ("RFPs") that were tailored to match the qualifications of the Syracuse and Buffalo Developers—and further collaborated on the RFP responses submitted by the Syracuse and Buffalo Developers—so that any evaluation committee presenting the proposals to the Board necessarily would recommend selecting the Syracuse and Buffalo Developers. (*See* Superseding Indictment ¶¶ 22-24; Compl. ¶¶ 68, 74-75, 78-84.)

Accordingly, when the Board of Directors of Fort Schuyler voted to issue the Syracuse and Buffalo RFPs, and resolved to approve a contract only "[u]pon completion of a competitive RFP process and evaluation of responses" (Compl. ¶ 77(c)), the Board unwittingly issued RFPs that were designed by Kaloyeros, Howe, Aiello, Gerardi, Ciminelli, Laipple, and Schuler to thwart

fair competition and guarantee the awards for the Syracuse and Buffalo Developers. Ultimately, the Syracuse Developer was the only party to respond to the Syracuse RFP, and the evaluation committee, based on a comparison between the qualifications requested in the rigged Syracuse RFP and those of the Syracuse Developer, recommended that the Board of Directors name the Syracuse Developer as SUNY Poly's preferred developer for Syracuse, which the Board did. (*See* Compl. ¶¶ 77, 86(a).) The Syracuse Developer was subsequently awarded by SUNY Poly contracts worth in excess of $100 million without further process. (*See* Compl. ¶ 86(a).)

The Buffalo Developer was one of three parties to respond to the Buffalo RFP, and the evaluation committee, based on a comparison between the qualifications requested in the rigger Buffalo RFP and those contained in the responding submissions, recommended that the Board of Directors name both the Buffalo Developer and one other developer as SUNY Poly's preferred developers for Buffalo, which the Board did. (*See* Compl. ¶ 77, 86(b).) The Buffalo Developer subsequently was awarded by SUNY Poly contracts worth at least approximately $750 million without further process.[3] (*See* Compl. ¶ 87.)

### C.     The Percoco Bribery Scheme

As noted, Howe also conspired with certain of his clients to funnel bribe payments to Percoco in exchange for official State actions. As detailed further below, Percoco initially agreed

---

[3] The other developer named as one of SUNY Poly's preferred developers in Buffalo received a contract worth approximately $25 million for a different project in Buffalo, New York. (*See* Compl. ¶ 87 n.13.)

to take official action on behalf of the Energy Company in exchange for payments directed by Kelly to Percoco through Percoco's wife; later, as Percoco's financial situation worsened, Percoco agreed to take official action on behalf of the Syracuse Developer in exchange for bribe payments directed by Aiello and Gerardi to Percoco through Howe's shell company.

With respect to the bribes paid to Percoco by the Energy Company, Kelly conspired with Howe to make corrupt payments totaling approximately $287,000 to Percoco by hiring Percoco's wife for a low-show job at the Energy Company. (Superseding Indictment ¶¶ 29-30.) In exchange, Percoco agreed to, and did, use his official power and influence to secure a valuable environmental contract for the Energy Company (the "Reciprocity Agreement"), and to aid the Energy Company's efforts to obtain an agreement from the State to purchase a guaranteed amount of power (the "PPA") from a new power plant that the Energy Company was building (the "New York Power Plant"). (Superseding Indictment ¶ 31.)

The Energy Company initially had retained Howe in or about August 2010 (by which time it was expected that the Governor would win the 2010 election) to provide consulting advice concerning regulatory approvals necessary for the New York Power Plant.[4] (Compl. ¶ 35(a).) At that time, Kelly decided the Energy Company should pay Howe individually (in addition to the

---

[4] More specifically, the Energy Company retained the Law Firm, which had as a subsidiary the government relations firm of which Howe was the principal employee. (Compl. ¶¶ 28(b), 35.) As described below, and in the Superseding Indictment and Complaint, the Executive Defendants, Kaloyeros, and Howe used these technical distinctions to disguise their relationships, and indeed, the Buffalo Defendants still attempt to hide behind these business forms in their briefing. (*See* Buffalo Defs.' MTD 47-49.)

payments to the Law Firm) to increase Kelly's access to the highest levels of the incoming administration without having to navigate any ethical, legal, or other constraints imposed on Howe by the Law Firm. (Compl. ¶ 35(a).) Accordingly, in consultation with Kelly, Howe established a shell company ("Howe's LLC") to receive secret payments from the Energy Company that Howe did not report to the Law Firm. (Compl. ¶ 35.) Over the course of the conspiracy, between August 2010 and April 2015, the Energy Company paid Howe's LLC approximately $474,000, in addition to approximately $332,000 paid to the Government Relations Firm, of which Howe received a significant percentage. (Compl. ¶ 35(b).)

After he started receiving payments from the Energy Company, Howe introduced Kelly to Percoco. (Compl. ¶ 37.) Soon thereafter, Kelly and Percoco embarked on a corrupt bargain to exchange bribes from the Energy Company for Percoco's agreement to use his official influence, as opportunities arose, to obtain valuable State action on behalf of the Company. (Superseding Indictment ¶¶ 30-31; Compl. ¶ 46.) In particular, Percoco took action to ensure the approval of the Reciprocity Agreement, which allowed the Energy Company to purchase emissions credits from New York that were necessary for its power plant in New Jersey. (Superseding Indictment ¶ 31(a); Compl. ¶¶ 47-48.) In order to funnel the bribe payments to Percoco, Kelly created a new position at the Energy Company for Percoco's wife that required little work. (Compl. ¶ 43.) Over the course of the next several years, she worked only a few hours per week, and yet, for her minimal work, she was paid approximately $7,500 per month (or, about $90,000 a year). (Compl. ¶ 44(d).)

In addition to the Reciprocity Agreement, Percoco also agreed to and did make significant efforts to help the Energy Company obtain the PPA.  Among other things, Percoco agreed to intervene to try to stop the reigniting of the old plants that might compete with the construction of the Energy Company's New York Power Plant (Compl. ¶ 51(a)), and also agreed to seek support for the New York Power Plant and the Energy Company's receipt of a PPA from the official in the Governor's Executive Chamber who oversaw the State agencies with authority over PPAs (Compl. ¶ 51(c)).

Although the actions Percoco took ultimately were unsuccessful in securing a PPA for the Energy Company, Percoco did not want Kelly to stop paying him bribes.  Accordingly, what had started as a bribery conspiracy by and among Percoco, Kelly, and Howe, evolved into a conspiracy in which Percoco and Howe worked to use Percoco's official position to extort Kelly and the Energy Company for continued payments.  Thus, in the fall of 2013, when Percoco learned from a State official that a PPA for the Energy Company would not be forthcoming, Percoco and Howe decided not to inform Kelly and instead pretended that Percoco still was actively trying to help secure the PPA in order to keep the payments, or "ziti" as they called it, flowing.  (Compl. ¶¶ 42(b), 53.)  Underscoring the fact that Kelly made payments to Percoco's wife as part of a corrupt bargain with Percoco, when Kelly finally realized in or about mid-June 2015 that there was no quo—that the Energy Company was not going to receive a PPA—Kelly decided to cut off the quid by firing Percoco's wife.  (Compl. ¶ 55.)

Percoco attempted to address his personal financial difficulties by again turning to Howe's clients—who had already shown a willingness to pay bribes for official action with respect to the Buffalo Billion fraud and bribery scheme. (Compl. ¶ 57.) Steven Aiello and Joseph Gerardi responded to Percoco's overtures by again turning to bribery to obtain decisions by State agencies favorable to the Syracuse Developer and to Aiello. Specifically, Aiello and Gerardi conspired with Howe to make corrupt payments totaling approximately $35,000 to Percoco, who accepted the bribes with the understanding that he would take official actions on behalf of Aiello, Gerardi, and their company as opportunities arose. (Superseding Indictment ¶ 33; Compl. ¶ 63.)

In or about August 2014, the Syracuse Developer made its first payment of approximately $15,000 to Percoco, sending the money through Howe's shell company and directing Howe to write checks to Percoco's wife, rather than paying Percoco directly. (Compl. ¶ 63.) Less than two weeks after the first payment, Aiello and Gerardi requested Percoco's intervention to reverse an unfavorable, costly ruling by ESD that would have required the Syracuse Developer to negotiate a labor peace agreement ("LPA") with a union in order to use $1.5 million in State funding to build a parking lot near one of its hotels. (Superseding Indictment ¶ 35(a); Compl. ¶¶ 61(a), 61(b).) In order to avoid the LPA requirement, but still obtain ESD funding, Gerardi initially tried to convince ESD that the parking lot project did not trigger the LPA law. (Compl. ¶ 62.) When these efforts failed, Aiello and Gerardi turned to Percoco. (Compl. ¶ 64(a).)

Several months thereafter, Gerardi and Aiello made another corrupt payment of approximately $20,000 to Percoco, again using Howe as a pass-through. (Compl. ¶¶ 63-64.) On

or about December 3, 2014, Gerardi pressed for Percoco's help in resolving the LPA issue. Percoco, who had been working on the Governor's re-election campaign and was less than one week away from returning to his former position as the Governor's Executive Deputy Secretary, pressured ESD to reverse its position, eliminating the need for the Syracuse Developer to negotiate an LPA. (*See* Compl. ¶ 64(f).)

Another opportunity for Percoco to use his official influence and position to benefit the Syracuse Developer arose in or about September 2015. As detailed above, the Syracuse Developer was named the preferred developer for SUNY Poly in Syracuse after Aiello, Gerardi, Howe, Kaloyeros, and others worked together to rig the bidding process. Pursuant to that fraudulently-obtained contract, the Syracuse Developer was awarded, without further competition, a contract worth approximately $15 million to construct a film hub (the "Film Hub"), as well as a separate contract worth approximately $90 million to build a manufacturing plant. (Superseding Indictment ¶ 13; Compl. ¶ 86(a).) By summer of 2015, however, the State had not yet released a significant portion of the funding allocated to the two projects. In response to requests for help from Aiello and Gerardi, which were conveyed to Percoco by Howe, Percoco exerted influence over certain supervisors at the New York State Division of Budget ("DOB") to grant their approval for the release of funds for the Film Hub and the manufacturing plant projects. (Compl. ¶ 65.) In response to pressure from Percoco, the DOB approved the projects, and the funds were released. (Superseding Indictment ¶ 35(b); Compl. ¶ 65(f).)

Around the same time, Percoco used his official position and influence to benefit Aiello in

yet another way: he secured a salary increase of approximately $5,000 for Aiello's son, who worked in the Executive Chamber. Between in or about November 2014 and September 2015, Aiello's son received two raises and a locality adjustment, increasing his salary approximately ten percent. Despite the fact that salary increases for Executive Chamber employees typically were limited to no more than ten percent in a given year, Aiello pressed for a further raise for his son. (Compl. ¶ 66(a).) In response, Percoco instructed an Executive Chamber employee with authority over, among other things, human resources issues, to "handle" the matter. (Compl. ¶ 66(c).) Within a few days, Aiello's son's total salary was increased to approximately $65,000 per year—increasing his salary by an additional ten percent over his previous raise. (Compl. ¶ 66(d).)

## II.    Procedural Background

As a result of the conduct described above, the defendants were charged by Complaint dated September 20, 2016. The Complaint, totaling 79 pages, set out the factual basis for the allegations in extensive detail, including quotations and references to specific electronic communications, bank and corporate records, and statements by witnesses, including Howe, who, as described, has pleaded guilty pursuant to a cooperation agreement with the Government.

On November 22, 2016, a grand jury sitting in this District returned a fourteen-count Indictment against the defendants. On May 11, 2017, the grand jury returned the Superseding Indictment, charging the defendants in fifteen counts. Specifically:

- Count One of the Superseding Indictment charged Kaloyeros, Aiello, Gerardi, Ciminelli, Laipple, and Schuler with participating in a wire fraud conspiracy related to the preferred developer RFPs, in violation of Title 18, United States Code, Section 1349;

- Count Two charged Kaloyeros, Aiello, and Gerardi with wire fraud related to the Syracuse RFP, in violation of Title 18, United States Code, Sections 1343 and 2;

- Count Three charged Aiello and Gerardi with paying bribes and gratuities to Howe related to the Syracuse RFP, in violation of Title 18, United States Code, Sections 666(a)(2) and 2;

- Count Four charged Kaloyeros, Ciminelli, Laipple, and Schuler with wire fraud related to the Buffalo RFP, in violation of Title 18, United States Code, Sections 1343 and 2;

- Count Five charged Kaloyeros, Ciminelli, Laipple, and Schuler with paying bribes and gratuities to Howe related to the Buffalo RFP, in violation of Title 18, United States Code, Sections 666(a)(2) and 2;

- Count Six charged Percoco with participating in a conspiracy to commit extortion under color of official right, in violation of Title 18, United States Code, Section 1951;

- Counts Seven and Eight charged Percoco with extortion under color of official right, with respect to the Energy Company and to the Syracuse Developer, respectively, in violation of Title 18, United States Code, Section 1951;

- Count Nine charged Percoco and Kelly with participating in a conspiracy to commit honest services wire fraud, in violation of Title 18, United States Code, Section 1349;

17

- Count Ten charged Percoco, Aiello, and Gerardi with participating in a conspiracy to commit honest services wire fraud, in violation of Title 18, United States Code, Section 1349;

- Counts Eleven and Twelve charged Percoco with soliciting bribes and gratuities from the Energy Company and from the Syracuse Developer, respectively, in violation of Title 18, United States Code, Sections 666(a)(2) and 2;

- Count Thirteen charged Kelly with paying bribes and gratuities to Percoco, in violation of Title 18, United States Code, Sections 666(a)(2) and 2;

- Count Fourteen charged Aiello and Gerardi with paying bribes and gratuities to Percoco, in violation of Title 18, United States Code, Sections 666(a)(2) and 2; and

- Count Fifteen charged Aiello and Gerardi with making false statements to federal officers, in violation of Title 18, United States Code, Section 1001(a)(2).

In addition to the facts set forth in the Complaint, the 38-page Superseding Indictment contained 18 pages of factual detail regarding the basis of the charges against the defendants. As such, the Government provided the defendants with an unusual and perhaps unprecedented amount of information—including citing specific documents and witness statements—regarding the factual bases for its allegations and what the Government views as its key evidence.

The Government began producing discovery shortly after the initial Indictment was returned. As a result of the scope and complexity of the defendants' criminal conduct, the discovery has been extensive, consisting in large part of email communications, corporate and

bank records, and official documents.  In order to alleviate any burden naturally imposed by the quantity of discovery, and to assist the defendants in their preparation for trial, the Government provided the defendants with tools to help the defendants organize the discovery and review it in preparation for motion practice and trial, including producing the discovery with metadata (including, at the request of the defense, obtaining additional metadata from custodians that had not previously produced it to the Government) and, wherever possible, in fully-searchable format. The Government also provided a detailed index setting forth the bates range for each category of discovery.  (Dkt. Nos. 235, 246 ("Gitner Decl.") Ex. T.)

Furthermore, the Government has provided significant additional detail and information regarding its view of the evidence in response to numerous requests from the defendants.  Prior to submitting their motions, the defendants submitted to the Government no fewer than 21 separate, written requests for additional discovery or information regarding discovery.  The Government has responded to each request in over 60 pages of letter responses.  (Gov. Ex. A.)

On May 19, 2017, the defendants filed the instant motions, arguing, in substance, that:

- Certain counts should be dismissed for legal or factual insufficiency;

- Grand jury minutes should be disclosed;

- Count One should be dismissed as "duplicitous";

- Various defendants should be severed from one another, and related surplusage should be stricken from the Superseding Indictment;

- Venue is not proper in the Southern District of New York, or the case should otherwise be transferred;

- Certain categories of evidence should be suppressed;

- The Court should order the production of certain additional discovery;

- The Indictment should be dismissed due to "preindictment prejudice"; and

- Count Fifteen, or the entire Superseding Indictment, should be dismissed for purported "prosecutorial misconduct."

As set forth below, the Government, in the interest of facilitating trial preparation, and preventing any risk of logistical difficulties or juror confusion at trial, concedes severance of the charges related to the Buffalo Billion fraud and bribery scheme (Counts One through Five and a false statements count) from charges related to the Percoco bribery scheme (Counts Six through Fourteen and a false statements count).  All of the defendants' remaining claims are without merit and should be denied.

## ARGUMENT

### I.  Motions to Dismiss Pursuant to Rules 7 and 12

The defendants move to dismiss various counts of the Superseding Indictment pursuant to Rules 7 and 12 of the Federal Rules of Criminal Procedure ("Rule 7" and "Rule 12," respectively). Specifically, the defendants argue as follows:

- Percoco and Kelly move to dismiss on the theory that the federal statute that prohibits bribery with respect to federally-funded programs is unconstitutional on its face, or at least

vague when applied to Percoco and Kelly's conduct. (*See* Percoco MTD 32-37; Kelly MTD 12-42.)

- Percoco and Kelly move to dismiss on the ground that the official acts in question must be specifically determined at the inception of the conspiracy. (*See* Percoco MTD 29-32; Kelly MTD 43-61.)

- Percoco and Kelly move to dismiss on the basis that the Superseding Indictment insufficiently alleges a gratuity theory. (*See* Percoco MTD 37-39; Kelly MTD 61-64.)

- Ciminelli, Laipple, and Schuler (the "Buffalo Defendants") and, separately, Kaloyeros move to dismiss on the ground that the Superseding Indictment does not contain sufficient allegations to make out charges for wire fraud. (*See* Buffalo Defs.' MTD 11-43; Kaloyeros MTD 11-20.)

- The Buffalo Defendants further move to dismiss on the basis that the Superseding Indictment does not contain sufficient allegations to sustain a charge for bribery. (*See* Buffalo Defs.' MTD 43-66.)

As set forth below, not one of these motions has merit. The Superseding Indictment contains a plain, concise, and definite recitation of the facts and charges alleged in reliance on longstanding and well-settled constitutional law. Accordingly, each motion to dismiss should be denied.

A.    **Legal Standard for Dismissal, Generally**

The dismissal of an indictment is an "'extraordinary remedy' reserved only for extremely limited circumstances implicating fundamental rights." *United States* v. *De La Pava*, 268 F.3d

157, 165 (2d Cir. 2001) (citation omitted); *United States* v. *Walsh*, 194 F.3d 37, 45 (2d Cir. 1999) (courts should not dismiss an indictment for lack of specificity absent a showing of prejudice). The law is well-settled that "[a]n indictment returned by a legally constituted and unbiased grand jury . . . if valid on its face, is enough to call for trial of the charge on the merits." *Costello* v. *United States*, 350 U.S. 359, 363 (1956). A defendant must wait until after the close of the Government's case-in-chief at trial or after the jury's verdict before contesting the sufficiency of the evidence. *See* Fed. R. Crim. P. 29; *see also, e.g.*, *United States* v. *Elson*, 968 F. Supp. 900, 905 (S.D.N.Y. 1997). On a pretrial motion to dismiss pursuant to Rule 12(b) of the Federal Rules of Criminal Procedure, the allegations of the indictment must be taken as true. *See Boyce Motor Lines, Inc.* v. *United States*, 342 U.S. 337, 343 n.16 (1952); *United States* v. *Goldberg*, 756 F.2d 949, 950 (2d Cir. 1985).

Rule 7(c) of the Federal Rules of Criminal Procedure, governing the types of information that must be contained in an indictment, provides that an indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c). In general, to satisfy the pleading requirements, "'an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.'" *United States* v. *Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992) (quoting *United States* v. *Tramunti*, 513 F.2d 1087, 1113 (2d Cir. 1975)). "An indictment is sufficient when it charges a crime with sufficient precision to inform the defendant of the charges he must meet and with enough detail that he may plead double jeopardy in a future prosecution based on the

same set of events." *United States* v. *Yannotti*, 541 F.3d 112, 127 (2d Cir. 2008) (quoting *Stavroulakis*, 952 F.2d at 693) (quotation marks omitted). When determining whether or not a count sufficiently alleges a violation, the indictment should be read "in its entirety." *United States* v. *Hernandez*, 980 F.2d 868, 871 (2d Cir. 1992).

### B.  Section 666 Is Constitutional (Percoco, Kelly)

Percoco and Kelly argue that counts charging violations of Title 18, United States Code, Section 666 ("Section 666"), which, as relevant here, criminalizes bribery of agents of governments and organizations receiving federal funds, should be dismissed because Section 666 is unconstitutional following the Supreme Court's opinion in *McDonnell* v. *United States*, 136 S. Ct. 2355 (2016). (*See* Percoco MTD 32-37; Kelly MTD 12-42.) Percoco and Kelly further argue that Section 666 is unconstitutionally vague as applied to them, and that related counts should therefore be dismissed. These arguments misconstrue both *McDonnell* and Section 666, and are incorrect.

### 1.  Applicable Law

#### a.  Facial Overbreadth

Defendants arguing that a federal statute is facially overbroad bear a heavy burden, as "[i]nvalidation for overbreadth is strong medicine that is not to be casually employed." *United States* v. *Williams*, 553 U.S. 285, 293 (2008) (internal quotation marks omitted). The "traditional rule" is "that a person to whom a statute may constitutionally be applied may not challenge that statute on the ground that it may conceivably be applied unconstitutionally to others in situations

not before the Court." *New York* v. *Ferber*, 458 U.S. 747, 767 (1982). There exists a limited exception to that principle in the First Amendment area, in recognition of "the sensitive nature of protected expression." *Id.* at 768.

This exception is exceedingly narrow, however, and may only be successfully invoked if the statute "prohibits a substantial amount of protected speech." *Williams*, 553 U.S. at 292. "To put the matter another way, particularly where conduct and not merely speech is involved, . . . the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick* v. *Oklahoma*, 413 U.S. 601, 615 (1973); *see also Williams*, 553 U.S. at 292 ("In order to maintain an appropriate balance, we have vigorously enforced the requirement that a statute's overbreadth be *substantial*, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." (emphasis in original)).

Thus, "overbreadth claims, if entertained at all, have been curtailed when invoked against ordinary criminal laws that are sought to be applied to protected conduct." *Broadrick*, 413 U.S. at 613. Facial overbreadth adjudication's "function, a limited one at the outset, attenuates as the otherwise unprotected behavior that it forbids the State to sanction moves from 'pure speech' toward conduct and that conduct—even if expressive—falls within the scope of otherwise valid criminal laws that reflect legitimate state interests in maintaining comprehensive controls over harmful, constitutionally unprotected conduct." *Id.* at 615. Critically, "[f]acial overbreadth has not been invoked when a limiting construction has been or could be placed on the challenged statute." *Id.* at 613. In sum, the overbreadth doctrine "has been employed by the Court sparingly

and only as a last resort." *Id.*

**b.     Section 666**

Section 666 proscribes the solicitation and offering of bribes relating to organizations that receive federal funding.  In particular, and as relevant here, Section 666 makes it a crime either to corruptly solicit or accept anything of value or to corruptly give or offer anything of value with the intent to influence an agent of an organization or of a State or local government "in connection with any business, transaction, or series of transactions of such organization, government, or agency [that receives a threshold amount of federal funding] involving any thing of value of $5,000 or more."  18 U.S.C. § 666(a)(1)(B), (a)(2).  Thus, Section 666 criminalizes "a quid pro quo agreement—to wit, a government official's receipt of a benefit in exchange for an act he has performed, or promised to perform, in the exercise of his official authority."  *United States* v. *Ganim*, 510 F.3d 134, 141 (2d Cir. 2007).

As the Supreme Court has described, Section 666 was designed "generally to protect the integrity of the vast sums of money distributed through Federal programs from theft, fraud, and undue influence by bribery" after prior bribery statutes had proven inadequate.  *Sabri* v. *United States*, 541 U.S. 600, 606 (2004); *see also Salinas* v. *United States*, 522 U.S. 52, 58 (1997) (noting that Section 666 "was designed to extend federal bribery prohibitions to bribes offered to state and local officials employed by agencies receiving federal funds").  For this reason, Section 666 has long withstood constitutional scrutiny.  Notably, in rejecting a claim that the Constitution required a nexus between the bribes in question and the federal funds paid to the relevant agency or

organization, the Supreme Court explained that

> Congress has authority under the Spending Clause to appropriate federal moneys to promote the general welfare, Art. I, § 8, cl. 1, and it has corresponding authority under the Necessary and Proper Clause, Art. I, § 8, cl. 18, to see to it that taxpayer dollars appropriated under that power are in fact spent for the general welfare, and not frittered away in graft or on projects undermined when funds are siphoned off or corrupt public officers are derelict about demanding value for dollars.

*Sabri*, 541 U.S. at 605. Nor for that matter, is Section 666 "an unduly coercive, and impermissibly sweeping, condition on the grant of federal funds." *Id.* at 608. In short, "Congress was within its prerogative to protect spending objects from the menace of local administrators on the take," and Section 666 was a perfectly valid exercise of Congress's power. *Id.*

Courts have similarly rejected challenges to Section 666 as vague or, as particularly relevant here, constitutionally overbroad. *See, e.g.*, *United States* v. *Rosen*, 716 F.3d 691, 699-700 (2d Cir. 2013) (rejecting void-for-vagueness challenges to bribery prosecution under Section 666); *United States* v. *Thompson*, 501 F. App'x 347, 364-65 (6th Cir. 2012) (rejecting facial overbreadth challenge to misappropriation prosecution under Section 666); *United States* v. *Deen*, No. 14 Cr. 184 (EEF), 2016 WL 900463, at *4 (W.D. La. Mar. 7, 2016) (same); *United States* v. *Musto*, No. 10 Cr. 338 (ARC), 2012 WL 5879609, at *4 (M.D. Pa. Nov. 21, 2012) (rejecting argument "that § 666 is unconstitutional because it is unduly overbroad in scope, seeks to criminalize non-criminal behavior, and otherwise fails to me[e]t constitutional requirements." (internal quotation marks omitted)). The Sixth Circuit's decision in *Thompson* is instructive. In *Thompson*, the court

considered a challenge to the portion of Section 666 that prohibits misappropriation of funds.[5]  The

defendant asserted that Section 666 was facially overbroad because the application of Section 666

"was so 'broad' as to result in 'the burdening of innocent associations or expressions or statutes

. . . creates unreviewable prior restraints on First Amendment rights and are overboard [sic] as a

matter of law.'"  *Thompson*, 501 F. App'x at 364 (quoting defendant's brief; ellipsis in original).

The Sixth Circuit held that Section 666 "does not implicate the First Amendment, because no

person has a constitutional right to misapply property.  Nor has the statute been applied in such a

way as to threaten the legitimate exercise of First Amendment rights."  *Id.* at 365.

      **2.**      **Discussion**

      **a.**      **Section 666 Is Not Facially Overbroad**

Kelly and Percoco contend that Section 666 "lacks an official act requirement" (Kelly

MTD 18-28), and that "[t]he absence of an official act requirement" renders Section 666

substantially overbroad by criminalizing expression protected by the First Amendment (Kelly

MTD 28-32).  Kelly and Percoco argue that without an official act requirement, and in particular

one that is bound by the same constraints that *McDonnell* placed on the term "official act"

contained in 18 U.S.C. § 201 ("Section 201"), Section 666 might improperly criminalize protected

_____

     [5] In addition to the prohibition on bribery with respect to federal funds set forth above, Section 666 makes it a crime for "an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof . . . [to] embezzle[], steal[], obtain[] by fraud, or otherwise without authority knowingly convert[] to the use of any person other than the rightful owner or intentionally misappl[y], property" of an organization, government, or agency receiving a threshold amount of federal funds.  18 U.S.C. § 666(a)(1)(A).

27

political expression. This argument is wrong on two counts: first, *McDonnell* does not impose a freestanding official act requirement on bribery statutes; second, even if *McDonnell* could be interpreted to raise facial overbreadth concerns related to Section 666's lack of an explicit reference to "official acts," that statute's plain language, together with proper jury instructions, solves any potential constitutional problem.

Percoco and Kelly incorrectly argue that *McDonnell* mandates the conclusion that Section 666 is facially unconstitutional. According to Percoco and Kelly, in *McDonnell*, "the Supreme Court held that federal bribery statutes must be 'bounded' by the requirement that the alleged bribe be offered in exchange for an 'official act,' a term the Court narrowly defined." (Kelly MTD 12.) They assert that "*McDonnell* stressed the constitutional necessity of the official act requirement" (Kelly MTD 16), and that a federal bribery statute without such a requirement "would be unconstitutionally overbroad and vague" (Kelly MTD 12)—though, notably, the word "overbroad" appears nowhere in the Supreme Court's opinion.

Percoco and Kelly simply are wrong about what *McDonnell* holds. *McDonnell* decided only a question of "the proper [statutory] interpretation of the term 'official act'" contained in Section 201(a)(3), which the parties had agreed to apply to honest services fraud and Hobbs Act extortion charges. *McDonnell*, 136 S.Ct. at 2367. Only after holding that Section 201(a)(3)'s definition of "official act" did not encompass "[s]etting up a meeting, talking to another official, or organizing an event (or agreeing to do so)—without more," *McDonnell*, 136 S.Ct. at 2372, did the Court go on to state that, "[i]n addition to being inconsistent with both text and precedent, the

Government's expansive interpretation of 'official act' would raise significant constitutional concerns," including the concern that ordinary interactions between politicians and constituents might be chilled. *Id.*

Critically, *McDonnell* does not hold that Section 201 is unconstitutional—rather, *McDonnell* proscribes a particular jury instruction in order to avoid any constitutional concerns. Indeed, nowhere in *McDonnell* does the Supreme Court purport to address the question raised in a facial overbreadth challenge, which is, even assuming that the statute prohibits protected speech, whether the overbreadth of the statute is not only "real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick*, 413 U.S. at 615. *McDonnell* does not consider that question, and it certainly does not hold that a bribery statute—however worded— without an official act requirement would be facially unconstitutional, much less that Section 666 is facially unconstitutional.

However, even assuming that the *McDonnell* Court's "significant constitutional concerns" with Section 201's definition of "official act," 136 S.Ct. at 2372, also apply to Section 666—and it is not at all clear that they do—it is apparent that Section 666's language is not overbroad and, even if it were, a jury instruction similar to that articulated in *McDonnell* would solve any remaining risk. In *McDonnell*, the Supreme Court raised the possibility that a broad definition of "official act" in Section 201 could "cast a pall of potential prosecution" over the relationship between public officials and constituents because officials may be concerned that assisting constituents after having accepted something of value would subject them to prosecution, and

because constituents may decline to engage with their representatives for the same reason.[6]  136 S.Ct. at 2372.  Assuming, *arguendo*, that constituent services constitute "speech" protected by the First Amendment,[7] there is no basis to conclude that the risk of curtailing this conduct is not "only . . . real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick*, 413 U.S. at 615.

It is true, as Percoco and Kelly observe, that Section 666 does not contain the term "official act," or require, on its face, the commission of an official act as defined in Section 201.  The question raised, however, is not whether the statute uses the magic words "official act," but rather whether the statute prohibits speech protected by the First Amendment.  Percoco and Kelly claim that "without a bright line to distinguish between *quid pro quo* bribery and ordinary 'democratic discourse,' the latter, which enjoys First Amendment protection, would be seriously threatened."[8]

---

[6] Kelly and Percoco also refer to concerns expressed in *McDonnell* regarding federalism, and contend, without reference to any rule that would justify facial invalidation of Section 666, that "Section 666 undermines federalism."  (Kelly MTD 38-40.)  The "federalism concerns" raised in *McDonnell* with respect to Section 201 do not apply to Section 666, which was crafted by Congress to protect the integrity of federal funds.  Indeed, as described above, the Supreme Court has already stated clearly that Section 666 was a proper use of the Spending and Necessary and Proper Clauses.  *Sabri*, 541 U.S. at 605.  For the same reason, Kelly and Percoco's basic argument that there should be no federal law that reaches bribery of state officials (*see* Kelly MTD 39-40) is without any support in the law, and is foreclosed by decades of precedent upholding Section 666's validity.

[7] Although the Supreme Court suggested that "citizens with legitimate concerns might shrink from participating in democratic discourse," it did not explain whether or how constituent services are protected under the First Amendment such that they would give rise to a claim for facial overbreadth.  *McDonnell*, 136 S.Ct. at 2372.

[8] Percoco and Kelly are incorrect that there must be a "bright line."  As noted above, "the

30

(Kelly MTD 16.)  However, Section 666 contains language that distinguishes quid pro quo bribery from ordinary political discourse—i.e., it requires that the bribe be made with the *intent to influence* the agent of the State or local government (or be solicited by the official with the intent to be influenced) "*in connection with* any business, transaction, or series of transactions of such organization, government, or agency involving any thing of value of $5,000 or more."  18 U.S.C. § 666(a)(1)(B), (a)(2) (emphasis supplied).  Thus, Section 666 does not prohibit normal constituent services or any other protected discourse; it prohibits payments made or received with a *corrupt intent* "in connection with" a transaction of the relevant government or agency.  *Cf. Thompson*, 501 F. App'x at 365 ("The statute, 18 U.S.C. § 666, does not implicate the First Amendment, because no person has a constitutional right to misapply property.  Nor has the statute been applied in such a way as to threaten[] the legitimate exercise of First Amendment rights."); *see also Ganim*, 510 F.3d at 141 (explaining that Section 666 criminalizes "a quid pro quo agreement—to wit, a government official's receipt of a benefit in exchange for an act he has performed, or promised to perform, in the exercise of his official authority").

Indeed, apparently as a result of the "in connection with" language contained in Section 666, the Second Circuit has generically referred to Section 666 as requiring an official act.  *See*

---

overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep."  *Broadrick*, 413 U.S. at 615; *see also Williams*, 553 U.S. at 292 ("In order to maintain an appropriate balance, we have vigorously enforced the requirement that a statute's overbreadth be *substantial*, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." (emphasis in original)).

*Rosen*, 716 F.3d at 700 ("To establish the corrupt intent necessary to a bribery conviction [including conspiracy to violate Section 666], the Government must prove that the defendant had a specific intent to give something of value in exchange for an official act . . . ." (internal quotations marks, brackets, ellipses, and citations omitted)); *United States* v. *Bahel*, 662 F.3d 610, 637 (2d Cir. 2011) ("Bribery requires intent 'to influence' an official act or 'to be influenced' in an official act . . . ." (quoting *United States* v. *Ford*, 435 F.3d 204, 210 (2d Cir. 2006))); *Ganim*, 510 F.3d at 141 (explaining that the "the requisite quid pro quo for the crimes at issue may be satisfied upon a showing that a government official received a benefit in exchange for his promise to perform official acts or to perform such acts as the opportunities arise"); *United States* v. *Bonito*, 57 F.3d 167, 171 (2d Cir. 1995) (approving a jury instruction for Section 666 that "made clear that the corrupt agreement, offer or payment must precede the official act to be influenced or rewarded"). While these cases may mean—although it is undecided—that Section 666 requires the commission of an "official act" (as the term is used in Section 201), at a minimum, they recognize that Section 666 contains a limiting principal of the very kind that Percoco and Kelly claim is missing from the statutory text.[9]

_____

[9] For this reason, the cases relied upon by Percoco and Kelly to argue that there is no "official act" requirement are beside the point. The question is not whether there is an "official act" requirement, but whether, particularly in light of the limitations contained within Section 666, Section 666 presents a real and substantial risk of overbreadth in comparison with its legitimate sweep.

For example, Percoco and Kelly argue that "[c]ourts in this circuit have interpreted the absence of the words 'official act' from section 666 to mean that the statute lacks an official act

The two hypotheticals offered by Kelly and Percoco do not support their argument that Section 666 prohibits a substantial amount of protected speech. *First*, Kelly and Percoco claim that "section 666 criminalizes—or at the very least substantially chills—ordinary campaign contributions." (Kelly MTD 29.) As an initial matter, there is little chance that Section 666 prohibits legitimate campaign contributions, since Section 666 requires proof that the payments were made as part of a corrupt quid pro quo agreement. *See, e.g.*, *Ganim*, 510 F.3d at 142. In any case, it appears that the very restriction that Kelly and Percoco claim must apply to bribery prosecutions based on campaign contributions—specifically, the rule set forth in *McCormick* v. *United States*, 500 U.S. 257, 273 (1991), that there must be an explicit promise by the official to

_____

requirement," relying on the opinion of the Honorable Kimba M. Wood in *United States* v. *Skelos*, No. 15 Cr. 317 (KMW), 2015 WL 6159326, at *4 (S.D.N.Y. Oct. 20, 2015). (Kelly MTD 20.) Percoco and Kelly quote the following language from Judge Wood's decision: "Defendants are incorrect in their assertion that the Government must allege official action that involved a 'decision or action on any question, matter, cause, suit, proceeding or controversy.'" *Skelos*, 2015 WL 6159326, at *4. All this passage means—as is clear from the rest of that Opinion—is that Section 666 does not incorporate Section 201's official act requirement. Section 666's bribery prohibition, however, is still bounded by its limitation that the bribe be made to influence an agent of a government or organization "in connection with any business, transaction, or series of transactions of such organization, government, or agency involving any thing of value of $5,000 or more." 18 U.S.C. § 666(a)(1)(B); *see also Skelos*, 2015 WL 6159326, at *4 ("The criminal conduct penalized by these statutes is the acceptance of payment in return for an agreement to perform a specific official act, i.e., a quid pro quo, with . . . the intent to carry out the act in question (bribery under § 666) . . . ."). Much the same can be said for the out-of-Circuit cases relied upon by Percoco and Kelly, which stand for the proposition that Section 666 criminalizes a broader array of acts than under Section 201's definition of "official act," but do not hold that Section 666 criminalizes every act by a politician, and do not undertake any analysis of the contours of the conduct prohibited by Section 666's "in connection with" language. *See United States* v. *Garrido*, 713 F.3d 985, 999-1002 (9th Cir. 2013); *United States* v. *McNair*, 605 F.3d 1152, 1184-91 (11th Cir. 2010).

perform or not perform an official act—in fact applies to prosecutions involving campaign contributions brought under Section 666. *See Rosen*, 716 F.3d at 701 (discussing *McCormick* in the context of Section 666).

*Second*, Kelly and Percoco claim that Section 666 chills legitimate political advocacy—that is, lobbying. (*See* Kelly MTD 30-31.) But nothing in Section 666 supports the view that it may be used to reach payments to lobbyists. Rather, Section 666 bans quid pro quo payments corruptly made to or corruptly received by an "agent" of a federally-funded program, defined as "a person authorized to act on behalf of another person or a government and, in the case of an organization or government, includes a servant or employee, and a partner, director, officer, manager, and representative." 18 U.S.C. § 666(d)(1). Lobbyists—defined by Kelly as "private citizens and . . . advocates" (Kelly MTD 30)—do not fall within Section 666's ambit unless the Government could prove that the lobbyist and the agent struck a corrupt bargain with respect to a particular transaction or matter.[10] Kelly and Percoco do not advance any explanation for how a statute that prohibits corrupt, quid pro quo arrangements with agents of governments or organizations receiving federal funds criminalizes any—let alone a substantial amount of—legitimate lobbying. Accordingly, in light of Section 666's plain language and Kelly and Percoco's failure to show that the statute "prohibits a substantial amount of protected speech,"

---

[10] Notably, the Government here has not charged any conduct associated with Howe's legitimate lobbying efforts. The Government *has* alleged violations of Section 666 where payments were made corruptly to Howe in order to get him to use his influence and power as an agent of the State for the benefit of the bribe-payers. (*See* Superseding Indictment ¶¶ 11, 43, 47.)

*Williams*, 553 U.S. at 292, the Court should reject their claim that Section 666 is overbroad.

Even if Section 666 did prohibit protected speech, though, it would still not be facially overbroad. *First*, Section 666's "plainly legitimate sweep" is broad. *Broadrick*, 413 U.S. at 615. As the Supreme Court has observed, Section 666 was designed "generally to protect the integrity of the vast sums of money distributed through Federal programs from theft, fraud, and undue influence by bribery" after prior bribery statutes had proven inadequate. *Sabri*, 541 U.S. at 606, 608. Thus, Section 666 validly bars bribery with respect to swaths of conduct that in no way implicate constituent services or other potential First Amendment questions, including bribery of agents of federally-supported organizations who are not public officials.[11] *See, e.g.*, *United States* v. *Rooney*, 37 F.3d 847, 851 (2d Cir. 1994) ("Section 666 was originally enacted in 1984 in response to several federal appellate decisions that held that state and local government officials and members of private organizations that distribute federal monies did not fall within the definition of a 'public official' subject to the provisions of the federal bribery statute, 18 U.S.C. § 201."). Thus, any theoretical chilling effect would be minimal in relation to the statute's legitimate sweep.

*Second*, where, as here, the challenged statute punishes not speech, but conduct—i.e., corruptly making or receiving quid pro quo payments—facial overbreadth challenges "are

---

[11] For this reason, even if *McDonnell* held that Section 201 would be unconstitutionally overbroad without a properly limiting jury instruction (which it did not hold), such a finding would not control Section 666, which has a much broader "legitimate sweep" than Section 201. *Sabri*, 541 U.S. at 606; *Rooney*, 37 F.3d at 851.

curtailed." *Broadrick*, 413 U.S. at 613. As the Supreme Court has explained, although laws regulating illegal conduct, "if too broadly worded, may deter protected speech to some unknown extent, there comes a point where that effect—at best a prediction—cannot, with confidence, justify invalidating a statute on its face and so prohibiting a State from enforcing the statute against conduct that is admittedly within its power to proscribe." *Id.* at 615.

*Third*, and perhaps most importantly, even if there were any merit to the defendants' suggestion that Section 666 is facially overbroad, it would nonetheless survive such a challenge because "a limiting construction has been or could be placed on the challenged statute." *Broadrick*, 413 U.S. at 613. Indeed, Section 666's requirement that the bribe be made or received with corrupt intent and "in connection with any business, transaction, or series of transactions of such organization, government, or agency," 18 U.S.C. § 666(a)(1)(B), (a)(2), could simply be clarified by a jury instruction that incorporates *McDonnell*'s limitations—i.e., the jury could be instructed that the "business, transaction, or series of transactions" required by Section 666 does not encompass simply "[s]etting up a meeting, talking to another official, or organizing an event (or agreeing to do so)[,] without more," *McDonnell*, 136 S. Ct. at 2372. In this way, any conceivable constitutional issue provoked by *McDonnell* would be solved. For this reason alone, Percoco and Kelly's challenge fails. *Broadrick*, 413 U.S. at 613.

### b.   Section 666 Is Not Vague as Applied to Percoco and Kelly

Percoco and Kelly also assert that Section 666 is unconstitutionally vague as applied to them. This claim may be dismissed out of hand. "The void-for-vagueness doctrine requires that

a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *United States* v. *Halloran*, 821 F.3d 321, 337 (2d Cir. 2016) (quotation marks omitted). "Although a law has to provide minimal guidelines in the form of explicit standards regarding what conduct is unlawful, it need not achieve meticulous specificity, which would come at the cost of flexibility and reasonable breadth." *Rosen*, 716 F.3d at 699 (internal quotation marks omitted). Notably, "[t]he need for flexibility is especially important in the context of criminal laws aimed at public corruption." *Id.* Even in the absence of sufficient standards, however, "a statute will survive an as-applied vagueness challenge if the conduct at issue falls within the core of the statute's prohibition, so that the enforcement before the court was not the result of the unfettered latitude that law enforcement officers and factfinders might have in other, hypothetical applications of the statute. " *United States* v. *Farhane*, 634 F.3d 127, 139-40 (2d Cir. 2011) (internal quotation marks omitted).

There can be little doubt that Percoco and Kelly were on notice that their conduct was illegal and that Section 666 did not encourage arbitrary enforcement. Percoco and Kelly have been charged with participating in a bribery scheme in which Percoco corruptly solicited and accepted bribes from Kelly in the form of a low-show job for Percoco's wife in exchange for Percoco's agreement to perform official actions, and "'it has always been as plain as a pikestaff that bribes and kickbacks' are prohibited." *Rosen*, 716 F.3d at 700 (quoting *Skilling* v. *United States*, 561 U.S. 358, 412 (2010)). Moreover, "the requirement that the Government prove [the] defendant's

specific intent to bribe eliminates the possibility that he will be prosecuted for bribery without fair notice." *Id.* Even if there were any merit to Percoco and Kelly's contention that the purported absence of an official act requirement renders Section 666 vague, this challenge would still fail, as the relevant conduct—which, as alleged, involved corrupt payments in exchange for an agreement to take actions that qualify as official action even if *McDonnell*'s definition of official act applied to Section 666—is well within the core of Section 666's prohibition.

For the foregoing reasons, Percoco and Kelly's challenge to Section 666 should be rejected.

## C.  *McDonnell* Did Not Invalidate the "As Opportunities Arise" Theory of Bribery (Kelly)

Kelly argues that Counts Nine and Thirteen of the Superseding Indictment must be dismissed because, in his view, allegations that bribes were paid in exchange for future official action as the opportunity arose or on an as-needed basis are legally insufficient to make out a charge for honest services fraud, in violation of 18 U.S.C. § 1346, or for bribery, in violation of Section 666.  (*See* Kelly MTD 43.)  Rather, Kelly contends, *McDonnell* requires that, at the inception of the agreement to pay bribes, the bribe-recipient agree to "take action on a *specific* question or matter."  (Kelly MTD 44 (emphasis in original).)  *McDonnell* requires no such thing, and Kelly's argument is flatly contradicted by the law of this Circuit.[12]

---

[12] To the extent that the Syracuse Defendants make reference to dismissal pursuant to Rule 12 in their motion for a bill of particulars (*see, e.g.*, Syracuse Mot. 19-20 (arguing for dismissal of bribery counts)), those arguments should be rejected for the same reasons as the arguments made by Kelly, Percoco, Kaloyeros, or the Buffalo Defendants.

The Second Circuit has long held that what Kelly terms the "retainer theory of bribery" is valid. The Second Circuit ruled on this precise question in *Ganim*. There, the Second Circuit addressed "whether proof of a government official's promise to perform a future, but unspecified, official act is sufficient to demonstrate the requisite quid pro quo for a conviction" for Hobbs Act extortion, honest services fraud, or federal programs bribery under Section 666. *Ganim*, 510 F.3d at 141-42; *see also id.* at 144-45 (noting that the defendant "claim[ed] that th[e] instruction misled the jury as to what establishes a quid pro quo under the Hobbs Act, because it did not require the jury to find 'that any of the benefits received were connected to a 'specific' act'"). The Second Circuit observed that it had previously "explained that 'the government does not have to prove an explicit promise to perform a particular act made at the time of payment,'" and that, "[i]nstead, 'it is sufficient if the public official understands that he or she is expected as a result of the payment to exercise particular kinds of influence—*i.e.*, on behalf of the payor—as specific opportunities arose.'" *Id.* at 144 (quoting *United States* v. *Coyne*, 4 F.3d 100, 114 (2d Cir. 1993)). The court further noted that "in order to establish the *quid pro quo* essential to proving bribery, 'the government need not show that the defendant intended for his payments to be tied to specific official acts (or omissions).'" *Id.* at 148 (quoting *United States* v. *Jennings*, 160 F.3d 1000, 1014 (4th Cir. 1998)). Accordingly, the Second Circuit held that "that the requisite quid pro quo for the crimes at issue may be satisfied upon a showing that a government official received a benefit in exchange for his promise to perform official acts or to perform such acts as the opportunities arise." *Id.* at 142. There is no ambiguity in the law of this Circuit:

> We have made it crystal clear that the federal bribery and honest services fraud statutes that [the defendant] was convicted of violating criminalize schemes involving payments at regular intervals in exchange for specific official acts as the opportunities to commit those acts arise, even if the opportunity to undertake the requested act has not arisen, . . . and even if the payment is not exchanged for a particular act but given with the expectation that the official will exercise particular kinds of influence.

*Rosen*, 716 F.3d at 700 (internal quotations marks, citations, and brackets omitted).[13]

Kelly nonetheless asserts that this precedent was implicitly overruled by the Supreme Court's holding in *McDonnell*. As noted above, *McDonnell* concerned the proper interpretation of the phrase "official act" in Section 201(a)(3). Section 201 "makes it a crime for 'a [federal] public official or person selected to be a [federal] public official, directly or indirectly, corruptly' to demand, seek, receive, accept, or agree 'to receive or accept anything of value' in return for being 'influenced in the performance of any official act.'"[14] *McDonnell*, 136 S.Ct. at 2365 (quoting 18 U.S.C. § 201(b)(2)). "An 'official act' [under Section 201(a)(3)] is defined as 'any

---

[13] Kelly's attempt to minimize the impact of controlling precedent is unconvincing. Although, referring to *Ganim*, Kelly concedes that "there is language in pre-*McDonnell* cases that could be interpreted to endorse the general retainer theory" (Kelly MTD 57 (citing *Ganim*, 510 F.3d at 147, as "implying that 'an ongoing commitment to perform acts to further the payor's interests' suffices as a '*quo*'")), Kelly attempts to draw attention away from the explicit holdings of *Rosen*, *Ganim*, and *Coyne* by asserting that the Second Circuit had other things in mind when it used the phrases "as-needed basis" or "as opportunities arise" (Kelly MTD 54). Kelly's interpretations are belied by the clear language of those opinions.

[14] The defendant in *McDonnell*, a state official, could not have been prosecuted under Section 201. However, the parties agreed to use Section 201's definition of "official act" in fashioning the jury instructions for the charged violations of the honest services fraud and Hobbs Act extortion statutes. *McDonnell*, 136 S.Ct. at 2365.

decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit.'" *Id.* (quoting 18 U.S.C. § 201(a)(3)). The Supreme Court observed that the decision or action must relate to a question or matter that is "focused and concrete"—i.e., "something specific and focused that is 'pending' or 'may by law be brought' before a public official." *Id.* at 2370, 2372.

Pulling the words "concrete" and "specific" out of context, Kelly argues that "[i]f no particular question or matter was contemplated or agreed upon by Mr. Kelly and Percoco, then the official act element of the specific intent is not satisfied." (Kelly MTD 49.) This contention is simply a nonsequitor. *McDonnell* does not state—much less hold—that the bribe-payer and bribe-recipient must agree on a "specific" or "concrete" official act at the time the bribery conspiracy is consummated. Rather, it provides that the bribe-payer and bribe-recipient must agree that the action the bribe-recipient will take in exchange for the bribe will *relate* to a "specific" or "concrete" *matter*.

In short, *McDonnell* says nothing about whether the government official or agent must agree to take a specific action on any particular matter—it holds only that the bribe-recipient must agree that the actions he or she does take will relate to a matter that is "specific" and "concrete." In fact, in *McDonnell*, the Government charged the defendant with receiving bribes "in exchange for performing official actions on an as-needed basis, as opportunities arose . . . ." *McDonnell*, 136 S.Ct. at 2365. The Supreme Court observed no infirmity with a conviction based on

performing official action on an as-needed basis, as opportunities arose; rather, the Supreme Court held that the actions the defendant agreed to take—"[s]etting up a meeting, talking to another official, or organizing an event (or agreeing to do so)"—standing alone, did not amount to "official actions" under Section 201. *Id.* at 2372. Nothing in *McDonnell*'s holding disturbs longstanding precedent in this Circuit upholding the "as opportunities arise" theory of bribery.

Kelly contends further that "[t]here are compelling constitutional and policy reasons to reject the general retainer theory of bribery." (Kelly MTD 57.) Kelly asserts that "[e]ven before *McDonnell*, the Supreme Court made clear that bribery statutes cannot be interpreted to criminalize the giving of gifts for goodwill or ingratiation, even if it is hoped that the goodwill or ingratiation will translate into official action." (Kelly MTD 57 (relying on *United States* v. *Sun-Diamond Growers of Cal.*, 526 U.S. 398, 405 (1999)).) Kelly reasons that "[i]f the Government were not required to allege and prove that action on a *specific* question or matter was agreed upon at the time a public official accepted a benefit from a constituent, then a public official who has received any benefit might thereafter be reluctant to take *any* official action that might benefit the constituent." (Kelly MTD 58-59 (emphasis in original).) Kelly offers no explanation, however, for why this concern is not answered by controlling law in this Circuit that the Government must prove that the bribe-recipient intended to be influenced in a corrupt manner with respect to a transaction or matter—whether specified at the time or not—in exchange for the bribes. *Ganim*, 510 F.3d at 144.

Finally, Kelly's position is untenable as a practical matter. Kelly argues, in substance, that

if the briber and bribee do not agree on a specific official action at the time the bribes are made, any future official action done in exchange for the bribes is immunized against prosecution. This conclusion is, sensibly, not the law. As set forth above, *McDonnell* has done nothing to alter the longstanding rule that a government official commits bribery when the "government official receive[s] a benefit in exchange for his promise to perform official acts or to perform such acts as the opportunities arise." *Ganim*, 510 F.3d at 142. Accordingly, Kelly's motion to dismiss Counts Nine and Thirteen should be denied.

### D. The Superseding Indictment Properly Alleges a Gratuity (Percoco, Kelly)

Kelly and Percoco seek to dismiss the Section 666 counts relevant to them (i.e., Counts Eleven, Twelve, and Thirteen) to the extent that those counts allege a gratuity offense. They assert that the charging language in the counts is deficient, and, in the alternative, that binding Second Circuit law construing Section 666 to include gratuity offenses was wrongly decided. These arguments should be rejected.

*First*, Kelly claims that Count Thirteen does not properly charge a gratuity offense because the word "gratuity" is not used and the word "reward" only appears in the "to wit" clause. (Kelly MTD 61-62.) Although Kelly acknowledges that courts in this Circuit recognize the word "reward" to signal a gratuity offense, he asserts—without any authority—that placing the word "reward" in the "to wit" clause is somehow insufficient to charge the crime. In fact, the law is to the contrary. The District Court has observed that "to wit" clauses, which go beyond the statutory language, are "sufficient to place [a defendant] on notice of the offenses with which he was charged

and serve[] the salutary purposes espoused by Rule 7(c)," which governs the Government's pleading requirements.  *United States* v. *Ashfaq*, No. 08 Cr. 1240 (HB), 2009 WL 1787717, at *3 (S.D.N.Y. June 23, 2009).  That ruling is consistent with the instruction that, when determining whether a count sufficiently alleges a violation, the indictment should be read "in its entirety." *Hernandez*, 980 F.2d at 871.

The "to wit" clause of Count Thirteen states that "[Kelly] paid [Percoco] . . . in exchange for, to influence, and to reward the taking of official action to benefit the Energy Company, including official action to advance the development of the New York Power Plant and the New Jersey Power Plant."  (Superseding Indictment ¶ 65.)  Moreover, the accompanying caption plainly describes the offenses: "Payments of Bribes and Gratuities – The Energy Company."  (Superseding Indictment at 34.)  This language clearly puts Kelly on notice that he is charged with a gratuity offense, and thus satisfies the Government's burden under Fed. R. Crim. P. 7(c).[15]  *See Yannotti*, 541 F.3d at 127 ("An indictment is sufficient when it charges a crime with sufficient precision to inform the defendant of the charges he must meet and with enough detail that he may plead double jeopardy in a future prosecution based on the same set of events." (quotation marks omitted)).

---

[15] Percoco's challenge to Counts Eleven and Twelve is even more baseless.  (Percoco MTD 38.)  The statutory language for each of those counts states that Percoco accepted corrupt payments "intending to be influenced and rewarded," and that allegation is reiterated in the "to wit" clause. (*See* Superseding Indictment ¶¶ 61, 63.)  Given that Count Thirteen is sufficiently pled under Rule 7(c), it necessarily follows that Counts Eleven and Twelve are sufficiently pled.

*Second*, Kelly and Percoco assert that the Section 666 counts improperly incorporate by reference factual allegations elsewhere in the Superseding Indictment which allege that Kelly and the Syracuse Defendants, respectively, bribed Percoco to perform official actions as opportunities arose. (Kelly MTD 63-64; Percoco MTD 38.) Kelly and Percoco urge that this incorporation of facts related to the bribery offense warrants dismissal of the gratuity offense even though, as noted above, the Section 666 counts specifically allege that Kelly (and the Syracuse Defendants) rewarded Percoco with corrupt payments in exchange for specific official actions. This argument is without merit. Count Thirteen properly charges Kelly in a single count with committing both bribery and gratuity offenses that constituted a continuing course of criminal conduct, and the same is true for Percoco with respect to Counts Eleven and Twelve. The Second Circuit "has long held that 'acts that could be charged as separate counts of an indictment may instead be charged in a single count if those acts could be characterized as part of a single continuing scheme.'"[16] *United States* v. *Olmeda*, 461 F.3d 271, 281 (2d Cir. 2006) (quoting *United States* v. *Tutino*, 883 F.2d 1125, 1141 (2d Cir. 1989)). Thus, there is no basis for dismissing Count Thirteen to the extent it charges a gratuity offense.

Finally, Kelly urges this Court to ignore clear and controlling Second Circuit precedent holding that Section 666 covers gratuity offenses. *See, e.g.*, *Bahel*, 662 F.3d at 637 ("[W]e have

---

[16] The Government, of course, may elect prior to trial to proceed on either a bribery or gratuity theory. *Cf. United States* v. *Sturdivant*, 244 F.3d 71, 79 (2d Cir. 2001) ("[P]rior to a defendant's conviction, prejudice to the defendant can be avoided by having the government elect to proceed based upon only one of the distinct crimes included within a duplicitous count.").

made clear that Section 666 extends to both bribes and gratuities.") (citing cases).  "As [Kelly] acknowledges, his proposed change in circuit law could be adopted only by the Court sitting en banc.  Absent such review," panels of the Second Circuit and District Courts "are bound by controlling circuit precedent."  *United States* v. *Whitman*, 555 F. App'x 98, 107 (2d Cir. 2014).

### E. The Superseding Indictment Properly Alleges Wire Fraud (Kaloyeros, Buffalo Defendants)

Kaloyeros and the Buffalo Defendants move to dismiss the wire fraud counts (Counts One, Two, and Four).  (*See* Kaloyeros MTD 11-20; Buffalo Defs.' MTD 11-43.)  Because the Superseding Indictment properly alleges wire fraud, these motions should be denied.

### 1. Applicable Law

"The federal mail and wire fraud statutes penalize using the mails or a wire communication to execute 'any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises.'"  *United States* v. *Greenberg*, 835 F.3d 295, 305 (2d Cir. 2016) (quoting 18 U.S.C. §§ 1341, 1343).  The "essential elements" of wire fraud are therefore "(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of . . . wires to further the scheme."  *United States* v. *Binday*, 804 F.3d 558, 569 (2d Cir. 2015) (quoting *Fountain* v. *United States*, 357 F.3d 250, 255 (2d Cir. 2004)).

In order to prove a "scheme to defraud," the Government must show "that the defendant possessed a fraudulent intent."  *Greenberg*, 835 F.3d at 305-06.  However, "the Government need not prove that the victims of the fraud were *actually* injured, but only that defendants *contemplated* some actual harm or injury to their victims."  *Id.* at 306 (emphasis in original; internal quotation

marks and citations omitted).

The Government must also prove that "the defendant acted with specific intent to obtain money or property." *United States* v. *Carlo*, 507 F.3d 799, 801 (2d Cir. 2007). However, "the interests protected by the mail and wire fraud statutes . . . extend to all kinds of property interests, both tangible and intangible." *Id.* at 801-02. And "[s]ince a defining feature of most property is the right to control the asset in question, [the Second Circuit has] recognized that the property interests protected by the statutes include the interest of a victim in controlling his or her own assets." *Id.* at 802. Accordingly, the Government may prove a scheme to defraud a victim of property by "showing that some person or entity has been deprived of potentially valuable economic information"—in other words, "the withholding or inaccurate reporting of information that could impact on economic decisions can provide the basis for a [wire] fraud prosecution." *United States* v. *Wallach*, 935 F.2d 445, 462-63 (2d Cir. 1991).

### 2. Discussion

As to the wire fraud charges contained in Counts One, Two, and Four, the Superseding Indictment clearly alleges the following facts, among others: (1) Kaloyeros, the Syracuse Defendants, the Buffalo Defendants, and Howe conspired to defraud Fort Schuyler by rigging the bidding on the RFPs while representing to Fort Schuyler that the process was fair, open, and competitive; (2) these co-conspirators engaged in the scheme to defraud so that Fort Schuyler would direct valuable contracts under its control to the Syracuse and Buffalo Developers; and (3) the co-conspirators exchanged emails and telephone calls in furtherance of the criminal

scheme. (*See* Superseding Indictment ¶¶ 22-27, 37-41, 44-45.) These allegations more than satisfy the pleading requirements for the charged crimes. *See, e.g.*, *Binday*, 804 F.3d 558, 569; *United States* v. *Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998) (noting that "[i]t is well settled that an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense" and further reiterating that "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime" (quotation marks and citations omitted)).

Nevertheless, Kaloyeros and the Buffalo Defendants raise a number of challenges to the sufficiency of the factual allegations underlying the wire fraud charges contained in Counts One, Two, and Four. In substance, they contend that the allegations contained in the Superseding Indictment are factually incorrect. It is axiomatic, however, that the allegations in the Superseding Indictment must be accepted as true. *See, e.g.*, *United States* v. *Murgio*, 209 F. Supp. 3d 698, 706 (S.D.N.Y. 2016) ("In evaluating a motion to dismiss, the Court 'accept[s] as true all of the allegations of the indictment.'" (quoting *Goldberg*, 756 F.2d at 950)); *see also Stavroulakis*, 952 F.2d at 693 ("[C]ommon sense must control, and . . . an indictment must be read to include facts which are necessarily implied by the specific allegations made." (quotation marks and brackets omitted)). For these reasons, and because the defendants' arguments are without factual or legal merit in any case, the motions to dismiss the wire fraud counts should be denied.

### a. The Superseding Indictment Sufficiently Alleges a Scheme to Defraud

*First*, the defendants contend that the Superseding Indictment fails to allege a scheme to defraud because it does not allege that the defendants "violated any statute, rule, or guidelines relating to the . . . RFP process." (Buffalo Defs.' MTD 13-16.) In support of this argument, the defendants refer to a stream of decisions in civil suits concerning State and local competition rules. (*See* Buffalo Defs.' MTD 15-16.) As an initial matter, the defendants' claim is remarkable because the Complaint alleges exactly that: Fort Schuyler used the procurement policies of the SUNY Research Foundation, which were "intended 'to promote open and free competition in procurement transactions' and 'to ensure that procurements are priced competitively and that the selection process is not influenced improperly.'" (Compl. ¶ 76.) Among other things, these "policies required that '[s]uppliers that develop or draft specifications, requirements, statements of work, or requests for bids or proposals for a procurement must be excluded from competing in any resulting procurement.'" (Compl. ¶ 76.) As the Complaint and Superseding Indictment lay out in detail, the defendants did indeed violate these rules.

In any event, while the defendants may prefer to be defending a suit regarding compliance with various procurement rules or competitive bid laws, the Superseding Indictment charges the defendants with the federal crime of wire fraud, accomplished by defrauding Fort Schuyler through material misrepresentations and omissions. Violation of a State statute, rule, or guideline is not an element of wire fraud, which, as set forth above, has been properly pled in the Superseding Indictment.

*Second*, the defendants argue that the Superseding Indictment fails to allege "the specific intent to harm or defraud the victim of the scheme."[17] (Buffalo Defs.' MTD 16.) The law is clear, however, that an indictment need not allege specific intent in order to properly charge wire fraud. *United States* v. *Speight*, 75 F. App'x 802, 804 (2d Cir. 2003) (rejecting argument that an indictment for mail fraud need allege an intent to harm or deceive); *United States* v. *Wey*, No. 15 Cr. 611 (AJN), 2017 WL 237651, at *11 (S.D.N.Y. Jan. 18, 2017) (rejecting argument that an indictment for wire fraud need allege fraudulent intent); *United States* v. *Martin*, 411 F. Supp. 2d 370, 373 (S.D.N.Y. 2006) (rejecting argument that an indictment for wire fraud need allege fraudulent intent because "the sufficiency of the government's evidence of the conspirators' fraudulent intent is not considered on a motion to dismiss the indictment" and the indictment need only track the language of the statute).

In any event, the defendants' fraudulent intent is clear from the allegations in the Superseding Indictment and "is readily inferable from the nature of the alleged scheme." *Wey*, 2017 WL 237651, at *11; *see also United States* v. *London*, 753 F.2d 202, 207 (2d Cir. 1985) ("[T]he intent to injure or harm required to be shown for mail fraud was apparent from the specific charges set forth in the indictment."). As the Superseding Indictment plainly states, the defendants secretly tailored the RFPs so that they would be chosen by Fort Schuyler as preferred developers

---

[17] The defendants also assert that the Superseding Indictment "fails to allege that Fort Schuyler was harmed as a result of the alleged scheme to defraud." (Buffalo Defs.' MTD 17.) As noted above, actual harm is not an element of wire fraud. *Greenberg*, 835 F.3d at 306; *Binday*, 804 F.3d at 570 n.10.

and ultimately awarded contracts worth hundreds of millions of dollars, while simultaneously representing to Fort Schuyler that the preferred developer bidding was open, fair, and competitive. (Superseding Indictment ¶¶ 22-27.) And, indeed, the Complaint is replete with factual detail demonstrating the defendants' fraudulent intent, including but not limited to communications showing the defendants' desire to conceal their activities, to represent that the bidding process was unbiased, and to be awarded the contract on qualifications other than price. (*See, e.g.*, Compl. ¶¶ 79, 82.)

The remainder of the support provided for the claim that the Superseding Indictment contains insufficient allegations of intent is a combination of assertions that either are irrelevant to the sufficiency of the intent allegations, attempt to present an entirely separate theory of the case, or make arguments about how someone (presumably a juror) should interpret documents. (*See, e.g.*, Buffalo Defs.' MTD 18 ("The Indictment is devoid of allegations as to precisely <u>how</u> the RFP was supposedly drafted to favor the Buffalo Developer . . . ."); *id.* ("[T]here is no allegation that the Buffalo Developer falsely represented its qualifications when responding to the RFP . . . ."); *id.* at 19 ("[T]he RFP was as plain vanilla as they come . . . .").) Indeed, Kaloyeros devotes an entire section of his brief to arguing that, notwithstanding the detailed description of the manner in which the defendants tailored the RFPs, "[t]here can be no dispute that there was no tailoring and therefore no fraud here."[18] (Kaloyeros MTD 15-17.) In addition to being irrelevant, and

---

[18] Kaloyeros also states, without any attribution or basis whatsoever, that "the Government

entirely improper under Rule 12, these arguments are wholly contradicted by the allegations contained in the Superseding Indictment and Complaint.

*Third*, the Buffalo Defendants dispute the materiality of the misrepresentations and omissions alleged in the Superseding Indictment. Their arguments have no merit. The Supreme Court has held that, when materiality is an element of a criminal fraud offense (like wire fraud), the question of materiality must be submitted to the jury. *See United States* v. *Gaudin*, 515 U.S. 506, 523 (1995). As a result, an indictment charging wire fraud will survive a motion to dismiss so long as it "contains a facially sufficient allegation of materiality." *United States* v. *Ferro*, 252 F.3d 964, 968 (8th Cir. 2001); *see also United States* v. *DeSantis*, 134 F.3d 760, 764 (6th Cir. 1998) ("[U]nless no reasonable mind could find a statement or omission to be material, a criminal trial court *must* submit the issue to the jury." (citing *Gaudin*, 515 U.S. at 511) (emphasis in original)). "The proper question to ask . . . in determining whether an indictment sufficiently alleges materiality is whether the statement or representation alleged to be false . . . is potentially capable of being proved material by the government at trial." *United States* v. *McGough*, 510 F.2d 598, 602 (5th Cir. 1975). The Supreme Court has explained that a statement is material if it has "a natural tendency to influence, or be capable of influencing, the decision of the decisionmaking

---

has made a full proffer of the facts it intends to prove regarding the Complaint's claim that the RFPs were tailored." (Kaloyeros MTD 15.) Kaloyeros seems to be assuming that because the facts described in the Complaint and Superseding Indictment present overwhelming proof, there must not be any additional evidence. Kaloyeros is mistaken.

body to which it was addressed." *Gaudin*, 515 U.S. at 509 (quotation marks and alteration omitted); *see also United States* v. *Corsey*, 723 F.3d 366, 373 (2d Cir. 2013) (per curiam) (same).

Here, the allegations in the Superseding Indictment are more than sufficient to allege the existence of material misrepresentations and omissions. As an initial matter, the plain language of the Superseding Indictment clearly alleges that the defendants charged in Count One "deceived and concealed *material* information from Fort Schuyler and its Board of Directors" in a number of ways. (Superseding Indictment ¶ 25 (emphasis added).) *Cf. United States* v. *Bhatia*, No. 05 Cr. 334, 2007 WL 2554402, at *8 (N.D. Cal. Sept. 4, 2007) ("The words in the indictment, that the defendant 'intended to devise a scheme and artifice to defraud owners and officers . . . and to induce them to part with money by means of material false and fraudulent representations and promises,' are sufficient to inform the defendant of the materiality element of the wire fraud charges against him."). The Superseding Indictment then provides a non-exhaustive list of the conspirators' material misrepresentations and omissions: specifically, Kaloyeros "falsely represented" to Fort Schuyler that the RFP processes were fair and competitive even though he and Howe had tailored the RFPs and predetermined the winners, and the Syracuse Developer and the Buffalo Developer each falsely certified that they had not retained anyone to attempt to influence the bidding process when in fact they had both bribed Howe for that purpose. (Superseding Indictment ¶ 25(a)-(c).) The Superseding Indictment also explains that, "[a]s a result of the criminal conduct alleged herein"—i.e., the defendants' use of material misrepresentations and omissions to defraud Fort Schuyler—the Syracuse Developer and the Buffalo Developer

received State contracts worth hundreds of millions of dollars. (Superseding Indictment ¶ 27; *see also id.* ¶ 39.)

The Buffalo Defendants counter that the Superseding Indictment does not explain how Kaloyeros's misrepresentation "had any capability of influencing the selection of the Buffalo Developer" as a preferred developer. (Buffalo Defs.' MTD 27.) But they ignore the allegations in the Superseding Indictment that Kaloyeros was a member of the Fort Schuyler Board (and President of SUNY Poly) who "selected and provided direction to Fort Schuyler's officers and others working on behalf of Fort Schuyler." (Superseding Indictment ¶ 8; *see also* Compl. ¶ 27(b) (Kaloyeros also ran the day-to-day operations of Fort Schuyler).) In view of his prominent role at Fort Schuyler and SUNY Poly, his false representations to the Board about the fairness of the procurement were certainly "capable of influencing" the Board's decision to ratify the RFP process by choosing a winner from among the participating developers. *Gaudin*, 515 U.S. at 509. This conclusion is not conjecture; rather, as set forth in the Complaint, members of the Fort Schuyler Board expected the RFPs to "provide a fair, open, and competitive bidding process with respect to both quality and price," and they "would have viewed the pre-announcement sharing of a draft of an RFP with a developer as an unfair and improper practice." (Compl. ¶¶ 75, 85.)

The Buffalo Defendants, however, assert that "the facts alleged support only the conclusion that the Buffalo Developer" was selected "on the merits of its truthful response to the Buffalo RFP." Moreover, in challenging the materiality of their company's false certification that it did not retain anyone to influence the RFP process, the Buffalo Defendants attach and cite extrinsic

documents related to the other winner of the Buffalo RFP. (Buffalo Defs.' MTD 27-28.) It is inappropriate on a motion to dismiss in a criminal case for defendants to draw inferences favorable to themselves and to rely on factual allegations outside of the charging instruments. "Paramount in evaluating [the motion] . . . is a far older and very well established principle: there is no summary judgment in criminal cases. . . . '[a] pretrial motion to dismiss is not a permissible vehicle for addressing the sufficiency of the government's evidence.'"[19] *United States* v. *Elie*, No. 10 Cr. 336 (LAK), 2012 WL 383403, at *1 (S.D.N.Y. Feb. 7, 2012) (quoting *United States* v. *DeLaurentis*, 230 F.3d 659, 660-61 (3d Cir. 2000)). Accordingly, the Buffalo Defendants' challenges with respect to materiality should be rejected.

**b.** **The Superseding Indictment Sufficiently Alleges Money or Property**

The defendants argue that the Superseding Indictment has failed to allege that money or property was an object of the scheme. (Buffalo Defs.' MTD 28-41; Kaloyeros MTD 11-18.) To the contrary, the Superseding Indictment amply alleges a scheme to deprive Fort Schuyler of its right to control its assets, which is a form of property. *See, e.g.*, *Carlo*, 507 F.3d at 802. The

---

[19] The Second Circuit has recognized a limited exception to this rule in cases where the Government "has made what can fairly be described as a full proffer of the evidence it intends to present at trial" with respect to any particular element of the offense. *United States* v. *Alfonso*, 143 F.3d 772, 776-77 (2d Cir. 1998). As noted above, in this case, the Government has never made a "full proffer" of any kind. (*See, e.g.*, Compl. ¶ 17 ("Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of the investigation.").)

Superseding Indictment alleges clearly that the defendants "devised a plan to secretly rig Fort Schuyler's bidding process so that State contracts that were ultimately worth hundreds of millions of dollars would be awarded to the Syracuse Developer and the Buffalo Developer."[20] (Superseding Indictment ¶ 22; *see also id.* ¶¶ 39, 41, 45 (alleging that the defendants tailored the RFPs so that their companies would win the awards).) Although not an element of wire fraud, the Superseding Indictment also makes clear that the defendants sought to deny Fort Schuyler economically valuable information: the Defendants "deceived and concealed material information from Fort Schuyler and its Board of Directors" by, *inter alia*, "falsely representing . . . that the bidding processes . . . were fair, open, and competitive." (Superseding Indictment ¶ 25.) Indeed, the Board was denied information regarding whom the RFPs were designed to benefit, and also was denied the value of competition.[21] (*See* Compl. ¶ 85.)

---

[20] Further description of the defendants' scheme to defraud Fort Schuyler of its right to control its assets may be found in the Complaint. (Complaint ¶ 74 ("In order to award these valuable deals to the Syracuse Developer and Buffalo Developer, Kaloyeros and Howe manipulated the RFP process to prevent Fort Schuyler from receiving or being able to fairly consider competing bids."); ¶ 78-79 (the RFPs were designed so Fort Schuyler "would have no choice" but to name the Syracuse and Buffalo developers).)

[21] Notably, the right-to-control theory, like any other theory of wire fraud, does not require proof of actual harm. For example, in circumstances analogous to those presented here, the defendants in *United States* v. *Yaron* conspired to defraud hospitals by steering certain construction and maintenance contracts to companies in exchange for kickbacks. No. 10 Cr. 363 (GBD), 2012 WL 2477646 (S.D.N.Y. June 28, 2012). The defendants argued that the evidence adduced at trial was insufficient to prove intent to defraud because in instances where there was a bidding process for the relevant contract, the conspiring company in fact submitted the lowest bid. *Id.* at *2. The court rejected the argument, explaining that "[t]he evidence indicated that the bribery payments were to ensure that contracts were awarded to the defendants even where it might have been

Moreover, the defendants' suggestion that the Government must specifically label as such the right-to-control theory in the indictment (*see* Buffalo Defs.' MTD 39-40) finds no support in Rules 7 or 12, and indeed is flatly contradicted by precedent. As noted above, the language in the indictment need only track the language of the statute, and "where a generally framed indictment encompasses the specific legal theory or evidence used at trial, there is no constructive amendment." *United States* v. *Banki*, 685 F.3d 99, 118 (2d Cir. 2012) (internal quotation marks and brackets omitted); *see also, e.g.*, Indictment, *United States* v. *Binday*, No. 12 Cr. 152 (CM) (S.D.N.Y. filed Feb. 15, 2012) (no reference to the right to control in indictment). Nor do the cases cited by the defendants indicate otherwise. In *Viloski*, for example, the Second Circuit hardly determined that an indictment need contain reference to the theory—instead, the court rejected the

---

otherwise awarded to a different company," and therefore "there was sufficient evidence for a rational trier of fact to find that the defendants intended to deprive [the victim] of its property right to control the awarding of contracts." *Id.*

Additionally, the defendants' factual argument that Fort Schuyler was not defrauded of property because the RFP process only resulted in being named a preferred developer and the Buffalo Developer only obtained actual building contracts "after extensive negotiations and a wholly separate bidding process" (Buffalo Defs.' MTD 29) finds no support in the Superseding Indictment, Complaint, or elsewhere. As the Superseding Indictment makes clear, the "preferred developer contracts were particularly lucrative for the Syracuse Developer and the Buffalo Developer, as the Syracuse Developer and the Buffalo Developer were then entitled to be awarded future development contracts of any size in Syracuse or Buffalo, respectively, without additional competitive bidding, and thus without competing on price or qualifications for particular projects." (Superseding Indictment ¶ 23.) Further, as a result of being named preferred developers, "the Syracuse Developer was awarded two State contracts worth a total of approximately $105 million, and the Buffalo Developer was awarded a State contract that was ultimately worth approximately $750 million." (Superseding Indictment ¶ 27.) Thus, naming the Buffalo and Syracuse Developers as "preferred developers" allowed the Kaloyeros and Howe to award assets to the Developers without further action from the Board.

argument that the theory was not expressly alleged on the ground that reference to the deprivation of economically valuable information was sufficient to give "notice that the Government sought to prosecute Viloski on that charge under § 1341." *United States* v. *Viloski*, 557 F. App'x 28, 33 (2d Cir. 2014). In short, there can be little doubt that the elements of wire fraud were properly alleged and the defendants were given sufficient notice of the charges against them.

Finally, the defendants' contention that the right-to-control theory is inconsistent with Supreme Court precedent is, as the defendants concede, precluded by controlling law in this Circuit. (*See* Kaloyeros MTD 17-20.) The Second Circuit has held, over the objections lodged by the defendants, that the right-to-control theory remains good law, and therefore the defendants' argument to the contrary must be rejected. *United States* v. *Finazzo*, 850 F.3d 94, 105-07 (2d Cir. 2017).

### c. The Superseding Indictment Sufficiently Alleges Use of Wires

The Buffalo Defendants complain that the wire fraud counts of the Superseding Indictment do not identify with specificity any wire transmissions "made by the Buffalo Defendants in furtherance of the alleged scheme." (Buffalo Defs.' MTD 41.) This argument is fatally flawed for several reasons. As a threshold matter, the Superseding Indictment does in fact allege that the six defendants, Howe, and others exchanged interstate emails and telephone communications with certain individuals located in Manhattan "[i]n the course of, and in furtherance of, the criminal scheme" to defraud Fort Schuyler. (Superseding Indictment ¶ 26.) No additional detail about the wire transmissions is necessary in an indictment. *See, e.g.*, *United States* v. *Zandstra*, No. 00 Cr.

209 (RWS), 2000 WL 1368050, at *4 (S.D.N.Y. Sept. 20, 2000) ("Nor must the indictment identify the exact mailing dates."); *United States* v. *Reale,* No. 96 Cr. 1069, 1997 WL 580778, at *13-14 (S.D.N.Y. Sept. 17, 1997) (indictment for mail and wire fraud that did not identify specific mailings and wire transfers and dates thereof was sufficient under Rule 7(c)). Next, the Buffalo Defendants' claim that they must "speculate" about the wires underlying Counts One and Four rings particularly hollow in view of the detailed Complaint in this case, which describes and quotes from numerous email communications with and among the defendants charged with defrauding Fort Schuyler. (*Compare* Buffalo Defs.' MTD 42 *with* Compl. ¶¶ 67-87.)

Furthermore, the Buffalo Defendants' apparent belief that the Superseding Indictment must identify wire transmissions made by them is mistaken and has no basis in the law. To the contrary, it is well established that a defendant can be guilty of wire fraud even if he personally sent no wires. *See, e.g.*, *United States* v. *Kim*, 246 F.3d 186, 190 (2d Cir. 2001) ("[I]t makes no difference that [the defendant] did not himself send the wires."). The defendant need only "cause[] a wire transmission," which occurs "when he 'act[s] with knowledge that the use of the wires would follow in the ordinary course of business, or if such use could reasonably have been foreseen.'" *Id.* (quoting *United States* v. *Zichettello*, 208 F.3d 72, 106 (2d Cir. 2000)) (second alteration in original). As a result, even a wire communication sent by an innocent third party can be the basis for a criminal conviction so long as that communication was reasonably foreseeable to the defendant. *United States* v. *Blackmon*, 839 F.2d 900, 908 (2d Cir. 1988) (citing *United States* v. *Muni*, 668 F.2d 87, 89-90 (2d Cir. 1981)).

Finally, the Government previously informed all defense counsel that it will be disclosing a list of wire transmissions upon which it intends to rely sufficiently in advance of trial. Accordingly, the Buffalo Defendants' motion to dismiss the wire fraud counts for failure to specify the wire communications should be denied.

### F. The Superseding Indictment Properly Alleges Bribery (Percoco, Kelly, Syracuse Defendants, Buffalo Defendants)

Several of the defendants urge the Court to dismiss certain of the bribery counts of the Superseding Indictment. The Buffalo Defendants argue that Count Five, which charges them with bribing Howe for official action related to the Buffalo RFP, does not allege several essential elements of Section 666. (*See* Buffalo Defs.' MTD 43; Superseding Indictment ¶¶ 46-47.) Separately, Percoco, Kelly, and the Syracuse Defendants attack Counts Six, Eight, Ten, Eleven, and Twelve on the ground that Percoco was not an agent of the State during his 2014 stint as the Governor's campaign manager and therefore cannot be prosecuted under Section 666. (*See* Percoco MTD; Kelly MTD 64.) None of these arguments has merit, and the defendants' various motions to dismiss the bribery counts should be rejected.

#### 1. Applicable Law

##### a. Section 666

As explained elsewhere, Section 666 makes it a crime either to corruptly solicit or accept anything of value or to corruptly give or offer anything of value with the intent to influence an agent of an organization or of a State, local or Indian tribal government "in connection with any business, transaction, or series of transactions of such organization, government, or agency [that

receives a threshold amount of federal funding] involving any thing of value of $5,000 or more."

18 U.S.C. § 666(a)(1)(B), (a)(2).

Two elements of this statute are relevant to the defendants' motions. *First*, the term "agent" is expressly defined in Section 666 as "a person authorized to act on behalf of another person or a government, and, in the case of an organization or government, includes a . . . representative." 18 U.S.C. § 666(d)(1). Courts interpreting this definition have determined that "'agent' includes 'persons who *act* as directors, managers, or representatives of covered organizations, even if those persons are not actually employed by the organizations from which they embezzled.'" *United States* v. *Roebuck*, No. 11 Cr. 127 (JGM), 2012 WL 4955208, at *2 (D. Vt. Oct. 17, 2012) (quoting *United States* v. *Sotomayor-Vasquez*, 249 F.3d 1, 8 (1st Cir. 2001)) (emphasis in *Sotomayor-Vasquez*). *Second*, as discussed above, *see supra* Part I.B.2, the "quo" element of the statute is reflected in the criminalization of bribery "in connection with any business, transaction, or series of transactions of" an entity receiving a qualifying amount of federal funds. Further, as has been well established, the Government need not show that the business or transaction at issue involved federal money because Section 666's "prohibition is not confined to a business or transaction which affects federal funds," *Salinas*, 522 U.S. at 57, and the Government also does not need to establish any nexus between the bribery and federal funds, *Sabri*, 541 U.S. at 605.

### b.   Hobbs Act Extortion and Honest Services Fraud

The Hobbs Act prohibits, among other things, interference with commerce by extortion, which, in relevant part, means "the obtaining of property from another, with his consent, induced

. . . under color of official right." 18 U.S.C. § 1951(b)(2). The Supreme Court has explained that extortion under color of official right includes the "rough equivalent of what we would now describe as 'taking a bribe.'" *United States* v. *Evans*, 504 U.S. 255, 260 (1992).

"In order to prove extortion under color of official right, 'the [g]overnment need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts.'" *United States* v. *Middlemiss*, 217 F.3d 112, 117 (2d Cir. 2000) (quoting *United States* v. *Delano,* 55 F.3d 720, 731 (2d Cir. 1995)). The Government is not required to establish "an explicit promise to perform a particular act made at the time of payment," and instead need only show that "the public official understands that he or she is expected as a result of the payment to exercise particular kinds of influence—*i.e.*, on behalf of the payor—as specific opportunities arose." *United States* v. *Coyne*, 4 F.3d 100, 114 (2d Cir. 1993). The crime of extortion is complete when the public official accepts payment in return for an agreement to perform official acts. As a result, a public official can be convicted of extortion "even where an official action is not ever carried out." *United States* v. *Skelos*, No. 15 Cr. 317 (KMW), 2015 WL 6159326, at *3 (S.D.N.Y. Oct. 20, 2015).

Meanwhile, the honest services fraud statute, 18 U.S.C. § 1346, specifies that the "scheme or artifice to defraud" criminalized by the wire fraud and mail fraud statutes "includes a scheme or artifice to deprive another of the intangible right of honest services." Following the Supreme Court's decision in *Skilling* v. *United States*, 561 U.S. 358, 409 (2010), which limited Section 1346 to criminalizing only classic bribes and kickbacks, the Second Circuit has "explained that, to

62

violate the right to honest services, the charged conduct must involve a quid pro quo, *i.e.*, an 'intent to give or receive something of value in exchange for an . . . act.'" *United States* v. *Nouri*, 711 F.3d 129, 139 (2d Cir. 2013) (quoting *United States* v. *Bruno*, 661 F.3d 733, 743-44 (2d Cir. 2011)).

### 2. Discussion

#### a. The Buffalo Defendants' Motion to Dismiss Should Be Denied

The Buffalo Defendants raise a number of challenges to the sufficiency of the factual allegations in the Superseding Indictment underlying the Section 666 bribery charge contained in Count Five. None of their arguments has merit and should be rejected wholesale. The Superseding Indictment clearly alleges the following facts, among others: Howe was an agent of SUNY Poly; the Buffalo Defendants corruptly retained Howe and made payments to him; SUNY Poly worked hand-in-glove with Fort Schuyler on the RFP process; and Howe took official action by providing confidential information to the Buffalo Defendants and helping them to secretly tailor the Buffalo RFP. Nothing more is required to plead a violation of Section 666. (Superseding Indictment ¶¶ 7, 11-12, 22-25.)

*First*, the Buffalo Defendants contend that the Superseding Indictment does not adequately allege that they paid bribes or gratuities because it does not detail any specific payments to Howe. (Buffalo Defs.' MTD 47-52.) But they acknowledge, as they must, that the Superseding Indictment alleges that, "in exchange for hundreds of thousands of dollars in payments to Howe from the Syracuse Developer and the Buffalo Developer," Howe and Kaloyeros devised a scheme

to rig the RFPs.  (Superseding Indictment ¶ 22.)  The Superseding Indictment further alleges that the Buffalo Defendants "paid bribes to Todd Howe" in exchange for official action in his role as an agent of SUNY Poly.  (Superseding Indictment ¶ 47.)  The Buffalo Defendants complain that these factual allegations combine the payments of their company and those of the Syracuse Developer, but they ignore that the Complaint specifically alleges that the Buffalo Developer agreed to pay the Law Firm approximately $100,000 per year for Howe's services.  (Compl. ¶ 72(a).)

The Buffalo Defendants counter that they never paid Howe directly, and instead had a legitimate agreement with the Law Firm that "long predate[d] any inkling of the Buffalo RFP." (Buffalo Defs.' MTD 48.)  They assert that these facts belie the allegation in Count Five that their payments were corrupt.  As a threshold matter, their claims are misleading.  Schuler, on behalf of the Buffalo Developer, entered into that agreement in or about January 2013, "just as the Buffalo Developer began seeking large State contracts through the Governor's Buffalo Billion initiative." (Compl. ¶ 72(a).)  Although Howe was not a party, the agreement specified that the Law Firm would provide the Buffalo Developer with "strategic advice and counsel regarding business generation initiatives across New York State."  (Compl. ¶ 72(a).)  Accordingly, the Government expects to prove at trial that the Buffalo Developer's agreement with the Law Firm was directly connected to the company's efforts to obtain projects through the Buffalo Billion.  That link is explicitly alleged in the Superseding Indictment, which explains that Howe helped rig the RFPs "in exchange for" payments from the Buffalo Developer. (Superseding Indictment ¶ 22.)  In any

event, the Buffalo Defendants' disagreements with the facts alleged in the Superseding Indictment cannot be resolved on a motion to dismiss. As noted previously, at this pretrial stage, the allegations in the indictment must be taken as true. *See, e.g.*, *Goldberg*, 756 F.2d at 950. The purpose of trial is precisely to resolve factual disputes raised by a defendant.[22]

*Second*, the Buffalo Defendants argue that the Superseding Indictment does not allege facts to suggest the existence of a quid pro quo between them and Howe. They assert that "Howe is not alleged to have voted, decided, or acted in any particular way with respect to any particular issue pertaining to the Buffalo RFP." (Buffalo Defs.' MTD 49.) Relatedly, the Buffalo Defendants

---

[22] Citing *United States* v. *Rooney*, 37 F.3d 847 (2d Cir. 1994), the Buffalo Defendants argue that their agreement with the Law Firm was a lawful retention of a consultant and thus was not "corrupt" under Section 666. In addition, they contend that their payments to the Law Firm constituted "bona fide salary . . . or other compensation paid" and therefore fall outside the scope of Section 666. (*See* Buffalo Defs.' MTD 50, 51-52 (citing 18 U.S.C. § 666(c)).) But the Superseding Indictment clearly alleges that Howe helped rig the RFPs "in exchange for" payments that the Buffalo Developer funneled to him—thereby alleging a corrupt quid pro quo. (Superseding Indictment ¶ 22.) In fact, the Complaint explains that the Buffalo Developer retained the Law Firm when it "began seeking large State contracts through the Governor's Buffalo Billion initiative." (Compl. ¶ 72(a).) The Complaint further explains that the Buffalo Defendants "caused the Buffalo Developer to pay Howe as a 'consultant' knowing that he was acting as an agent and representative of [SUNY Poly] and intending for him to use his official position for their benefit." (Compl. ¶ 72.) Tellingly, even though the agreement sought "strategic advice and counsel regarding business generation initiatives across New York State" from Howe's government relations firm, the agreement also stated that "it would not include any lobbying of State or Federal officials." (Compl. ¶ 72(a).) These factual allegations establish that the payments to Howe were corrupt and were not "bona fide" compensation. *Cf. United States* v. *Walsh*, 156 F. Supp. 3d 374, 385 (E.D.N.Y. 2016) (Section 666(c)'s safe harbor only protects "fixed compensation for services obtained without fraud or deceit and in the normal routine of a business"). That is enough to proceed to trial on Count Five. *See id.* at 393 ("[A] reasonable juror could conclude that Section 666(c) does not provide a safe-harbor for the Defendant's conduct in this case.").

contend that the *McDonnell* definition of an "official action" applies to Section 666, and that the Superseding Indictment does not identify any specific official actions taken by Howe. (Buffalo Defs.' MTD 61-64.) These arguments fail.

As explained in detail elsewhere, the language of Section 666 is different from that of Section 201, the statute interpreted in *McDonnell*. Therefore, that decision does not automatically import the same definition of "official action" into Section 666, which already contains its own quid pro quo requirement. *See supra* Part I.A.2.a. In any event, the Superseding Indictment more than sufficiently alleges that Howe took official actions that survive *McDonnell* "in connection with . . . business" of SUNY Poly, in exchange for the Buffalo Defendants' corrupt payments. Indeed, the Superseding Indictment alleges that, "in exchange for" payments from the Buffalo Defendants, Howe worked with Kaloyeros to "devise[] a plan to secretly rig Fort Schuyler's bidding process." (Superseding Indictment ¶ 22.) As part of this scheme, Howe provided the Buffalo Defendants with secret information about the RFPs and helped them tailor the requirements to favor their company. (Superseding Indictment ¶¶ 23-24.) Later, Howe participated in the conspirators' efforts to deceive the Fort Schuyler evaluation committee and Board. (Superseding Indictment ¶ 25.) As a result of Howe's acts, the Buffalo Defendants ultimately won an RFP leading to a contract worth over $750 million. All of these actions represented the quo that Howe exchanged for the Buffalo Defendants' quid. [23]

---

[23] For the same reason—that the Buffalo Defendants corruptly paid Howe bribes in

*Third*, the Buffalo Defendants dispute that Howe was an agent of SUNY Poly, citing the supposed absence of allegations showing that Howe was authorized to act on behalf of SUNY Poly. (Buffalo Defs.' MTD 52-53.) But the Buffalo Defendants read the Superseding Indictment too narrowly. The Superseding Indictment alleges, among other things, that Howe was retained as a consultant to SUNY Poly in or about 2012, served as a close advisor to Kaloyeros, maintained an office at SUNY Poly, and acted as an agent of SUNY Poly with respect to the development projects in Buffalo and Syracuse. (Superseding Indictment ¶ 11; Compl. ¶ 69.) These factual allegations are plainly sufficient to establish that Howe was a "representative"—and thus, an "agent"—of SUNY Poly. *See* 18 U.S.C. § 666(d)(1) (defining "agent" as someone who, "in the case of an organization or government, includes a . . . representative"). In *United States* v. *Toro*, for example, the District Court concluded that an independent contractor hired by a school qualified as an agent under Section 666 because, "[b]y retaining [the contractor] to recruit students for its program, the School enlisted her as its representative and authorized her to act on its behalf in that endeavor." *United States* v. *Toro*, No. 89 Cr. 0268 (RWS), 1989 WL 63118, at *2 (S.D.N.Y.

---

exchange for his official action in helping to rig the RFP bidding—the Buffalo Defendants' conduct falls within the core of Section 666's prohibition, and there is no merit to their suggestion that the statute may be void for vagueness. *Rosen*, 716 F.3d at 700; *see also supra* Part I.B.2.b. As for the Buffalo Defendants' concern that Section 666 might "encompass actions taken by private entities," it is one of Section 666's explicit purposes to protect against bribery at private organizations receiving federal money, *Rooney*, 37 F.3d at 851, and, as is discussed above, no federal nexus is required. *Sabri*, 541 U.S. at 605.

June 8, 1989).  The same reasoning applies to Howe, who, as alleged, was retained by SUNY Poly to advise and act on development projects.

*Fourth*, the Buffalo Defendants argue that the Superseding Indictment suffers from a "total disconnect" because Howe was an agent of SUNY Poly but the RFP process was run by Fort Schuyler.  (Buffalo Defs.' MTD 54-60.)  According to the defendants, "SUNY Poly itself could not and did not take any 'official action' on the Buffalo RFP, because the Buffalo RFP was not a 'transaction or business' *of* SUNY Poly.  It was a transaction entirely controlled and effectuated by Fort Schuyler."  (Buffalo Defs.' MTD 60 (emphasis in original).)  This argument is incorrect both factually and legally.  Contrary to the Buffalo Defendants' arguments, the Superseding Indictment alleges that Fort Schuyler was "affiliated with SUNY Poly" and was created to "enter into contracts with private companies on SUNY Poly's behalf, for the purpose of carrying out development projects paid for with State funding" and related to SUNY Poly.  (Superseding Indictment ¶ 7; Compl. ¶ 25(c).)  SUNY Poly and Fort Schuyler were linked together by Kaloyeros, who sat on the Fort Schuyler board and "selected and provided direction to Fort Schuyler's officers and others working on behalf of Fort Schuyler."  (Superseding Indictment ¶ 8.)  In fact, "Fort Schuyler's officers . . . were hired by [Kaloyeros] and relied on staffing from the Research Foundation, and [Kaloyeros] supervised and controlled Fort Schuyler's day-to-day operations."  (Compl. ¶ 27(b).)

In view of the interconnectedness of these two entities, the "business" of SUNY Poly for the purposes of Section 666 included the RFP process, the award of development contracts, and

the construction of SUNY Poly-related projects, and, as a result, the Buffalo Defendants could make corrupt payments to Howe as an agent of SUNY Poly intending to influence that competitive procurement. The Second Circuit case *United States* v. *Bonito*, 57 F.3d 167 (2d Cir. 1995), is squarely on point. There, the defendant bribed a New Haven official who sat on a joint New Haven-Housing Authority committee in connection with that committee's selection of a location for low-income housing. *Id.* at 173. The defendant argued that Section 666 could not reach his conduct because the federal funds at issue belonged to the Housing Authority, not New Haven, and he only bribed an agent of New Haven. *Id.* In rejecting this argument, the Second Circuit pointed out that the decision about housing location "was being conducted in close cooperation between the City [of New Haven] and the Housing Authority," and, as a result, the decision "was, at all times relevant to this case, the business of both" entities. *Id.* The Second Circuit affirmed that Section 666 covers "the corruption of an official as he plays a significant, if not dominant, role in the improper disposition of federal monies by another organization." *Id.*[24] The same reasoning applies in this case. The RFP process was the "business" of both SUNY Poly and Fort Schuyler because it "was being conducted in close cooperation between" the two entities, with Kaloyeros bridging the two sides. *Id.* Accordingly, the Buffalo Defendants' corrupt payments to

---

[24] The Housing Authority in *Bonito* dispensed federal monies in the form of grants. At that time, the Second Circuit cautioned that "[i]t would be quite another case if the corrupted business" did not affect "federal funds directly." *Bonito*, 57 F.3d at 173. However, the Supreme Court later ruled that the Government does not need to establish any nexus between the alleged misconduct and federal funds. *See Sabri*, 541 U.S. at 605.

Howe to secure his help (and that of Kaloyeros) in rigging the RFP process are properly proscribed by Section 666.[25]

**b.     Percoco's Motion to Dismiss Should Be Denied**

Percoco makes two arguments in support of his motion to dismiss certain counts of the Superseding Indictment.  First, he asserts that he could not violate Section 666 when he served as the Governor's campaign manager between in or about April 2014 and December 2014 because he was not an "agent" of the State.  Second, he contends that bribes paid to him during that time

---

[25] The Buffalo Defendants quote extensively from the Eleventh Circuit case *United States* v. *Doran*, 854 F.3d 1312, 1314 (11th Cir. 2017), in which the court reversed the conviction of a university professor who embezzled money from a "closely affiliated" student investment fund established by the university but that received no federal money.  (Buffalo Defs.' MTD 57-59 (also citing in a similar vein *Fischer* v. *United States*, 529 U.S. 667 (2000) and *United States* v. *McLean*, 802 F.3d 1228 (11th Cir. 2015)).)

*Doran* is inapposite because it concerned the embezzlement prohibition in Section 666, which, in relevant part, makes it a crime for an agent to steal money from an organization receiving a qualifying amount of federal funds.  18 U.S.C. § 666(a)(1).  Although the defendant in *Doran* was clearly an agent of the victim fund, the government failed to prove that the fund received enough federal money to come within the protection of Section 666, which is an element of the offense.  The government argued that the defendant was an agent of the university (which received sufficient federal funds), but the Eleventh Circuit found that agency relationship to be irrelevant because the embezzlement victim was the fund, not the university.  *Doran*, 854 F.3d at 1315-16.

That ruling has little bearing on the charged offense here, which is that the Buffalo Defendants paid bribes to Howe "in connection with any business, transaction, or series of transactions" of SUNY Poly.  18 U.S.C. § 666(a)(2).  As explained above, because of the interlocked relationship between SUNY Poly and Fort Schuyler, the RFP process, the award of development contracts, and the construction of SUNY Poly-related projects were in fact "business" of SUNY Poly.  Accordingly, Howe's status as an agent of SUNY Poly is relevant to the charged crime.

period cannot form the basis of charges of Hobbs Act extortion, honest services wire fraud, and bribery. Neither argument has merit.

Percoco's claim that he was not an agent for part of 2014 hinges entirely on his assertion that an agent under Section 666 must have "actual legal authority to act on behalf of an organization or government." (Percoco MTD 22.) However, this "actual legal authority" test—a term that Percoco neither defines nor explains—has no basis in either the statute or the case law. To the contrary, Section 666 defines an agent expansively as "a person authorized to act on behalf of another person or a government, and, in the case of an organization or government, includes a servant or employee, and a partner, director, officer, manager, and representative." 18 U.S.C. § 666(d)(1). The First Circuit has explained that this definition includes "persons who *act* as directors, managers, or representatives of covered organizations, even if those persons are not actually employed by the organizations from which they embezzled." *United States* v. *Sotomayor-Vazquez*, 249 F.3d 1, 8 (1st Cir. 2001) (emphasis in original); *see also Toro*, 1989 WL 63118, at *1-2 (holding that an independent contractor retained by an organization was an agent); *United States* v. *Hudson*, 491 F.3d 590, 594-95 (6th Cir. 2007) (same); *United States* v. *Vitillo*, No. 03 Cr. 555, 2005 WL 1693932, at *4 (E.D. Pa. July 19, 2005) (same). In other words, a person's official position with an organization is not the operative question under Section 666. So long as the person can act on behalf of an organization or government, he qualifies as an agent of that entity for purposes of Section 666 liability, irrespective of his official title or position. This broad interpretation of the definition of "agent" is warranted because, in certain circumstances, "an

outside consultant with significant managerial responsibility may pose as significant a threat to the integrity of federal funds as a manager actually employed by the agency in question." *Sotomayor-Vazquez*, 249 F.3d at 8.

The cases cited by Percoco do not support his position that an agent under Section 666 must have "actual legal authority," whatever that term may mean. He relies principally on the Fifth Circuit case *United States* v. *Phillips*, in which the court determined that a tax assessor did not qualify as an agent of the local parish government. (Percoco MTD 23-24 (citing 219 F.3d 404 (5th Cir. 2000).) The court cited the definition of "agent" in Section 666, and then listed numerous factors that persuaded it that the tax assessor did not meet the requirements, including, among others, the parish's lack of supervisory control over him, the existence of state laws setting out his duties, and the payment of his salary by a different entity. *Phillips*, 219 F.3d at 412-13. The court further noted that the tax assessor had no power to control the parish or its funds, and "had no legal authority to bind the parish." *Id.* Percoco highlights this last phrase, but that was just one of the factors that the court found probative of the tax assessor's lack of "authorization to act" on behalf of the parish or its funds. *See id.* at 413. The Fifth Circuit certainly did not hold that the tax assessor's lack of "legal authority to bind" was dispositive of the "agent" inquiry.[26]

---

[26] Percoco also claims that *United States* v. *Willis*, 844 F.3d 155, 167 (3d Cir. 2016), "implicitly requir[ed] proof of actual authority." (Percoco MTD 24.) It is not clear what exactly Percoco means by his description of that case. In conducting the "agent" inquiry, the Third Circuit observed that "[t]he plain language of the statute merely requires that the individual be 'authorized to act on behalf of another person or government.'" *Willis*, 844 F.3d at 167. The court then

Percoco excerpts a similar line from the Second Circuit case *United States* v. *Mazer*, 631 F. App'x 57, 61 (2d Cir. 2015), in which the Court ruled that the evidence at trial was sufficient for the jury to find that the defendant was an agent of the City, as defined by Section 666(d)(1). (Percoco MTD 23.) Percoco seizes upon the fact that the defendant in *Mazer* had "authority to act on behalf of and bind the [government entity] in connection with his work." *See Mazer*, 631 F. App'x at 61. But again, the court's determination in *Mazer* that the defendant could "bind" the agency was made after its evaluation of the evidence *presented at trial*. The court did not rely solely on the defendant's title or legal relationship with the entity, but rather evaluated the evidence in its entirety to reach its determination that the defendant had the authority to "bind" the entity. Moreover, Percoco takes this fact out of context. The defendant's authority to "bind" the government entity was simply one piece of evidence that supported the jury's finding that the defendant "had authority to act on behalf of the City." *Id.* Percoco offers no statute, case, or other authority—and the Government is aware of none—that has grafted on to the plain-language definition of "agent" the heightened requirement that the person have "actual legal authority" or "official legal authority" to act for a government or organization. (*See* Percoco MTD 24-25.) *Cf.*

---

identified the trial evidence that supported the jury's finding that the defendant was an agent of the relevant entity. *Id.* As with *Phillips*, the court never held that "actual legal authority" is a requirement for an agent. The same is true for the other cases cited by Percoco. Furthermore, the Government notes that the cases cited by Percoco examined whether the evidence presented at trial was sufficient to prove the agent element of Section 666(a)(1)(B)—a markedly different posture from the pretrial stage of this case. The allegations in the Superseding Indictment are sufficient to plead that Percoco was an agent and therefore warrant a trial.

*United States* v. *Keen*, 676 F.3d 981, 989-90 (11th Cir. 2012) (rejecting the defendant's effort to add a requirement to the "agent" definition because "[n]owhere does the statutory text either mention or imply an additional qualifying requirement that the person be authorized to act specifically with respect to the entity's funds" and "absent the need to avoid absurd consequences, we generally may not reinterpret the plain meaning of a statute").

Applying the proper definition of "agent," it is clear that the Superseding Indictment alleges more than sufficient facts to plead that Percoco was an agent of the State throughout 2014, during which time he accepted tens of thousands of dollars of corrupt payments from Kelly, Aiello and Gerardi. The Superseding Indictment alleges that, even after Percoco had formally left his State position, "he continued to function in a senior advisory and supervisory role with regard to the Governor's Office, and continued to be involved in the hiring of staff and the coordination of the Governor's official events and priorities, and to travel with the Governor on official business, among other responsibilities." (Superseding Indictment ¶ 4; *see also* Compl. ¶ 26(c).) Furthermore, the Superseding Indictment alleges that, prior to his official return to the Executive Chamber, Percoco was able to exert pressure and provide advice to State officials in an effort to reverse an ESD decision that was unfavorable for the Syracuse Developer, and ESD did in fact change its position. (Superseding Indictment ¶ 35(a); *see also* Compl. ¶ 64.) Taken together, these factual allegations establish that, in or about 2014, Percoco continued to have authorization to act on behalf of the State even though he had given up his official title and left State service. As a

result, it was a crime for him to accept bribes in or about 2014, as charged in Count Twelve and in part in Count Eleven.

Next, Percoco extends his faulty analysis to the Hobbs Act extortion charges and the honest services wire fraud charge.[27] He argues that he did not "have actual authority to act on behalf of and bind the government" when he was the campaign manager, and thus he cannot be prosecuted under any federal bribery statute. (Percoco MTD 26-28.) These arguments fare no better. The Superseding Indictment alleges that Percoco received bribe payments from Aiello and Gerardi while he was on the campaign, but that he took official action to benefit the Syracuse Developer and Aiello in exchange for those bribes *after* he returned to State service. Specifically, Percoco took official action to release State funds for the Film Hub in or about September 2015, and later the same month, he took official action to secure a salary increase for Aiello's son, a State employee. (Superseding Indictment ¶ 35(b)-(c).)

The case law supports the allegations in the Superseding Indictment. In *United States* v. *Meyers*, the Seventh Circuit expressly approved an indictment charging an extortion conspiracy that began *before* a co-conspirator ascended to public office and ended after that person took an

---

[27] Count Six of the Superseding Indictment charges Percoco with conspiring to commit extortion under color of official right in violation of the Hobbs Act from in or about 2012 through 2016. (Superseding Indictment ¶ 48-49.) Count Eight, meanwhile, charges him with the substantive crime of extorting the Syracuse Developer in or about 2014, while he was working on the campaign. (Superseding Indictment ¶¶ 52-53.) Count Ten charges him with honest services fraud in connection with his official action taken to benefit the Syracuse Developer. (Superseding Indictment ¶¶ 57-59.)

official action.[28]   529 F.2d 1033, 1035-36 (7th Cir. 1976).   Two candidates for local elected

positions accepted bribes in consideration for their future official acts; they were subsequently

elected and took office.   *Id.* at 1035.   The Seventh Circuit explained that the defendants could be

charged with a Hobbs Act extortion conspiracy that spanned both the pre- and post-election time

period because "a criminal conspiracy is a continuing crime in that the conspiracy continues until

the goal for which it was formed has been attained"—which occurred after the defendants became

public officials.   *Id.* at 1036.   Percoco is properly charged in Counts Six and Eight because he

received payments during his time with the campaign and agreed to take official actions in the

future, as opportunities arose.   The same reasoning applies to the honest services wire fraud

charged in Count Ten.

Relying on *United States* v. *Manzo*, 636 F.3d 56 (3d Cir. 2011), Percoco counters that the

extortion charges fail to state a claim because he neither "acted []or pretended to act in an official

capacity" while he served as campaign manager and accepted corrupt payments from the Syracuse

Developer.   (Percoco MTD 27.)   Putting aside the allegations in the Superseding Indictment that

allege that Percoco had authority to act as an agent of the Governor even while he was working on

the campaign (*see* Superseding Indictment ¶ 4), *Manzo* is factually distinguishable in a critical

---

[28] The converse is also true.   Courts have affirmed the extortion conspiracy convictions of former public officials who accept payments *after* they took official actions and then relinquished their public positions.   *See United States* v. *Forszt*, 655 F.2d 101, 104 (7th Cir. 1981) ("[W]e now hold that it is unlawful for a public official to sell his public trust while in office even though the last installment for the services rendered is to come after he leaves office."); *United States* v. *Lena*, 497 F. Supp. 1352, 1359 (W.D. Pa. 1980), *aff'd*, 649 F.2d 861 (3d Cir. 1981).

way. The two defendants—a mayoral candidate and his campaign manager—accepted payments during the campaign and promised to take certain actions after the election. But the candidate lost the vote and never took public office. *Manzo*, 636 F.3d at 60. As a consequence, the Third Circuit concluded that the *Manzo* defendants did not act under the color of official right and also could not conspire to commit extortion. *Id.* at 65, 68. The Third Circuit distinguished *Meyers* on the ground that the Seventh Circuit "rested its decision on the basis that the defendants ultimately obtained office." *Id.* Unlike the *Manzo* defendants, Percoco returned to his powerful State position after the Governor successfully won reelection in 2014. Accordingly, he is appropriately charged with extortion in violation of the Hobbs Act.

In sum, the Court should deny the Buffalo Defendants and Percoco's motions to dismiss certain counts of the Superseding Indictment for failing to properly allege bribery.

### G.     Grand Jury Minutes Should Not Be Disclosed (Buffalo Defendants)

As a tag-along to their motion to dismiss the relevant wire fraud and bribery counts, the Buffalo Defendants demand to review the grand jury minutes pertaining to the Government's legal instructions to the grand jury. (*See* Buffalo Defs.' GJ Mot. 13-15.) This motion should be denied.

The bar for obtaining disclosure of grand minutes is exceedingly high, and such relief is never granted absent extraordinary circumstances. That is because grand jury proceedings are "accorded a presumption of regularity, which generally may be dispelled only upon particularized proof of irregularities in the grand jury process." *United States* v. *R. Enters., Inc.*, 498 U.S. 292, 301 (1991). A review of grand jury minutes "should not be permitted without concrete allegations

of Government misconduct." *United States* v. *Leung*, 40 F.3d 577, 582 (2d Cir. 1994). "Mere speculation that . . . the Government may have improperly instructed the grand jury . . . falls far short of the showing to overcome the presumption of secrecy." *United States* v. *Forde*, 740 F. Supp. 2d 406, 414 (S.D.N.Y. 2010).

Here, the Buffalo Defendants offer no "concrete allegations of Government misconduct." *Leung*, 40 F.3d at 582. Instead, they reason that, because—in their view—the Superseding Indictment does not properly allege wire fraud or bribery with respect to the RFPs, the grand jury must have been mis-instructed on the law to have returned the indictment. (*See* Buffalo Defs.' GJ Mot. 7.) The fatal problem with this argument is their mistaken initial premise. As explained in detail above, the Superseding Indictment does in fact sufficiently allege a wire fraud scheme to deprive Fort Schuyler of the right to control its assets, and a bribery scheme to pay Howe for official actions. *See supra* Parts I.E, I.F. As a result, there is no reason to believe that the Government incorrectly instructed the grand jury on the law, and no basis for disclosing the grand jury minutes.

## II. Motion to Dismiss Count One as "Duplicitous"

Count One charges the Buffalo Defendants, the Syracuse Defendants, and Kaloyeros with conspiring to commit wire fraud in connection with their fraudulent scheme to secretly tailor the preferred developer RFPs and thereby defraud Fort Schuyler. The Buffalo Defendants assert that Count One should be dismissed as duplicitous. They contend that Count One improperly alleges a single conspiracy because the rigging of the Buffalo RFP is a separate and distinct crime from

the rigging of the Syracuse RFP. This argument fails because the Superseding Indictment sufficiently alleges that Kaloyeros, Aiello, Gerardi, Ciminelli, Laipple, and Schuler all agreed to participate in a common plan to rig the RFPs. Furthermore, the Superseding Indictment alleges that, as a factual matter, Howe facilitated the sharing of ideas between the Buffalo Defendants and the Syracuse Defendants as they collectively executed the plan. These allegations are more than sufficient to support the single conspiracy charged in Count One at the pretrial stage.

## A. Applicable Law

"An indictment is duplicitous if it joins two or more distinct crimes in a single count." *United States* v. *Aracri*, 968 F.2d 1512, 1518 (2d Cir. 1992). The Second Circuit has cautioned that a "conspiracy indictment presents unique issues in the duplicity analysis because a single agreement may encompass multiple illegal objects." *Id.* (internal quotation marks omitted). That is why "the allegation in a single count of a conspiracy to commit several crimes is not duplicitous, for the conspiracy is the crime and that is one, however diverse its objects." *Id.* (internal quotation marks and alterations omitted).

Consequently, as long as "the Indictment on its face sufficiently alleges a single conspiracy, the question of whether a single conspiracy or multiple conspiracies exists is a question of fact for the jury." *United States* v. *Rajaratnam*, 736 F. Supp. 2d 683, 688 (S.D.N.Y. 2010); *see also United States* v. *Szur*, No. 97 Cr. 108 (JGK), 1998 WL 132942, at *11 (S.D.N.Y. Mar. 20, 1998) (same); *United States* v. *Friedman*, 854 F.2d 535, 561 (2d Cir. 1988) ("Whether the evidence in a case establishes single or multiple conspiracies is a question of fact to be resolved by a properly

instructed jury."). "'Boilerplate allegations' of a single conspiracy survive this 'facial test.'" *Rajaratnam*, 736 F. Supp. 2d at 688 (quoting *United States* v. *Ohle*, 678 F. Supp. 2d 215, 222-23 (S.D.N.Y. 2010)). Applying this standard, "courts in this Circuit have repeatedly denied motions to dismiss a count as duplicitous." *Ohle*, 678 F. Supp. 2d at 222.

## B. Discussion

Count One alleges that the Buffalo Defendants, the Syracuse Defendants, and Kaloyeros "willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit wire fraud" in violation of federal law. (Superseding Indictment ¶ 38; *see also id.* ¶ 39 (alleging that Kaloyeros and Howe worked "in collaboration and in concert with" both the Buffalo Defendants and the Syracuse Defendants).) More specifically, the Superseding Indictment alleges that the Buffalo Defendants and the Syracuse Defendants exchanged ideas through Howe for potential qualifications to include in the relevant RFPs. (Superseding Indictment ¶ 24.) The foregoing allegations are sufficient as a matter of law to allege a single conspiracy.

The Buffalo Defendants counter that the Superseding Indictment does not contain "any allegations of mutual dependence or overlap between the two alleged 'bid rigging schemes' other than" the participation in both schemes of Kaloyeros and Howe. (Buffalo Defs.' Duplicity Mot. 1.) They are wrong. The fraudulent scheme charged in Count One involved the secret tailoring of the Buffalo and Syracuse RFPs to include qualifications favorable to the Buffalo Developer and the Syracuse Developer, respectively. The Superseding Indictment explains that the Buffalo Defendants and the Syracuse Defendants "collaborated" with each other "by, among other things,

80

exchanging through Howe ideas for potential qualifications to be included in the Syracuse and Buffalo RFPs" (Superseding Indictment ¶ 24), and thereby assisted each other in tailoring the RFPs to their respective companies. The Second Circuit has explained that "a single conspiracy is not transformed into multiple conspiracies merely by virtue of the fact that it may involve two or more phases or spheres of operation, so long as there is sufficient proof of mutual dependence and assistance." *United States* v. *Chavez*, 549 F.3d 119, 125-26 (2d Cir. 2008). On its face, Count One clearly alleges that the charged defendants not only agreed to a common plan to defraud Fort Schuyler, but also provided each other with assistance. That is enough to defeat a pretrial motion to dismiss.

The Buffalo Defendants also argue that the existence of two separate counts of substantive wire fraud—one for each of the RFPs—somehow supports their claim of duplicity with respect to Count One. (Buffalo Defs.' Duplicity Mot. 1; *see* Superseding Indictment ¶¶ 40-43 (Counts Two and Three).) But the law is to the contrary. "[U]nder the law of this Circuit, 'acts that could be charged as separate counts of an indictment may instead be charged in a single count if those acts could be characterized as part of a single continuing scheme.'" *Aracri*, 968 F.2d at 1518 (quoting *United States* v. *Tutino*, 883 F.2d 1125, 1141 (2d Cir. 1989)); *see also United States* v. *Trippe*, 171 F. Supp. 2d 230, 238 (S.D.N.Y. 2001) ("[I]t is firmly established in this Circuit that an indictment count may allege a conspiracy to commit multiple crimes."). Indeed, "[i]t is elementary that conspiracy is a crime, separate and distinct from the substantive offense," and a defendant may well be guilty of conspiracy without being guilty of a substantive offense that was an object of the

conspiracy. *United States* v. *Coplan*, 703 F.3d 46, 66 (2d Cir. 2012) (quotation marks omitted); *see also, e.g.*, *Salinas* v. *United States*, 522 U.S. 52, 64 (1997) ("A person, moreover, may be liable for conspiracy even though he was incapable of committing the substantive offense."); *United States* v. *Rigas*, 281 F. Supp. 2d 660, 665 (S.D.N.Y. 2003) ("As the agreement, not the commission of the substantive crime, is the essence of the conspiracy, *United States* v. *Gore*, 154 F.3d 34, 40 (2d Cir. 1998), a single conspiracy may include multiple groups of people, and the pursuit of multiple illegal objects does not automatically divide a single conspiracy into multiple conspiracies."). Accordingly, there is nothing discordant about charging one conspiracy (Count One) to commit two acts of wire fraud (Counts Two and Three) where, as alleged in the Superseding Indictment, the Buffalo Defendants, Syracuse Defendants, and Kaloyeros agreed on a common plan to rig the RFPs and provided mutual assistance to each other.

For the reasons stated above, the Buffalo Defendants' motion to dismiss Count One should be denied.

## III.    Motions to Sever

Each defendant seeks to sever the charges against him in the Superseding Indictment from the charges against various other defendants on the dual grounds that they are improperly joined in violation of Fed. R. Crim. P. 8(b) ("Rule 8(b)") and that the risk of prejudice of a joint trial requires discretionary severance pursuant to Fed. R. Crim. P. 14 ("Rule 14"). The defendants' Rule 8(b) arguments fail because the defendants and the charges share a substantial identity of facts and participants, which supports joinder under Rule 8(b). However, the Government

concedes that a discretionary severance pursuant to Rule 14 is appropriate in order to separate the charges related to the Buffalo Billion fraud and bribery scheme (the "Buffalo Billion Scheme") from the charges related to the Percoco bribery scheme (the "Percoco Scheme"). Severance in this way would avoid any potential spillover prejudice between the two schemes, while also serving the interests of efficiency, consistency, and fairness that underlie the rules governing joint trials of multiple defendants. As a result, there would be one trial for the six defendants charged with a single conspiracy to rig the RFPs and defraud Fort Schuyler (Counts One through Five and a false statements charge), and a separate trial for the four defendants involved in the bribery of Percoco in exchange for official action (Counts Six through Fourteen and a false statements charge).

A.    **Applicable Law**

The federal criminal justice system has a strong policy in favor of joint trials of defendants who are indicted together. *See, e.g.*, *Zafiro* v. *United States*, 506 U.S. 534, 537 (1993). Joint trials generally ensure fairness and serve the interests of justice "by avoiding the scandal and inequity of inconsistent verdicts" and by "enabling more accurate assessments of relative culpability." *Richardson* v. *Marsh*, 481 U.S. 200, 210 (1987). Joint trials also eliminate the random unfairness of the last-tried defendants having "the advantage of knowing the prosecution's case beforehand." *Id.* In addition, joint trials promote efficiency by obviating the need for the Government to "present[] the same evidence again and again," or to call "victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying." *Id.* These factors explain why joint trials "play a vital role in the criminal justice system." *Zafiro*, 506 U.S. at 537 (quotation marks omitted).

A defendant in a multi-count, multi-defendant case who seeks severance from the indictment must show either that (1) he was misjoined in violation of Fed. R. Crim. P. 8(b), or (2) notwithstanding proper joinder of defendants or charges, a discretionary severance pursuant to Rule 14 is warranted because the defendant would be severely prejudiced by a joint trial.

### 1.    Rule 8(b)

Rule 8(b) permits the Government to "charge 2 or more defendants" in the same indictment "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). The Second Circuit has "interpreted the 'same series of acts or transactions' language of Rule 8(b) to mean that 'joinder is proper where two or more persons' criminal acts are unified by some substantial identity of facts or participants, or arise out of a common plan or scheme.'" *United States* v. *Rittweger*, 524 F.3d 171, 177 (2d Cir. 2008) (quoting *United States* v. *Cervone*, 907 F.2d 332, 341 (2d Cir. 1990)). As evidenced by the use of the disjunctive "or," the satisfaction of either prong is sufficient to support joinder. *See, e.g.*, *United States* v. *Chalmers*, 474 F. Supp. 2d 555, 571 (S.D.N.Y. 2007) (ruling that "joinder is appropriate where, as in this case, the defendants' criminal acts are alleged to arise out of a common plan or scheme"); *United States* v. *Aronson*, No. 98 Cr. 564 (DAB), 1999 WL 97923, at *3 (S.D.N.Y. Feb. 24, 1999) (finding joinder was proper where the charges shared a substantial identity of facts and participants).

In addition, courts in this Circuit apply "a commonsense rule to decide whether, in light of the factual overlap among charges, joint proceedings would produce sufficient efficiencies such

that joinder is proper notwithstanding the possibility of prejudice to either . . . of the defendants resulting from the joinder." *Rittweger*, 524 F.3d at 177 (internal quotation marks omitted).

Joinder is presumptively appropriate where defendants are charged with participating in a single conspiracy. *See, e.g.*, *United States* v. *Nerlinger*, 862 F.2d 967, 973 (2d Cir. 1988) ("The established rule is that a non-frivolous conspiracy charge is sufficient to support joinder of defendants under Fed. R. Crim. P. 8(b)."). But Rule 8(b) also permits the joinder of defendants charged in distinct conspiracies so long as those defendants share either a substantial identity of facts or participants, or a common plan or scheme. *See, e.g.*, *United States* v. *Attanasio*, 870 F.2d 809, 815 (2d Cir. 1989).

## 2. Rule 14

Rule 14, meanwhile, permits discretionary severance even where the defendants are properly joined under Rule 8(b). Rule 14 provides that "[i]f the joinder of offenses or defendants in an indictment . . . for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. P. 14(a). The Supreme Court has instructed that a discretionary severance should be granted "'*only if* there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.'" *United States* v. *Harwood*, 998 F.2d 91, 95 (2d Cir. 1993) (quoting *Zafiro*, 506 U.S. at 539) (emphasis in *Harwood*). To carry this burden, a defendant "must, at the threshold,

articulate specific instances of 'legally cognizable prejudice.'"[29] *Id.* (quoting *Zafiro*, 506 U.S. at 541). In *dicta*, the Supreme Court has hypothesized that a risk of prejudice to a defendant's trial right "might occur when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a co-defendant," or when "[e]vidence that is probative of a defendant's guilt but technically admissible only against a codefendant" is admitted at a joint trial. *Zafiro*, 506 U.S. at 539. However, "[a] defendant's right to a fair trial does not include the right to exclude relevant and competent evidence," including testimony or other evidence that is harmful to a co-defendant. *United States* v. *Rosa*, 11 F.3d 315, 341 (2d Cir. 1993). Accordingly, "[e]vidence at the joint trial of alleged coconspirators that, because of the alleged conspiratorial nature of the illegal activity, would have been admissible at a separate trial of the moving defendant is neither spillover nor prejudicial." *Id.*

Importantly, "[e]ven if prejudice is shown . . . severance is not necessarily required" under Rule 14. *United States* v. *Diaz*, 176 F.3d 52, 104 (2d Cir. 1999). That is because, "even when the risk of prejudice is high, measures less drastic than severance, 'such as limiting instructions, often will suffice to cure any risk of prejudice.'" *Id.* (quoting *Zafiro*, 506 U.S. at 539). "Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." *Zafiro*, 506 U.S. at 538-39.

---

[29] In contrast, severance due to misjoinder under Rule 8(b) does not require a showing of prejudice. *See, e.g.*, *Rittweger*, 524 F.3d at 178-79.

**B.      Discussion**

All of the charged defendants move for severance and propose different configurations of co-defendants with whom they should be tried.  The defendants' arguments with respect to joinder under Rule 8 are wrong because the overlapping schemes charged in the Superseding Indictment have a substantial identity of facts and participants.   However, the Government concedes discretionary severance under Rule 14 of the charges related to the Percoco Scheme from the charges related to the Buffalo Billion Scheme in order to avoid potential spillover prejudice between the two schemes.  If the Court severs the charges in this way, no further severance under Rule 14 would be warranted, as any potential prejudice within each scheme could easily be resolved through appropriate limiting instructions.

**1.      The Buffalo Billion Defendants Should Be Tried Together**

Kaloyeros, Aiello, Gerardi, Ciminelli, Laipple, and Schuler should stand trial together on the charges related to the Buffalo Billion.  They are properly joined under Rule 8(b), and, furthermore, none of them would face a substantial risk of prejudice at the joint trial.  As a result, severance of the charges related to the Buffalo Billion Scheme is not warranted.

Joinder of these six defendants is proper because their offenses share a substantial identity of facts and participants, and also arise from a common plan.  As set forth above, Kaloyeros, the Syracuse Defendants, and the Buffalo Defendants collaborated with Howe to secretly insert qualifications tailored to the two developers into RFPs issued by Fort Schuyler, and deceive Fort Schuyler about the purportedly competitive nature of the RFP process.  The Syracuse Defendants

and the Buffalo Defendants were not siloed off from each other. Instead, as alleged in the Superseding Indictment, the Buffalo Defendants and the Syracuse Defendants shared potential qualifications to include in the RFPs, with Howe facilitating those discussions.[30] (Superseding

---

[30] The Buffalo Defendants question whether Howe made them aware that the potential qualifications shared by the Syracuse Defendants had in fact come from those defendants. (Buffalo Defs.' MTSE 18, 23 (incorrectly asserting that the Buffalo Defendants had no involvement in the Syracuse RFP, and vice versa).) But the allegation in the Superseding Indictment that Kaloyeros, Howe, Aiello, Gerardi, Ciminelli, Laipple, and Schuler "*collaborated* in secretly tailoring the Syracuse and Buffalo RFPs by, among other things, exchanging through Howe ideas for potential qualifications to be included in the Syracuse and Buffalo RPFs" (Superseding Indictment ¶ 24 (emphasis added)), makes clear that the defendants from the two developers were aware of the existence of other co-conspirators. Nothing more is required to properly charge a conspiracy. It is axiomatic that a defendant need not know the specific identities of co-conspirators to be part of that conspiracy. *United States* v. *Sureff*, 15 F.3d 225, 230 (2d Cir. 1994) (a single conspiracy "may encompass members who neither know one another's identities, nor specifically know of one another's involvement" (internal citations omitted)).

In any event, there is no doubt that the Buffalo Defendants and the Syracuse Defendants knew of each other and their shared membership in a conspiracy to rig the RFPs. For example, the defendants shared ideas over email about potential qualifications to use to secretly tailor their respective RFPs, and later on, the Syracuse Defendants shared their response to the Syracuse RFP with the Buffalo Defendants. Moreover, Aiello was invited to a fundraising dinner hosted by Ciminelli while the RFP bidding process was ongoing.

Evidence of this collaboration between the Buffalo Defendants and the Syracuse Defendants was produced to the defendants in discovery months ago. Documents show that, in or about August 2013, almost two months before the public issuance of the RPFs, Howe forwarded to Aiello an email in which Laipple proposed qualifications for the Buffalo RFP. Howe wrote: "This is what Ciminelli came back with … Any of this relevant to you guys?" Similarly, in or about September 2013, Howe forwarded to Laipple and Schuler an email from Gerardi that contained the Syracuse Developer's specific qualifications. Howe instructed the two Buffalo executives to look at Gerardi's document "as a template, if you feel some of these are appropriate."

A few months later, in or about November 2013, Howe wrote to Aiello and Gerardi and asked them to mail a copy of the Syracuse Developer's response to the Syracuse RFP to Schuler "ASAP." Around this time—after the RFPs had been released but before Fort Schuyler had chosen

Indictment ¶ 24.)  Accordingly, Kaloyeros, the Buffalo Defendants, and the Syracuse Defendants are properly charged in Count One with participating in a single conspiracy to commit wire fraud. *See supra* Part II (explaining why Count One is not duplicitous).  That charge is, on its own, enough to join those defendants.  *See Nerlinger*, 862 F.2d at 973 ("The established rule is that a non-frivolous conspiracy charge is sufficient to support joinder of defendants under Fed. R. Crim. P. 8(b).").

In addition, the facts and witnesses that the Government would introduce at trial to prove the corruption of the two RFPs are inextricably intertwined.  Indeed, the genesis of these RFPs occurred at virtually the same time.  On or about August 20, 2013, Kaloyeros informed Howe and an executive at Fort Schuyler that he would "like to issue an RFP for a strategic partner in Syracuse and a similar one in Buffalo." (Compl. ¶ 77(a).)  Later, Kaloyeros sent Ciminelli the draft Syracuse RFP and informed him that the "[d]raft of relevant sections from RFP enclosed. . obviously, we need to replace Syracuse with Buffalo and fine tune the developer requirements to fit." (Compl. ¶ 79(g).)  The subsequent procurement process for the RFPs involved many of the same Fort Schuyler and SUNY Poly employees, including, for example, the Fort Schuyler Executive and the Director of Procurement identified in the Complaint.  (*See, e.g.*, Compl. ¶¶ 78(d), 78(h), 81.)  Both

---

any winners—Howe forwarded Aiello a reminder about a fundraising event for the Governor in Buffalo that was hosted by Ciminelli.  In his note to Aiello, Howe wrote: "Location for tomorrow."

The defendants have all these documents in their possession.  Nonetheless, in an effort to aid the defendants with their trial preparation, the Government sent a letter to all defendants on June 30, 2017 identifying the bates stamps of the referenced documents.  (Gov. Ex. A at US061-62.)

the Buffalo Defendants and the Syracuse Defendants deceived the same victims at Fort Schuyler: the Board of Directors and the evaluation committee assigned by it to review the responses to the two RFPs. (Superseding Indictment ¶ 24; Compl. ¶¶ 68, 77(e), 86.) Throughout the scheme, Kaloyeros, Howe, the Buffalo Defendants, and the Syracuse Defendants also interacted with the same set of campaign staffers and State officials, including the Deputy Director of State Operations. In short, the criminal acts of the co-conspirators charged in Count One are "unified by some substantial identity of facts or participants." *Rittweger*, 524 F.3d at 177 (internal quotation marks omitted). Moreover, it is clear that, "in light of the factual overlap among charges, joint proceedings would produce sufficient efficiencies such that joinder is proper notwithstanding the possibility of prejudice" to any defendant. *Id.* (internal quotation marks omitted).

The six defendants charged in Count One also are properly joined because their alleged crimes arose out of a common plan to defraud Fort Schuyler by secretly tailoring the RFPs to favor the Syracuse Developer and the Buffalo Developer. That common plan is an independent justification for joinder. *See id.* Indeed, the Second Circuit has observed that the criminal justice system's preference for joint trials "is particularly strong where, as here, the defendants are alleged to have participated in a common plan or scheme." *United States* v. *Salameh*, 152 F.3d 88, 115 (2d Cir. 1998).

The Buffalo Defendants contend that they did not share a plan with the Syracuse Defendants because, according to them, there is no allegation that they influenced the Syracuse RFP or communicated with the Syracuse Defendants. (Buffalo Defs.' MTSE 8, 16-18.) The

Syracuse Defendants make a similar argument in the reverse direction. (Syracuse Defs.' Mot. 32-33.) As explained above, however, the allegation in the Superseding Indictment that the Syracuse Defendants and the Buffalo Defendants collaborated on the scheme to defraud Fort Schuyler is sufficient to establish their participation in a single conspiracy at this pretrial stage. (Superseding Indictment ¶ 24.)

Furthermore, the developer defendants' challenge takes too narrow a view of what constitutes a "common plan or scheme" for joinder purposes. Indeed, it is well-established that defendants do not even need to be members of the same conspiracy to share a common scheme and thus be properly joined under Rule 8(b). *See, e.g.*, *Rittweger*, 524 F.3d at 177. For example, in *Attanasio*, the Second Circuit ruled that the defendants were properly joined even though the indictment charged two different conspiracies with just one overlapping defendant (the "Common Defendant"). 870 F.2d at 811. In one conspiracy, the Common Defendant and an appellant were paid for no-show jobs, *see id.* at 811-12, and in the other, two different appellants helped the Common Defendant disguise ordinary income as lower-taxed capital gains, *id.* at 813. Although the two conspiracies featured totally distinct methods of increasing the Common Defendant's illicit income and mostly different members, the Second Circuit found a common thread that connected the two conspiracies—namely, the transactions of both conspiracies "were a part of a series of acts that shared a common purpose: to conceal and launder [the Common Defendant's] income . . . ." *Id.* at 815. Here, where the defendants *are* charged in a single conspiracy and collaborated to deceive Fort Schuyler, there is a clear unifying purpose supporting joinder.

The cases cited by the Buffalo Defendants and the Syracuse Defendants do not compel a different result. Those cases stand for the proposition that a defendant who is charged in one crime, but was not "aware of or joined in" the other alleged offenses, does not share a common plan or scheme with his co-defendants. *United States* v. *Menashe*, 741 F. Supp. 1135, 1138 (S.D.N.Y. 1990); *see also United States* v. *Lech*, 161 F.R.D. 255 (S.D.N.Y. 1995) (finding no common plan or scheme where the defendant "had no involvement in the other schemes charged, and at most he had cursory knowledge of the other criminal activities involving" his co-defendants). That is not the case here. As explained above, the Superseding Indictment charges that the Buffalo Defendants collaborated with the Syracuse Defendants and exchanged ideas about how to tailor the RFPs (Superseding Indictment ¶ 24), and the Government expects to prove that allegation at trial. Consequently, the wire fraud conspiracy alleged in Count One is *not* a "hub-and-spoke" conspiracy where the only common thread is the wholly independent use of Howe and Kaloyeros's corrupt services by the Syracuse Defendants and the Buffalo Defendants. (*See* Buffalo Defs.' MTSE 17-18.) To the contrary, all the defendants in Count One are alleged to have collaborated to defraud Fort Schuyler. Thus, *Menashe*, *Lech*, and other such cases are inapposite. Accordingly, the charges against Kaloyeros, the Syracuse Defendants, and the Buffalo Defendants are properly joined under Rule 8(b).

Separately, there is no justification for severing any of the six Buffalo Billion Scheme defendants under Rule 14 because none of them would face a "serious risk" of prejudice at a joint trial on the Buffalo Billion Scheme. *Harwood*, 998 F.2d at 95 (internal quotation marks omitted).

The Buffalo Defendants counter that they would be prejudiced by evidence of the Syracuse Defendants' efforts to tailor the Syracuse RFP, and the Syracuse Defendants make the mirror argument.[31] (*See* Buffalo Defs.' MTSE 29-30; Syracuse Defs.' Mot. 37-38) This concern is illusory because there is no legal basis for them to exclude evidence of statements and actions taken in furtherance of the conspiracy by their co-conspirators; quite the opposite, it is axiomatic that such evidence is properly admissible against all conspirators. *See, e.g.*, *United States* v. *Diaz*, 878 F.2d 608, 616 (2d Cir. 1989) ("In this conspiracy case, evidence of crimes, wrongs or acts by coconspirators is admissible . . . ."); *United States* v. *Gupta*, 747 F.3d 111, 123 (2d Cir. 2014) (explaining that co-conspirator statements made in furtherance of the conspiracy are not hearsay under Fed. R. Evid. 801(d)(2)(E)). In other words, evidence of the Syracuse Defendants' crimes would be admissible against the Buffalo Defendants, and vice versa—even if the two groups had separate trials. Therefore, a joint trial carries no added risk of prejudice. *See Rosa*, 11 F.3d at 341 ("Evidence at the joint trial of alleged coconspirators that, because of the alleged conspiratorial nature of the illegal activity, would have been admissible at a separate trial of the moving defendant is neither spillover nor prejudicial."); *United States* v. *Spinelli*, 352 F.3d 48, 55-56 (2d Cir. 2003) (affirming the district court's denial of severance where "much of the evidence about [a co-conspirator's] crimes would have been admissible at a separate trial of [the appellant], since it was relevant to proving the nature and scope of the conspiracy in which both were, to differing degrees,

---

[31] In a similar vein, the Buffalo Defendants seek to sever from Kaloyeros in an effort to distance themselves from evidence related to the Syracuse RFP. (*See* Buffalo Defs.' MTSE 2 n.2.)

involved").

### 2. The Percoco Scheme Defendants Should Be Tried Together

The Syracuse Defendants (Aiello and Gerardi), Percoco, and Kelly should stand trial together on the charges related to the Percoco Scheme. They are properly joined under Rule 8(b), and, furthermore, any risk of prejudice at the joint trial could be cured with limiting instructions to the jury. As a result, the Court should deny the Syracuse Defendants and Kelly's motions to sever themselves from each other.

Although the Syracuse Defendants and Kelly were not (based on the Government's current understanding of the facts) aware of each others' bribery of Percoco and thus did not share a common plan or scheme, they and Percoco *are* unified by a substantial identity of facts and participants. Furthermore, "in light of the factual overlap among charges, joint proceedings would produce sufficient efficiencies such that joinder is proper notwithstanding the possibility of prejudice to . . . the defendants resulting from the joinder." *Rittweger*, 524 F.3d at 177 (internal quotation mark omitted). These factors are more than sufficient to permit joinder under Rule 8(b).

The factual overlap is substantial because both the Syracuse Defendants and Kelly were bribing Percoco in exchange for official action during the same time period—from in or about 2014 through 2015—and arranged their bribes to Percoco through Howe. As a result, much of the evidence necessary to proving Kelly's bribery of Percoco is the same as the evidence that will prove the Syracuse Defendants' bribery of Percoco. For example, the Government will introduce the following evidence against the Syracuse Defendants, Kelly, and Percoco:

- In or about mid-2014, Percoco was experiencing financial hardship when a massive balloon payment of $800,000 was due on the mortgage for his expensive Westchester County house. (Compl. ¶¶ 39, 60.)

- During the same time period, Percoco provided false information to the Governor's Assistant Counsel and obtained an ethics opinion regarding private sector employment. (Compl. ¶ 59.)

- Percoco had left State service to work on the Governor's campaign but, as alleged in the Superseding Indictment, nonetheless "continued to function in a senior advisory and supervisory role with regard to the Governor's Office, and continued to be involved in the hiring of staff and the coordination of the Governor's official events and priorities, and to travel with the Governor on official business, among other responsibilities." (Superseding Indictment ¶ 4.)

- Percoco himself linked the two conspiracies in his contemporary communications. For example, on or about July 24, 2014, Howe asked Percoco to speak about the Energy Company with a State energy official, who had recently met with Kelly. Percoco uncharacteristically responded that he was "barred from having those conversations" because, according to Howe, Percoco was seeking additional money from Howe's other clients, including the Syracuse Developer, but had not yet received any payments. (Compl. ¶ 60(b).)

Evidence of all these overlapping facts will be important at trial to prove the crimes of Kelly and

the Syracuse Defendants, as well as Percoco. Because Rule 8(b) permits joinder where "two or more persons' criminal acts are unified by some substantial identity of facts or participants," *Cervone*, 907 F.2d at 341, the four defendants involved in the Percoco Scheme are properly joined. What is more, the efficiency of presenting these overlapping facts at a single trial is self-evident and provides additional support for joinder. *See, e.g.*, *Rittweger*, 524 F.3d at 177.

No further severance is necessary under Rule 14. Any risk of prejudice attendant to a joint trial can be sufficiently cured with "measures less drastic than severance, such as limiting instructions." *Diaz*, 176 F.3d at 104 (internal quotation marks omitted). Kelly and the Syracuse Defendants argue that evidence of the others' bribery of Percoco would be prejudicial because they did not participate in the same conspiracy. (Kelly MTSE 39-43; Syracuse Defs.' Mot. 38-39.) However, "even 'the fact that evidence may be admissible against one defendant but not another does not necessarily require a severance.'" *Spinelli*, 352 F.3d at 56 (quoting *United States* v. *Carson*, 702 F.2d 351, 367 (2d Cir. 1983)). Rather, "to the extent that a category of evidence is irrelevant to [one particular defendant], a limiting instruction will suffice to remove any prejudice." *United States* v. *Bennett*, 485 F. Supp. 2d 508, 515 (S.D.N.Y. 2007); *see also Zafiro*, 506 U.S. at 539; *United States* v. *Ferguson*, 246 F.R.D. 107, 125 (D. Conn. 2007) ("A limiting instruction may adequately reduce the risk of prejudice to a defendant even in cases where evidence is presented against one defendant that would not be admissible in a separate trial of a co-defendant.").

Kelly also speculates that the other defendants could present defenses that conflict with his own, but he offers no concrete discussion of what such defenses might be. (Kelly MTSE 43.) This

abstract concern does not require severance under Rule 14.  Moreover, it is well-established that mutually antagonistic defenses are "not prejudicial per se," *Zafiro*, 506 U.S. at 538, and they support severance only when "acceptance of one party's defense would tend to preclude the acquittal of the other," *Salameh*, 152 F.3d at 116 (quotation marks and brackets omitted).  In other words, "the defenses must conflict to the point of being so irreconcilable as to be mutually exclusive before we will find such prejudice as denies defendants a fair trial."  *United States* v. *Cardascia*, 951 F.2d 474, 484 (2d Cir. 1991).  Kelly falls well short of making such a showing.

Meanwhile, the efficiencies of a joint trial weigh heavily against a Rule 14 severance. "[T]he Court must weigh Defendants' arguments of prejudice against the competing interest in judicial efficiency promoted by a joint trial," and, as is clear from the overlapping facts detailed above, "the efficiency of prosecuting all counts and all Defendants together outweighs the slight possibility of prejudice."  *Aronson*, 1999 WL 97923, at *3.  A joint trial eliminates the inefficiency and burden of having the same witnesses called twice, and the same evidence related to Percoco and Howe presented twice.  This is particularly so because, if Kelly and the Syracuse Defendants were tried separately, Percoco would be a defendant in both cases.  Percoco's willingness to accept bribes from and perform official actions for the severed defendant(s) would almost certainly be admissible under Federal Rule of Evidence 404(b) or otherwise, and there would be no efficiency gained by severance.  *Cf. United States* v. *Dacunto*, No. 00 Cr. 620 (AGS), 2001 WL 13343, at *3 (S.D.N.Y. Jan. 5, 2001) (denying severance on the ground that prejudicial 404(b) evidence would be admitted against a co-defendant).  Accordingly, Percoco, Aiello, Gerardi, and Kelly should be

tried together on the Percoco Scheme.

### 3. All Defendants Are Properly Joined, But Discretionary Severance Is Appropriate Under Rule 14

Contrary to the defendants' arguments, all eight defendants are properly joined because there is a clear and substantial overlap in facts and participants between both the bid rigging and Percoco bribery schemes. However, the Court need not rule on joinder because the Government acknowledges that the defendants and charges should be severed into two trials pursuant to Rule 14 to significantly reduce the risk of spillover prejudice, simplify the logistics and proof of the trials, and decrease the burden of trial preparation on the defendants. As explained in detail below, the least prejudicial and most efficient division is to try the defendants and counts related to the Buffalo Billion Scheme separately from those related to the Percoco Scheme.

Although the Superseding Indictment charges two overlapping schemes, joinder is appropriate because of the substantial identity of facts and participants. As an initial matter, the Syracuse Defendants are involved in both schemes and clearly demonstrate how the schemes interlock: one of the official actions that Percoco took to benefit the Syracuse Developer was to use his position and influence to try to secure the release of millions of dollars earmarked for the construction of a SUNY Poly project awarded to the Syracuse Developer pursuant to the fraudulently obtained Syracuse RFP. (Superseding Indictment ¶ 13, 27, 35(b).) *See Attanasio*, 870 F.2d at 812-13, 815 (finding overlap where, among other things, one Common Defendant participated in both conspiracies). Other facts that straddle both schemes and that the Government would prove at a joint trial include, among other things, the following:

- The history of the Syracuse Developer's purposeful transition from a builder of private strip malls and supermarkets to a developer of high-value State-funded projects (Compl. ¶ 30(a));

- The Syracuse Defendants' concerted efforts to cultivate favor and influence with the Governor's office through campaign donations and the retention of Howe (Compl. ¶ 73);

- Percoco's solicitation of campaign donations from both the Syracuse Defendants and the Buffalo Defendants, and the access and influence gained through donations to the Governor's campaign (Compl. ¶ 73);

- Howe's long-standing relationship with the Governor and his senior staff, including Percoco, the Former Director of State Operations, and the Deputy Director of State Operations, among others (*see* Superseding Indictment ¶ 9; Compl. ¶ 28); and

- Aiello and Gerardi's lies to federal officers regarding both the Buffalo Billion Scheme and the Percoco Scheme during their respective proffers on or about June 21, 2016 (Superseding Indictment ¶ 69; Compl. ¶ 88).

In view of the substantial number of shared facts and participants between the two schemes, Rule 8(b) permits joinder of the eight charged defendants. *Cf. United States* v. *Rittweger*, 259 F. Supp. 2d 275, 284 (S.D.N.Y. 2003) (finding joinder proper where two of five conspirators overlapped, where the schemes occurred at approximately the same time, and where both schemes were efforts to fraudulently induce investment).

Nonetheless, the Court need not decide the propriety of joinder under Rule 8(b) because

the Government concedes that the Superseding Indictment should be severed under Rule 14 into two trials. In particular, the Government requests that the Court order one trial focused on the Buffalo Billion Scheme (involving defendants Kaloyeros, Aiello, Gerardi, Ciminelli, Laipple, and Schuler and Counts One through Five of the Superseding Indictment, along with a false statement count), and a different trial regarding the Percoco Scheme (involving defendants Percoco, Aiello, Gerardi, and Kelly, and Counts Six through Fourteen and a false statement count).[32]

There are several reasons that counsel in favor of two trials. *First*, the two proposed trials would eliminate the risk of spillover prejudice to (1) Kaloyeros, Ciminelli, Laipple, and Schuler with respect to evidence specific to the Percoco Scheme, about which these defendants had no knowledge or awareness, and (2) Percoco and Kelly with respect to evidence specific to the Buffalo Billion Scheme, about which they had no knowledge or awareness. Accordingly, the Government's proposed severance dispels any "serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence," *Harwood*, 998 F.2d at 95 (internal quotation marks omitted), and obviates any need for further severance under Rule 14. As explained above, the limited risk of prejudice associated with each of the two trials can be effectively cured with limiting instructions.

---

[32] If the Court grants a discretionary severance and orders the two trials proposed by the Government, the Government intends to seek a superseding indictment from the grand jury that would split the current Count Fifteen, charging Aiello and Gerardi with false statements, into two counts—namely, one count charging the Syracuse Defendants with making false statements related to the RFP bid rigging scheme, and one count charging them with making false statements related to their bribery of Percoco.

*Second*, severance would result in two relatively simple and streamlined trials. Each trial would present an easy-to-understand corruption scheme: namely, one scheme to rig a competitive bidding process, and one scheme to bribe a high-level State official for official actions. The Government's proposed severance would moot the concerns of Kaloyeros and Kelly that the Superseding Indictment is too complex and contains too many counts. (*See* Kaloyeros MTSE 9-10; Kelly MTSE 38-39, 45.) Neither of the two proposed trials would present "esoteric theories of law and complex business transactions beyond the ken of the ordinary juror." *United States* v. *Moten*, 564 F.2d 620, 627 (2d Cir. 1977). "Indeed, juries in this district and others routinely decide complex cases involving . . . fraud, and [the defendants] ha[ve] made no showing as to why this case is notably more difficult in any respect." *Bennett*, 485 F. Supp. 2d at 515.

Furthermore, the Government's proposed severance would also reduce the expected length of each trial to an "estimate of four . . . weeks for their case-in-chief [for each trial]," which, "even if inaccurate, does not approach the four-month benchmark for severance set by the Second Circuit in [*United States* v. *Casamento*, 887 F.2d 1141, 1152 (2d Cir. 1989)]." *Id.* Meanwhile, the six counts related to the Buffalo Billion Scheme, and the ten counts related to the Percoco Scheme, do not approach the huge number of counts in other cases and thus do not require further severance. *See, e.g.*, *United States* v. *Branker*, 395 F.2d 881, 887-88 (2d Cir. 1968) (requiring severance of certain defendants charged with only a handful of counts out of an *80-count* indictment) (cited by Kelly MTSE 45).

*Third*, and relatedly, the Government's proposed severance also significantly reduces the

burden on the defendants as they prepare for trial. Each defendant has repeatedly complained about the volume of discovery in this case, and the burden of reviewing documents that relate to schemes of which he was not a member. The two proposed trials would permit all the defendants, other than the Syracuse Defendants, to focus on discovery related to either the Buffalo Billion Scheme or the Percoco Scheme.[33] To the extent that the defendants now claim that they cannot identify the relevant discovery, the Government points out that it has previously provided the defendants with, among other things, fully keyword-searchable electronic productions, a detailed and constantly updated discovery index (*see* Gitner Decl. Ex. T), and letter responses to bills of particulars demands that direct each specific defendant to relevant documents (*see* Gov. Ex. A).

In sum, the Government respectfully requests that the Court grant a severance under Rule 14 and order one trial for the six defendants involved in the Buffalo Billion Scheme, and a separate trial for the four defendants involved in the Percoco Scheme.[34]

---

[33] Given the substantial number of overlapping facts between the defendants charged in the Buffalo Billion Scheme, as described above, further severance would not result in additional savings of the defendants' time and resources. The same is true for the defendants charged in the Percoco Scheme.

[34] Separately, several defendants make motions to strike various allegations from the Superseding Indictment as surplusage. (*See* Buffalo Defs.' Surplusage Mot. 1-5; Kelly MTSE 50-59.) These motions depend substantially on their corresponding motions to sever. At a high level, the motions to strike argue that certain allegations are irrelevant, prejudicial, and inflammatory as applied to either the Buffalo Defendants or Kelly because those allegations are relevant only to their co-defendants. If the Court orders severance under Rule 14 as proposed by the Government, we will prepare revised versions of the Superseding Indictment that, in conformance with the Court's order, will divide the counts into two trials and remove and/or redact irrelevant allegations.

## IV.     Motion for Change of Venue

The Buffalo Defendants and Kaloyeros move for dismissal of the charges against them for lack of venue, or, in the alternative, for a change of venue to the United States District Court in the Western District of New York, where the Buffalo Defendants' company—the Buffalo Developer—is headquartered and primarily conducts business.  (*See* Buffalo Defs.' Venue Mot.; Kaloyeros Venue Mot.)  Both motions fail.  First, the Superseding Indictment properly alleges venue in the Southern District of New York, which defeats their motions to dismiss.  Second, the Buffalo Defendants are charged alongside the Syracuse Defendants and Kaloyeros in a single conspiracy to defraud Fort Schuyler.  Their argument that the "center of gravity" for this criminal scheme is Buffalo, New York therefore has no basis in fact or logic.  The motions to dismiss or, in the alternative, transfer venue, should be denied.

### A.     Applicable Law

"The Sixth Amendment to the Constitution provides that the accused in a criminal prosecution has the right to be tried in the 'district wherein the crime shall have been committed.'" *United States* v. *Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1188 (2d Cir. 1989).  At trial, the Government will have the burden of proving by a preponderance of the evidence that venue exists for prosecuting each of the counts in the Superseding Indictment in this District.  *See, e.g.*, *id.*; *United States* v. *Peterson*, 357 F. Supp. 2d 748, 751 (S.D.N.Y. 2005).

The standard, however, is different at this stage of the case.  "Where venue is challenged on a pre-trial motion to dismiss, the Government's burden is limited to showing that the indictment

alleges facts sufficient to support venue." *Peterson*, 357 F. Supp. 2d at 751. It is well established in this District that "[t]he Government need only allege that criminal conduct occurred within the venue, even if phrased broadly and without a specific address or other information, in order to satisfy its burden with regard to pleading venue." *United States* v. *Ohle*, 678 F. Supp. 2d 215, 231 (S.D.N.Y. 2010) (internal quotation marks and citation omitted). Accordingly, "it is sufficient to defeat defendant's venue motion that the indictment alleges in [each count] that the conduct occurred 'in the Southern District of New York and elsewhere.'" *United States* v. *Elcock*, No. 07 Cr. 582 (CM), 2008 WL 123842, at *3 (S.D.N.Y. Jan. 10, 2008); *see also Ohle*, 678 F. Supp. 2d at 231 (same); *United States* v. *Szur*, No. 97 Cr. 108 (JGK), 1998 WL 132942, at *9 (S.D.N.Y. Mar. 20, 1998) (same). "Whether such acts alleged in the Indictment in fact occurred in the Southern District of New York is appropriately left for trial. . . ." *Szur*, 1998 WL 132942, at *9.

"As a general rule a criminal prosecution should be retained in the original district" where the case was charged. *United States* v. *Posner*, 549 F. Supp. 475, 477 (S.D.N.Y. 1982). Discretionary transfers of venue are governed by Federal Rule of Criminal Procedure 21(b), which provides that, "for the convenience of parties and witnesses, and in the interest of justice, the court upon motion of the defendant may transfer the proceeding as to that defendant or any one or more of the counts thereof to another district." Fed. R. Crim. P. 21(b). The "burden is on the moving defendant to justify a transfer under Rule 21(b)." *United States* v. *Spy Factory, Inc.*, 951 F. Supp. 450, 464 (S.D.N.Y. 1997) (quotation marks omitted).

The Supreme Court introduced a list of factors that courts routinely consider in analyzing

a defendant's motion to transfer venue: (1) location of defendant; (2) location of possible witnesses; (3) location of events likely to be in issue; (4) location of documents and records likely to be involved; (5) disruption of defendant's business unless the case is transferred; (6) expense to the parties; (7) location of counsel; (8) relative accessibility of place of trial; (9) docket condition of each district involved; and (10) any other special elements which might affect the transfer. *Id.* at 455 (citing *Platt* v. *Minnesota Mining & Mfg. Co.*, 376 U.S. 240, 244 (1964)). "No one of these considerations is dispositive, and it remains for the court to try to strike a balance and determine which factors are of greatest importance." *United States* v. *Maldonado-Rivera*, 922 F.2d 934, 966 (2d Cir. 1990) (quotation marks and brackets omitted).

**B.  Discussion**

**1.  Venue Is Properly Alleged in the Superseding Indictment**

The Buffalo Defendants move to dismiss Counts One, Four, and Five of the Superseding Indictment for failure to allege venue in this District, and Kaloyeros moves to dismiss Counts One, Two, and Four on the same grounds. Their arguments, however, are easily rejected. At the outset, the Buffalo Defendants and Kaloyeros concede that the contested counts allege that the charged crimes occurred "in the Southern District of New York and elsewhere." (Buffalo Defs.' Venue Mot. 15; Kaloyeros Venue Mot. 5.) This fact alone is fatal to their motion. *See, e.g.*, *Elcock*, 2008 WL 123842, at *3 ("[I]t is sufficient to defeat defendant's venue motion that the indictment alleges in [each count] that the conduct occurred 'in the Southern District of New York and elsewhere.").

The Buffalo Defendants resist this authority and instead contend that this Court should "evaluate whether the alleged facts [in the Superseding Indictment] support the generic statement." (Buffalo Defs.' Venue Mot. 16.) They rely on a slightly different articulation of the standard for assessing a motion to dismiss—namely, that "[p]rior to trial, it suffices for the government to allege with specificity that the charged acts support venue in this district." *United States* v. *Martino*, No. 00 Cr. 389 (RCC), 2000 WL 1843233, at *1 (S.D.N.Y. Dec. 14, 2000) (internal quotation marks omitted). This phraseology notwithstanding, the allegation that the criminal conduct occurred in this District and elsewhere is specific enough to allege venue because, "[a]t the motion to dismiss stage, the allegations in the indictment must be taken as true." *United States* v. *Valencia Rugeles*, No. 04 Cr. 363 (JGK), 2007 WL 1540981, at *1 (S.D.N.Y. May 24, 2007) (citing *United States* v. *Goldberg*, 756 F.2d 949, 950 (2d Cir. 1985)).

In any event, the Superseding Indictment contains numerous other allegations that suffice to establish venue at the pre-trial stage. The Superseding Indictment alleges that, "[i]n the course of, and in furtherance of, the criminal scheme," the Buffalo Defendants, the Syracuse Defendants, Kaloyeros, and Howe, "as well as others, including employees of SUNY Poly and Fort Schuyler, exchanged interstate emails and telephone calls with individuals located in Manhattan, New York," including, among others, the assistant secretary for economic development and employees of ESD. (Superseding Indictment ¶ 26.) Those allegations are incorporated by reference in Counts One, Two, Four, and Five, and show that venue is proper here for each count. First, Counts One and Four charge certain of the defendants, including the Buffalo Defendants, with conspiring to,

106

and committing, wire fraud.  The Second Circuit has expressly held that wire communications made in furtherance of the crime and sent to and/or from the Southern District are sufficient to support venue.  *See, e.g.*, *United States* v. *Kim*, 246 F.3d 186, 191-92 (2d Cir. 2001).  Second, Count Five charges the Buffalo Defendants with paying bribes to Howe in connection with the Buffalo RFP.  The Second Circuit has held in a federal bribery case brought under 18 U.S.C. § 201 that venue was proper in this District where the defendant called individuals in New York seeking bribes.  *See United States* v. *Stephenson*, 895 F.2d 867, 874-75 (2d Cir. 1990).  For all these Counts, the allegations in paragraph 26 of the Superseding Indictment sufficiently allege venue. [35]

The Buffalo Defendants and Kaloyeros complain that the allegations in paragraph 26 do not identify any specific wires.  (Buffalo Defs.' Supp. Venue Mot. 2; Kaloyeros Venue Mot. 5.) They contend that those details are necessary because wires must be sufficiently connected to the offense to serve as a basis for venue.  But this argument confuses what the Government must prove to prevail at trial with the far more limited question of what the indictment must allege to survive a motion to dismiss.  At this stage of the case, "[t]he Government need only allege that criminal conduct occurred within the venue, even if phrased broadly and without a specific address or other information, in order to satisfy its burden with regard to pleading venue."  *Ohle*, 678 F. Supp. 2d at 231 (internal quotation marks omitted).  The Government does not need to *prove* venue with a

---

[35] The Buffalo Defendants incorrectly assert that the allegations in paragraph 26 of the Superseding Indictment are not relevant to the bribery charged in Count Five and cannot be used to show venue.  (Buffalo Defs.' Supp. Venue Mot. 2.)  In fact, Count Five expressly incorporates by reference the allegations in paragraph 26.

preponderance of the evidence until trial. *See, e.g.*, *Szur*, 1998 WL 132942, at *9. More generally, courts have routinely held that an indictment need not allege the particular dates of wires or mailings. *See, e.g.*, *United States* v. *Zandstra*, No. 00 Cr. 209 (RWS), 2000 WL 1368050, at *4 (S.D.N.Y. Sept. 20, 2000) (collecting cases). Therefore, it is not surprising that the cases cited by the Buffalo Defendants in which the courts dissected the wires to analyze the propriety of venue dealt with post-trial challenges. *See United States* v. *Geibel*, 369 F.3d 682, 697 (2d Cir. 2004) (appeal following three-week trial) (cited by Buffalo Defs.' Supp. Venue Mot. 6); *United States* v. *Tzolov*, 642 F.3d 314, 316 (2d Cir. 2011) (appeal following trial) (cited by Buffalo Defs.' Supp. Venue Mot. 6); *United States* v. *Ramirez*, 420 F.3d 134, 137 (2d Cir. 2005) (appeal following trial) (cited by Buffalo Defs.' Supp. Venue Mot. 5). The level of detail demanded by the Buffalo Defendants and Kaloyeros is simply not required to allege venue in an indictment. Accordingly, their motions to dismiss for lack of venue should be denied.

### 2. Discretionary Transfer of Venue Is Not Warranted

The Buffalo Defendants move in the alternative for a discretionary transfer of venue to their home District. That motion should also be denied. As an initial matter, almost all of the Buffalo Defendants' arguments in favor of a Rule 21(b) transfer begin with the faulty premise that the charges against them will be severed and they will be tried on their own. For example, they argue that Buffalo is "their home, their families' home, and the place where they are employed." (Buffalo Defs.' Venue Mot. 23.) But the Government has explained in detail why the Buffalo Defendants should be tried together with the Syracuse Defendants and Kaloyeros—their co-

conspirators in the scheme to defraud Fort Schuyler. *See supra* Part III.B.1. Aiello and Gerardi reside in the Syracuse region and Kaloyeros resides in the Albany area; Buffalo is not their home and is not obviously more convenient for them compared to Manhattan. Accordingly, because the Buffalo Defendants should have a joint trial with the Syracuse Defendants and Kaloyeros, their many assertions about the convenience of Buffalo lose all appeal.[36]

Furthermore, the narrow focus on their own actions leads the Buffalo Defendants to overlook events that were part of their crimes and criminal conspiracy but occurred outside of Buffalo. For example, their assertion that Buffalo is the "nerve center" of the charged criminal conduct completely ignores that, among other things, (1) the victim, Fort Schuyler, was primarily based in Albany; (2) Kaloyeros maintained his offices in Albany; (3) certain events related to the Syracuse RFP took place in Syracuse; (4) wires were exchanged in furtherance of the conspiracy with individuals based in Manhattan, including ESD employees; and (5) Howe was based in Washington, D.C. and traveled frequently throughout New York State. (*Compare* Buffalo Defs.' Venue Mot. 29-32 *with* Superseding Indictment ¶¶ 6-15, 22-27.) Regardless of whether the Buffalo defendants are tried with any of their co-conspirators or other co-defendants, Buffalo is decidedly *not* the "nerve center" of the RFP bid-rigging crimes.

---

[36] Kaloyeros, oddly, joins in the Buffalo Defendants' motion to transfer venue to the Western District of New York. But he does not even try to explain why Buffalo would be a more convenient location for him as compared to Manhattan. (*See* Kaloyeros Venue Mot. 5.)

It follows *a fortiori* that the *Platt* analysis does not support a discretionary transfer to Buffalo. The defendants charged with crimes related to the RFP bid-rigging scheme are located throughout New York State (Factor 1); the events likely to be in issue also occurred throughout the State (Factor 3); the vast bulk of discovery is electronic and accessible anywhere (Factor 4); any savings on expenses for the Buffalo Defendants from a trial in Buffalo would not apply to the Syracuse Defendants, Kaloyeros, or the Government (Factor 6); while Ciminelli, Laipple, and Schuler have counsel in Buffalo, some of Ciminelli's defense lawyers are actually based in New York City, as are counsel for Kaloyeros and Gerardi (Factor 7); "New York is easily accessible by air and other public transport," *United States* v. *Stein*, 429 F. Supp. 2d 633, 645 (S.D.N.Y. 2006) (Factor 8); and "this Court already has scheduled trial in this case, ensuring that defendants will receive ample attention regardless of docket conditions," *id.* at 645-46 (Factor 9). In addition, a discretionary transfer is not necessary to avoid disruption to the Buffalo Defendants' business because, as one of the Buffalo Developer's executives publicly confirmed to the press in or about early February 2017, Ciminelli, Laipple, and Schuler have all resigned their positions at the company (Factor 5). *See* David Robinson, "Louis Ciminelli and two other execs facing charges resign," *The Buffalo News*, Feb. 6, 2017, available online. Finally, although the Buffalo Defendants assert that witnesses will include employees of the Buffalo Developer, they overlook all of the other witnesses, including, for example, directors of Fort Schuyler and ESD employees, who are not based in Buffalo (Factor 2).

The convenience for Ciminelli, Laipple, and Schuler of being in Buffalo is the only *Platt*

factor that even arguably weighs in favor of transfer. Each of the Buffalo Defendants cites a

number of family difficulties that would be alleviated if the trial took place in Buffalo. (*See* Dkt.

Nos. 95, 96, 97, and 262.) However, this solitary factor for transfer—particularly in light of the

difficulties that would be imposed on co-defendants—cannot overcome the weight of all the other

*Platt* factors that counsel against a trial in Buffalo and support keeping the prosecution in the

Southern District, where the case was originally charged. *See, e.g.*, *United States* v. *Wilson*, No.

01 Cr. 53 (DLC), 2001 WL 798018, at *3 (S.D.N.Y. July 13, 2001) (denying a motion to transfer

venue in a case estimated to last six to eight weeks notwithstanding the burden on the defendant's

family). Indeed, the general trend since the 1980's has been for courts to deny motions to transfer

venue that are sought "to mitigate the financial, emotional, or practical burdens of trial in a distant

locale." *United States* v. *Quinn*, 401 F. Supp. 2d 80, 85-86 (D.D.C. 2005) (citing cases and

treatises). "This is hardly surprising when one considers the massive expansion of technology and

the relative decline in costs for long-distance travel over the past few decades." *Id.* at 86.

Based on the foregoing, the Buffalo Defendants' and Kaloyeros's motions to dismiss the

charges against them for lack of venue, or to transfer venue, should be rejected in whole.

## V.     Motions to Suppress Evidence

Kaloyeros moves to suppress all evidence obtained from his personal email account

pursuant to judicially authorized search warrants.[37] (Kaloyeros MTSW.) Kaloyeros contends that the warrants were issued without probable cause, and were overbroad and lacking in particularity. Separately, Ciminelli moves to suppress all evidence obtained from his personal email account pursuant to a judicially authorized search warrant on the ground that the specified time period was overbroad.[38] (*See* Ciminelli Email MTSW.) These motions are meritless. The warrants and their accompanying affidavits properly articulated probable cause to believe that evidence of specific crimes would be found at the specified locations. Furthermore, the warrants clearly described the items to be seized. Consequently, the Court should deny the respective suppression motions of Kaloyeros and Ciminelli.

## A. Relevant Facts

### 1. Email Search Warrant for Kaloyeros and Ciminelli's Personal Accounts

On December 8, 2015, the Honorable Ronald L. Ellis, United States Magistrate Judge for the Southern District of New York, issued a warrant ("Email Warrant-1") pursuant to Rule 41 of the Federal Rules of Criminal Procedure ("Fed. R. Crim. P.") for the search and seizure of the

---

[37] Kaloyeros also challenges the State search warrant that authorized the seizure and search of his cellphone. (Kaloyeros MTSW.) The Government does not intend to rely on the State search warrant to establish the admissibility of any contents of the cellphone, and instead intends to apply for its own search warrant for those materials. Accordingly, Kaloyeros's motion to suppress with respect to the cellphone should be denied as moot.

[38] Ciminelli also moves to suppress certain cellphone location information obtained pursuant to a judicially authorized search warrant. The Government does not intend to introduce such evidence at trial, and therefore the motion is moot.

respective personal email accounts of Kaloyeros (the "Kaloyeros Email Account") and Ciminelli (the "Ciminelli Email Account"; together with the Kaloyeros Email Account, the "Subject Email Accounts") during the time period between in or about December 2012 and the date of the warrant. (*See* Dkt. No. 248 ("Miller SW Decl.") Ex. A.)

The affidavit supporting Email Warrant-1 ("Supporting Affidavit-1"), sworn to by Criminal Investigator Eric J. Blachman of the United States Attorney's Office for the Southern District of New York ("USAO"), set forth facts giving rise to probable cause that the Subject Email Accounts contained evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 666, 1341, 1343, 1346, and 1349, relating to efforts to rig the Buffalo RFP process and defraud Fort Schuyler, ESD, and/or the State of New York (the "Subject Offenses"). In particular, Supporting Affidavit-1 described the following key facts relevant to the motions of Kaloyeros and Ciminelli:

- The FBI and the USAO were investigating Fort Schuyler's award in or around 2014 of taxpayer-funded Buffalo Billion projects to the Buffalo Developer.

- Fort Schuyler applied for the Buffalo Billion funding from ESD.

- Kaloyeros was, among other things, a member of the Fort Schuyler Board.

- On or about September 9, 2013, Kaloyeros used the Kaloyeros Email Account to send a draft of the Buffalo RFP—prior to the RFP being made public—to the Ciminelli Email Account. That draft sought a developer with, among other things, "[o]ver 15 year[s]" of experience. Kaloyeros's email message stated, in part, "obviously, we need to replace Syracuse with Buffalo and fine tune the developer requirements to fit."

- The Government previously had obtained an order pursuant to Section 2703(d) of the Stored Communications Act (the "Section 2703(d) Order") that compelled the email provider to turn over so-called "header" information—i.e., the senders, recipients, and dates of emails, but not the subject lines or message contents—for all the emails in the Subject Email Accounts between in or about July 2013 and October 2015. The results for the Ciminelli Email Account showed very little activity both before and after Ciminelli received the draft Buffalo RFP.

- In or about early October 2013, according to an email obtained from the Buffalo Developer pursuant to a grand jury subpoena, an executive of the Buffalo Developer suggested internally that the company leadership discuss the Buffalo Billion, "[n]ot necessarily to tip our hand to what is currently being worked on w Dr. K but more focused on what we can do to gain better insight on some of the other projects that will spin off of the initiative. Are we connected to the right people, sources."

- The Buffalo RFP was publicly issued in or about mid-October 2013. It required, among other things, a developer with "[o]ver 50 years" of experience.

- According to a media report, the Buffalo Developer apparently was one of the few developers in the Buffalo area with more than 50 years of experience.

- On or about November 1, 2013, a Fort Schuyler employee sent an email to developers who had requested the Buffalo RFP and stated, in part, that the 50 years requirement had been a "typographical error" and, in fact, the requirement was 15 years of experience.

- The internal reactions of executives and employees of the Buffalo Developer to the "typographical error" email included: "Grrrr"; "50 was a bit obnoxious"; "so much for that thought"; and "15 is still pretty good."

- In the middle of the bidding process, in or about November 2013, Ciminelli hosted a party for the Governor in Buffalo and contributed approximately $25,000 to the Governor's campaign.

- In or about January 2014, Fort Schuyler chose the Buffalo Developer as one of the two winners of the RFP, which authorized the award of taxpayer-funded projects to the company. In or about March 2014, the Buffalo Developer in fact was awarded a project.

(Miller SW Decl. Ex. B ¶¶ 8-29.)

Supporting Affidavit-1 contained the following additional information relevant to the defendants' motions, based on Investigator Blachman's training and experience:

- "[E]mployees who engage in criminal activity related to their work and/or business matters will often use their personal email addresses instead of their employer-provided email addresses to communicate about their criminal activity in an effort to conceal those communications."

- "[G]overnment officials who unlawfully manipulate or influence a competitive bidding process for taxpayer-funded contracts to favor or benefit their co-conspirator bidders will often receive some kind of compensation from those co-conspirator bidders."

(Miller SW Decl. Ex. B ¶¶ 31-32.)

### 2. Follow-up Email Search Warrant for Kaloyeros's Personal Account

On March 4, 2016, the Honorable James C. Francis IV, United States Magistrate Judge for the Southern District of New York, issued a warrant ("Email Warrant-2") pursuant to Fed. R. Crim. P. 41 for a follow-up search of the Kaloyeros Email Account during the time period between on or about December 8, 2015 to the date of the warrant. (*See* Miller SW Decl. Ex. C.)

The affidavit supporting Email Warrant-2 ("Supporting Affidavit-2"), sworn to by Investigator Blachman, set forth facts giving rise to probable cause that the Kaloyeros Email Account contained evidence, fruits, and instrumentalities of the same Subject Offenses. In addition to all the key facts set forth in Supporting Affidavit-1, Supporting Affidavit-2 also described the following facts:

- On or about August 21, 2013, after Kaloyeros instructed a Fort Schuyler executive to draft RFPs for Buffalo and Syracuse, Howe advised Kaloyeros that he had "'vitals' for buffalo and Syracuse friends." Kaloyeros replied: "Please gmail not email."

- A few days later, Howe sent Kaloyeros "vitals for buffalo," which consisted of a number of developer qualifications; one of the emails showed that an executive of the Buffalo Developer had suggested a qualification. Howe also sent Kaloyeros an email attaching a list of qualifications for the Syracuse Developer.

- Kaloyeros subsequently complained to Howe in or about early September 2013 that the Buffalo qualifications "are not unique to Lou's company..we need more definite specs, like minimum X years in Y, Z number of projects in high tech, etc, etc."

- The Syracuse Developer was the only company to bid on the Syracuse RFP, and it eventually was awarded a SUNY Poly-related project.

- Howe received payments from the Syracuse Developer in or about 2015.

(Miller SW Decl. Ex. D ¶¶ 26-27, 40-43, 59-61.)  In addition, Supporting Affidavit-2 described yet another scheme involving a SUNY Poly-related procurement to construct student housing on the university's Albany campus (the "Albany RFP").  The facts supported probable cause to believe that Kaloyeros also conspired with the head of a local developer (the "Albany Executive") to rig that competitive procurement process.  (Miller SW Decl. Ex. D ¶¶ 44-57.)

### B.    Applicable Law

In considering a request for a search warrant, "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . , there is a fair probability that contraband or evidence of a crime will be found in a particular place."  *Illinois* v. *Gates*, 462 U.S. 213, 238 (1983).  Such determinations must be approached in a practical way, *id.* at 231-32, because "probable cause is a flexible, common-sense standard," *Texas* v. *Brown*, 460 U.S. 730, 742 (1983).  Additionally, the training and experience of law enforcement agents bear significantly on probable cause determinations. *Gates*, 462 U.S. at 232.  Inferences drawn by law enforcement agents based on facts known to them, the totality of the circumstances, and their training and experience may all support a probable cause finding.  *Id.* at 231-32.

Once a search warrant has issued, the issuing judge's "determination of probable cause

should be paid great deference by reviewing courts." *Id.* at 236 (internal quotation marks omitted).

"[A]fter-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review.' *Id.* Thus, "[a]lthough in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." *United States* v. *Smith*, 9 F.3d 1007, 1012 (2d Cir. 1993) (quoting *United States* v. *Ventresca*, 380 U.S. 102, 109 (1965)).

### 1.     Particularity and Overbreadth

Particularity and overbreadth are distinct legal concepts that both apply to search warrants. With respect to particularity, a warrant must be "sufficiently specific to permit the rational exercise of judgment by the executing officers in selecting what items to seize." *United States* v. *Shi Yan Liu*, 239 F.3d 138, 140 (2d Cir. 2000) (brackets and internal quotation marks omitted). This requirement has three components:

> First, a warrant must identify the specific offense for which the police have established probable cause. Second, a warrant must describe the place to be searched. Third, the warrant must specify the items to be seized by their relation to designated crimes.

*United States* v. *Galpin*, 720 F.3d 436, 445-46 (2d Cir. 2013) (internal citations and quotation marks omitted). With respect to the third prong, it is well established that "[t]he Fourth Amendment does not require that every item or document to be seized be specifically identified in the warrant; generic terms may be used to describe the materials to be seized." *United States* v. *Levy*, No. 11 Cr. 62 (PAC), 2013 WL 664712, at *5 (S.D.N.Y. Feb. 25, 2013), *aff'd*, 803 F.3d 120

(2d Cir. 2015).  Courts have recognized that flexibility in a warrant is particularly important with respect to documentary evidence, which may be difficult to describe with precision in advance compared with physical evidence.  *See, e.g.*, *id.*; *United States* v. *Riley*, 906 F.2d 841, 845 (2d Cir. 1990) ("It is true that a warrant authorizing seizure of records of criminal activity permits officers to examine many papers in a suspect's possession to determine if they are within the described category.  But allowing some latitude in this regard simply recognizes the reality that few people keep documents of their criminal transactions in a folder marked 'drug records.'").  Accordingly, the inclusion in a warrant of an illustrative "list providing examples of the items to be seized, albeit a list modified by the phrase 'including, but not limited to,' offers sufficient guidance to law enforcement officers to pass constitutional muster."  *United States* v. *Lustyik*, 57 F. Supp. 3d 213, 228 (S.D.N.Y. 2014); *see also Riley*, 906 F.2d at 843 (approving a warrant calling for the seizure of "records of the distribution of cocaine . . . including but not limited to, bank records, brokerage house records, business records, [and] safety deposit box keys or records").

The overbreadth doctrine, on the other hand, focuses on whether the "description of the objects to be seized . . . is broader than can be justified by the probable cause upon which the warrant is based."  *Galpin*, 720 F.3d at 446 (internal quotation marks and citation omitted).  "While the particularity analysis concerns whether the warrant enables the executing officer to ascertain and identify with reasonable certainty those items that the magistrate has authorized him to seize, the overbreadth inquiry asks whether the warrant authorized the search and seizure of items as to which there is no probable cause."  *Lustyik*, 57 F. Supp. 3d at 228 (internal quotation marks,

citation, and alteration omitted). A warrant is not overbroad if it only authorizes the Government to seize and search evidence, fruits, and instrumentalities of specific crimes supported by probable cause. *See id.* at 229.

## 2. The Good Faith Exception

The exclusory rule "does not apply to evidence seized 'in objectively reasonable reliance on' a warrant issued by a detached and neutral magistrate judge, even where the warrant is subsequently deemed invalid." *United States* v. *Falso*, 544 F.3d 110, 125 (2d Cir. 2008) (quoting *United States* v. *Leon*, 468 U.S. 897, 922 (1984)). Accordingly, evidence collected pursuant to a search warrant later found defective will be suppressed only if (1) the issuing judge was knowingly misled; (2) the issuing judge wholly abandoned his judicial role; (3) the application was so lacking in indicia of probable cause as to render reliance upon it unreasonable; or (4) the warrant is so facially deficient that reliance upon it is unreasonable. *Id.* The central question is "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Leon*, 468 U.S. at 922 n.23. If the reviewing court finds that the officer's reliance on the warrant was objectively reasonable, suppression is not warranted. *See, e.g.*, *United States* v. *Singh*, 390 F.3d 168, 183 (2d Cir. 2004). Moreover, to trigger the exclusory rule, law enforcement "conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring* v. *United States*, 555 U.S. 135, 144 (2009).

### 3.     Claims of Material Misstatements or Omissions

A search warrant affidavit is presumed reliable.  *See Franks* v. *Delaware*, 438 U.S. 154, 171 (1978); *United States* v. *Klump*, 536 F.3d 113, 119 (2d Cir. 2008).  "The task of a reviewing court is simply to ensure that the 'totality of the circumstances' afforded the [issuing judge] a 'substantial basis' for making the requisite probable cause determination."  *United States* v. *Clark*, 638 F.3d 89, 93 (2d Cir. 2011) (quoting *Gates* 462 U.S. at 238).  "In certain circumstances, however, a defendant may challenge the truthfulness of factual statements made in the affidavit, and thereby undermine the validity of the warrant and the resulting search or seizure," *United States* v. *Awadallah*, 349 F.3d 42, 64 (2d Cir. 2003), though not every statement in a warrant affidavit must be true, *see United States* v. *Canfield*, 212 F.3d 713, 717 (2d Cir. 2000).

In order to successfully challenge the truthfulness of the factual statements in a supporting affidavit, the defendant must demonstrate (1) that there were intentional misstatements or omissions in the search warrant affidavit; and (2) that those misstatements or omissions were material.  *See Awadallah*, 349 F.3d at 64.  The defendant must establish both components—i.e., intent and materiality—by a preponderance of the evidence.  *See Klump*, 536 F.3d at 119.  "The *Franks* standard is a high one."  *Rivera* v. *United States*, 928 F.2d 592, 604 (2d Cir. 1991).

To find that there were intentional misstatements or omissions in the search warrant affidavit, "the reviewing court must be presented with credible and probative evidence that the omission of information . . . was 'designed to mislead' or was 'made in reckless disregard of whether [it] would mislead.'"  *United States* v. *Rajaratnam*, 719 F.3d 139, 154 (2d Cir. 2013)

(quoting *Awadallah*, 349 F.3d at 68).  A misstatement or omission is intentional when "the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth." *Canfield*, 212 F.3d at 717-18.  And "[t]o prove reckless disregard for the truth, the defendant[] must prove that the affiant in fact entertained serious doubts as to the truth of his allegations." *Rajaratnam*, 719 F.3d at 154 (citation and brackets omitted).

"To determine if misrepresentations or omissions are material, a court corrects the errors and then resolves de novo whether the hypothetical corrected affidavit still establishes probable cause." *United States* v. *Lahey*, 967 F. Supp. 2d 698, 711 (S.D.N.Y. 2013).  "If the corrected affidavit supports probable cause, the inaccuracies were not material to the probable cause determination and suppression is inappropriate." *Canfield*, 212 F.3d at 718.  In other words, "[t]he ultimate inquiry is whether, after putting aside erroneous information and material omissions, there remains a residue of independent and lawful information sufficient to support probable cause." *Id.* (internal quotation marks omitted).

### C.    Discussion

#### 1.    The Email Search Warrants Were Supported by Probable Cause

Kaloyeros argues that the Email Warrants were issued without probable cause because the information in the Supporting Affidavits did not establish probable cause that a crime had been committed.  He is wrong.  To the contrary, "given all the circumstances set forth in the affidavit," there was more than a "fair probability that contraband or evidence of a crime" would be found in the Subject Email Accounts.  *Gates*, 462 U.S. at 238.

As set forth above, Supporting Affidavit-1 contained clear evidence establishing probable cause that Kaloyeros had participated in a conspiracy to commit wire fraud, honest services fraud, and/or bribery, and that evidence of those crimes likely would be found in the Kaloyeros Email Account. The Magistrate Judges were presented with the following facts, among others, at the time they approved the Email Warrants: Kaloyeros was a member of the Board of Directors of Fort Schuyler, which issued the Buffalo RFP in or about October 2013 and selected the winners. On or about September 9, 2013, before the public issuance of the Buffalo RFP, Kaloyeros sent an email to Ciminelli, the head of the Buffalo Developer, that attached a draft of the Buffalo RFP. Kaloyeros wrote, in part, that he would "need to replace Syracuse with Buffalo and fine tune the developer requirements to fit." Notably, the draft RFP included a requirement that the developer have 15 years of experience. However, when the Buffalo RFP was issued more than a month later, the experience requirement had been increased to 50 years. The Buffalo Developer was one of the only developers in the region that satisfied that requirement. A Fort Schuyler employee announced a few weeks later that the 50 years had been a typographical error and that the requirement should have been 15 years. Following that change, executives and employees at the Buffalo Developer expressed dismay, with email messages such as "Grrrrr" and "so much for that thought." Meanwhile, Ciminelli held a fundraiser for the Governor's campaign in midst of the RFP selection process, in or about November 2013.

Those facts were more than sufficient to show probable cause that Kaloyeros conspired with Ciminelli to rig the Buffalo RFP by purposefully setting the experience requirement at 50

years, which would favor the Buffalo Developer, thereby defrauding Fort Schuyler, ESD, and/or the State, and, moreover, that evidence of those crimes likely would be located in their personal email accounts. In Supporting Affidavit-1, the investigator explained that, based on his training and experience and his participation in other fraud investigations, public officials engaged in fraud sometimes use their personal email accounts rather than their work emails to conceal their wrongdoing, and they often receive some kind of compensation in exchange for their corrupt actions in rigging a competitive procurement. (Miller SW Decl. Ex. B ¶ 32.) It is axiomatic that the training and experience of law enforcement agents bear significantly on probable cause determinations, and inferences drawn by agents based on facts known to them, the totality of the circumstances, and their training and experience may all support a probable cause finding. *Gates*, 462 U.S. at 231-32. As a result, the sum total of facts and inferences in Supporting Affidavit-1 more than established sufficient probable cause for the Email Warrants to issue.

It necessarily follows that Supporting Affidavit-2 also established probable cause for Email Warrant-2. Supporting Affidavit-2 contained the same facts as Supporting Affidavit-1, but also added content from emails discovered after the execution of Email Warrant-1. Of particular note, on or about August 21, 2013, after Kaloyeros told Howe and a Fort Schuyler executive to create RFPs for Buffalo and Syracuse, Howe wrote separately to Kaloyeros and stated that he had "'vitals' for buffalo and Syracuse friends. I will get to you on Friday when back in office." Kaloyeros responded with: "Please gmail not email." (Miller SW Decl. Ex. D ¶ 26(a)-(b).) A few days later, Howe sent Kaloyeros lists of qualifications for the Syracuse Developer and the Buffalo

Developer. Kaloyeros, however, demanded additional qualifications for the Buffalo Developer because the ones that Howe sent were not "unique" enough. (Miller SW Decl. Ex. D ¶ 26(a).) These emails only bolstered the Government's showing of probable cause that Kaloyeros had conspired to defraud Fort Schuyler, ESD, and/or the State. In addition, Supporting Affidavit-2 also included new facts about Kaloyeros's involvement in rigging the Syracuse RFP and another procurement process connected to SUNY Poly. (Miller SW Decl. Ex. D ¶¶ 40-57.)

Kaloyeros raises several questions about these facts, but none of them undermines the magistrate's finding of probable cause. *First*, Kaloyeros asserts that Supporting Affidavit-1 does not state which "law, regulation, contract, or industry standard" prohibited communications between Kaloyeros and the Buffalo Developer before the RFP's public issuance. (Kaloyeros MTSW 5.) As explained elsewhere in this Opposition, a defendant's commission of federal wire fraud does not depend on the existence of any state laws or regulations. *See supra* Part I.E.2.a.

*Second*, Kaloyeros contends that there is nothing in Supporting Affidavit-1 to suggest that the "typographical error" was not inadvertent. (Kaloyeros MTSW 5.) As an initial matter, Supporting Affidavit-1 did describe an email from a Fort Schuyler employee to multiple developers who had requested the Buffalo RFP that stated, in part, that the 50-year requirement had been a "typographical error" and, in fact, the requirement was 15 years of experience. But, in any event, it is well-established that "[t]he fact that an innocent explanation may be consistent with the facts alleged . . . does not negate probable cause." *United States* v. *Fama*, 758 F.2d 834, 838 (2d Cir. 1985). Moreover, it was clear that the circumstances outlined in Supporting Affidavit-1

all belied an innocent explanation, including, among other things, that Kaloyeros shared the draft RFP with Ciminelli, after which the RFP included a requirement that the winning bidder have more than 50 years of experience (which news reports indicated described the Buffalo Developer), and that Buffalo Developer employees expressed frustration that the 50-year requirement subsequently was removed.

*Third*, Kaloyeros suggests that the 50-year requirement was changed and therefore may not have benefited the Buffalo Developer. (Kaloyeros MTSW 5-6.) However, the crime of conspiracy is complete when the members agreed to commit wire fraud and then took an overt act in furtherance of that agreement. It does not depend on the success of the scheme. *See, e.g.*, *United States* v. *Trapilo*, 130 F.3d 547, 552 n.9 (2d Cir. 1997); *United States* v. *Tutino*, 269 F.2d 488, 491 (2d Cir. 1959).

*Fourth*, Kaloyeros argues that Supporting Affidavit-1 does not identify the conspirators' false statements or the money or property at issue, which are elements of wire fraud. (Kaloyeros MTSW 12.) He is mistaken—Supporting Affidavit-1 clearly describes Kaloyeros and Ciminelli's fraudulent efforts to "fine tune" the Buffalo RFP's requirements to fit the Buffalo Developer, and notes that, as one of the winners of the Buffalo RFP, the Buffalo Developer was entitled to a valuable preferred status that led directly to the award of a $750 million development project. These facts are more than enough to establish probable cause of the commission of wire fraud.

## 2. The Email Warrants Were Not Overbroad

Kaloyeros also contends that the Email Warrants are invalid because they are overbroad in seeking all the emails in the Kaloyeros Email Account within the specified time periods, which necessarily included emails "without any connection to the alleged crimes." (Kaloyeros MTSW 17.) Ciminelli makes a similar argument. He points out that the Section 2703(d) Order provided "header" information for the Ciminelli Email Account from July 2013 through October 16, 2015. (Ciminelli Email MTSW 6-7.) Those results showed that Ciminelli exchanged several emails with Kaloyeros on or about September 9, 2013, but that the two did not correspond again through the end of the time period covered by the Section 2703(d) Order. Ciminelli asserts that the Government should not have been allowed to obtain emails dating back to December 2012, or up through December 2015—even though Supporting Affidavit-1 explained that the Governor announced the Buffalo Billion initiative in December 2012 and the construction of its projects remained ongoing as of December 2015.

These arguments are meritless for several reasons. As an initial matter, "[i]t has long been perfectly appropriate to search the entirety of a premises or object as to which a warrant has issued based on probable cause, for specific evidence as enumerated in the warrant, which is then to be seized." *United States* v. *Ulbricht*, No. 14 Cr. 68 (KBF), 2014 WL 5090039, at *14 (S.D.N.Y. Oct. 10, 2014). This general rule applies with equal force to searches of email accounts. Indeed, in the suppression context, courts have almost uniformly "upheld the Government's ability to obtain the entire contents of the email account to determine which particular emails come within

the search warrant." *In re A Warrant for All Content & Other Info. Associated with the Email Account xxxxxxx@gmail.com Maintained at Premises Controlled By Google, Inc.*, 33 F. Supp. 3d 386, 394 (S.D.N.Y. Aug. 7, 2014) (collecting cases); *see also id.* at 393 ("[W]e view it as well-established that a search warrant can properly permit the Government to obtain access to electronic information for purposes of a search even where the probable cause showing does not apply to the entirety of the electronic information that is disclosed to the Government."). That is what the Government did here. Email Warrant-1 sought the full contents of the Kaloyeros Email Account and the Ciminelli Email Account from the start of the Buffalo Billion initiative through December 2015, at which time the Buffalo Developer was actively constructing the $750 million project awarded to it by Fort Schuyler pursuant to the RFP. Email Warrant-1 made clear that investigators could seize evidence related to the defined "Subject Offenses"—specifically, violations of Title 18, United States Code, Sections 666, 1341, 1343, 1346, and 1349, during the specified time period. (Miller SW Decl. Ex. A at 5.) Therefore, it was proper for investigators to search their accounts for evidence of the Subject Offenses.[39]

What is more, the time period specified in Email Warrant-1 was confined to the possible beginning and continuation of Ciminelli and Kaloyeros's fraudulent scheme. As Ciminelli observes, the subscriber information obtained by the Government pursuant to the Section 2703(d)

---

[39] As a practical matter, the Government must search an entire email account to obtain evidence of the specified subject offenses, as service providers such as Google and Yahoo do not conduct their own searches of email accounts prior to turning over the contents of the accounts to the Government pursuant to a judicially authorized search warrant.

order showed that he opened his personal email account in or about 2008. However, the oldest emails sought by Email Warrant-1 were dated in or about December 2012, when the Buffalo Billion was first announced. The Second Circuit has never required a temporal limitation in a warrant, and courts in this District have, in some cases, rejected overbreadth challenges to warrants that did not include any time frames at all. *See, e.g.*, *United States* v. *Hernandez*, No. 09 Cr. 625 (HB), 2010 WL 26544, at *9 (S.D.N.Y. Jan. 6, 2010); *United States* v. *Levy*, 11 Cr. 62 (PAC), 2013 WL 664712, at *10-11 (S.D.N.Y. Feb. 25, 2013). In contrast, Email Warrant-1 contains a time restriction supported by the time periods discussed in Supporting Affidavit-1, including the fact that Kaloyeros and Ciminelli remained involved in the Buffalo Billion from 2012 to 2015. *Cf. Hernandez*, 2010 WL 26544, at *9 ("[A] time frame is less relevant to a warrant's breadth where the criminal acts are complex and necessarily extend over a significant period of time.").

The returns from the Section 2703(d) Order do not change this analysis. That order only provided "header" information for the Ciminelli Email Account between July 2013 and October 2015, which was several months shorter than the time period set forth in Email Warrant-1. As was entirely appropriate, in obtaining the Email Warrants, the Government sought to determine whether Ciminelli and other potential co-conspirators communicated about the Buffalo RFP over the entire time span of the project. The defendants cite no authority for the proposition that the Government's application for a search warrant must be limited to the same time period covered by a prior Section 2703(d) Order. Furthermore, contrary to Ciminelli's assertion, the absence of emails related to the Subject Offenses is evidence in and of itself. The returns from Email Warrant-

1 show that the Ciminelli Email Account was dormant between December 2012 and September 9, 2013, on which day the account was reactivated and soon thereafter received the draft Buffalo RFP from Kaloyeros.  After that exchange, the Ciminelli Email Account largely went inactive again. That pattern of activity is circumstantial evidence that Ciminelli revived his personal email account for the express purpose of receiving the draft RFP.  In short, there was ample probable cause set forth in Supporting Affidavit-1 to justify the time period searched.

Separately, Ciminelli argues that Email Warrant-1 is overbroad because it also permitted the agents to view all the emails in Ciminelli's Account in the relevant time period in order to determine which ones were evidence of the Subject Offenses and could be seized.  Ciminelli contends that the Government should have limited its request to emails with Kaloyeros because the Government supposedly had "dispositive information showing that Mr. Ciminelli had potentially relevant email communications with one other individual (Mr. Kaloyeros)." (Ciminelli Email MTSW 8.)  But again the Government had no obligation to limit its search to the emails with Kaloyeros that had been previously identified through grand jury subpoena returns and the Section 2703(d) Order.  In granting the Email Warrant-1, Judge Ellis expressly found that investigators had probable cause to search the Ciminelli Email Account for evidence related to co-conspirators other than Kaloyeros, including their "identities and locations" and their email addresses.  (Miller SW Decl. Ex. A at 6.)

The defendants cite *United States* v. *Cioffi*, in which the court found that an email search warrant was overbroad because "[t]he Warrant did not, on its face, limit the items to be seized

from [the defendant's] personal email account to emails containing evidence of the crimes charged in the indictment or, indeed, any crime at all," and did not attach and incorporate the agent's detailed affidavit. 668 F. Supp. 2d 385, 396 (E.D.N.Y. 2009) (cited by Kaloyeros MTSW 18; Ciminelli Email MTSW 8-9). Their reliance on *Cioffi* is inapposite. Unlike the warrants in that case, the Email Warrants here clearly instructed the agents to seize only those emails containing evidence of specific crimes that were enumerated on the face of the Email Warrants. In particular, both warrants authorized law enforcement personnel to "locate any evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 666, 1341, 1343, 1346, and 1349," which were defined as the "Subject Offenses." (*See* Miller SW Decl. Ex. A at 5.) Furthermore, the "warrants were also specific . . . as to what type of evidence should be searched for" and "listed specific categories of items." *Ulbricht*, 2014 WL 5090039, at *14. In particular, Email Warrant-1 instructed law enforcement to look for:

- "Evidence of the commission of the Subject Offenses, including correspondence related to the drafting of the RFP and to the modification of developer requirements contained in the RFP";

- "Evidence of the preparation of the commission of the Subject Offenses, including correspondence related to KALOYEROS's transmission of the draft RFP to LOUIS CIMINELLI prior to the release of the RFP to the public as well as correspondence related to the Buffalo Billion between KALOYEROS and LOUIS CIMINELLI";

131

- "Identities and locations of co-conspirators, including correspondence between KALOYEROS, LOUIS CIMINELLI, and co-conspirators regarding the commission of the Subject Offenses"; and

- "Location of other evidence, including additional email accounts affiliated with KALOYEROS, LOUIS CIMINELLI, and/or co-conspirators used in furtherance of the Subject Offenses."

(*See* Miller SW Decl. Ex. A at 5-6.) Email Warrant-2 included a similar list of evidence of violations of the Subject Offenses. (*See* Miller SW Decl. Ex. C at 5-6.) These instructions provided clear direction to the investigators searching the Kaloyeros Email Account and Ciminelli Email Account of both the offenses alleged to have been committed by Kaloyeros and Ciminelli, and the types of evidence they were authorized to seize.

Finally, Ciminelli faults Email Warrant-1 for not setting out a search protocol similar to the one outlined by the Ninth Circuit in *United States* v. *Comprehensive Drug Testing, Inc.* (*"CDT"*), 579 F.3d 989 (9th Cir. 2009) (en banc). But there is no such requirement in the Second Circuit. *See, e.g.*, *United States* v. *D'Amico*, 734 F. Supp. 2d 321, 365 (S.D.N.Y. 2010) ("The Second Circuit has yet to address in a comprehensive opinion like *CDT* the unique Fourth Amendment issues raised by computer searches. To date, it does not appear that any district court decision in this Circuit has embraced *CDT*."). Supporting Affidavit-1 did identify some of the methods that law enforcement might use to search the email accounts, although the list was not exhaustive. (Miller SW Decl. Ex. B ¶¶ 36-37.) Because that list "at least provided some

information to the magistrate judge about the types of methods the Government contemplated using," it was "far more than the Constitution required" and thus sufficient to uphold Email Warrant-1. *United States* v. *Vilar*, No. 05 Cr. 621 (KMK), 2007 WL 1075041, at *38 (S.D.N.Y. Apr. 4, 2007).

### 3. The Email Warrants Were Relied Upon in Good Faith

Even if the information in the Supporting Affidavits were insufficient to support probable cause, or the items to be seized or time frame as described in the Email Warrants were overbroad—which, for the reasons outlined above, they are not—Kaloyeros's and Ciminelli's respective motions should still be denied because the FBI and USAO investigators relied in good faith on the magistrate judge's determination that the Email Warrants were proper. The defendants' arguments to the contrary are unavailing.

*First*, Kaloyeros argues that the Supporting Affidavits were misleading because the Government did not attach copies of the RFPs. He contends that the RFPs would have "debunk[ed] the Government's probable cause argument" because winning the RFP did not guarantee the Buffalo Developer a development contract. (Kaloyeros MTSW 19-20.) He is wrong. To suppress a warrant on the ground of a material omission, a defendant must show (1) that there were intentional omissions in the search warrant affidavit; and (2) that those omissions were material. *See Awadallah*, 349 F.3d at 64. Kaloyeros fails to satisfy either prong. The Supporting Affidavits did not purposefully omit information about the RFPs. To the contrary, Supporting Affidavit-1, for example, accurately stated that Fort Schuyler issued the RFP to "procure developer services

133

through a competitive public process," and then quoted language from the RFP itself. (Miller SW Decl. Ex. B ¶¶ 14-15.) After the Buffalo Developer was selected as a winner, the Fort Schuyler Board issued a resolution that "authorized awarding [the Buffalo Developer] one or more taxpayer-funded projects set forth in the RFP," which happened in or about March 2013. (Miller SW Decl. Ex. B ¶¶ 23-24.) Because these representations about the RFP were accurate and fair, the Government had no obligation to attach a copy of the RFP.

Furthermore, Kaloyeros is mistaken that any additional minutiae about the RFPs would have been material to the magistrate. As explained above, the crime of conspiring to commit wire fraud was complete when the conspirators agreed to participate in the scheme to deprive Fort Schuyler of its right to control its assets and took at least one overt act in furtherance of that scheme. *See Tutino*, 269 F.2d at 491 ("Final success of the illegal agreement is, of course, not necessary in order to complete the crime of conspiracy, so long as the agreement is shown, and some overt act toward its accomplishment is proved."); *Trapilo*, 130 F.3d at 552 n.9 (same). As a result, it is irrelevant to the probable cause determination whether the Buffalo Developer won the Buffalo RFP (which it did) or received a lucrative construction project (which it also did).

*Second*, Kaloyeros rehashes his arguments that the Supporting Affidavits did not include facts relevant to the elements of the Subject Offenses, and that the Email Warrants were not particular because they authorized the Government to collect the entire Kaloyeros Email Account within the specified time period. As discussed above, these contentions lack merit. Moreover, in view of all the facts set forth in the Supporting Affidavits, those affidavits were not so lacking in

indicia of probable cause as to render reliance upon them unreasonable. *See United States* v. *Raymonda*, 780 F.3d 105, 118 (2d Cir. 2015). Similarly, because the Email Warrants provided a relevant time frame and sufficiently particular categories of evidence of the Subject Offenses, the warrants were not so facially deficient that reliance upon either of them was unreasonable. *See id.* Indeed, the investigators were entitled to rely on the magistrate's finding of probable cause. *See, e.g.*, *United States* v. *Cancelmo*, 64 F.3d 804, 809 (2d Cir. 1995) ("[W]e decline to hold that the agents acted unreasonably in accepting the magistrate's legal conclusion that probable cause existed.").

*Third*, Ciminelli contends that length of the specified time frame rendered Email Warrant-1 facially deficient. (Ciminelli Email MTSW 10-11.) As discussed above, the time periods in Email Warrant-1 corresponded to the start of the Buffalo Billion initiative and continued through the Buffalo Developer's ongoing construction of the project (which it won pursuant to the rigged Buffalo RFP). As a result, it was objectively reasonable for a law enforcement officer not to question that time period. *See Hernandez*, 2010 WL 26544, at *12 ("[T]he fact that the precise relevance of the absence of an express time frame on the particularity and breadth of warrant has yet to be settled in this Circuit . . . supports the idea that agents reasonably relied on the magistrate's authorization and should be protected by the 'good faith' exception."); *United States* v. *Cohan*, 628 F. Supp. 2d 355, 367 (E.D.N.Y. 2009) (same).

Finally, the defendants have not argued—much less demonstrated—that the magistrate wholly abandoned his judicial role. *See Raymonda*, 780 F.3d at 118. Accordingly, "the executing

officers were entitled in good faith to rely on the warrant," and the evidence obtained from the Email Warrants should not be suppressed. *United States* v. *Irving*, 452 F.3d 110, 125 (2d Cir. 2006).

## VI.    Motions for Bills of Particulars

Each defendant moves for an order requiring the Government to provide additional information in the form of a bill of particulars. The defendants are entitled to information sufficient to understand the charges against him, to prepare a defense, and to protect against double jeopardy. The Government has provided such information, and much more, in the Superseding Indictment, the Complaint, extensive discovery with a detailed index, and various voluntary disclosures, including lengthy written responses to 21 written requests for discovery and bills of particulars. The defendants will also have trial exhibits, a witness list, and 3500 material reasonably in advance of trial.[40]   The defendants are not entitled to what they now request, which amounts to nothing more than an improper attempt to obtain a preview of the Government's case and legal theories and to limit the evidence and arguments the Government may use at trial.

### A.    Applicable Law

The proper scope and function of a bill of particulars is to provide sufficient information about the nature of the charge, to enable a defendant to prepare for trial, to avoid unfair surprise,

---

[40] The parties have also initiated discussions regarding a schedule for pre-trial disclosures to include disclosure of Government exhibit lists, witness lists, and 3500 material sufficiently in advance of trial to permit the defendants to be adequately prepared.

and to preclude a second prosecution for the same offense. *See* Fed. R. Crim. P. 7(f); *United States* v. *Torres*, 901 F.2d 205, 234 (2d Cir. 1990), *abrogated on other grounds*, *United States* v. *Marcus*, 628 F.3d 36 (2d Cir. 2010); *United States* v. *Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987). A bill of particulars is required only when the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused. *Torres*, 901 F.2d at 234 (citation omitted); *see also United States* v. *Cephas*, 937 F.2d 816, 823 (2d Cir. 1991); *United States* v. *Panza*, 750 F.2d 1141, 1148 (2d Cir. 1984). In addition, if the information needed to serve those purposes is provided through some other means, a bill of particulars is not necessary. *See Bortnovsky*, 820 F.2d at 574; *United States* v. *Morales*, 280 F. Supp. 2d 262, 274 (S.D.N.Y. 2003); *United States* v. *Sattar*, 314 F. Supp. 2d 279, 318-19 (S.D.N.Y. 2004).

A bill of particulars is not appropriate where the bill is sought to obtain evidentiary detail useful to the defendant but not necessary to apprise him of the charges. *See Torres*, 901 F.2d at 234. "A bill of particulars is not a general investigative tool, a discovery device or a means to compel the government to disclose evidence or witnesses to be offered prior to trial." *United States* v. *Gibson*, 175 F. Supp. 2d 532, 537 (S.D.N.Y. 2001) (citation omitted). The Government is not required to "particularize all of its evidence," *Cephas*, 937 F.2d at 823, to disclose the precise manner in which the crimes charged in the indictment were committed, *see Torres*, 901 F.2d at 233-34, or to provide a preview of the Government's case or legal theory, *see United States* v. *Muyet*, 945 F. Supp. 586, 599 (S.D.N.Y. 1996). *See also United States* v. *Bellomo*, 263 F. Supp. 2d 561, 580 (E.D.N.Y. 2003) ("A bill of particulars is not designed to: obtain the government's

evidence; restrict the government's evidence prior to trial; assist the defendant's investigation; obtain the precise way in which the government intends to prove its case; interpret its evidence for the defendant, or disclose its legal theory."); *United States* v. *Henry*, 861 F. Supp. 1190, 1197 (S.D.N.Y. 1994) ("This instrument should not function to disclose evidence, witnesses, and legal theories to be offered by the Government at trial or as a general investigative tool for the defense."). The ultimate test is whether the information sought is necessary to give notice of the charge against the defendant, not whether it would be helpful to him. *See United States* v. *Trippe*, 171 F. Supp. 2d 230, 240 (S.D.N.Y. 2001); *United States* v. *Conley*, No. 00 Cr. 816, 2002 WL 252766, at *4 (S.D.N.Y. Feb. 21, 2002).

Because "a bill of particulars confines the Government's proof to particulars furnished," it can "restrict unduly the Government's ability to present its case." *Henry*, 861 F. Supp. at 1197; *see also United States* v. *Mahabub*, No. 13 Cr. 908 (AJN), 2014 WL 4243657, at *2 (S.D.N.Y. Aug. 26, 2014) (recognizing that "care must be taken" in deciding whether to order a bill of particulars because "[t]he government's presentation of evidence at trial is limited to the particulars contained in the bill"); *United States* v. *Samsonov*, No. 07 Cr. 1198 (CM), 2009 WL 176721, at *3 (S.D.N.Y. Jan. 23, 2009) ("The vehicle of a bill of particulars serves to inform a defendant of the nature of the charge, when he is otherwise insufficiently informed, and must not be misused to compel disclosure of how much the Government can prove, nor to foreclose the Government from using proof it may develop as the trial approaches."). Moreover, because the Government's provision of particulars is tantamount to an itemized preview of its proof, a bill creates the very

real danger that a defendant will "tailor [his] testimony to explain away the Government's case." *Henry*, 861 F. Supp. at 1197. These concerns animate the rule that "if the defendant has been given adequate notice of the charges against [him] and can prepare fully for trial with reasonably diligent efforts, the Government cannot be required to disclose additional details about its case." *Id.*

Applying these principles, courts routinely deny motions for bills of particulars that are, at bottom, demands for additional details of the manner in which the offense was committed. *See United States* v. *Mitlof*, 165 F. Supp. 2d 558, 569 (S.D.N.Y. 2001) (noting that the Government may not be compelled to provide a bill of particulars disclosing the manner in which it will prove charges, the manner in which defendant committed the crime charged, or a preview of the Government's evidence or legal theories). Courts also "routinely den[y]" demands for bills of particulars setting forth the identities of co-conspirators. *Trippe*, 171 F. Supp. 2d at 240; *see also United States* v. *Bin Laden*, 92 F. Supp. 2d 225, 242 (S.D.N.Y. 2000) ("[R]equests, such as those made by the Defendants here, for particulars as to when, where, how, and with whom each individual defendant joined an alleged conspiracy have 'almost uniformly been denied.'" (citation omitted)); *Torres*, 901 F.2d at 233-34 (demands for "whens" and "wheres" and "by whoms" within charged conspiracy are improper attempts at general pre-trial discovery).

**B.   Discussion**

The defendants' requests for bills of particulars should be denied because the Complaint, the Superseding Indictment, discovery produced to date, and additional information provided by

the Government are far more than sufficient to put the defendants on notice of the nature and specifics of the crimes of which they are accused and to permit them to adequately prepare their defenses. *See, e.g.*, *Bortnovsky*, 820 F.2d at 574. The Superseding Indictment contains 18 pages of factual support for the charges, and that detail is supplemented by a 79-page complaint that documents the criminal conduct, replete with citations to specific documents produced in discovery and references to statements made by Howe and other witnesses to the Government. The defendants make no serious argument that they have not been apprised of the charges against them, *see Torres*, 901 F.2d at 234, nor could they—the Superseding Indictment and Complaint explain in depth the nature of the conspiracies to defraud Fort Schuyler, to bribe Howe in exchange for official action relating to the RFPs, to bribe Percoco in exchange for official action on behalf of the Energy Company, and to bribe Percoco in exchange for official action on behalf of the Syracuse Developer. *See supra* Background Part I, Argument Part I.

The principal argument advanced by the defendants is that the Government must provide ever more information because the scope of discovery in the case renders preparation for trial difficult. (*See* Percoco BOP Mot. 15-17; Kaloyeros BOP Mot. 14-15; Kelly Disc. Mot. 8-10, 13; Syracuse Defs.' Mot. 12-13.) However, the quantity of discovery only warrants a bill of particulars "if it obfuscates the allegedly unlawful conduct and unfairly inhibits the defendant's preparation for trial," *United States* v. *Mahaffy*, 446 F. Supp. 2d 115, 120 (E.D.N.Y. 2006); *see also Bortnovsky*, 820 F.2d at 574-75. Nothing could be further from the facts here.

Over the nine months since this case was charged, the Government has provided significant

guidance to help the defendants sort and understand the evidence and effectively prepare for trial, and no bill of particulars is warranted. First and foremost, as described above, the charging instruments in this case themselves provide a roadmap to the defendants, both to understand the nature and circumstances of the charged conduct, but also to search and review the discovery. *See, e.g.*, *United States* v. *Mandell*, 710 F. Supp. 2d 368, 385 (S.D.N.Y. 2010) (denying request for particularization of alleged misrepresentations where the indictment was 34 pages long and Government had provided voluminous, organized discovery); *Trippe*, 171 F. Supp. 2d at 240 (no bill of particulars required where defendant had benefit of 15-page indictment and discovery). The Complaint in particular provides specific reference to documents and statements that allows the defendants to make use of the documents disclosed in discovery, which were produced with metadata and in searchable format. The Complaint provides specific dates for particular communications and actions, permitting the defendants to sort and prioritize discovery, and describes the subject matter and entities involved so that the defendants can make use of the extensive discovery index provided by the Government to focus on relevant custodians.

Furthermore, the Government has responded in writing to each of the defendants' 21 letters making various discovery requests. (*See* Gov. Ex. A.) In the Government's letters, the Government identified specific documents and disclosed particular witness statements in response to defense requests. The Government also responded to each request for particulars. Although, as set forth above, no additional particulars were warranted, the Government directed the defendants to portions of the Complaint and Indictments that provided the detail requested by the defendants.

The Government also directed the defendants to the documents of particular custodians, identified by Bates range, that the Government believed provided the factual detail requested by the defendants and should be prioritized in the defendants' review. These categories—while undoubtedly still large—constituted only a subset of the documents produced in discovery and, as noted, were linked to specific requests for factual detail. For these reasons, there is no basis to conclude that the discovery in this case "obfuscates the allegedly unlawful conduct and unfairly inhibits the defendants' preparation for trial," *Mahaffy*, 446 F. Supp. 2d at 120.

The cases cited by the defendants are easily distinguishable. For example, in *Bortnovsky*, the Government failed to identify the false burglaries and false claims that formed the basis of the charges up to and through trial, leaving defense counsel "unguided as to which documents would be proven falsified or which of some fifteen burglaries would be demonstrated to be staged," despite the fact that defense counsel had only four days to prepare for trial. 820 F.2d at 574-75. Here, the Government has been transparent about the nature and circumstances of the charges from the moment the Complaint was unsealed, and has provided extensive guidance to assist with review of discovery. This case is instead analogous to circumstances where judges have declined to require a bill of particulars. *See, e.g.*, *United States* v. *Skelos*, No. 15 Cr. 317 (KMW), 2015 WL 6159326, at *13 (S.D.N.Y. Oct. 20, 2015) (denying request for bill of particulars because "the Government here has done more than merely produce 'mountains of documents'; instead, the Government has provided the information in an organized and comprehensible fashion"); *Mahaffy*, 446 F. Supp. 2d at 120 (no bill of particulars required where "[t]he Indictment fairly specifies the

allegedly unlawful conduct, and the Government has not dissembled by means of its discovery"); *United States* v. *Chalmers*, 410 F. Supp. 2d 278, 285 (S.D.N.Y. 2006) (no bill of particulars required where the Government produced discovery and provided "roadmaps").

Furthermore, there is no valid justification for the specific requests set forth in the defendants' briefs. In support of their requests for a list of all un-indicted co-conspirators, the defendants rely on *United States* v. *Nachamie*, 91 F. Supp. 2d 565 (S.D.N.Y. 2000), in which former District Judge Shira Scheindlin ordered the Government to file a bill of particulars in an eight-defendant health care fraud case in which the Indictment and discovery did little to identify the roles of each of the eight defendants or the conduct giving rise to the charges. (*See* Percoco BOP Mot. 9-15; Kelly Disc. Mot. 22-24; Kaloyeros BOP Mot. 8-10; Syracuse Defs.' Mot. 22-24.) *Nachamie* is readily distinguishable on its facts. There, Judge Scheindlin found that the Indictment contained few, if any, specific allegations as to the roles played by each of the eight named defendants, all of whom were accused of conspiring to submit Medicaid claims that were alleged to be false in at least five different ways. *Id.* at 571-73. Finding that the Indictment and discovery materials thus gave each defendant little ability to understand his role in or connection to the charged conspiracy—or to other participants in the conspiracy—Judge Scheindlin concluded that the Government needed to provide further detail about the nature of the charges against the defendants, including the identities of unindicted co-conspirators relevant to each of the eight defendants. *Id.* at 571-73. This case presents an entirely different picture: the particulars of the conduct giving rise to the charges are pled with specificity amplified by detailed and extensive

discovery. And although there also may be eight defendants in this case, that is where the similarities between the cases ends. Here, the roles of the defendants and Howe are described in detail in the Complaint and Superseding Indictment, which make plain which subset of defendants were co-conspirators in each scheme.

Under these circumstances, courts routinely deny blanket requests for the identities of all co-conspirators. *See, e.g.*, *Rittweger*, 259 F. Supp. 2d at 292 (concluding, in thirteen-count, multi-defendant securities fraud case that the indictment and discovery were sufficient and "[t]here is no need to provide a list of all unindicted co-conspirators"); *United States* v. *Amendolara*, No. 01 Cr. 694 (DAB), 2002 WL 31368279, at *5-6 (S.D.N.Y. Oct. 21, 2002) (citing the *Nachamie* factors before denying a request for the identities of all unindicted co-conspirators because "the Indictment and discovery material already provided to Defendant Anello by the Government sufficiently facilitate his ability to avoid surprise and prepare for trial"); *Trippe*, 171 F. Supp. 2d at 240 (denying a bill of particulars seeking names of all co-conspirators and aiders and/or abettors in securities and mail fraud case in light of sufficiency of information contained in the Indictment and through discovery) (collecting cases); *United States* v. *Rodriguez*, No. 99 Cr. 367 (DLC), 1999 WL 820558, at *2 (S.D.N.Y. Oct. 13, 1999) (denying motion for a bill of particulars identifying known co-conspirators where the Indictment coupled with discovery allowed a defendant "both to prepare his defense and to avoid prejudicial surprise at trial"); *see generally United States* v. *Wedd*, No. 15 Cr. 616 (KBF), 2016 WL 1055737, at *4 (S.D.N.Y. Mar. 10, 2016) (denying motion for bill of particulars and contrasting *Nachamie* because "here the underlying fraud is . . . adequately

described in the Indictment to prevent prejudicial surprise").[41]

As to the defendants' specific requests for additional particulars about the Government's case above and beyond that already provided, the defendants make no showing that such additional information is "necessary" in order to prepare for trial.[42]  Instead, these requests are transparent attempts to preview the Government's case and unduly restrict the Government's evidence and arguments at trial.[43]  *See, e.g.*, *Bellomo*, 263 F. Supp. 2d at 580; *Henry*, 861 F. Supp. at 1197.

---

[41] The defendants put heavy emphasis on the "factors" set forth in *Nachamie* and applied with respect to the request in that case for the identities of co-conspirators.  However, as *Nachamie* itself makes clear, those "factors" are only one method of evaluating the same standard set forth herein, namely whether "the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused."  *United States* v. *Walsh*, 194 F.3d 37, 47 (2d Cir. 1999).  As discussed above, thus, applying those "factors" here does not in any way alter calculus because here, unlike in *Nachamie*, the Government has "otherwise . . . provided adequate notice of the particulars."  *Nachamie*, 91 F. Supp. 2d at 572.

[42] For example, the Syracuse Defendants seek additional information regarding the statements that the Government alleges are false in Count Fifteen, contending, apparently, that the information already provided is too vague for them to understand the nature of the charge, to enable them to prepare for trial, and to avoid unfair surprise.  (*See* Syracuse Defs.' Mot. 24-27.)  In fact, the Superseding Indictment specifies the place, time, and subject matter of the false statements (Superseding Indictment ¶ 69) and the Complaint contains a paragraph and three separate subparagraphs across two single-spaced pages setting forth specific statements made by Aiello and Gerardi that are false (Compl. ¶ 88).  The Government also has produced in discovery both reports and original notes memorializing the statements made by Aiello and Gerardi.  Further detail is not necessary.  *Torres*, 901 F.2d at 234.

[43] As for the defendants' request for the Government to specify the wire transmissions upon which it intends to rely at trial, this request is premature and, accordingly, would "unduly restrict the government's ability to present its case," *United States* v. *Booth*, No. 99 Cr. 378 (LBS), 1999 WL 1192317, at *8 (S.D.N.Y. Dec. 14, 1999); *see also Chalmers*, 410 F. Supp. 2d at 285 (denying motion for disclosure of all wire transmissions to be relied on at trial because "given the volume of documents in this case, it would be premature to require the Government to limit itself now to the specified acts of the Superseding Indictment or any additional acts it might be able to specify

Indeed, many of the requests are so vague that they cannot be interpreted as anything other than an attempt to require the Government to provide a description of its case-in-chief and its legal theories. (*See, e.g.*, Kaloyeros BOP Mot. 3 (requesting that the Government "[i]dentify with particularity the basis of the allegation that Howe and Dr. Kaloyeros 'devised a plan to secretly rig' the bidding process"); *id.* at 4 (requesting that the Government "[i]dentify with particularity the basis for the allegation that Howe and Dr. Kaloyeros pre-selected the Syracuse Developer and the Buffalo Developer"); Buffalo Defs.' BOP Mot. 68 ("With respect to Count One, the Court should order the government to specify the alleged scheme or artifice to defraud, including: (a) information concerning the means and method of the scheme . . . ."); *id.* ("Regarding the bribery charge, the Court should order the government to provide: (1) information relating to Howe's status as an agent of a governmental organization . . . .").) In other instances, the defendants actually argue that the Government should provide particulars so that the defense can preview the Government's case, or in order to limit the Government's ability to introduce evidence at trial. (*See, e.g.*, Syracuse Defs.' Mot. 18 (seeking information regarding the alleged official acts in order to "give[] Defendants and the Court a chance to determine the alleged basis on which any

---

in a bill of particulars"). As the Government has already represented to the defendants in its correspondence (*see* Gov. Ex. A), the Government will disclose a list of wire transmissions upon which it intends to rely sufficiently in advance of trial. *See Chalmers*, 410 F. Supp. 2d at 286 (denying motion for bill of particulars but ordering the Government "to identify, thirty days before the start of trial, . . . any allegedly unlawful transmissions and transactions, not already identified in the Superseding Indictment, that it will seek to prove at trial"); *cf. United States* v. *Silver*, 117 F. Supp. 3d 461, 471 (S.D.N.Y. 2015) (ordering Government either to identify wire transmissions to be relied on at trial or explain why it should not so identify two and a half months prior to trial).

conviction must rest in this case"); Kelly Disc. Mot. 16 (seeking information regarding the alleged official acts "[b]ecause the Government is not bound by its informal response at trial").) Of course, neither of these are valid purposes for a bill of particulars. *See, e.g.*, *Samsonov*, 2009 WL 176721, at *3 ("The vehicle of a bill of particulars . . . must not be misused to compel disclosure of how much the Government can prove, nor to foreclose the Government from using proof it may develop as the trial approaches."); *Mitlof*, 165 F. Supp. 2d at 569 (noting that Government may not be compelled to provide bill of particulars disclosing manner in which it will prove charges, manner in which defendant committed the crime charged, or a preview of Government's evidence or legal theories).

Accordingly, the motions for bills of particulars should be denied.

## VII. Motions to Compel Disclosure of *Brady* Material

The defendants move for an order requiring the Government to turn over various categories of witness statements on the theory that those statements are exculpatory under the rule set forth in *Brady* v. *Maryland*, 373 U.S. 83 (1963), and its progeny. These motions are little more than a thinly-veiled attempt to gain early access to material covered by the Jencks Act, 18 U.S.C. § 3500, and should be denied.

First and most critically, as the Government has repeatedly told defense counsel in response to their numerous discovery letters, the Government recognizes its obligations under *Brady*, and is unaware of any *Brady* material at this time. Should the Government become aware of *Brady* material, it will promptly produce it. As a result, the defendants' requests for an order pertaining

to the disclosure of *Brady* material should be denied, consistent with the well-established practice in this District in such circumstances. *See, e.g.*, *United States* v. *Ikoli*, No. 16 Cr. 148 (AJN), 2017 WL 396681, at *3 (S.D.N.Y. Jan. 26, 2017) (denying motion to compel where "the Government represents that it recognizes its obligations under *Brady*, and that while the Government is not aware of any *Brady* material, should the Government become aware of any, it will produce it promptly" (internal quotation marks and alterations omitted)); *United States* v. *Gallo*, No. 98 Cr. 338 (JGK), 1999 WL 9848, at *8 (S.D.N.Y. Jan. 11, 1999) (denying defendant's motion to compel production of *Brady* material based on Government's representations that "it is aware of its obligations under *Brady* . . . and will produce any *Brady* material to the defense well before trial"); *United States* v. *Yu*, No. 97 Cr. 102 (SJ), 1998 WL 57079, at *4-5 (E.D.N.Y. Feb. 5, 1998) (denying defense request that Government provide early disclosure of *Brady* material because Government acknowledged its continuing obligation to provide exculpatory material upon its discovery and assured that it would comply with that obligation); *United States* v. *Perez*, 940 F. Supp. 540, 553 (S.D.N.Y. 1996) (same).

Further, as discussed below, none of the items specifically requested by the defendants fall under *Brady*.

## A.    Applicable Law

The government has a "constitutional duty to disclose evidence favorable to an accused when such evidence is material to guilt or punishment." *United States* v. *Coppa*, 267 F.3d 132, 135 (2d Cir. 2001). "[A] prosecutor must disclose evidence if, without such disclosure, a

reasonable probability will exist that an outcome of a trial in which the evidence had been disclosed would have been different." *Id.* at 142. "The rationale underlying *Brady* is not to supply a defendant with all the evidence in the Government's possession which might conceivably assist the preparation of his defense, but to assure that the defendant will not be denied access to exculpatory evidence only known to the Government." *United States* v. *LeRoy*, 687 F.2d 610, 619 (2d Cir. 1982). The scope of the government's *Brady* obligation does not extend to "investigative files merely because they contain information which could assist the defendant." *United States* v. *Reddy*, 190 F. Supp. 2d 558, 575 (S.D.N.Y. 2002). The government is not required to disclose exculpatory, material evidence if the defendant knows or should have known of "the essential facts permitting him to take advantage of any exculpatory evidence." *Id.* (citing *United States* v. *Zackson*, 6 F.3d 911, 918 (2d Cir. 1993)).

The Second Circuit has often "reiterate[d] the longstanding constitutional principle that as long as a defendant possesses *Brady* evidence in time for its effective use, the government has not deprived the defendant of due process of law simply because it did not produce the evidence sooner." *Coppa*, 267 F.3d at 144; *United States* v. *Conyers*, No. 15 Cr. 537 (VEC), 2016 WL 7189850, at *8 (S.D.N.Y. Dec. 9, 2016) ("The Government satisfies its burden under *Brady* and *Giglio* so long as it turns over information in time for its 'effective use at trial.'" (quoting *Coppa*, 267 F.3d at 146)); *see also United States* v. *Nixon*, 418 U.S. 683, 701 (1974) ("Generally, the need for evidence to impeach witnesses is insufficient to require its production in advance of trial."); *United States* v. *Velasquez*, No. 96 Cr. 126 (JFK), 1997 WL 414132, at *6 (S.D.N.Y. July 23,

1997) ("'[I]mpeachment' information is properly disclosed when the witness is called to testify at trial.").

### B.    Kelly and Percoco's *Brady* Requests

Kelly contends that three categories of materials fall under *Brady*'s rule and should be disclosed: "(1) material tending to show that Howe altered the content of documents that were sent to Mr. Kelly and did so for the purpose of deceiving Mr. Kelly; (2) material tending to show that Mr. Kelly believed or was told that the Energy Company's hiring of Percoco's wife had been authorized by an ethics opinion; and (3) material tending to show that the State officials whom Percoco allegedly pressured or advised to take official action—including those identified by title in the Complaint—did not perceive Percoco to be pressuring or advising them at all." (Kelly Disc. Mot. 27.) Percoco joins in Kelly's final request. (*See* Percoco *Brady* Mot. 4-5.) These requests should be denied.

### 1.    Altered Emails

Kelly requests materials relating to Howe's alterations of certain emails, as referenced in the Complaint. As an initial matter, none of these alterations, which did little more than change the tone of emails to convey greater enthusiasm or to edit out unflattering nicknames, does anything to undermine the fact that Kelly knowingly and willfully entered into a conspiracy to bribe Percoco. For example, as described in the Complaint, on or about October 8, 2013, Howe wrote the following in an email to Percoco:

> Herb – spoke to [the NYPA President] this morning about 'operation fat man'. He says you need to get Herbert focussed [sic] so he calls

> a meeting with all involved to coordinate otherwise those psc folks
> will be off the reservation.  Seems like [the NYPA President] feels
> it should be done soon as this issue goes public mid-week next week.
> Will let you handle as you know best how to move forward.

(Compl. ¶ 51(b).)  When Howe forwarded this chain to Kelly, he changed "operation fat man" to

"[Energy Company]" and "ok. Thanks" to "Ok. on it now. thanks."  (Compl. ¶ 51(b) n.6.)  As

noted in the Complaint, "Howe has acknowledged that he revised this email and certain others

before forwarding, and explained that he did so in part to emphasize that [Percoco] was advocating

for the Energy Company, as [Percoco] had promised to do."  (Compl. ¶ 51(b) n.6.)  The altered

emails therefore constitute, at most, impeachment material under *Giglio* v. *United States*, 405 U.S.

150, 154 (1972), which the Government is only required to produce in advance of trial.  *See, e.g.*,

*United States* v. *Trippe*, 171 F. Supp. 2d 230, 237 (S.D.N.Y. 2001) ("The usual practice in this

district is that the Government agrees to make impeachment information available to the defense

at the same time as Jencks Act material . . . .").

Particularly in light of the facts that the Government has produced all of Howe's emails in

its possession and has identified them in a discovery index, nothing further would be required even

if the emails did constitute *Brady* material.  *See*, *e.g., United States* v. *Healey*, 860 F. Supp. 2d

262, 269 (S.D.N.Y. 2012) ("In the *Brady* context, the Government is under no duty to direct a

defendant to exculpatory evidence within a larger mass of disclosed evidence, even when that

larger mass is enormous . . . ." (internal quotations marks and citation omitted)); *United States* v.

*Rubin/Chambers, Dunhill Ins. Servs.*, 825 F. Supp. 2d 451, 454 (S.D.N.Y. 2011) ("The

Government is under no general obligation to sort or organize *Brady* material disclosed to

defendants." (citation omitted)); *United States* v. *Ohle*, No. 08 Cr. 1109 (JSR), 2011 WL 651849, at *4 (S.D.N.Y. Feb. 7, 2011) (While "the Government may not properly conceal exculpatory evidence from a defendant, [the rule] does not place any burden upon the Government to conduct a defendant's investigation or assist in the presentation of the defense's case." (quoting *United States* v. *Marrero*, 904 F.2d 251, 261 (5th Cir. 1990))).

Nevertheless, as Kelly notes (*see* Kelly Disc. Mot. 33-34), the Government has already voluntarily disclosed, in an abundance of caution and to assist in the defendants' trial preparation, information regarding the other instances of such alterations of which the Government is currently aware. (*See* Gitner Decl. Ex. H at 2; Ex. I at 7-9.) Accordingly, Kelly's motion to compel with respect to emails altered by Howe should be denied. *See United States* v. *Wedd*, 15 Cr. 616 (KBF), 2016 WL 1055737, at *4 (S.D.N.Y. Mar. 10, 2016) (denying motion to compel where the Government had already provided the requested information by letter).

### 2. Ethics Opinion

Kelly requests that the Court compel the Government to produce evidence tending to show that Kelly had obtained from the Governor's Office an ethics opinion endorsing the hiring of Percoco's wife by the Energy Company. (Kelly Disc. Mot. 35-36.) As an initial matter, even if such a document existed and were not merely a fiction invented by Kelly to cover his wrongdoing, it would not render Kelly innocent of violating federal criminal laws relating to bribery. But even assuming that such a document would in some manner undermine the Government's case and constitute *Brady* material, there would still be no basis for a motion to compel. The Government

has already disclosed the information it has identified regarding the purported existence of an ethics opinion, going so far as to disclose witness statements that merely relate the fact that Kelly told other people that such a document exists. (*See* Gitner Decl. Ex. O at 5; Ex. R at 1-2.) For this reason, Kelly's motion to compel with respect to a supposed ethics opinion should be denied. *Ikoli*, 2017 WL 396681, at *3; *Wedd*, 2016 WL 1055737, at *4.

### 3.     Other State Officials

Kelly and Percoco seek to compel the Government to produce "any evidence tending to show that when Percoco spoke with other officials (particularly those who had decision-making authority with respect to the ECA or the PPA) about the Energy Company, he did *not* pressure or advise them to take official action favorable to the Energy Company." (Kelly. Disc. Mot. 37; Percoco *Brady* Mot. 3-5.) In their view, "any evidence tending to show that any of the State officials relevant to the issues in this case—particularly those State officials identified by title in the Complaint as being the subjects of Percoco's pressure or advice—denied being pressured or advised by Percoco, or made statements inconsistent with the pressure or advice alleged" falls within the rule set forth in *Brady*. (Kelly Disc. Mot. 38-39.)

To the extent that Kelly and Percoco seek statements by individuals other than those whom the Government contends were asked, advised, or pressured by Percoco to take official action, such statements not only do not constitute *Brady* material, they are irrelevant to the charges against Percoco. Evidence of instances in which Percoco did not perform or cause others to perform an official act do not tend to negate either Percoco's or Kelly's guilt. *See United States* v. *Scarpa*,

897 F.2d 63, 70 (2d Cir. 1990) ("A defendant may not seek to establish his innocence . . . through proof of the absence of criminal acts on specific occasions."); *see also United States* v. *Williams*, 205 F.3d 23, 34 (2d Cir. 2000) (evidence that the defendant did not engage in drug activity during particular trips to Jamaica not relevant to whether defendant engaged in drug activity on other trips to Jamaica. Thus, the fact that Percoco may not have made a request of some particular individual "who had decision-making authority with respect to the ECA or the PPA" (Kelly. Disc. Mot. 37) or who is "relevant to the issues in this case" (Kelly Disc. Mot. 38) has no bearing on whether Percoco did make such a request of another individual and is not exculpatory.

To the extent that Kelly and Percoco now request disclosure of statements by individuals whom the Government contends were asked, advised, or pressured by Percoco in which those individuals deny being asked, advised, or pressured, the Government is not aware of any such statements and will promptly produce such statements of which it does become aware. Accordingly, Kelly and Percoco's motions to compel with respect to "other officials" should be denied. *Ikoli*, 2017 WL 396681, at *3; *Wedd*, 2016 WL 1055737, at *4.

### C. Kaloyeros and the Buffalo Defendants' *Brady* Requests

Kaloyeros, joined by Ciminelli, Laipple, and Schuler, claims that "[e]xtraordinary relief is necessary" with respect to *Brady*. (Kaloyeros *Brady* Mot. 3.) Because Kaloyeros believes that the Government has not provided enough exculpatory evidence, he argues that

> [t]he Court should order the Government to: (1) immediately articulate exactly what criteria it is using to identify *Brady* material in the context of this Indictment, (2) produce all statements by witnesses or their attorneys; (3) memorialize and produce any

154

> unrecorded statements, including those from witnesses' attorneys; and (4) detail (a) its communications with counsel and witnesses, (b) whether those communications were recorded, and (c) its practices related to the memorialization of potential *Brady* material, including from attorney proffers.

(Kaloyeros *Brady* Mot. 3.)  Kaloyeros has identified no statute, precedent, rule, or other authority that would justify such an order.  In fact, the Jencks Act prohibits what Kaloyeros requests: "[i]n any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpena, discovery, or inspection until said witness has testified on direct examination in the trial of the case." 18 U.S.C. § 3500.  The Second Circuit has made clear that the "Jencks Act prohibits a District Court from ordering the pretrial disclosure of witness statements," including "those witness statements that, although they might indeed contain impeachment evidence, do not rise to the level of materiality prescribed by *Agurs* and *Bagley* for mandated production."[44]  *Coppa*, 267 F.3d at 145-46.  For this reason alone, Kaloyeros's request for an "extraordinary remedy" should be denied.

The purported factual basis for this request is similarly unfounded.  Kaloyeros contends

---

[44] Kaloyeros strangely claims that his proposed order would "allow an assessment of whether further discovery regarding undisclosed *Brady* material is necessary."  (Kaloyeros *Brady* Mot. 4.)  Given that Kaloyeros's proposal would require the Government not only to disclose all witness statements and attorney proffers but also to somehow memorialize any previously unrecorded witness statements and generate a report of all of the Government's communications with any attorney or witness, it is not entirely clear what *further* discovery Kaloyeros has in mind.

that such an order is justified for three reasons. *First*, Kaloyeros asserts that the Government has not produced to him statements made by Aiello and Gerardi during their proffer sessions with the Government in which Aiello and Gerardi denied certain allegations.[45] (*See* Compl. ¶ 88; Superseding Indictment ¶ 69.) Although Kaloyeros is well aware of these falsely exculpatory statements, the substance of which is set forth in the Complaint and Superseding Indictment, the Government will produce their statements to Kaloyeros and other defendants promptly.[46] *See also LeRoy*, 687 F.2d at 619 ("The rationale underlying *Brady* is not to supply a defendant with all the evidence in the Government's possession which might conceivably assist the preparation of his defense, but to assure that the defendant will not be denied access to exculpatory evidence only known to the Government."). There is therefore no arguable *Brady* violation with respect to these materials. *See Conyers*, 2016 WL 7189850, at *8 ("The Government satisfies its burden under *Brady* and *Giglio* so long as it turns over information in time for its 'effective use at trial.'" (quoting *Coppa*, 267 F.3d at 146)).

*Second*, Kaloyeros opines that "[i]t is not plausible that Howe's interviews lack additional exculpatory material." (Kaloyeros *Brady* Mot. 8.) Kaloyeros's support for this inference is that, somehow, because all defendants other than Kaloyeros were charged with bribery and the charging instruments do not contain any allegation specifying Kaloyeros's knowledge of bribes paid to

---

[45] The Government has previously produced Aiello and Gerardi's statements to Aiello and Gerardi.

[46] The Government also will produce notes of any attorney proffers of the defendants.

Howe, Howe must have told the Government that Kaloyeros "(1) did not accept or pay any bribes; and (2) was unaware of any bribery of Howe." (Kaloyeros *Brady* Mot. 8.) It is left to the imagination how the conclusion flows from the premise. Even if Howe had made these comments, they would not be exculpatory for the very reason Kaloyeros identifies in his briefing: Kaloyeros is not charged with bribery or conspiracy to commit bribery. (Kaloyeros *Brady* Mot. 8.) Nor, for that matter, is Kaloyeros's knowledge of Howe's bribery somehow material to whether Kaloyeros defrauded Fort Schuyler, as Kaloyeros contends. In any event, the Government is not aware of any such statements by Howe.

*Third*, Kaloyeros argues that because the Government has not produced statements from other witnesses that exculpate him, the Government must be evading its duty under *Brady*. In support of this contention, Kaloyeros cites a string of conclusions he draws from the extensive evidence that has been produced to him—conclusions that are either irrelevant or nothing more than self-serving arguments about the meaning of particular documents. (Kaloyeros *Brady* Mot. 9.) None of these assertions leads to the inference that witnesses must have made exculpatory statements as to Kaloyeros.

Finally, Kaloyeros repeatedly asserts that the "Government's *Brady* [p]osition is [a]bsurd." (Kaloyeros *Brady* Mot. 7, 10.) Kaloyeros never identifies what position he is referring to, nor what makes it absurd. His argument appears to center around a bizarre insistence that some witness must have told the Government that terms contained in the RFPs are "quite sensible and laudable," or "vanilla," or "meritorious," or "generic," or have "independent merit." (Kaloyeros *Brady* Mot.

2-3, 7, 9.)  Even if someone had offered his or her opinion on the terms of the RFPs, a statement by some individual opining on the quality of particular terms of the RFPs has no bearing on whether Kaloyeros and his co-conspirators chose those terms because they would favor a particular bidder.  For example, Kaloyeros seems to think that he cannot be guilty of rigging an RFP if the requirements he used to tailor the RFP are also in some way "good," such as requiring particular forms of support for minority and women-owned businesses.  (Kaloyeros *Brady* Mot. 2.)  In other words, attempting to insert a requirement of 50 years of experience might somehow be exculpatory because experience is "quite sensible and laudable."  (Kaloyeros *Brady* Mot. 2.)  This position is nonsensical—a term can be both "laudable" or "sensible" or "vanilla" or "generic" or "meritorious" and still be used to favor a particular bidder.  *See Coyne*, 4 F.3d at 107 (defendant required that a vehicle to be purchased by the county have "leather seats, a sun-roof, a maroon exterior, a gray interior, a particular tire size, certain rearview mirrors, and power seats" in order to tailor the request for a particular bidder).  In short, Kaloyeros's view that a statement by an individual that terms in the RFPs are "quite sensible and laudable," or "vanilla," or "meritorious," or "generic," or have "independent merit" would constitute *Brady* material is utterly without merit.

For the reasons set forth above, Kaloyeros's motion for "extraordinary relief" should be denied.  *See United States* v. *Basciano*, No. 05 Cr. 60 (NGG), 2010 WL 4668789, at *3 (E.D.N.Y. Nov. 9, 2010) ("Defendant has not established a reasonable basis for the Court to conclude that the materials requested contain *Brady* or *Giglio* material, or even if there is any such material, that Defendant's rights are at risk of being violated if it is not disclosed soon, such that this court should

perform in camera review and compel the Government to make disclosures.").

## VIII.   Motion to Dismiss for "Preindictment Prejudice"

Aiello and Gerardi move to dismiss the Superseding Indictment, or release grand jury minutes and poll grand jurors, on the basis of purported "preindictment prejudice." (Syracuse Defs.' Mot. 42-48.) There is no factual or legal support for such a claim, and the motion should be denied.

### A.      Relevant Facts

As described above, on September 20, 2016, before any of the statements that Aiello and Gerardi now allege deprived them of an impartial grand jury were made, United States Magistrate Judge Gabriel W. Gorenstein found probable cause to support issuance of arrest warrants for Aiello and Gerardi. As set forth in the Complaint supporting the issuance of those warrants and in greater detail above, the Complaint articulated ample evidentiary support for the conclusion that, in violation of federal law, Aiello and Gerardi paid bribes to Percoco and Howe in exchange for official action, colluded with Kaloyeros, Howe, Ciminelli, Laipple, and Schuler to defraud Fort Schuyler, and made false statements to federal officers. On September 22, 2016, Aiello and Gerardi were arrested in Syracuse, New York, and presented for an initial appearance in federal court in Syracuse.

On the day of the arrests of Aiello and Gerardi, as well as their six co-defendants, the United States Attorney's Office issued a press release and the United States Attorney held a press conference to describe for the public the nature of the charges against the eight defendants—as

well as Todd Howe—accused of criminal involvement in extensive public corruption. At the press conference, the United States Attorney explained the charges contained in the Complaint, and, among other things, stated,

> [a]s to the other 8 men, the charges at this stage are still merely allegations but we intend to prove every single one of them at a fair trial in federal court. The charges against these 8 men are laid out in a detailed complaint that runs to about 80 single space pages. I commend it to your attention, the actual document, as I have time only to give a brief summary this afternoon.

> In essence today's complaint shines a light on yet another sordid side of a show me the money culture that has so plagued government in Albany. It turns out that the state legislature does not have any kind of monopoly on crass corruption in New York.

(Syracuse Defs.' Mot. Ex. K.)

On October 6, 2016, and October 10, 2016, the United States Attorney participated in a discussion at the College of Saint Rose and in a television interview, respectively, in which he discussed current law and issues regarding public corruption prosecutions. Aiello and Gerardi have pointed to no comments made by the United States Attorney during his discussion at the College of Saint Rose regarding the prosecution of Aiello or Gerardi. (*See id.*) When asked during the television interview about the charges contained in the Complaint, the United States Attorney explained that journalism helped trigger the investigation and otherwise declined to comment on the charges against the defendants, other than to say that the Complaint explained that there was "probable cause to believe that these particular individuals committed these particular crimes . . . ." (Syracuse Defs.' Mot. Ex. O at 4.)

160

As detailed above, on November 22, 2016, a grand jury sitting in this District returned the Indictment, and on May 11, 2017, the same grand jury returned the Superseding Indictment, both charging Aiello and Gerardi with crimes arising from their bribery, fraud, and false statements. Aiello and Gerardi do not proffer any evidence that the Indictment or Superseding Indictment were not properly returned, that anything improper occurred in the grand jury, or that they suffered any actual prejudice in the return of the Indictment or Superseding Indictment.

### B.    Applicable Law

A defendant is "constitutionally entitled to have his case considered by an impartial and unbiased grand jury," *United States* v. *Burke*, 700 F.2d 70, 82 (2d Cir. 1983). Grand jury proceedings carry a "presumption of regularity, which generally may be dispelled only upon particularized proof of irregularities in the grand jury process." *United States* v. *R. Enters., Inc.*, 498 U.S. 292, 301 (1991) (quoting *United States* v. *Mechanik*, 475 U.S. 66, 75 (1986) (O'Connor, J., concurring in the judgment)); *see also*, *e.g.*, *Hamling* v. *United States*, 418 U.S. 87, 139 n.23 (1974); *United States* v. *Leung*, 40 F.3d 577, 581 (2d Cir. 1994) (describing the "presumption of regularity that attaches to the grand jury proceedings"); *United States* v. *Nunan*, 236 F.2d 576, 594 (2d Cir. 1956) (same); *United States* v. *Gibson*, 175 F. Supp. 2d 532, 534 (S.D.N.Y. 2001) (same).

A defendant seeking to overcome the strong presumption of regularity faces a high bar, which can be met only in "truly extreme cases." *United States* v. *Broward*, 594 F.2d 345, 351 (2d Cir. 1979). Indeed, a defendant cannot carry that burden without demonstrating "some grossly prejudicial irregularity or some other particularized need or compelling necessity" that outweighs

the Government's and the grand jury's substantial interest in secrecy. *Gibson*, 175 F. Supp. 2d at 534. Such a showing requires more than mere "speculation and surmise," *Gibson*, 175 F. Supp. 2d at 534 (internal quotation marks omitted); rather, the defendant must present "persuasive evidence of actual grand jury prejudice" before the presumption of regularity may be overcome. *Burke*, 700 F.2d at 82. For this reason, "the burden is on the party seeking disclosure [of grand jury materials] to show a 'particularized need' that outweighs the need for secrecy." *United States* v. *Moten*, 582 F.2d 654, 662 (2d Cir. 1978) (quoting *Dennis* v. *United States*, 384 U.S. 855, 868 (1966)).

Furthermore, "[d]ismissal of an indictment because of a defect in the grand jury proceedings is a drastic remedy that is rarely used." *United States* v. *Silver*, 103 F. Supp. 3d 370, 376 (S.D.N.Y. 2015) (internal quotations marks omitted). Thus, "[t]he district court's authority to dismiss an indictment, whether to eliminate prejudice or to deter official misconduct, is narrowly circumscribed to instances where the misconduct at issue 'amounts to a violation of one of those few, clear rules which were carefully drafted and approved by the Supreme Court and by Congress to ensure the integrity of the grand jury's functions.'" *Id.* at 376-77 (quoting *United States* v. *Williams*, 504 U.S. 36, 46 (1992)) (internal quotations and brackets omitted). Even then, a defendant moving to dismiss an indictment must demonstrate that the misconduct prejudiced him or her, meaning "'that the violation substantially influenced the grand jury's decision to indict,' or . . . there is 'grave doubt' that the decision to indict was free from the substantial influence of such violations." *Bank of Nova Scotia* v. *United States*, 487 U.S. 250, 256 (1988) (quoting *Mechanik*,

475 U.S. at 78 (O'Connor, J., concurring in the judgment)). As this Court has observed, there does not appear to be "a single case where a court has taken the extreme step of dismissing an indictment solely based on pre-indictment publicity, whether instigated by the prosecutor or simply derived from the media at large." *Silver*, 103 F. Supp. 3d at 380.

## C. Discussion

Aiello and Gerardi point to a number of actions by the Government, none of which were particularly remarkable, as evidence of "unchecked and improper prosecutorial tactics." (Syracuse Defs.' Mot. 42.) Aiello and Gerardi have not, however, demonstrated that the conduct they complain of constituted "a violation of one of those few, clear rules which were carefully drafted and approved by the Supreme Court and by Congress to ensure the integrity of the grand jury's functions," *Silver*, 103 F. Supp. 3d at 376-77 (internal quotation marks omitted), let alone explained how the conduct "substantially influenced the grand jury's decision to indict," *Bank of Nova Scotia*, 487 U.S. at 256.

*First*, Aiello and Gerardi describe how they were each handcuffed and placed under arrest in their homes in Syracuse, New York, and then driven to the courthouse for presentment, in what they term, without factual description, as a "perp walk." (Syracuse Defs.' Mot. 43-44.) Aiello and Gerardi call this sequence of events an "extraordinarily prejudicial drama." (*Id.* at 44.) Aiello and Gerardi do not, however, suggest what rule or law the Government might have violated. Aiello and Gerardi also do not explain how an arrest in the privacy of one's own home, followed by being driven to the courthouse to be presented before a magistrate judge on the charges, is prejudicial,

163

or, indeed how the Court can conclude that these events, which transpired in Syracuse and largely in Aiello and Gerardi's homes, "substantially influenced" the decision of the grand jury in the Southern District of New York to indict. *Bank of Nova Scotia*, 487 U.S. at 256.

*Second*, Aiello and Gerardi contend that various public statements made by the United States Attorney violate the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, which provide that

> [w]ith respect to a grand jury or other pending investigation of any criminal matter, a lawyer participating in or associated with the investigation (including government lawyers and lawyers for targets, subjects, and witnesses in the investigation) shall refrain from making any extrajudicial statement which a reasonable person would expect to be disseminated by means of public communication that goes beyond the public record or that is not necessary to inform the public that the investigation is underway, to describe the general scope of the investigation, to obtain assistance in the apprehension of a suspect, to warn the public of any dangers or otherwise to aid in the investigation, if there is a substantial likelihood that such dissemination will interfere with a fair trial or otherwise prejudice the administration of justice.

Local Criminal Rule 23.1(b). Aiello and Gerardi also argue that these statements violate 28 C.F.R. § 50.2(b)(2), which provides that "[a]t no time . . . shall personnel of the Department furnish any statement or information, which could reasonably be expected to be disseminated by means of public communication, if such a statement or information may reasonably be expected to influence the outcome of a pending or future trial."

None of the United States Attorney's comments violated either rule, nor prejudiced Aiello or Gerardi. Aiello and Gerardi first point the Court to the United States Attorney's statement, in

January 2015, that "our unfinished fight against public corruption continues. You should stay tuned" (Syracuse Defs.' Mot. Ex. G at 2), as well as his "tweet" of December 2015, reading, "[a]s alleged, this is my official Twitter account. And this, allegedly, is my first tweet. Stay tuned . . ." (Syracuse Defs.' Mot. Ex. H). These opaque statements—made many months before the charges in this case and with no apparent connection to this case—make no comment on the charges against Aiello and Gerardi whatsoever. *See* Local Criminal Rule 23.1(b). Moreover, the phrase "stay tuned," made in some unrelated context, can hardly have "substantially influenced" the grand jury in indicting Aiello and Gerardi some 22 and 11 months after the respective statements were made.

Aiello and Gerardi next point to the statement made during the United States Attorney's press conference that "[i]n essence today's complaint shines a light on yet another sordid side of a show me the money culture that has so plagued government in Albany. It turns out that the state legislature does not have any kind of monopoly on crass corruption in New York." (Syracuse Defs.' Mot. Ex. K.) Aiello and Gerardi assert that this language "associate[s] the accused with a long line of convicted criminals or a broader pattern of recognized wrongdoing," which "tend[s] to blur the distinction between legitimate public commentary and improper opinion." *Silver*, 103 F. Supp. 3d at 379. The context of the statement makes clear, however, that the remarks did not improperly express an opinion on the guilt of the accused, or otherwise prejudice them. In particular, immediately before making the statement, the United States Attorney explained that "the charges at this stage are still merely allegations but we intend to prove every single one of them at a fair trial in federal court. The charges against these 8 men are laid out in a detailed

complaint that runs to about 80 single space pages. I commend it to your attention, the actual document, as I have time only to give a brief summary this afternoon." (Syracuse Defs.' Mot. Ex. K.) Thus, while the United States Attorney contextualized the charges in an effort to explain them and their scope, as well as the danger associated with the alleged conduct, he did not unfairly influence the grand jury by making any improper comment as to his opinion of the guilt of the accused.

Finally, Aiello and Gerardi offer the statements of the United States Attorney at St. Rose College and on television.  As to the statements made at St. Rose College—which is in Albany, New York—Aiello and Gerardi do not allege that the United States Attorney actually made any comment whatsoever regarding the charges against them, and therefore his discussion regarding public corruption investigations and the law generally can hardly violate Local Criminal Rule 23.1(b) or 28 C.F.R. § 50.2(b)(2), or otherwise constitute an improper commentary on the guilt of the accused.  As for the televised interview, the United States Attorney specifically declined to make any statement regarding the guilt of the accused, and provided merely a high-level comment on the genesis of the investigation and stated, in substance, that the Complaint set forth probable cause to believe that the defendant had committed the crime charged.  None of these statements violate any prohibitions relating to grand jury practice.

Even if any of these statements, individually or in concert, did violate any particular rule regarding the grand jury—which they do not even come close to doing—neither disclosure of grand jury materials nor dismissal would be warranted, as the defendants have shown neither

"persuasive evidence of actual grand jury prejudice," *Burke*, 700 F.2d at 82, nor "that the violation substantially influenced the grand jury's decision to indict, or . . . grave doubt that the decision to indict was free from the substantial influence of such violations," *Bank of Nova Scotia*, 487 U.S. at 256 (internal quotation marks omitted). As the Court has noted, "the existence of negative pretrial publicity is generally not sufficient to show substantial influence or actual prejudice," *Silver*, 103 F. Supp. 3d at 379-80, and the defendants have offered no cause to believe that any of the comments of the United States Attorney would have any impact on the grand jury—particularly in light of the extensive evidence set forth in the Complaint.

Apparently mindful of the weakness of their case, and of this Court's prior admonition that "dismissal might be appropriate in instances where the defendant can show 'a history of prosecutorial misconduct, spanning several cases, that is so systematic and pervasive as to raise a substantial and serious question about the fundamental fairness of the process which resulted in the indictment,'" *id.* at 380-81 (quoting *Bank of Nova Scotia*, 487 U.S. at 259), Aiello and Gerardi assert that the United States Attorney's comments were part of a history of prosecutorial misconduct. In support of this conclusory claim, Aiello and Gerardi point to the Court's decision in *Silver*, to a civil complaint alleging, among other things, that information regarding an FBI search was provided to the media, and to findings in an unrelated case that another federal agent had leaked information to the press. (*See* Syracuse Defs.' Mot. 47.) These isolated and unrelated incidents simply have nothing to do with the claim that the United States Attorney's "media strategy" with respect to public corruption cases was improperly prejudicial. Put simply, there is

nothing offered by Aiello or Gerardi "to raise a substantial and serious question about the fundamental fairness of the process which resulted in the indictment." *Bank of Nova Scotia*, 487 U.S. at 259. Accordingly, their motion to dismiss or to order disclosure of grand jury materials should be denied.

## IX. Motion to Dismiss for "Prosecutorial Misconduct"

Aiello and Gerardi move to dismiss Count Fifteen on the ground that the Government somehow committed misconduct by explicitly warning them that they were subjects of its investigation before they lied during proffer sessions. The Syracuse Defendants' core complaint is that, if the Government had called them targets instead of subjects, they would not have traveled to Manhattan and made false statements to federal officers. This counterfactual completely ignores the reality that they did, in fact, willfully and knowingly lie to the Government. For this reason, and as set forth below, Aiello and Gerardi's arguments fail.

### A. Relevant Facts

Aiello and Gerardi are charged in Count Fifteen with willfully and knowingly making material false statements to federal agents and prosecutors during individual proffer sessions on or about June 21, 2016. (Superseding Indictment ¶¶ 68-69.) Prior to the meeting that gave rise to the charges in Count Fifteen, the Government offered each of Aiello and Gerardi the opportunity, if they so desired, to speak directly with prosecutors and investigators if they wished to cooperate with the Government's investigation. In advance of those voluntary proffers, the Government informed the defendants' shared attorney, Anthony Copani, Esq., that his clients were subjects of

an ongoing investigation.  (Compl. ¶ 88; Dkt. No. 183-4 ("Copani Aff.") ¶ 6.)  The Government also cautioned Copani that the Government believed Aiello had lied to the FBI during a prior interview.  (Compl. ¶ 88.)

Aiello and Gerardi voluntarily agreed to meet and speak with the Government.  Before they made any statements, Aiello and Gerardi were informed that they were free to leave at any time. Nonetheless, during their individual meetings, Aiello and Gerardi each lied—repeatedly—about specific facts relating to what the Government ultimately determined was their involvement in rigging the Syracuse RFP and their decision to bribe Percoco for official actions.   Aiello and Gerardi told those lies in the presence of their shared attorneys, Copani and his partner, who were present throughout both individual proffer sessions.  Aiello and Gerardi lied even though they and Copani signed proffer agreements that expressly allowed the Government to use their proffer statements "in a prosecution for false statements, obstruction of justice or perjury with respect to any acts committed or statements made during . . . the meeting."  In addition, the Government warned Aiello and Gerardi several times that lying to federal officers is a crime, and the Government specifically informed Aiello, again, about its doubts as to the truth of his prior statements to the FBI.  Aiello and Gerardi ignored these multiple warnings.  In fact, when the Government cautioned during the proffers that their statements were not credible and gave them the opportunity to reconsider, Aiello and Gerardi each repeated their lies.

Approximately two weeks after Aiello and Gerardi lied during their proffer sessions, on or about July 6, 2016, the Government sent letters to Copani informing him that Aiello and Gerardi

were now targets of its investigation. (Copani Aff. ¶ 14.) Not surprisingly, the Syracuse Defendants' decision to lie during the proffer sessions affected the Government's view of their criminal exposure and led, in part, to their shift from subjects to targets.

Subsequently, in or about August 2016, Copani and another of the Syracuse Defendants' attorneys, Stephen Coffey, Esq., met with the Government and, among other things, indicated that Aiello and/or Gerardi might seek to testify before the federal grand jury. The Government, however, did not call either defendant as a witness in the grand jury.

**B.     Discussion**

Lying to federal officers is a crime. Federal law provides, in relevant part, that "whoever, in any matter within the jurisdiction of the executive . . . branch of the Government of the United States, knowingly and willfully . . . makes any materially false, fictitious, or fraudulent statement," is guilty of a federal offense. 18 U.S.C. § 1001(a)(2). This proscription applies to everyone interviewed by the Government, regardless of whether the Government believes them to be targets, subjects, or simply witnesses.

Aiello and Gerardi claim that the Government acted inappropriately before the proffer sessions when it informed their attorney, Copani, that they were subjects rather than targets. They assert that Count Fifteen should be dismissed because, in a counterfactual world, they would not have voluntarily spoken with the Government if only they had been told they were targets. This argument is nonsense. *First*, and foremost, the Syracuse Defendants committed a crime when they chose to lie to federal officers. Aiello and Gerardi confoundingly contend that they would not

170

have lied to federal officers if they had been deemed targets, but were willing to make false statements to federal officers because they had been labeled "only 'subjects.'" (Syracuse Defs.' MTD 4 (arguing that the Government's view of them as "only 'subjects' caused them to submit to questioning that they would never have undergone had they known" they were targets).) Yet, interviewees who understand themselves to be subjects do not have free passes to lie to federal officers. The Syracuse Defendants' after-the-fact regrets that they decided to meet with, and repeatedly lie to, the Government do not change the fact that they made false statements to federal officials on June 21, 2016.

*Second*, to the extent the Syracuse Defendants imply that the Government somehow duped them into attending the proffer sessions, that suggestion is baseless. Well in advance of the proffer sessions, the Government expressly informed Copani that the Syracuse Defendants were subjects. (Compl. ¶ 88; Copani Aff. ¶ 6.) The Government specifically cautioned Copani that it believed Aiello's prior statements to the FBI were not truthful. (Compl. ¶ 88.) The Government reiterated its warnings to Aiello, Gerardi, and their attorneys in person immediately before, and then several times during, the individual proffer sessions. (*Id.*) As a result, Aiello and Gerardi knew full well on June 21, 2016 that lying would be a crime and that the Government believed they were not being truthful.

*Third*, the Syracuse Defendants' claim that the Government misled Aiello and Gerardi about its views of their criminal liability is without merit. Since the beginning of its interactions with the Syracuse Defendants' attorneys, the Government made clear that Aiello and Gerardi had

potential criminal exposure.  The Government never suggested that Aiello and Gerardi were merely fact witnesses, but rather relayed the Government's view that Aiello and Gerardi were, at that time, subjects of an ongoing investigation.

The only case that the Syracuse Defendants cite in support of their argument for dismissal of Count Fifteen is *United States* v. *Jacobs*, 547 F.2d 772 (2d Cir. 1976).  *Jacobs* is entirely inapposite.  There, a special "Strike Force" prosecutor appointed by the U.S. Attorney General did not warn the defendant of her status as a target before the defendant testified in a federal grand jury sitting in the Eastern District of New York.  *Id.* at 774.  Because "the uniform practice of prosecutors in our circuit" is to warn targets before they testify in the grand jury, and the Second Circuit sought to "make the practice of the Task Force conform to that of the United States Attorney in the *same* district," *id.* at 773-76 (emphasis in original), the Court exercised its "supervisory power . . . in a circumscribed manner" by dismissing a perjury charge against the defendant that was based on her unwarned grand jury testimony, *id.* at 775.  The Second Circuit emphasized that the dismissal was an "*ad hoc* sanction" meant to bring the practices of the Strike Force in line with those of the United States Attorney's Office.  *Id.* at 778.  Indeed, after the Second Circuit dismissed the perjury charge in *Jacobs*, the Supreme Court vacated the Second Circuit's opinion, since "the fact that the prosecutor may have erred in failing to give a grand jury witness adequate warnings does not lead inexorably to the conclusion that the witness cannot be prosecuted for perjury."  *United States* v. *Jacobs*, 429 U.S. 909, 909-10 (1976) (Stevens, J., concurring in summary disposition).  On remand, the Second Circuit reaffirmed its dismissal of the perjury

charge, but emphasized repeatedly that its intent was "to impose a one-time sanction to encourage uniformity of practice (whatever the practice might be) between the Strike Force and the United States Attorney in the *same* district," and for its "opinion to have no prospective application as precedent for the District Courts on the constitutional issue." *Jacobs*, 547 F.2d at 773, 775.

As a result, *Jacobs* has no application to the instant case. Neither Aiello nor Gerardi testified in the grand jury. Instead, they each voluntarily answered questions posed by federal officers. They did so after being warned several times—accurately—that they were viewed as subjects, meaning people "whose conduct is within the scope of the grand jury's investigation." United States Attorneys' Manual ("USAM") § 9-11.151. (*See* Copani Aff. ¶ 15 ("I understand the difference between a subject and a target in a federal criminal investigation.").) Moreover, Aiello and Gerardi were both represented throughout their respective proffer sessions by counsel, which was a protection unavailable to the *Jacobs* defendant when she testified in the grand jury. *See* Fed. R. Crim. P. 6(d) (limiting attendees at grand jury proceeding to government attorneys, testifying witness, interpreters, and stenographers); *see also United States* v. *Mandujano*, 425 U.S. 564, 581 (1976) (plurality opinion) ("Under settled principles the witness may not insist upon the presence of his attorney in the grand jury room."). In short, the "one-time sanction" imposed in *Jacobs* to enforce uniformity in grand jury practice between Strike Force attorneys and AUSAs in the Eastern District of New York has no relevance whatsoever to Aiello and Gerardi's decision to lie to federal officers.

In the absence of any helpful case law, Aiello and Gerardi turn next to the USAM as support for their claim that the Government did not send a "supplemental warning that their conduct was being investigated for possible violation of federal criminal law," as advised by Department of Justice guidelines, before their proffer sessions. (Syracuse Defs.' Mot. 4-5.) As an initial matter, it is well-established that USAM guidelines "provide no substantive rights to criminal defendants." *United States* v. *Piervinanzi*, 23 F.3d 670, 682 (2d Cir. 1994). Furthermore, as set forth above, Aiello and Gerardi's claim is devoid of factual support as well: both Aiello and Gerardi were advised that they were subjects before their proffer sessions. The Government sent them target letters after the proffer sessions because Aiello and Gerardi's lies influenced, in part, the change in their respective statuses.

Finally, Aiello and Gerardi complain that they were not given the chance to testify in the grand jury before the initial indictment was returned. (Syracuse Defs.' Mot. 5.) Again, their sole citation is to the USAM, which merely advises that "reasonable requests by a 'subject' or 'target'" to testify "should be given favorable consideration." USAM § 9-11.152. However, it is axiomatic that "a prospective defendant has no constitutionally protected right to appear before the grand jury considering his case." *United States* v. *Rodriguez*, 777 F. Supp. 297, 298 (S.D.N.Y. 1991) (citing *United States ex rel. McCann* v. *Thompson*, 144 F.2d 604 (2d Cir.), *cert. denied*, 323 U.S. 790 (1944)); *see also United States* v. *Williams*, 504 U.S. 36, 52 (1992) ("[N]either in this country nor in England has the suspect under investigation by the grand jury ever been thought to have a right to testify or to have exculpatory evidence presented."). Accordingly, it was entirely proper

for the Government to refuse Aiello and Gerardi the opportunity to testify in the grand jury. For all these reasons, the Syracuse Defendants' contention that the Government engaged in misconduct in relation to the crimes charged in Count Fifteen should be rejected, along with their motion to dismiss that Count.

## CONCLUSION

For the reasons set forth above, the defendants' pretrial motions should be denied in their entirety.

Dated: New York, New York
June 30, 2017

Respectfully submitted,

JOON H. KIM
Acting United States Attorney
for the Southern District of New York

By:      /s/
    Janis Echenberg
    Robert Boone
    David Zhou
    Matthew Podolsky
    Assistant United States Attorneys
    Tel.: (212) 637-2597/2208/2438/1947