# EXHIBIT A

15-3118
USA v. Boyland



1    UNITED STATES COURT OF APPEALS

2    FOR THE SECOND CIRCUIT

3    - - - - - -

4    August Term, 2016

5    (Argued:  February 22, 2017                    Decided:  July 10, 2017)

6    Docket No. 15-3118

7    _____

8    UNITED STATES OF AMERICA,

9                                        *Appellee,*

10                        - v. -

11    WILLIAM F. BOYLAND, JR.,

12                                        *Defendant-Appellant.*[*]
13    _____

14    Before:  KEARSE, WALKER, and HALL, *Circuit Judges.*

15                        Appeal from a judgment of the United States District Court for the Eastern District of

16    New York, Sandra L. Townes, *Judge,* convicting defendant on 21 counts of public-corruption-related

17    offenses, *see* 18 U.S.C. §§ 371, 666, 1343, 1349, 1951(a), and sentencing him principally to 168

18    months' imprisonment, to be followed by a three-year term of supervised release, and ordering him

19    to forfeit $169,410.14 and pay $155,610.14 in restitution.  On appeal, defendant challenges his

20    conviction, contending primarily that the jury instructions with respect to 19 of his counts of

---

[*]The Clerk of Court is respectfully directed to amend the caption as set forth above.

1    conviction were erroneous in light of the Supreme Court's subsequent decision in *McDonnell v. United*

2    *States*, 136 S. Ct. 2355 (2016), which narrowed the interpretation of "official act" within the

3    meaning of the federal bribery statute, 18 U.S.C. § 201(a)(3), as effectively incorporated in sections

4    prohibiting *quid pro quo* corruption.  The government concedes that, in light of *McDonnell*, the

5    district court's instructions on 11 honest-services wire fraud counts were erroneous.  We conclude that

6    those instructions, to which defendant did not object at trial, do not meet the "plain error" standard;

7    and we find no basis for reversal in defendant's other contentions.

8            Affirmed.

9                LAN X. NGUYEN, Assistant United States Attorney, Brooklyn, New
10                    York (Robert L. Capers, United States Attorney for the Eastern
11                    District of New York, Amy Busa, Assistant United States
12                    Attorney, Brooklyn, New York, on the brief), *for Appellee*.

13                JAMES M. BRANDEN, New York, New York, *for Defendant-*
14                    *Appellant*.

15    KEARSE, *Circuit Judge*:

16          Defendant William F. Boyland, Jr. ("Boyland"), appeals from a judgment entered in

17    the United States District Court for the Eastern District of New York following a jury trial before

18    Sandra L. Townes, *Judge*, convicting him on 21 counts of public-corruption-related offenses, to wit:

19    Hobbs Act extortion conspiracy and attempted extortion, in violation of 18 U.S.C. § 1951(a) (Counts

20    One, Two, Sixteen, and Eighteen), conspiracy to commit bribery and to violate the Travel Act, in

21    violation of *id*. § 371 (Counts Three and Seventeen), bribery in violation of *id*. § 666(a)(1)(B) (Counts

1    Four and Nineteen), honest-services wire fraud conspiracy and honest-services mail fraud conspiracy,

2    in violation of *id*. § 1349 (Counts Five and Twenty-One), 10 counts of honest-services wire fraud, in

3    violation of *id*. § 1343 (Counts Six-Fifteen), and theft of government property in violation of *id*.

4    § 666(a)(1)(A) (Count Twenty).  He was sentenced principally to 168 months' imprisonment, to be

5    followed by a three-year term of supervised release, and was ordered to forfeit $169,410.14 and to pay

6    $155,610.14 in restitution.

7            On appeal, Boyland challenges his conviction, contending primarily that the jury

8    instructions with respect to Counts One through Nineteen were erroneous in light of *McDonnell v.*

9    *United States*, 136 S. Ct. 2355 (2016), which narrowed the interpretation of "official act" within the

10   meaning of the federal bribery statute, 18 U.S.C. § 201(a)(3), as effectively incorporated in sections

11   prohibiting *quid pro quo* corruption.  He also argues that certain evidence was improperly admitted

12   at trial.  The government concedes that, in light of *McDonnell*, the instructions on Counts Five through

13   Fifteen, the honest-services wire fraud counts, were erroneous.  For the reasons that follow, we

14   conclude that the trial court's instructions on Counts Three, Four, Seventeen, and Nineteen through

15   Twenty One were not erroneous; that the instructions on the Hobbs Act and honest-services wire fraud

16   counts, to which defendant did not object at trial, do not meet the "plain error" standard; and that

17   Boyland's other contentions provide no basis for reversal.

18                                          I.  BACKGROUND

19           At the times pertinent to this prosecution, Boyland was an elected member of the New

20   York State Assembly, representing the 55th Assembly District, an area that includes the Brownsville,

1    Bedford-Stuyvesant, Crown Heights, and Bushwick sections of Brooklyn.  In the 21-count superseding

2    indictment (the "Indictment") Boyland was charged principally with engaging in honest-services wire

3    fraud, in schemes to, *inter alia*, solicit bribes in connection with a proposed carnival and in connection

4    with a proposed real estate venture for which New York State ("State") grant monies were to be

5    obtained.

6          The government's evidence at Boyland's several-week trial, the sufficiency of which

7    is not challenged on appeal, included numerous audio and video recordings--the accuracy of which

8    was stipulated (*see* Trial Transcript ("Tr.") 87-91)--as well as emails and documents; testimony by

9    Federal Bureau of Investigation ("FBI") special agents Brian Getson and Sean Quinn, who operated

10    undercover in meeting with Boyland and his aides in connection with schemes through which Boyland

11    and the undercover agents were to receive New York City ("City") permits or State monies; testimony

12    by numerous other witnesses as to the precise mechanics of those schemes; and testimony by Ry-Ann

13    Hermon, Boyland's then-chief of staff who, prior to Boyland's trial, had pleaded guilty to bribery and

14    extortion charges.  The trial evidence, taken in the light most favorable to the government, included

15    the following.


16    A.    *The Evidence*

17          Getson testified that in August 2010, Alan Weiner--a carnival promoter who had passed

18    away before Boyland's trial, but who in 2010-2011 was working with the government after pleading

19    guilty to charges relating to bribing public officials--contacted Boyland, with whom he had had a

20    relationship for several years, and offered Boyland money in exchange for helping to secure permits

21    for a carnival to be held in Boyland's Brooklyn assembly district.  (*See* Tr. 77-78.)  Getson testified

1    (without objection) that he learned that "Boyland responded that," "[i]n exchange for his assistance

2    getting carnivals in the assembly district," "he would be willing to take money from a nonprofit"

3    corporation.  (*Id*. at 78.)

4            Weiner thereafter introduced Boyland to Getson, who was posing as a Philadelphia

5    promoter of carnivals and real estate businesses who was willing to pay bribes as a means of doing

6    business.  All of the meetings Getson had with Boyland and/or his representatives were recorded.  (*See*

7    *id*. at 85.)

8            1.    *The Carnival Scheme*

9            In order to operate a carnival on City-owned property, an owner must obtain various

10   licenses and permits from the relevant City agencies.  Getson was introduced to Boyland by Weiner

11   in August 2010 at Boyland's district office, and the three discussed the process of "secur[ing] the

12   property" (Government Exhibit ("GX") T-301, at 3) on which Getson and Weiner claimed to want to

13   hold a carnival--a site on Rockaway Avenue in Brownsville--meaning obtaining the necessary permits

14   for that property.

15           City agency approval is facilitated by letters of support from local elected officials.  At

16   that meeting, Boyland stated he would "have this thing locked up" and "have the okays done . . . by

17   early next week" (*id*. at 4), as the Rockaway property was owned by the City; Getson testified he

18   understood this to mean that Boyland would "get the okays" from "whatever city agencies would have

19   control over that property at Rockaway" (Tr. 101).

1          In October 2010, Getson, Boyland, and Weiner had a dinner meeting.  Boyland

2   indicated that approval would be forthcoming from the City's Department of Housing Preservation and

3   Development ("HPD"), a relevant agency that had not been identified at their prior meeting.  (*See*

4   Tr. 108-10.)  Boyland said, "So guys, how do we do business?  What's our next steps here? . . . .  How

5   do we do business?  What's our next steps here? . . . .  'Cause we got HPD.  HPD is locked up.  We're

6   there."  (GX T-302, at 1.)

7          Later in the conversation, Boyland said he would be running for reelection in 2012 (*id*.

8   at 15-16), and Weiner responded, "Obviously, obviously you will get support from us" (*id*. at 16),

9   leading to the following colloquy:

10         [Boyland]:  Yeah?  We are just in a money raising mode right now.

11         [Getson]:  What can we do for you in that regard?

12         [Boyland]:  Well I'll get you something.  We're just in this ... I've got
13   something coming on the 28th.  It's a ... We gotta ... On this end, it is not a big
14   deal.  We have about a 100 grand we have to have in the pot.  You know that
15   is just to sustain ourselves and help others around us because that is the name
16   of the game, of course, and, um, building.  We will have all kinds of
17   conversations about it but that is the number at this point.

18   (*Id*.)

19         Boyland stated that he had found it more profitable to have fundraisers at small private

20   venues and "we are having something on the 28th.  I'll send you an invite.  You get your network to

21   come out and support it or whatever."  (*Id*. at 16-17.)  Getson testified that he asked whether Boyland

22   had any type of non-profit organization set up, and Boyland responded that he had four.  Getson then

23   talked about compensating Boyland, "directly paying him for his assistance in helping us with the

24   carnivals," and that "Boyland's idea was some kind of consultancy or consulting agreement"

6

1    (Tr. 126-27):

2            [Getson]:  What are, what are, so what are like in terms of like can I
3    compensate you or whatever for helping us out or setting up the meetings for
4    us what is the best kind of approach?

5            [Boyland]:  Um, a consultancy, a consulting firm, folks we have
6    worked with in the past.  You know?

7            [Getson]:  Yeah?

8            [Boyland]:  You will be introduced to those guys.

9    (GX T-302, at 17.)

10           Four days later, Getson and Boyland spoke by telephone.  Boyland said he had "all of

11   the . . . information regarding the parks"; that he would soon "have okays on everything"; and that he

12   was going to "send [Getson] the invite" for the fundraiser.  (GX T-303, at 2.)

13           The following week, Getson received two emails from Boyland's office.  One contained

14   a lease application for the carnival.  The other was an invitation to Boyland's October 28 fundraising

15   event, with suggested contributions ranging from $1,000 to $3,800.  (Tr. 143.)  Getson attended the

16   fundraiser and made a $3,800 contribution, the maximum allowed for an individual contribution to

17   a candidate for state election.

18           On November 3, 2010, Getson, Weiner and Boyland had another dinner meeting.

19   Boyland announced that he had met with the new Parks president and that they "pretty much ha[d] the

20   green light" for "anywhere we're gonna do [a carnival] in Brooklyn."  (GX T-305, at 3.)  Weiner

21   suggested that the approval process would be expedited if Boyland were to write supporting letters

22   directly to the licensing/permitting agencies.  Boyland appeared to acquiesce.

1    As the plans for the carnival progressed, however, Boyland began asking Getson for

2    more money.  For example, on January 17, 2011, Boyland told Getson by telephone that he was "a

3    thousand dollars short on some gospel sponsorship for a band" and asked if Getson could provide him

4    the money.  (Tr. 213.)  Getson agreed but stated that, due to logistics, he would be unable to do so

5    until after the gospel event.  At a dinner the following week, after assuring Getson that they were

6    "[g]ood to go" with the city agencies and that he had completed the letter of support, Boyland again

7    inquired about the money, asking if he could "have [his] girl [Hermon] call [Getson] about that gospel

8    thing."  (GX T-308, at 2, 32.)  After Getson agreed (*see* Tr. at 257), Hermon contacted him in early

9    February asking him for "$2,000 for a bus trip to Albany" (Tr. 266).  Thereafter, Getson received an

10   invoice from Boyland's office in the amount of $3,000.

11   Getson paid that sum on February 17, 2011, outside of Boyland's office.  He had come

12   to the office to see Boyland; but Boyland's father--former Assemblyman William F. Boyland Sr.

13   ("Frank Boyland")--was there and said, "[l]et's step outside and you and I'll take care of this. . . .  You

14   know how it is" (GX T-101, at 7).  Thus, out on the sidewalk, Getson handed Boyland's father a

15   $3,000 check, with the payee line left blank.  The elder Boyland, upon receiving the check for his son,

16   said to Getson, "[J]ust legally, you know, you know[ ]this is against the law, right?" to which Getson

17   responded, "[o]h, absolutely."  (*Id*. at 10.)

18   The two then reentered the building, and Getson saw Frank Boyland go back to

19   Boyland's office.  Getson then met with Boyland and Frank Boyland in Boyland's office to discuss the

20   carnival plans.  Boyland referred to letters of support that Weiner had previously drafted for Boyland's

21   signature (*see*, *e.g.*, GX LC-2A (Boyland Letter to NYC Department of Consumer Affairs

22   Commissioner Jonathan Mintz, dated February 24, 2011 ("vouch[ing]" for Weiner's experience "and

1    character"))) and said they were "good" (GX T-101, at 11).  Getson then handed Boyland "fresh"

2    letters of support for Boyland to provide.  (Tr. 303.)  Boyland accepted the new drafts (*see* GX T-101,

3    at 12), which were thereafter typed on Assembly letterhead, signed by Boyland, and given to Weiner

4    (*see*, *e.g.*, GX LC-2E (Boyland Letter to Commissioner Mintz, dated March 8, 2011 ("I am writing

5    to express my strong support for these permits and request that you grant them expeditiously. . . .  I

6    know that you will look favorably on this application and grant your approval."))).

7           Getson testified that "almost immediately after this [February 17] meeting" he received

8    a call from Hermon, who stated that Boyland had put her on the carnival project in order to "expedite

9    everything through." (Tr. 331.)  Indeed, Hermon had so stated in a voicemail message left on Getson's

10    phone shortly after the meeting, in which she "express[ed her] gratitude on behalf of Assemblyman

11    Boyland for [Getson's] assistance" on their projects.  (GX T-311, at 1.)  At trial, Hermon testified that

12    she attributed Boyland's instruction to expedite the carnival matter to the fact that Getson "gave

13    [Boyland] money."  (Tr. 1603.)

14         2.  *The Real Estate Scheme*

15           During an October 2010 telephone conversation with Getson about the carnival

16    application, Boyland said he was "looking for some investors" for a $140 million hospital project in

17    his district.  (GX T-303, at 3.)  Twice thereafter, Getson mentioned that he had a "business partner"

18    who might be interested.  Boyland said he would like to meet Getson's partner and that he had in mind

19    a site that might present a "good opportunity for [them] to get in and do some developing" (GX T-308,

20    at 5).

1    Getson finally introduced Boyland and Quinn at a dinner in March 2011, and the three

2    discussed possible real estate projects in Boyland's district.  Boyland touted an abandoned hospital in

3    his district, stating that the State's Department of Health had approved plans to recommission the

4    hospital site.  He estimated that it could be bought at a bargain price of 8 to 12 million dollars, and

5    they discussed purchasing the property and then selling it back at a profit after the city formally

6    approved the redevelopment.

7    Getson testified that some 10 days later, Hermon called him to "ask for money on the

8    Assemblyman's behalf," "$7,000," to pay for a lawyer (Tr. 414, 416).  Hermon termed this a "personal

9    ask" from Boyland, not intended to "go[] towards the campaign." (*Id*. at 1665.)  Boyland later said he

10   preferred to receive the money in cash.  Getson subsequently brought the cash to a meeting at

11   Boyland's district office on March 25, 2011, saying that it would be from himself and Quinn (Tr. 430);

12   Boyland responded that he understood, and commented that "[y]ou guys are business" (GX T-104A,

13   at 6).  Before paying Boyland, Getson said that he and Quinn wanted Boyland to "help [them] get . . .

14   state grants" to cover expenses associated with investing in "brownfield" sites (*id*. at 7), meaning real

15   estate plagued by an environmental issue that needs to be treated prior to development[Tr. 250];

16   Boyland responded that "it's right here at home so it's a no-brainer" (*id*.).  Interpreting this response

17   to mean that securing state grants for real estate investments in Boyland's district was "something

18   [Boyland] c[ould] do easily" (Tr. 433), Getson handed Boyland the $7,000.

19   A week later, Boyland gave Getson and Quinn a tour of the assembly district and

20   pointed out various brownfield sites and the abandoned hospital they had previously discussed. Quinn

21   reiterated his desire to buy the hospital property in anticipation of a profitable resale and asked

22   Boyland "what kind of ways do you have to influence the city on the actual sale of the property?"

10

1    (GX T-107, at 48).   Boyland cited his ability to steer state grants toward developments.   (*See*

2    GX T-107, at 67 ("the one thing that I can, I can probably, you know, more than likely, you know, uh,

3    sell, is the sure thing when it comes to city and state financing and their support on the project").)

4            Quinn also inquired about the possibility of zoning changes to upgrade the

5    neighborhood, and Boyland stated that such a task would "[n]ot [be] a problem" (*id*. at 25).   Boyland

6    further proposed demolishing certain buildings to create more uniformity in the area; when Quinn

7    asked whether the contracts for these demolition projects could be granted to his associates, Boyland

8    stated that that would be "[s]omething to do" (*id*. at 72), which Quinn understood to indicate that

9    Boyland "positively thought [that] was a good idea" (Tr. 2160).   Boyland also said that

10           the good thing about what we're, what we're proposing here is that everything
11           we've seen I'm in control of.  You know, I'm the politician.  I'm the guy that can
12           make the move over on this end so we know the, the, the folks that can pull
13           the, you know, sort of triggers we're looking for.

14    (GX T-107, at 69.)

15            At their next meeting to discuss the real estate project, Boyland offered a slightly

16    changed approach.   While Getson and Quinn would still buy the property for roughly $8 million,

17    instead of selling it to the development company they would sell it to a non-profit Boyland controlled,

18    "probably get[ting] 15 [million dollars]" for it.  (GX T-120A, at 91.)  Boyland also emphasized that

19    he would still be able to deliver to Getson and Quinn the benefits that they had previously discussed,

20    including:  "writ[ing] you a couple of grants" (*id*. at 32) to help cover the costs of environmental

21    remediation, awarding Quinn's associates the "demolition contracts" (*id*. at 77) worth several million

22    dollars (*see* Tr. 2292), and "sew[ing] everything up" if there was ever a zoning issue (GX T-120A,

11

1    at 86).  Boyland also embraced Quinn's idea of "bury[ing]" owners of the coveted properties in

2    violations as a means of lowering the properties' value (*id*. at 35-36).

3          As to compensation for Boyland, Quinn suggested "put[ting] one of [his] people" on

4    the staff of Boyland's non-profit entity as a no-show employee, allowing Boyland to retain his or her

5    supposed salary, and Boyland said, "[w]e'll do it[,] [w]e'll do it."  (*Id*. at 41.)  Boyland also said,

6    however, that he would expect to receive $250,000 for his role in the project.  (*See* Tr. 618.)  After

7    Quinn expressed some reluctance, Boyland vowed that he was fully committed to the project, noting

8    that "if [he] had any kind of qualms about it, I'd still be in Brooklyn" (GX T-120A, at 91):

9    I understand what it takes to get these projects completed.  Um, and I just, you
10   know . . . shit, I just laid out my motherfuckin' pay line for you.  It's where I am
11   right now.  I mean, what I want to do, my goal for myself is, like I said, over
12   the next 3 to 4 years, work these projects, get them done.

13   (*Id*.)

14         Thereafter, neither Quinn nor Getson made any more payments to Boyland, although

15   they did make a counteroffer to pay him $5,000 for each bribable official he could attract to the real

16   estate scheme.  Boyland declined, and there were no further discussions of the real estate scheme.

17   Boyland stated that the type of people he would bring would be worth considerably more than $5,000.


18         3.    *The Fraudulent Voucher Scheme*

19         The government presented multiple witnesses and exhibits to show that in 2007-2011,

20   Boyland submitted to the State numerous requests for per diems and travel reimbursements for

21   assembly district business trips that he did not take.  For example, there were dates on which he

1    claimed such reimbursement for travel to and from Albany, New York, when instead he was in the

2    Hamptons or out of the country on personal trips--or in New York City meeting with Getson or Quinn.

3    The evidence showed that Boyland collected more than $71,000 as a result of such fraudulent

4    vouchers.

5          4.  *Mail Fraud Conspiracy With Respect to the Nonprofit Entity*

6          Finally, the government presented evidence, principally through testimony by Hermon,

7    that Boyland diverted more than $56,000 of State funds to his own use.  Members of the State

8    Assembly are allotted moneys that they have discretion to have sent to nonprofit public-interest

9    corporations.  One to which Boyland had such funds sent was the nonprofit corporation Wayside

10   Outreach and Development ("Wayside").  However, Hermon testified that Boyland essentially treated

11   that money as "his money" (Tr. 1237) by, for example, having "Wayside[] . . . pay for large

12   [campaign] events" (Tr. 1079).

13   B. *The Jury Instructions*

14         The district court instructed the jury as to the elements of each of the offenses that

15   Boyland was alleged to have committed.  To the extent pertinent to Boyland's contention that the

16   instructions were not consistent with the honest-services fraud law as subsequently announced in

17   *McDonnell*, the court's instructions included the following.

18         As to Counts Two and Eighteen, which alleged that Boyland had attempted to extort

19   money under color of official right in violation of 18 U.S.C. § 1951, the jury was instructed that it

13

1    needed to find that Boyland had, *inter alia*, "used the authority of his office or position to obtain . . .

2    money, goods or services," which the court equated with "represent[ing] him[self] as capable of doing

3    something, or of refusing to do something, because of his official position." (Tr. 3110.)   The court

4    instructed that "[t]he focus of [that] inquiry" was "whether the money, goods or services were given

5    to the defendant because of the defendant's mis[]use of his position," and whether "the defendant knew

6    the giver's consent was wrongfully obtained -- that is, that the money, goods or services were given

7    in connection with the defendant's misuse of his official position rather than being given voluntarily."

8    (Tr. 3111-12.)  The court told the jury that these principles also applied to Counts One and Sixteen,

9    which alleged extortion conspiracy in violation of 18 U.S.C. § 1951(a).  (*See* Tr. 3115-17.)

10                   The instructions on Counts Six through Fifteen, charging honest-services wire fraud

11    in violation of 18 U.S.C. § 1343, likewise highlighted the relevance of Boyland's elected position to

12    the charge.  In the course of instructing the jury on the first element the government needed to prove--

13    "[t]hat the defendant knowingly devised or participated in a scheme to defraud the public of its right

14    to the honest services of a public official through bribery or kickbacks" (Tr. 3143)--the court stated

15    the following:

16                         A public official owes a duty of honest and faithful service to the public he
17                         served and [to] his public employer.  When a public official solicits, agrees to
18                         receive or receives a corrupt payment for or because of official action, the
19                         official has breached his duty of honest and faithful disinterested service.  The
20                         term "official act" includes the decisions o[r] actions generally expected of a
21                         public official, including but not limited to contacting or lobbying other
22                         governmental agencies, and advocating for his constituents.

23    (Tr. 3144.)  The court stated that this principle was also applicable to Count Five, conspiracy to

24    commit honest-services fraud.  (*See* Tr. 3150.)

                                                    14

1    The court's instructions on the remaining counts, apart from a stray reference to an

2    "official act" in the course of describing an illegitimate defense to a federal programs bribery charge

3    (*see* Tr. 3126) and an overview of what amounts to bribery under New York law (*see* Tr. 3134-37),

4    did not discuss actions taken in an official capacity as being a prerequisite for conviction.

5    C. *The Verdict*

6    The jury found Boyland guilty on all 21 counts charged in the Indictment.  Boyland was

7    sentenced as indicated above.  This appeal followed.

8                                    II. DISCUSSION

9    On appeal, Boyland challenges his conviction, contending principally that the jury

10   charge as to Counts One through Nineteen was erroneous in light of the Supreme Court's subsequent

11   decision in *McDonnell*, 136 S. Ct. 2355, which narrowed the interpretation of "official act" within the

12   meaning of the federal bribery statute, 18 U.S.C. § 201(a)(3), as effectively incorporated in sections

13   prohibiting *quid pro quo* corruption.  He acknowledges that he did not object to the instructions but

14   argues that he is entitled to relief upon plain-error review.  Boyland also challenges some of the trial

15   court's evidentiary rulings.

16   The government concedes that the district court's unobjected-to instructions on Counts

17   Five through Fifteen, the 11 honest-services fraud counts, were erroneous in light of *McDonnell*, but

18   it contends that the error does not warrant relief under plain-error analysis.  And it argues that the

1    court's other instructions were not affected by *McDonnell* and that there were no evidentiary or other

2    errors.

3         For the reasons that follow, we conclude that the "plain error" standard is not met; and

4    we find no basis for reversal in defendant's other contentions.

5    A.  *The Plain-Error Standard*

6         The Federal Rules of Criminal Procedure allow limited review of an unpreserved error

7    pursuant to Fed. R. Crim. P. 52(b), if it meets specific criteria.  As stated by the Supreme Court,

8         Rule 52(b) permits an appellate court to recognize a "plain error that
9    affects substantial rights," even if the claim of error was "not brought" to the
10   district court's "attention."  Lower courts, of course, must apply the Rule as this
11   Court has interpreted it.  And the cases that set forth our interpretation hold
12   that an appellate court may, in its discretion, correct an error not raised at trial
13   only where the appellant demonstrates that (1) there is an "error"; (2) the error
14   is "clear or obvious, rather than subject to reasonable dispute"; (3) the error
15   "affected the appellant's substantial rights, which in the ordinary case means"
16   it "affected the outcome of the district court proceedings"; and (4) "the error
17   seriously affect[s] the fairness, integrity or public reputation of judicial
18   proceedings."

19   *United States v. Marcus*, 560 U.S. 258, 262 (2010) (quoting *Puckett v. United States*, 556 U.S. 129,

20   135 (2009)); *see*, *e.g.*, *United States v. Olano*, 507 U.S. 725, 731-37 (1993); *Johnson v. United States*,

21   520 U.S. 461, 466-67 (1997); *United States v. Cotton*, 535 U.S. 625, 631-32 (2002).  The *Marcus*

22   Court emphasized that

23        [t]he third criterion specifies that a "plain error" must "affec[t]" the appellant's
24   "substantial rights."  In the ordinary case, to meet this standard an error must
25   be "prejudicial," which means that there must be a reasonable probability that
26   the error affected the outcome of the trial,

16

1   *Marcus*, 560 U.S. at 262 (quoting *Olano*, 507 U.S. at 734-35), and that the "fourth 'plain error'

2   criterion . . . permits an appeals court to recognize 'plain error' only if the error 'seriously affect[s] the

3   fairness, integrity, or public reputation of judicial proceedings,'" *Marcus*, 560 U.S. at 265 (quoting

4   *Johnson*, 520 U.S. at 467).

5          The burden of meeting the above criteria for relief under plain-error analysis is on the

6   defendant. *See*, *e.g.*, *United States v. Dominguez Benitez*, 542 U.S. 74, 82 (2004). The government

7   may point to parts of the record in an effort to counter any ostensible showing of prejudice the

8   defendant may make. *See*, *e.g.*, *United States v. Young*, 470 U.S. 1, 16 (1985).

9          Boyland argues that, where the error a defendant raises on appeal results from a

10   supervening Supreme Court decision, we should apply the modified version of the plain error test

11   discussed in *United States v. Viola*, 35 F.3d 37, 41-43 (2d Cir. 1994) ("*Viola*"), *abrogated on other*

12   *grounds by Salinas v. United States*, 522 U.S. 52 (1997). On the basis that in such a scenario the

13   defendant would not have been sufficiently on notice to have objected to the error at trial, the modified

14   plain error test would shift the burden to the government to demonstrate that the defendant did not

15   suffer prejudice. *See Viola*, 35 F.3d at 41-43. In the wake of *Johnson v. United States*, 520 U.S. 461,

16   469-70 (1997), we have acknowledged doubt as to the continued viability of the modified plain error

17   test but have not had the need to address it. *See*, *e.g.*, *United States v. Prado*, 815 F.3d 93, 102-03 (2d

18   Cir. 2016). We similarly decline to address its continued viability here because, regardless of which

19   party bears the burden with respect to the prejudice prong, we are convinced that Boyland did not

20   suffer any prejudice.

1    B.  McDonnell

2           In *McDonnell*, the government and the defendant former governor of Virginia had

3    agreed that, for purposes of considering whether a public official committed honest-services wire

4    fraud and Hobbs Act extortion, the jury should determine whether the official, in exchange for loans

5    or gifts, performed "official act[s]" as that term is defined in the federal bribery statute, 18 U.S.C.

6    § 201(a)(3).  *See* 136 S. Ct. at 2365.  The Supreme Court ruled that, in instructing the jury, the trial

7    court had interpreted that term too expansively.  *See id*. at 2374.

8           The *McDonnell* Court held that, in order to prove that the defendant performed an

9    official act as that term is defined in § 201, the government must prove two factors.  First it must

10   identify "a 'question, matter, cause, suit, proceeding or controversy' that 'may at any time be pending'

11   or 'may by law be brought' before a public official" that would involve "a formal exercise of

12   governmental power, such as a lawsuit, hearing, or administrative determination."  *McDonnell*, 136

13   S. Ct. at 2368 (quoting 18 U.S.C. § 201(a)(3)).  The Court noted that the subject of whether a state-

14   created commission "would 'allocate grant money for'" a briber's desired project "qualif[ies] as [a]

15   question[] or matter[] under § 201(a)(3)," as that is an issue that "is focused and concrete, and . . .

16   involves a formal exercise of governmental power that is similar in nature to a lawsuit, administrative

17   determination, or hearing."  *McDonnell*, 136 S. Ct. at 2370.

18          Second, the government must prove that "the public official made a decision or took

19   an action 'on' that question, matter, cause, suit, proceeding, or controversy, or agreed to do so."

20   *McDonnell*, 136 S. Ct. at 2368.  The Court ruled that these criteria are not met by proof merely that

21   an official hosted an event, meeting, or speech "related to" a pending question or matter.  *Id*. at 2370.

1    Nonetheless, the Court stated that while "setting up a meeting, calling another public

2    official, or hosting an event does not, standing alone, qualify as an 'official act,'" *id*. at 2368, such

3    actions "could serve as evidence of an agreement to take an official act," *id*. at 2371.  And a jury would

4    be entitled to "conclude that an agreement was reached if the evidence shows that the public official

5    received a thing of value knowing that it was given with the expectation that the official would

6    perform an 'official act' in return." *Id*.  Further, the Court noted that the government is not required

7    to prove that the defendant official actually performed the agreed task; it is enough for purposes of the

8    federal bribery statute to show that the official "agree[d]" to make a decision or take an action.  *Id*.

9    at 2370-71.  In addition, § 201 would be violated by an agreement to "us[e one's] official position to

10   exert pressure on *another* official to perform an 'official act.'"  *McDonnell*, 136 S. Ct. at 2370

11   (emphasis in original).   If a public official agrees to "use[] his official position to provide advice to

12   another official, knowing or intending that such advice will form the basis for an 'official act' by

13   another official, that too can qualify as a decision or action for purposes of § 201(a)(3)."  *McDonnell*,

14   136 S. Ct. at 2370.

15   C. *The Instructions in the Present Case*

16   Most of the counts against Boyland involved assessment of whether what he offered

17   or sold amounted to an "official act," though some did not.

19

1          1. *Honest-Services Fraud:  Counts Five Through Fifteen*

2                  We agree with the parties that the district court's honest-services charge with respect

3      to Counts Five through Fifteen in this case did not meet the standards set by *McDonnell*.  The district

4      court instructed the jury, *inter alia*, that an official act encompassed "decisions o[r] actions generally

5      expected of a public official, *including but not limited to contacting or lobbying other governmental*

6      *agencies*, and advocating for his constituents."  (Tr. 3144 (emphasis added).)  As *McDonnell* makes

7      clear, however, "[s]etting up a meeting, talking to another official, or organizing an event (or agreeing

8      to do so)--without more--does not fit th[e] definition of 'official act.'"  *McDonnell*, 136 S. Ct. at 2372.

9      The instruction that merely "contacting . . . other governmental agencies" qualified as an official act

10     for purposes of § 1343 was therefore erroneous in light of *McDonnell*.


11         2. *Hobbs Act Extortion: Counts One, Two, Sixteen, and Eighteen*

12                 While  the  government  does  not  similarly  concede  that  there  was  error  in  the

13     instructions given to the jury with respect to the alleged Hobbs Act extortion offenses (whether

14     attempted (Counts Two and Eighteen) or conspiratorial (Counts One and Sixteen)), we are inclined

15     to view these instructions also as flawed.  With respect to the honest-services wire fraud counts, both

16     sides had requested instructions that included the terms by which § 201(a)(3) defines "official act."

17     But their proposed instructions with respect to the Hobbs Act counts did not include that language,

18     and the jury was told that in order to convict on these counts it needed to find that Boyland knew that

19     any money he accepted "was offered in exchange for a specific exercise of [Boyland's] official

20     powers" (Tr. 3111).  *McDonnell* concerned the meaning of "official act" as used in 18 U.S.C.

1    § 201(a)(3) because the parties agreed to use that definition for purposes of instructing the jury as to

2    both honest-services fraud and Hobbs Act extortion.  *See McDonnell*, 136 S. Ct. at 2365.  However,

3    in addition to considering Congressional intent, the Court's analysis turned upon constitutional

4    concerns stemming from the breadth of the interpretation advanced by the government.  *See id*.

5    at 2372-73.  Particularly troubling to the Court was the possibility of criminal penalties for innocuous

6    conduct by government officials attempting to serve their constituents.  *See id*. at 2372.  We believe

7    that the instructions provided to the jury here with regard to Hobbs Act extortion, not explicitly

8    incorporating the definition of "official act" in 18 U.S.C. § 201(a)(3), suffered from the same flaws,

9    in that they did not sufficiently inform the jury as to the nature of the power that the government was

10   required to prove the defendant exercised or promised to exercise.  The jury could have believed, as

11   with the counts of honest-services wire fraud, that merely contacting another government agency

12   sufficed to constitute a misuse of his "official powers."

13        3.  *Federal Funds Bribery: Counts Four, Seventeen, and Nineteen*

14            We do not reach the same conclusion with respect to the instructions given for Counts

15   Four, Seventeen, and Nineteen, alleging bribery and bribery conspiracy with respect to the carnival

16   and real estate schemes, in violation of 18 U.S.C. § 666.  That section is more expansive than § 201,

17   in which "official act[s]" are limited to acts on pending "question[s], matter[s], cause[s], suit[s],

18   proceeding[s], or controver[ies]," 18 U.S.C. § 201(a)(3).  Section 666 prohibits individuals from

19   "solicit[ing] . . . anything of value from any person, *intending to be influenced* or rewarded *in*

20   *connection with any* business, transaction, or series of transactions of [an] organization, government,

1  or agency." 18 U.S.C. § 666(a)(1)(B) (emphases added).  We do not see that the *McDonnell* standard

2  applied to these counts.

3       4.     *Voucher Fraud and Other Conspiracy:  Counts Three, Twenty, and Twenty-One*

4           The remaining three counts, alleging conspiracy to commit bribery and violate the

5  Travel Act (Count Three), voucher fraud (Count Twenty), and mail fraud conspiracy (Count Twenty-

6  One), likewise do not depend on the meaning of official act under § 201(a)(3).  We do not see error

7  in the instructions on these counts.

8  D. *Effect on Boyland's Substantial Rights*

9           While the instructions with respect to the honest-services fraud and Hobbs Act

10  extortion counts were erroneous in light of the standard set by *McDonnell*, we cannot conclude that

11  the errors affected Boyland's substantial rights.  The carnival and real estate schemes to which Boyland

12  agreed with Getson and Quinn were concrete matters that, in order to proceed as planned, required

13  formal governmental decisions.  City licenses and permits were required for the operation of a

14  carnival.  And City or State approvals were required in order to secure grant money, to award the

15  contemplated demolition contracts, and to enact zoning changes.  All of these approvals would require

16  the formal exercise of governmental power.

17           Boyland promised that he would ensure that all of the necessary governmental actions

18  occurred.  For example, with respect to the carnival scheme, he stated that he already had the City's

22

1    HPD "locked up" and that its approval would be forthcoming.  He undertook to provide letters to the

2    Commissioner of the City's Department of Consumer Affairs ("DCA") that "vouch[ed]" for Weiner's

3    character (GX LC-2A); Boyland expressed his "strong support for these permits[,] . . . request[ing]

4    that [DCA] grant them expeditiously"; and he stated, "I know that you will look favorably on this

5    application and grant your approval" (GX LC-2E).

6               Similarly, with respect to the real estate scheme, Boyland assured Getson and Quinn

7    that he would get them State grant money for the renovation of the building, would have zoning

8    changes implemented, and would see that Quinn's associates were awarded lucrative demolition

9    contracts.  While making these promises and assuring Getson and Quinn that he had locked up

10   approvals for the carnival scheme, Boyland was, as described in Parts I.A.2. and I.A.1. above, asking

11   Getson and Quinn for money for various of his projects or for his personal use.

12              In sum, all of Boyland's dealings with Getson and Quinn involved concrete matters

13   that, in order to proceed, needed to be brought before public officials or agencies that would have to

14   make formal and focused administrative decisions.  In connection with each matter, Boyland agreed

15   to ensure that favorable governmental decisions would be made, whether for licensing, work contracts,

16   zoning, or funding.  Although the jury was not instructed as to its need to find that the matters were

17   concrete, that they required focused governmental decisions, and that Boyland took action on these

18   matters, we see no reasonable possibility, in light of the record as a whole, that that flaw affected the

19   outcome of the case.

23

1    E.  *Other Arguments*

2          Boyland's other arguments lack merit and do not warrant extended discussion.  They

3    include a claim that his convictions on Counts Twenty and Twenty-One should be vacated on the

4    ground of prejudicial spillover from counts as to which we have concluded that Boyland is not entitled

5    to relief on plain-error review, and a challenge to the admission of certain testimony by the undercover

6    FBI agents on a ground Boyland did not mention in the district court.

7                                          CONCLUSION

8          We have considered all of Boyland's arguments on this appeal and have found in them

9    no basis for reversal.  The judgment of the district court is affirmed.