UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

     - v. -

JOSEPH PERCOCO,
  a/k/a "Herb,"
ALAIN KALOYEROS,
  a/k/a "Dr. K.,"
PETER GALBRAITH KELLY, JR.,
  a/k/a "Braith,"
STEVEN AIELLO,
JOSEPH GERARDI,
LOUIS CIMINELLI,
MICHAEL LAIPPLE, and
KEVIN SCHULER,

             Defendants.

No. 16 Cr. 776 (VEC)

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS
JOSEPH GERARDI'S AND STEVEN AIELLO'S MOTION TO DISMISS FOR
PROSECUTORIAL MISCONDUCT, SEVER, AND FOR A BILL OF
<u>PARTICULARS</u>**

**O'CONNELL & ARONOWITZ**

**Stephen R. Coffey**
**Scott W. Iseman**
54 State Street
Albany, NY 12207
(518) 462-5601

*Attorneys for Defendant Steven Aiello*

**WALDEN MACHT & HARAN LLP**

**Milton L. Williams**
**Avni P. Patel**
One Battery Park Plaza
New York, NY 10004
(212) 335-2030

*Attorneys for Defendant Joseph Gerardi*

# TABLE OF CONTENTS

MOTION TO DISMISS FOR PROSECUTORIAL MISCONDUCT .............................. 1

MOTION FOR BILL OF PARTICULARS AND MOTION TO DISMISS ..................... 3

   A. Insufficiency of the Government's Response to Motion for Bill of Particulars ....... 3

   B. Dismissal is the Only Remedy for the Legal Insufficiency of Each Count .............. 6

      1. Failure to Allege a Cognizable Property Deprivation in the Wire Fraud Counts ... 6

      2. Failure to Allege Legally Sufficient "Official Acts" in the § 666 and Honest Services Counts ..................................................................................................... 9

      3. The False Statement Count should be Dismissed for Duplicity and Legal Insufficiency ............................................................................................................ 14

NEED FOR SEVERANCE .............................................................................................. 15

MOTION TO STRIKE SURPLUSAGE ......................................................................... 20

PREINDICTMENT PREJUDICE ................................................................................... 21

# TABLE OF AUTHORITIES

**CASES**

*Bank of Nova Scotia v. United States*,
    487 U.S. 250 (1988) ............................................................................................ 1

*Cleveland v. United States*,
    531 U.S. 12  (2000) ............................................................................................. 8

*Huddleston v. United States*,
    485 U.S. 681 (1988) ......................................................................................... 20

*McDonnell v. United States*,
    136 S. Ct. 2355 (2016) ............................................................................... passim

*McNally v. United States*,
    483 U.S. 350 (1987) ............................................................................................ 8

*Skilling v. United States*,
    561 U.S. 358 (2010) ............................................................................................ 9

*United States v. Aleskerova*,
    300 F.3d 286 (2d Cir. 2002) ............................................................................ 21

*United States v. Babb*,
    807 F.2d 272 (1st Cir. 1986) .............................................................................. 1

*United States v. Berger*,
    224 F.3d 107 (2d Cir. 2000) ............................................................................ 16

*United States v. Binday*,
    804 F.3d 558 (2d Cir. 2015) .............................................................................. 7

*United States v. Blandford*,
    33 F.3d 685 (6th Cir. 1994) ............................................................................. 14

*United States v. Boyland*,
    No. 15-3118, 2017 WL 2918840 (2d Cir. July 10, 2017) ............................... 10

*United States v. Bravo-Fernandez*,
    No. 10-232, 2017 U.S. Dist. LEXIS 33944 (D.P.R. March 7, 2017) ............. 13

*United States v. Dedman*,
    527 F.3d 577 (6th Cir. 2008) ........................................................................... 15

*United States v. Duffy*,
    188 F. Supp.2d 281 (E.D.N.Y. 2002) ............................................................. 19

*United States v. Finazzo*,
    850 F.3d 94 (2d Cir. 2017) ................................................................................ 8

*United States v. GAF Corp.*,
928 F.2d 1253 (2d Cir.1991)........................................................................... 6

*United States v. Ganim*,
510 F.3d 134 (2d Cir. 2007)........................................................... 10, 11, 12, 13

*United States v. Hasting*,
461 U.S. 499 (1983).................................................................................... 2

*United States v. Maldonado-Rivera*,
922 F.2d 934 (2d Cir. 1990).......................................................................... 16

*United States v. McGowan*,
58 F.3d 8 (2d Cir. 1995)............................................................................... 19

*United States v. Sadler*,
750 F.3d 585 (6th Cir. 2014) ....................................................................... 7, 8

*United States v. Sakoc*,
115 F. Supp.3d 475 (D. Vt. 2015).................................................................. 14

*United States v. Silver*,
No. 16-1615-CR, 2017 WL 2978386 (2d Cir. July 13, 2017) ..................... 9, 11, 12, 14

*United States v. Stringer*,
730 F.3d 120 (2d Cir. 2013).......................................................................... 14

*United States v. Sun-Diamond Growers of California*,
526 U.S. 398 (1999)..................................................................................... 10

*United States v. Trinh*,
638 F. Supp.2d 143 (D. Mass. 2009) ............................................................... 1

*United States v. Twersky*,
No. 92-CR-1082, 1994 U.S. Dist. LEXIS 8744 (S.D.N.Y. June 29, 1994)................. 13

*United States v. Wey*,
No. 15-CR-611 (AJN), 2017 WL 237651 (S.D.N.Y. Jan. 18, 2017).......................... 16

*United States v. Yildiz*,
355 F.3d 80 (2d Cir. 2004)............................................................................. 6

## STATUTES

18 U.S.C. § 1001 .............................................................................. 2, 3, 14, 15

18 U.S.C. § 201 ...................................................................................... 9, 10

18 U.S.C. § 666................................................................................... passim

**RULES**

Federal Rule of Criminal Procedure 14 ........................................................................... 18

Federal Rule of Criminal Procedure 8 ...................................................................... 17, 18

Federal Rule of Evidence 404 .................................................................................... 18, 20

Federal Rule of Evidence 801 ........................................................................................ 6

## MOTION TO DISMISS FOR PROSECUTORIAL MISCONDUCT

The Government would like to transform Defendant's Motion to Dismiss the Indictment for Prosecutorial Misconduct into a counterfactual claim about how defendants might have behaved. *See* Gov't Opp. 168. But at its core, the motion is nothing of the sort. It is rather a claim about how the Government *did* behave. The factual claim with respect to the defendants simply goes to the prejudice they suffered. *See Bank of Nova Scotia v. United States*, 487 U.S. 250, 254 (1988) (requiring inquiry into prejudice before court invokes supervisory powers).

It would have been troubling enough if the Government had simply failed to properly alert Aiello and Gerardi that they were "targets" of the investigation. *See United States v. Trinh*, 638 F. Supp.2d 143 (D. Mass. 2009) (declining to dismiss indictment where defendant misled about "target" status, but, implicitly, not finding intentional misrepresentation); *see also United States v. Babb*, 807 F.2d 272 (1st Cir. 1986) (affirming perjury conviction where defendant misled, but making no inquiry into whether there was active deceit by the government). Yet what puts the Government's conduct past the bar of what this Court should tolerate is the fact that the prosecutor actively and, we can only presume, intentionally misled both men about their status.

To be sure, the Government's reply papers do not explicitly concede the truth of the facts alleged in the Affidavit of Anthony Copani and discussed in Defendants' moving papers with respect to the Government's active misrepresentation. Copani Aff.; Defs.' Mot. to Dismiss 3. The Government's actions infer intentionality, and its failure to acknowledge its mistake, either contemporaneously or now. What is more, the Government failed to respond to the defendant's assertions, and facts delineated in their submitted affidavit, as

is required when a defendant submits an affidavit challenging the Government's actions. But the Government's failure to deny is so probative that defendants ask the Court to treat the evidence of Government misrepresentation as conclusive and to presume intentionality.

Even if the Court did not make this presumption, it could find powerful evidence of bad faith from the Government's own narrative, which notes that it had believed Aiello "had lied to the FBI during a prior interview" (on April 26, 2016) and told him so on June 21, 2016. Gov't Opp. 168-69; Compl. ¶ 88. If the Government truly believed that Aiello had committed one or more 18 U.S.C. § 1001 violations at the April 26, 2016 interview, its representation on June 21, 2016 that he and Gerardi were still merely "subjects" strongly suggests an intent to deceive. It also suggests a kind of desperation, since after an investigation of more than a year, the Government seems to have decided that it needed the June 21, 2016 interview to get a preview of how Aiello and Gerardi would be defending themselves against any charges.

Alternatively, if the Court decides not to draw the inferences we request, we ask for a hearing at which the defendants can question and explore the credibility of any innocent explanation the Government offers.

If the Court, by inference or after a hearing, finds intentional deceit by the Government, the defendants assert that such misconduct meets the high bar required for dismissal as an exercise of the Court's supervisory power. *See United States v. Hasting*, 461 U.S. 499 (1983). Certainly, prejudice should be easy to find. After an investigation lasting more than a year that turned up so little evidence of criminality that the Government can now make a straight-faced claim that Aiello and Gerardi were mere "subjects," the

Government gained a treasure trove of discovery it would not have obtained had it been forthright. At the very least, such a conclusion would counsel dismissal of Court Fifteen.

## MOTION FOR BILL OF PARTICULARS AND MOTION TO DISMISS

Mindful of the burden on defendants seeking dismissal of an indictment, our initial papers gave the Government an opportunity to clarify the allegations in the Superseding Indictment so as to give defendants adequate notice and to avoid duplicity and legal insufficiency. However, putting hopes of strategic gain and surprise over its duty to set out legally sufficient offenses, the Government has stubbornly refused to commit itself to specificities, and relies on inapt boilerplate language and prior allegations in the sprawling Complaint. Neither of these satisfies the Government's obligations in this case. Moreover, the Government's defense of its sketchy charging language bespeaks a commitment to legal theories that find no support in the relevant case law.

We therefore must drop the conditionality of our initial motion to dismiss Counts Three, Ten, and Fourteen, and Fifteen of the Superseding Indictment, and join our co-defendants in urging the dismissal of Counts One and Two.

### A. Insufficiency of the Government's Response to Motion for Bill of Particulars

The Government offers two sorts of responses to defendants' cogent arguments for a bill of particulars with respect to the "property" of which victims were deprived in the alleged bid-rigging schemes; the "official acts" that were the subject of the quid pro quos alleged in the 18 U.S.C. § 666 and honest services fraud counts; the false statements charged in the 18 U.S.C § 1001 count; and other critical aspects of the offenses charged in the indictment.

First, the Government utilizes case law that relieve it from committing itself pre-trial to how it will prove its case, and the "wheres," "whens," "hows" and "manners in which" the charged offenses were committed. Gov't Opp. 136-39. Yet the "property," "official acts," and "false statements" are not details about the charged offenses. They are elements. The Superseding Indictment fails to articulate whose "official acts" form the basis of the bribery counts. We trust that the Court will instruct the jury that it must find each of these elements with particularity. Defendants will also be able to claim prejudicial duplicity if there is any lack of clarity on which crime the jury has found. However, there is no substitute for up-front clarity at the onset. Indeed, in *McDonnell v. United States*, 136 S. Ct. 2355 (2016), the Supreme Court highlighted why constitutional and prudential considerations require the Government to be particularly clear on the "official act" on which a quid pro quo finding is based. Particularly, the cases we cited demand clarity for Count Fifteen that is not satisfied by the Government's pointing to the Superseding Indictment's specification of the "place, time, and subject matter of the false statements." Gov't Opp. 145 n. 42.[1]

Second, the Government relies on the discovery, and especially the Complaint, in this case as substitutes for a bill of particulars. However, as we have previously argued,

---

[1] The Government notes that "[i]f the Court grants a discretionary severance and orders the two trials proposed by the Government, the Government intends to seek a superseding indictment from the grand jury that would split the current Count Fifteen, charging Aiello and Gerardi with false statements, into two counts -- namely, one count charging the Syracuse Defendants with making false statements related to the RFP bid rigging scheme, and one count charging them with making false statements related to their bribery of Percoco." Gov't Opp. 100 n.32. Such a separation will in no way address the legally deficient nature of the false statement allegations and unjustifiably exposes Aiello and Gerardi to the risk of an unjustified and inadequately supported conviction.

these are not legally adequate substitutes because they do not bind the Government nor do they give defendants the clarity as to the elements of the charged offenses that they are entitled to. With respect to Count Fifteen, to take one example, neither the FBI 302s, nor the handwritten notes from the proffer sessions, offer any indication of which statements were deemed to be lies or reflect that Aiello and Gerardi were in any way dishonest.

Even the information the Government has been willing to give is inconsistent and lacks clarity. In the bribery scheme/charges background portion of the Superseding Indictment, the "[o]fficial acts" Percoco is said to have taken for the benefit of the "Syracuse Developer" include the actions related to the Labor Peace Agreement ("LPA") that Percoco took while he was serving on the Governor's campaign and not in government. Superseding Indictment ¶ 35(a). Yet, in its papers, when defending the bribery charges against Percoco's argument that he lacked official status, the Government now says that Percoco:

> took official action to benefit the Syracuse Developer and Aiello in exchange for those bribes *after* he returned to State service. Specifically, Percoco took official action to release State funds for the Film Hub in or about September 2015, and later the same month, he took official action to secure a salary increase for Aiello's son, a State employee. (Superseding Indictment ¶ 35(b)-(c).)

Gov't Opp. 75 (emphasis in original).

What happened to the LPA allegations? Were the actions that Percoco is alleged to have taken in connection to them "official acts" of the sort that might support the honest services and 18 U.S.C. § 666 charges against Aiello and Gerardi? Is the Government now conceding they do not belong in the case? We have no way of knowing at this time.

Should the Court nevertheless deny our motion for further particulars and not, as we urge below, dismiss the relevant Counts, we urge the Court to rule that the Affidavit of Criminal Investigator Deleassa Penland will be deemed a Government admission under Federal Rule of Evidence 801 (d)(2)(D). The Second Circuit has made clear that prosecutors can "bind" the Government, as an evidentiary matter, through their filings. *See United States v. Yildiz*, 355 F.3d 80, 82 (2d Cir. 2004). Bills of particulars certainly fall within this category, indeed even ones that have been superseded. *See United States v. GAF Corp.*, 928 F.2d 1253, 1258–62 (2d Cir.1991). The same argument can be made for the entire Complaint in this case, which is a "sworn statement[] submitted to a judicial officer[] [that] the government might be said to have adopted." *Yildiz*, 355 F.3d at 82. Because we expect the Government would nonetheless contest extension of this doctrine to the entire Complaint, and even to those parts it vaguely alludes to when responding to our bill of particulars demand, we ask this Court to make clear that the Government will be so bound. At the very least, those parts of the Complaint that the Government relies on to substitute for a bill of particulars should be given the status of a proper bill.

## B. Dismissal is the Only Remedy for the Legal Insufficiency of Each Count

### 1. Failure to Allege a Cognizable Property Deprivation in the Wire Fraud Counts

Responding to our demand that the Government specify the property deprivation that forms the basis of the Counts alleging "bid-rigging," the Government's papers identify the victim of the charged fraud as the Fort Schuyler Board of Directors and the property deprivation as their "right to control" their assets through the denial of "economically valuable information." Gov't Opp. 55-56. Even though the Government's brief lacks the binding clarity of a bill of particulars, this assertion is somewhat more informative than the

Superseding Indictment, which simply claimed that defendants defrauded Fort Schuyler "in its award of significant taxpayer-funded development contracts by representing to Fort Schuyler that the bidding processes for those contracts were fair, open, and competitive," when in fact the RFPs had been tailored. Superseding Indictment ¶ 39; *see also* ¶ 41.

Although the Government seems to think alluding to the "right to control" line of cases ends the analysis, the invocation is just a start. And when the relevant law is considered, as well as the Government's failure to acknowledge it in the Superseding Indictment and in the Government's response, the need for dismissal becomes clear.

In *United States v. Binday*, 804 F.3d 558 (2d Cir. 2015), after noting that a cognizable property deprivation can be found "where the defendant's scheme 'den[ies] the victim the right to control its assets by depriving it of information necessary to make discretionary economic decisions,'" the Second Circuit cautioned:

> It is not sufficient, however, to show merely that the victim would not have entered into a discretionary economic transaction but for the defendant's misrepresentations. The "right to control one's assets" does not render every transaction induced by deceit actionable under the mail and wire fraud statutes. Rather, the deceit must deprive the victim "of potentially valuable economic information." "Our cases have drawn a fine line between schemes that do no more than cause their victims to enter into transactions they would otherwise avoid—which do not violate the mail or wire fraud statutes—and schemes that depend for their completion on a misrepresentation of an essential element of the bargain—which do violate the mail and wire fraud statutes."

*Id.* at 570 (citations omitted).

We note that not all Circuits have embraced this approach. For example, in *United States v. Sadler*, 750 F.3d 585 (6th Cir. 2014), where the defendant lied to pharmaceutical

distributors when she ordered massive quantities of hydrocodone for her pain-management clinic, the Sixth Circuit noted that the mail/wire fraud statute:

> is "limited in scope to the protection of *property rights,*" and the ethereal right to accurate information doesn't fit that description. [*McNally v. United States*, 483 U.S. 350, 360 (1987)] (emphasis added). Nor can it plausibly be said that the right to accurate information amounts to an interest that "has long been recognized as property." [*Cleveland v. United States,* 531 U.S. 12, 23 (2000).]"

*Id.* at 591. Therefore, in the face of this brewing Circuit split, we seek to preserve our right to challenge the whole notion of "right to control" as a theory of property deprivation.

We need not prevail on such a categorical challenge to obtain dismissal here, however, for even the Second Circuit has clarified the difference between legally insufficient "mere" deceit and a legally sufficient deprivation of the right to control. The Superseding Indictment's allegations are of the insufficient variety. In *United States v. Finazzo*, 850 F.3d 94 (2d Cir. 2017), the Court reviewed its cases and noted:

> The common thread of these decisions is that misrepresentations or non–disclosure of information cannot support a conviction under the "right to control" theory unless those misrepresentations or non–disclosures can or do result in tangible economic harm. This economic harm can be manifested directly—such as by increasing the price the victim paid for a good—or indirectly—such as by providing the victim with lower–quality goods than it otherwise could have received.

*Id.* at 111.

The Government's papers are quiet as to what "tangible harm" could have resulted from defendants' allegedly false representation to the Fort Schuyler Board of Directors "that the bidding process[] [was] fair, open, and competitive." Superseding Indictment ¶ 25 The Superseding Indictment gives no clue, and even the Government's papers fail to

indicate a readiness to prove "economic" or "tangible" harm by anything other than *ipse dixit.*

As the Government is unwilling to allege specificities and meet its burden to articulate this critical element of the fraud counts against the defendants, Counts One and Two should be dismissed.

### 2. Failure to Allege Legally Sufficient "Official Acts" in the § 666 and Honest Services Counts

While the Government dances around *McDonnell*, trying to avoid the full applicability of the Supreme Court's analysis to this case, it ultimately seems ready to acknowledge that both honest services fraud and 18 U.S.C. § 666 -- if it is to be found constitutional -- must require (1) proof of a quid pro quo, *see Skilling v. United States*, 561 U.S. 358 (2010) (honest services); Gov't Opp. 33 ("Section 666 requires proof that the payments were made as part of a corrupt quid pro quo agreement"), and (2) proof that this quid pro quo be with respect to an "official act," as defined in *McDonnell*; Gov't Opp. 31-33.

While the *McDonnell* Court's "official act" analysis for honest services charges, drawing on 18 U.S.C. § 201, was ostensibly based on party agreement, the Government does not appear to be offering "an alternative definition that would allay the constitutional concerns expressed in *McDonnell*." *United States v. Silver*, No. 16-1615-CR, 2017 WL 2978386, at n.67 (2d Cir. July 13, 2017). Thus we assume that if this Court determines that a bribery statute incorporates an official act element, it will, like the Second Circuit in *United States v. Silver,* "apply the *McDonnell's* definition of an 'official act,' as derived from § 201(a)(3)." *Id.*

As the Second Circuit recently noted, § 666 is less demanding than the honest services statute, as the Court applied it in *McDonnell*. In *United States v. Boyland*, No. 15-3118, 2017 WL 2918840 (2d Cir. July 10, 2017), the Court explained that § 666:

> is more expansive than § 201, in which "official act[s]" are limited to acts on pending "question[s], matter[s], cause[s], suit[s], proceeding[s], or controver[ies]," 18 U.S.C. § 201(a)(3). Section 666 prohibits individuals from "solicit[ing] . . . anything of value from any person, *intending to be influenced* or rewarded *in connection with any* business, transaction, or series of transactions of [an] organization, government, or agency." 18 U.S.C. § 666(a)(1)(B) (emphases added).

*Id.* at *9 (Parallel language appears in § 666(a)(2) for payors.) Indeed, this expansiveness has led our co-defendants to make cogent arguments of § 666's unconstitutionality, *see* Kelly Mot. to Dismiss -- arguments that we continue to join.

Even so, § 666 still demands a specificity that Count Fourteen purports, but fails, to meet by charging payments made "in exchange for, to influence, and to reward the taking of official action to benefit the Syracuse Developer, including official action to advance its development projects in the State." Superseding Indictment ¶ 67. Therefore, the Government's failure to articulate one or more specific official acts, or even the specific transactions they relate to, as the subject of quid pro quos alleged in the Superseding Indictment, requires that Counts Three, Ten, and Fourteen be dismissed.

Recognizing that payments made simply to gain a "reservoir of goodwill" – which would not even support a gratuity charge under *United States v. Sun-Diamond Growers of California*, 526 U.S. 398 (1999) – would not support a bribery charge under either statute, the Government, relies heavily on *United States v. Ganim*, 510 F.3d 134 (2d Cir. 2007). Gov't Opp. 39, 43. There, addressing an extortion prosecution, the Circuit explained:

> [S]o long as the jury finds that an official accepted gifts in exchange for a promise to perform official acts for the giver, it need not find that the specific act to be performed was identified at the time of the promise, nor need it link each specific benefit to a single official act. To require otherwise could subvert the ends of justice in cases—such as the one before us— involving ongoing schemes. In our view, a scheme involving payments at regular intervals in exchange for specific officials acts as the opportunities to commit those acts arise does not dilute the requisite criminal intent or make the scheme any less "extortionate."

510 F.3d at 147. The issue here, however, is whether *Ganim* is still good law after *McDonnell,* and, to the extent it is, what is now required in way of pleading and, come trial, proof.

The *McDonnell* Indictment specified "at least five 'official acts'" taken by McDonnell. 136 S. Ct. at 2365-66. The Court reversed in *McDonnell* because the jury instructions (1) "did not adequately explain to the jury how to identify the 'question, matter, cause, suit, proceeding or controversy'"; (2) "did not inform the jury that the 'question, matter, cause, suit, proceeding or controversy' must be more specific and focused than a broad policy objective"; and (3) did not inform the jury "that to convict Governor McDonnell, it had to find that he made a decision or took an action—or agreed to do so— on the identified 'question, matter, cause, suit, proceeding or controversy,' as [the Court] construed that requirement." *Id.* at 2374; *see United States v. Silver*, 2017 WL 2978386, at *12.

From *McDonnell,* the Government appeared to have taken the lesson that it does not need to specify "official acts" in the Indictment and can rely exclusively, at least for now, on an "as opportunities arose" theory. Perhaps by the end of the trial, it will sort through its proof, find some qualifying "official acts," and urge the Court to give the necessary instructions of the sort that will ensure that the "official action" Percoco

allegedly agreed to take to "advance [the Syracuse Developer's] development projects in the State," Superseding Indictment ¶ 67, was something other than asking for a meeting. Perhaps it will not. The Court should not tolerate this gamesmanship. In the absence of any indication that the Government can and will identify "official acts" within the meaning of *McDonnell*, Counts Three, Ten, and Fourteen should be dismissed for legal insufficiency and duplicity.

The Government's reliance on *Ganim* does not solve its problem. It would be extremely odd if, in order to avoid unconstitutional vagueness and other *McDonnell* concerns, an "official act" were required when an indictment specifies a particular quid pro quo transaction, as in *McDonnell,* but one were not required when the government fails to specify any identifiable subject of the corrupt bargain. Indeed, the Government got nowhere when it tried to salvage the trial court's instructions in *Silver* by pointing to "as specific opportunities arose" language. *United States v. Silver*, 2017 WL 2978386, at *13.

The Government appears to recognize the tension between *Ganim* and *McDonnell*, and argues, that *McDonnell* "'holds only that the bribe-recipient must agree that the actions he or she does take will relate to a matter that is 'specific' and 'concrete.'" Gov't Opp. 41. It is hard to know precisely what the Government means. If its use of "relate" is meant to water down *McDonnell*'s demand for a decision or action *on* an identified specific matter, its analysis is inconsistent with the Supreme Court's and that of the Second Circuit in *Silver*. *See United States v. Silver*, 2017 WL 2978386, at *12 (reversing where instructions "did not convey to the jury that an official action must be a decision or action on a matter involving the formal exercise of government power akin to a lawsuit, hearing, or agency

determination," and did not "prevent the jury from concluding that meetings or events with a public official to discuss a given matter were official acts by that public official").

Perhaps, on the other hand, the Government reads *McDonnell* to permit the "as opportunities arise" theory endorsed by *Ganim*, so long as the "opportunities" are understood from the start to include specific "official acts" of the sort defined by *McDonnell*. If this is the case, we contend that *McDonnell's* reference to "identified" questions or matters requires the rejection of *Ganim's* analysis. For now, it is sufficient for us to demand that the Government specify pre-trial, and take on the burden of proving later, that the understanding between Aiello, Gerardi, and those they are said to have bribed was not simply to have meetings or engage in other activities of the sort found legally insufficient in *McDonnell*. Legally sufficient "official acts" must be alleged and proved, and presented to the jury with a clarity that avoids duplicity. Absent any indication of compliance with *McDonnell* in this regard, Counts Three, Ten, and Fourteen should be dismissed.

At the very least, the Superseding Indictment's failure to acknowledge the limitations that *McDonnell's* "official acts" analysis places on bribery prosecutions counsels disclosure of the instructions given to the Grand Jury or, at a minimum, review by this Court. While McDonnell was decided prior to the grand jury presentation in this case, *compare United States v. Bravo-Fernandez*, No. 10-232, 2017 U.S. Dist. LEXIS 33944 (D.P.R. March 7, 2017); *United States v. Twersky*, No. 92-CR-1082, 1994 U.S. Dist. LEXIS 8744 (S.D.N.Y. June 29, 1994) (both ordering in camera reviewing following changes in law), the Indictment's lack of clarity, the Government's shifting positions, and

its unsuccessful defense of the instructions in *Silver* strongly suggests that *McDonnell's* teaching were not appropriately reflected in the Grand Jury instructions here.

### 3. The False Statement Count should be Dismissed for Duplicity and Legal Insufficiency

Because the Government steadfastly refuses to identify the precise allegedly false statements that form the basis the 18 U.S.C. § 1001 charge in Count Fifteen, that count must be dismissed for duplicity.

We have already spelled out the considerable authority holding that "specification of how a particular element of a [false statement] charge will be met (as opposed to categorical recitation of the element) is of such importance to the fairness of the proceeding that it must be spelled out in the indictment." *See* Defs.' Mot. to Dismiss 26 (quoting *United States v. Stringer*, 730 F.3d 120, 126 (2d Cir. 2013)); *see also United States v. Sakoc*, 115 F. Supp.3d 475, 487 (D. Vt. 2015) (finding constructive amendment because Court could not be certain that the jury convicted defendant of the same false statements on which the grand jury indicted him). While there is authority for § 1001 counts that do not specify particular false statements, the readiness of the government to give a bill of particulars has been part of the analysis. *See United States v. Blandford*, 33 F.3d 685, 705 (6th Cir. 1994) (because "a bill of particulars and a revised bill provided [defendant] with a more detailed account of the precise statements that supported his § 1001 prosecution," that count "therefore presented [defendant] with adequate notice of the offense for which he was charged.)

These cases speak to what must be charged in an indictment or specified in a bill of particulars, and understandably offer no basis for finding the Government's vague

gestures to the Complaint and discovery as sufficient substitutes. Moreover, as noted *supra*, nothing in the discovery, e.g. 302s and handwritten notes, specifically indicates which statement were believed to be false.

Under these circumstances, dismissal is not only required but justly deserved. Moreover, this is a matter we must raise now. In *United States v. Dedman*, 527 F.3d 577 (6th Cir. 2008) where the indictment had a single § 1001 count that, at trial, opened the way for proof that the defendant had made several different false statements during an interview with a government agent, the Sixth Circuit, even as it affirmed her conviction, noted that because "[s]eparate allegedly false statements . . . are not mere 'multiple factual predicates' but rather are entirely separate offenses," the § 1001 count "may have been duplicitous, but unfortunately for [defendant], '[f]ailure ... to raise the question prior to trial and verdict waived the vice of duplicity,' and we cannot now reverse on that ground." 527 F.3d at 600 n. 10 (citations omitted).

## NEED FOR SEVERANCE

Initially, the Government threw a hodgepodge of barely related charges together in its Indictment, which presumably was to obtain maximum media coverage of its "Crusade Against Albany Corruption." Then, its Superseding Indictment made a desultory effort to address the duplicity problem in Count One. Thereafter, faced with meritorious severance motions and the prospect of actually trying this case, the Government announced its willingness to sever this case into two trials -- (1) trying the alleged Syracuse RFP fraud together with the Buffalo RFP fraud, and (2) trying the bribery scheme/charges against Kelly with the bribery scheme/charges against Aiello and Gerardi. The Court's acceptance of the Government's proposal, *see* Order of July 18, 2017, will surely start to develop some

semblance of order to this sprawling case. For Aiello and Gerardi, however, the division the Court has made is not sufficient, and leaves them subjected to two ill-joined and unduly prejudicial trials.

We continue to urge the Court to sever the two alleged RFP frauds. The Government has simply not alleged, and cannot be expected to show, "sufficient proof of mutual dependence and assistance." *United States v. Maldonado-Rivera*, 922 F.2d 934, 963 (2d Cir. 1990); *see United States v. Berger*, 224 F.3d 107, 114-15 (2d Cir. 2000). Certainly, there is not the slightest reason to expect the Government to lay out "one integrated fraudulent scheme." *United States v. Wey*, No. 15-CR-611 (AJN), 2017 WL 237651, at *4 (S.D.N.Y. Jan. 18, 2017).

The defendants assert that the best the Government can offer to support its claim of "mutual dependence," is the following: that (1) Howe forwarded an email from Gerardi to the Buffalo Defendants regarding qualifications; (2) Howe forwarded an email from the Buffalo Defendants to Aiello regarding qualifications; (3) that at Howe's request, Gerardi provided the Buffalo Defendants with a copy of his Syracuse RFP response; and (4) that Aiello was invited to a fundraiser hosted by Ciminelli. Gov't Opp. 88 n. 30; *see* Letter from Government to Defense Counsel, dated June 30, 2017. Much as the Government would like to rely on the hope that trial will kick up better evidence of coordination, the Court can take confidence from the meager yield of the Government's review of its proof that the two separate RFP schemes will remain distinct without anything approaching proof of "mutual dependence."

Nor is there a legally sufficient basis to try the two bribery schemes together. The Government, having reversed itself and directly contradicting the very Complaint on which it leans for support, now grudgingly concedes that "the Syracuse Defendants and Kelly were not (based on the Government's current understanding of the facts) aware of each others' bribery of Percoco and thus did not share a common plan or scheme." Gov't Opp. 94. Nonetheless, trying to squeeze within the Federal Rule of Criminal Procedure 8(b) framework, the Government contends, "they and Percoco are *unified* by a substantial identity of facts and participants." *Id.* It goes on to argue: "The factual overlap is substantial because both the Syracuse Defendants and Kelly were bribing Percoco in exchange for official action during the same time period—from in or about 2014 through 2015—and arranged their bribes to Percoco through Howe. As a result, much of the evidence necessary to proving Kelly's bribery of Percoco is the same as the evidence that will prove the Syracuse Defendants' bribery of Percoco." *Id.*

Yet the weakness of its claim becomes clear when the Government sets out this "factual overlap." This "factual overlap" theory includes the Government's allegations that Percoco was experiencing financial difficulties; that he gave false information to obtain an ethics opinion; that he kept a hand in State operations while working on the Governor's campaign; and that Percoco may have had Aiello and Gerardi in mind in a conversation with Howe relating to Kelly. Gov't Opp. 95.

The joinder of the two schemes is simply not authorized by Fed. R. Crim. P. 8(b). As we noted in our initial brief,, the Percoco-Kelly scheme ran from 2012 to 2016 and involved more than $287,000 in alleged bribery payments to get emissions credits worth millions of dollars. Defs.' Mot. to Dismiss 35-36. Alternatively, the Percoco-Syracuse

Developer scheme was in 2014-15, and involved $35,000 in alleged bribery payments to get a raise for Aiello's son, avoid a Labor Peace Agreement[2], and expedite a payment of monies owed by the State. *Id.* Much as the Government would like to profit from the spillover prejudice, should jurors presume that whoever dealt with Percoco had to pay him, these two schemes lack the relationship required by Rule 8(b).

Should the Court find the conjunction of the two schemes to pass muster under Rule 8(b), severance under Fed. R. Crim. P. 14 is surely appropriate. Certainly there is a grave risk of spillover prejudice. Jurors might fairly consider evidence of Percoco's conduct in one scheme when evaluating his conduct in the other. *See* Fed. R. Evid. 404(b). The risk that they might draw conclusions about Aiello's and Gerardi's dealings with Percoco from what they hear about Kelly's irrelevant scheme, however, is substantial, and cannot possibly be cured by limiting instructions and functions as improper propensity evidence against Aiello and Gerardi.

Moreover, the "factual overlap" that the Government points to is minimal. Aiello and Gerardi's matters are not matters that will take long to prove. In contrast, the discovery related to the Kelly/Energy Company issue is millions of pages, and Kelly's lawyer has already advised the Court that Kelly's alleged role in the case will deal with arcane and complex areas of energy regulatory law and include the testimony of an untold number of witnesses lacking any relevance to Aiello or Gerardi.

---

[2] But see the confusion generated by the Government's apparent abandonment of the LPA allegations discussed *supra* and at Gov't Opp. 75.

Finally, there is the stark fact that, should the Government have its way, Aiello and Gerardi – at most bit players in the Government's Crusade Against Albany Corruption – would be the only defendants in this case to be subjected to two trials, far from home. If the trial was severed in half, the only defendants that would suffer from increased personal costs and expenses are Aiello and Gerardi. The Government's proposal – made after it reaped the tactical advantage of forcing Aiello, Gerardi and the other defendants to review millions of irrelevant documents for months, thus cannot be fairly read as an even-handed attempt to reduce prejudice or increase efficiency. The Court should not tolerate this brinksmanship.

Should this Court limit its severance granting to its Order of July 18, 2017, we ask to have ample time after the first trial to prepare for the second – a period that, because of uncertainties as to trial length we cannot be sure that the Court's Order will provide. Such preparation may include the extensive research of the record from the first trial needed to litigate any applicable collateral estoppel issues. *See United States v. Duffy*, 188 F. Supp.2d 281 (E.D.N.Y. 2002) (finding that earlier acquittals collateral estopped government in subsequent prosecution); *see also United States v. McGowan*, 58 F.3d 8, 12 (2d Cir. 1995) (describing framework for determining whether collateral estoppel bars a later prosecution). We would also need ample time to draft motions in limine and witness examinations (both of which might well be related to matters raised in the first trial), jury instructions, and opening and closing statements. Although we agree with the Government that the two trials involve schemes that do not materially overlap, the Government's unfocused presentation of this case from the start raises considerable concern that its proof in the first trial will sprawl into factual matters implicated in the second. The

aforementioned are efforts that defendants cannot sufficiently engage in while engaged in the first trial, which would itself be complex and lengthy. We request no fewer than 60 days from the end of the first trial to the start of the second, in order to properly prepare.

## MOTION TO STRIKE SURPLUSAGE

The Government did not take the trouble to respond specifically to our motion to strike the references to campaign contributions from the Superseding Indictment. *Cf.* Gov't Opp. 102 n.34 (referring to motions to strike only in context of severance motion). Yet its papers do offer backhanded support for the motion.

In the course of defending the § 666 charges, the Government avows: "[T]here is little chance that Section 666 prohibits legitimate campaign contributions, since Section 666 requires proof that the payments were made as part of a corrupt quid pro quo agreement." Gov't Opp. 33. Yet, the Superseding Indictment nonetheless suggests the campaign contributions by Aiello and Gerardi to the Governor, made in absence of any quid pro quo, are inculpatory evidence in this § 666 prosecution. Even the Government's brief makes frequent reference to political contributions, *see* Gov't Opp. 5, 6, 99, 115, 123, ample indication that it intends to make this a clear issue in the case.

In the absence of evidence of such a quid pro quo – and the Government has not given the slightest indication that there is any – defendants urge the Court to remove this prejudicial surplusage and preclude the Government from introducing what can only be described as non-complying Fed. R. Evid. 404(b) evidence from the case. *See Huddleston v. United States*, 485 U.S. 681, 689 (1988); *United States v. Aleskerova*, 300 F.3d 286, 296

(2d Cir. 2002) (addressing factual foundation required for introduction of similar act proof).

## PREINDICTMENT PREJUDICE

On the issue of preindictment prejudice, the Government essentially shrugs and observes: "Aiello and Gerardi point to a number of actions by the Government, none of which were particularly remarkable, as evidence of 'unchecked and improper prosecutorial tactics.'" Gov't Opp. 163. That the Government finds "nothing to see" here only strengthens defendants' argument that irreparable damage was done by the Government's actions and that dismissal of the Superseding Indictment is the only appropriate remedy. Moreover, notwithstanding the Government's efforts to isolate each of its acts, the pattern here, as we stated in our initial papers, ought to be recognized as a parade of prohibited actions linking this case to others, which was strategically and methodically carried out to maximize the preindictment prejudice to Aiello and Gerardi.

Dated: July 21, 2017
     New York, NY

                    Respectfully submitted,

**O'CONNEL & ARONOWITZ**          **WALDEN MACHT & HARAN LLP**

By:   /s/ Stephen R. Coffey            By:    /s/ Milton L. Williams
**Stephen R. Coffey**                 **Milton L. Williams**
54 State Street                     One Battery Park Plaza
Albany, NY 12207                 New York, NY 10004
(518) 462-5601                     (212) 335-2963
*Attorneys for Defendant*          *Attorneys for Defendant*
*Steven Aiello*                     *Joseph Gerardi*

By:   /s/ Scott W. Iseman             By:    /s/ Avni P. Patel
**Scott W. Iseman**                   **Avni P. Patel**
54 State Street                     One Battery Park Plaza
Albany, NY 12207                 New York, New York 10004
(518) 462-5601                     (212) 335-2041
*Attorneys for Defendant*          *Attorneys for Defendant*
*Steven Aiello*                     *Joseph Gerardi*