# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : |
| v. | :     **Case No. 1:16-cr-00776** |
| | : |
| JOSEPH PERCOCO, | :     <u>**ORAL ARGUMENT**</u> |
|     a/k/a "Herb," | :     <u>**REQUESTED**</u> |
| ALAIN KALOYEROS, | : |
|     a/k/a "Dr. K," | : |
| PETER GALBRAITH KELLY, JR., | : |
|     a/k/a "Braith," | : |
| STEVEN AIELLO, | : |
| JOSEPH GERARDI, | : |
| LOUIS CIMINELLI, | : |
| MICHAEL LAIPPLE, and | : |
| KEVIN SCHULER, | : |
| | : |
|     Defendants. | : |
| | : |
| | : |
| | : |

## OMNIBUS REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THE BUFFALO DEFENDANTS' PRETRIAL MOTIONS

**LIPSITZ GREEN SCIME CAMBRIA LLP**
*Attorney for Defendant Michael Laipple*
Herbert L. Greenman
42 Delaware Avenue, Suite 120
Buffalo, New York 14202
716.849.1333

**HODGSON RUSS LLP**
*Attorneys for Defendant Louis Ciminelli*
Daniel C. Oliverio
Timothy W. Hoover
The Guaranty Building
140 Pearl Street, Suite 100
Buffalo, New York 14202
716.856.4000

**CONNORS LLP**
*Attorney for Defendant Kevin Schuler*
Terrence M. Connors
1000 Liberty Building
Buffalo, New York 14202
716.852.5533

**DLA PIPER LLP (US)**
*Attorneys for Defendant Louis Ciminelli*
John M. Hillebrecht
Jessica A. Masella
1251 Avenue of the Americas
New York, New York 10020
212.335.4500

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .........................................................................................1

ARGUMENT ...............................................................................................................4

I.   THE BUFFALO DEFENDANTS SHOULD BE TRIED SEPARATELY.....................4

A.   The Buffalo Defendants Are Improperly Joined With The Syracuse
     Defendants And Should Be Severed Pursuant To Rule 8(b)...............................8

B.   A Separate Trial For The Buffalo Defendants Is Also Warranted Pursuant
     To Rule 14 Because It Serves The Interests Of Fairness And Efficiency...........13

II.  ALL CHARGES AGAINST THE BUFFALO DEFENDANTS SHOULD BE
     DISMISSED PURSUANT TO FEDERAL RULE OF CRIMINAL
     PROCEDURE 12 .....................................................................................................15

A.   The Wire Fraud Charges Must Be Dismissed ....................................................15

1.   The Indictment Fails To Allege A Scheme To Defraud Fort
     Schuyler Through Material Misrepresentations Made With
     Fraudulent Intent ..........................................................................................16

     a.   The Indictment Fails To Allege A Scheme To Defraud Fort
          Schuyler.................................................................................................16

     b.   The Indictment Fails To Allege Facts Sufficient To
          Establish That The Buffalo Defendants Acted With The
          Requisite Specific Intent .......................................................................26

     c.   The Indictment Falls Short Because The Alleged
          Misstatements Are Not Material To The Transaction ................31

2.   The Indictment's Allegations Do Not Establish A Valid Property
     Interest As The Object Of Any Alleged Scheme Or Artifice To
     Defraud .........................................................................................................36

     a.   The Government Has Effectively Conceded That The
          Indictment Does Not Allege A Valid Tangible Property
          Interest As The Object Of Any Alleged Scheme To
          Defraud..................................................................................................36

     b.   The Indictment Does Not Allege The "Right To Control"
          Theory Of Wire Fraud............................................................................40

     c.   The Court Should Reject The Government's Attempt To
          Prosecute A Theory Of Wire Fraud That Was Not Charged
          By The Grand Jury.................................................................................42

     d.   The "Right To Control" Theory Of Wire Fraud Does Not
          Align With Those Allegations Actually Presented In The
          Indictment..............................................................................................45

3. The Indictment Fails To Allege Any Specific Wire Transmissions ........50

B. The Bribery Charge Should Be Dismissed...........................................................50

1. There Was No Corrupt Offer Or Agreement To Give Anything Of Value.......................................................................................................52

a. The Indictment Fails To Adequately Allege The Buffalo Defendants Paid Bribes Or Illegal Gratuities ..............................52

b. Any Payments Were Not Made With The Requisite Corrupt Intent And Cannot Establish Criminal Liability Within The Meaning Of Section 666 ...............................................................54

2. Howe Is Not An Agent Of Any Pertinent Governmental Organization............................................................................................59

3. Fort Schuyler Is Not A Qualifying State Agency ...................................60

4. There Is No Nexus Between the Alleged Bribe and Any Agency Receiving More Than $10,000 In Federal Benefits ................................65

5. The Alleged Corrupt Conduct Was Not In Connection With A Transaction Or Business Of The Agency Involving Anything Of Value Of $5,000 Or More......................................................................67

6. The Indictment Fails To Allege Any "Official Action" As Defined In McDonnell Which Necessitates The Dismissal Of Count Five...........68

III. THERE IS A PARTICULARIZED NEED TO DISCLOSE A NARROW SUBSET OF THE GRAND JURY TRANSCRIPTS TO AVOID A MISCARRIAGE OF JUSTICE......................................................................................70

IV. THE GOVERNMENT SHOULD BE PRECLUDED FROM USING ANY EVIDENCE OBTAINED FROM THE UNCONSTITUTIONAL SEARCH OF DEFENDANT CIMINELLI'S PERSONAL EMAIL ACCOUNT ...............................73

CONCLUSION....................................................................................................................77

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Bank of Nova Scotia v. United States*,
   487 U.S. 250 (1988) .......................................................................................... 70

*Brega Transp. Corp. v. Brennan*,
   105 A.D.3d 985 (2d Dep't 2013) ...................................................................... 22

*Cleveland v. United States*,
   531 U.S. 12 (2000) ............................................................................................ 46

*Fischer v. United States*,
   529 U.S. 667 (2000) ................................................................................... 66, 67

*Hunts Point Terminal Produce Co-op. Ass'n, Inc. v. N.Y. City Econ. Dev. Corp.*,
   36 A.D.3d 234 (1st Dep't 2006) ...................................................................... 21

*In re Blueline Commuter, Inc. v. Montgomery Cnty.*,
   126 A.D.3d 1161 (3d Dep't 2015) .................................................................... 22

*McArdle v. Bd. of Estimate of Mt. Vernon*,
   347 N.Y.S.2d 349 (Sup. Ct. Westchester Cnty. 1973), *aff'd*, 45 A.D.2d 822 (2d Dep't
   1974) .................................................................................................................. 22

*McDonnell v. United States*,
   136 S. Ct. 2355 (2016) ......................................................................... 68, 69, 70

*McNally v. United States*,
   483 U.S. 350 (1987) ............................................................................. 36, 38, 39

*Stirone v. United States*,
   361 U.S. 212 (1960) ..................................................................................... 72, 73

*Terminate Control Corp. v. Horowitz*,
   28 F.3d 1335 (2d Cir. 1994) ............................................................................. 40

*United States v. Alkaabi*,
   223 F. Supp. 2d 583 (D.N.J. 2002) .................................................................. 73

*United States v. Attanasio*,
   870 F.2d 809 (2d Cir. 1989) ............................................................................. 11

*United States v. Bank of N.Y. Mellon*,
   941 F. Supp. 2d 438 (S.D.N.Y. 2013) .............................................................. 25

*United States v. Barthelman*,
  No. 13-10016-MLB, 2013 WL 3946084 (D. Kan. July 31, 2013) .......................................74

*United States v. Binday*,
  804 F.3d 558 (2d Cir. 2015) ................................................................................................48

*United States v. Bonito*,
  57 F.3d 167 (2d Cir. 1995) ...........................................................................................passim

*United States v. Boyland*,
  No. 11 Cr. 850 (SLT) Dkt. No. 81 (E.D.N.Y. filed Jan. 17, 2014).......................................69

*United States v. Boyland*,
  No. 15-3118, 2017 WL 2918840 (2d Cir. July 10, 2017) ......................................... 68, 69, 70

*United States v. Brunshtein*,
  No. 98 Cr. 769 (MJW), 1998 WL 35249640 (S.D.N.Y. filed July 22, 1998) .......................69

*United* States v. *Carrozza*,
  728 F. Supp. 266 (S.D.N.Y. 1990) ............................................................................. 9, 12, 13

*United States v. D'Amato*,
  39 F.3d 1249 (2d Cir. 1994) ...................................................................................... 28, 42, 46

*United States v. Doran*,
  854 F.3d 1312 (11th Cir. 2017)...........................................................................................67

*United States v. Falkowitz*,
  214 F. Supp. 2d 365 (S.D.N.Y. 2002) ...................................................................................16

*United States v. Finazzo*,
  850 F.3d 94 (2d Cir. 2017) ........................................................................................ 28, 31, 49

*United States v. Finazzo*,
  No. 10-CR-457 (RRM)(RML), 2014 WL 184134 (E.D.N.Y. Jan. 14, 2014) .......................28

*United States v. Forrester*,
  No. 02 CR.302 WHP, 2002 WL 1610940 (S.D.N.Y. July 22, 2002) ...................................16

*United States v. Ganim*,
  256 F. App'x 399 (2d Cir. 2007) .........................................................................................52

*United States v. Guadagna*,
  183 F.3d 122 (2d Cir. 1999) ................................................................................................28

*United States v. Harloff*,
  815 F. Supp. 618 (W.D.N.Y. 1993) ......................................................................................58

*United States v. Henry*,
    29 F.3d 112 (3d Cir. 1994) ....................................................................... 37, 43

*United States v. Kurtz*,
    No. 04-CR-0155A, 2008 WL 1820903 (W.D.N.Y. Apr. 21, 2008) .................................... 30

*United States v. Lech*,
    161 F.R.D. 255 (S.D.N.Y. 1995) .................................................................... 8, 9

*United States v. Lustyik*,
    57 F. Supp. 3d 213 (S.D.N.Y. 2014) .................................................................. 75

*United States v. Mann*,
    172 F.3d 50 (6th Cir. 1999) ......................................................................... 58

*United States v. Mariani*,
    90 F. Supp. 2d 574 (M.D. Pa. 2000) ............................................................. 43, 44

*United States v. Martino*,
    No. S1 00 CR 389 (RCC), 2000 WL 1843233 (S.D.N.Y. Dec. 14, 2000) ........................... 16

*United States v. Milstein*,
    401 F.3d 53 (2d Cir. 2005) .......................................................................... 73

*United States v. Mittelstaedt*,
    31 F.3d 1208 (2d Cir. 1994) ......................................................................... 25

*United States v. Nerlinger*,
    862 F.2d 967 (2d Cir. 1988) ......................................................................... 12

*United States v. Pierce*,
    224 F.3d 158 (2d Cir. 2000) ..................................................................... 37, 48

*United States* v. *Pinson*,
    860 F.3d 152 (4th Cir. 2017) ................................................................ 59, 66, 67

*United States v. Pirro*,
    212 F.3d 86 (3d Cir. 2000) .......................................................................... 50

*United States v. Radley*,
    632 F.3d 177 (5th Cir. 2011) ..................................................................... 43, 72

*United States* v. *Rajaratnam*,
    753 F. Supp. 2d 299 (S.D.N.Y. 2010) ........................................................... 8, 9, 10

*United States v. Regent Office Supply Co.*,
    421 F.2d 1174 (2d Cir. 1970) ........................................................................ 26

*United States v. Rittweger*,
   524 F.3d 171 (2d Cir. 2008) ........................................................................12

*United States v. Rooney*,
   37 F.3d 847 (2d Cir. 1994) ..........................................................................58

*United States v. Rosen*,
   716 F.3d 691 (2d Cir. 2013) ........................................................................54

*United States v. Rosen*,
   No. 11 Cr. 300 (JSR), 2011 WL 8193905 (S.D.N.Y. filed Mar. 31, 2011) ..........................69

*United States v. Rossomando*,
   144 F.3d 197 (2d Cir. 1998) ...................................................................48, 46

*United States v. Sadler*,
   750 F.3d 585 (6th Cir. 2014) .......................................................................49

*United States v. Shellef*,
   507 F.3d 82 (2d Cir. 2007) ..........................................................................25

*United States v. Slay*,
   717 F. Supp. 689 (E.D. Mo. 1989) .........................................................38, 39, 40

*United States v. Sotomayor-Vazquez*,
   249 F.3d 1 (1st Cir. 2001) ...........................................................................60

*United States v. Starr*,
   816 F.2d 94 (2d Cir. 1987) ....................................................................passim

*United States v. Telink, Inc.*,
   702 F. Supp. 805 (S.D. Cal 1988), *aff'd,* 910 F.2d 598 (9th Cir. 1990)................................44

*United States v. Viloski*,
   557 F. App'x 28 (2d Cir. 2014) ................................................................41, 45

*United States* v. *Vitillo*,
   490 F.3d 314 (3d Cir. 2007) ........................................................................60

*United States v. Walker*,
   191 F.3d 326 (2d Cir. 1999) ........................................................................26

*United States v. Wallach*,
   935 F.2d 445 (2d Cir. 2010) ........................................................................42

*United States v. Walsh*,
   156 F. Supp. 3d 374 (E.D.N.Y. 2016) .........................................................57, 58

*United States v. Wey*,
   No. 15 Cr. 611 (AJN), 2017 WL 237651 (S.D.N.Y. Jan. 18, 2017) .....................................74

**STATUTES**

18 U.S.C. § 666(a)(2) ...........................................................................................52

18 U.S.C. § 666(c) .................................................................................... 50, 57, 58

18 U.S.C. § 1341 ...................................................................................... 25, 37, 41

18 U.S.C. § 1343 ...............................................................................................50

18 I.S.C. § 2703(d) ...........................................................................................73

**RULES & OTHER AUTHORITIES**

Fed. R. Crim. P. 6(e)(3)(E)(ii) ...............................................................................70

Fed. R. Crim. P. 7(c)(1) .........................................................................................50

Fed. R. Crim. P. 7(f) ...............................................................................................70

Fed. R. Crim. P. 8(b) ......................................................................................passim

Fed. R. Crim P. 12 ...............................................................................................15

Fed. R. Crim. P. 14 ...........................................................................................13, 14

Fort Schuyler Management Corporation Buffalo Developer RFP Evaluation, FORT
   SCHUYLER MANAGEMENT CORPORATION, available at http://www.ftsmc.org/relevant-
   documents/ (last visited July 21, 2017) ..........................................................33, 34

Request For Proposal: For A Strategic Research, Technology Outreach, Business
   Development, Manufacturing, And Education And Training Partnership With A
   Qualified Local Developer In The Greater Buffalo Area, FORT SCHUYLER
   MANAGEMENT CORPORATION .............................................................................16

*Summary Of The Competitive Procurement Conducted By Fort Schuyler Management
   Corporation For The Awards Under The Request For Proposals For A Qualified
   Local Developer In The Greater Buffalo Area*, FORT SCHUYLER MANAGEMENT
   CORPORATION, available at http://www.ftsmc.org/relevant-documents/ (last visited
   July 21, 2017)..........................................................................................33, 34

Whiteman Osterman & Hanna LLP, *Attorney Biography: Richard E. Leckerling* (last
   visited July 13, 2017), *available at* http://www.woh.com/attorneys/Richard-E-
   Leckerling-23-attorney.htm. ..........................................................................55

## <u>PRELIMINARY STATEMENT</u>

The government's factual recitation of the case is replete with obsessive references to the Governor. Numerous allusions are made to the "Governor's campaign," events are described in time in relation to the "Governor's election in 2010," and a story is told about the Governor's "economic development efforts." (Gov. Opp. at 4–6, 13–15).[1] Obviously, the Governor is not charged in this case. Yet the government conspicuously opted to cast the Governor as a central figure in its fallacious narrative. This choice speaks volumes and tells the Court everything it needs to know about this case. The government's investigation, and resulting Indictment,[2] were both driven by an agenda to implicate the Governor's office in some type — any type — of criminal scheme.

To the contrary, the government pays little attention to Louis Ciminelli, Michael Laipple, and Kevin Schuler (the "Buffalo Defendants"). This is so because there is nothing there. The government focused attention on Mr. Ciminelli, the head of the Buffalo Developer, because he "was already a major political donor" who "was being cultivated by the Governor's campaign to support the Governor." (Gov. Opp. at 6). Messrs. Laipple and Schuler are painted with the same brush, because they are also executives at the Buffalo Developer. Nothing illegal, improper, or even unusual about Mr. Ciminelli's political donations is alleged. Indeed, they were run-of-the-mill, legal, made in his own name, and openly disclosed. The donations were in line with other donations given by Mr. Ciminelli, over the course of several decades, not only to numerous other candidates for Governor and other public offices, but to Andrew Cuomo as well. Simply put, the donations paled in comparison to numerous other donations made by Mr. Ciminelli to local

---

[1] References and citations herein to the "government opposition" or "Gov. Opp." are to the Government's Omnibus Memorandum of Law in Opposition to Defendants' Pretrial Motions, filed on June 30, 2017 (Dkt. No. 264).

[2] References and citations herein to the "Indictment" are to the operative superseding indictment, S1 16 Cr. 776 (VEC), filed on May 11, 2017 (Dkt. No. 162).

cultural organizations and other charities, and were of the type and amount to be expected for a successful individual business owner who had both personal and business interests in investing in his local community.

In looking at the few "factual" allegations that are made about the Buffalo Defendants, it becomes clear that the government's charges in this case are based on the slimmest of reeds. The facts, even as alleged, do not specify any misconduct, never mind adequately allege federal crimes. When juxtaposed to the government's flimsy narrative, it becomes crystal clear why the Buffalo Defendants are in this case. Mr. Ciminelli had the misfortune of being among the "major political donor[s]" — whatever that means — to the Governor's campaign. Messrs. Laipple and Schuler, as two of his executives, get carried along with him. The Buffalo Developer, by far one of the largest and most successful construction management, general contracting, and design-build firms located in Buffalo, was selected as a "preferred developer" pursuant to a single RFP process, to locate a qualified local developer in that area. At the time that occurred, there was no particular project attached to that designation and no guarantee of any to come, but, as it turned out, the Buffalo Developer did eventually negotiate a contract to build a solar panel manufacturing plant. The funds were provided pursuant to the Governor's much-publicized "Buffalo Billion" initiative, although, again, it was not clear what money existed for what projects at the time the RFP was issued. The project was, by all reports, completed on time, on budget, and in compliance with all specifications. The press praised the facility for its prospects to attract high-tech and good-paying jobs and to stimulate further economic development in a struggling economy.

As a result of these grossly attenuated connections to the Governor, and the prosecution's extraordinary wide net, the Buffalo Defendants are unjustly impugned in this case, the

consequences of which have been extraordinary. This case has already ravaged their lives, their families, and their livelihoods. Before news of the government's investigation leaked, the Buffalo Developer maintained a longstanding and thriving business. Over time, the Buffalo Developer matured and expanded both in terms of volume and capacity for complex projects. In recent years, it was heralded for its ability to carry out complicated projects involving public-private partnerships. It employed over 300 individuals and had multiple projects ongoing and in its pipeline worth more than $1 billion each, not to mention dozens of other smaller projects. The Buffalo Developer made significant contributions to the fledgling Western New York economy, including assisting in the slow revitalization after a period of long dormancy, by creating good jobs and stimulating local construction projects, which would themselves, in time, bring more jobs to Buffalo. Each of the Buffalo Defendants, as officers of that institution, had an important leadership role in this venture. Each of the Buffalo Defendants had an untarnished reputation and was well-known and well-respected in an industry where one's reputation is everything.

A city once on the brink of an exciting renaissance may now face the cyclical fate of its past. The Buffalo Developer, upon news of the investigation, never mind the charges, had numerous projects cancelled. Its ability to obtain new business is severely compromised. It has had to lay off dozens of loyal, longtime employees. Each of the Buffalo Defendants, after decades of establishing their honesty and integrity, is left with a taint from this case that may never be overcome, even with dismissal or acquittal. While it may be too late to save their reputations, it is not too late for this Court to effect justice. For the reasons set forth below and in our opening briefs, the charges in this case are replete with fatal deficiencies, any one of which necessitates dismissal of the charges. The Court should see these charges for what they

are against the Buffalo Defendants — a political game of cat and mouse and one with enormous consequences.  The government attempts to shoe-horn the Buffalo Defendants' non-criminal conduct into various federal charges because they happen to be tangentially linked to the government's real interest in this case — the Governor's Office.  The Buffalo Defendants deserve more from the criminal justice system than to become the political collateral of this dangerous volley.  Thus, the Buffalo Defendants seek an immediate dismissal of all charges against them.

## ARGUMENT

## I.        THE BUFFALO DEFENDANTS SHOULD BE TRIED SEPARATELY.

As explained in our opening brief, the Court should sever the charges against the Buffalo Defendants in Counts One, Four, and Five of the Indictment.  The government's best efforts — made in hundreds of pages of charging documents and briefing in opposition to the Defendants' motions — to cast the allegations in the Indictment as comprising two broadly-defined "overlapping schemes" fall far short of the mark.  (Gov. Opp. at 87).  Instead, the allegations of the Indictment (as well those in the Complaint, the voluminous discovery, and the government's opposition) continue to demonstrate that the Indictment charges <u>four</u> schemes, each involving a separate subgroup of Defendants.  Although the government attempts to flesh out a "common plan" among these various schemes, that effort, too, is insufficient.  Instead, each of the alleged schemes encompasses a diverse and distinct set of facts.  Each alleges a separate and distinct goal.  Each involves different Defendants, with almost no overlapping players.  Since there is no sufficient nexus between the Buffalo RFP Scheme and any of the other schemes alleged in the Indictment, the Buffalo Defendants should be severed and tried separately on Counts One, Four, and Five because they were not properly joined pursuant to Rule 8(b).

The government now concedes, and the Court has ordered, that at the very least a severance of what it terms "the Buffalo Billion Scheme" from the "the Percoco Scheme" is appropriate. (Gov. Opp. at 83). In particular, the government concedes that this severance, which it terms "discretionary," would serve to eliminate the otherwise present "spillover prejudice" as well as to promote efficiency. (Gov. Opp. at 83). Although the Buffalo Defendants agree that they are properly severed from the allegations of the so-called Percoco Scheme, which allegations have nothing to do with the Buffalo Defendants, the government's proposed severance plan does not go far enough.[3] Instead, it fails to account for the improper joinder of the Buffalo Defendants with the Syracuse Defendants together under the umbrella of the so-called Buffalo Billion Scheme. Accordingly, the Buffalo Defendants should be severed from the Syracuse Defendants and the Buffalo Defendants should stand trial alone.

We recognize that it is unusual to ask for a severance that may necessitate three (or more) separate trials stemming from the same Indictment. But that request is dictated by the extraordinary nature of the charging decisions in this case. The government has strung together four separate alleged criminal fraud schemes, each of which involves a separate set of operative facts, documents, witnesses, and allegations. Other than that their cooperating witness, Todd Howe, appears to admit culpability in all four alleged schemes, only the broadest characterization (*e.g.*, fraud and bribery in connection with public funds for projects within New York State) could even arguably connect them. And because each of the eight Defendants

---

[3] The Buffalo Defendants agree that severance from the Percoco Scheme is warranted, but the Buffalo Defendants do not concede that such severance is "discretionary." (Gov. Opp. at 1). Instead, for all of the reasons set forth in the Joint Memorandum of Law in Support of the Buffalo Defendants' Motion for Severance, filed on May 19, 2017 (the "Severance Memorandum") (Dkt. No. 222), such severance is required pursuant to Rule 8(b), because the Buffalo Defendants are improperly joined. The government continues to argue that there is a link sufficient to support joinder of the Buffalo Defendants with the Percoco Scheme. That link is non-existent. The only connection put forth is Percoco's "solicitation of campaign donations" from the Buffalo Defendants and the "access and influence" supposedly gained. (Gov. Opp. at 99). However, the government fails to note that these donations and fundraising efforts were lawful and properly disclosed, and there is no allegation that they were part of any criminal scheme.

asserts he will contest his guilt at trial, the government's unusual charging decision necessitates an unusual severance plan.

For the Buffalo Defendants, the government's severance plan which the Court has now ordered, does not go far enough. As set forth in detail in the Buffalo Defendants' motion to dismiss,[4] the case against the Buffalo Defendants suffers from numerous fatal deficiencies and contains almost no allegations of any actual misconduct, criminal or otherwise. Against this backdrop of thin-to-nonexistent allegations (never mind proof), it is clear that to try the Buffalo Defendants in a joint trial with any other Defendant would pose a severe risk of spillover prejudice to the Buffalo Defendants. If convicted, the Court and the public would be left with a serious doubt as to whether the jury heard and adequately considered the evidence — or lack thereof — against the Buffalo Defendants or whether they were merely confused, mistaken, or improperly associating the Buffalo Defendants with other alleged schemes with which they had no involvement. The Buffalo Defendants are in no way attempting to avoid a fair trial, for themselves, the government, or the public. Instead, the Buffalo Defendants ask that the Court hold a separate trial, at which the jury can fairly consider only the evidence directly relevant to them.

The government continues to press the argument that the Buffalo Defendants are properly joined with the Syracuse Defendants as to their alleged participation in one scheme (but not the other in which the Syracuse Defendants are charged). The government attempts to create the appearance of proper joinder by lumping both alleged schemes together and labeling them the "Buffalo Billion Scheme." (Gov. Opp. at 83). Even putting aside that the label itself is wrong, it

---

[4] *See* Joint Memorandum of Law in Support of the Buffalo Defendants' Motion to Dismiss the Indictment Pursuant to Federal Rule of Criminal Procedure 12, filed on May 19, 2017 ("Buffalo Def. MTD") (Dkt. No. 220).

does not establish any facts supporting joinder.[5]  The Buffalo RFP Scheme and the Syracuse RFP

Scheme are two distinct alleged schemes that involved different RFPs, different projects,

different locations, different developers, and different outcomes.  At most, Howe and Kaloyeros

are alleged to have participated in both, and that cannot support joinder.  There is no allegation,

and none is logically apparent, that the Buffalo Defendants made any attempt to influence the

Syracuse RFP or had any interest in the results of the Syracuse RFP, let alone that they somehow

united together with the Syracuse Defendants in one conspiracy, joined another conspiracy, or

hatched a common plan or scheme involving the Syracuse RFP.  Joinder is therefore improper

and this Court should grant severance pursuant to Rule 8(b).

In addition, severance of the Buffalo Defendants would yield a streamlined trial.  It

would be the most efficient use of the Court's resources.  As the Buffalo Defendants have thus

far made clear in their pretrial submissions, these three individuals are closely aligned and

similarly situated.  They were all employed during all relevant times by the Buffalo Developer.

They are each alleged to have had some role in the Buffalo RFP process.  Thus, the witnesses

and documentary evidence that are relevant to any one of the Buffalo Defendants are likely to be

relevant to all.

In contrast, none of the Buffalo Defendants are alleged to have had any role in the

Syracuse RFP process.  None are alleged to have been familiar with the inner-workings of the

Syracuse Developer.  None are alleged to have had any business dealings with the Syracuse

---

[5]  As explained in the Buffalo Defendants' Severance Memorandum, "Buffalo Billion" is a term that
describes an initiative (not a formal program or bank account) to stimulate the economy of areas in *Western* New
York.  Syracuse is located in *Central* — not Western — New York.  Any implication that the Syracuse RFP Scheme
bears any relation to the Buffalo Billion is wrong.  The government nonetheless persists in its efforts to link the
Buffalo RFP Scheme and Syracuse RFP Scheme through use of the catchy, but inaccurate, "Buffalo Billion
Scheme" label.  Even if both the Syracuse and Buffalo Defendants were alleged to have engaged in fraud related to
the same economic initiative, that fact would not demonstrate that their cases were properly joined.  Instead, it
would demonstrate — at most — that separate subgroups of Defendants had allegedly engaged in separate schemes
related to separate projects in separate cities funded by the same broadly defined economic initiative.

Developer. None are alleged to have even known about the Syracuse RFP Scheme. None had anything to do with, or even knowledge of, the Percoco Scheme. Thus, any attempt to join the Buffalo Defendants with the Syracuse Defendants will simply increase the pretrial and trial work necessary for the Court and serve to confuse the jury at trial.[6] A separate trial of the Buffalo Defendants would ensure a fair trial for the Buffalo Defendants during which an impartial (and not unduly confused) jury can properly consider the evidence — or lack thereof — against them.

### A. The Buffalo Defendants Are Improperly Joined With The Syracuse Defendants And Should Be Severed Pursuant To Rule 8(b).

Such joinder of the Buffalo RFP and Syracuse RFP schemes is improper under Rule 8(b). Instead, "joinder under Rule 8(b) . . . is proper where the criminal acts of two or more persons (1) arise out of a common plan or scheme, or (2) are unified by some substantial identity of facts or participants." *United States v. Lech*, 161 F.R.D. 255, 256 (S.D.N.Y. 1995). For a common plan or scheme to exist, there must be a strong connection between the schemes. *See United States v. Rajaratnam*, 753 F. Supp. 2d 299, 304 (S.D.N.Y. 2010) (reviewing concepts of sufficient connections between schemes, such as where one scheme stemmed from the other). There should be some key link between the schemes. *See id.* A plan cannot be common where a single defendant is the only one aware of the plan. *See id.* (citing *United States v. Menashe*, 741 F. Supp. 1135, 1138 (S.D.N.Y. 1990)).

The government argues that the alleged crimes arose out of a "common plan to defraud Fort Schuyler by secretly tailoring the RFPs to favor the Syracuse Developer and the Buffalo Developer." (Gov. Opp. at 90). This characterization is misleading in its broad language. When

---

[6] Indeed, the government's proposed severance plan multiplies, rather than streamlines, the work required by the Court and jurors. The government, after having charged eight defendants together in one case, proposed, and the Court has ordered, two trials: one six-defendant trial and one four-defendant trial. Each such trial will be relatively unwieldy, potentially confusing to jurors, and time-consuming for the Court.

one drills down to look for the details to learn what is "common" about the "plan," the government's argument falls apart.

The Indictment makes a single attempt to allege any link in the conduct of the Buffalo Defendants with the Syracuse Defendants. The Indictment alleges that the Buffalo Defendants, the Syracuse Defendants, and Defendant Kaloyeros "collaborated in secretly tailoring the Syracuse and Buffalo RFPs by, among other things, exchanging *through Howe* ideas for potential qualifications to be included in the Syracuse and Buffalo RFPs." (Indictment ¶ 24) (emphasis added). In particular, the government points to four emails (from among the millions of pages produced in discovery) that purportedly show Howe forwarding emails from the Buffalo Defendants, with his commentary, to the Syracuse Defendants, and vice versa. (*See* Gov. Opp. at 88 n.30). That does not amount to proper joinder. *See Lech*, 161 F.R.D. at 256 ("[T]wo separate transactions do not constitute a series within the meaning of Rule 8(b) merely because they are of a similar character or involve one or more common participants.") (internal quotation marks omitted). The use of one single center of a wheel by different defendants otherwise unconnected by any outer rim cannot demonstrate a common plan or scheme. *See United States v. Carrozza*, 728 F. Supp. 266, 270 (S.D.N.Y. 1990). Similarly, a handful of similarities between actors and crimes fails to illustrate a common plan or scheme. *Id.* At most, the allegations of the Indictment reveal two groups of defendants pursuing two different and unrelated goals and this is insufficient to support joinder. *See, e.g.*, *Rajaratnam*, 753 F. Supp. 2d at 310–11 (finding indictment alleged no more than that both defendants "sought to enrich themselves by trading on inside information" and finding that such "allegation amounts to little more than that both defendants separately conspired to commit the same offense").

Noticeably absent is any allegation that the Buffalo Defendants and Syracuse Defendants corresponded *with each other* in any way related to any criminal scheme. Also absent is any indication that either the Syracuse Defendants or the Buffalo Defendants had any knowledge that the communications were part of any alleged criminal scheme. No further particulars are alleged about how one group supposedly "collaborated" with the other.

Joinder is not proper in instances where commission of one offense did not depend on or lead to commission of the other offense and proof of one act did not constitute or depend upon proof of the other act. *Rajaratnam*, 753 F. Supp. 2d at 304. Here, it defies logic that the Syracuse Defendants would have been aware of the Buffalo Defendants' alleged scheme, or vice versa, when each had no purpose in the other's and no motive to participate. Both RFPs sought preferred *local* developers for distinct projects in different parts of the state. The Buffalo Defendants would have no reason to take any interest in the results of the Syracuse RFP, much less to develop a common plan involving the Syracuse RFP and some attempt to defraud Fort Schuyler. Nor has the government proffered otherwise.

Without more, these four emails simply demonstrate that, at most, the Buffalo Defendants were aware that Howe had communications with the Syracuse Defendants. Indeed, both the Syracuse and Buffalo Developer had entered into lawful consultancy agreements with the law firm affiliated with Howe; as such these types of communications are presumptively legitimate. The government does not proffer any evidence tending to undercut this presumption of legitimacy. For example, the government could have proffered — but did not — that Howe told the Buffalo Defendants of the Syracuse Defendants' participation in the Syracuse RFP Scheme or that Howe asked the Buffalo Defendants to assist or further the Syracuse RFP

Scheme. Despite having access to Howe as its primary witness in this case, the government remains silent on this issue, which strongly suggests that no evidence along these lines exists.[7]

The government's last attempt to argue for proper joinder is that the Buffalo and Syracuse RFP Schemes are "inextricably intertwined," citing that the RFPs were generated around the same time, they involved some of the same Fort Schuyler and SUNY Poly officials and the Fort Schuyler Board, and some interaction with "the same set of campaign staffers and State officials." (Gov. Opp. at 89–90). Taking the last item first, it is not clear what this has to do with any of the allegations of criminal conduct in this case. There are no allegations that any of the charged crimes involved any "campaign staffer" or "State official." There are no allegations that any of the Buffalo Defendants' campaign contributions or fundraisers were anything other than lawful and properly disclosed.

As for the other supposed links, these amount to nothing more than an allegation that the Buffalo Defendants and the Syracuse Defendants, each group separately and through a separate RFP process, allegedly defrauded the same victim.

The government's reliance on *United States v. Attanasio*, 870 F.2d 809 (2d Cir. 1989), to support its argument that there is a common plan alleged here is misplaced. (Gov. Opp. at 91). In that case, the Second Circuit held that two conspiracies were properly joined by a common plan, where each conspiracy involved a plan to conceal and launder one defendant's income. *See Attanasio*, 870 F.2d at 815. Both conspiracies were focused on a common goal — the illegal laundering of money belonging to defendant Attanasio. *See id.* at 811–13. Those facts are inapposite here, where, unlike in *Attanasio*, each alleged RFP Scheme involved markedly different projects and objectives.

---

[7]  The government has not been shy about making detailed proffers about Howe's testimony providing support for its charges, where such supporting testimony exists. *See, e.g.*, Compl. ¶¶ 35, 40, 51–53, 59, 65.

Finally, although the Buffalo Defendants and Syracuse Defendants are currently charged with one conspiracy, and a "non-frivolous conspiracy charge" can ordinarily support joinder, *United States v. Nerlinger*, 862 F.2d 967, 973 (2d Cir. 1988), the analysis does not end there. Where the allegations actually demonstrate two separate schemes, courts can nonetheless order severance because the schemes are improperly joined in the first place. *See, e.g.*, *Carrozza*, 728 F. Supp. at 270 (severing defendant Carrozza from other defendants charged in a single conspiracy count with him). Indeed, such a severance would ensure that the government is not acting with "limitless discretion" and is not "absolve[d]" of its obligation to consider the fairness of joinder. *United States v. Rittweger*, 524 F.3d 171, 180 (2d Cir. 2008). Instead of showing one conspiracy, the few emails cited by the government actually make apparent that the Syracuse Defendants and Buffalo Defendants were each — without any knowledge of the other's alleged scheme — communicating separately with Howe. Despite the government's use of the word "collaborated," ordinarily meaning "to work together to achieve a common goal,"[8] there is no indication that the Buffalo Defendants worked with the Syracuse Defendants toward any common goal.[9]

Instead, the crux of the government's fraud allegation against the Buffalo and Syracuse Defendants is that each group and Howe worked to "secretly tailor" their respective RFPs to

---

[8] *Collaborate Definition*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/collaborate (last visited July 13, 2017).

[9] The government's approach to joinder of the Buffalo RFP Scheme and the Syracuse RFP Scheme is similar to its initial approach in charging Defendant Kelly and the Syracuse Defendants with a single conspiracy to bribe Percoco. That charge (Count Nine in the original indictment) has been split into two separate charges (Counts Nine and Ten of the current Indictment). This decision to split one conspiracy count into two apparently came after counsel for Kelly repeatedly demanded any evidence showing that these bribery allegations were actually one conspiracy. Now, the government has admitted that there are no facts warranting its initial decision to charge Defendant Kelly and the Syracuse Defendants in a single conspiracy. The government should do the same here and concede that — despite their initial decision to charge the Buffalo Defendants and Syracuse Defendants in one conspiracy — the alleged RFP Schemes are two conspiracies that are improperly joined. Indeed, the few emails the government points to make apparent that Count One is actually two distinct schemes that share too little to be properly joined.

such a specific degree, and with unique criteria, that each of the Syracuse and Buffalo Developers, respectively, would be in effect the only developer eligible to be selected in its respective region. Therefore, according to the government's own theory, any "collaborat[ion]" with an unlawful purpose makes no logical sense. A secret tailoring to such a specific degree for one Developer would not have any application to the other. And the government — despite having access to Howe as a cooperating witness — does not fill in the blanks with any proffer about what he will say on the topic. Thus, as in *Carrozza*, severance is appropriate, because "there is virtually no outer rim connecting [the Buffalo Defendants] to the other defendants." *Carrozza*, 728 F. Supp. at 270. Accordingly, the purported "single" conspiracy in Count One is in fact two conspiracies, and the charge in Count One does not prevent the Court from granting severance.

**B.    A Separate Trial for the Buffalo Defendants Is Also Warranted Pursuant To Rule 14 Because It Serves the Interests Of Fairness And Efficiency.**

Even if the Court finds that the Buffalo Defendants are properly joined with the Syracuse Defendants pursuant to Rule 8(b), severance is still warranted under Rule 14 because a joint trial of the Buffalo RFP Scheme and Syracuse RFP Scheme still carries with it an impermissible risk of spillover prejudice. In addition, a trial of the Buffalo Defendants alone would promote the goal of efficiency because it would be shorter, streamlined, and prevent juror confusion.

The government attempts to argue that all of the evidence related to the Syracuse RFP Scheme would be admissible at a trial of only the Buffalo Defendants, such that Rule 14 severance of the Buffalo Defendants from the Syracuse Defendants is not warranted. (Gov. Opp. at 93). Not so. This contention ignores that those two groups are improperly charged in one conspiracy. And even if the Court were to find that they are properly charged as part of one conspiracy, in all likelihood at separate trials the government would make tactical decisions

about which — if any — evidence relating to the Syracuse RFP Scheme it would attempt to introduce against the Buffalo Defendants. At a separate trial, because there is no indication that either group knew of the other's alleged involvement in any criminal conduct, the government would likely decide that any such evidence would be more distracting and confusing than probative. Thus, in all likelihood, the government would (and should) drastically trim the evidence about the Syracuse RFP Scheme at a trial of the Buffalo Defendants, and vice versa.

Thus, at a separate trial, the jury would view only that evidence related to the Buffalo Defendants and would be able to make informed judgments based on the evidence relevant to the Buffalo Defendants. There would be no risk of guilt by association, and the jury would not be subjected to endless evidentiary rulings and limiting instructions as to which evidence might be considered against which of the Defendants. The cleanest and most efficient approach here is to completely sever the Buffalo Defendants and avoid a convoluted six-defendant trial of both the Buffalo RFP Scheme and the Syracuse RFP Scheme.[10]

In addition, nowhere does the government's proposed severance plan address what it plans to do with the allegations concerning the Syracuse Defendants' involvement in a different wholly unrelated scheme, namely, the Percoco Scheme. The government does not guarantee that it will not seek to somehow introduce the Percoco Scheme evidence during its proposed joint trial of the Buffalo and Syracuse Defendants, as, for example, so-called 404(b) evidence or background to the conspiracy for the Syracuse Defendants. Even according to the government, the Buffalo Defendants had nothing to do with the Percoco Scheme and "had no knowledge or awareness" of that scheme. (Gov. Opp. at 100). The government concludes that, according to its

---

[10] The Buffalo Defendants agree that Defendant Kaloyeros is properly joined with them, pursuant to Rule 8(b), as far as his alleged conduct with respect to the Buffalo RFP Scheme (but not the Syracuse RFP Scheme). Therefore, the Buffalo Defendants continue to ask that the Court grant severance of just the Buffalo Defendants pursuant to Rule 14, so that their trial will involve only the evidence and facts directly relevant to their alleged conduct.

severance plan, the Buffalo Defendants are protected from unfair spillover prejudice because they would be somehow insulated from any evidence related to the Percoco Scheme. That is only true if there were no chance that any of the Percoco Scheme evidence could make an appearance at the Buffalo Defendants' trial. But the government has not conceded that it will not seek to introduce the Percoco Scheme evidence against the Syracuse Defendants at a joint trial of the Buffalo and Syracuse Defendants. Thus, the only way to ensure that the Buffalo Defendants will not be exposed to evidence about the wholly unrelated Percoco Scheme is to sever the Buffalo Defendants from the Syracuse Defendants.

Moreover, at a trial of just the Buffalo Defendants, fewer defendants will mean fewer witnesses. Fewer defendants will also mean fewer lawyers to object, cross-examine, and engage in the frequent sidebar discussions with the Court likely to come up in a joint trial. Even if the government can present evidence about the Syracuse RFP Scheme at a trial about the Buffalo Defendants, it would most likely streamline such evidence at a separate trial. Here, not only does justice require severance, severance is also logical and is the best way to apply the Court's and the jurors' resources.

For the foregoing reasons, the Buffalo Defendants respectfully request that this Court grant their motion for severance and completely sever the charges against them in Counts One, Four, and Five of the Indictment.

## II. ALL CHARGES AGAINST THE BUFFALO DEFENDANTS SHOULD BE DISMISSED PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 12.

As argued in our opening brief, the Court should dismiss Counts One, Four, and Five for their failure to allege the essential elements of the charged crimes.

## A.     The Wire Fraud Charges Must Be Dismissed.

The government's opposition fails to address the myriad glaring legal deficiencies which require dismissal of the wire fraud charges (Counts One and Four) as against the Buffalo Defendants.  Instead, the government attempts to obfuscate the issues by contorting these deficiencies raised by the Buffalo Defendants as questions of fact to be reserved for decision at a later stage of the proceedings.  This ignores the fact that our arguments are based entirely on the facts alleged by the government and/or reflected in documents referenced in the Indictment.  *See, e.g.*, *United States v. Forrester*, No. 02 CR.302 WHP, 2002 WL 1610940, at *1 (S.D.N.Y. July 22, 2002) ("The Court may consider documents outside of the indictment [on a motion to dismiss], but cannot give any weight to contrary factual assertions made by the defendant."); *United States v. Martino*, No. S1 00 CR 389 (RCC), 2000 WL 1843233, at *1 (S.D.N.Y. Dec. 14, 2000) (same).  Where the government does choose to respond, however, its arguments in opposition only further demonstrate how impermissible its theory of liability is in this case.  Accordingly, the wire fraud counts must be dismissed as against the Buffalo Defendants.

### 1.     The Indictment Fails To Allege A Scheme To Defraud Fort Schuyler Through Material Misrepresentations Made With Fraudulent Intent.

A scheme to defraud is an essential element of wire fraud, which requires the government to show that:  "(1) a scheme to defraud existed; (2) the defendant ha[d] [the] specific intent to defraud; and (3) material misrepresentations."  *United States v. Falkowitz*, 214 F. Supp. 2d 365, 374 (S.D.N.Y. 2002).  The Indictment falls short on each of these three elements.

#### a.     The Indictment Fails To Allege A Scheme To Defraud Fort Schuyler.

The government does not contend that Fort Schuyler was defrauded by any false statements the Buffalo Developer made as to its substantive suitability for the "preferred

developer" position, which was the object of the Buffalo RFP.[11]  Instead, the government argues

that there were improprieties in the drafting of the RFP itself that the Buffalo Defendants failed

to disclose.  This is a very different kind of fraud scheme than one typically sees and the lens

through which it must be analyzed is also different.  The Indictment in this case would only

properly allege a scheme to defraud if the alleged improprieties in the RFP process — the pre-

RFP communications — were known to the defendants to have been improper, such that the

failure to disclose those communications when the Buffalo Developer subsequently submitted an

honest summary of its experience and expertise was enough to constitute a scheme to defraud.

Yet, as set forth in the Buffalo Defendants' opening brief, the Indictment fails to allege that the

Buffalo Defendants were put on notice that any pre-RFP communications between the Buffalo

Defendants, Howe, and Kaloyeros were forbidden or improper.  (*See* Buffalo Def. MTD at 13–

16).

    The Indictment does not (and cannot) allege that the Buffalo Defendants violated any

statute, rule, or guideline relating to the Buffalo RFP process if they engaged in any alleged pre-

RFP communications.  In acknowledgement of this fact, the government retreats from its original

position in noting that any such violation is seemingly irrelevant to its case.  The government

was forced to make this concession as it became clear that the square peg would never fit into the

circular hole.  As the government concedes in its brief, Fort Schuyler was created as "a separate

non-profit corporation" precisely because the "strict rules governing SUNY Institutions that

prevented SUNY Poly from easily engaging in partnerships with private companies."  (Gov.

Opp. at 8).  In other words, Fort Schuyler was created to do what the public entities could not in

---

[11]    Request For Proposal: For A Strategic Research, Technology Outreach, Business Development, Manufacturing, And Education And Training Partnership With A Qualified Local Developer In The Greater Buffalo Area, FORT SCHUYLER MANAGEMENT CORPORATION, Oct. 15, 2013 ("Buffalo RFP"), annexed to the May 19, 2017 Declaration of Jessica A. Masella ("Masella Dec.") as Exhibit A.

a way that the public entities could not.  To construe Fort Schuyler's purpose otherwise is to render its creation superfluous and meaningless.

The government disputes this contention by directing the Court to certain allegations set forth in the Complaint.  (*See* Complaint, Dkt. No. 1 ("Compl.")).  The Complaint alleges "Fort Schuyler used the procurement policies of the SUNY Research Foundation, which were 'intended to promote open and free competition in procurement transactions and to ensure that procurements are priced competitively and that the selection process is not influenced improperly,'" which required "that '[s]uppliers that develop or draft specifications, requirements, statements of work, or requests for bids or proposals for a procurement must be excluded from competing in any resulting procurement.'"  (Gov. Opp. at 49 (quoting Compl. ¶ 76) (internal quotations omitted)).  The government identifies this allegation, contained nowhere in the Indictment itself, as support for the proposition that the defendants acted improperly with respect to the Buffalo RFP.

Thus, by the logic of the government's own position, the Buffalo Defendants' conduct could *only* constitute a scheme to defraud if they had knowledge that this procurement policy applied to the Buffalo RFP and they deliberately violated it and lied about it.  Without the allegation that the Buffalo Defendants were aware that any pre-RFP communications would disqualify them from participation in the Buffalo RFP, by dint of the Research Foundation's policies, there can be no improper conduct.

Neither the Indictment nor the Complaint identifies the basis for the allegation that Fort Schuyler adopted any of the procurement policies of the SUNY Research Foundation.  Despite diligent efforts, counsel to date has been unable to find any document, website entry, or email indicating that these rules applied to the Buffalo RFP.  However, accepting this allegation as true

(as is proper at this stage of the proceedings), there is still no allegation that the Buffalo Defendants were <u>aware</u> of this procurement policy. While Fort Schuyler may have adopted the procurement policies of the SUNY Research Foundation generally, there is no allegation that those policies were specifically adopted to govern the Buffalo RFP process. There are similarly no allegations setting forth how this rule was interpreted by Fort Schuyler (the RFP-issuing entity) or what its traditional practice was with respect to pre-RFP communications. Nor is it intuitively obvious that the "procurement policies of the SUNY Research Foundation," which purport to apply to "procurement transactions" (Compl. ¶ 76), would necessarily apply to a process like the Buffalo RFP, which merely solicited qualifications from potential "preferred developers," did not involve a specific project or contract, and did not involve any pricing whatsoever. (*See* Buffalo Def. MTD at 19–20). Pivotally, the SUNY Research Foundation policy language is not included in the Buffalo RFP itself, the only document which would memorialize the terms governing the Buffalo RFP process, or which could provide the Buffalo Defendants with notice that any pre-RFP communications would disqualify the Buffalo Developer from participating in the RFP. As the government well knows, that is far from a universal rule.

In any event, in fact, the RFP documents referenced in the Indictment demonstrate clearly that Fort Schuyler *did not* intend to adopt New York State procurement guidelines like the SUNY policy to control the Buffalo RFP and Syracuse RFP. In particular: (i) the Syracuse RFP served as a template for the Buffalo RFP and later Fort Schuyler RFPs;[12] and (ii) an earlier draft of the Syracuse RFP explicitly included the following provision:

---

[12] A comparison indicates that they are substantively identical. *See* Masella Dec. ¶¶ 10–12 & Exs. G–I. These RFPs, far from being "tailored" to the Buffalo Developer's qualifications, are so generic that Fort Schuyler continued to use them as a template for other RFPs. *See* Masella Dec. at ¶¶ 10–12 & Exs. G–I. That the documents

> DEVELOPER will comply with all New York State procurement guidelines and all applicable New York state laws and regulations for any procurement involving this RFP, including without limitation prevailing wage requirements.[13]

This provision was intentionally removed from the final, as-issued version of the Syracuse RFP — a decision that had nothing at all to do with the Buffalo Defendants — and was not included in the subsequent Buffalo RFP or any of Fort Schuyler's other RFPs.[14] Accordingly, notwithstanding the Complaint's allegations, Fort Schuyler's intention — at least with respect to the RFPs at issue — was plainly to <u>avoid</u> compliance with New York State procurement guidelines. One can disagree with the wisdom, as a policy matter, of using private corporations like Fort Schuyler in this fashion. But the government cannot simply ignore it.

Even assuming, however, that this SUNY Research Foundation rule was adopted by Fort Schuyler to govern the Buffalo RFP process, the government fails to allege that the Buffalo Defendants were put on notice of the existence of this rule, so that they could intentionally violate it. There are no allegations that the Buffalo Defendants were aware of or informed that the SUNY Research Foundation's procurement policies were adopted by Fort Schuyler. The government does not allege that the Buffalo Defendants knew that pre-RFP communications would have the effect of disqualifying them from the Buffalo RFP.

Even assuming the Buffalo Defendants had some affirmative duty to determine what policies governed the Buffalo RFP (outside the four corners of the RFP documentation itself), it is not at all clear that they could have learned what the government now touts as the lynchpin of alleged criminality. The Fort Schuyler website itself fails to provide any information relating to

---

that are crucial to these charges contradict the charges is stunning. That the government's brief ignores this argument completely stuns even more.

[13] This draft of the Syracuse RFP, dated September 3, 2013, was produced by the government in discovery. Its bates number is "FS_SDNY170664."

[14] *See* Masella Dec. at ¶¶ 4, 6, 8–9 & Exs. A, C, E–F.

the policies it employs during the RFP process generally. Similarly, the website fails to reference at all the procurement policies employed by the SUNY Research Foundation, an entirely separate and distinct non-profit corporation. How were the Buffalo Defendants to have known these policies even existed? How were they to have known that they governed this specific RFP (which, again, was not for a specific contract or project, contained no specifications or pricing, and was not intuitively a "procurement")? Certainly, the government provides no answer.

Furthermore, outside the government procurement context it is simply not the case that pre-RFP communications are inappropriate or disqualifying. In fact, entities and individuals familiar with a private RFP process (which the Buffalo RFP emphatically was), such as other developers and Fort Schuyler, would have expected a pre-RFP exchange of information to develop the RFP. Such information sharing is often necessary to develop an RFP that is adequately designed to the goal envisioned by the issuing entity. Fort Schuyler was created precisely because it would not be subject to the kinds of State procurement rules that apply to SUNY Poly, such as the SUNY Research Foundation policy the government now cites. (*See* Indictment ¶ 7). Viewed against this backdrop, the lack of any cognizable scheme to defraud is even more apparent. Indeed, if anything, the Buffalo Defendants would have been aware that in its dealings with Fort Schuyler, a private non-profit entity, the very specific rules governing how public entities must conduct the selection of contractors simply do not apply to it (and they are not explicitly alleged to have applied here). *See generally Hunts Point Terminal Produce Co-op. Ass'n, Inc. v. N.Y. City Econ. Dev. Corp.*, 36 A.D.3d 234, 245–46 (1st Dep't 2006) (finding fairness obligations governing RFPs issued by public entities do not apply to a non-profit development corporation). Again, we accept at this stage the government's claim that Fort

Schuyler "adopted" the SUNY Research Foundation policies. Our point is a different one: the Buffalo Defendants cannot have knowingly violated those policies if they were ignorant of them (and there is no allegation that they were aware of them).

As we argued in our opening brief (*see* Buffalo Def. MTD at 13–16), case law makes clear that, even in the public procurement context, where legislation and regulations provide specific requirements for bidding, public entities are permitted to include specifications that favor certain bidders over others.[15] Under this case law, a specification that may favor one bidder over others "is not facially anticompetitive [if it] does not, in and of itself, guarantee the award of the contract to a particular bidder." *Blueline Commuter, Inc.*, 126 A.D.3d at 1163. The government argues that this case law is irrelevant. (Gov. Opp. at 49). This studiously ignores the fact that these legal principles — familiar to the Buffalo Defendants who, have worked in this industry for decades — provide the context against which the Indictment's allegations must be weighed. These cases are relevant because they further evidence how the Buffalo Defendants did not act with the requisite specific intent to defraud Fort Schuyler, because the actual practice and their experience in the industry refute any notion that they acted improperly. The cases, in other words, are relevant precisely because they illustrate that the alleged conduct the government identifies as nefarious is actually commonplace and wholly proper. Absent any allegations to the contrary (and there are none), there is no reason to believe that the Buffalo

---

[15] *See In re Blueline Commuter, Inc. v. Montgomery Cnty.*, 126 A.D.3d 1161, 1163 (3d Dep't 2015) (in public bid context, government entities "are permitted to include bid specifications that may be more favorable to some bidders over others, as long as the public interest is served and the specifications are not intended to ensure that one particular bidder be awarded the contract"); *see also Brega Transp. Corp. v. Brennan*, 105 A.D.3d 985, 987 (2d Dep't 2013) ("Municipalities may fix reasonable standards . . . even if they tend to favor one bidder over another."); *McArdle v. Bd. of Estimate of Mt. Vernon*, 347 N.Y.S.2d 349, 351–55 (Sup. Ct. Westchester Cnty. 1973), *aff'd*, 45 A.D.2d 822 (2d Dep't 1974) (consultant who prepared "detailed specifications for a contract subsequently to be bid upon by others" that were "specially tailored for [his] benefit" could participate in the bidding process and "accept the contract if awarded," provided all bidders had access to the specifications and "adequate time" to prepare bids).

Defendants would have understood these pre-RFP communications — common in many contexts — to be improper.

The Indictment's failure to allege the defendants were aware, or had reason to believe, that Fort Schuyler had adopted the particular procurement policy referenced in the Complaint — in light of the fact that neither the Buffalo RFP nor Fort Schuyler's website mention these procurement policies or suggest in any way whatsoever that they could apply to the Buffalo RFP process — defeats any allegation that there existed a scheme to defraud Fort Schuyler by allegedly violating those putative policies. Again, the government's position at base is that the Buffalo Defendants defrauded Fort Schuyler by not revealing that they had violated the SUNY Research Foundation policies. It is akin to an allegation that participants in a cross-country road race defrauded the race organizers by not revealing that they had not obeyed the speed limit (which the race's rules required) because they drove 55 miles per hour on a stretch of road where the limit was 40 mph — but there were no speed limit signs.

Similarly, although the Indictment alleges that Kaloyeros "falsely represented to Fort Schuyler . . . that the bidding process[] for . . . the Buffalo RFP [was] fair, open, and competitive" (Indictment ¶ 25 (a)), there is no allegation that the Buffalo Defendants had any knowledge of these putative representations. Even if they did, and even if Kaloyeros believed that statement to have been false, such alleged knowledge of falsity cannot be imputed to the Buffalo Defendants, and that knowledge is not alleged. Again, without any allegation of any agreed-upon, defined process proscribing certain conduct, of which the Buffalo Defendants had knowledge, these allegations cannot possibly constitute a knowing scheme to defraud. In any event, of course, the process *was* "fair, open, and competitive" — as evidenced by the fact that

ultimately _**two**_ preferred developers were selected. (*See* Gov. Opp. at 55 ("other winner of the Buffalo RFP"); Masella Dec. ¶ 14 & Ex. K).

Furthermore, as mentioned above, the government's argument that the pre-RFP communications provided a predicate for a scheme to defraud rests entirely on the allegation that the defendants "secretly tailor[ed]" the RFP, so that the winners were "predetermined." (Indictment ¶¶ 24, 25, 39, 45). But that claim cannot withstand even cursory scrutiny of the documents relied upon by the Indictment. The whole gist of the government's case against the Buffalo Defendants is that they larded the Buffalo RFP with idiosyncratic requirements or experiences unique to the Buffalo Developer so that it would have to win. But the documents relied upon by the government and cited in the Indictment show unequivocally that this is simply not so.

If we could only have Your Honor consider one group of documents cited in the Indictment, it would be the RFPs themselves. (*See* Masella Dec. ¶¶ 10–12 & Exs. G–I). As we previously demonstrated, they are so general as to be boilerplate. (*See* Buffalo Def. MTD at 19–20). The Syracuse RFP is identical to the Buffalo RFP. (*See* Masella Dec. ¶¶ 10–12 & Exs. G–I). Far from being "tailored" to guarantee an easy win for the Buffalo Developer, the Buffalo RFP was so "one size fits all" that it was actually used as a template for multiple other RFPs throughout New York State. (*See* Masella Dec. ¶¶ 10–12 & Exs. G–I). Perhaps this explains why an RFP process the government depicts as hand-crafted to guarantee a victory for the Buffalo Developer (and only the Buffalo Developer) resulted in a split verdict and the selection of two winners. Again, the documents cited in the Indictment themselves gut the government's theory of its case. This negates the formulaic allegations that a scheme to defraud existed and

necessitates dismissal. Perhaps this is why the government failed to address them anywhere within its 180-page opposition brief.

On the other hand, if the alleged harm is simply that Fort Schuyler believed the RFP information was confidential and that it was deceived when the Buffalo Developer was allegedly provided with and used the information in drafting its proposal, or that the certification that the Buffalo Developer had not hired any lobbyists was deceptive, this would fail to establish wire fraud. The government fails to address and therefore effectively concedes our argument (*see* Buffalo Def. MTD at 16–25) that the Indictment's claims that Fort Schuyler was "deceived" fail, by themselves, to constitute a scheme to defraud. *See United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987) ("Misrepresentations amounting only to a deceit are insufficient to maintain a mail or wire fraud prosecution."); *see also United States v. Mittelstaedt*, 31 F.3d 1208, 1217 (2d Cir. 1994) ("[L]ack of information that might have an impact on the decision regarding where government money is spent, without more, is not a tangible harm and therefore does not constitute a deprivation of section 1341 'property.'"). There is a crucial distinction "between schemes that do no more than cause their victims to enter into transactions they would otherwise avoid—which do not violate the mail or wire fraud statutes—and schemes that depend for their completion on a misrepresentation of an essential element of the bargain—which do violate the mail and wire fraud statutes." *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007). Hence, "deceit that does not go to the nature of the bargain itself where the customers received exactly what they paid for is not sufficient absent contemplation of harm to the victims." *United States v. Bank of N.Y. Mellon*, 941 F. Supp. 2d 438, 464 (S.D.N.Y. 2013) (internal quotation marks omitted).

At most, the Indictment alleges efforts to deceive Fort Schuyler to induce it to select the Buffalo Developer as one of the "preferred developers." The Buffalo Developer's response to the RFP is not alleged to have contained any falsehoods concerning the Buffalo Developer's qualifications, skills, or experience — information which might go to the nature of the bargain itself. Accordingly, any alleged deceit was "only collateral" to the selection of the Buffalo Developer for the role of "preferred developer." *See Starr*, 816 F.2d at 98 (misrepresentations that "were only collateral to the sale and did not concern the quality or nature of the goods" do not suffice). Therefore, any alleged "deceit" which might have induced Fort Schuyler to enter into the transaction could not have "influenc[ed] [Fort Schuyler's] assessment of the value of the bargain," because collateral misrepresentations have no relevance whatsoever to the "quality, adequacy or price" of the Buffalo Developer's skills and experience as was represented in its response to the RFP. *United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1182 (2d Cir. 1970). Accordingly, any such collateral misrepresentations — which, at most, are what the Indictment alleges — cannot form the basis of a scheme to defraud.

> **b.** **The Indictment Fails To Allege Facts Sufficient To Establish That The Buffalo Defendants Acted With The Requisite Specific Intent.**

Proof of fraudulent intent, or the specific intent to harm or defraud the victim of the scheme, "is an essential component of the 'scheme to defraud' element" of wire fraud. *United States v. Walker*, 191 F.3d 326, 334 (2d Cir. 1999); *see also Starr*, 816 F.2d at 98. As indicated above, the Buffalo Defendants' citations to case law concerning State and local competition rules are relevant for the purpose of determining whether the Buffalo Defendants could have acted with the requisite specific intent. (*See supra* at 16–26). In this regard, accepting the Indictment's allegations as true, if the Buffalo Defendants did not in fact intentionally violate any relevant statute, rule, or guideline, then the Buffalo Defendants could not have had the

specific intent to defraud that is required to establish wire fraud. While the government contends that the violation of a State statute, rule, or guideline is not an element of wire fraud (Gov. Opp. at 49), as discussed above that argument fails to recognize that on these specific facts if the conduct underlying the alleged scheme to defraud is not prohibited (and known to be prohibited), then there can be no scheme to defraud. Given that, the Buffalo Defendants plainly lack the necessary specific intent to defraud.

In opposition, the government first summarily argues that an indictment need not allege specific intent to properly charge wire fraud. (Gov. Opp. at 50–51). However, as argued above, because the government fails to allege the Buffalo Defendants had knowledge that any pre-RFP communications violated the applicable procurement policies, there can be no scheme to defraud, no fraudulent intent regarding the RFP, and hence no wire fraud. The government next argues that, "[i]n any event, the defendants' fraudulent intent is clear from the allegations in the [] Indictment and 'is readily inferable from the nature of the alleged scheme.'" (Gov. Opp. at 50 (quoting *United States v. Wey*, No. 15 Cr. 611 (AJN), 2017 WL 237651, at *11 (S.D.N.Y. Jan. 18, 2017)). In support, the government contends the "Indictment plainly states[] the defendants secretly tailored the RFPs so that they would be chosen by Fort Schuyler as preferred developers and ultimately awarded contracts worth hundreds of millions of dollars, while simultaneously representing to Fort Schuyler that the preferred developer bidding was open, fair, and competitive." (Gov. Opp. at 50–51 (citing Indictment ¶¶ 22–27)). However, the Indictment as a whole provides conflicting allegations which, when taken together, fail to establish (1) that Fort Schuyler was actually harmed, (2) that the Buffalo Defendants contemplated any harm towards Fort Schuyler, or (3) that Fort Schuyler was deceived in any material way.

The government does not allege that Fort Schuyler was actually harmed by the Buffalo Developer's truthful summary of its experience, expertise, and fitness for a position as "preferred developer," but instead simply contends correctly that "actual harm is not an element of wire fraud." (Gov. Opp. at 50 n.17 (citing *United States v. Greenberg*, 835 F.3d 295, 306 (2d Cir. 2016); *United States v. Binday*, 804 F.3d 558, 570 n.10 (2d Cir. 2015)). However, while an alleged scheme to defraud need not have been successful, the defendant must have at least *contemplated* some actual harm or injury to the property rights of the victim in a fundamental way. *See United States v. Finazzo*, No. 10-CR-457 (RRM)(RML), 2014 WL 184134, at *10 (E.D.N.Y. Jan. 14, 2014) (government must "'show that the defendant contemplated some actual harm or injury'" and that such harm related to "property right[s]") (quoting *United States v. Wallach*, 935 F.2d 445, 461 (2d Cir. 2010)), *aff'd*, 850 F.3d 94 (2d Cir. 2017); *Starr*, 816 F.2d at 98 ("Moreover, the harm contemplated must affect the very nature of the bargain itself."). A defendant, therefore, must have had the "conscious knowing intent to defraud" and must have "contemplated or intended some harm to the property rights of the victim." *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999) (internal quotation marks omitted).

In instances "[w]here the scheme does not cause injury to the alleged victim as its necessary result, the government must produce evidence independent of the alleged scheme to show the defendant's fraudulent intent." *United States v. D'Amato*, 39 F.3d 1249, 1257 (2d Cir. 1994) (internal citations omitted). Accordingly, the government's failure to allege that Fort Schuyler was actually harmed requires that the government establish independent evidence of the defendants' fraudulent intent. The Indictment's failure to allege such facts only supports the conclusion that the Buffalo Defendants did not contemplate any actual harm or injury to the property rights of Fort Schuyler.

More fundamentally, the Indictment fails to allege facts establishing that the Buffalo Defendants deceived Fort Schuyler at all, let alone that they contemplated harm to Fort Schuyler. While the Indictment alleges that the Buffalo Developer was "preselected" to win the "preferred developer" status for the Buffalo RFP (Indictment ¶ 23), this allegation is directly contradicted by other allegations in the Indictment. There is no allegation that any alleged coconspirator had the power to determine who would be deemed a "preferred developer," in advance or otherwise. Neither the Buffalo Defendants nor their codefendants had the ability to "preselect" the winner, because the winners (plural) were selected by the independent Board of Fort Schuyler. (*See* Indictment ¶ 7). As explained above, if one looks at the actual Buffalo RFP, the crucial document referred to throughout the Indictment, one sees nothing consistent with these conclusory allegations. One sees, instead, a request for fairly generic qualifications.[16]

As discussed above (and ignored by the government), it is of crucial importance that the Buffalo RFP is nearly identical to the Syracuse RFP and other Fort Schuyler RFPs. In turn, the Buffalo Developer's response merely provided general information about the Buffalo Developer, including services offered, profiles of company management personnel, and examples of prior experience and current projects. (*See* Masella Dec. ¶ 5 & Ex. B). The RFP was not for any particular project, and accordingly did not include any specifications, financial information, pricing information, or the like, and therefore the Buffalo Developer's submission could not constitute a "bid" in the usual sense — because there was nothing concrete upon which to bid. (*See* Masella Dec. ¶ 4 & Ex. A). It was akin to a company brochure or resume.

---

[16] As discussed in our opening brief (*see* Buffalo Def. MTD at 19–20) and above (*supra* at 24, 35), the claim that the Buffalo RFP was "tailored" to fit the Buffalo Developer and ensure its selection cannot survive the indisputable fact that the Buffalo RFP is *identical* to the Syracuse RFP and that that form was used as a template for several other RFPs outside of the Buffalo area. *See* Masella Dec. ¶¶ 10–12 & Exs. G–I.

The Indictment does not allege that the Buffalo Developer falsely represented its qualifications in its response to the RFP, so as to mislead Fort Schuyler's assessment of its bona fide credentials, experience, or fitness for the "preferred developer" status. The Indictment does not allege that the Buffalo Developer deceived Fort Schuyler in relation to the quality or price of the transaction, which might evidence any contemplated harm to property. The Indictment, therefore, wholly fails to allege that the Buffalo Defendants intended harm of the kind that went to "the very nature of the bargain itself" — which is what the law requires. *Starr*, 816 F.2d at 98; *see United States v. Kurtz*, No. 04-CR-0155A, 2008 WL 1820903, at *2 (W.D.N.Y. Apr. 21, 2008) ("As a consequence, the deceit practiced must be related to the contemplated harm, and that harm must be found to reside in the bargain sought to be struck.").

The government ignores these arguments and simply responds that the "Complaint is replete with factual detail demonstrating the defendants' fraudulent intent, including but not limited to communications showing the defendants' desire to conceal their activities, to represent that the bidding process was unbiased, and to be awarded the contract on qualifications other than price." (Gov. Opp. at 51 (citing Compl. ¶¶ 79, 82)). However, in fact, the Indictment seems to allege the contrary — that Fort Schuyler received exactly what it requested in the Buffalo Developer's response to the Buffalo RFP, which is not alleged to be deceptive as to qualifications or experience. That the government presses this argument as to the Buffalo Defendants and the Buffalo RFP is perplexing and highlights the confusion at the heart of this prosecution. As parsed out in the government's brief, the Buffalo Defendants supposedly manipulated the Buffalo RFP process so that the Buffalo Developer could "be awarded the contract on qualifications other than price." (Gov. Opp. at 51 (citing Compl. ¶¶ 79, 82)). But the Buffalo RFP was not designed to award a "contract" for any project (but, rather, "preferred

developer" status) and did not include any specifications or other information needed to "price" out a true bid, so the responses to the Buffalo RFP did not include any "price" because that would have been impossible. (*See* Masella Dec. ¶¶ 4–5 & Exs. A–B).

The government fails to address the Buffalo Defendants' argument that the only allegations of any false statement relating to the Buffalo RFP — that the "Buffalo Developer falsely certified [on the 'Disclosure of Lobbyist' form] that no one was retained, employed, or designated by or on behalf of the Buffalo Developer to attempt to influence the procurement process," which was allegedly false because of Howe's engagement (through a law firm the Buffalo Developer had retained) (Indictment ¶ 25 (c)) — does not evidence fraudulent intent. (*See* Buffalo Def. MTD at 20–22). Specifically, there are no allegations suggesting that this misrepresentation was made by any of the Buffalo Defendants, no clear allegations as to its falsity, and no allegations suggesting the statement was made with knowledge of its falsity. More to the point, because the alleged misrepresentation could not be said to go to "[t]he very nature of the bargain itself," it clearly does not imply the necessary intent to harm Fort Schuyler in a pecuniary way. *Starr*, 816 F.2d at 98; *see id.* (misrepresentations that "were only collateral to the sale and did not concern the quality or nature of the goods" do not suffice). Accordingly, as the wire fraud counts fail to allege the necessary fraudulent intent, they must be dismissed.

### c. The Indictment Falls Short Because The Alleged Misstatements Are Not Material To The Transaction.

The Indictment further fails to allege a cognizable scheme to defraud because its allegations do not establish the materiality of the Buffalo Defendants' purported misrepresentations. To be material, a misrepresentation must be capable of influencing a decision-maker. *United States v. Finazzo*, 850 F.3d 94, 109 n.16 (2d Cir. 2017). The Indictment fails to allege that any misrepresentation or omission purportedly made by the Buffalo

Defendants which related to the Buffalo RFP was material. The two alleged misrepresentations referenced in the Indictment — Kaloyeros's alleged misrepresentation that the process was "fair and open" and the Buffalo Developer's alleged misrepresentation that it did not hire a lobbyist — were not in fact false, and such representations cannot therefore satisfy the third element of a scheme to defraud. However, the representations fail to support the government's theory of wire fraud for the additional reason that, even if these representations <u>were</u> false, the Indictment does not (and cannot) allege that such representations were capable of influencing Fort Schuyler's independent decision-making process on the Buffalo RFP.

The Indictment fails to allege how Kaloyeros's representation that the process was fair and open could have impacted Fort Schuyler's evaluation process. Indeed, nothing in the government's own allegations support the claim that the process was anything other than fair and open. The Fort Schuyler Evaluation Committee knew full well what the RFP requested from potential respondents, knew what those respondents submitted, evaluated the submissions in what is not alleged to have been an unfair process, scored the position according to a scoring matrix that is not alleged to have been unfair or out of the ordinary, and awarded *two* respondents the designation of "preferred developer." The decision-makers knew what they were looking for — developers local to the Buffalo area with sufficient experience and expertise to function as a "preferred developer" — knew the questions posed to potential candidates, received submissions that are not alleged to contain false statements about experience and expertise, and made their selections. In what material way were they misled? In what material way was this process unfair?

The Indictment does not allege that Kaloyeros participated in the vote to select the Buffalo Developer as a "preferred developer" or allege that he participated in the evaluation of

the Buffalo Developer's response to the Buffalo RFP in any way. Rather, the Indictment's allegations support the conclusion that the Buffalo Developer was ultimately selected as a "preferred developer" by an independent Evaluation Committee empaneled by Fort Schuyler pursuant to regular internal procedures, which thereafter selected the Buffalo Developer on the merits of its submission, while also selecting a second developer.

With respect to the alleged misrepresentation made by the Buffalo Developer that it had not retained anyone as a lobbyist, the immateriality of that representation is apparent on the face of the RFP responses themselves.[17] (Indictment ¶ 25 (c)). Both the Buffalo Developer and another developer were chosen as "preferred developers" as a result of the Buffalo RFP — and the second developer wholly omitted the lobbyist disclosure form from its submission altogether. (*See* Masella Dec. ¶¶ 14–15 & Exs. K–L). The alleged misrepresentation could not have been material to the Evaluation Committee's internal process, where the information was simply not considered at all in the Committee's determination to award "preferred developer" status to the second developer.

The Indictment fails to allege how Kaloyeros's alleged misrepresentation as to "fairness" had any capability of influencing the selection process. In fact, Fort Schuyler has memorialized the procedures that were taken to ensure the independent, neutral evaluation process attendant to the Buffalo RFP.[18] The government attempts to remedy this deficiency by arguing that

---

[17] As a threshold matter, given the nature of the form at issue, that alleged misrepresentation is not even false. (*See* Buffalo Def. MTD at 20–22).

[18] *See Summary Of The Competitive Procurement Conducted By Fort Schuyler Management Corporation For The Awards Under The Request For Proposals For A Qualified Local Developer In The Greater Buffalo Area*, FORT SCHUYLER MANAGEMENT CORPORATION, available at http://www.ftsmc.org/relevant-documents/ (last visited July 21, 2017) (summarizing the competitive procurement conducted by Fort Schuyler following its request for proposals for a qualified developer in the greater Buffalo area); see also Summary of Fort Schuyler Management Corporation Buffalo Developer RFP Evaluation, FORT SCHUYLER MANAGEMENT CORPORATION, available at http://www.ftsmc.org/relevant-documents/ (last visited July 21, 2017) (summarizing Fort Schuyler's evaluation of the three developers that submitted proposals in response to the Buffalo RFP, including the selection committee's evaluation matrices).

Kaloyeros's status as a member of the Fort Schuyler Board, who "'selected and provided direction to Fort Schuyler's officers and others working on behalf of Fort Schuyler,'" rendered him capable of influencing "the Board's decision to ratify the RFP process." (Gov. Opp. at 54 (quoting Indictment ¶ 8; *see also* Compl. ¶ 27(b))). Yet, Kaloyeros's isolated, vague representation to Fort Schuyler's Board that the RFP process was "fair" cannot plausibly be said to have influenced the Board's review (and subsequent adoption) of the Evaluation Committee's independent consideration and scoring of the responses to the Buffalo RFP — hardly. Notably, the Indictment does not allege these misrepresentations were made to the Evaluation Committee. While the government insinuates (Gov. Opp. at 54) that Kaloyeros could have influenced the Board in some other way (presumably, by pressuring Board Members to favor the Buffalo Developer's proposal), there are no allegations that this occurred. Rather, the allegations suggest only that the Buffalo RFP, from conception to culmination, proceeded exactly according to plan. And there is support for it in the Complaint. (*See* Compl. ¶ 77 (c)).

As alleged, the Fort Schuyler Board "appoint[ed] a selection committee to review submissions," which used "matrices created by the evaluation committee" to "compare[] each bidder's submission." (Compl. ¶ 77(c), (e)). The Committee, in turn, would recommend the selection of the "preferred developers," but the Board retained "final authority for making the selection." (Compl. ¶ 77(c)). The Indictment fails to allege any other misrepresentations or improper influence by Kaloyeros with respect to this process. The government cannot summarily allege this process was not "fair" where the facts establish otherwise — that the Board ratified the decision of the committee it empaneled to evaluate the responses to the Buffalo RFP pursuant to a detailed evaluation matrix and proper internal procedures. In fact,

Fort Schuyler itself maintains that the Buffalo Developer was awarded "preferred developer" status pursuant to strict procedures designed to maintain the integrity of the competitive RFP.[19]

Second, the government's argument that the alleged misrepresentations were material because they resulted in the Buffalo Developer "receiv[ing] State contracts worth hundreds of millions of dollars" misses the mark. (Gov. Opp. at 53–54 (quoting Indictment ¶ 27; *see also* Indictment ¶ 39)). The only direct result of the Buffalo RFP was that the Buffalo Developer was awarded "preferred developer" status. In no way did the award of "preferred developer" status ensure the Buffalo Developer would be awarded a State contract. The contract that the Buffalo Developer ultimately entered into followed an additional negotiation process and was the product of extensive negotiations occurring over a period of months following the Buffalo RFP. Crucially, as discussed above, the government's oft-repeated central claim that Kaloyeros and Howe "tailored the RFPs and predetermined the winners" (Gov. Opp. at 53) is simply rhetoric contradicted by the Indictment's own factual allegations. As explained in the Buffalo Defendants' opening brief and again above, the actual RFP is as plain vanilla as can be and can hardly be said to be "tailored" to the Buffalo Developer. (*See* Buffalo Def. MTD at 19–20). Instead, the RFP sought historical information of the applicant-developers, information such as qualifications, skills, and experience.[20] That these fairly generic requirements were not unfairly exclusionary is underscored by the fact that three developers in the Buffalo area believed that

---

[19] *See Summary Of The Competitive Procurement Conducted By Fort Schuyler Management Corporation For The Awards Under The Request For Proposals For A Qualified Local Developer In The Greater Buffalo Area*, FORT SCHUYLER MANAGEMENT CORPORATION, available at http://www.ftsmc.org/relevant-documents/ (last visited July 21, 2017) (summarizing the competitive procurement conducted by Fort Schuyler following its request for proposals for a qualified developer in the greater Buffalo area); see also Summary of Fort Schuyler Management Corporation Buffalo Developer RFP Evaluation, FORT SCHUYLER MANAGEMENT CORPORATION, available at http://www.ftsmc.org/relevant-documents/ (last visited July 21, 2017) (summarizing Fort Schuyler's evaluation of the three developers that submitted proposals in response to the Buffalo RFP, including the selection committee's evaluation matrices).

[20] *See* Masella Dec. ¶ 4 & Ex. A at § 5.B.(a) (providing response must include: information on developer's overall size and office locations; description of history and background of developer; staffing list and organizational chart; list identifying largest shareholders or partners, etc.).

they qualified and went to the time and expense of responding to the RFP, and is even more forcefully demonstrated by the remarkable fact that the Fort Schuyler Evaluation Committee determined that <u>two</u> of those developers had sufficiently met those requirements and the Board awarded <u>both</u> of them "preferred developer" status. If Kaloyeros and Howe were truly attempting to finagle the process to "predetermine" the Buffalo Developer as the winner, they did a poor job of it.

2. **The Indictment's Allegations Do Not Establish A Valid Property Interest As The Object Of Any Alleged Scheme Or Artifice To Defraud.**

As argued in our opening brief, the Indictment is also fatally flawed because it fails to allege any valid property interest as the object of the alleged scheme. (*See* Buffalo Def. MTD at 28–41). In an attempt to remedy the Indictment's failure to allege a cognizable property interest, the government now contends that the Indictment sufficiently alleges an intangible property interest as the object of the alleged scheme to defraud. The Indictment does not, however, contain any allegations that would support the government's intangible "right to control" theory. More fundamentally, the application of such a theory conflicts with those allegations that are actually presented in the Indictment and would create additional deficiencies that necessitate dismissal of the wire fraud charges.

Despite the government's last-ditch effort to recast its theory of wire fraud, the Indictment still fails to allege any property interest falling within the ambit of the wire fraud statute. For these reasons, the Court should reject the government's attempt to invoke a theory of wire fraud which is not alleged in the Indictment and presumably was not presented to the grand

jury.[21] The Court should dismiss the wire fraud counts for their failure to allege a cognizable property interest as the object of any purported scheme to defraud.

> **a.** **The Government Has Effectively Conceded That The Indictment Does Not Allege A Valid Tangible Property Interest As The Object Of Any Alleged Scheme To Defraud.**

An indictment charging wire fraud must allege that the putative scheme contemplated depriving another of money or property. *McNally v. United States*, 483 U.S. 350, 360 (1987). Absent a valid property right with which the defendant might interfere, the defendant's plan to make misleading statements to the intended victim would not constitute a scheme to defraud. *See United States v. Pierce*, 224 F.3d 158, 166 (2d Cir. 2000).

The government has effectively conceded that the Indictment fails to allege a cognizable tangible property right alleged to have been the object of any purported scheme to defraud. As was argued in the Buffalo Defendants' opening brief, the Indictment's allegations focusing on Fort Schuyler's "right" to a "fair" "competitive process" do not allege the deprivation of a cognizable property right. *See United States v. Henry*, 29 F.3d 112, 116 (3d Cir. 1994) (affirming dismissal of indictment and finding that a fair bidding opportunity was not a traditionally recognized, enforceable property right). The government fails to dispute this, and effectively concedes that the Indictment's allegations either that Fort Schuyler was somehow deprived of a "fair, open and competitive" RFP process (Indictment ¶ 25 (a)), or of a competitive process in seeking bids for future contracts (Indictment ¶ 16), are each too inchoate an expectation to constitute the type of property interest necessary to establish wire fraud.

Similarly, the Buffalo Defendants established that the ability of Fort Schuyler to designate preferred developers that would be "permitted" to bid on future contracts (Indictment

---

[21] *See* Joint Memorandum of Law in Support of the Buffalo Defendants' Motion For An Order Compelling Disclosure of the Grand Jury Transcripts, May 19, 2017 (Dkt. No. 224) ("Buffalo Def. GJ Mem."); *see also infra* at 70–73.

¶ 16) was not a property right — or, if it was, it was a "purely abstract or theoretical" one, and thus insufficient under the wire fraud statute. (*See* Buffalo Def. MTD at 32–36 (citing, *inter alia*, *United States v. Griffin*, 324 F.3d 330, 355 (unissued federal income tax credits had insufficient value to the state to constitute property; the "only property interest the State ha[d] in the tax credits [was] purely abstract or theoretical"); *see also Cleveland v. United States*, 531 U.S. 12, 26 (2000) (because section 1341 "requires the object of the fraud to be 'property' in the victim's hands," a Louisiana video-poker license was not "property" of the state before it was issued); *Sekhar v. United States*, 133 S. Ct. 2720, 2727 (2013) ("a yet-to-be-issued recommendation that would merely approve (but not effect) a particular investment" was not a protectable property interest under the Hobbs Act)).

In addition to the numerous cases cited in the Buffalo Defendants' opening brief (*see* Buffalo Def. MTD at 28–41), this point is well illustrated by the decision in *United States v. Slay*, 717 F. Supp. 689 (E.D. Mo. 1989). In *Slay*, the City of St. Louis had enacted an ordinance which authorized the Board of Aldermen to award franchises to construct and operate cable television systems within the City. The ordinance did not, however, grant any authority to actually operate a cable television franchise, which would require the City to pass a separate ordinance. 717 F. Supp. at 691. All applicants were required to provide the names of the officers, directors and major stockholders of the applicant corporations. Defendants submitted an application for the cable television franchise on behalf of Archway Cablevision. Before any decision was made, defendants withdrew the Archway Cablevision bid for the franchise, which was ultimately awarded to other applicants. 717 F. Supp. at 691. The indictment alleged that the application falsely represented the ownership interest in Archway Cablevision and concealed the interest of defendant Slay and a co-conspirator.

A jury convicted defendants of mail and wire fraud, in connection with their attempt to obtain the franchise. Prior to sentencing, the Supreme Court decided *McNally v. United States*, 483 U.S. 350 (1987), and Slay was granted a new trial. The resulting superseding indictment charged defendants with: (1) a scheme or artifice to defraud the City and its officials of their right to be aware of all material and relevant facts concerning the ownership of Archway Cablevision; and (2) a scheme to obtain money and property, specifically a cable television franchise from the City. Defendants moved to dismiss the indictment for its failure to state an offense under the fraud statutes. 717 F. Supp. at 691.

In granting the motion, the court first addressed the City's interest in accurate information regarding the actual owners of Archway Cablevision. The court found such an interest "does not rise to a property interest within the meaning of *McNally*." 717 F. Supp. at 692 (quoting *United States v. Slay*, 858 F.2d 1310, 1316 (8th Cir. 1988)). The court then addressed the theory that defendants intended to devise a scheme "to obtain money and property, specifically a cable television franchise from the City," by false pretenses. 717 F. Supp. at 692. Defendants argued that the franchise was not "property" of the City within the meaning of the fraud statutes. 717 F. Supp. at 692.

The court found that "the franchise lacks the essential elements of a contract . . . [and] is a mere proposition" until acceptance and that the government failed to explain "how mere contemplation of an ongoing contractual relationship rises to a property right protected by the . . . fraud statutes." 717 F. Supp. at 693. The court held that "[b]ecause the franchise had not yet been granted to Archway Cablevision, defendants' scheme could not have deprived the City of any contractual or property right, which would only arise after the franchise was awarded." 717 F. Supp. at 693. Similarly, the court reasoned that the City was also not deprived of any right to

control its money or property and there was no indication that cable television customers would

have had to pay a higher price for cable television services provided by Archway Cablevision

than for services provided by another company. 717 F. Supp. at 694.

In dismissing the indictment for failure to allege a cognizable property interest protected

by the fraud statutes, the court concluded:

> the City of St. Louis had no property or contractual rights in the
> cable television franchise because such rights would only arise
> after the City granted the franchise for valuable consideration to a
> particular entity. The . . . Ordinance did not grant authority to the
> successful applicant to actually operate a cable television
> franchise. . . . The City still had to pass a separate ordinance to
> award the actual franchise. [] **The culmination of the application
> process would have been to select the entity with whom to
> negotiate the final franchise. Had defendants' scheme
> succeeded they would have merely been selected as the
> corporation who would receive the franchise; the terms of the
> actual franchise would have to be worked out by the City and
> Archway Cablevision and a separate ordinance awarding the
> franchise would have to be passed by the City.** Therefore, the
> Court concludes that the indictment fails to state an offense against
> defendants because defendants' scheme as set out therein did not
> and would not defraud the City of any property protected by the
> mail and wire fraud statutes.

717 F. Supp. at 694–95 (emphasis added).

Here, the Buffalo RFP was likewise a step towards the creation of a contractual

relationship, which could only result in a property interest subject to the protections of the fraud

statutes once that contractual relationship came to fruition, in the form of an actual contract for

an actual project which occurred only after extensive negotiations and a wholly separate bidding

process. The result of the Buffalo RFP was the designation of certain "preferred developers"

who would thereafter seek to win actual contracts for actual projects, through separate

negotiations. *See Slay*, 717 F. Supp. at 694–95 ("The culmination of the application process

would have been to select the entity with whom to negotiate the final franchise."). The

"preferred developer" designation may (or may not) ultimately lead to obtaining money or property, but it does not, by itself, suffice as a cognizable property interest of Fort Schuyler for the purposes of the wire fraud statute. *See also Terminate Control Corp. v. Horowitz*, 28 F.3d 1335, 1343, 1351–52 (2d Cir. 1994) (prospect of future contractual relations is not a tangible property interest).

### b. The Indictment Does Not Allege The "Right To Control" Theory Of Wire Fraud.

Recognizing the Indictment's threshold failure to identify any cognizable property interest that could serve as the object of the alleged scheme to defraud, as argued in the Buffalo Defendants' opening brief, the government now invokes a theory of wire fraud which is wholly absent from, and not even implicated by, the Indictment's actual allegations. The government attempts to remedy this facial deficiency by invoking the "right to control" theory of wire fraud — namely, that the defendants executed a "scheme to defraud Fort Schuyler of its right to control its assets." (Gov. Opp. at 55). The Court should reject the government's attempt to retroactively fabricate a theory of wire fraud that is not contained within the four corners of the Indictment, and which does not comport with what the Indictment actually does allege.

The Indictment in this case explicitly identifies the "money and property" that was the purported object of the alleged scheme as "the award of significant taxpayer-funded development contracts." (Indictment ¶ 39; *cf.* ¶ 1 (defendants "secretly rig[ged] the bidding process for State contracts worth hundreds of millions of dollars"); ¶ 22 (process was rigged to obtain "hundreds of millions of dollars")). As such, the Indictment alleges, and has always only alleged, that the object of the purported scheme to defraud was tangible property in the form of "State contracts worth hundreds of millions of dollars." (Indictment ¶ 1). The government now posits that the Indictment adequately alleges the intangible, "right to control" theory of wire fraud. But

nowhere in the Indictment is there any allegation that the Buffalo Defendants defrauded Fort Schuyler of its "right to control." The wire fraud counts do not incorporate any allegations which even arguably invoke this theory. The wire fraud counts do not allege, for example, that the object of the purported scheme was to defraud Fort Schuyler of "potentially valuable information that could impact [] [Fort Schuyler's] economic decisions." *See, e.g.*, *United States v. Viloski*, 557 F. App'x 28, 33 (2d Cir. 2014) (finding indictment provided sufficient notice that government sought to prosecute defendant on "right to control" theory under Section 1341 where it alleged object of conspiracy was the deprivation of "potentially valuable information that could impact [] [the victim's] economic decisions"); *United States v. D'Amato*, 39 F.3d 1249, 1259 (2d Cir. 1994) (indictment alleged "right to control" theory by charging that mailing was used to "defraud [the victims] of the right to control the expenditure of corporate funds"); *United States v. Wallach*, 935 F.2d 445, 461 (2d Cir. 1991) (indictment charged victims were "defrauded of the $1.14 million in payments as well as the 'right to control' how the money was spent"). The government's failure to allege an intangible property interest as the object of the scheme is even more apparent in light of the fact that the Indictment elsewhere explicitly alleges deprivations of intangible interests in alleged schemes not involving the Buffalo Defendants. (*See* Indictment ¶ 56 ("having devised and intending to devise a scheme and artifice to defraud, and to deprive the public of its intangible right to PERCOCO's honest services as a senior official in the Office of the Governor"); ¶ 59 (same)). The government knows how to charge an "intangible property rights" theory when it wants to. It did not do so here.

The Indictment alleges that the defendants devised a scheme to deprive Fort Schuyler of "money or property" — which it specifically alleged (repeatedly) to be "State contracts . . . worth hundreds of millions of dollars" (Indictment ¶¶ 1, 22, 39) — and never

alleges that the object of the purported fraudulent scheme was any intangible property interest. The government's belated damage control is inconsistent with the Indictment it drafted and asked the grand jury to return.

<blockquote>
<strong>c. The Court Should Reject The Government's Attempt To Prosecute A Theory Of Wire Fraud That Was Not Charged By The Grand Jury.</strong>
</blockquote>

At the outset, the government's attempt to construct a "right to control" theory of wire fraud from the Indictment's allegations only reinforces the arguments in support of the Buffalo Defendants' motion for disclosure of the grand jury minutes. (*See* Buffalo Def. GJ Mem. at 6–16). Were it not for the government's opposition brief, there would be no indication whatsoever that the theory of wire fraud alleged in the Indictment sounds in the "right to control." Accordingly, there is nothing to suggest that the intangible "right to control" theory of wire fraud was considered and charged by the grand jury. Because the government now alleges a theory which is so patently absent from the allegations of the Indictment, disclosure of the grand jury minutes is necessary to confirm the integrity of the grand jury's decision to return the Indictment. *See, e.g.*, *United States v. Radley*, 632 F.3d 177, 185 (5th Cir. 2011) ("when a grand jury charges one specific theory of a scheme to defraud, the defendant may not be convicted based on another theory").

Any attempt by the government now to read the "right to control" theory into the existing text of the Indictment is improper and violative of the fundamental constitutional protections afforded criminal defendants. "In the context of a mail fraud prosecution, the objects of the scheme to defraud must be alleged with sufficient particularity so as to apprise the defendants of what they must be prepared to meet." *United States v. Mariani*, 90 F. Supp. 2d 574, 585 (M.D. Pa. 2000). This principle was illustrated in *United States v. Henry*, where the court held that the government could not pursue its theory that a bid-rigging scheme defrauded the Delaware River

Joint Toll Bridge Commission of its confidential business information and right to control how its money was invested where the indictment only alleged that the defendants defrauded other entities bidding for the contracts "of money and property, in that [they] denied those other [entities] a fair and honest opportunity" to bid.  29 F.3d 112, 113 (3d Cir. 1994).

Similarly, in *United States v. Mariani* the court rejected the government's contention that the term "'property' as used in the indictment means whatever may constitute property, without any specification by the Grand Jury."  90 F. Supp. 2d at 586.  There, the court concluded that the indictment sufficiently alleged a property interest in particular statutory fees and royalties but did not sufficiently allege certain "non-monetary" property interests.  *Id.* at 577.  The allegations merely tracked the statute's language and did not specify the "precise objects of the alleged scheme to defraud."  *Id.* at 588.  The court held that "the term 'property' is not so clear and unambiguous as to avoid the necessity of having to specify the property that was the object of the scheme to defraud."  *Id.*  The court cautioned that "to allow the government to proceed in such a manner would expose the defendants to the danger of being convicted of mail fraud based upon property interests not considered by the Grand Jury," and would effectively enable the prosecution to "amend the indictment by asserting that defendants' scheme deprived its victims of property interests not considered by the Grand Jury."  *Id.*  Because the indictment failed to provide the defendants with "notice that these property interests could be the basis of the mail fraud charges," the court precluded "the government from relying on forms of property not specified in the indictment."  *Id.*; *see also United States v. Telink, Inc.*, 702 F. Supp. 805, 808–09 (S.D. Cal 1988), *aff'd,* 910 F.2d 598 (9th Cir. 1990) (rejecting theories of "money and property" not articulated in the indictment and holding that "[a]n indictment must allege with specificity

how the property loss occurred in order to safeguard constitutional rights guaranteed by the Fifth and Sixth Amendments").

Here, the Indictment does not provide any indication that the "right to control" theory of wire fraud belatedly advanced by the prosecution was being charged. The Indictment fails to even mention a "right to control" theory, and this Court "should not concoct one now." *Telink, Inc.*, 702 F. Supp. at 808–09. Without the makeweight argument that a right to control theory should be engrafted onto an Indictment that explicitly and repeatedly alleges <u>only</u> that the object of the putative scheme was "contracts worth hundreds of millions of dollars," the Indictment is insufficient on its face and must be dismissed. The government should not be permitted to avoid this result by unilaterally changing its theory of prosecution in its opposition papers at such a late date.

> **d.      The "Right To Control" Theory Of Wire Fraud Does Not Align With Those Allegations Actually Presented In The Indictment.**

Even if this Court were to find that the Indictment could be read to allege a "right to control" theory (which it plainly does not), such a theory of wire fraud would fail because it does not comport with those allegations that are actually contained within the four corners of the Indictment. "'[A]pplication of the 'right to control' theory is predicated on a showing that some person or entity has been deprived of potentially valuable economic information.'" *United States v. Viloski*, 557 F. App'x 28, 32 (2d Cir. 2014) (quoting *United States v. Wallach*, 935 F.2d 445, 462–63) (alterations omitted). The government contends that the Indictment "amply alleges a scheme to deprive Fort Schuyler of its right to control its assets, which is a form of property." (Gov. Opp. at 55 (citing *United States v. Carlo*, 507 F.3d 799, 802 (2d Cir. 2007)). In support, the government contends that the Indictment "alleges clearly that the defendants 'devised a plan to secretly rig Fort Schuyler's bidding process so that State contracts that were ultimately worth

hundreds of millions of dollars would be awarded to the Syracuse Developer and the Buffalo

Developer.'" (Gov. Opp. at 56 (quoting Indictment ¶ 22)). However, even as articulated by the

government, this allegation does not present a proper "right to control" theory of wire fraud.

Rather, it alleges a scheme to defraud Fort Schuyler, the object of which was *tangible* money or

property in the form of "State contracts that were ultimately worth hundreds of millions of

dollars." (Indictment ¶ 22).

The government attempts to gloss over what is perhaps the most critical fact in this case:

the Buffalo RFP was not a bidding process, was not tied to any specifically-identified project,

and did not itself result in the award of any contract. Being selected as one of the two "preferred

developers" did not guarantee the Buffalo Developer the award of anything, and the "preferred

developer" status could be cancelled or revoked by Fort Schuyler at any time. The Buffalo RFP

itself made explicit that being named a "preferred developer" did not, in any way, guarantee any

actual future contracts. (*See* Masella Dec. ¶ 4 & Ex. A at § 8.). Although the Buffalo Developer

eventually obtained such contracts, it did so only after extensive negotiations and a wholly

separate negotiation process (this one requiring detailed specifications with prices proposed and

negotiated). Fort Schuyler is not alleged to have been deprived of its "right to control" the

subsequent negotiations and bidding process which resulted in an executed contract for a specific

"State contract." Notably, the Buffalo RFP did not contemplate the award of any specified

project and "the object of the fraud [must] be 'property' in the victim's hands." *Cleveland v.

United States*, 531 U.S. 12, 26 (2000). Accordingly, the only property the control of which Fort

Schuyler could have been defrauded of as a result of the Buffalo RFP was the award of the

"preferred developer" designation itself. It is the "preferred developer" status which must be the

object of any alleged deprivation for the purposes of the government's "right to control" theory

of wire fraud. The only "asset" that Fort Schuyler may be properly alleged to have been deprived of is its "right to control" which entities were awarded "preferred developer" status as a result of the Buffalo RFP process. (*See* Gov. Opp. at 56 n.20, 56).

With respect to the "right to control" theory of wire fraud, "the concrete harm contemplated by the defendant is to deny *the victim* the right to control *its assets* by depriving it of information necessary to make discretionary economic decisions." *Rossomando*, 144 F.3d 197, 201 n.5 (2d Cir. 1998) (emphasis added); *see also United States v. D'Amato*, 39 F.3d 1249, 1257 (2d Cir. 1994) ("A person charged with mail fraud under the right to control theory must intend to injure the person or entity misled . . . and the person or entity must thus be a specific target of the inaccurate or concealed information."). The government clearly alleges that the victim of the Buffalo Defendants' purported fraudulent scheme was Fort Schuyler. (*See, e.g.*, Gov. Opp. at 55 ("the [] Indictment amply alleges a scheme to deprive Fort Schuyler of its right to control its assets, which is a form of property")). Accordingly, Fort Schuyler could only have been deprived of its "right to control" those assets which constituted property in its hands at the time of the alleged scheme to defraud, property of a kind protected by the wire fraud statute. For the reasons set forth in the Buffalo Defendants' opening brief (*see* Buffalo Def. MTD at 28–41), the "preferred developer" designation does not constitute a cognizable property interest protected by the wire fraud statute. For this reason, any alleged deprivation of Fort Schuyler's "right to control" the decision regarding which developers it would designate as "preferred developers" as a result of the Buffalo RFP process fails to state an offense; it does not constitute a protected property interest that was the object of any alleged scheme to defraud.

The government's arguments to the contrary are without merit. The government argues that naming the Buffalo Developer as a "preferred developer" "allowed [] Kaloyeros and Howe

to award assets to the Developer[] without further action from the Board." (Gov. Opp. at 56 n.21). Even assuming the truth of these allegations, the Indictment cannot be read to allege that the Buffalo Defendants deprived Fort Schuyler of its "right to control" the distribution of State assets it would acquire at a later time in making a discretionary economic decision presently before it. As the government concedes, even the funds for the actual contract for an actual project that the Buffalo Developer eventually negotiated and secured were not the property of Fort Schuyler. Instead, "[t]he funding for these projects came from the Empire State Development Corporation ('ESD'), New York State's main economic development agency." (Gov. Opp. at 7; *see id*. at 8–9 ("Buffalo Billion funds only would be provided by ESD to the developers . . . .") (emphasis added)). The award of State contracts was not the direct result of the Buffalo RFP — which only designated the Buffalo Developer as a "preferred developer" — and the Indictment fails to allege that Fort Schuyler was defrauded in any subsequent negotiations or bidding that occurred following the Buffalo RFP. The government's attempt to construe the State contracts as the assets that Fort Schuyler was deprived of its "right to control" fails because such assets were not the object of the Buffalo RFP and were not property in the hands of the victim, Fort Schuyler.

Accordingly, the only "asset" that Fort Schuyler could have been denied the "right to control," through the deprivation of information necessary to make discretionary economic decisions, was the award of "preferred developer" status. However, as was set forth above and in our opening brief, such "assets" are not cognizable property interests protected by the wire fraud statute. (*See* supra at 36–50; *see also* Buffalo Def. MTD at 28–41). Absent a valid property right with which the defendant might interfere, a defendant's plan to make misleading

statements to the intended victim would not constitute a scheme to defraud. *See United States v. Pierce*, 224 F.3d 158, 166 (2d Cir. 2000).

Application of the "right to control" theory on these facts fails for the additional reason that "[t]he 'right to control one's assets' does not render every transaction induced by deceit actionable under the . . . the fraud statutes[,] [r]ather, the deceit must deprive the victim 'of potentially valuable economic information.'" *United States v. Binday*, 804 F.3d 558, 570 (2d Cir. 2015) (quoting *United States v. Wallach*, 935 F.2d 445, 463 (2d Cir 1991)); *see also United States v. Rossomando*, 144 F.3d 197, 201 n.5 (2d Cir. 1998) (quoting *United States v. Dinome*, 86 F.3d 277, 284 (2d Cir. 1996)) ("In cases resting upon the so-called 'right to control' theory of mail fraud, 'the information withheld either must be of some independent value or must bear on the ultimate value of the transaction.'").

The only misrepresentation alleged in the Indictment has literally nothing to do with the qualifications of the Buffalo Developer, the quality of any contemplated services, or any pricing information. Such a misrepresentation cannot "bear on the ultimate value of the transaction." The fraud statutes are "'limited in scope to the protection of *property rights*,' and the ethereal right to accurate information doesn't fit that description." *United States v. Sadler*, 750 F.3d 585, 591 (6th Cir. 2014) (quoting *McNally v. United States*, 483 U.S. 350, 360 (1987)) (emphasis in original). "Nor can it plausibly be said that the right to accurate information amounts to an interest that 'has long been recognized as property.'" *Sadler*, 750 F.3d at 591 (quoting *Cleveland v. United States*, 531 U.S. 12, 23 (2000)); *see Sadler*, 750 F.3d at 591 ("Even when Congress amended the fraud statutes to cover *some* intangible rights, it did not stretch the statute to cover the right to accurate information before making an otherwise fair exchange.") (emphasis in original).

"[M]isrepresentations or non-disclosure of information cannot support a conviction under the 'right to control' theory unless those misrepresentations or non-disclosures can or do result in tangible economic harm. This economic harm can be manifested directly—such as by increasing the price the victim paid for a good—or indirectly—such as by providing the victim with lower-quality goods than it otherwise could have received." *United States v. Finazzo*, 850 F.3d 94, 111 (2d Cir. 2017). The tangible economic harm requirement is an essential element of the "right to control" theory. *See id.* at 113 n.20 ("[t]he loss of the right to control money or property *only* constitutes deprivation of money or property if the scheme could cause or did cause tangible economic harm to the victim") (emphasis added). There are no such allegations here.

The government fails in its last-ditch effort to allege a cognizable property interest as the object of any purported scheme to defraud. On these facts, application of the "right to control" theory of wire fraud fails to state an offense and in fact contradicts those allegations which are actually presented in the Indictment.

### 3. The Indictment Fails To Allege Any Specific Wire Transmissions.

The failure of the Indictment to identify any specific wire transmissions made by the Buffalo Defendants in furtherance of the alleged scheme renders Counts One and Four fatally deficient. *See United States v. Pirro*, 212 F.3d 86, 92–93 (3d Cir. 2000). To properly charge a wire fraud offense, there must be an interstate wire transmission in furtherance of a scheme to defraud. *See* 18 U.S.C. § 1343. The failure to identify any specific wire transmission fails to satisfy the level of specificity demanded by Rule 7(c)(1) and the Constitution.

### B. The Bribery Charge Should Be Dismissed.

As detailed in our opening brief (*see* Buffalo Def. MTD at 43–66), the bribery charge (Count Five) is woefully deficient on multiple grounds. The Indictment alleges that Howe engaged in "official action" in exchange for the purported "bribes" (Indictment ¶ 45), but no

such "official action" is identified. The Indictment's other allegations, however, refute any such *quid pro quo* theory. Furthermore, the government actually does not contend that the Buffalo Defendants (or even the Buffalo Developer) paid bribes "to" Todd Howe himself. Instead, the alleged "bribes" were payments made pursuant to an agreement between the Buffalo Developer and a law firm (not with Howe or Howe's employer) that was executed months before any notion of the Buffalo RFP — the alleged *quo* — was even conceived. That contractual relationship belies any allegation that the Buffalo Defendants acted with the requisite corrupt intent. Legally valid payments do not constitute "bribes" sufficient to establish Section 666 liability. *See* 18 U.S.C. § 666(c).

Crucially, the Indictment alleges that the Buffalo Defendants paid "bribes" to Howe "in his capacity as an agent and representative of SUNY Poly," "in exchange for, to influence, and to reward the taking of official action . . . in connection with obtaining the Buffalo RFP." (Indictment ¶ 47). However, the government does not explain how Howe took "official action" as an "agent" of SUNY Poly with respect to the Buffalo RFP (Indictment ¶ 47), when the Buffalo RFP was in fact issued and evaluated by Fort Schuyler — a totally distinct private entity for which there are no allegations that Howe acted as an "agent" — and there is no allegation that SUNY Poly had any role in the Buffalo RFP process that would have enabled SUNY Poly to take any action at all, let alone "official action."

Although the government now argues that Fort Schuyler and SUNY Poly worked "hand-in-glove" with respect to the Buffalo RFP, that is contradicted by the Indictment's allegations, which demonstrate that SUNY Poly had no role whatsoever in the Buffalo RFP — a process that was carried out entirely by Fort Schuyler. (*See, e.g.*, Indictment ¶ 7 ("Fort Schuyler was governed by a Board of Directors, which, among other things, was charged with selecting private

companies to partner with Fort Schuyler in SUNY Poly-related development projects"); ¶ 22

("Fort Schuyler's bidding process"); ¶ 16 ("the Buffalo Developer was named by Fort Schuyler

as a preferred developer"); ¶ 23 ("had Fort Schuyler issue two requests for proposals"); ¶ 24

("qualifications that would favor the Buffalo Developer in Fort Schuyler's selection process for

the Buffalo RFP"); ¶ 25 ("the defendants, deceived and concealed material information from Fort

Schuyler and its Board of Directors"); ¶ 39 ("devised a scheme to defraud Fort Schuyler in its

award of significant taxpayer-funded development contracts by representing to Fort Schuyler");

¶ 45 ("scheme to defraud Fort Schuyler in its award of the Buffalo RFP by representing to Fort

Schuyler")).  Moreover, the allegations reveal that Fort Schuyler, as an entity, was created years

earlier, for the very purpose of effectuating private-public contractual relationships — which is

precisely why Fort Schuyler (not SUNY Poly) ran the Buffalo RFP process.  (*See* Indictment

¶ 7).

 The Indictment suffers from numerous fatal deficiencies, and the government's

attenuated and convoluted theory of Section 666 liability necessitates dismissal of Count Five.

This Court should recognize that the facts alleged in the Indictment (accepted as true) fail to

constitute a Section 666 offense, and dismiss Count Five accordingly.

### 1. There Was No Corrupt Offer Or Agreement To Give Anything Of Value.

 The Indictment is fatally deficient for its failure to allege any facts establishing that the

Buffalo Defendants "corruptly g[ave], offer[ed], or agree[d] to give anything of value to any

person, with [the] intent to influence or reward."  18 U.S.C. § 666(a)(2).  There are, accordingly,

no allegations of an illegal *quid pro quo* from which the Buffalo Defendants' specific intent to

bribe may be established.  *See United States v. Ganim*, 256 F. App'x 399, 401 (2d Cir. 2007)

(government sufficiently alleged requisite *quid pro quo* to support Section 666 count where each

bribery-related count of the supplemented indictment set forth benefits defendant received in exchange for his promises to perform official acts). However, not only does the Indictment fail to allege that the Buffalo Defendants maintained the requisite corrupt intent in the giving or offering of a bribe — its allegations disprove as much.

<strong>a.      The Indictment Fails To Adequately Allege The Buffalo<br>Defendants Paid Bribes Or Illegal Gratuities.</strong>

The government has conceded that the Buffalo Defendants never made any payments directly to Howe. (*See* Gov. Opp. at 64 ("Howe was not a party" to the Buffalo Developer's agreement with the law firm)). It acknowledges, as it must, that the only payments that have anything to do with Howe were payments the Buffalo Developer (the entity) made to a well-known Albany law firm, Whiteman, Osterman & Hanna LLP ("WOH"), that did work for the Buffalo Developer and which in turn owned WOH Government Solutions LLP ("WOHGS"), an affiliated government relations entity, which in turn employed Howe.

The government, however, maintains that the Indictment sufficiently alleges the payment of bribes by providing that "'in exchange for hundreds of thousands of dollars in payments to Howe from the Syracuse Developer and the Buffalo Developer,' Howe and Kaloyeros devised a scheme to rig the RFPs." (Gov. Opp. at 63–64 (quoting Indictment ¶ 22); *see also id.* (quoting Indictment ¶ 47) ("the Buffalo Defendants 'paid bribes to Todd Howe' in exchange for official action in his role as an agent of SUNY Poly")). The Indictment alleges simply that Howe was "retained by and received payments from" the Buffalo Developer. (Indictment ¶ 12). The Buffalo Developer's retention of WOH began in January 2013 — nine months prior to the Buffalo RFP's announcement — and continued long after the Buffalo RFP, through 2016. (*See* Masella Dec. ¶ 13 & Ex. J). The retention letters demonstrate that the Buffalo Developer paid WOH a flat annual fee, through equal quarterly or monthly payments. The Buffalo Developer is

not alleged to have ever paid WOHGS directly (because it did not) or to have ever paid Howe directly (because it never did).  There is similarly no allegation that the Buffalo Developer controlled, determined, or even knew (because it did not) the amount that Howe was in turn paid by WOH.  (Buffalo Def. MTD at 48 n.16).  Other than the conclusory label attached by the government, absolutely nothing about this arrangement connotes a "bribe."

The government attempts to punt its failure to identify any specific payments by casting it as a question of fact to be resolved at trial.  However, this is a fatal deficiency — a bribery prosecution failing to identify any payment made by the alleged bribor that actually went to the alleged bribee — that renders the Indictment subject to dismissal.  (*See* Buffalo Def. MTD at 43–49).

> **b.** **Any Payments Were Not Made With The Requisite Corrupt Intent And Cannot Establish Criminal Liability Within The Meaning Of Section 666.**

In addition to the Indictment's failure to identify the specific payments alleged to have been "bribes," there is an utter absence of allegations from which the Buffalo Defendants' corrupt intent might be inferred.  There are no facts specific to the temporal relationship between the payments and putative favorable treatment, the communications between the parties to the alleged illicit transaction, or other indicia of an illegal agreement that would suggest the existence of a *quid pro quo* relationship in which bribes were paid *in return for* specific "official acts" — as is required.  *See United States v. Rosen*, 716 F.3d 691, 700 (2d Cir. 2013).

Moreover, the Indictment's allegations actually refute any inference of corrupt intent because:  (i) the only payments made by the Buffalo Developer were made to a law firm (WOH) — not directly to Howe or even to the firm where he worked (WOHGS); (ii) the payments were made pursuant to a retainer agreement for an engagement that began months before there was any indication of an impending Buffalo RFP; (iii) the payments amounted to a flat annual rate set

each year and paid in quarterly or monthly installments; and (iv) there is no indication of how much — if any — of the payments would result in compensation for Howe.

In opposition, the government claims in wholly conclusory *ipse dixit* that "the Buffalo Developer's agreement with the Law Firm was directly connected to the company's efforts to obtain projects through the Buffalo Billion."  (Gov. Opp. at 64).  In support, the government points to the fact that the retention agreement was executed in January 2013, which it alleges was "'just as the Buffalo Developer began seeking large State contracts through the Governor's Buffalo Billion initiative.'"  (Gov. Opp. at 65 (quoting Compl. ¶ 72(a))).  The government further acknowledges that, while "Howe was not a party, the agreement specified that the Law Firm would provide the Buffalo Developer with 'strategic advice and counsel regarding business generation initiatives across New York State.'"  (Gov. Opp. at 65 (quoting Compl. ¶ 72(a))).  From there, the government somehow leaps to the conclusion that the Buffalo Developer's retention of WOH was a sham or a "guise."  (Gov. Opp. at 8).

On its face, the Indictment's allegations are far from plausible.  Instead, the retainer agreement referenced in the Indictment clearly evidences an engagement between the Buffalo Developer and WOH, a well-known and long-established Albany law firm.  (*See* Masella Dec. ¶ 13 & Ex. J).  The agreement is drafted on firm-letterhead and is executed by Richard E. Leckerling, the firm's co-managing partner.[22]  Notably, Leckerling is also the coordinating partner of WOH's Governmental Relations Practice Group, "specializing in the representation of clients before the New York State Legislature, the Executive branch, and other state agencies in regard to a broad array of issues before state government."[23]  Further, the retainer agreement

---

[22]  *See* Whiteman Osterman & Hanna LLP, *Attorney Biography: Richard E. Leckerling* (last visited July 13, 2017), *available at* http://www.woh.com/attorneys/Richard-E-Leckerling-23-attorney.htm.

[23]  *See id.*

memorializes the terms of the contractual relationship, providing: "the scope of our representation will be limited to strategic advice and counsel regarding business generation initiatives across New York State [and] will not include New York State or Federal Lobbying: and, therefore, no registration would be required with the New York State Joint Commission on Public Ethics, U.S. House of Representatives or U.S. Senate." (*See* Masella Dec. ¶ 13 & Ex. J).

The government apparently believes this limitation in the scope of the representation to explicitly exclude lobbying is "telling" and evidences a "corrupt quid pro quo." (Gov. Opp. at 65 n.22). It is not clear what argument the government is making here. As best we can tell, it appears to be that because Howe sometimes acted as a lobbyist and because WOH explicitly provided the engagement did not involve lobbying, then the engagement must somehow have been a sham. This makes no sense. In fact, the Buffalo Developer engaged a law firm to provide "strategic advice and counsel" and the law firm explicitly further engaged its subsidiary to provide "strategic consulting services." (*See* Masella Dec. ¶ 13 & Ex. J). And those services were in fact provided. As the government well knows, several WOH lawyers, along with Howe, provided advice, counsel, and consulting to the Buffalo Developer, throughout the multi-year term of the engagement. There was nothing "sham" about this engagement. Indeed, several WOH lawyers, including Mr. Leckerling himself, performed substantial services in connection with the engagement, and recorded their time accordingly.

The government somehow makes a leap — without any explanation — from the engagement letter's language that "no lobbying" would occur, to the conclusion that the payments were thus somehow "corrupt" and "not 'bona fide' compensation." (Gov. Opp. at 65 n.22). But the explicit terms of the engagement letter provide for a broad range of legal and consulting services, including "strategic advice and counsel" and "strategic consulting services"

that extend far beyond "lobbying" activities, which have a particular definition that would require registration. The government supports this claim with an insinuation they know to be inaccurate: that the engagement involved services only from Howe and WOHGS. (*See* Gov. Opp. at 65 n.22).

Fantastically, the government contends that the Buffalo Developer executed this agreement to disguise allegedly improper payments to Howe. (*See, e.g.*, Gov. Opp. at 11 n.4). Apparently, the government's theory is that the Buffalo Developer engaged an intermediary — one comprised entirely of lawyers, and one lawyer in particular (a managing partner that specialized in governmental relations practice no less) — to enter into an otherwise valid, contractual arrangement, as a sham for the purpose of bribing a particular individual (Howe). The agreement does not mention Howe, it contains no provisions directing that Howe will be paid at all, and does not allocate the Buffalo Developer any control over the disbursement of any monies paid to WOH. Instead, regular monthly payments were made long before the Buffalo RFP began and continued long after it. There is no allegation that the Buffalo Defendants even knew how much of their payments, if any, ended up in Howe's pocket. Accordingly, the government's contention that the Buffalo Developer "funneled" payments to Howe, is contradicted by the agreement itself. (Gov. Opp. at 65 n.22). Their argument turns the facts alleged in the Indictment upside down.

Any payments to WOH were, therefore, legally obligated by the terms of the retainer agreement. (*See* Masella Dec. ¶ 13 & Ex. J). Section 666 expressly excludes from its scope any payments in the nature of "bona fide salary . . . or other compensation paid." 18 U.S.C. § 666(c). As such, the Indictment's allegations do not, as the government contends, "establish that the payments to Howe were corrupt and were not 'bona fide' compensation." (*See* Gov. Opp. at 65

n.22).  The government cites to *United States v. Walsh*, 156 F. Supp. 3d 374 (E.D.N.Y. 2016),

for the proposition that the Indictment's allegations suffice to proceed to trial and allow a jury to

determine whether or not Section 666(c) provides a safe-harbor for the Buffalo Defendants'

conduct.  (*See* Gov. Opp. at 65 n.22 (citing *Walsh*, 156 F. Supp. 3d at 393)).  However, in *Walsh*

the criminal complaint alleged the defendant submitted false time sheets to his employer

representing that he worked regular and overtime hours that he did not in fact work.  *Walsh*, 156

F. Supp. 3d at 385.  Unlike *Walsh*, here there is no dispute that the payments were not made by

the Buffalo Defendants to Howe, or even by the Buffalo Defendants to Howe's employer,

WOHGS.  Instead, the allegations are that the Buffalo Developer made payments to a law firm

pursuant to the terms of its retainer agreement as bona fide compensation in exchange for

services rendered.

On these facts, a reasonable juror could *not* conclude that any payments eventually made

to Howe constituted anything but "bona fide salary" paid to him, not by the defendants, but by

WOHGS, his employer.  *See United States v. Harloff*, 815 F. Supp. 618 (W.D.N.Y. 1993)

(dismissing several counts of an indictment finding that the conduct, as a matter of law, fell

within § 666(c)'s safe harbor); *see also United States v. Mann*, 172 F.3d 50 (6th Cir. 1999)

(affirming district court's decision to grant pretrial motion to dismiss a theft of funds count

finding that the defendant's alleged conduct fell within the safe-harbor provision set forth in

Section 666(c)).  If anything, *Walsh* supports the conclusion that such a determination may be

properly made by the Court at this stage of the proceedings.  *See Walsh*, 156 F. Supp. 3d at 393

(declining "to deny Defendant's motion to dismiss the theft of funds count as procedurally

improper" and addressing the merits of the parties' positions with respect to the ordinary

meaning of Section 666(c), its legislative history, and the relevant case law).

The allegations in the Indictment permit only one logical conclusion: this retainer agreement was executed for its stated purpose and there is no indication of any otherwise-nefarious intention. The Buffalo Developer's lawful engagement of a law firm to perform legal and consulting services does not demonstrate corrupt intent — rather, it demonstrates the opposite and undermines any allegations of such an improper motive. *See United States v. Rooney*, 37 F.3d 847, 854 (2d Cir. 1994) (overturning defendant's conviction and noting the legislative history of Section 666 made clear it was not intended to apply to acceptable commercial and business practices or to constrain lawful commercial business transactions).

Count Five of the Indictment is fatally deficient for its failure to: (1) identify any actual bribe or gratuity that was paid in return for "official action"; (2) establish corrupt intent with respect to any payments that may have been made by the Buffalo Developer, never mind the Buffalo Defendants; and (3) allege how lawful and proper payments to a law firm (whose affiliate government relations firm employed Howe) pursuant to an engagement agreement, in the form of annual flat fees, could constitute "bribes" under Section 666.

**2.      Howe Is Not An Agent Of Any Pertinent Governmental Organization.**

The Indictment's failure to allege facts demonstrating Howe was an agent of any governmental organization requires the dismissal of Count Five. The Indictment makes only the vaguest of allegations with respect to Howe's work with SUNY Poly; it provides that he was a "consultant" for SUNY Poly, a "close advisor" to Kaloyeros, that he "maintained an office" there, and "acted as an agent with respect to, among other things, SUNY Poly's development projects." (Indictment ¶ 11). No further particulars are alleged. There are no factual allegations that Howe had any official capacity whatsoever, other than passing references to how his unidentified "official position" enabled him to execute the purported scheme. (*See, e.g.*, Indictment ¶¶ 39, 45). Crucially, there are no allegations that Howe was an employee of SUNY

Poly, that he had any authority to act on behalf of SUNY Poly, or that he had any authority to bind SUNY Poly. Indeed, there are no allegations that Howe did anything in particular at SUNY Poly. In sum, there are zero factual allegations demonstrating that Howe had any authority at SUNY Poly whatsoever — and most certainly none at Fort Schuyler.

Thus, the Indictment's allegations, even if proven, are insufficient as a matter of law. Although the "broadest definition" of "agent," "adopted by the First, Third, and Eleventh Circuits," can be applied to a privately employed individual, the definition is restricted to "any person with authorization to act on behalf of the covered entity in some capacity." *United States v. Pinson*, 860 F.3d 152, 165 (4th Cir. 2017) (overturning Section 666 conviction for a private employee who delivered project invoices to a government agency but did not appear to have any "actual or implied authority to act" on the government agency's behalf). That type of authority may include, for example, where an independent contractor is designated as a "primary engineer" of a building project and he is given "authority to manage certain construction projects," *United States v. Vitillo*, 490 F.3d 314, 318–19 (3d Cir. 2007), or where a consultant "met with outside officials on the entity's behalf, and involved himself in the entity's personnel decisions," *United States v. Sotomayor-Vazquez*, 249 F.3d 1, 9 (1st Cir. 2001). There are no allegations that Howe did anything specific, never mind that he managed anything, made any decisions, or otherwise represented SUNY Poly with any authority. In light of these cases, the broad brush categorizations of him as an "advisor" and "consultant," are insufficient.

Even assuming the Indictment's bold conclusory allegation that Howe was somehow an "agent" of SUNY Poly suffices, there is a total disconnect between that putative fact and the scheme alleged — a scheme to "secretly rig *Fort Schuyler's* bidding process . . . for the Buffalo RFP." (Indictment ¶¶ 22–24 (emphasis added)). The Indictment contradicts itself when it

alleges that SUNY Poly (through Howe) took "official action" regarding the Buffalo RFP when the rest of the Indictment makes clear it was "Fort Schuyler's selection process for the Buffalo RFP" that Howe was supposedly bribed to influence. (Indictment ¶ 24). The Indictment fails to allege that Howe was an agent of Fort Schuyler, the entity responsible for the subject RFP, or that the Buffalo Defendants had reason to believe such was the case. Count Five must be dismissed on that basis as well.

### 3. Fort Schuyler Is Not A Qualifying State Agency.

As was set forth in the Buffalo Defendants' moving papers, the Indictment is also fatally deficient because Fort Schuyler is simply not a qualifying agency for the purposes of Section 666. (*See* Buffalo Def. MTD at 55–60). In its opposition, the government attempts to bridge this chasm with the following conclusory allegation: "SUNY Poly worked hand-in-glove with Fort Schuyler on the RFP process." (Gov. Opp. at 63). Even if such an allegation were in the Indictment, the fact remains that Fort Schuyler is not the same entity as SUNY Poly. SUNY Poly's status as a qualifying agency for the purposes of Section 666 cannot simply be imputed to Fort Schuyler, nor can Fort Schuyler's RFP process be deemed the business of SUNY Poly. That much is clear from the face of the Indictment. This fact defeats the government's theory of prosecution for the purposes of Section 666.

While the government may not explicitly allege it, its opposition suggests that Fort Schuyler was an entity expressly created to perpetrate this alleged scheme. The government suggests that Fort Schuyler was, in reality, controlled by Howe and Kaloyeros. The Indictment's allegations, however, directly refute this notion. As alleged in the Indictment, Fort Schuyler was created in 2009, "as a non-profit real estate corporation affiliated with SUNY Poly that could enter into contracts with private companies on SUNY Poly's behalf, for the purpose of carrying out development projects paid for with State funding." (Indictment ¶ 7). The Indictment alleges

that Howe was not even retained as a consultant to SUNY Poly until 2012, and that Fort Schuyler's actions were controlled by that entity's Board of Directors. (*See* Indictment ¶¶ 7, 11).

The government effectively concedes, as it must, that the primary reason Fort Schuyler was created as a private, not-for-profit entity was to allow it to procure development and construction work in a manner unavailable to state entities like SUNY Poly. Fort Schuyler was a distinct, private entity, and it must be treated as such for the purpose of Section 666. The government cannot allege that bribing a SUNY Poly consultant was the equivalent of bribing an agent of Fort Schuyler—a deliberately separate entity.

The government cannot have its cake and eat it too. Fort Schuyler existed to effectuate projects that, if undertaken by a state entity like SUNY Poly, would have progressed more slowly and expensively or not at all. That SUNY Poly and Fort Schuyler had common goals and a degree of "interconnectedness" (Gov't Opp. at 68–69) does not destroy the legal significance of their distinct legal existences. The Indictment's allegations belie any such assertion. It was Fort Schuyler that issued the Buffalo RFP. It was Fort Schuyler that evaluated the responses to the Buffalo RFP. It was Fort Schuyler's Board of Directors that ultimately adopted the recommendation of the Fort Schuyler Evaluation Committee in selecting the Buffalo Developer as a "preferred developer." The Buffalo RFP was the business of Fort Schuyler; it was not, and could not have been, the business of SUNY Poly.

While SUNY Poly's status as a public university that receives federal funds might make **it** a Section 666-qualifying agency, the same is not true of Fort Schuyler. Similarly, while the Research Foundation received federal funding, it too is separate and distinct from Fort Schuyler, even if it "paid the salaries" for certain individuals "affiliated" with Fort Schuyler. (Indictment ¶ 7). Notably, while the Indictment explicitly alleges that both SUNY Poly and the

Research Foundation were qualifying agencies "receiv[ing] federal funds in excess of $10,000 per year" (Indictment ¶¶ 3,4), nowhere does it allege that Fort Schuyler received any federal funds at all. The independent actions of an entirely distinct non-profit entity may not be attributed to a qualifying agency to establish liability under Section 666.

The government's citation to *United States v. Bonito*, 57 F.3d 167 (2d Cir. 1995), is in no sense "squarely on point." (Gov. Opp. at 69). In *Bonito*, the defendant was charged with bribing co-defendant Joseph DeMatteo, a New Haven City official. 57 F.3d at 169. DeMatteo represented New Haven on a *joint* City of New Haven/New Haven Housing Authority committee which was established to identify and approve sites for low income housing to be purchased by the Housing Authority. The Housing Authority is an organization created by Connecticut statute, which administers projects funded by the federal Department of Housing and Urban Development ("HUD"), and operates under close HUD supervision. Importantly, it exists independently of the City of New Haven, which is a municipality of the state of Connecticut. *Bonito*, 57 F.3d at 170. The court described the committee as follows: "the relationship between the two entities was one of cooperation; while final legal authority to choose sites may have remained with the Housing Authority, the mayor had issued a directive saying that his approval was required." *Id.* The City of New Haven, in other words, had complete authority to approve or reject the proposed housing sites.

The *Bonito* court concluded that the business before the joint committee constituted the business of both New Haven and the Housing Authority, holding as follows:

> In the case at bar, the mayor of New Haven had directed that no site be accepted by the Housing Authority for the placement of low income housing without his prior approval. He placed DeMatteo, as his agent, on the joint New Haven-Housing Authority committee to represent New Haven's interests in site selection. Whether the Housing Authority had sole legal authority for site

> selection, it had decided to cooperate with the City, and, in fact, the
> only site it approved and sent to HUD for its consideration was
> endorsed by DeMatteo in his capacity as the City's representative.
> This enterprise -- deciding on the location of scattered site housing
> -- was being conducted in close cooperation between the City and
> the Housing Authority. It was, at all times relevant to this case, the
> business of both.

57 F.3d at 173. The court's decision was clearly based on the facts that: (1) implementation of

the project — to identify sites for low-income housing — was carried out between the two

agencies as a "joint" undertaking, with both agencies having representatives on a *joint*

committee; and (2) that the individual being bribed was an agent of an organization that had

ultimate *decision-making authority* with respect to the project (site selection). *Id.* No such thing

occurred here. Instead, the allegations of the Indictment make clear that it was Fort Schuyler,

not SUNY Poly, who held all of the decision-making authority for the Buffalo RFP process.

Here, the Indictment provides that Fort Schuyler drafted and issued the Buffalo RFP,

communicated with responding developers, appointed an internal Evaluation Committee, and

ultimately, Fort Schuyler's Board of Directors voted to adopt the Evaluation Committee's

recommendation to name the Buffalo Developer as one of two "preferred developers." All

without the participation of SUNY Poly. At no stage of the Buffalo RFP process did SUNY Poly

take any action with respect to the Buffalo RFP. SUNY Poly did not correspond with

respondents, evaluate the RFP responses, or ultimately select a "preferred developer." In stark

contrast to how the mayor's approval was required before the Housing Authority could take

action in *Bonito*, here SUNY Poly's opinion and approval were not required before Fort Schuyler

could act on the Buffalo RFP.

Further, SUNY Poly did not appoint an agent to represent its interests for the purposes of

the Buffalo RFP process. The government asserts vaguely that "Kaloyeros bridg[ed] the two

sides" (Gov. Opp. at 69), but does not explain what exactly that means. In fact, Kaloyeros

expressly recused himself from the Buffalo RFP selection — so he can hardly be said to have caused both entities to conduct the business of the Buffalo RFP in "close cooperation." Instead, he intentionally eliminated the only arguable connection between the two entities.

Nor does Howe provide *Bonito's* necessary collaborative link between these two entities either. Howe is not alleged to have been employed by Fort Schuyler nor is he alleged to have served as an agent or representative of Fort Schuyler. The Indictment's allegations do not provide that Howe played any role, whatsoever, in Fort Schuyler's decision-making process. Because the relevant business here was not considered jointly by separate entities acting as part of a state-created committee, applying *Bonito*'s holding to these facts would require that both Fort Schuyler and SUNY Poly issued the RFP, evaluated the responses, and selected the "preferred developers." Accordingly, unlike in *Bonito*, Howe, as the alleged bribe-recipient, has no relationship to the entity that carried out the *quo*, in exchange for the *quid*.

That the Buffalo RFP could not have been the business of both Fort Schuyler and SUNY Poly is only further evidenced by the fact that Fort Schuyler is a private entity. In *Bonito*, both New Haven and the Housing Authority were likely Section 666-qualifying entities, but the government prosecuted the case with New Haven as the affected entity for the purposes of Section 666's jurisdictional predicate. *See Bonito*, 57 F.3d at 167, 174 (2d Cir. 1995). Here, however, the allegations underscore that Fort Schuyler is a private entity, and belie any suggestion that its business was also that of the State. The Indictment fails to allege that Fort Schuyler received the $10,000 in federal benefits to satisfy Section 666's jurisdictional prerequisite, and so the government attempts to remedy this fatal deficiency by characterizing Fort Schuyler's actions as those of the State. However, to do so would disregard Section 666's explicit jurisdictional requirement — the Court should decline the government's invitation here.

### 4. There Is No Nexus Between The Alleged Bribe And Any Agency Receiving More Than $10,000 In Federal Benefits.

Nowhere in the Indictment is there any allegation that Fort Schuyler, the agency authorizing the Buffalo RFP, received any federal benefits at all. The closest it gets is an allegation that SUNY Poly received "federal funds in excess of $10,000 per year" and that public funding for SUNY Poly "came through" — whatever that means — the SUNY Research Foundation, "which paid, at least in part, the salaries of many individuals affiliated with SUNY Poly and Fort Schuyler." (Indictment ¶ 7). This allegation is not sufficient to meet the jurisdictional requirement of Section 666.

In concluding that "the fact that no New Haven funds were implicated by DeMatteo's corrupt activities did not place Bonito's conduct outside the scope of § 666," the *Bonito* court cautioned that it "would be quite another case if the corrupted business affected neither the financial interests of the protected organization nor, as in this case through the Housing Authority, federal funds directly." *Bonito*, 57 F.3d at 173. Ours is the exact situation the *Bonito* court cautioned against. Here, the Buffalo RFP, as the alleged corrupted business, affects neither the financial interests of the protected organization (SUNY Poly), nor does it affect federal funds directly, because as discussed earlier, the indictment does not allege Fort Schuyler meets Section 666's jurisdictional requirement of having received $10,000 in federal monies within one year of the offense.[24] In any event, as discussed in detail (*supra* at 36–50), the Buffalo RFP did not result in the award of any contract or the disbursement of any funds. It merely resulted in the selection of two "preferred developers."

---

[24] While the government correctly notes that it need not establish a nexus between the bribery and the federal funds (*see* Gov. Opp. at 69 n.24 (citing *Sabri v. United States*, 541 U.S. 600 (2004))), Section 666 liability is still predicated upon the threshold showing that the defrauded organization received "benefits in excess of $10,000 under a Federal program." *Fischer v. United States*, 529 U.S. 667, 676 (2000).

The Indictment's factual allegations fail for the additional reason that, while the Indictment attempts to allege an effect on federal *funds*, it nowhere alleges any specific facts about federal *benefits*. The cases make clear that these are not one and the same. *See United States v. Pinson*, 860 F.3d 152 (4th Cir. 2017) (vacating defendant's conviction where defendant received payments resulting from federal housing grant and the Fourth Circuit found that the federal grant money received is not a "benefit" for the purposes of Section 666); *see also Fischer v. United States*, 529 U.S. 667 (2000) ("a government 'benefit' . . . did not include certain payments made 'in the usual course of business'"). Instead, the "key question is whether the funds are paid to the entity 'for significant and substantial reasons in addition to compensation or reimbursement,'" provided that, to make this determination, "courts should examine the recipient entity's 'structure, operation, and purpose' as well as 'conditions under which the organization receives the federal payments.'" *Pinson*, 860 F.3d at 167 (quoting *Fischer*, 529 U.S. at 679–81). A "benefit" under Section 666 results in the recipient entity being subjected to "'substantial Government regulation' that helps them achieve 'long-term objectives' or policy goals 'beyond performance of an immediate transaction,'" whereas, "if the payment is made 'simply to reimburse,' then the recipient entity isn't receiving a 'benefit.'" *Pinson*, 860 F.3d at 167 (quoting *Fischer*, 529 U.S. at 679–80).

Count Five should be dismissed for the additional reason that the Indictment contains no allegation that receipt of any funds by Fort Schuyler was sufficiently linked to the "structure, operation, and purpose" of any federal program to turn Fort Schuyler's receipt of federal funds (if any, since none is even alleged) into receipt of a "benefit." *See Fischer*, 529 U.S. at 681; *see also United States v. Doran*, 854 F.3d 1312, 1315 (11th Cir. 2017); *United States v. Pinson*, 860 F.3d 152 (4th Cir. 2017).

5. **The Alleged Corrupt Conduct Was Not In Connection With A Transaction Or Business Of The Agency Involving Anything Of Value Of $5,000 Or More.**

As noted above, because the Buffalo RFP cannot be considered the "transaction or business" of SUNY Poly, the Indictment fails to state a Section 666 offense. *See United States v. Bonito*, 57 F.3d 167, 174 (2d Cir. 1995). In this respect, the Indictment does not allege that the Buffalo Defendants sought "official action" with respect to the alleged Section 666-qualifying state agency — because the Indictment does not allege that any qualifying state agency was in a position to take any "official action" on the Buffalo RFP or had any influence whatsoever over "Fort Schuyler's selection process for the Buffalo RFP." (Indictment ¶ 24).

The Indictment does not allege that Fort Schuyler itself was a qualifying Section 666 agency and concedes that Fort Schuyler was a private non-profit real estate corporation created to "enter into contracts with private companies"; it was Fort Schuyler (not SUNY Poly) that, according to the Indictment, "was charged with selecting private companies to partner with Fort Schuyler in SUNY Poly-related development projects." (Indictment ¶ 7). The government cannot avoid the inevitable conclusion: while SUNY Poly might be a qualifying agency for the purposes of Section 666, the face of the Indictment makes plain that SUNY Poly itself could not and did not take any "official action" on the Buffalo RFP, because the Buffalo RFP was not a "transaction or business" of SUNY Poly. It was a transaction entirely controlled and effectuated by Fort Schuyler.

6. **The Indictment Fails To Allege Any "Official Action" As Defined In *McDonnell* Which Necessitates The Dismissal Of Count Five.**

In our opening brief, the Buffalo Defendants argued that the absence of an explicit "official action" element in Section 666 renders the statute facially unconstitutional. (*See* Buffalo Def. MTD at 45, 61 n.22). The Buffalo Defendants further incorporated by reference

and joined in full the arguments establishing Section 666's unconstitutionality, as set forth in the memorandum in support of Defendant Peter Galbraith Kelly's motion to dismiss.  (*See* Buffalo Def. MTD at 45).  The Second Circuit recently addressed whether the Supreme Court's decision in *McDonnell v. United States*, 136 S. Ct. 2355 (2016), applied to Section 666 in *United States v. Boyland*, No. 15-3118, 2017 WL 2918840 (2d Cir. July 10, 2017).

*Boyland* held that the failure to define "official action" for the purposes of Section 666 did not render jury instructions on those counts erroneous on appeal.  *Id.* at *9.  This is understandable, as Section 666 does not contain an express "official action" element.  The narrowed definition of "official action" articulated by the Supreme Court in *McDonnell*, however, was necessitated by constitutional concerns to ensure bribery statutes remained cabined within their constitutional bounds.  *Id.* at *9.  While *Boyland* declined the opportunity to affirmatively adopt an "official action" element in its interpretation of Section 666[25], the *McDonnell* decision still governs Section 666's constitutional limitations.  Accordingly, notwithstanding the Second Circuit's recent decision in *Boyland*, the Buffalo Defendants maintain that without an "official action" element, Section 666 exceeds its constitutional bounds.  *See McDonnell v. United States*, 136 S. Ct. 2355 (2016).  The reasons this is so are ably set forth in the reply memorandum in further support of Defendant Peter Galbraith Kelly's motion to dismiss, which we adopt and join in full and which we respectfully request be incorporated herein by reference.

---

[25]  *See United States v. Boyland*, No. 15-3118, 2017 WL 2918840, at *9 (2d Cir. July 10, 2017) (quoting 18 U.S.C. §§ 201, 666) ("[Section 666] is more expansive than § 201, in which 'official act[s]' are limited to acts on pending 'question[s], matter[s], cause [s], suit[s], proceeding[s], or controver[ies].' Section 666 prohibits individuals from 'solicit[ing] . . . anything of value from any person, *intending to be influenced* or rewarded *in connection with any* business, transaction, or series of transactions of [an] organization, government, or agency.' We do not see that the *McDonnell* standard applied to these counts.") (internal citations omitted) (emphases in original).

Alternatively, however, in this case the government has expressly elected to engraft onto Section 666 an "official action" element,[26] no doubt due to concerns about the very constitutional issues that the absence of such an element would present.[27] Here, it is clear that the government's only theory of liability underlying Count Five is that the Buffalo Defendants' alleged bribe payments (the *quid*) were exchanged for Howe's "official action" (the *quo*). The Indictment uses the phrase eighteen times. (*See, e.g.*, Indictment ¶¶ 31, 32, 35, 43, 47, 49, 51, 53, 56, 59, 61, 63, 65, 67; *see also* Compl. ¶¶ 2, 3, 4, 6, 9, 10, 33, 46, 51, 57). In instances such as this — where the Indictment and Complaint are both riddled with allegations of "official action" — the prosecution must be held to the charge it has chosen. Accordingly, notwithstanding *Boyland*, because the Indictment alleges that bribes were exchanged for "official action," the government has effectively adopted *McDonnell*'s narrowed definition of that term for the purposes of proving the alleged violation of Section 666 underlying Count Five.

Further, as set forth in the Buffalo Defendants' opening brief, the Indictment fails to allege any set of facts which could be construed to satisfy the definition of "official action" under *McDonnell*. (*See* Buffalo Def. MTD at 61–66). Count Five must be dismissed accordingly.[28]

---

[26] *Compare* (Indictment ¶ 47 (alleging the Buffalo Defendants paid "bribes" to Howe "in his capacity as an agent and representative of SUNY Poly," "in exchange for, to influence, and to reward the taking of *official action . . .* in connection with obtaining the Buffalo RFP") (emphasis added)) *with* Superseding Indictment, *United States v. Boyland*, No. 11 Cr. 850 (SLT) Dkt. No. 81 (E.D.N.Y. filed Jan. 17, 2014) (no allegation of "official action"); Indictment, *United States v. Rosen*, No. 11 Cr. 300 (JSR), 2011 WL 8193905 (S.D.N.Y. filed Mar. 31, 2011) ("defendant, would and did corruptly give, offer, and agree to give something of value to a person, to wit, New York State Assemblyman William Boyland, Jr., with intent to influence and reward Boyland, an agent of a state government, in connection with a business, transaction, and series of transactions of the State of New York"); Indictment, *United States v. Brunshtein*, 98 Cr. 769 (MJW), 1998 WL 35249640 (S.D.N.Y. filed July 22, 1998) ("defendant gave cash to a DOF employee in return for the elimination and reduction of real estate taxes and interest").

[27] Although, as previously argued, such an effort to plead around this constitutional infirmity would be nugatory. *See* Memorandum of Law in Support of Joseph Percoco's Motion to Dismiss the Superseding Indictment, filed on May 19, 2017, at 21–22, 27–28.

[28] If the Court does not dismiss the Indictment as against the Buffalo Defendants, it should order the government to file a bill of particulars pursuant to Federal Rule of Criminal Procedure 7(f). For all the reasons set forth in the Buffalo Defendants' motion to dismiss (Buffalo Def. MTD 66–71), a bill of particulars is warranted.

## III. THERE IS A PARTICULARIZED NEED TO DISCLOSE A NARROW SUBSET OF THE GRAND JURY TRANSCRIPTS TO AVOID A MISCARRIAGE OF JUSTICE.

As explained in the Buffalo Defendants' Motion For An Order Compelling Disclosure of the Grand Jury Transcripts ("Buffalo Def. GJ Mem.") (Dkt. No. 224), Federal Rule of Criminal Procedure 6(e)(3)(E)(ii) expressly authorizes a district court to compel disclosure of grand jury transcripts where the defendant sufficiently "shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii). Erroneous legal instructions can constitute such a ground, provided that there is "grave doubt that the decision to indict was free from such substantial influence" of the defect. *Bank of Nova Scotia v. United States*, 487 U.S. 250, 263 (1988). Where the defendant demonstrates a non-speculative possibility that the prosecutor's instructions to the grand jury regarding disputed elements of the offense were erroneous, the district court is entitled to order the government to disclose the grand jury transcripts, notwithstanding that the indictment otherwise appears valid on its face. (*See* Buffalo Def. GJ Mem. at 4–6).In our opening brief we set forth six concrete reasons to believe that the prosecutors may have provided the grand jury incorrect instructions on the legal elements of the crimes charged. (*See* Buffalo Def. GJ Mem. at 6–13). In its three-paragraph response to our 16-page motion, the government derisively summarizes our arguments as "reason[ing] that, because—in [the Buffalo Defendants'] view— the Superseding Indictment does not properly allege wire fraud or bribery with respect to the RFPs, the grand jury must have been mis-instructed on the law." (Gov. Opp. at 78). That caricature ignores our real argument. At root, the six reasons proffered in our opening brief rely not on the absence of a particular allegation or an evaluation of what we believe the evidence will show or some missing verbiage, but flat-out inconsistencies in the Indictment itself. (*See, e.g.*, Buffalo Def. GJ Mem. at 14 ("this motion is based almost entirely on inconsistencies and

contradictions apparent on the face of the Indictment itself")). To reiterate just one example, the Indictment speaks with two voices as to what "property" was alleged to be the object of the wire fraud. (*See* Buffalo Def. GJ Mem. at 8–9.)

> Was it "the award of significant taxpayer-funded development contracts" (Indictment ¶ 39) or the "right" to a fair RFP process (*see, e.g.*, Indictment ¶ 45)? As we stated in our opening brief, the Indictment itself begs the questions: What was the grand jury told about what specific "money or property" was the object of the scheme? What was the grand jury instructed as to the necessary prerequisites of a property right cognizable under the wire fraud statute? What was the grand jury instructed as to the necessary link between the alleged fraudulent conduct and the property that was allegedly it object?

(Buffalo Def. GJ Mem. at 14).

In its opposition, the government has further muddied the waters — providing an additional concrete reason why the Court should order disclosure of the discrete portions of the grand jury minutes we have requested. Faced with the deficiencies inherent in its allegations as to property, the government blithely asserts for the first time in its opposition brief that the property at issue is Fort Schuyler's "right to control its assets." (Gov. Opp. at 55). But that simply injects an additional layer of uncertainty into this case. As explained above (*supra* at 40–42), the Indictment repeatedly alleges distinctly that the object of the scheme was tangible property — to wit, "state contracts worth hundreds of millions of dollars." (Indictment ¶¶ 1, 22, 39). The intangible "right to control" theory appears nowhere in the Indictment, either explicitly or implicitly. That the government now posits a theory of prosecution wholly absent from the Indictment highlights the need to determine what instructions the grand jury received.

As the Fifth Circuit has observed, "when a grand jury charges one specific theory of a scheme to defraud, the defendant may not be convicted based on another theory." *United States v. Radley*, 632 F.3d 177, 185 (5th Cir. 2011). That is precisely what the government is

attempting to do here. The government simply did not charge the Buffalo Defendants with depriving Fort Schuyler of the intangible right to control its own decision-making. The tangible property actually alleged in the Indictment to have been the object of any fraud ("hundreds of millions of dollars") is not the same thing as the "information necessary to make discretionary economic decisions," and even the government has not contended otherwise.

Permitting such a constructive amendment would permit the petit jury to convict based on something that was not passed on by the grand jury and would "destroy[] the defendant's substantial right to be tried only on charges presented in an indictment returned by a grand jury." *Stirone v. United States*, 361 U.S. 212, 217 (1960). For the Buffalo Defendants to be "convicted on a charge the grand jury never made against him . . . [would be] fatal error." 361 U.S. at 219. Numerous cases support this position, in a variety of factual contexts. *See, e.g.*, *United States v. Milstein*, 401 F.3d 53 (2d Cir. 2005); *United States v. Alkaabi*, 223 F. Supp. 2d 583, 585 (D.N.J. 2002). Although adequate notice would not cure the Fifth Amendment violation discussed above, the Indictment plainly did not apprise counsel that they would have to defend against the type of "right to control" case that the government now intends to advance. This new-found theory drastically increases the need to grant this motion given the strong indications that the grand jury never passed on the "right to control" theory and for the other infirmities identified in our opening brief. (*See* Buffalo Def. GJ Mem. at 6–16).

## IV. THE GOVERNMENT SHOULD BE PRECLUDED FROM USING ANY EVIDENCE OBTAINED FROM THE UNCONSTITUTIONAL SEARCH OF DEFENDANT CIMINELLI'S PERSONAL EMAIL ACCOUNT.

As set forth here and in more detail in the Memorandum of Law in Support of Louis Ciminelli's Motion to Suppress the Email Search, filed on May 19, 2017 (Dkt. No. 226), the evidence collected from the search of the Ciminelli Personal Email Account should be suppressed because, although the search was conducted pursuant to a search warrant, the warrant

was overbroad and not supported by probable cause. In particular, the government sought and obtained the entire contents of the Ciminelli Personal Email Account during a three-year period (from December 2012 to December 2015). This is astounding on its face. Prior to seeking authorization for that expansive search of personal correspondence, the government was already in possession of an index of the entire contents of the Ciminelli Personal Email Account, which showed — at the very most — that there were seven emails potentially relevant to its investigation, exchanged during a two-day period in September 2013.[29]

Indeed, the government relied on that very absence of any email correspondence prior to the two-day period in September 2013 and the absence of anything but email containing retail solicitations after the two-day period to assist it in establishing probable cause for the search warrant. The government cannot have it both ways. The government points to the absence of anything other than junk email during the three-year period (except for the two-day period in September 2013) as somehow proof of nefarious intent in this case, and then asks for blanket authority to read hundreds, if not thousands, of Mr. Ciminelli's personal emails during the same three-year period of time. (*See* Masella Dec. ¶ 21 & Ex. R). This approach defies logic and should be rejected.

In the government opposition, the government cites to several cases standing for the proposition that email searches, conducted pursuant to search warrants, have been upheld even where there was no limiting time period or where there were no particular search protocols employed to otherwise limit the search. (Gov't Opp. at 127–29). But the government does not address *United States v. Barthelman*, No. 13-10016-MLB, 2013 WL 3946084, at *11 (D. Kan. July 31, 2013), cited in our opening brief, in which the court suppressed email obtained pursuant

---

[29] That index was produced to the government by the email service provider, pursuant to Title 18, United States Code, Section 2703(d) (the "2703(d) Order") before the government sought and obtained its search warrant.

to search warrant because it found a warrant covering a six-month and nine-month time period too broad.

In addition, the other cases relied on by the government are inapposite here. In none of those cases did the government already have an email-by-email catalogue of the entire contents of the email account that was later searched pursuant to a warrant. It is this fact — that the government already knew that no potentially relevant email would be found during almost the entirety of the three-year period — that makes its request for a warrant for that period overbroad. *United States v. Wey*, a recent case from this District in which the district court suppressed evidence seized pursuant to numerous search warrants, is directly on point. There, the district found that the search warrants authorizing the search for all documents in certain locations were overboard, despite the fact that there was probable cause for at least some of the materials described in the warrant, because of the "sheer scope" of the materials reached, including where there was no temporal restriction in the search warrant. 2017 WL 2574026, at *27.

The government cites *United States v. Lustyik*, 57 F. Supp. 3d 213 (S.D.N.Y. 2014), a case that involves the search of email accounts pursuant to search warrants, for the proposition that a "warrant is not overbroad" if it authorizes the government to "seize and search evidence, fruits, and instrumentalities of specific crimes supported by probable cause." (Gov. Opp. at 120 (citing *Lustyik*, 57 F. Supp. 3d at 229)). But *Lustyik*'s recital of black-letter Fourth Amendment law in fact supports Mr. Ciminelli's position, not the government's. Here — although Mr. Ciminelli is not challenging that there were sufficient allegations articulated in the search warrant to support the conclusion that there was probable cause to believe that a crime had been committed, and that there might be probable cause for the government to search and seize the seven emails sent and received through the Ciminelli Personal Email Account during the two-

day period in September 2013 — there was no probable cause to believe that "evidence, fruits, or instrumentalities" of any crime would be found in the remainder of the email correspondence in that Account.  Indeed, by the time that the search warrant application was made, the government was in possession, pursuant to the 2703(d) Order, of dispositive proof that there was in fact *no email* in the Ciminelli Personal Email Account that would constitute "evidence, fruits, or instrumentalities" of any crime during the nine-month period preceding September 2013 and the 26-month period following it.  Thus, there was no probable cause to search the Ciminelli Personal Email Account during those time periods.  Accordingly, the search warrant for the Ciminelli Personal Email Account was overbroad, and any evidence obtained as a result of that search should be suppressed.

## CONCLUSION

For the reasons set forth above and in their opening briefs, the Buffalo Defendants respectfully request the Court grant their pretrial motions in full.

Dated: New York, New York
July 21, 2017

Respectfully submitted,

**HODGSON RUSS LLP**
*Attorneys for Defendant Louis Ciminelli*

By: __s/Daniel C. Oliverio__

Daniel C. Oliverio
Timothy W. Hoover
The Guaranty Building
140 Pearl Street, Suite 100
Buffalo, New York 14202
716.856.4000

**DLA PIPER LLP (US)**
*Attorneys for Defendant Louis Ciminelli*

By: __s/John M. Hillebrecht__

John M. Hillebrecht
Jessica A. Masella
1251 Avenue of the Americas
New York, New York 10020
212.335.4829

**LIPSITZ GREEN SCIME CAMBRIA LLP**
*Attorney for Defendant Michael Laipple*

By: __s/Herbert L. Greenman__

Herbert L. Greenman
42 Delaware Avenue, Suite 120
Buffalo, New York 14202
716.849.1333

**CONNORS LLP**
*Attorneys for Defendant Kevin Schuler*

By: __s/Terrence M. Connors__

Terrence M. Connors
1000 Liberty Building
424 Main Street
Buffalo, New York 14202
716.852.5533