# EXHIBIT A

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8-3-17

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------x

UNITED STATES OF AMERICA,               :

            -v.-                        :          13-cr-923 (LAP)

                                        :          OPINION & ORDER

LARRY DAVIS and DCM ERECTORS, INC.      :

            Defendants.                 :

                                        :

------------------------------------x

### List of Attorneys

Attorney for United States of America

Robert Lee Boone
Carrie Heather Cohen
Kan Min Nawaday

United States Attorney's Office
Southern District of New York
One St. Andrew's Plaza
New York, NY 10007

Attorney for Defendant Larry Davis

Sanford N. Talkin

Talkin, Muccigrosso & Roberts
40 Exchange Place
New York, NY 10005

Attorneys for Defendant DCM Erectors, Inc.

Kevin Ronald Puvalowski
Sarah Elizabeth Aberg

Sheppard Mullin Richter & Hampton, LLP
30 Rockefeller Plaza
New York, NY 10112

1

TABLE OF CONTENTS

I. BACKGROUND .............................................. 4
  A. The Defendants ........................................4
  B. Port Authority MWBE Program ..........................5
  C. Solera/DCM Joint Venture .............................9
  D. GLS Subcontract ......................................10
  E. The WTC contracts with Port Authority ................10
  F. The Indictment .......................................13
  G. Trial ................................................15
  H. The Post-Trial Motions ...............................19

II. DISCUSSION ............................................. 20
  A. Rule 29 Motion for Acquittal..........................20
    1. Standard Of Review..................................23
    2. Wire Fraud and Conspiracy to Commit Wire Fraud-
       Elements...........................................23
    3. Sufficiency of the Evidence.........................25
       a. Defendants' misrepresentations did not go to an ....
       essential element of the contract ................. 42
          i. The Port Authority received the full benefit of
          its bargain with Defendants...................... 42
          ii. The MWBE sections were not essential elements of
          the contracts ................................... 45
             (a) Breaches of the MWBE sections of the contracts
             were not violations of law..................... 45
             (b) The MWBE sections of the contracts were merely
             "aspirational"................................. 46
       b. Defendants' misrepresentations did not expose the
       Port Authority to potential or actual economic harm...... 49
          c. Much of the Government's evidence was legally
          irrelevant........................................ 63
  B. Rule 29(d) Conditional Determination of New Trial
  (Rule 33) ...............................................68
  C. Sufficiency of the Indictment, Constructive Amendment and
  Variance.................................................75
    1. Sufficiency of the Indictment ....................... 75
    2. Constructive Amendment/Prejudicial Variance ............ 79

III. CONCLUSIONS............................................ 100

2

LORETTA A. PRESKA, Senior United States District Judge:

The Court entered a judgment of conviction as to Defendants Larry Davis ("Davis") and DCM Erectors, Inc. ("DCM") (collectively, the "Defendants") on August 10, 2016 following a jury trial. Both Defendants were found guilty of one count of Wire Fraud in violation of Title 18, United States Code, Section 1343 and one count of Conspiracy to Commit Wire Fraud in violation of Title 18, United States Code, Section 1349. 18 U.S.C. § 1343 (2012); 18 U.S.C. §1349 (2012).

Defendants move, pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure, for a judgment of acquittal or a new trial. The Defendants also seek to dismiss the indictment, S3 13 Cr. 123 (LAP), and to vacate the convictions on the grounds of constructive amendment and prejudicial variance.

For the reasons set forth below, the Court:

1.  grants the motion for acquittal;

2.  conditionally grants the motion for a new trial;

3.  denies the motion to dismiss the indictment; and

4.  grants the motion to vacate the convictions on the grounds of constructive amendment and prejudicial variance.

I.    BACKGROUND

      A. The Defendants

      Defendant Larry Davis is the owner and President of DCM. (See Trial Transcript[1] ("Tr.") at 157.) DCM is a firm with an expertise in erecting the structural steel for office buildings. In its construction jobs, DCM typically furnishes and erects the steel. (See id.)

      DCM won the steel decking contract for Tower 1 ("One-WTC") ("Tower 1") of the World Trade Center ("WTC"). (See Tr. 157; see also Government Exhibit 1 ("GX-1")). On July 25, 2007, DCM executed the Structural Steel and Metal Deck Contract ("Tower 1 Contract") with Tishman Construction Corporation, the construction manager for the project hired by the Port-Authority-owned company, 1-WTC, LLC. (See GX-1.) The contract amount was $256 million. (See GX-1 at 32.)

      Subsequently, DCM also became involved in the construction of the neighboring World Trade Center PATH Transportation Hub ("Hub"). (See Tr. 170-71.) On May 12, 2009, Larry Davis signed a subcontract ("Hub subcontract") on behalf of DCM with the

---

[1] For ease of reference, citations to the trial transcript will use the continuous page numbers (pp. 1-1177) running throughout eight separate docket entries [dkt. nos. 74, 76, 78, 80, 82, 84, 86, 88].

general contractor, Phoenix, LLC, for the metal decking of the
Hub.[2] This contract was priced at $330 million. (See GX-2 at 1.)

B. Port Authority MWBE Program

In large construction projects worth over a million
dollars, the Port Authority has participation goals for
minority-owned and woman-owned business enterprises ("MWBEs").
(See Tr. 71.) The "overall goal" of the Port Authority is for
MBEs to have 12 percent participation and for WBEs to get five
percent participation in large contracts. (See Tr. 71:11-16.) To
help fulfill the Port Authority's goal, when the Port Authority
signs a contract for a large job with a prime contractor
(typically a non-minority owned business), the contract will
customarily include a provision related to subcontracts with
MWBEs. (See Tr. 71:17-21.)

The Port Authority certifies MWBEs as being in fact
minority-owned or woman-owned and publishes an online directory
of these firms that includes the companies' names and a specific
trade for which they are certified. (See Tr. 73:20-74:12.) As a
practice, the Port Authority refers prime contractors to this
directory of MWBEs in all of its contracts. (See Tr. 74:8-12.)
To begin the certification process, a prospective MWBE fills out

---

[2] Though the general contractor would change from Phoenix to
Tishman Turner, DCM remained the metal decking subcontractor.
(See Tr. 184.)

an application with a series of questions regarding ownership and control of the business and submits supporting documentation. (See Tr. 75:9-15.) The Port Authority will only certify a MWBE if the business is 51 percent minority-owned or woman-owned and the minority or woman business owner operates, controls, and manages the operation. (See Tr. 75:9-20.) To aid the certification analysts' review of MWBE certification applications, the Port Authority maintains an internal guidelines document that outlines the approval criteria. (See GX-20; see also Tr. 76:3-11.) Once the Port Authority makes the certification decision, the owner is notified by letter. (See Tr. 76:1-2.) If certified, the business is then listed by the Port Authority in the MWBE online directory. (See Tr. 75:21-25.)

While the Port Authority encourages prime contractors to form joint ventures ("JVs") or otherwise subcontract with MWBES, the Port Authority does not certify JVs as MWBEs. (See Tr. 79:4-7.) Instead, a related but separate process governs the participation of JVs in Port Authority projects where one of the joint venturers is an MWBE.[3] (See Tr. 79:13-19.) In such an instance, a prospective JV submits an application to the Port Authority describing the work to be performed and the role of

---

[3] In order for a JV including a MWBE to obtain approval to work on a specific Port Authority project, the MWBE must already be a certified MWBE with the Port Authority according to the certification process previously described. (See Tr. 85:8-13.)

the MWBE in the project. (See Tr. 81:2-14; see also GX-24.) The application also calls for a copy of the JV agreement. (See GX-24; Tr. 81:15-21.) The Port Authority maintains a separate internal guidance document designed "to assist Port Authority staff in providing direction and oversight to [MWBE JVs] which are operative on PA construction sites." (See GX-23 at 1; see also Tr. 84:7-8.)

Port Authority tabulates its progress towards its "aspirational" goal, (see Tr. 129:17-19), of ensuring the involvement of MWBEs through a system of MWBE "credit," (see Tr. 129). After reviewing MWBE involvement in a particular job, the Port Authority assigns a numerical figure in dollars to reflect the involvement of MWBEs according to its own internal standards. Because of the idiosyncrasies of the Port Authority's process, the credit figure does not necessarily correspond to the monies actually received by MWBEs on Port Authority projects. For example, if a MWBE is paid $100,000 for supplying material to a building, unless the MWBE also installed the material, the Port Authority will determine the credit figure to be $60,000. (See GX-1 at 8; see also Tr. 131.)

Thus, despite the financial connotation of the word "credit," as the word is used in this specialized context, credit has a non-pecuniary meaning. Credit does not connote any

actual pecuniary exchange between the Port Authority and a contractor but is rather an evaluative figure assigned by the Port Authority to characterize the participation of MWBE firms in Port Authority projects. (See Tr. 82-83, 101.) This credit figure has at least two relevant applications. First, the credit figure calculated by the Port Authority is used by the Port Authority in its annual reports to its Board of Directors and the public. (See Tr. 129.) Second, that same figure is "credited" to the contractors and is used as a way for the Port Authority to monitor the contractors' performance towards the Port Authority MWBE goals under their contracts. (See 127-28.)

At trial, the parties stipulated that the Port Authority policies and guidelines as contained in the MWBE certification guidelines, (see GX-20), and MWBE JV guidelines, (see GX-23), and reflected in the JV application, (see GX-24), were to be considered by the jury only for the limited purpose of explaining the Port Authority's certification process for MWBEs. (See Tr. 85:19-86:4.) The stipulation further provided that the guidelines and the policies of the Port Authority "are not criminal laws" and that "[v]iolation of those polices and guidelines is not a crime, and whether the defendants complied with those requirements is not determinative of the innocence or guilt of any defendant in this case." (See id.)

C. Solera/DCM Joint Venture

At some point, DCM formed a JV with Solera Construction, Inc. ("Solera"), forming Solera Construction, Inc./DCM Erectors, Inc. JV ("Solera/DCM"). (See GX-31; see also Tr. 262:23-263:8.) The Port Authority certified Solera Construction as a minority-owned business ("MBE").[4] (See Tr. 90.) The President and one hundred percent owner of Solera Construction is Johnny Garcia, (see Tr. 90), a Hispanic man born and raised in Ecuador. (See Tr. 216-17.)

There was evidence at trial that Solera/DCM began as early as 2001, (see GX-30; see also 267:11-13); in 2004, Solera and DCM executed a detailed general JV Agreement that was not specific to any one project. (See GX 31; Tr. 262:23-263:8.) In 2006, the two companies executed a substantially similar version of the 2004 JV Agreement, but this time, the JV was formed for the express purpose of partnering on the construction for One-WTC. A few years later, in February 2009, DCM and Solera signed another JV agreement, this time coming together to perform the subcontracting work of metal decking for the Hub. (See GX 33; see also Tr. 263.)

---

[4] When a firm receives certification from the Port Authority as an MWBE, it allows a prime or general contractor hiring the MWBE to report the money paid to the MWBE subcontractor as fulfilling the Port Authority's goals on MWBE involvement. (See Tr. 71:17-21; 73:20-74:1).

D. GLS subcontract

On the Tower 1 project, DCM subcontracted with GLS Enterprises, Inc. ("GLS"), a woman-owned business that was certified by the Port Authority as a WBE for payroll services. (See Tr. 704:11.) Gale D'Aloia, the founder, owner and manager of GLS, (see Tr. 759: 2-7), started the payroll management company in 2001, (see Tr. 676). In 2006, GLS received certification as a WBE for payroll management services. (See Tr. 759 at 12-14.) GLS handled all of the DCM payroll for both the Tower 1 and the Hub. (See Tr. 732:16-18; 761: 13-15.)

In around 2009, GLS took on further subcontractual work at both the Tower 1 and the Hub, this time for surveying. (See Tr. 704-05; 707:6-9; 747:8-10.)  GLS billed DCM for the payroll management and surveying that it provided. (See Tr. 690:3-4; 714:14-15.)

E. The WTC contracts with Port Authority

The $256 million contract that DCM signed for the metal decking for One-WTC contained a section (Section 8) titled "Minority and Women's Business Enterprises Program." (See GX-1 at 6.) The section provides definitions of a MBE and a WBE. A MBE, according to the contract, is "a business entity which is at least fifty-one percent (51%) owned by one or more members of one or more minority groups . . . and whose management and daily

10

business operations are controlled by one or more such individuals who are citizens or permanent resident aliens." (See GX- 1 at 6.) The contract defined a WBE in the substantially similar terms. (See id.)

The contract directed bidders to submit a MWBE participation plan that contained the names of the MWBE contractors, the description of the work to be performed by each MWBE contractor as well as the dollar value of the work. (See GX-480, 481A, 481B, 481C (participation plans submitted by Defendants).) The contract specified that the MWBE participation plan "should meet or exceed" the Port Authority's goals of twelve and five percent participation for minority and woman-owned enterprises respectively. (See GX-1 at 7.) "If such goals are not met, Contractor shall be responsible for demonstrating its 'good faith' efforts to achieve the goals." (See id.) The contract provided that a monthly statement of payments reports "reflecting the actual payments to MBE/WBE contractors must be submitted throughout the duration of the performance of the Contract." (See id. at 8.)

The contract required that DCM "use and document every good faith effort to comply with its MWBE Participation Plan and to permit its MWBE Subcontractors to Perform." (See id. at 7.) The contract defined the following activity, inter alia, as "good

11

faith efforts:" attendance at pre-bid meetings; utilization of
the Authority's online Directory of certified MBE/WBEs; active
and affirmative solicitation of bids for subcontracts from
MBEs/WBEs; dividing the work to be subcontracted into smaller
portions or encouraging the formation of JVs or similar
arrangements among subcontractors in order to increase the
likelihood of achieving the MBE/WBE goals. (See id.)

The contract noted the consequences of a contractor's lack
of performance of the MWBE aspects of the agreement. (See id at
8.) If before the award of the contract, and after the Port
Authority's and Tishman Construction's review of the
participation plan submitted by the bidder, Tishman Construction
determined that DCM had "not made a good faith effort to meet
the MBE/WBE participation goals and that the contractor had not
demonstrated that a full or partial waiver of such goals is
appropriate, [Tishman] may advise the bidder that it is not
responsible and may reject the bidder's Proposal." (See id. at 8
(emphasis added).) If DCM "fail[ed] to demonstrate good faith in
carrying out its MBE/WBE participation plan and in permitting
its MBE/WBE Subcontractors to perform and the Contractor has not
demonstrated that a full or partial waiver of the above referred
MBE/WBE participation goals is appropriate, then, upon receipt
of a future Proposal or Proposals from [DCM], [Tishman] may
advise the Contractor that is it not a responsible bidder and

may reject such proposal." (See id. (emphasis added).) The
contract additionally gave the ability to DCM to "request a full
or partial waiver of the above described MBE/WBE participation
goals by providing a reasonable demonstration to [Tishman] that
its good faith efforts will not result in compliance with the
[MWBE] goals." (See id.)

The $330 million contract that DCM signed for the metal
decking on the Hub, in all relevant respects, contained the same
requirements for the MWBE component of the Hub project as were
included in the One-WTC contract. (See GX-2D.) This contract was
between the contractor, Phoenix Constructors JV, and DCM, the
subcontractor responsible for furnishing, fabricating and
erecting the structural steel and the metal decking of the Hub.
(See GX-2 at 1.)

F. The Indictment

On March 23, 2016, Defendants were charged in a two-count
indictment. (See Indictment S3 13 Cr. 923 ("Indictment"), dated
Mar. 23, 2016 [dkt. no. 38].) The indictment charged each
Defendant with one count of wire fraud in violation of 18 U.S.C.
§ 1343 and one count of conspiracy to commit wire fraud in
violation of 18 U.S.C. § 1349.

According to the Indictment, in relation to the Solera/DCM
work, the Defendants misrepresented: a) that Solera/DCM workers

performed the metal decking at One WTC and the Hub when in fact the workers were employed by a different, non-minority contractor; b) Solera/DCM performed steel procurement work when DCM procured the steel. In relation to the GLS work, the Indictment alleged that the Defendants misrepresented that GLS performed surveying work at the World Trade Center site when in fact DCM performed the surveying work.

With respect to harm to the Port Authority, the Indictment stated that Defendants defrauded the Port Authority when they a) "fraudulently claimed MBE credit for One WTC and the WTC Hub in excess of $70 million based on the value of work Solera/DCM purportedly performed" on the World Trade Center project; and b) "fraudulently claimed WBE credit for $6.3 million of surveying and payroll management work GLS purportedly was performing as a subcontractor to DCM on One WTC and the WTC Hub. . . ." (See Indictment ¶ 12, 12a, 15, 15a.) In language largely tracking the wire fraud statute, the Indictment also provided:

> From in or about 2008 through in or about September 2012, in the Southern District of New York and elsewhere, [the Defendants] willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire. . . writings, signs, signals, pictures, and sounds for the purpose of executing such a scheme and artifice, to wit, Davis and DCM engaged in a scheme to commit M/WBE fraud in connection with the World Trade Center Project and in furtherance of such scheme facsimiles and wire transfers

were caused to be sent, including, but not limited to,
fraudulent invoices, e-mails related to fraudulent
invoices, and payments of money.

(See Indictment ¶ 16.)

       G. Trial

Trial began on August 1, 2016. The Government called ten
witnesses. The Government's case relied heavily on the testimony
of two cooperating witnesses, Garcia and D'Aloia, owners and
operators Solera and GLS, respectively, with whom Defendants
allegedly conspired to defraud the Port Authority.

The Government's most important witness was Johnny Garcia,
the President of Solera. In self-contradictory testimony, Mr.
Garcia testified that he did "basically nothing" on the WTC
project as part of the Solera/DCM JV, (see Tr. 286), but also
testified to doing work on the project, including, inter alia,
interviewing, firing and managing Solera and Solera/DCM
employees, as well as travelling to Spain (three times) and
China to oversee steel and glass procurement respectively for
the One-WTC Tower and Hub. (See Tr. 433, 531.) Additionally, Mr.
Garcia testified to the genesis of the relationship with
Defendants, prior MBE work he had done on the Goldman Sachs'
building, and his intent throughout the alleged fraudulent
scheme. Garcia testified that he had no intent of "actually do[]

metal deck erection" and instead developed his company to be a
"pass-through" for non-minority companies. (See Tr. 220.)

Gale D'Aloia, the President and manager of GLS, testified
in a similarly conclusory manner that she "committed fraud."
(See Tr. 656.) D'Aloia explained the process that led to her
role as the payroll subcontractor for DCM at the WTC project,
(see 676, 679-80, 703-04) as well as the role GLS had in the WTC
surveying work, (see Tr. 704-05, 743-44). She also explained the
complex payroll operation she performed. (See Tr. 761-62.)

The Government called three Port Authority witnesses: Ida
Perich, the general manager of the Office of Business Diversity
and Civil Rights at the Port Authority; Alan Reiss, executive
manager at the Port Authority and Director of World Trade Center
construction; and Francis Pescetto, a Port Authority engineer.

Ms. Perich provided an overview of the Port Authority's
MWBE goals. She described the application process for
certification as an MWBE, a process her office executes, the
MWBE monitoring effort in general, and how it specifically
functioned with respect to the One-WTC project. (See Tr. 75.)

Mr. Reiss described the construction process in general on
Port Authority projects, (see Tr. 147), and on the WTC projects
in particular, (see Tr at. 155). Reiss testified that the WTC
projects were completed by Defendants. (See Tr. 167, 174-75,

184-85, 188-89 ("DCM was building [One-WTC] satisfactorily. They had a skilled crew"), 210.)  Mr. Reiss also testified to extra work that DCM was hired to do on the WTC projects and the increased costs of the projects over the original $330 million (Hub) and $256 million (One-WTC) lump-sum contracts. (See Tr. 176). The Port Authority agreed to pay an additional $153 million on the One-WTC job, bringing the total price tag to $409 million. (See Tr. 167.) For the $330 million Hub, the Port Authority agreed to pay $210 million in extra work, bringing the total price tag to $540 million. (See Tr. 174-75.) On direct, Mr. Reiss seemed to imply that DCM miscalculated the cost of steel and labor leading to an increase in the price of finishing the job. (See Tr. 165-66.)  Later on cross-examination and redirect examination, Mr. Reiss clarified this testimony, however, and explained that the extra money was for "certain changes to the building that were requested [by Port Authority] on the way up;" "delays in construction;" and "bad weather and storms," including some "incredible snowstorms some winters." (See Tr. 210.)

Mr. Pescetto, who worked on the WTC Hub project as an office engineer, described his receiving and reviewing monthly requisition packages from DCM for the Hub project, which included DCM's statements of payments to the subcontractors, Solera/DCM and GLS. (See Tr. 900.)

Two construction workers who specialize in metal decking testified for the Government. Thomas Gavaghen, a member of Ironworkers Local 40 and decking foreman on the One-WTC job, testified to the metal decking construction process on both the Tower and the Hub. (See Tr. 599.) Keith Brown, a seventeen-year employee of DCM Erectors, Local 40 member, and the "walking boss" on the WTC site, described the chain of command on the construction site and explained that as walking boss he supervised Gavaghen and reported to a DCM employee, Kevin Murphy, who was the "super" on the job. He testified on cross that DCM Erectors was definitely the company employing him at Tower 1. (See Tr. 633.)

The Government called two employees of Tishman, the construction manager on the One-WTC job. Robyn Odita, Tishman Construction's Affirmative Action Manager explained her role in supervising the MWBE process for the Goldman Sachs building in the early 2000s, (see Tr. 641-48), a project for which Solera/DCM fulfilled its MWBE goals under its contract with Tishman, (see Tr. 653). Flora Ramos, the second Tishman employee to testify, is the Director of Community Relations at Tishman Construction, (see Tr. 829), and served as a compliance officer and affirmative action officer overseeing progress towards the MWBE goals at the One-WTC site, (see Tr. 830). Ramos explained the various documents DCM submitted to Tishman to report its

18

performance towards the Port Authority's MWBE goals, including
certified payrolls, monthly employment utilization reports,
statement of payments to subcontractors, and a participation
plan at the beginning of the project. (See Tr. 837.)

Michael Kossuth, a surveyor and member of Operating
Engineers Local 15 D, was a "party chief" and lead surveyor on
the WTC site. He was employed by GLS during the WTC project. He
explained the surveying process as well as the chain of command
for the surveying work. (See Tr. 869.)

The defense called one witness, Jacintha Bobb, a payroll
administrator for DCM from 2001 until 2014. (See Tr. 954.) Ms.
Bobb also handled payroll for Solera/DCM. She testified that a
number of people who had roles in the WTC project were on
Solera/DCM's payroll. (See Tr. 956.)

On August 10, 2016, the jury returned verdicts of guilty
against both Defendants on both the wire fraud and conspiracy to
commit wire fraud charges. (See Verdict Sheet, dated Aug. 10,
2016 [dkt. no. 69]).

H. The Post-Trial Motions

At the close of the Government's case, the Defendants moved
for acquittal under Fed. R. Crim. P. 29(a). (See Tr. 924; see
also Defs.' Ltr., dated Aug. 8, 2016 [dkt. no. 67], at 5.)
Defendants submitted a Memorandum of Law on October 7, 2016

supplementing their pending Rule 29 motion for acquittal and, in
the alternative, moving for a new trial under Fed. R. Crim. P.
33. (See Defs.' Mem. of Law in Supp. of Post-Trial Mots.
("Mot."), dated Oct. 7, 2016 [dkt. no. 94].) The Government
submitted its opposition on December 5, 2016. (See Gov't Mem. Of
Law in Opp. To Defs.' Post-Trial Mot. ("Opp."), dated Dec. 5,
2016 [dkt. no. 95].) The Defendants replied on January 23, 2017.
(See Defs.' Reply Mem. of Law in Supp. of Post-Trial Mots.
("Reply Br."), dated Jan. 23, 2017 [dkt. no. 102].) Oral
argument on the post-trial motions was held on April 26, 2017.
(See Oral Argument Transcript ("OA Tr."), dated Apr. 26, 2017
[dkt. no. 109].) Following oral argument, the Government
submitted a short supplemental letter-brief. (See Gov't Supp. to
Mem. of Law ("Gov't Supp. Br."), dated May 5, 2017 [dkt. no.
111].) The Defendants replied with a letter-brief of their own.
(See Defs.' Ltr., dated May 9, 2017 [dkt. no. 113].)

II.  DISCUSSION

    A. Rule 29 Motion for Acquittal

        1.   Standard of Review

    A judgment of acquittal pursuant to Federal Rule of
Criminal Procedure 29 must be entered if no "rational trier of
fact could have found the essential elements of the crime beyond
a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319

(1979); United States v. Guadagna, 183 F.3d 122, 129 (2d Cir. 1999) (citing United States v. Mariani, 725 F.2d 862, 865 (2d Cir. 1984)). A defendant challenging the sufficiency of the evidence supporting a conviction faces "a heavy burden, as the standard of review is exceedingly deferential." United States v. Binday, 804 F.3d 558, 572 (2d Cir. 2015) (internal quotation marks and citation omitted). The district court "must view the evidence in the light most favorable to the Government, crediting every inference that could have been drawn in the Government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence." United States v. Brock, 789 F.3d 60, 63 (2d Cir. 2015) (citing United States v. Coplan, 703 F.3d 46, 62 (2d Cir. 2012)(internal quotation marks omitted)).

"[T]estimonial inconsistencies. . . revealed on cross-examination" are for the jury to resolve. United States v. O'Connor, 650 F.3d 839, 855 (2d Cir. 2011) (internal quotation marks and citation omitted). "'It is the province of the jury and not of the court' to determine whether a witness who may have been 'inaccurate, contradictory and even untruthful in some respects' was nonetheless 'entirely credible in the essentials of his testimony.'" Id. (quoting United States v. Tropiano, 418 F.2d 1069, 1074 (2d Cir. 1969), cert. denied, 397 U.S. 1021 (1970)). While the Court will credit all inferences that could

be drawn from the evidence in the favor of the verdict, specious inferences should not be credited. A jury's inference must arise from "a logical and convincing connection between the facts established and the conclusion inferred." United States v. Gore, 154 F.3d 34, 41 (2d Cir. 1998) (quoting United States v. Salmon, 944 F.2d 1106, 1114 (3d Cir. 1991)(internal quotation marks omitted)).

The district court looks at "the evidence in its totality," and the Government "need not negate every theory of innocence." United States v. Autuori, 212 F.3d 105, 114 (2d Cir. 2000); see also United States v. Glenn, 312 F.3d 58, 63 (2d Cir. 2002). The court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is "nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." Guadagna, 183 F.3d at 130 (internal quotation marks and citation omitted). "If the evidence viewed in the light most favorable to the prosecution gives 'equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence,' then 'a reasonable jury must necessarily entertain a reasonable doubt.'" Glenn, 312 F.3d at 70 (quoting United States v. Lopez, 74 F.3d 575, 577 (5th Cir. 1996), cert. denied, 517 U.S. 1228 (1996)).

2.   Wire Fraud and Conspiracy to Commit Wire Fraud-
Elements

"The 'essential elements of' both [mail and wire fraud]
offenses are '(1) a scheme to defraud, (2) money or property as
the object of the scheme, and (3) use of the mails or wires to
further the scheme.'" <u>Binday</u>, 804 F.3d at 569 (quoting <u>Fountain
v. United States</u>, 357 F.3d 250, 255 (2d Cir. 2004)).  "To prove
conspiracy [to commit wire fraud], the Government must show that
the defendant agreed with another to commit [wire fraud]; that
he 'knowingly' engaged in the conspiracy with the 'specific
intent to commit the offenses that were the objects of the
conspiracy'; and that an overt act in furtherance of the
conspiracy was committed." <u>United States v. Monaco</u>, 194 F.3d
381, 386 (2d Cir. 1999)(internal quotation marks and citations
omitted)(brackets added).

A "scheme to defraud" is the first element of wire fraud.
<u>See</u> <u>United States v. Dinome</u>, 86 F.3d 277, 283 (2d Cir. 1996).
Proof of fraudulent intent, or the specific intent to harm or
defraud the victims of the scheme, is an essential component of
the "scheme to defraud" element. <u>See</u> <u>id.</u>; <u>see</u> <u>also</u> <u>United States
v. Starr</u>, 816 F.2d 94, 98 (2d Cir. 1987). Proof of deceit,
without more, is not sufficient to find a scheme to defraud. <u>See</u>
<u>United States v. Regent Office Supply Co.</u>, 421 F.2d 1174, 1180-

81 (2d Cir. 1970). "It is not required that the victims of the scheme in fact suffered harm, but 'the Government must, at a minimum, prove that defendants contemplated some actual harm or injury to their victims.'" Binday, 804 F.3d at 569 (quoting United States v. Novak, 443 F.3d 150, 156 (2d Cir. 2006)).

The Court of Appeals has explained that "a cognizable harm" sufficient to support a scheme to defraud "occurs where the defendant's scheme 'denies the victim the right to control its assets by depriving it of information necessary to make discretionary economic decisions.'" Binday, 804 F.3d at 570 (quoting United States v. Rossomando, 144 F.3d 197, 201 n.5 (2d Cir. 1998)). However, merely showing that a victim would not have entered into a discretionary economic transaction but for the defendant's misrepresentations is not enough to prove deprivation of the right to control one's assets, i.e., harm. Id. at 570. The Court of Appeals in Binday elaborated on the required standard of proof of economic harm under this "right to control" theory this way:

> The "right to control one's assets" does not render every transaction induced by deceit actionable under the mail and wire fraud statutes. Rather, the deceit must deprive the victim "of potentially valuable economic information." United States v. Wallach, 935 F.2d 445, 463 (2d Cir.1991). "Our cases have drawn a fine line between schemes that do no more than cause their victims to enter into transactions they would otherwise avoid—which do not violate the mail or wire fraud statutes—and schemes that depend for their completion on a misrepresentation of an

essential element of the bargain—which do violate the mail and wire fraud statutes." <u>United States v. Shellef</u>, 507 F.3d 82, 108 (2d Cir. 2007).

Thus, <u>we have repeatedly rejected application of the mail and wire fraud statutes where the purported victim received the full economic benefit of its bargain. But we have upheld convictions for mail and wire fraud where the deceit affected the victim's economic calculus or the benefits and burdens of the agreement.</u> The requisite harm is also shown where defendants' misrepresentations pertained to the quality of services bargained for, such as where defendant attorneys "consistently misrepresented to their clients the nature and quality of the legal services they were providing. . . for a hefty fee." <u>United States v. Walker</u>, 191 F.3d 326, 335-36 (2d Cir. 1999); <u>accord</u> <u>United States v. Paccione</u>, 949 F.2d 1183, 1196 (2d Cir. 1991)("Use of the mails in furtherance of a scheme to offer services in exchange for a fee, with the intent not to perform those services, is within the reach of [18 U.S.C.] § 1341.") Lastly, we have repeatedly upheld convictions where defendants' misrepresentations in a loan or insurance application or claim exposed the lender or insurer to unexpected economic risk. <u>See e.g.</u>, <u>United States v. Chandler</u>, 98 F.3d 711, 716 (2d Cir. 1996); <u>United States v. Dinome</u>, 86 F. 3d 277, 284-85 (2d Cir. 1996); <u>United States v. Rodolitz</u>, 786 F.2d 77, 80-81 (2d Cir. 1986).

<u>Id.</u> at 570-71 (emphasis added).

In sum, where "the purported victim received the full economic benefit of its bargain," an essential element[5] of the bargain is not implicated, and thus the wire fraud statute does not apply. <u>Id.</u> at 570.

---

[5] "To support a mail [or wire] fraud claim, 'the harm contemplated [in a scheme to defraud] must affect the very nature of the bargain itself.'" <u>Novak</u>, 443 F.3d at 159.

3.    Sufficiency of the Evidence

The inquiry to determine whether Defendants here had intent to defraud under the "right to control" theory is a fact-sensitive one that requires the Court to determine whether the jury could rationally have found that Defendants' alleged scheme to defraud involved a misrepresentation of an essential element of their bargain with the Port Authority. In other words, the question is whether Defendants' compliance with the Port Authority's MWBE requirements was an essential element of the contracts for Tower 1 and the Transit Hub.

In analyzing these right to control/essential element cases, it appears that convictions have been upheld where the deceit had the potential to cause economic harm to the victim or where it involved a violation of the law. Convictions where these factors were not present were reversed, even though the victim would not have entered into the transaction had it known of the deceit.

In United States v. Schwartz, 924 F.2d 410 (2d Cir. 1991), United States v. Frank, 156 F.3d 332 (2d Cir. 1998), and United States v. Walker, 191 F.3d 326 (2d Cir. 1999), the Court of Appeals upheld wire fraud convictions "because the defendants' compliance with the law in carrying out their contractual

obligations was a fundamental part of the bargain between the parties." Novak, 443 F.3d at 159.

In Frank, the defendant represented to his municipal customers that their hazardous waste would be disposed of at least 106 miles from shore as required by new federal regulations, which marked "a significant increase from the previous distance of twelve miles." Novak, 443 F.3d at 158 (citing Frank, 156 F.3d at 334-35). Given the new federal requirements, "municipal customers paid two to four times more for disposal at the 106-mile site." Frank, 156 F.3d at 335. Contrary both to the agreement and the federal regulations, defendant's company "routinely dumped sludge in waters well short of the 106-mile site." Id. A representative of one of the customer municipalities testified that the "short-dumping could have subjected the municipality to fines and the loss of its environmental permit." Id.; see also Binday, 804 F.3d at 570 n.11. The Court of Appeals held that "this evidence suffices to establish that the [defendants] intended to harm the municipalities." Frank, 156 F.3d at 335.

Similarly, in Schwartz, "defendants induced a company to sell them [night-vision goggles] by falsely representing" that the equipment would not be exported to "nations that U.S. law prohibited from purchasing" the equipment. Binday, 804 F.3d at

570 n.11 (citing Schwartz, 924 F.2d at 414-16). The relevant law governing the export of night-vision goggles - The Arms Export Control Act – made violation of its provisions or the regulations issued under the Act a criminal offense subject to a 20 year maximum prison sentence a $1 million fine. See 22 U.S.C. 2778(b)(2) and (c); see also Schwartz, 924 F.2d at 413-14. In these circumstances, the defendants' misrepresentations, e.g., the contract language that they would be "fully responsible for compliance with all laws and regulations pertaining to the export of night-vision goggles," Schwartz, 924 F.2d at 414, "were not simply fraudulent inducements," id. at 421, quoted in Binday, 804 F.3d at 570 n.11, but "went to an essential element of the bargain between the parties," id. at 421. Accordingly, the Court of Appeals affirmed the conviction for wire fraud.

Walker involved an immigration attorney and an interpreter who "filed fraudulent work authorization and asylum applications with the Immigration and Naturalization Service on behalf of their clients." Novak, 443 F.3d at 158-59. During the scheme, the defendants "'consistently misrepresented to their clients the nature and quality of the legal services they were providing.'" Id. at 158-59 (quoting Walker, 191 F.3d at 335.) In the INS applications that defendants prepared, they used "nearly identical, boilerplate stories of persecution," instead of the clients' individual facts. See Walker, 191 F.3d at 336. This was

concealed from the clients, who could not understand English. Based on the misrepresentations of the attorney and the interpreter, "the clients were obliged to become parties to a dishonest scheme and were required to sign false statements themselves." Id. Consequently, the fraud "embroiled several of [the clients] in legal difficulty, forcing them to sign cooperation agreements to avoid prosecution." Id. at 336 n. 1. On these facts, because there was sufficient proof that the clients "did not get what they bargained for," the Court of Appeals upheld the wire fraud conviction. Novak, 443 F.3d at 159 (citing Walker, 191 F.3d at 336).

United States v. Paccione, 949 F.2d 1183 (2d Cir. 1991), an additional case cited by the Government where wire fraud convictions were upheld, is another example where defendants' compliance with law in carrying out their contractual obligations was a fundamental part of the bargain between the parties. There, a waste-disposal company called Environmental Contractors "offered to provide doctors with infectious-waste disposal services that would be safe and adequate to relieve them of the risk of civil and criminal liability." Id. at 1197. "Environmental Contractor's customers did not get what they paid for," id., however; by illegally dumping the medical waste without permits in unauthorized locations, Environmental

Contractors exposed its customers to "substantial regulatory
risks." Id.

Convictions for wire fraud on a right to control theory
have also been upheld where deceit created the potential of
economic harm. In Paccione, the scheme also deprived New York
City of higher fees from defendants and their customers who,
under normal circumstances, would have had to pay the City for
dumping the medical waste. See 949 F.2d at 1194. In United
States v. Chandler, a woman exposed a bank to an undisclosed
economic risk when she applied for credit using the identity of
a dead woman. See 98 F.3d 711, 716 (2d Cir. 1996). The lender
was exposed to potential loss, the Court reasoned, "because it
extended credit to someone whom it did not know had more than
one identity." Id. In United States v. Carlo, a financial
middle-man "knowingly gave false and misleading information to
real estate developers about the status of funding he was trying
to arrange for them in the hope that they would continue their
projects, at great risk and expense, while he pursued an ever-
dwindling chance of actually securing funding." 507 F.3d 799,
802 (2d Cir. 2007). Because the misrepresentations exposed the
developers to economic risk, the conviction was affirmed.

In United States v. Dinome, a couple made false statements
about their income and employment as part of a residential

mortgage loan application. See 86 F.3d 277, 279 (2d Cir. 1996).
The Court of Appeals upheld the couple's conviction for wire
fraud because their lies resulted in undisclosed economic risk
for the bank. The Court explained, "[t]he information withheld
in this case significantly diminished "'the ultimate value of
the [mortgage] transaction' to the bank as defined by its
standard lending practices, whether or not a subsequent default
ensued." Id. at 284 (quoting United States v. Locascio, 6 F.3d
924, 939 (2d Cir. 1993)). Even if default never ensued, the
false information created economic risk: "[a] mortgage loan that
is more exposed to default because of an inadequate income
stream to fund the required periodic payments is reduced in
value as an asset." Id. at 284 n.7.

In Binday, defendants orchestrated a life insurance fraud
scheme wherein they made applications for life insurance
policies using straw buyers, essentially taking out policies on
other peoples' lives, an arrangement known in the industry as
"Stranger Oriented Life Insurance" or "STOLI." See Binday, 804
F.3d at 565. In making their applications to the insurance
companies, the defendants lied in response to insurers'
questions aimed at detecting precisely the type of scheme that
defendants were perpetrating. Id. at 567. Defendants lied in
their applications about the purpose of the policy, how the
premiums would be paid, and whether the applicant had discussed

selling the policy. Id. Defendants also lied to the insurers by providing required certifications that, to their knowledge, the policies were not STOLI. For example, each defendant certified to Lincoln Life Insurance Company that the premiums would not be paid by financing from third parties, that there was no agreement to transfer ownership of the policy, and that the policy "does not violate the stated intent and spirit of the Lincoln Policy Regarding Investor Owned Life Insurance." Id. The Court of Appeals found that the evidence supported a finding of intent to harm because a reasonable jury could have inferred that the misrepresentations made by the Defendants went to essential elements of the bargain. See id. at 575-76. The potential of economic harm was present because the "value of insurance transactions inherently depends on the ability of insurance companies to make refined, discretionary judgments on the basis of full information." Id. at 576.

Finally, in Wallach, defendants misappropriated funds of a publicly held corporation and then covered up their scheme by submitting false invoices to the company. United States v. Wallach, 935 F.2d 445, 460-61 (2d Cir 1991). As a result of the false invoices, the corporation's prospectus for a stock offering contained false information. Id. The Court of Appeals upheld the convictions for wire fraud on a right to control theory because shareholders were deprived "of potentially

32

valuable economic information." Id. at 462-63. Elaborating on
the potential for economic harm,[6] the Court of Appeals explained,
"[w]hen intentionally deprived of accurate information regarding
how corporate assets are being spent, a shareholder's investment
is placed at great risk." Id. at 463. The Court of Appeals
continued, "[i]f corporate officers and directors, and those
acting in concert with them, were free to conceal the true
nature of corporate transactions, it is conceivable that the
assets of the corporation could be so dissipated as to render a
shareholder's investment valueless." Id.

In contrast to the cases noted above, convictions for wire
fraud have typically been reversed where "purported victim[s]
received the full economic benefit of [their] bargain," Binday,
804 F.3d at 570, even if the alleged victims would not have
entered transactions had they been aware of the defendant's
deceit, see id. at 570 n.10.

In United States v. Regent Office Supply Co., a company
selling stationery employed agents who misrepresented their

---

[6] In Wallach defendants' misrepresentations not only posed
economic risk but were themselves violations of securities laws.
See Wallach, 935 F.2d at 463 ("The importance of this right to
information is recognized by the statutes and rules that govern
the operation of a publicly held corporation. Indeed, the
officers of a publicly held corporation are legally obligated to
keep and to maintain books and records which 'accurately and
fairly reflect the transactions and dispositions of the assets'
of the corporation."(quoting 15 U.S.C. § 78m(b)(2)(A))).

identities to potential customers to ingratiate themselves so that the customer would entertain the agent's offer. See Regent, 421 F.2d at 1176. These agents lied about their professions, for example, saying they were doctors seeking to offload stationery or told customers they were in the "difficult situation" of possessing stationery that belonged to deceased third parties and had to dispose of it. Id. The Court of Appeals there "concluded that no conviction under the mail fraud statute could stand where the misrepresentation was 'not directed to the quality, adequacy or price of goods to be sold, or otherwise to the nature of the bargain." United States v. Shellef, 507 F.3d 82, 108 (2d. Cir 2007) (quoting Regent, 421 F.2d at 1179). It is worth noting that in Regent, the defendants had stipulated that the false representations were "reasonably calculated to induce purchasing agents of ordinary prudence . . . to buy their wares," 421 F.2d at 1181, that is, the Defendants had "an intent to deceive. . . and even to induce" victims to enter into the transactions, id. "[W]ithout more," however, the Court found insufficient evidence of the fraudulent intent required by the wire fraud statute. Id.

In United States v. Starr, defendants operated a bulk-mailing service by hiding high cost mail in low cost packaging and "represented that funds deposited with them would be used only to pay for their customers' postage fees." Starr, 816 F.2d

34

at 99. In fact, defendants appropriated a portion of the fees for themselves. Notwithstanding this deceit, the Court of Appeals held that "[t]he misappropriation of funds simply ha[d] no relevance to the object of the contract; namely, the delivery of mail to the appropriate destination in a timely fashion." Id. at 100; see Shellef, 507 F.3d at 108. The alleged victims "received exactly what they paid for," and "there was no discrepancy between benefits reasonably anticipated and actual benefits received." Id. 98-99, quoted in Binday at 570 n. 10. Because "the evidence [did] not identify what harm, if any, the [defendants] intended to inflict on their customers," id. at 99, there was no intent to defraud, and the convictions were overturned.

In Shellef, the Court of Appeals concluded that a wire fraud indictment was legally insufficient because it did not allege that "there was a 'discrepancy between benefits reasonably anticipated' and actual benefits received." Shellef, 507 F.3d at 109 (quoting Starr, 816 F.2d at 98). Defendants were distributors of industrial chemicals. Id. at 87. Defendant Shellef's company, Poly Systems, entered into a contract with Allied Signal in which Poly would purchase amounts of a highly regulated industrial chemical known as CFC-113. Id. at 90-91. An important aspect of this regulation was that domestic sales of CFC-113 were subject to steep excise taxes. Id. at 99. In

35

purchases of CFC-113 for domestic re-sale or use, purchasers customarily paid a higher, excise tax-adjusted price to the seller. See id. at 91, 93, 95. When Poly bought the CFC-113 from Allied, it promised to export all of the CFC-113 out of the U.S. and thereby acquired the CFC-133 at a lower price without the excise tax adjustment. Id. There was evidence at trial, and the indictment alleged, that Allied would not have entered the contract if it had been aware of Poly's intent to sell CFC-113 domestically. Id. at 91 (contract required exportation); see also id. at 96 (continuing promises from Shellef to "confine himself to export sales"); see also id. at 109. On these facts, the jury returned a wire fraud conviction. Id. at 96.

The Court of Appeals reversed the conviction and explained that the Government's "no-sale," see id. at 107, or right to control theory, see id. (Allied deprived of "right to define the terms for the sale of its property"), as alleged in the indictment did not constitute a scheme to defraud within the meaning of the wire fraud statute because the indictment did not allege that the defendants contemplated actual harm to the victims "due to [their] deception," id. at 107-08. The indictment failed to assert that the defendant's misrepresentation "had relevance to the object of the contract" and stated "only that. . . [the] misrepresentation induced [the alleged victim] to enter into a transaction it would have

otherwise have avoided." Id. at 109; Binday, 804 F.3d at 570

n.10. Therefore, the Court of Appeals, explained:

> [t]he jury here might have erroneously convicted Shellef
> and Rubenstein even though it concluded that the defendants
> did not misrepresent an "essential element" of the bargain,
> but rather made "simpl[e] fraudulent inducements to gain
> access to" Allied and Elf products. Schwartz, 924 F.2d at
> 421. Because we cannot rule out that possibility, we do not
> think a jury can be permitted to convict either defendant
> on the "no-sale" theory. See [United States v.] Szur, 289
> F.3d [200,] 208 (concluding that a remand is required where
> the jury may have convicted on a legally invalid theory).

Shellef, 507 F.3d at 109.

In United States v. Mittelstaedt, the wire fraud conviction

of a Government employee who "concealed [his] ownership interest

in property that his [Government] department agreed to purchase"

was overturned. Binday, 804 F.3d at 570 n.10 (quoting

Mittelstaedt, 31 F.3d 1208, 1218 (2d Cir. 1994)(internal

quotation marks omitted)). The Court of Appeals reiterated that

it was insufficient to show that, had the Government known the

truth about his ownership, it would have refused the

transaction. Binday, 804 F.3d at 570 n.10 (citing Mittelstaedt,

31 F.3d at 1218).

In Novak, defendant vice-president and business manager of

an elevator construction union orchestrated a scheme wherein

union members submitted to contractors time sheets for hours not

actually worked. The contractors paid the union employees for

those hours, and then the union members paid portions of their

37

salary in kickbacks to Novak. <u>Novak</u>, 443 F.3d at 153-54. The
contractor was not aware of the kickbacks, and the Government
maintained that "the contractors would never have issued checks
for the no-show hours had they known that a portion of the money
would be received by Novak. . . ." <u>Id.</u> at 158. The Court of
Appeals held that the evidence was insufficient to support the
jury's mail fraud verdict because there was insufficient
evidence to show the requisite intent to harm the contractors.
<u>Id</u>. Restating the fraudulent intent standard from <u>Starr</u>, the
Court said that in order to support a mail fraud claim, "the
harm contemplated [ ] must affect the very nature of the bargain
itself." <u>Novak</u>, 443 F.3d at 159. The Government failed to
demonstrate the requisite intent to harm because "the
contractors received all they bargained for, and Novak's conduct
did not affect an essential element of those bargains." <u>Id.</u> at
159; <u>see also</u> <u>Binday</u>, 804 F.3d at 570 n.10. The Court summarized
the cases as follows:

> We find unconvincing the Government's argument that the
> instant case falls within the ambit of <u>Schwartz</u>, <u>Frank</u>, and
> <u>Walker</u>. An intent to harm a party to a transaction cannot
> be found where the evidence merely indicates that the
> services contracted for were dishonestly completed. That is
> the teaching in <u>Starr</u>. In <u>Schwartz</u>, <u>Frank</u>, and <u>Walker</u>, an
> intent to harm was found because the defendants' compliance
> with the law in carrying out their contractual obligations
> was a fundamental part of the bargain between the parties.
> Although the Government insists that the contractors would
> not have paid for the no-show hours had they been aware
> that Novak would receive a portion of the money, that
> hypothetical contention is inadequate to support a finding

> of fraudulent intent. To support a mail fraud claim, "the
> harm contemplated [in a scheme to defraud] must affect the
> very nature of the bargain itself. Such harm is apparent
> where there exists a 'discrepancy between benefits
> reasonably anticipated because of the misleading
> representations and the actual benefits which the defendant
> delivered, or intended to deliver.'" Starr, 816 F.2d at 98
> (quoting United States v. Regent Office Supply Co., 421
> F.2d 1174, 1182 (2d Cir. 1970)). Here, as in Starr, the
> contractors received all they bargained for, and Novak's
> conduct did not affect an essential element of those
> bargains. Without more, the evidence is insufficient to
> show the requisite intent to harm. Because the Government
> failed to carry its burden of establishing that Novak
> intended to harm the contractors, we find the evidence
> insufficient to support the jury's verdict regarding the
> mail fraud charge, and thus reverse Novak's conviction on
> that count.

Novak, 443 F.3d at 159.

Proceeding now to the facts of this case, the Court finds

that the Government's evidence of Defendants' intent to defraud

the Port Authority was so meager that no reasonable jury could

find guilt beyond a reasonable doubt. Guadagna, 183 F.3d at 130.

Although all reasonable inferences must be drawn in favor of the

Government on a Rule 29 motion, the Court is convinced that the

jury must have resorted to speculation in finding the requisite

fraudulent intent. See Starr, 816 F.2d at 98-99.

At trial, there was evidence that the Defendants practiced

a deceit on the Port Authority. The jury was entitled to believe

that the JV application submitted for Solera/DCM's certification

by the Port Authority contained misrepresentations. On the

application form for certification on the One-WTC job and in the

copy of the JV agreements provided to the Port Authority as part
of the application, Solera is represented as having 60%
ownership of the Solera/DCM JV. (See GX-300; GX-32; GX-33.)
Profits and losses were represented to be shared according to
the same 60/40 split between Solera and DCM. (See GX-300 at 4;
GX-32; GX-33.) The application represented that capital
contributions had the same 60/40 split. (See GX-300 at 4.)
Garcia is listed as Solera's representative along with Larry
Davis, DCM's representative, as a person "having control of and
participation in the contract."[7] (See GX-300 at 4.)

Garcia, the one hundred percent owner of Solera, denied the
accuracy of this application and the JV agreements. He testified
that Solera did not own 60% of Solera/DCM, (see Tr. 274), that
Solera did not share profits and losses 60/40, (see Tr. 274-75),
that Solera contributed only $600 in capital to the JV, (see Tr.
265), and that the Solera/DCM was controlled completely by Larry
Davis and not at all by Garcia, (see Tr. 223-24). Garcia also
testified that he, along with Defendant Larry Davis, backdated

---

[7] Mr. Garcia testified at trial that the JV documents "listed"
him as the President of the JV. (See Tr. 223.) This is not true.
The 2004, 2006 and 2009 JV agreements never list Garcia as
President of the Solera/DCM JV. Instead, the JV agreements list
Garcia as President of Solera Construction, Inc. and Larry Davis
as President of DCM Erectors, Inc. (See GX-31 at 6; GX-32 at 8;
GX-33 at 8.) On the application form, (see GX-300 at 4-5), any
of the specific responsibilities Garcia is listed as having
clearly apply to Solera Construction, Inc., a company which it
is undisputed that Garcia owned and controlled.

the project-specific[8] JV agreements for Tower 1 and the Hub to make it appear as if the agreements had been in existence since 2006. (See Tr. 264.) On July 30, 2010, after reviewing Solera/DCM's MBE JV certification, the Port Authority granted permission for Solera/DCM to begin work on the WTC projects.[9] (See GX-300). With respect to Solera's ownership, control, and profit-sharing in the JV, the jury could have reasonably concluded that the Port Authority was deceived.

The record, however, shows little else. Notwithstanding the length of trial and the voluminous documentary record, the evidence was not sufficient for a rational jury to find that the alleged misrepresentations went to an essential element of the contract or that they exposed the Port Authority to potential or actual economic harm.

---

[8] The only supposedly back-dated documents were the project-specific JV agreements relating to Tower One and the Hub, (see Tr. 264), which are substantially the same as the agreements that had been in effect between Solera and DCM for years. (Compare GX-31 (general JV agreement from 2004) and GX- 32 (JV from the WTC-1 project); see Reply Br. at 5.)

[9] Solera/DCM received approval to work three years after DCM signed the One-WTC decking contract with the Port Authority and one year after DCM signed the Hub contract with the Port Authority. (See GX-300.) DCM thus won these contracts years before any alleged misrepresentations were made in the JV application or participation plans, (see Tr. 927), for Solera/DCM.

a.   Defendants' misrepresentations did not go to
an essential element of the contract

i. The Port Authority received the full
benefit of its bargain with Defendants

The basis of the bargain between the Port Authority and
Defendants was the construction of a 104-floor tower[10] and the
construction of a large transportation hub.[11] That work was
completed. (See Tr. 167, 174-75, 184-85, 188-89, 210, 556
(Garcia testifying that the "decking was done by the Joint
Venture").) The evidence was undisputed that Defendants built

---

[10] Port Authority witness Alan Reiss made clear on direct that
the One-WTC contract with DCM was for the structural steel and
metal deck for the tower:

Q. This is a contract for metal deck?
A. Correct.
Q. If we could go to the next page. You can look on the
screen if it's easier. Does this page indicate what the
contract is for and who is involved in the contract?
A. Yes.
Q. What does it say about that?
A. It says that the project is for Tower 1, 1 World Trade
Center. The trade is the structural steel and metal deck
for the tower.

(See Tr. 158.)

[11] According to the Hub contract, DCM was responsible for
"station construction" of the "transit hall structure" as well
as furnishing, fabricating and erecting structural steel,
intumescent (paint) coating, metal decking and precast concrete.
(See Tr. 170; see also GX 2.)

42

One-WTC "satisfactorily"[12] and completed the Hub as well. (See Tr. 174-75, 184, 188-89.)  No evidence at trial suggested that the Defendants "misrepresented to the [Port Authority] the nature or quality of the service they were providing." Starr, 816 F.2d at 99. Not only did the Defendants complete the work as originally contracted, but they also completed extra work required by the Port Authority, work for which the Port Authority's Alan Reiss agreed Defendants were entitled to be

---

[12] On cross-examination, Mr. Reiss, executive manager at the Port Authority and Director of World Trade Center construction (Tr. 144), testified to the following:

> Q. In fact, you personally were involved with the project since May of 2007, right?
> A. Correct.
> Q. You had occasion to know how the job was going, right?
> A. Yes.
> Q. In terms of actually getting the building [One-WTC] built, it got built, right?
> A. Correct. . .
> Q. Did you have a view on how DCM was accomplishing its obligations under the contract to build this building [One-WTC]?
> A. DCM was building the building satisfactorily. They had a skilled crew.

(See Tr. 189.)

paid a "fair and reasonable price." (See Tr. 184.)[13]   The only
rational conclusion that can be drawn from the testimony of
Reiss, the very man "responsible for the construction of the
Port Authority projects at the World Trade Center," (see Tr.
144), is that the Port Authority received "exactly what [it]
paid for, and there was no discrepancy between benefits
reasonably anticipated and actual benefits received." See
Shellef, 507 F.3d at 109 (internal quotation marks and citation
omitted), quoted in Binday, 804 F.3d at 570 n.10); see also
Novak, 443 F.3d at 159. The Government did not impeach Reiss's
testimony or otherwise offer evidence that the Port Authority
did not receive the full benefit of its bargain.

---

[13] Mr. Reiss testified to Defendants' completion of the extra
work:

  Q. Doesn't it stand to reason, Mr. Reiss, that DCM was going
  to have to do additional work, a lot of additional work
  because of the Port Authority's decision to boot Phoenix off
  the project? Isn't that right?
  A. Yes. . . .
  Q. And that extra work was done, right?
  A. Yes.
  Q. DCM is entitled to get paid for the work that it does,
  isn't it?
  A. A fair and reasonable price.
  Q. Okay. The Port Authority agreed on what the fair and
     reasonable price was, among other ways, in a mediation with
     a Judge in New Jersey. Isn't that right?
  A. Yes.

(See Tr. 184-85.)

For these reasons, there was insufficient evidence at trial for a rational jury to find that the Port Authority did not receive the full benefit of its bargain with Defendants.

#### ii. The MWBE sections were not essential elements of the contracts

##### (a) Breaches of the MWBE sections of the contracts were not violations of law

In contrast to the cases mentioned above where defendants' deceit went to an essential element of the bargain because defendants violated laws or exposed their counterparties to legal liability, see, e.g., Schwartz, Frank, Walker, and Paccione, there was no such evidence here. The parties here stipulated that violation of Port Authority policies and guidelines in the MWBE certification process "is not a crime, and whether the defendants complied with those requirements is not determinative of the innocence or guilt of any defendant in this case." (See Tr. 85.) Indeed, if a contractor does not satisfy the MWBE goals, the Port Authority can waive them. (See GX-1 at 8.) The only contractual remedy for failing to satisfy MWBE goals is that the Port Authority "may" refrain from doing business with the contractor in the future. (See id.) If the Port Authority or its contractors do not fulfill the MWBE goals,

45

there is no evidence that that failure will or might cause a criminal or any other kind of investigation to be opened. For these reasons, the Government's reliance on the Schwartz, Frank, Walker, and Paccione cases is misplaced. See Schwartz, 924 F.2d at 421 (producer of night-vision goggles risked investigation and lost good will when products exported in violation of federal law); see also Frank, 156 F.3d at 335 (customers exposed to losing environmental permits and possible fines); Walker, 191 F.3d at 336 n.1 (lawyer obliged his clients to make false statements and exposed them to criminal liability); Paccione, 949 F.2d at 1197 (waste removal scheme exposed doctors to regulatory risks).

       (b) The MWBE sections of the contracts were merely "aspirational"

Not only did the evidence show that the MWBE sections of the contracts did not concern the quality or nature of the goods or services being provided, but it showed that they were merely

collateral aspects of the building contracts.[14] See Starr, 816
F.2d at 98. Ms. Perich, the general manager of the Office of
Business Diversity and Civil Rights at the Port Authority,
testified that the Port Authority's goal for meeting minority
and women participation is "an aspirational goal." (See Tr.
129.) Ms. Perich also testified that during and after a
contractor performs a particular job, the Port Authority is free
to give or reject MWBE credit after reviewing a contractor's
submitted statements of payment. (See Tr. 128.) Ultimately,
these figures of MWBE credit are "compiled" and reported to the
Port Authority's Board of Commissioners "to let

---

[14] At oral argument, the Government argued for what amounts to a
new public entity exception to the existing framework of
fraudulent intent in wire fraud cases. (See OA Tr. 25-26.) The
Government was unable to cite any case support for such an
approach however. (See id. ("Your honor, in looking at the cases
in this area, none of them are exactly on point . . . . We
haven't seen any cases where it's quite like this case, where
it's a public entity is the contracting party.").) Because the
Port Authority is a public entity with broad public purposes,
the Government argued that terms that might not ordinarily be
considered essential elements of a contract between private
parties could be essential elements in contracts involving
public entities. (See id.) While it is theoretically possible
that a public party could have sui generis essential elements in
its bargains because of its public nature, in the Court's view,
such circumstances do not warrant any change in wire fraud
doctrine.

them know how well the agency met its [MWBE] commitment."[15] (See Tr. 89.)

The enforcement mechanisms for a breach of the MWBE sections of the contracts, noted above, also demonstrate that MWBE compliance was not an essential element of the contract. If a contractor fails to make "a good faith effort" to meet the MWBE participation goals, first, the Contractor has an opportunity to demonstrate "that a full or partial waiver of the [MWBE] participation goal is appropriate." (See GX 1 at 8; GX 2D at 3.) Second, if the Contractor cannot show waiver is appropriate, "then, upon receipt of a future Proposal. . . from the Contractor, the Construction Manager may advise the Contractor that it is not a responsible bidder and may reject such Proposal(s)." (See GX at 1; see also GX 2D at 3 (similar language)).

It bears repeating no evidence at trial suggested that MWBE credit has a pecuniary quality. (See Tr. 82-83, 101, 127-29, 131.) It is the Port Authority's own statistical quotient of

---

[15] The Government also pointed to the Port Authority's "substantial [MWBE] compliance and oversight system," including Ms. Perich's twenty-person office, as evidence probative of the MWBE program's essentiality to the bargain. (Gov't Supp. Br. at 4.) That the Port Authority engaged twenty people to monitor an "aspirational" goal, however, does not convert the aspiration into an essential element of the bargain (or aid the public fisc).

minority involvement and does not correspond directly to money being paid out by the Port Authority. (See id.) The end user of the MWBE credit statistics is the Port Authority itself. (See Tr. 88-89.) There was no evidence that suggested that legal liabilities of any kind attach to the Port Authority if its goals are not met. Neither was there any suggestion in the evidence that there is any monetary consequence whatsoever to the Port Authority if it does not meet these "aspirational" goals. Instead, the most grave consequence or harm posed to the Port Authority by a contractor's MWBE noncompliance is that such activity "jeopardizes the integrity of the program." (See Tr. 98.) A wire fraud conviction must rest on more than this.

For these reasons, there was insufficient evidence for a rational jury to find that the MWBE sections of the contract were essential elements of the Defendants' bargain with the Port Authority.

> b.  Defendants' misrepresentations did not
> expose the Port Authority to potential or actual
> economic harm

There was also insufficient evidence for a rational jury to find that Defendants' deceit exposed the Port Authority to risk of economic harm or undisclosed economic risk. See Chandler, 98 F.3d at 716; see also Binday, 804 F.3d at 571. As a preliminary,

it is worth noting that all of the wire fraud cases where
convictions were upheld where intent was found based on a risk
of economic harm involved financial instruments. See Chandler,
98 F. 3d at 716 (a loan); see Binday, 804 F.3d at 565 (insurance
product); see also Wallach, 935 F.2d at 460-61 (publicly held
stock). Because this case involves no such financial instrument,
the unexpected economic risk cases appear inapposite here. See
Binday, 804 F.3d at 571 ("[W]e have. . . upheld convictions
where defendants' misrepresentations in a loan or insurance
application or claim exposed the lender or insurer to unexpected
economic risk.") (emphasis added).

Nonetheless, even if the economic risk category of
fraudulent intent applied here, there was insufficient evidence
at trial that Defendants' misrepresentations exposed the Port
Authority to economic risk or actual economic harm. The
Government argued several theories of contemplated economic harm
over the course of the case. First, the Government alleged in
the Indictment that economic harm was based on the Defendants'
fraudulent claiming of MWBE credit. (See Indictment at ¶12, 12a,
15, 15a.) Then, at trial, the Government shifted to a new
theory that Defendants' misrepresentations caused millions of
dollars of additional payments by Port Authority to Defendants.
(See Tr. 1005-06.) Then, at the Rule 29 colloquy and in
closing, the Government argued that payments to Johnny Garcia

50

reflected on a few certified payrolls caused actual harm to the
Port Authority because Garcia in fact did no work. (See Tr.
1006.) Finally, in post-trial briefing, the Government,
appearing to concede that Garcia did at least some work, argued
that the certified payrolls listing Garcia still caused actual
harm because Garcia did no "construction-related work." (See
Opp. at 31, 33, 39.) For the reasons discussed below, no
reasonable jury could have found that Defendants'
misrepresentations exposed the Port Authority to actual or
potential pecuniary harm.

As a preliminary matter, the original $256 million One-WTC
contract and the $330 million Hub contract were lump-sum
contracts. (See GX-1 at 39; GX-2 at 5.) Because the contract
prices were fixed, it would have been impossible for the lack of
real work by Garcia, for example, or any other allegedly
improper payments to D'Aloia or Garcia, to expose the Port
Authority to actual or potential pecuniary harm on these
contracts. Instead, any monies paid to Garcia or D'Aloia under
these contracts would have come out of Defendants' pockets.
Thus, the only possible loci of actual or potential economic
harm to the Port Authority were the $153 and $210 million cost
increases to the original contracts.

As noted, the Government argues two sources of actual or potential economic harm to the Port Authority: cost increases and Garcia and his daughter's (Estafania Garcia) appearance, (see Opp. at 38), on some certified payrolls. Regarding the cost increases after the lump-sum contracts, it would have been pure speculation for the jury to convict based on an inference that the Defendants' misrepresentations caused actual economic harm to the Port Authority. See Gore, 154 F.3d at 41 (finding jury convicted on "sheer speculation" where there was no "logical and convincing connection between the facts established and the conclusion inferred" (internal quotation marks and citation omitted)). Only one witness testified to the cause of the cost overruns: Alan Reiss, executive manager at the Port Authority and Director of World Trade Center construction. Reiss established that the cost overruns at both sites were due to a number of factors, such as the Port Authority's request for extra work that was not part of the original contract (see Tr. 184, 190); design changes to Tower 1 as well as the 9-11 memorial (see Tr. 178, 210-11); logistical problems (see Tr. 211); delays procuring curved steel for the Hub from Europe and issues with fireproof paint (see Tr. 211); and bad weather (see Tr. 210-11 (Hurricane Sandy)). Reiss never ascribed the cost

increases to the Defendants' misrepresentations.[16]  Thus, as in Gore, 154 F.3d at 41, any inference that the cost overruns were due to Defendants' misrepresentations would not be a "logical and convincing connection between the facts established and the conclusion inferred."

Regarding the second source of economic harm relied on by the Government--Garcia and his daughter's receipt of payments based on certified payrolls, after the lump-sum contracts, [17] the Port Authority made those payments under a new, more stringent regime. Among other measures adopted to minimize

---

[16] Initially, when asked on direct examination why DCM needed more money for Tower 1, Mr. Reiss testified:

> DCM, the schedule of values, which is what they believe the contract will cost, they broke the contract down into pieces, how much each floor would cost, how much the TV spire would cost. As they began to build the building, the actual cost of the labor and the steel to build a particular floor, let's say, exceeded the schedule of values that was listed in the contract. As they worked their way up the building, eventually the full $256 million was expended, yet they had purchased the steel.

(See Tr. 165-66.)

On cross-examination and redirect examination, Reiss was asked to elaborate on the reasons for WTC site cost increases. (See Tr. 181-82, 184, 210-211.) As noted above, he did so, mentioning numerous other contributing factors to the cost increases, but he never suggested DCM's miscalculation of its "schedule of values" or any of the other reasons stated had anything to do with Defendants' supposed misrepresentations about its MWBE compliance.

[17] The actual amounts paid over the original lump-sum contract amounts were determined in a settlement before a New Jersey court. (See Tr. 184-85.)

costs, the Port Authority began to pay the contractors' payrolls directly based on certified payrolls submitted monthly by the contractors. (See Tr. 167, 174, 719.) A few of these payrolls contain Garcia's name, (see, e.g., GX-417D), and his daughter's name, (see, e.g., GX-417E at 7). The Government argues, relying on Garcia's testimony that he did no work on these projects, that any money Garcia was paid on the basis of these payrolls was actual harm to the Port Authority. For the reasons discussed below, no reasonable jury could have convicted Defendants on such a theory.

The evolution of Garcia's testimony is instructive. On direct examination, the Government elicited from Garcia the conclusory statement that "I did basically nothing." (See Tr. 286; see also Tr. 506-07.) Garcia also offered similar opinions that his work was "fake," (see Tr. 539), "basically nothing," (see Tr. 506-07), and that he "felt [his work] is [sic] just a paper trail," (see Tr. 538). On cross-examination and re-redirect, however, Garcia testified, without contradiction, to a veritable litany of tasks that he and his daughter performed that contributed to the WTC projects.

In light of the evolution of Garcia's testimony, the Government's position shifted as well. In its summation, the Government argued to the jury that Garcia did "nothing." (See

Tr. 1005-06.) In its post-trial briefing, however, the Government retreated from this claim, arguing a theory it had not argued to the jury, viz., that Garcia did no "construction-related" work. (See Opp. at 31, 33, 39.)[18]

As to the work he did perform, Garcia attended meetings with the Port Authority relating to the Tower and the Hub. (See Tr. 283; Tr. 291 (attended meeting with Port Authority to argue for Solera to be paid); Tr. 408 (attending nine to ten coordination meetings with Tishman over span of seven months regarding Tower 1); Tr. 409 (daughter and Garcia combined attended 30-40 Tower 1 meetings with Tishman).) Garcia participated in internal Solera/DCM meetings. (See Tr. 295 (met twice weekly with Davis for the purpose of "going over the project"); see also Tr. 320, 321 (after 2009, meetings twice weekly with Jeff Gannett, Vice President of DCM Erectors,

---

[18] In United States v. Silver, ___ F. 3d ___ , 2017 WL 2978386 at *16 (2d Cir. July 13, 2017), the Court of Appeals noted with respect to the Real Estate Scheme counts that "it is not clear beyond a reasonable doubt that a rational jury would have convicted Silver if given proper instructions under McDonnell." So also here, it is not at all clear that the jury would have convicted these Defendants under the Government's current theory. (See infra text accompanying notes 23-25)(the Government concedes that Garcia did some work, D'Aloia does not appear on any certified payrolls); infra, p. 65 (the contracts do not require Garcia personally to lay steel decking or D'Aloia personally to do surveying).)

Richard Gilbert, a safety professional, and Davis at DCM's
office to discuss progress on WTC project).)

On behalf of the JV, Garcia took out a $100,000 loan, (see
Tr. 413), was the primary contact person for a time with an
outside lawyer advising on MBE compliance, (see Tr. 388), wrote
letters to the Port Authority, (see Tr. 431), wrote letters to
debtors of the JV seeking payment, (see Tr. 430-31), dealt with
suppliers, (see Tr. 513), and signed two years of monthly
certified payrolls, (see Tr. 510). Garcia testified that dealing
with suppliers, Tishman, and the Port Authority were "important
parts of the job" that the JV was doing on the World Trade
Center site. (See Tr. 513-15.) Signing the certified payrolls,
Garcia admitted, was "part of the job of the boss." (See Tr.
511.)

Garcia travelled internationally for meetings and
observations. (See Tr. 531 (three trips to Spain to visit steel
supplier); Tr. 410-11 (China for nine days to observe production
and testing of Tower 1 podium glass and report back to Davis).)
Garcia travelled domestically for meetings and observations.
(See Tr. 284 (Pittsburgh to visit fabricator of Tower metal
decking); Tr. 296 (Plainfield, N.J. to view steel arrived from
Spain).)

Garcia personally hired employees to work on the WTC projects. (See Tr. 284-85 (Javier Ronquillo to Solera as on-site manager checking Tower construction progress); Tr. 322 (Gloria Rodriguez to Solera); Tr. 285 (proposed nephew, Arturo Santos, for job at Solera/DCM); Tr. 301 (sister employed by Solera); Tr. 407, 412 (daughter, Estefania Garcia, employed by Solera and Solera/DCM); Tr. 425, 427 (Bill Cooper employed at Solera).) Garcia contributed Solera management and staff to Solera/DCM JV. (See Tr. 412 (Garcia and daughter); Tr. 285 (Gloria Rodriguez).) On at least one occasion, Garcia fired an employee on the projects. (See Tr. 432 (firing Kiwi Kalloo, Solera project manager on Hub).) Garcia managed Solera and Solera/DCM employees. (See Tr. 404-05 (directing niece, Christina Huguet, (Solera/DCM) about accepting steel to be shipped from Spain to Hub); Tr. 321 (directing nephew, Javier Ronquillo, to attend meetings and go to WTC site); Tr. 365, 409 (directing daughter to attend meetings); Tr. 427 (Solera employee, Bill Cooper, reported to Garcia).) By Garcia's admission, at least one of the employees he managed, his niece, Christina Huguet, was doing "real work" helping to procure steel for the Hub, (see Tr. 531-32, 539-40), while the WTC decking, "fake or real," was in fact done by the JV, (see Tr. 556).

As to Garcia's daughter, Estefania, it is undisputed that Garcia hired her to work for Solera Construction during the time

period of the alleged conspiracy. Estefania, who Garcia
considered to be an assistant project manager on Tower 1,
attended dozens of meetings regarding Tower 1's podium glass at
Garcia's direction on behalf of the JV. (See Tr. 408-10.)
Estefania sent emails on her father's behalf, (see Tr. 495-96),
"got involved" with issues with steel procurement, (see Tr. at
532), and was "trained" by Garcia "to make a presence" at
meetings, among other things, by taking notes, (see Tr. at
541).[19] Though Estefania's name appeared on certified payrolls,
as was the case for Garcia himself, there was no testimony
suggesting that those certified payrolls did not correspond to
one of the many days in which Estefania was performing tasks
such as those mentioned above.

As for Gale D'Aloia, the Government also argued that she
performed no work. By paying her to do "nothing," (see Tr. 933-
34, 1005-06), the Government maintained that the Defendants
caused actual pecuniary harm to the Port Authority. (See Tr.
933-34, 1005-06.) D'Aloia's testimony followed a similar arc to
Garcia's testimony. On direct, in conclusory fashion, D'Aloia
admitted to "not actually doing work." (See Tr. 657.) Then, on

---

[19] In a moment that could only underscore the legitimacy of
Estefania's work, Garcia refused to testify that Estefania was
part of the alleged fraud, testifying instead that he did not
know whether his daughter was part of the scheme or not. (See
Tr. 542.)

cross-examination, D'Aloia testified--also without

contradiction--to doing plenty of work. D'Aloia testified that

she was the "real" manager and owner of GLS, a "real company",

(see Tr. 758-59), and subcontractor to DCM on the WTC Tower and

Hub. GLS performed a complex payroll management service for DCM

and related companies. (See Tr. 761, 769.) In addition, D'Aloia

hired and managed GLS's surveyors for the construction projects.

(See Tr. 751, 754-55, 768-71.) D'Aloia handled payroll for the

GLS surveyors and obtained the necessary insurance and approvals

in order for the surveyors to get on the WTC site. (See Tr. 769-

71.) She interfaced with the GPS system subcontractor, Leica,

and trained in how to use the novel technology. (See Tr. 711.)

Also, D'Aloia purchased two laptops for the surveying work and

applied to purchase surveying equipment. (See id.) [20]

    The Government's arguments as to D'Aloia are all over the

map. At closing, the Government argued both that D'Aloia did no

work, (see Tr. 1005), and that she did no surveying work, (see

---

[20] D'Aloia even testified that she did not think there was
anything illegal about the way she was running GLS. She
testified that she told the Government in a proffer session that
she had supervised the GLS surveyors but that the Government
eventually convinced her during that meeting that she did not do
enough to supervise the surveyors. (See Tr. 810.) Before that
meeting, she thought what she was doing "was perfectly fine."
(See id.) D'Aloia also testified that at her guilty plea
allocution, when asked whether she thought she was defrauding
the Port Authority, she said "[a]t the time I was doing it, I
didn't realize it." (See Tr. 811.)

Tr. 1002-1004)--while at the same time conceding that Defendants "made a big deal out of the point that you don't have to be a surveyor to run a surveying company" . . . . That's true, that is technically correct, you don't have to be a surveyor to be head of a surveying company", (see Tr. 1003). In post-trial briefing, however, the Government seems to argue only that D'Aloia did no work. (See Opp. at 37-38.) The Government simply argued that D'Aloia's supposed non-work resulted in economic harm to the Port Authority because it contributed to the WTC cost overruns (See id.) (Of course, as noted above, this alleged causal link was severed by Reiss's testimony.) The Government does not mention surveying work in its post-trial briefing. In contrast to its argument about Garcia, the Government does not argue that D'Aloia's name appeared on certified payrolls corresponding to direct payments from the Port Authority.[21] Thus, the Government's theory of economic harm is even more attenuated as to D'Aloia than it is as to Garcia.

No rational jury could have found that Garcia and D'Aloia did no work--a premise essential to the Government's actual harm theory. When considered with their undisputed and detailed

---

[21] In fact, at the Rule 29 colloquy during trial, the Government appeared to concede that Ms. D'Aloia's name never appeared on a certified payroll when it did not contest defense counsel's statement to the Court with respect to the certified payrolls that "[Ms. D'Aloia] is not listed and her fee is not listed." (See Tr. 937.)

testimony about the work they actually did, Garcia and D'Aloia's conclusory opinions about their work (see Tr. 286 (Garcia did "basically nothing"), Tr. 506-07; see also Tr. 657 (D'Aloia "not actually doing work,")), which in places were offered as legal conclusions,[22] (see Tr. 570 (Garcia: "the emails back and forth were apposite of the fraud we were committing"); Tr. 347 (Garcia describing a payment as a "fee to be part of this fraud"); see also Tr. 656 (D'Aloia: "I committed fraud")), were insufficient, even viewed in the light most favorable to the Government, to allow a rational jury to find that they in fact did no work on the WTC projects.  See Gore, 154 F.3d at 41 ("vague statement [by defendant] made contemporaneously with a single sale of heroin" was insufficient "to support the essential element of a conspiracy--the agreement"); Jackson v. Virginia, 443 U.S. 307, 319, 320 (1979) (explaining that essential issue is whether "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" and that a "mere modicum" of evidence is not sufficient to support a finding of guilt beyond a reasonable doubt); cf. United States

---

[22] See Cameron v. City of New York, 598 F.3d 50, 62 (2d Cir. 2010) ("[W]itnesses may not present testimony in the form of legal conclusions. . . . Such testimony undertakes to tell the jury what result to reach, and thus attempts to substitute the [witness's] judgment for the jury's.")(internal quotation marks and citations omitted)).

v. Rea, 958 F.2d 1206, 1215-16 (2d Cir. 1992) (quoting Fed. R.
Evid. 701, Advisory Committee Note on 1972 Proposed Rules)("[I]f
'attempts are made to introduce meaningless assertions [in the
form of lay opinion] which amount to little more than choosing
up sides, exclusion for lack of helpfulness is called for by
[Rule 701.]'")). Here, Garcia and D'Aloia's testimony goes
beyond the category of "conflicting" testimony, which, of
course, on a Rule 29 motion is for the jury to weigh. Taken
together with their detailed and undisputed testimony about the
work they performed, Garcia and D'Aloia's conclusions about
doing no work have no evidentiary value. Guadagna, 183 F.3d at
133 (acquittal required where "slim reed" of evidence about
timing of allegedly fraudulent sales call "require[d] too great
an inferential stretch" to establish intent to defraud).
Accordingly, no reasonable jury could have found that Garcia and
D'Aloia did no work whatsoever on the Hub and Tower 1.

This is fatal to the Government's actual harm theory. If
one concedes--as the Government appears to--that Garcia[23] (and
D'Aloia)[24] did some work related to Tower 1 and the Hub, the

[23] The Government appears to concede that Garcia at least did
some work when by adding the qualifier in post-trial briefing
that Garcia did no "construction-related" work (See Opp. at 31,
33, 39).
[24] As noted above (supra p. 58-59), the Government argued in
summations both that D'Aloia did no work and that she did no
surveying work, (see Tr. 1002:8-9), and in-post trial briefing
that she did no work.

fraudulent certified payrolls theory of actual harm evaporates.
There is nothing in the record to suggest that the few certified
payrolls on which Garcia's name appears, (see, e.g., GX-417D),
did not relate to one of the days when Garcia[25] was concededly on
site or doing some activity related to the project. Indeed,
Garcia offered no testimony about which days he worked or did
not work or otherwise about DCM's receiving money fraudulently
through certified payrolls. Accordingly, there is a complete
lack of evidence that those few certified payrolls that included
Garcia's name were in any way false. (See id.)

For the reasons discussed above, no reasonable jury could
have found Defendants guilty beyond reasonable doubt on a theory
of potential or actual economic harm.

                    c.   Much of the Government's evidence was
                          legally irrelevant

In large part, the evidence the Government offered at trial
had no probative value on the question of whether the Port
Authority received the full benefit of its bargain but instead

---

[25] Again, the Government never argued that D'Aloia's name
appeared on certified payrolls.

tended to prove facts tangential to the contracts.[26] For example, the Government spent a significant portion of its case attempting to prove that Solera/DCM and GLS were "pass-throughs,"[27] in the Port Authority's jargon, and that the Port Authority did not approve of the use of pass-throughs. (See Tr. 97-98.) Assuming, arguendo, that the Government did prove that Solera/DCM and GLS were pass-throughs, this fact is of no probative value because "pass-through" is not mentioned or defined in the contracts. The only language in the record binding on Defendants about what constitutes a MBE or WBE is:

---

[26] Counsel for the Government described the WTC contract[s] as only "one lie" among "several lies" to induce the Port Authority to contract with DCM and, for that reason, said, "[s]o I don't want us to get too hung up on the contract." (See Oral Argument Transcript ("OA Tr."), dated Apr. 26, 2017 [dkt. no. 109], at 20.) Because fraudulent intent under the Government's right to control theory can only be found where "the harm contemplated . . . affect[s] the very nature of the bargain itself," Novak, 443 F.3d at 159 (quoting Starr, 816 F.2d at 98), it is of no consequence that a defendant makes many subsidiary "lies" to induce a transaction unless those lies go to an essential element of the bargain. Here there is no evidence that they did.

[27] At trial, a Port Authority witness for the Government defined a pass through as a minority or women-owned firm that is "placed on a plan to do a particular body of work with their own workforce supervising the work, and they in fact, don't do that." (See Tr. 98.)

> "Minority-owned business" or "MBE" means a business entity
> which is at least fifty-one percent (51%) owned by one or
> more members of one or more minority groups. . . and whose
> management and daily business operations are controlled by
> one or more such individuals. . . .[28]

(See GX-1 at 6.)

The same can be said for other lines of the Government's proof such as testimony that Johnny Garcia did not personally lay the Tower and Hub decking (see Tr. 253), that Gale D'Aloia personally did no surveying, (see Tr. 711), that Garcia was not a daily or even frequent in-person supervisor of Solera/DCM's decking work, (see Tr. 597-98).[29] There was nothing in the contracts that required them to do so.

There was similarly irrelevant testimony that many of the union members who worked for Solera/DCM, (see Tr. 611), had longstanding ties with each other from a previous employer, AC

---

[28] Essentially identical language defines a WBE, (see GX-1 at 6), and very similar language is contained in DCM's contract for the Transportation Hub, (see GX-2C at 1). It is important to point out again that the Port Authority does not certify JVs as MWBEs. (See Tr. 79:4-7; see also supra pp. 6-7.) A separate process governs approval of projects where one of the joint venturers is an MWBE. (See Tr. 79:13-19; see also supra text accompanying note 3.) Therefore, the contract definition of MWBE here applies only to Solera and GLS, not the Solera/DCM JV.
[29] The Government's own witnesses--Garcia, Thomas Gavaghen, Keith Brown, and Michael Kossuth--unanimously confirmed, without contradiction, that in the normal course of business it is union members who perform and supervise the on-site labor for such tasks as laying metal decking and surveying; it is not construction company owners. (See Tr. 501-04 (Garcia); 631:19-632:1 (Brown); 613 (Gavaghen); 874-75 (Kossuth).)

Associates (see Tr. 587-88, 628), called AC's offices for more
tools, (see Tr. 596), and received shipments at the WTC site in
trucks with AC's signage on them, (see Tr. 615).[30] For GLS's
part, there was testimony that D'Aloia hired former DCM
employees onto her payroll to perform the surveying under her
subcontract with DCM. (See Tr. 711-12.) Whatever this evidence
is probative of, the relevant contracts do not address this
subject matter. There was nothing in the contracts that, for
example, prohibited hiring of union members who had worked
together on prior projects, even if they had worked for DCM.
Accordingly, this evidence is not relevant to the question of
whether Defendants' deceit went to an essential element of the
bargain or exposed the Port Authority to actual or potential

---

[30] Garcia testified on cross-examination that there was nothing
unusual about this kind of arrangement:

> Q. If there is a kind of leader, a supervisor, foreman, who
> goes to the other [contractor], he's got his favorite guys
> who usually work with him right?
> A. Correct.
> Q. So it is not unusual for those [union members] to go
> work for that other company, too, right?
> A. Right.
> Q. Isn't it true that basically what you have is union guys
> stay in groups and they might move from contractor to
> contractor depending on what's going on, depending on which
> buildings are getting built, isn't that right?
> A. That's correct.

(See Tr. 503-04)

economic harm or whether the Port Authority received the benefit
of the bargain.

The proof the Government offered to demonstrate that the
MWBE sections were essential elements of the WTC contracts or
that the Port Authority did not receive the benefit of its
bargain boiled down to testimony that the Port Authority would
not have entered into the contracts or approved Solera/DCM to
work on the WTC site if it knew that Defendants did not intend
to comply with the MWBE program.  (See Gov't Supp. Br. at 3
("The evidence at trial established that the Port Authority
would not have awarded the defendants the opportunity to work on
the World Trade Center projects had the Port Authority known
that the defendants had no intention of complying with the M/WBE
requirements."); Tr. 73-75, 148-49.) This "no-sale" theory of
harm, cf. Shellef, 507 F.3d at 109, has been the Government's
chief argument as to why Defendants' alleged misrepresentations
went beyond mere deceit and amounted to wire fraud.

The cases, however, could not be clearer: it is not enough
for the Government to show that but for the misrepresentation,
the transaction would not have occurred. See Novak, 443 F.3d at
159 ("Although the Government insists that the contractors would
not have paid for the no-show hours had they been aware that
Novak would receive a portion of the money, that hypothetical

67

contention is inadequate to support a finding of fraudulent intent."); see also Shellef, 507 F.3d at 108 (explaining that "schemes that do no more than cause their victims to enter into transactions they would otherwise avoid" do not violate the wire fraud statute); Binday, 804 F.3d at 570 (same language). Where proof of a misrepresentation affecting an essential element of a bargain is lacking, the Government cannot, without more, bootstrap such proof by showing that an alleged deceit was a "but-for" cause of a transaction.

B. Rule 29(d) Conditional Determination of New Trial (Rule 33)

In addition to their motion for acquittal under Federal Rule of Criminal Procedure 29(a), Defendants here move for new trial under Federal Rule of Criminal Procedure 33. Rule 29(d) requires that, upon granting a motion for acquittal, a district court must make a conditional determination on a Defendant's motion for new trial under Rule 33. Fed. R. Crim. P. 29(d).

Federal Rule of Criminal Procedure 33 allows a court to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Rule 33 gives the trial court "broad discretion . . . to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." United States v. Ferguson, 246 F.3d 129, 133 (2d Cir.

2001) (internal citation and quotation marks omitted). "The ultimate test" when considering a Rule 33 motion "is whether letting a guilty verdict stand would be a manifest injustice . . . . There must be a real concern that an innocent person may have been convicted." United States v. Persico, 645 F.3d 85, 109 (2d Cir. 2011). As the Court of Appeals explains:

> [m]anifest injustice cannot be found simply on the basis of the trial judge's determination that certain testimony is untruthful, unless the judge is prepared to answer "no" to the following question: "Am I satisfied that competent, satisfactory and sufficient evidence in this record supports the jury's finding that this defendant is guilty beyond a reasonable doubt?"

United States v. Sanchez, 969 F.2d 1409, 1414 (2d Cir. 1992).

While a district court "has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29 . . . it nonetheless must exercise the Rule 33 authority sparingly and in the most extraordinary circumstances." Ferguson, 246 F.3d at 134 (internal citation and quotations omitted). "When considering a motion for a new trial under Rule 33, a district court has discretion to "'weigh the evidence and in so doing evaluate for itself the credibility of the witnesses.'" United States v. Truman, 688 F.3d 129 (quoting Sanchez, 967 F.2d at 1413). Even in cases involving a witness's perjured testimony, however, a new trial is warranted only if "the jury probably would have acquitted in the absence of the

false testimony." Id. at 1413–14. "The district court must
strike a balance between weighing the evidence and credibility
of witnesses and not wholly usurp[ing] the role of the jury."
Ferguson, 246 F.3d at 133 (internal citation and quotations
omitted). More specifically,

> [b]ecause the courts generally must defer to the jury's
> resolution of conflicting evidence and assessment of
> witness credibility, "[i]t is only where exceptional
> circumstances can be demonstrated that the trial judge may
> intrude upon the jury function of credibility assessment."
> Sanchez, 969 F.2d at 1414. An example of exceptional
> circumstances is where testimony is patently incredible or
> defies physical realities, although the district court's
> rejection of trial testimony by itself does not
> automatically permit Rule 33 relief."

Ferguson, 246 F.3d at 133-34.

The interests of justice here require the conditional grant
of a new trial.  The Court notes Judge Kahn's recognition in
United States v. Robinson, No. 1-CR-131 (LEK), 2003 WL 21095584
at *5 (N.D.N.Y. May 14, 2003), aff'd, 430 F.3d 537 (2d Cir.
2005):

> "While the jury's determinations are properly accorded
> great respect, in rare occasions the Court must
> exercise its discretion and set aside a verdict when
> the prosecution has clearly failed to meet its burden
> of proving guilt beyond a reasonable doubt. The Court
> recognizes that the grant of a new trial is
> extraordinary."

As Judge Kahn did in Robinson, the Court notes here that it has
presided over more than a few criminal trials in almost twenty-

five years on the Mother Court.  To the Court's recollection
this is the only case in which it has granted a new trial.

The Court is aware that its authority to grant a new trial
under Rule 33 must be exercised "sparingly." See Ferguson, 246
F.3d at 134, quoted in Robinson, 2003 WL 21095584 at *2. After
weighing the evidence and evaluating the credibility of
witnesses for itself, see Truman, 688 F.3d at 141, the Court has
great concern that "innocent person(s) may have been convicted,"
Persico, 645 F.3d at 109. The Court has this concern for the
same reasons described at length in the Rule 29(a) sufficiency
analysis above, namely that the evidence was insufficient for a
rational jury to find beyond a reasonable doubt that Defendants
intended to defraud the Port Authority. The evidence
demonstrated beyond peradventure that the Defendants'
misrepresentations did not go to an essential element of the
bargain and did not subject the Port Authority to actual or
potential economic harm. The Court is thus not satisfied that
"competent, satisfactory and sufficient evidence in this record
support[ed] the jury's finding that [these] defendants [are]
guilty beyond a reasonable doubt." See Sanchez, 969 F.2d at
1404. For these reasons, letting a guilty verdict stand here
would be a "manifest injustice." Id.

71

Though there is a great overlap here between considerations counseling acquittal under Rule 29 and new trial under Rule 33, the two analyses are not co-extensive. Rule 33 affords broader discretion to grant a new trial than Rule 29 does to enter a judgment of acquittal. See Ferguson, 246 F.3d at 134. When considering a Rule 33 motion, though the Court cannot totally usurp the role of the jury, see id. at 133, the Court can make a credibility assessment of witnesses "where exceptional circumstances can be demonstrated." See Sanchez, 969 F.2d at 1414.

In considering Garcia and D'Aloia's testimony in the Rule 29(a) discussion above, the Court could not make a credibility determination but instead found that the evidence was too meager for a reasonable jury to have found beyond a reasonable doubt that Garcia and D'Aloia performed no work. Now, on the Rule 33 analysis, the Court considers the credibility of their testimony and its probable effect on the verdict.

Considering their testimony in its entirety, when Garcia and D'Aloia offered the conclusory assertions that Garcia did "basically nothing", (see Tr. 286, 507), or that D'Aloia was "not actually doing work" (see Tr. 659; Tr. 657), and other similar statements, they offered "patently incredible"

testimony. <u>Ferguson</u>, 246 F.3d at 134.[31] Had D'Aloia and Garcia
been truthful throughout their testimony, that is, by leaving
out these absurd characterizations of their work, the jury would
have been left with undisputed accounts of countless tasks these
business owners actually performed in relation to the WTC
projects. In such a situation, the Government's theories of
economic harm with respect to both the cost overruns and the
certified payrolls would have collapsed completely, relying as
they did upon the premise that Garcia and D'Aloia were being
paid to do "nothing."

---

[31] In finding Garcia and D'Aloia's testimony about doing nothing
incredible, the Court also relies on their attitude and
demeanor.  Garcia's conclusory statements that he did "basically
nothing," (<u>see</u> Tr. 286), that the money he received in
connection with the WTC projects "basically was my fee to be
part of this scheme," (<u>see</u> Tr. 287), or that he had no role in
the construction of the Hub, (<u>see</u> Tr. 287-88), were delivered on
direct in a memorized, mechanical fashion--no doubt a result of
his cooperation agreement.  Those statements were in stark
contrast to Garcia's recitation of the scores of actual tasks
which he performed in support of the construction projects--
which was credible and detailed. D'Aloia's testimony was even
more dramatic where she acknowledged that until she met with the
Government at a proffer session, she believed she had done
nothing wrong whatsoever, (<u>see</u> Tr. 810). Her confession that
essentially the Government had talked her into believing she had
committed a crime was quite stunning, to the point that the
Court is concerned that despite her plea, D'Aloia might not have
had the requisite criminal intent.

(See Tr. 1005.)[32] Therefore, in absence of this incredible testimony, "the jury probably would have acquitted" Defendants. Truman, 688 F.3d at 141 (quoting Sanchez, 969 F.2d at 1413-14).

Extraordinary circumstances warranting a new trial are presented by Garcia and D'Aloia's patently incredible testimony, making the "soundness of the verdict doubtful." United States v. Autuori, 212 F. 3d 105, 121 (2d Cir. 2000). After taking into account all of the facts and circumstances of the case, the Court has a real concern that innocent parties may have been convicted. Consequently, a new trial is conditionally ordered to avoid a miscarriage of justice.

---

[32] The Government at closing argued:

> Ask yourselves, why did [DCM] run out of money [to complete the job at the original contract prices]? It's obvious why they ran out of money. It's obvious that one reason they ran out of money is because they were spending money for people to do nothing. Garcia testified he made over $2 million in this scheme. D'Aloia made hundreds of thousands of dollars in this scheme. . . .

> Obviously, if the Port Authority is paying money to people like Johnny Garcia to do nothing and that money is not being spent toward actually building the project, you are going to run out of money. Why does this matter? It matters because it cost the Port Authority money. Obviously it's going to cost them money to pay people to do nothing. Garcia told you, when we talked about it early, he was actually on the payroll.

(See Tr. at 1005.)

C. Sufficiency of the Indictment, Constructive Amendment and Variance

In addition to the Rule 29 and 33 motions, Defendants move to dismiss the indictment on the grounds of insufficiency for failing to allege an essential element of wire fraud, i.e., intent to harm. Defendants also seek reversal of their convictions arguing that the Government, through the evidence adduced at trial and the jury instructions, constructively amended the indictment and/or committed a prejudicial variance of the indictment.

### 1. Sufficiency of the Indictment

Defendants first challenge the sufficiency of the indictment.[33] There are two constitutional requirements for an indictment: that it 1) contain "the elements of the offense charged," and 2) enable a defendant to plead an acquittal or conviction in bar of future prosecutions for the same offense.

---

[33] The scrutiny given an indictment depends on the timing of the defendant's objection. United States v. Wydermyer, 51 F.3d 319, 324 (2d Cir. 1995). When a defendant does not challenge the sufficiency of the indictment until after trial, courts interpret the indictment liberally in favor of sufficiency. Id. Here, Defendants first challenged the sufficiency of the indictment at the close of the Government's case in their motion for acquittal. (See Defs.' Ltr., dated Aug. 8, 2016 [dkt. no. 67], at 5.) Because the trial was nearly complete when Defendants first challenged the sufficiency of the indictment, the Court gives the indictment a liberal interpretation. See Pirro, 212 F.3d at 92.

United States v. Resendiz-Ponce, 549 U.S. 102, 108 (2007); see also Pirro, 212 F.3d at 91 ("A criminal defendant is entitled to an indictment that states the essential elements of the charge against him."). An indictment that fails to allege the essential elements of the crime charged offends both the Fifth and Sixth Amendments. See Pirro, 212 F.3d at 92. The Court of Appeals has repeatedly held that "[t]o satisfy the pleading requirements of Fed. R. Crim. P. 7(c)(1), an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." United States v. LaSpina, 299 F.3d 165, 177 (2d Cir. 2002)(internal quotations omitted); see also Pirro, 212 F.3d at 92. Finally, "the Fifth Amendment requires that an indictment contain some amount of factual particularity to ensure that the prosecution will not fill in elements of its case with facts other than those considered by the grand jury." Pirro, 212 F.3d at 92 (citations omitted).

The wire fraud statute, in relevant part reads:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1343.

The indictment here, in relevant part, reads:

> From in or about 2008 through in or about September 2012,
> in the Southern District of New York and elsewhere, [the
> Defendants] willfully and knowingly, having devised and
> intending to devise a scheme and artifice to defraud, and
> for obtaining money and property by means of false and
> fraudulent pretenses, representations, and promises, did
> transmit and cause to be transmitted by means of wire. . .
> writings, signs, signals, pictures, and sounds for the
> purpose of executing such a scheme and artifice, to wit,
> Davis and DCM engaged in a scheme to commit M/WBE fraud in
> connection with the World Trade Center Project and in
> furtherance of such scheme facsimiles and wire transfers
> were caused to be sent, including, but not limited to,
> fraudulent invoices, e-mails related to fraudulent
> invoices, and payments of money.

(See Indictment ¶ 16.)

The indictment's language here clearly tracks the language
of the statute. The indictment alleges the essential elements of
wire fraud, that is, (1) a scheme to defraud, (2) money or
property as the object of the scheme, and (3) use of . . . the
wires to further the scheme, as they are typically rendered.
See, e.g., Binday, 804 F.3d at 569. Although to prove wire fraud
at trial, the Government must prove the defendants intended or
contemplated harm to the alleged victims, there is some
authority for the proposition that this scienter requirement
need not be "explicitly alleged" in the charging document. See
United States v. Gelzer, 50 F.3d 1133, 1138 (2d Cir.
1995)(finding indictment was sufficiently pled where indictment

tracked 18 U.S.C. 924(c)(1) (use of firearm during crime of violence) although statutory language did not explicitly mention the knowledge of the firearm required for conviction); cf. Shellef, 507 F.3d at 109 (explaining that indictment charging wire fraud on a right to control theory must assert that deceit had "relevance to the object of the contract" or similar language). In light of the Court's holdings with respect to constructive amendment and prejudicial variance, however, this question need not be decided.

The indictment also states the approximate time and place of the alleged scheme and provides some level of factual detail sufficient to put Defendants on notice of the nature of the charges mentioned. In this indictment, the Government alleged that DCM "fraudulently claimed MBE credit for One WTC and WTC Hub in excess of $70 million based on the value of the work Solera/DCM purportedly performed." (See Indictment ¶ 12.) Providing more detail, the indictment explains, among other things, that DCM placed workers who were not Solera/DCM's employees "on Solera/DCM's payroll to make it appear as if Solera/DCM was performing the metal decking work when it was not doing so." (See id. ¶ 12a.) On the WBE side of the alleged fraud, the Indictment stated that DCM "fraudulently claimed" $6.3 million in WBE credit and represented to the Port Authority

that GLS performed surveying work that, in fact, DCM performed. (See id. ¶¶15, 15a.)[34]

Here, under a liberal interpretation favoring sufficiency, because the indictment closely tracks the language of the statute and provides factual detail and a timeframe for the alleged fraud, Defendants were "sufficiently apprised of the charges to allow for a preparation of a defense." See Gelzer, 50 F.3d at 1138; see also United States v. Frias, 521 F.3d 229, 235-36 (2d Cir. 2008). Thus, the motion to dismiss the indictment on the grounds of insufficiency is denied.

### 2. Constructive Amendment/Prejudicial Variance

The Defendants argue, in the alternative, that even if the indictment sufficiently alleged the crimes charged, the Government's evidence and argument at trial proved facts materially different from those alleged in the indictment to Defendants' prejudice and thus operated as a prejudicial variance. Because the changes were reflected in the jury instructions, Defendants also argue that the indictment was constructively amended.

---

[34] Without the benefit of the trial testimony that demonstrated beyond peradventure that WMBE credits do not have any pecuniary quality, a liberal interpretation of the indictment favoring sufficiency would find it sufficient, even if scienter must be explicitly alleged.

The theory of "constructive amendment" is based on the fundamental principle that "after an indictment has been returned its charges may not be broadened through amendment except by the grand jury itself." Stirone v. United States, 361 U.S. 212, 215-16 (1960).  "To prevail on a constructive amendment claim, a defendant must demonstrate that either the proof at trial or the trial court's jury instructions so altered an essential element of the charge that, upon review, it is uncertain whether the defendant was convicted of conduct that was the subject of the grand jury's indictment." United States v. Salmonese, 352 F.3d 332, 337 (2d Cir. 1998); see also United States v. LaSpina, 299 F.3d 165, 181 (2d Cir. 2002).  Although the Court must permit "significant flexibility in proof," the defendant must be provided with "notice of the core criminality to be proven at trial." United States v. LaSpina, 299 F.3d at 181 (quoting United States v. Delano, 55 F.3d 720, 729 (2d Cir. 1995)).  A constructive amendment is a per se violation of the Fifth Amendment, LaSpina, 299 F.3d at 181, and constructive amendments have been found when the government alleges one theory of the case in the indictment but argues another at trial. See, e.g. Stirone v. United States, 361 U.S. at 217 (proof of interference with interstate shipment of steel from Pennsylvania to Michigan and Kentucky was constructive amendment of indictment that alleged interference with shipment of sand

into Pennsylvania); United States v. Salinas, 654 F.2d 953 (5th
Cir. 1981) (indictment alleging aiding and abetting theft by
named bank official was constructively amended by proof showing
that defendant aided and abetted another official), overruled on
other grounds by United States v. Adamson, 700 F.2d 953 (5th
Cir. 1983).

The theory of "variance" is related to constructive
amendment and "occurs when the charging terms of the indictment
are left unaltered, but the evidence offered at trial proves
facts materially different from those alleged in the
indictment." United States v. Salmonese, 353 F.3d at 621
(quoting United States v. Frank, 156 F.3d at 337 n.5).  Unlike
constructive amendment, a variance 'does not broaden the
possible basis for conviction beyond that contained in the
indictment.'" LaSpina, 299 F.3d at 183 (quoting United States v.
Patino, 962 F.2d 263, 266 (2d Cir. 1992).  "Accordingly, a
defendant must show that the variance resulted in 'substantial
prejudice' in order to obtain relief from his conviction." Id.
(quoting United States v. McDermott, 245 F.3d 133, 139 (2d Cir.
2001)).  "To decide whether a variance is prejudicial, the court
must decide 'whether the variance infringes on the 'substantial
rights' that indictments exist to protect--'to inform an accused
of the charges against him so he may prepare his defense and to

avoid double jeopardy.'" United States v. Ortiz, 666 F. Supp. 2d
399, 403-04 (S.D.N.Y. 2009). Here, whether it is viewed as a
constructive amendment or as a prejudicial variance, the
Government's ever-shifting theory on a crucial element of the
case--the intent to defraud--requires that the convictions be
vacated.

In considering the issue of constructive amendment, the
Court is mindful that it is a fairly narrow doctrine in this
Circuit.[35] See United States v. Lee, 833 F.3d 56, 70 (2d Cir.
2016) (explaining that "this court has proceeded cautiously in
identifying [constructive amendment]") Indeed, the Court is
aware of only six cases since 1988 in which the Court of Appeals
has found constructive amendments. See United States v. Mollica,
849 F.2d 723, 730 (2d Cir. 1988); United States v. Zingaro, 858
F.2d 94, 99 (2d Cir. 1988); United States v. Milstein, 401 F.3d
53, 65 (2005); United States v. Wozniak, 126 F.3d 105, 111 (2d
Cir. 1997); United States v. Dhinsa, 243 F.3d 635 (2d Cir.
2001); United States v. Hassan, 578 F.3d 108 (2d Cir. 2008).
Over the past five years the Court of Appeals has cited United
States v. D'Amelio, 683 F.3d 412 (2d Cir. 2012)--a leading 2012

---

[35] In addition to its "cautious" approach to constructive
amendment, the Court of Appeals has also acknowledged that its
"constructive amendment jurisprudence has resulted in what we
recently characterized as apparently 'divergent results.'"
United States v. Rigas, 490 F.3d 208, 228 (2d Cir. 2007)(quoting
United States v. Milstein, 401 F.3d 53, 65 (2d Cir.2005)).

constructive amendment case--a total of nineteen times. See,
e.g., United States v. Bastian, 770 F.3d 212, 220 (2d Cir.
2014). The Court of Appeals did not find a constructive
amendment in a single one of those nineteen cases. Even after
taking this background into account, however, the Court
concludes that a constructive amendment occurred here.

To establish constructive amendment of an indictment in
violation of the Fifth Amendment, "a defendant must show that
the trial evidence or jury instructions 'so altered an essential
element of the charge that, upon review, it is uncertain whether
the defendant was convicted of conduct that was the subject of
the grand jury's indictment." Bastian, 770 F. 3d at 220 (quoting
Rigas, 490 F.3d at 227). "A constructive amendment occurs where
the actions of the court 'broaden the possible bases for
conviction from that which appeared in the indictment.'" Id.
(quoting United States v. Banki, 685 F.3d 99, 118 (2d Cir.
2011)). The Court of Appeals elaborated upon the standard as
follows:

> Even if an indictment might have been drawn in more general
> terms to encompass the ultimate conviction, where "only one
> particular kind of [criminal conduct] is charged. . . a
> conviction must rest on that charge and not another."
> United States v. Zingaro, 858 F.2d 94, 99 (2d Cir. 1988)
> (internal quotation marks omitted). . . .
>
> Not every divergence from the terms of an indictment,
> however, qualifies as a constructive amendment. We have
> "consistently permitted significant flexibility in proof"

adduced at trial to support a defendant's conviction, "provided that the defendant was given notice of the core of criminality to be proven" against him. United States v. D'Amelio, 683 F.3d 412, 417 (2d Cir. 2012) (emphases in original) (internal quotation marks omitted); see also United States v. Agrawal, 726 F.3d 235, 259–60 (2d Cir. 2013). So long as the indictment identifies the "essence of [the] crime" against which the defendant must defend himself, discrepancies in "the particulars of how a defendant effected the crime" do not constructively amend the indictment. D'Amelio, 683 F.3d at 418. Ultimately, whether an indictment has been constructively amended comes down to whether "the deviation between the facts alleged in the indictment and the proof [underlying the conviction] undercuts the[ ] constitutional requirements" of the Grand Jury Clause: allowing a defendant to prepare his defense and to avoid double jeopardy. Rigas, 490 F.3d at 228.

Bastian, 770 F.3d at 220 (emphases in original).

The leading (and only) Supreme Court case where a constructive amendment was found is United States v. Stirone, 361 U.S. 212 (1960). There, the indictment alleged that a victim had a contract to supply concrete from a plant in Pennsylvania to be used to build a steel-processing factory in Pennsylvania and that, in order to perform the contract, he "caused supplies and materials (sand) to move in interstate commerce. . . from outside the State of Pennsylvania into the State of Pennsylvania." See id. at 213-14. The indictment also alleged that Stirone, a union member, unlawfully delayed that commerce by preventing the movement "of aforesaid material and supplies" in violation of the Hobbs Act. See id. at 213-14; see also 18 U.S.C. § 1951 (2012).

84

Then, at trial, the Government introduced evidence not only
of the defendant's interference with the shipments of sand but
also of his "interference with steel shipments from the steel
plant in Pennsylvania into Michigan and Kentucky." The court
instructed the jury that it could find guilt either on "a
finding that (1) sand used to make the concrete had been shipped
from another state into Pennsylvania or (2) [defendant's]
concrete was used for constructing a mill which would
manufacture articles of steel to be shipped in interstate
commerce. . . ." Stirone, 361 U.S. at 271-72 (internal quotation
marks omitted). The Supreme Court reversed the conviction
explaining:

> The indictment here cannot fairly be read as charging
> interference with movements of steel from Pennsylvania to
> other States nor does the Court of Appeals appear to have
> so read it. The grand jury which found this indictment was
> satisfied to charge that Stirone's conduct interfered with
> interstate importation of sand. But neither this nor any
> other court can know that the grand jury would have been
> willing to charge that Stirone's conduct would interfere
> with interstate exportation of steel from a mill later to
> be built with Rider's concrete. And it cannot be said with
> certainty that with a new basis for conviction added,
> Stirone was convicted solely on the charge made in the
> indictment the grand jury returned.

Stirone, 361 U.S. at 217.

The Court of Appeals has explained that the line between a
constructive amendment and a non-prejudicial variance "lies in
whether the jury convicted based 'on a complex of facts
distinctly different from that which the grand jury set forth in

the indictment,' Jackson v. United States, 359 F.2d 260, 263
(D.C. Cir. 1966) (describing Stirone), or whether the indictment
charged a single set of discrete facts from which the
government's proof was at most a non-prejudicial variance,"
United States v. D'Amelio, 683 F.3d at 419 (citing United States
v. Knuckles, 581 F.2d 305, 312 (2d Cir. 1978)). The key element
that the Court of Appeals uses to analyze whether a constructive
amendment has occurred is the "core of criminality." D'Amelio,
683 F.3d at 412. The Court of Appeals instructs that each
indictment alleges "a core of criminality." D'Amelio, 683 F.3d
at 412. If that core of criminality remains the same in the
indictment as it was at the end of trial, then no constructive
amendment occurs. D'Amelio, 683 F.3d at 417.  If, on the other
hand, the core of criminality alleged in the indictment differs
from the core of criminality alleged by the end of trial, then a
constructive amendment has occurred. Id.

The Court of Appeals has said, "[i]n determining whether
this case involves proof at trial of a distinctly different
complex set of uncharged facts, which under Stirone would
require reversal of the conviction, or a single set of discrete
facts consistent with the charge in the indictment, we are
guided by a comparison between two of our cases: United States
v. Knuckles, 581 F.2d 305 (2d Cir. 1978), and United States v.

Wozniak*, 126 F.3d 105 (2d Cir. 1997)." See D'Amelio, 683 F.3d at 419.

In Knuckles, defendants were charged with the distribution of heroin. At trial, the proof showed that the drug in question was cocaine, not heroin. The "operative facts" were the same whether the substance was cocaine or heroin: the time, place, people, and object proved at trial were all the same. For this reason, the court found that defendants had notice, could defend against the charge, and would be protected from double jeopardy, and thus the convictions were affirmed. Knuckles, 581 F.2d at 312.

Wozniak was charged with conspiracy to possess with intent to distribute cocaine and methamphetamines in an indictment charging eight members of a drug ring. The evidence at trial showed only [the defendant's] use of cocaine and marijuana and his possession with intent to distribute marijuana but not possession with intent to distribute cocaine and methamphetamines as charged in the indictment. D'Amelio, 683 F.3d at 420. The jury instruction provided that it did not matter that "'a specific count of the indictment charges that a specific controlled substance was involved in that count, and the evidence indicates that, in fact, a different controlled substance was involved,' and that as 'long as the jury found

that some controlled substance was involved, that fact would be sufficient to convict.'"  Id. (quoting Wozniak, 126 F.3d at 108-09). The Court of Appeals also observed that, in addition to the cocaine and methamphetamine conspiracy in which Wozniak was charged, a separate indictment charging a marijuana conspiracy was returned in which Wozniak was not charged. On these facts, the Court of Appeals found a constructive amendment because there was not a "single set of operative facts that would alert Wozniak that at trial he would face marijuana evidence as well as whatever cocaine evidence the government possessed. . . ." Wozniak, 126 F.3d at 111.

Here, the indictment here makes the following allegations:

> Davis and DCM engaged in a scheme to commit M/WBE fraud in connection with the World Trade Center Project and in furtherance of such scheme facsimiles and wire transfers were caused to be sent, including, but not limited to, fraudulent invoices, e-mails related to fraudulent invoices, and payments of money.

(See Indictment ¶ 16.)

> From in or about 2007 through in or about June 2012, DCM, the defendant, fraudulently claimed MBE credit for One WTC and the WTC Hub in excess of $70 million based on the value of work Solera/DCM purportedly performed. . . .

(See Indictment ¶ 12.)

> Beginning in or about 2007 through in or about September 2012, DCM, the defendant, fraudulently claimed WBE credit for $6.3 million of surveying and payroll management work GLS purportedly was performing. . . .

(See Indictment ¶ 15.) Because these allegations quoted above were sufficiently stated in the indictment, evidence or argument advanced regarding them at trial did not work a constructive amendment.

In opening statements, however, the Government added a new theory of economic harm: because Davis and DCM were paying "kickbacks to [Garcia and D'Aloia] who were not doing any actual work," Davis and DCM couldn't finish [the WTC] projects for the agreed-upon price" and "the Port ended up paying Davis and DCM hundreds [of] millions of dollars more than the original contract price to get the Freedom Tower and the hub done." (See Tr. 46:21-47:2.)

After Mr. Reiss's testimony failed to link the cost overruns to Defendants' misrepresentations, the Government's theory of harm shifted yet again. During the Rule 29 colloquy at the close of its case, the Government introduced the argument that that actual harm to the Port Authority was caused when Johnny Garcia was "at some point listed" on a few certified payrolls. (See Tr. 937:9-12.) At closing, the Government pressed both of these theories again. (See Tr. 1004:25-1005:10; Tr. 1006:9-11.)

Thereafter, at the Government's request, the Court instructed the jury that it could find liability based on a right to control theory:

> It is not necessary that a defendant intend that his misrepresentation actually inflict a financial loss – it suffices that a defendant intend that his misrepresentation induce a counterparty to enter a transaction without the relevant facts to make an informed economic decision on a matter that could expose the victim to economic harm.

(See Tr. 1136-37.)

Finally, in post-trial briefing, the Government reverted to the "no-sale" theory to argue that the MWBE clauses were an essential element of the bargain. (See Gov't Supp. Br. at 3) ("[t]he Port Authority would not enter a contract with a company that did not agree to meet the Port Authority's goals regarding M/WBE participation.").) It also argued potential economic harm: "the misrepresentations about who was actually doing the work plainly exposed the Port Authority to undisclosed economic risk." (See Opp. at 37.)

Given the combination of the trial evidence, argument, and the Court's instruction, the Court concludes "that the trial evidence or jury instructions so altered an essential element of the charge that, upon review, it is uncertain whether the defendant was convicted of conduct that was the subject of the grand jury's indictment." Bastian, 770 F.3d at 220. Such a broaden[ing] of the possible bases for conviction from that

which appeared in the indictment," id., constitutes a constructive amendment.

In this case, it is beyond cavil that, by the end of evidence, argument, and the jury charge, the Government alleged the following two factual "complexes" or theories: 1) by depriving the Port Authority of relevant facts to make an informed economic decision with respect to the WTC projects, Defendants induced the Port Authority to enter into a transaction it would have otherwise avoided and thereby denied it the benefit of the bargain, (see Opp. at 36 (citing Tr. 148-49), 37); and 2) that payments to Garcia and D'Aloia caused actual economic harm to the Port Authority by increasing the cost of the overall project and/or payments made to DCM based on Garcia's appearance on the certified payrolls caused actual economic harm. (see Opp. at 38-39.)

Turning to the right to control theory first, either the right to control theory was contained in the core of criminality of the indictment or it was not. If the right to control theory was within the core criminality charged in the indictment, then the indictment is insufficient because Shellef teaches that when a right to control theory involving a contract is alleged in an indictment there must also be an allegation that the misrepresentation had "relevance to the object of the contract"

or an equivalent allegation, that there was a "discrepancy
between benefits reasonably anticipated and actual benefits
received," or that the misrepresentation went to "the nature of
the bargain." Shellef, 507 F.3d at 108 (internal quotations
omitted); see also United States v. Binday, 908 F. Supp.2d 485,
491 (S.D.N.Y. 2012)("Given the 'Shellef' language in the present
indictment, there is no danger that a jury might improperly
convict the defendants based on a misrepresentation[] that had
no relevance to the object of the contracts in question."),
aff'd, 804 F.3d 558 (2d Cir. 2015). This indictment contained
none of this language or anything approximating it.

If, however, the right to control theory was not part of
the core of criminality contained in the indictment, then
offering evidence, argument, and an instruction based on such a
theory constitutes an impermissible constructive amendment.[36]
Here, the indictment did not contain within its core of
criminality the Government's right to control theory of harm.
There is no allegation in the indictment that comes close to the
right to control theory contained in the jury instruction, (see

---

[36] See United States v. Salmonese, 352 F.3d 608, 620 (2d Cir.
2003) ("There is no constructive amendment where a generally
framed indictment encompasses the specific legal theory or
evidence used at trial.") (internal quotation marks omitted)).
It follows from this statement, as a contrapositive, that there
is constructive amendment where a generally framed indictment
does not encompass the specific legal theory or evidence used at
trial.

supra p. 90), which reads "it suffices [for a finding of fraudulent intent] that a defendant intend that his misrepresentation induce a counterparty to enter a transaction without the relevant facts to make an informed economic decision on matter that could expose the victim to economic harm," (see Tr. 1136-37.) Also, the indictment never specifies, as would be required for an indictment relying on a right to control theory, that the MWBE aspect of the contract was an essential element of the contract (or similar language). See Shellef, 507 F.3d at 108; see also Binday, 908 F. Supp.2d at 491. Without that language, a sufficiently pled right to control theory was not contained in the indictment. Accordingly, the evidence and jury charge pursuant to a right to control theory worked a constructive amendment.

Similar logic applies to the Government's theories of actual harm. The core of criminality alleged by the Government by the end of trial included both the cost overrun theory and the certified payroll theory of actual harm. However, no allegation in the indictment encompasses these factual complexes

or would have put the Defendants fairly on notice.[37] Therefore, by the end of trial, the Government alleged a different core of criminality from that of the indictment with respect to its theories of actual harm.

Considering the Knuckles/Wozniak line established by the Court of Appeals, this case is on the Wozniak side. The delta between these two complexes of fact transcends "flexibility in proof" or "the particulars of how a defendant effected the crime" and instead amounted to a changed essence of the crime. Bastian, 770 F.3d at 220. By way of contrast, many of the cases where no constructive amendment was found involved changes between indictment and proof that are markedly more minor than those in this case. In Knuckles, the type of drug was the only allegation that changed (heroin to cocaine) between indictment and trial, but all the particulars about time, place, and persons remained the same. See Knuckles at 309. In Knuckles and similar cases, other details remained the same. See id.; see Bastian 770 F.3d at 223 (.32 caliber revolver in §924(c)(1) plea

---

[37] The closest the indictment gets to the actual harm allegations is the mention of "fraudulent invoices" and "payments of money" in the "to wit" section of the indictment. (See Indictment ¶ 16.) These allegations would not have put Defendants on notice of the theory of actual harm concerning Garcia certified payrolls, much less any theory relating to the cost overruns, because invoices and certified payrolls are two distinct kinds of documents, a fact the Government seemed to acknowledge. (See Tr. 937:9-12)

agreement when indictment identified a shotgun); D'Amelio, 680
F.3d at 422 (computer and internet alleged as means of
committing enticement of a minor in indictment changed to
computer and telephone at trial); United States v. Danielson,
199 F.3d 666 (2d Cir. 1999)(indictment under 18 U.S.C. §922(g)
charging possession of "rounds" while instructions said
"shells"); United States v. Dupre, 462 F.3d 131, 142 (2d Cir.
2006)(wire fraud conviction affirmed where "to wit" clause of
indictment charged a single wire transfer and evidence disclosed
an additional one). These changes are de minimis when compared
to the changes in this case.

This case is analogous to Stirone and Wozniak, where
indictments, trial proof, and jury instructions implicated
different courses of conduct. See Stirone, 361 U.S. at 214
(Hobbs Act indictment mentioned only interference with sand
shipments into Pennsylvania, but jury instruction allowed guilt
to rest on interference with steel shipments from Pennsylvania
Michigan and Kentucky); Wozniak, 126 F.3d at 111 ("The count [in
the indictment] stated no single set of operative facts that
would alert Wozniak that at trial he would face marijuana
evidence as well as whatever cocaine evidence the government
possessed."). Just as in Stirone and Wozniak, the change in the
evidence and the charge from indictment to trial worked a
prejudicial surprise on these Defendants. See D'Amelio 680 F.3d

at 421 ("As was the case in Wozniak, in Stirone, the defendant
well may have been surprised by the introduction of different
and unrelated proof adduced at trial." (internal quotation marks
and citations omitted)); see also Wozniak, 126 F.3d at 111 ("The
general rule that allegations and proof must correspond is based
upon the obvious requirements (1) that the accused shall be
definitely informed as to the charges against him, so that he
may be enabled to present his defense and not be taken by
surprise by the evidence offered at trial; and (2) that he may
be protected against another prosecution for the same offense."
(internal citations omitted)).  Because a constructive amendment
constitutes a per se violation of the Fifth Amendment, LaSpina,
299 F.3d at 181, the convictions must be vacated.

Turning to the question of prejudicial variance, because
the indictment did not contain the right to control theory that
was argued at trial and included in the jury instructions or the
theories of actual harm relied upon in the Government's
arguments, (see Tr. 1004:25-1005:10 (cost overruns mentioned in
closing); see also Tr. 1006:9-11 (Garcia's certified payrolls
mentioned to jury for first time in Government's closing)),
Defendants here were surprised and not able to prepare
adequately.

For example, with respect to the cost overruns allegedly caused by the Defendants' misrepresentations, Defendants note that:

> [b]y making the argument in its opening statement that the extra amounts paid to DCM by the Port Authority over and above the agreed-upon contract amounts resulted from the alleged fraud, the Government unexpectedly and very directly put into issue years' worth of factual detail relating to millions of dollars of claimed change orders, force orders, and other required additional work – work that ended up being the subject of numerous court proceedings in New Jersey. . . . [H]ad those allegations been contained in the Indictment, the Defendants would have been able to prepare in detail to prove definitely that the additional funds sought and obtained from the Port Authority were entirely legitimate and justified and had nothing whatsoever to do with the alleged fraud. Not only would we have had an opportunity to collect and analyze the massive amount of paperwork relating to change orders in order to disprove the Government's theory through documentation, we would have had an opportunity to more fully obtain and exploit evidence relating to the New Jersey court proceedings at which these cost overages were repeatedly litigated (and resolved in Defendant's favor).

(See Mot. at 22-23.)

With respect to the Johnny Garcia certified payroll theory first argued by the Government at closing, the Defendants note:

> Similarly, had the Indictment alleged that the Port Authority suffered economic harm as a result of the fact that Johnny Garcia's own time appeared on a few certified payrolls – an issue that was expressly raised by the Government only after the Government rested its case - the defense could have cross-examined Mr. Garcia as to those specific days and searched for evidence to show that Mr. Garcia indeed worked on those days.

> Stated another way, based on the Indictment, the defense reasonably believed that the contemplated loss it would have to address at trial concerned whether MBE and WBE were

fraudulently obtained from the Port Authority and whether
such credit constituted cognizable economic harm. That
shifted at the outset of the trial, to the need to address
whether that the Port Authority suffered hundreds of
millions of dollars of cost overages incurred over years
because of the alleged fraud. That then shifted again after
the Government rested to whether one person (Johnny Garcia)
actually worked on a few days that were reflected in a few
thousand dollars worth of certified payroll records.

(See Mot. at 22-23(emphasis in original).) Clearly, the

Defendants were prejudiced by the Government's shifting

theories.

This series of surprises is precisely the kind of dynamic

the constructive amendment and prejudicial variance doctrines

are designed to prevent.[38] See Milstein, 401 F.3d at 65 (finding

constructive amendment where indictment Government charged drug

misbranding due to repackaging, but trial proof showed drug

misbranding due to contamination); Zingaro, 858 F.2d at 102-03

---

[38] The Court of Appeals in Mollica suggested that the risk of
surprise is particularly acute in fraud prosecutions:

> In light of the current broad range of conduct covered by
> the federal fraud statutes, it is critical that courts
> "vigilantly enforce the Fifth Amendment requirement that a
> person be tried only on the charges contained in the
> indictment returned by the grand jury." United States v.
> Weiss, 752 F.2d 777, 791 (2d Cir. 1985) (Newman, J.,
> dissenting in part), cert. denied, 474 U.S. 944 (1985). In
> order to avoid amending an indictment in violation of the
> Fifth Amendment, the Government in fraud cases should
> "think through the nature of the crime it wishes to allege
> and then spell out the offense in a carefully drafted
> indictment, instead of confronting the defendant with its
> theory of criminality for the first time at trial. Id. at
> 795.

Mollica, 849 F.3d at 729 (emphasis added).

(constructive amendment in racketeering case where indictment gave "no inkling" that Defendant was charged with extortions other than Yonkers social club loansharking activity detailed in indictment); Mollica, 849 F.2d at 725, 729 (finding constructive amendment where jury was allowed to consider purported money laundering activity as part of charged tax fraud conspiracy although "it was not established that [the money laundering scheme] was included in the original indictment").

For these reasons, the Court concludes that there was a constructive amendment as well as a prejudicial variance in this case. Accordingly, the finding of constructive amendment independently requires that Defendants' convictions on Counts One and Two be vacated.

III. CONCLUSIONS

For the reasons set forth above, the Court:

1.    grants the motion for acquittal (dkt. no. 93) under Fed. R. Crim. P. 29;

2.    conditionally grants the motion for a new trial under Fed. R. Crim. P. 29(d) and 33(a);

3.    denies the motion to dismiss the indictment; and

4.    grants the motion to vacate the convictions on the grounds of constructive amendment and prejudicial variance.

SO ORDERED.

Dated:    New York, New York
          August 3, 2017

*Loretta A. Preska*

LORETTA A. PRESKA
Senior United States District Judge