

*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

August 23, 2017

**BY ECF**

The Honorable Valerie E. Caproni
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

    Re:   *United States* v. *Joseph Percoco, et al.*, S1 16 Cr. 776 (VEC)

Dear Judge Caproni:

    The Government respectfully writes in response to letters filed on August 7, 8, and 9, 2017, on behalf of defendant Alain Kaloyeros [Dkt. No. 308] (the "Kaloyeros Letter"), defendants Louis Ciminelli, Michael Laipple, and Kevin Schuler [Dkt. No. 309] (the "Buffalo Defendants' Letter"), and defendants Steven Aiello and Joseph Gerardi [Dkt. No. 310] (the "Syracuse Defendants' Letter").  These letters call to the Court's attention a recent decision granting motions pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure for a judgment of acquittal or a new trial in *United States* v. *Davis*, No. 13 Cr. 123 (LAP), 2017 WL 3328240 (S.D.N.Y. Aug. 3, 2017).[1]  As set forth below, the defendants' reliance on that decision, particularly in support of their motions to dismiss the Superseding Indictment in this case, is misplaced.

    *Davis* concerned certain representations regarding the participation of minority-owned and women-owned business enterprises ("MWBE") made by the defendants in that case when entering into construction contracts with the Port Authority.  *See id.* at *4-5.  In particular, the contract between the defendants and the Port Authority required the defendants to use "every good faith effort to comply with" certain MWBE goals of the Port Authority by utilizing MWBE as subcontractors.  *Id.* at *4.

    The defendants in *Davis* argued, among other things, that no reasonable jury could have found that the defendants intended to defraud the Port Authority.  The court undertook "a fact-sensitive" "inquiry to determine whether Defendants here had intent to defraud under the 'right to control' theory."  *Id.* at *9.  The court considered whether a reasonable jury could have found that the "defendants contemplated some actual harm or injury to their victims," which could include "'den[ying] the victim the right to control its assets by depriving it of information necessary to make discretionary economic decisions.'"  *Id.* at *8 (quoting *United States* v. *Binday*, 804 F.3d

---

[1] The Government is still weighing its appellate options with respect to the *Davis* opinion.

August 23, 2017
Page 2

558, 569-70 (2d Cir. 2015)).  After surveying cases with analogous facts, the court in *Davis* determined that, for the conviction to stand, a rational jury must have been able "to find that the alleged misrepresentations went to an essential element of the contract or that they exposed the Port Authority to potential or actual economic harm."  *Id.* at *15.  Turning to the facts, the court held that "there was insufficient evidence for a rational jury to find that the MWBE sections of the contract were essential elements of the Defendants' bargain with the Port Authority," because failure to abide by the MWBE provisions of the contract were merely "aspirational," and because failure to abide by those provisions could not expose the Port Authority to criminal or other liability.  *See id.* at *16-17.  The court further found that there was "insufficient evidence for a rational jury to find that Defendants' deceit exposed the Port Authority to risk of economic harm or undisclosed economic risk" because the court claimed that the Government did not put forth sufficient evidence to show a connection between the MWBE provisions and cost to the Port Authority.  *See id.* at *17-22.

The Buffalo Defendants, Syracuse Defendants, and Kaloyeros now offer the *Davis* decision as support for their motions to dismiss the Superseding Indictment for failure to sufficiently allege wire fraud.  *Davis* provides no support for the defendants' position.  The court in *Davis* granted motions for acquittal based on the sufficiency of the evidence adduced *at trial*.  In fact, the defendants in *Davis* also challenged the sufficiency of the indictment before trial, and the court rejected that claim, holding that "[t]he indictment's language here clearly tracks the language of statute" and "states the approximate time and place of the alleged scheme and provides some level of factual detail sufficient to put Defendants on notice of the nature of the charges mentioned."  *Id.* at *27-28.

As set forth in detail in the Government's opposition to the defendants' pretrial motions in this case [Dkt. No. 264], the Superseding Indictment is plainly sufficient.[2]  (*See* Gov.'s Opp'n 46-60.)  Nothing more is required at this stage.[3]  *See, e.g.*, *United States* v. *Stavroulakis*, 952 F.2d

---

[2] Counsel for Kaloyeros also suggests that *Davis* sets forth certain requirements for an indictment in a right-to-control case.  (Kaloyeros Letter 1.)  The language referenced by counsel, however, comes not from the *Davis* court's discussion of the sufficiency of the indictment, but from its analysis of whether a constructive amendment occurred at trial.  *Davis*, 2017 WL 3328240, at *32.  Furthermore, the case relied upon by the *Davis* court—*United States* v. *Shellef*, 507 F.3d 82 (2d Cir. 2007)—does not, as counsel for Kaloyeros suggests, require that an indictment contain certain magic words to be sufficient in a right-to-control case.  Rather, that case merely holds that in a case proceeding under a "no sale" theory of wire fraud, it is not sufficient to allege "only that [the defendant]'s misrepresentation induced [the victim] to enter into a transaction it would otherwise have avoided."  *Shellef*, 507 F.3d at 109.  Regardless, the Superseding Indictment contains ample allegations regarding the relevance of the deceit to the object of the contract and to the nature of the bargain, as Kaloyeros's counsel claims are necessary.  (*See, e.g.*, Superseding Indictment ¶¶ 22, 39, 41, 45.)

[3] Analogously, and as relevant to other charges contained in the Superseding Indictment, the Honorable William H. Walls of the District Court for the District of New Jersey recently denied a motion to dismiss an indictment for failure to allege acts that satisfy the definition of "official act" under *McDonnell* v. *United States*, 136 S. Ct. 2355 (2016).  *United States* v. *Menendez*, No. 15 Cr. 155, slip op. (D.N.J. Aug. 8, 2017).  That court held that "[w]hether the acts alleged in the

August 23, 2017
Page 3

686, 693 (2d Cir. 1992) ("'[A]n indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.'" (quoting *United States* v. *Tramunti*, 513 F.2d 1087, 1113 (2d Cir. 1975))).

In any event, although the Government has not purported to make "a full proffer of the evidence it intends to present at trial" regarding its wire fraud theory—which means that the defendants' challenge to the sufficiency of the evidence must wait until trial, *United States* v. *Perez*, 575 F.3d 164, 166-67 (2d Cir. 2009)—the facts proffered thus far by the Government, many of which are detailed in the Complaint and Superseding Indictment, reflect sufficient evidence that the defendants deprived Fort Schuyler of the right to control its assets by making material misrepresentations that went to an essential element of their bargain with Fort Schuyler. In particular, the Government expects the evidence at trial to prove that the selection of a preferred developer was a critical economic decision for Fort Schuyler[4] that would permit Fort Schuyler to award additional contracts quickly to the developer without a further bidding process on each future project. (*See* Superseding Indictment ¶¶ 22-23; Compl. ¶¶ 75-77.) As a result, the choice of the preferred developer was Fort Schuyler's principal method of influencing the way potentially tens or hundreds of millions of dollars would be spent on future construction contracts. (*See* Superseding Indictment ¶¶ 13, 16, 27; Compl. ¶¶ 75-77, 85-87.) The Government also expects the evidence at trial to show that the Buffalo and Syracuse Defendants (as well as Kaloyeros) knew that the winner of the Buffalo and Syracuse RFPs would in turn win lucrative state contracts—which is why it was so crucial for them to be selected as the preferred developers and why they were willing to pay bribes to Howe in an attempt to ensure their selection. For example, during the RFP process, Howe shared with the Buffalo Defendants confidential information about large construction projects that were likely to be available to the chosen preferred developer, including confidential information about what became the $750 million Riverbend project. (Compl. ¶¶ 72-73.)

Accordingly, for both Fort Schuyler and the Buffalo and Syracuse Defendants, the RFP process was inextricably intertwined with the award of State contracts, and the choice of the preferred developer had substantial economic consequences to Fort Schuyler (and, of course, to the Buffalo and Syracuse Defendants). And although Kaloyeros represented to Fort Schuyler that preferred developers would be selected on the basis of requests for proposals that were designed to have fair, open, and competitive bidding processes for Fort Schuyler's benefit, in fact the defendants designed the requests for proposals, at least in part, for the benefit of the Buffalo and Syracuse Developers and in an attempt to ensure that those entities would be selected. (*See* Superseding Indictment ¶¶ 22-23, 25, 39, 41, 45; Compl. ¶¶ 68, 74, 85.)

---

Superseding Indictment satisfy the definition of an 'official act' under *McDonnell* is a factual determination that cannot be resolved before the Government has the opportunity to present evidence at trial." *Id.* at 1.

[4] SUNY Poly and Fort Schuyler were linked together by Kaloyeros, who sat on the Fort Schuyler board and "selected and provided direction to Fort Schuyler's officers and others working on behalf of Fort Schuyler." (Superseding Indictment ¶ 8.) In fact, "Fort Schuyler's officers . . . were hired by [Kaloyeros] and relied on staffing from the Research Foundation, and [Kaloyeros] supervised and controlled Fort Schuyler's day-to-day operations." (Compl. ¶ 27(b).)

August 23, 2017
Page 4

      The circumstances presented here thus bear no resemblance to those in *Davis*. *Davis*—at least as the court characterized it—concerned representations made by the defendants during an arms-length negotiation regarding certain ancillary, "aspirational" steps to be taken by the defendants in fulfilling their obligations under the relevant contract. *See Davis*, 2017 WL 3328240, at *15-22. By contrast, the fraud perpetrated by the Buffalo Defendants, Syracuse Defendants, and Kaloyeros went to the entire making of the relevant agreements, and was accomplished by using an insider (Kaloyeros) to disguise the nature of the deal.

      The case at bar is instead analogous to *United States* v. *Yaron*, where the court denied a Rule 29 motion in which the defendants argued that there could not be intent to defraud because the conspiring company in fact submitted the lowest bid, No. 10 Cr. 363 (GBD), 2012 WL 2477646, at *2 (S.D.N.Y. June 28, 2012). The court held that "[t]he evidence indicated that the bribery payments were to ensure that contracts were awarded to the defendants even where it might have been otherwise awarded to a different company," and therefore "there was sufficient evidence for a rational trier of fact to find that the defendants intended to deprive [the victim] of its property right to control the awarding of contracts." *Id.*

      Furthermore, even if the court's reasoning in *Davis* were at all applicable here, it is clear that "the alleged misrepresentations went to an essential element" of the preferred developer agreements, and that the defendants contemplated that Fort Schuyler would be exposed to potential or actual economic harm, as the design of the fraud was to forestall other competitors from being chosen instead of the Buffalo or Syracuse Developers. *Davis*, 2017 WL 3328240, at *15; *see also Yaron*, 2012 WL 2477646, at *2. Of course, at this stage, the only relevant inquiry is whether the Superseding Indictment is sufficient, which it undoubtedly is.

      The defendants make a number of other, ancillary arguments regarding *Davis* that have no merit. Counsel for Kaloyeros contends that "*Davis* illustrates the elusive nature of the right to control theory" and "[a]t bottom, the right to control theory is simply too amorphous and vague to satisfy due process." (Kaloyeros Letter 2.) To the contrary, *Davis* makes no such pronouncements regarding the validity of the right to control theory, which has been repeatedly reaffirmed, not only in *Davis*, but by the Second Circuit as recently as this year, in *United States* v. *Finazzo*, 850 F.3d 94, 105-07 (2d Cir. 2017). Counsel for Kaloyeros offers no legal authority whatsoever for the notion that the Due Process Clause of the Constitution invalidates the right-to-control theory as "elusive."

      Counsel for the Buffalo Defendants argues that "*Davis* shows that the right-to-control theory does not free the government from having to establish actual or potential harm." (Buffalo Defs.' Letter 5.) It is well established, however, that harm is not an element of wire fraud. *See, e.g.*, *United States* v. *Novak*, 443 F.3d 150, 156 (2d Cir. 2006). Rather, the Government must prove that the defendants *intended* the possibility of some cognizable harm. *Davis*, 2017 WL 3328240, at *8 ("'It is not required that the victims of the scheme in fact suffered harm, but the Government must, at a minimum, prove that defendants contemplated some actual harm or injury to their victims.'" (quoting *Binday*, 804 F.3d at 569 (quotation marks internal to *Binday* omitted))). Indeed, "it is not necessary that a defendant intend that his misrepresentation actually inflict a financial loss—it suffices that a defendant intend that his misrepresentations induce a counterparty to enter a transaction without the relevant facts necessary to make an informed economic decision." *Binday*, 804 F.3d at 579.

August 23, 2017
Page 5

      Finally, the defendants make a number of claims entirely disconnected from the holding of *Davis* that the fact that a Rule 29 motion was granted in *Davis* means that there must be any of a number of flaws with the Government's case here. (*See, e.g.*, Kaloyeros Letter 2 ("*Davis* reinforces Defendants' concern as to the Government's *Brady* practices"); Syracuse Defs.' Letter 2 (arguing that *Davis* supports a motion for a bill of particulars because "*Davis* exposes the inherent danger in the Government's response and the Government's position as pure brinksmanship that totally frustrates the Syracuse Defendants' Due Process right to know what the actual allegations against them are so that they may mount a defense and avoid Double Jeopardy in the future"). Counsel for the Buffalo Defendants goes so far as to assert that "the government is prosecuting the exact same case against the Buffalo Defendants that it prosecuted in *Davis*." (Buffalo Defs.' Letter 5.)

      Needless to say, there is no authority for the notion that arguable infirmities in one case must exist in some other case brought under the same statute or legal theory. Nor do the defendants cite to the numerous cases in which convictions concerning the right-to-control theory were upheld, including cases where the facts actually are analogous to the allegations here. *See Yaron*, 2012 WL 2477646, at *2; *see also, e.g.*, *United States* v. *Viloski*, 557 F. App'x 28, 34 (2d Cir. 2014) (affirming conviction under right-to-control theory where the defendant hid from the victim company that he was paying kickbacks to a company employee); *United States* v. *Chandler*, 98 F.3d 711, 716 (2d Cir. 1996) (affirming conviction on fraud charges because the jury was entitled to infer that the defendant intended to expose the victim bank to unwanted risk when she used a false name to open an account, even if she intended to make all necessary payments to the bank); *United States* v. *Coyne*, 4 F.3d 100, 110 (2d Cir. 1993) (affirming mail fraud conviction where the defendant rigged bidding for a vehicle despite the fact that the victim received what it paid for).

      For the reasons set forth above, the recent decision in *United States* v. *Davis* does not support any of the defendants' pending motions.

      Respectfully submitted,

      JOON H. KIM
      Acting United States Attorney

By: /s/
    Janis Echenberg/Robert Boone/
    David Zhou/Matthew Podolsky
    Assistant United States Attorneys
    (212) 637-2597/2208/2438/1947

cc:  Counsel for all defendants (via ECF)