**Daniel C. Oliverio**
Chairman
Direct Dial: 716.848.1433
Direct Facsimile: 716.819.4752
*DOliverio@hodgsonruss.com*

October 6, 2017

**Via CM-ECF**

Honorable Valerie E. Caproni
United States District Judge
United States District Court
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007

        Re:    *United States v. Joseph Percoco, et al.*, No. 16-CR-776 (VEC) (S.D.N.Y.)

Dear Judge Caproni:

        We represent Defendant Louis Ciminelli. We write on behalf of Mr. Ciminelli, Defendant Kevin Schuler, and Defendant Michael Laipple (the "Buffalo Defendants"), in response to the recently amended wire-fraud charges set forth in the Second Superseding ("S2") Indictment (Dkt. 321). These amendments only strengthen the case for dismissal of Counts 1, 4, and 5. In the alternative, the Court should disclose or inspect the grand-jury transcripts. Also in the alternative, the case against the Buffalo Defendants should be transferred to Buffalo for trial.

**I.**     <u>**The Government's Latest Wire-Fraud Theory Is Legally Unsustainable.**</u>

        In the 12 months following the Buffalo Defendants' arrest, the government has made four attempts at pleading a cognizable theory of wire fraud.[1] As the table below illustrates, the government's pleadings and supporting arguments over this span have continually flailed about for a valid theory, *compare United States v. Davis*, No. 13-CR-923, 2017 WL 3328240, at *29 (S.D.N.Y. Aug. 3, 2017) (criticizing "the Government's ever-shifting theory on . . . the intent to defraud"), and have only recently, after briefing regarding *Davis*, acknowledged the vital differences between the Buffalo Request for Proposal ("RFP") and the Riverbend contract that the Buffalo Developer ultimately negotiated with Fort Schuyler Management Corporation ("Fort Schuyler").

---

[1]     The Criminal Complaint (Dkt. 1) was filed on September 20, 2016, and the Buffalo Defendants were arrested two days later. The Original Indictment (Dkt. 49) was returned on November 22, 2016; the First Superseding ("S1") Indictment (Dkt. 162) was returned on May 11, 2017; and the S2 Indictment was returned on September 19, 2017.

| Source | The Government's Shifting Wire-Fraud Theories | The Government's Evolving Interpretation of the Relationship Between the Buffalo RFP and the Riverbend Contract | The Purported Object of the Scheme to Defraud |
|---|---|---|---|
| **Complaint (Sept. 20, 2016)** | Alleges that the Buffalo Defendants schemed to "defraud Fort Schuyler by secretly rigging the bids for large development deals." (Dkt. 1 ¶ 68.) | Describes the Buffalo RFP as a "bidding process for [significant taxpayer-funded development] contracts." (Dkt. 1 ¶ 12.)<br><br>Alleges that the Buffalo Defendants were "guaranteed to win the contracts." (Dkt. 1 ¶ 12.) | Fort Schuyler's tangible property interest in the award of the Riverbend contract. |
| **Government press conference (Sept. 22, 2016)[2]** | Accuses the Buffalo Defendants of rigging the bidding process for "state contracts." | Claims that preferred developers were "guaranteed to win [state] contracts." | Fort Schuyler's tangible property interest in the award of the Riverbend contract. |
| **Original Indictment (Nov. 22, 2016) and S1 Indictment (May 11, 2017)** | Alleges that the Buffalo Defendants "devised a scheme to defraud Fort Schuyler in its award of significant taxpayer-funded development contracts." (Dkt. 49 ¶ 37; Dkt. 162 ¶ 39.) | Describes the Buffalo RFP as a bidding process for "significant taxpayer-funded development contracts." (Dkt. 49 ¶ 37; Dkt. 162 ¶ 39.) | Fort Schuyler's tangible property interest in the award of the Riverbend contract. |
| **Opposition to pretrial motions (June 30, 2017)** | Argues that the S1 Indictment alleges a scheme to deprive Fort Schuyler of its "right to control" funds disbursed pursuant to state contracts primarily because the S1 Indictment "makes clear that the defendants sought to deny Fort Schuyler economically valuable information." (Dkt. 264 at 55-56.) | Disputes that "the RFP process only resulted in [the Buffalo Developer] being named a preferred developer," and that the Riverbend contract was awarded only after separate contract negotiations. (Dkt. 264 at 57 n.21.)<br><br>Argues that the preferred-developer award "*entitled* [the Buffalo Developer] to be awarded future development contracts." (Dkt. 264 at 57 n.21 (quoting S1 Indictment ¶ 23) (emphasis added).) | Fort Schuyler's intangible property interest in the award of the preferred-developer designation.<br><br>– or –<br><br>Fort Schuyler's intangible right to control its assets. |

---

[2]  A video recording of the press conference can be found at the following link: http://www.lohud.com/videos/news/politics/2016/09/22/90848914/ (last visited Oct. 6, 2017).

| Source | The Government's Shifting Wire-Fraud Theories | The Government's Evolving Interpretation of the Relationship Between the Buffalo RFP and the Riverbend Contract | The Purported Object of the Scheme to Defraud |
|---|---|---|---|
| **Government letter regarding *United States v. Davis* (Aug. 23, 2017)** | Argues that "the defendants deprived Fort Schuyler of the right to control its assets by making material misrepresentations that went to an essential element of their bargain with Fort Schuyler." (Dkt. 313 at 3.) | Argues that the Buffalo RFP was separate from, but related to, the Riverbend contract. (Dkt. 313 at 3.)<br><br>Argues that the Riverbend project was "*likely* to be *available* to the chosen preferred developer." (Dkt. 313 at 3 (emphasis added).) | Fort Schuyler's intangible right to control its assets. |
| **S2 Indictment (Sept. 19, 2017)** | Alleges that the Buffalo Defendants "devised a scheme to defraud Fort Schuyler of its right to control its assets, and thereby exposed Fort Schuyler to risk of economic harm." (Dkt. 321 ¶¶ 39, 45.) | Amends the S1 Indictment to reflect the fact that the Buffalo RFP was separate from "taxpayer-funded development contracts." (Dkt. 321 ¶ 39.)<br><br>Amends the S1 Indictment to specify that the alleged deceit pertained only to "the drafting and selection process related to the RFPs." (Dkt. 321 ¶ 25.) | Fort Schuyler's intangible right to control its assets. |

The latest iteration of the wire-fraud charges is the most legally deficient yet.

As Judge Preska explained in *Davis*, when an indictment alleges a right-to-control theory "there must also be an allegation that the misrepresentation had 'relevance to the object of the contract' or an equivalent allegation, that there was a 'discrepancy between benefits reasonably anticipated and actual benefits received,' or that the misrepresentation went to 'the nature of the bargain.'" 2017 WL 3328240, at *32 (quoting *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007)). These additional allegations are indispensable because the Second Circuit has drawn a line between "schemes that do no more than cause their victims to enter into transactions they would otherwise avoid," which do not violate the wire-fraud statute, and "schemes that depend for their completion on a misrepresentation of an essential element of the bargain." *Shellef*, 507 F.3d at 108.[3]

---

[3] Other circuits have rejected the right-to-control theory entirely, finding it to be inconsistent with the Supreme Court's definition of the property interests covered by the mail- and wire-fraud statutes. *See*

Yet the S2 Indictment does *not* allege that the Buffalo Defendants' deceit bore on the nature or object of the Riverbend contract, that the Buffalo Defendants misled Fort Schuyler about the services the Buffalo Developer would provide under that contract, or that Fort Schuyler received less than it bargained for. And these omissions are no accident. In its August 23, 2017 letter regarding *Davis*, the government portrayed the S1 Indictment as alleging that the Buffalo Defendants made "material misrepresentations that went to an essential element of their bargain with Fort Schuyler." (Dkt. 313 at 3.) The Buffalo Defendants' reply emphasized a critical disconnect: the only "bargain" between the Buffalo Developer and Fort Schuyler was the Riverbend contract, and the alleged deceit did not pertain to *any* element (let alone an essential element) of the Riverbend contract, but instead pertained solely to the RFP process. (Dkt. 315 at 2-3.) That process, as we have explained throughout this case, resulted only in the designation of the Buffalo Developer (and one other company) as a "preferred developer," a status that did not guarantee any actual contract for any actual project. Three weeks after receiving our *Davis* reply, the government amended its indictment to formally acknowledge the distinction between the Buffalo RFP and the Riverbend contract; confirm that the alleged deceit pertains only to the Buffalo RFP; and reorient its right-to-control theory around the newly minted claim that the alleged deceit exposed Fort Schuyler to a "risk of economic harm." (Dkt. 321 ¶¶ 25, 39, 45.) Because the government does not and cannot make the allegations *Shellef* requires, "the indictment is insufficient." *Davis*, 2017 WL 3328240, at *32.

The "economic risk" concept on which the government now relies does not permit it to circumvent *Shellef*'s requirements. This concept, as Judge Preska remarked in *Davis*, has only been applied in cases involving financial instruments. *See id.* at *17 ("[A]ll of the wire fraud cases where convictions were upheld where intent was found based on a risk of economic harm involved financial instruments.").[4] Indeed, in cataloguing the range of right-to-control theories it has approved, the Second Circuit recently observed: "we have repeatedly upheld convictions where defendants' misrepresentations *in a loan or insurance application or claim* exposed the lender or insurer to unexpected economic risk." *United States v. Binday*, 804 F.3d 558, 571 (2d Cir. 2015) (emphasis added). *Binday*'s financial-instrument caveat aligns with the holding in *Shellef*. The value of a financial instrument depends on a fine-grained calculation of

---

*United States v. Sadler*, 750 F.3d 585, 591 (6th Cir. 2014) (Sutton, J.) (holding that the fraud statutes are "limited in scope to the protection of property rights, and the ethereal right to accurate information doesn't fit that description" (emphasis and internal quotation marks omitted)); *United States v. Bruchhausen*, 977 F.2d 464, 468 (9th Cir. 1992) ("[T]he interest of the manufacturers in seeing that the products they sold were not shipped to the Soviet Bloc in violation of federal law is not 'property' of the kind that Congress intended to reach in the wire fraud statute."). As Defendant Kaloyeros explains in his motion to dismiss (Dkt. 177 at 17-20), the Second Circuit's continued recognition of the right-to-control theory is inconsistent with *Sekhar v. United States*, 133 S. Ct. 2720 (2013), *Skilling v. United States*, 561 U.S. 358 (2010), *Cleveland v. United States*, 531 U.S. 12 (2000), and *McNally v. United States*, 483 U.S. 350 (1987). Though we join Defendant Kaloyeros's arguments, the Court need not reach them because Counts 1 and 4 are defective and must be dismissed under Second Circuit precedent.

[4] Judge Preska ultimately held that, "even if the economic risk category of fraudulent intent applied here, there was insufficient evidence at trial that Defendants' misrepresentations exposed the Port Authority to economic risk or actual economic harm." *Davis*, 2017 WL 3328240, at *17.

risk and reward. *See Binday*, 804 F.3d at 579 ("[T]he value of credit or insurance transactions inherently depends on the ability of banks and insurance companies to make refined, discretionary judgments on the basis of full information." (quoting *United States v. Rossomando*, 144 F.3d 197, 201 n.5 (2d Cir. 1998) (alteration in original)). Misrepresentations that skew this calculation go to "an essential element of the bargain." *Shellef*, 507 F.3d at 108.

In any event, even stretching the "economic risk" concept beyond cases involving financial instruments would not resolve the fundamental defect in the government's wire-fraud theory. As noted above, the S2 Indictment expressly limits the Buffalo Defendants' alleged deceit to "the drafting and selection process *related to the RFPs*." (Dkt. 321 ¶ 25 (emphasis added).) But the RFP process that the government describes does not entail any economic risk to Fort Schuyler.

The leading economic-risk cases provide a useful frame of reference. In *Binday*, an insurance company was exposed to undisclosed economic risk when it issued insurance policies—conditional promises to pay money—based on the defendants' misrepresentations about facts affecting the policies' value to the insurer. *See* 804 F.3d at 565, 573, 579-80. In *United States v. Chandler*, 98 F.3d 711 (2d Cir. 1996), a bank was exposed to undisclosed economic risk when it extended credit to the defendant without knowing the defendant's true credit history. *See id.* at 713, 716. In *United States v. Dinome*, 86 F.3d 277 (2d Cir. 1996), a bank was exposed to undisclosed economic risk when it issued the defendant a mortgage loan without knowing his true income. *See id.* at 279, 284 & n.7.

The allegations in the S2 Indictment fall short on both sides of the equation.

First, there is no dispute that when Fort Schuyler named the Buffalo Developer one of two preferred developers, it was not giving the Buffalo Developer a loan, a credit line, a contract, a promise, or anything else, nor was it in any way limiting its right to award development contracts how and to whom it wished. The S2 Indictment now acknowledges that the Buffalo RFP was distinct from the subsequent negotiations for the Riverbend contract. (Dkt. 321 ¶ 39.) Deceit in the RFP process could not deprive Fort Schuyler of the right to control its assets when Fort Schuyler expressly refused to stake any asset on the RFP's outcome.[5] In fact, the RFP made clear that Fort Schuyler was not obligated to do anything in particular as a result of the RFP process; even the preferred-developer designation, once given, could be cancelled or revoked at any time.

Second, the S2 Indictment alleges no deceit akin to the misrepresentations in *Binday* (nature and value of insurance policy), *Chandler* (defendant's credit history), and *Dinome* (defendant's income). The government concedes that the Buffalo Defendants never misled Fort Schuyler about the Buffalo Developer's qualifications or the services the Buffalo

---

[5] The preferred-developer designation cannot itself be an "asset" that Fort Schuyler had the right to control, because that designation is not property in the hands of Fort Schuyler. (Dkt. 220 at 32-36; Dkt. 299 at 37-41, 46-49.)

Developer was offering. Thus, the Buffalo RFP did not put Fort Schuyler in the position of, say, a bank extending a loan that is less economically sound than it believes. The RFP process was not an economic transaction, Fort Schuyler did not give up anything when it named preferred developers, and the qualifications Fort Schuyler received from the Buffalo Developer were entirely accurate.

At bottom, the S2 Indictment alleges that a supposedly deceitful prelude to an untainted, arms-length contract negotiation constitutes wire fraud. But the Second Circuit long ago rejected this proposition.

The two defendants in *United States v. Regent Office Supply Co.*, 421 F.2d 1174 (2d Cir. 1970) sold stationery. *See id.* at 1176. Both stipulated that their salespeople "secured sales" by beginning sales calls with a deception designed to curry favor with the prospective customer. *Id.* The salespeople would say, for example, that they had been referred by a friend of the customer, or that a recent death had left them with stationery that needed to be sold and "the customer would help to relieve this difficult situation by purchasing it." *Id.* Their descriptions of the stationery's price and quality were accurate. *See id.* at 1177. The government argued that the customers were "entitled to give [their] patronage based on honest information." *Id.* Thus, it contended, mail fraud occurred when, "[a]s a result of the transactions of which the untrue statements were a part, money and property changed hands." *Id.* at 1181. The district court convicted the defendants, but the Second Circuit reversed. *See id.* at 1177, 1182. The court held that although the salespeople may have acted with an intent to deceive the potential customers and thereby induce them to purchase stationery, "they did not intend to defraud them, because the falsity of their representations was not shown to be capable of affecting the customer's understanding of the bargain nor of influencing his assessment of the value of the bargain to him." *Id.* at 1181-82; *accord United States v. Gole*, 21 F. Supp. 2d 161, 166 (E.D.N.Y. 1997) (citing *Dinome* and *Regent Office* as support for the proposition that "a scheme to induce someone to purchase property at fair value is not a scheme to defraud merely because the defendant intended to persuade the purchaser to act by false statements not going to the issue of the 'ultimate value' of the sale"), *aff'd*, 158 F.3d 166 (2d Cir. 1998); *United States v. Slay*, 717 F. Supp. 689, 694, 696 (E.D. Mo. 1989) (holding that the government "failed to demonstrate how the City's interest in the inducement phase of a contractual relationship rises to a cognizable property right," and dismissing the indictment).

Like the deceptions with which the salespeople in *Regent Office* began their otherwise honest negotiations for stationery sales, the alleged deceit in the Buffalo RFP was no more than a prelude to the untainted, arms-length negotiations for the Riverbend contract. The salespeople in *Regent Office* lied to "get in the door," but then honestly negotiated and performed contracts to sell products of a certain quality at a certain price. At most, the S2 indictment alleges the same, and *Regent Office* teaches that that does not suffice. As in *Regent Office*, the alleged deception in the nonbinding RFP process did not obscure the nature of the bargain Fort Schuyler struck in the Riverbend contract. Indeed, the S2 Indictment expressly alleges that the deceit at issue was confined to the RFP process, and even with respect to the RFP process the

government does not dispute that the Buffalo Developer never misrepresented its qualifications. As in *Regent Office*, the government's new theory of wire fraud is legally untenable.

## II. At the Very Least, the Court Should Disclose or Review the Grand-Jury Transcripts.

The government is abusing the grand jury in an effort to find a case, any case, against the Buffalo Defendants. Since the inception of this matter, the government's *modus operandi* has been to charge first and then (attempt to) support later. Our justice system, however, operates in the reverse order, and for good reason; any other way exposes innocent men and women to unwarranted criminal prosecution—the deleterious impact of which the Buffalo Defendants feel every day.

Indeed, the Second Circuit has recognized that "'[i]t is improper to utilize a Grand Jury for the sole or dominating purpose of preparing an already pending indictment for trial.'" *United States v. Dardi*, 330 F.2d 316, 336 (2d Cir. 1964). Nor is the grand jury "meant to be the private tool of a prosecutor." *United States v. Fisher*, 455 F.2d 1101, 1105 (2d Cir. 1972). Yet this is exactly what is happening here. One complaint, one indictment, two superseding indictments, and many iterations of a failed theory later, the government is *still* attempting to prepare some cognizable theory for trial and using the grand jury as a weapon to do so.

The superseding indictments were not based on new evidence, new counts, or new defendants. They were based purely on the fact that the government read the defendants' briefing and decided its existing theory was untenable. Each time, the government used the grand jury to resuscitate its case and returned with a stitched-up theory, ignoring the fact that it is still legally deficient. All the while, the Defendants have been faced with a consistently moving target as they prepare for the fight of their lives.

The government's frequent revisions to its wire-fraud theory raise serious questions about the existence and accuracy of the instructions, the evidence or lack of evidence, and the argument presented to the grand jury regarding the right-to-control theory of wire fraud. Given this context, the Buffalo Defendants' motion for disclosure or Court inspection of the grand-jury transcripts (Dkt. 223) is particularly compelling.

We understand that "a defendant seeking disclosure of grand jury minutes has the burden of showing a particularized need that outweighs the default need for secrecy in grand jury deliberations." *United States v. Hoey*, No. S3 11-CR-337, 2014 WL 2998523, at *3 (S.D.N.Y. July 2, 2014) (internal quotation marks omitted). We understand, also, that it is the rare case where such a request is granted. This, however, is the rare case. The Buffalo Defendants go beyond mere speculation in not only asserting, but proving, that the government continues to fundamentally shift its theory to fit a narrative it formed and publicized a year ago. As the table above illustrates, the government's explanation of its wire-fraud theory has been in constant motion. First the Government alleged a tangible-property theory. (Dkt. 49 ¶ 37; Dkt. 162 ¶ 39.) Then it argued that the Buffalo Defendants "sought to deny Fort Schuyler economically valuable information." (Dkt. 264 at 56.) Then it argued that the Buffalo Defendants made "material

misrepresentations that went to an essential element of their bargain with Fort Schuyler." (Dkt. 313 at 3.) Now, in the S2 Indictment, the government alleges that the Buffalo Defendants "exposed Fort Schuyler to risk of economic harm." (Dkt. 321 ¶¶ 39, 45.)

All of this raises a critical question: if the government itself cannot figure out what its theory is, what has it been telling the grand jury? At this point, and under these peculiar circumstances, the Buffalo Defendants are entitled to know.

### III.     The Bribery Charge Is Also Legally Deficient.

Count 5 of the S2 Indictment charges the Buffalo Defendants with violating 18 U.S.C. § 666(a)(2), which prohibits "corrupt" payments to agents of certain federally funded entities if the payments are intended to influence or reward the agent in connection with a "business" or "transaction" of the entity worth at least $5,000. Count 5 alleges that the Buffalo Defendants paid Todd Howe to take "official action in his capacity as an agent and representative of SUNY Poly, in connection with obtaining the Buffalo RFP." (Dkt. 321 ¶ 47.) The Buffalo Defendants have previously described the many facial deficiencies in this charge. (Dkt. 220 at 43-66; Dkt. 299 at 50-70.) Recent developments have bolstered these arguments in two respects.

First, as discussed above, the S2 Indictment acknowledges the separation between the Buffalo RFP and the Riverbend contract. This is significant to Count 5 because section 666 requires a "transaction" or "business" worth "$5,000 or more," 18 U.S.C. § 666(a)(2), and the "transaction" alleged in Count 5 is "the Buffalo RFP" (Dkt. 321 ¶ 47). The S2 Indictment alleges that the *Riverbend contract* was ultimately worth at least $5,000 (*e.g.*, *id.* ¶ 22), but it never alleges that the *Buffalo RFP* was worth at least $5,000. In fact, the Buffalo RFP was not a "transaction" or "business," and the preferred-developer designation had no economic value at all. *See supra* § I.

Second, recent Second Circuit precedent supports the Buffalo Defendants' argument that Count 5 is facially incompatible with *McDonnell v. United States*, 136 S. Ct. 2355 (2016). The S2 Indictment alleges that Howe took "official action in his capacity as an agent and representative of SUNY Poly." (Dkt. 321 ¶ 47.) The government has argued that Count 5 need not comply with *McDonnell*'s narrow definition of "official act" because *McDonnell* construed a different statute, 18 U.S.C. § 201. (Dkt. 264 at 65-66.) But as set forth in Defendant Kelly's letter dated September 27, 2017 (Dkt. 327[6]), the Second Circuit recently held that *McDonnell* applies to section 666 counts that, like Count 5, allege "official acts" as the *quo*. *See United States v. Skelos*, Nos. 16-CR-1618, 16-CR-1697, 2017 WL 4250021, at *2 (2d Cir. Sept. 26, 2017) (summary order).

The government tries to undermine *Skelos* by characterizing it as inconsistent with the published opinion in *United States v. Boyland*, 862 F.3d 279 (2d Cir. 2017) (Dkt. 331 at

---

[6]    The Buffalo Defendants endorse this letter and incorporate it by reference here.

1-2), which held that the trial court did not plainly err when it declined to apply *McDonnell*'s definition of "official act" to the section 666 counts at issue, *see* 862 F.3d at 291. But *Skelos* considered and rejected this very argument. Specifically, in *Skelos* the government cited *Boyland* for the proposition that "*McDonnell* does not apply to Section 666," and insisted that "*Boyland* is binding." Gov't Supp. Br., *United States v. Skelos*, 2017 WL 3505148, at *2-3 (2d Cir. Aug. 7, 2017). The court responded that the government was overstating *Boyland*. *See Skelos*, 2017 WL 4250021, at *2 (finding the government's reliance on *Boyland* misplaced, and attributing *Boyland*'s "conclusion that *McDonnell* did not apply to the § 666 counts *in that case*" to the fact that in *Boyland* "the § 666 counts were not charged in terms of official acts" (emphasis in original)).

The government's claim that *Skelos* cannot "overrule the stated law of the Circuit" (Dkt. 331 at 2) simply begs the question, by equating "the stated law of the Circuit" with its interpretation of *Boyland*. *Skelos* expressly rejected the government's overreading of *Boyland*. A summary order though it may be, *Skelos* is the only Second Circuit decision addressing what *Boyland* meant when it said: "We do not see that the *McDonnell* standard applied to *these* [section 666] *counts*." 862 F.3d at 291 (emphasis added).[7] *Skelos* rejected the exact argument that the government espouses here, and the Court should do the same. *See, e.g.*, *United States v. Tejeda*, 824 F. Supp. 2d 473, 475 (S.D.N.Y. 2010) ("The Court is not persuaded that it is at liberty not only to disregard but contradict a Second Circuit ruling squarely on point merely because it was rendered in a summary order."); *Shady Records, Inc. v. Source Enters., Inc.*, 371 F. Supp. 2d 394, 398 n.1 (S.D.N.Y. 2005) ("[A] district court must seek enlightenment as to the law where it finds it. . . . [T]he considered opinion of a panel of appellate judges . . . must surely be considered a valuable source of wisdom."). Thus, the S2 Indictment must be measured against *McDonnell*'s definition of "official act." For the reasons previously given (Dkt. 220 at 61-66; Dkt. 299 at 68-70), Count 5 flunks that standard.

**IV.** **The Case Against the Buffalo Defendants Should Be Transferred to the Western District of New York.**

Recent decisions granting motions to transfer further debunk the government's argument that the granting of such motions is rare or exotic. *See, e.g.*, *United States v. Picard*, No. 16-CR-952, 2017 WL 2377528, at *3 (D.S.C. June 1, 2017) (transferring venue to the Southern District of New York); *United States v. Canseco*, No. 16-CR-953, 2017 WL 1344543, at *2 (D.S.C. Apr. 12, 2017) (transferring venue to the Central District of California); *see also United States v. Bennett*, No. 15-CR-766, slip op. (Dkt. 50) at 4-5 (D.S.C. Jan. 5, 2017) (transferring venue to the Southern District of New York because transfer would relieve "a great

---

[7] Indeed, the fact that *Skelos* was a summary order shows just how little the Second Circuit thought of the government's *Boyland* argument. *See Bell v. Luna*, 856 F. Supp. 2d 388, 401 n.3 (D. Conn. 2012) ("[S]ince summary orders are meant to be used only when the law on a given topic is settled, summary orders presumably provide particularly good evidence of what legal principles the Second Circuit considers as established at any given point in time."); *Zhong v. U.S. Dep't of Justice*, 489 F.3d 126, 139 (2d Cir. 2007) (Jacobs, C.J., dissenting) ("When an issue is settled (as this one has been), panels that follow precedent have no occasion to revisit it—they simply apply the rule by summary order.").

financial burden on Defendant and his possible witnesses" while imposing only a "*de minimis* financial impact on the Government," and because only one material witness lived in South Carolina, whereas "three of the Government's witnesses, the Defendant, and four defense witnesses reside in or around the Southern District of New York"). In short, when the facts viewed in light of the *Platt* factors support a transfer of venue, courts order transfer.

Here, the facts overwhelmingly support transfer and the interests of justice demand it. Buffalo is plainly the nerve center of the case. Indeed, the government has made no real argument to the contrary, relying instead on a groundless presumption favoring trial in the original venue—even though here venue in the Southern District is at most a legal contrivance that, on the government's own telling, hangs by a thread. The Buffalo Defendants, their counsel, their former company, their third-party witnesses, their character witnesses, many of the government's witnesses, and the investigating agents (the Buffalo FBI[8]) all work and reside in Buffalo. The burden of a trial in Manhattan would be enormous. The Court should grant the motion to transfer the Buffalo Defendants.

## V.     Conclusion.

For the foregoing reasons and those set forth in the Buffalo Defendants' prior motions, briefs, and letters, the Court should, after hearing oral argument, issue an Order dismissing Counts 1, 4, and 5 of the S2 Indictment. In the alternative, the Court should disclose or review the grand-jury transcripts. Finally, if any of the counts against the Buffalo Defendants is not dismissed, the Court should transfer their case to the Western District of New York.

Respectfully yours,

/s/Daniel C. Oliverio

Daniel C. Oliverio

DCO/nm
cc:     All counsel of record (*via CM-ECF*)

---

[8]     *See, e.g.*, *Picard*, 2017 WL 2377528, at *2 n.1 (emphasizing that "[i]t would clearly be more convenient" for two government agents living in New Jersey "to appear in the Southern District of New York than in the . . . District of South Carolina").