

**Daniel C. Oliverio**
Chairman
Direct Dial: 716.848.1433
Direct Facsimile: 716.819.4752
*DOliverio@hodgsonruss.com*

October 18, 2017

<u>**Via CM-ECF**</u>

Honorable Valerie E. Caproni
United States District Judge
United States District Court
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York  10007

   Re: *United States v. Joseph Percoco, et al.*, No. 16-CR-776 (VEC) (S.D.N.Y.)

Dear Judge Caproni:

   We represent Defendant Louis Ciminelli.  We write on behalf of Mr. Ciminelli, Defendant Kevin Schuler, and Defendant Michael Laipple (the "Buffalo Defendants"), in reply to the government's letter of October 13, 2017 (Dkt. 336) (the "Supplemental Response").

## I. <u>Introduction.</u>

   The arguments raised in the Supplemental Response undercut the government's attempt to characterize the Second Superseding ("S2") Indictment as simply adding a few clarifications.  Most importantly, the Supplemental Response acknowledges the separation between the Buffalo Request for Proposal ("RFP") and the Riverbend contract more explicitly than ever, going so far as to fashion a new right-to-control theory to address it.  This new creation is one of *five* distinct right-to-control theories thrown into the Supplemental Response.  The jumble of theories suggests, and due consideration confirms, that the government has no valid theory at all, and dismissal now is required.

## II. <u>The wire-fraud charges should be dismissed.</u>

   The Buffalo Defendants' supplemental submission illustrates the many shifts in the government's wire-fraud theory.  (Dkt. 334 at 2-3.)  In response, the government argues that it always meant to charge a right-to-control theory, and that shifting theories is not a reason to dismiss the S2 Indictment.  (Dkt. 336 at 6.)  The government does *not* attempt to reconcile the "different sentences in different documents" (*id.*) articulating radically different right-to-control theories.  (And how could it, given the welter of theories that appear in the Supplemental Response itself.)  More broadly, the government's response misses the point.  Though the constant changing of theories is an excellent reason for the Court to order a bill of particulars and



October 18, 2017
Honorable Valerie E. Caproni
Page 2

disclose or inspect the grand-jury transcripts, the Buffalo Defendants have not argued that it is an independent reason to dismiss the S2 Indictment.  Rather, their point is this: the fact that the defendants' briefing has chased the government from one theory to another signals a pleading problem of the sort described in *United States v. Davis*, No. 13-CR-923, 2017 WL 3328240, at *29 (S.D.N.Y. Aug. 3, 2017) ("[T]he Government's ever-shifting theory on a crucial element of the case—the intent to defraud—requires that the convictions be vacated.").  An examination of the five right-to-control theories posited in the Supplemental Response shows the problem to be incurable.

   *Risk of economic harm*.  The S2 Indictment alleges that by denying Fort Schuyler Management Corporation ("Fort Schuyler") the right to control its assets, the Buffalo Defendants "exposed Fort Schuyler to risk of economic harm."  (Dkt. 321 ¶¶ 39, 45.)  This is the only right-to-control theory articulated in the S2 Indictment.  Nevertheless, while the government quotes the "risk of economic harm" language in its Supplemental Response (Dkt. 336 at 2, 4, 5), it does not dispute that this theory is limited to financial-instrument cases (Dkt. 334 at 4-5); *Davis*, 2017 WL 3328240, at *17; *United States v. Binday*, 804 F.3d 558, 571 (2d Cir. 2015).  Nor does it dispute that the financial-instrument cases cannot be analogized to the facts alleged in the S2 Indictment (Dkt. 334 at 5-6).  Indeed, the government does not even bother to identify the supposed economic risk.  In short, this theory has been abandoned.

   *Exposure to legal liability*.  In the course of this prosecution, the government has cited just one rule as precluding the conduct alleged in Counts 1 and 4: the SUNY Research Foundation's policy that "suppliers" who "develop or draft" RFPs cannot participate in the subsequent procurement.  (*E.g.*, Dkt. 264 at 49 (brackets and internal quotation marks omitted).)  This policy is not a law and it operates against "suppliers," not Fort Schuyler.[1]  When the Buffalo Defendants observed that "a violation of these policies would [not] have exposed Fort Schuyler to legal liability" (Dkt. 309 at 5), the government did not disagree (Dkt. 313).  And when the Buffalo Defendants argued that their alleged misconduct did not violate any procurement law (Dkt. 220 at 8, 13), the government countered that "compliance with various procurement rules or competitive bid laws" is immaterial (Dkt. 264 at 49).  In its Supplemental Response, however, the government claims for the first time that the Buffalo Defendants "exposed Fort Schuyler to criminal and civil liability for bid-rigging."  (Dkt. 336 at 4.)  This allegation does not appear in any pleading, and the government offers no explanation beyond the drive-by assertion quoted above.  Because the government has not and cannot identify any civil or criminal liability to which Fort Schuyler was exposed, this theory fails.[2]

   *Lost opportunity to oversee negotiations for the Riverbend contract*.  Having finally realized that extensive, counseled negotiations separate the Buffalo RFP from the Riverbend contract (Dkt. 334 at 2-3), the government is now scrambling to incorporate those

---

[1]   It also did not apply to the Buffalo RFP.  (Dkt. 299 at 18.)

[2]   To the extent that the wire-fraud charges alleged in the S2 Indictment are themselves the "criminal liability" to which the government refers, its argument is irredeemably circular.

Case 1:16-cr-00776-VEC   Document 337   Filed 10/18/17   Page 3 of 5



October 18, 2017
Honorable Valerie E. Caproni
Page 3

negotiations into its wire-fraud theory. To that end, the Supplemental Response claims that the alleged misrepresentations about the Buffalo RFP tricked Fort Schuyler's Board of Directors (the "Board") into delegating to Defendant Kaloyeros its authority to negotiate contracts with preferred developers. (Dkt. 336 at 4, 5 n.2.)

This theory is untenable for several reasons. First and foremost, no pleading says anything about the Board delegating its authority to oversee contract negotiations. Indeed, the complaint alleges that the Board "had the final authority for making the selection of preferred developers and authorizing contracts." (Dkt. 1 ¶ 77(c).) As Defendant Kaloyeros explains, the Board's resolutions authorized the Board President to negotiate potential development contracts.[3] Second, even if the Board had relinquished its authority to oversee the contract negotiations, that authority is not property in the hands of Fort Schuyler. (Dkt. 220 at 32-41; Dkt. 299 at 37-41, 45-49.) This flaw again illustrates the government's penchant for dressing deficient honest-services claims in right-to-control garb. Third, although the government hints that the Riverbend negotiations were a sham (Dkt. 336 at 5 n.2 (describing the Buffalo Defendants as "'negotiat[ing]' a valuable contract with a co-conspirator")), innuendo is the most it can manage. The government does not and cannot allege that the negotiated terms of the Riverbend contract disadvantaged Fort Schuyler in any way. This defect is incurable. *Compare United States v. Mittelstaedt*, 31 F.3d 1208, 1217 (2d Cir. 1994) (holding that a fiduciary's failure to disclose his interest in his employer's real-estate projects could not constitute mail fraud absent evidence that this information had independent value or bore on the value of the transaction), *with*, *United States v. Finazzo*, 850 F.3d 94, 97, 115 (2d Cir. 2017) (upholding a mail- and wire-fraud conviction where the defendant induced his employer to pay excessive prices to a vendor he secretly controlled).

*Lost opportunity to select a different preferred developer.* After first arguing that the Buffalo Defendants "denied Fort Schuyler the opportunity to select a *potentially more suitable* developer" (Dkt. 336 at 4 (emphasis added)), the government clarifies that, according to its theory, it is enough that Fort Schuyler was denied the opportunity to "fairly consider[]" other RFP submissions "*whether or not* those bids may have been more suitable and beneficial to Fort Schuyler" (*id.* at 5 n.2 (emphasis added)). This is the same no-sale theory that Judge Preska rejected in *Davis*.[4]

The government's protestations only prove the point. Attempting to distance itself from the no-sale theory, the government writes: "There is no claim that the defendants convinced Fort Schuyler to enter into a bargain it might otherwise have avoided; rather the defendants deceived Fort Schuyler so as to guarantee that their companies would receive contracts that might otherwise have gone to others." (Dkt. 336 at 6.) This is no distinction at all. Arguing that Fort Schuyler might have contracted with a different developer states a no-sale

---

[3]   The Buffalo Defendants endorse Defendant Kaloyeros's letter and incorporate it by reference.

[4]   This theory's many other infirmities are described in the Buffalo Defendants' prior briefing. (Dkt. 299 at 37-50; Dkt. 315 at 3-5.)



October 18, 2017
Honorable Valerie E. Caproni
Page 4

theory just as much as arguing that Fort Schuyler might have avoided contracting with the Buffalo Developer. *See Davis*, 2017 WL 3328240, at *23 (rejecting, as a deficient no-sale theory, the government's argument that "the Port Authority would not have entered into the contracts or approved Solera/DCM to work on the WTC site if it knew that Defendants did not intend to comply with the MWBE program"). As the Second Circuit has repeatedly held, but-for causation is insufficient. *See, e.g.*, *United States v. Shellef*, 507 F.3d 82, 107-09 (2d Cir. 2007) (rejecting, as legally deficient, a wire-fraud charge alleging only that the "victim" would not have contracted with the defendant but for the defendant's misrepresentations); *United States v. Novak*, 443 F.3d 150, 159 (2d Cir. 2006) (reversing a mail-fraud conviction where the government proved only that the "victim" would not have made certain contract payments had it known that the defendant would be receiving a portion of them).[5]

   *Deceit going to an essential element of the bargain.* Immediately following its contrived distinction of the no-sale cases, the government writes: "Regardless, the S2 Indictment contains ample allegations regarding the relevance of the deceit to the object of the contract and to the nature of the bargain." (Dkt. 336 at 6.) As the Buffalo Defendants have explained (Dkt. 315 at 2-4), this argument is unsustainable. The only "contract" between the Buffalo Developer and Fort Schuyler was the Riverbend contract, under which Fort Schuyler agreed to pay certain sums in exchange for construction-management services. The deceit alleged in the S2 Indictment has nothing to do with this core exchange nor even with the contract's ancillary terms. The alleged deceit was directed solely to the RFP process, and the government does not claim that it had any impact on the terms or results of the Riverbend contract. Deceit that merely leads the "victim" into an honest negotiation is not wire fraud. *See United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1181-82 (2d Cir. 1970).[6] The government has seen these arguments before, yet its only answer is to point the Court to its claim that the Board delegated contracting authority to Defendant Kaloyeros. (Dkt. 336 at 4-5.) As discussed above, these

---

[5]   In a similar vein, the government quotes *United States v. Yaron*, No. 10-CR-363, 2012 WL 2477646, at *2 (S.D.N.Y. June 28, 2012), for the proposition that wire fraud occurs when, but for the alleged deceit, a contract "might have been otherwise awarded to a different company." (Dkt. 336 at 5 n.2.) If *Yaron* is as broad as the government evidently believes, it is contrary to established limits on the right-to-control theory. Moreover, as discussed in prior briefing, *Yaron* is inapposite. That case concerned actual bids for contracts, not a non-binding prelude to contract negotiations, and the defendants' scheme ensured that they would be awarded construction contracts even if another company was the low bidder. *See* 2012 WL 2477646, at *2.

[6]   The government's attempt to limit *Regent Office* to its facts (Dkt. 336 at 5 n.2) is meritless. The Second Circuit frequently cites *Regent Office* as establishing an important limitation on the right-to-control doctrine. *See, e.g.*, *Binday*, 804 F.3d at 578; *Shellef*, 507 F.3d at 108; *Novak*, 443 F.3d at 159; *Mittelstaedt*, 31 F.3d at 1216. *Regent Office* also cannot be distinguished on the ground that the Buffalo Defendants secured "an exclusive or semi-exclusive right to 'negotiate'" the Riverbend contract (Dkt. 336 at 5 n.2). The preferred-developer designation did not entitle the Buffalo Developer to anything. (Dkt. 315 at 3; Dkt. 334 at 4-7.) Like the stationery customers in *Regent Office*, Fort Schuyler was free to negotiate however and with whomever it wished. (*Id.*)



October 18, 2017
Honorable Valerie E. Caproni
Page 5

allegations do not appear in any pleading and, moreover, they confirm the separation between the Buffalo RFP and the Riverbend contract that dooms the government's essential-element theory.

### III.     Conclusion.

For the foregoing reasons and those set forth in the Buffalo Defendants' prior motions, briefs, and letters, the Court should, after hearing oral argument, issue an Order dismissing Counts 1, 4, and 5 of the S2 Indictment. In the alternative, the Court should order a bill of particulars for Counts 1 and 4, and disclose or review the grand-jury transcripts. Finally, if any of the counts against the Buffalo Defendants is not dismissed, the Court should transfer their case to the Western District of New York.

Respectfully yours,

/s/Daniel C. Oliverio

Daniel C. Oliverio

DCO/nm
cc:     All counsel of record (*via CM-ECF*)