1114 Avenue of the Americas
New York, NY 10036

212 506 3900 main
www.steptoe.com

Michael Campion Miller
212 506 3995 direct
212 506 3950 fax
mmiller@steptoe.com



October 18, 2017

Via ECF

Hon. Valerie E. Caproni
United States District Court Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

**Re:** *U.S. v. Percoco, et al.* **(Case No. 16-cr-00776-VEC)**

Dear Judge Caproni:

We represent Defendant Alain Kaloyeros in the above-referenced matter. We write in response to the Government's October 13, 2017 letter addressing our October 6, 2017 letter. (Docket Nos. 333, 336).

Our October 6, 2017 letter demonstrated that the Second Superseding Indictment reinforced three of Dr. Kaloyeros' motions: the motion to dismiss, the *Brady* motion, and the motion to suppress. (Docket Nos. 171, 176, 200). It also showed that the new indictment buttressed the Buffalo Defendants' motion for disclosure of grand jury materials, which Dr. Kaloyeros joined. (Docket No. 223). The Government's letter in response strengthens these motions even further.

I.    The Court Should Dismiss the Case.

Our October 6, 2017 letter demonstrated that the Second Superseding Indictment failed to adequately allege two critical elements of wire fraud: (1) a scheme to defraud, which requires an intent to defraud and materiality; and (2) money or property as the object of the alleged scheme. (Docket No. 333 at 3–4). That failure stems from a simple fact: the Second Superseding Indictment only alleges a fraudulent RFP process, and contains no allegation that the non-binding process somehow impacted or could have impacted the terms of the separately negotiated development contracts. The Government makes two principal arguments in response. Both should be rejected.

A.    The Government Cannot Rely on a Generic Recitation of the Elements.

The Government first suggests that it has met its burden merely by tracking the elements of the wire fraud statute. (Docket No. 336 at 3). It has not.



Hon. Valerie E. Caproni
October 18, 2017
Page 2

To the extent an offense "includes generic terms, it is not sufficient that the indictment shall charge the offense in the same generic terms as the definition." *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992). It must instead "state the specifics" and "descend to particulars." *Id.* (citing *Russell v. United States*, 369 U.S. 749, 765 (1962) ("In an indictment upon a statute, it is not sufficient to set forth the offence in the words of the statute, unless those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished[.]") (quotation omitted)).

And, here, those specifics foreclose the Government's case.

B.      The Second Superseding Indictment's Specific Allegations Are Insufficient.

The Government claims that the Second Superseding Indictment is viable because it alleges that the RFP process "cede[d] to Kaloyeros the authority to award those projects," and thereby "denied Fort Schuyler the opportunity to select a potentially more suitable developer" and "exposed Fort Schuyler to criminal and civil liability for bid-rigging." (Docket No. 336 at 3). This argument should be rejected for three reasons.

1.      The Indictment Lacks the Allegations on which the Government's Case Is Now Based.

The Government maintains that it has been "clear and consistent" as to its theory. (Docket No. 336 at 4). It has not. (*See* Docket No. 334 (tracking the evolution of the Government's theory)). Rather, the Government's theory has continually shifted.

The Government's letter is more of the same. The theory articulated there—that control over negotiations was ceded to Dr. Kaloyeros, which deprived FSMC of the chance to select a potentially more suitable developer and exposed it to legal risk—is not alleged in the Second Superseding Indictment. (*See* Second Superseding Indictment ¶¶ 22–27). It does not contain any allegations regarding negotiations, an alternative "suitable developer," or legal risk. *Id.* Nor does it allege that the RFP processes impacted—or even potentially affected—the price, quality, terms, or results of the development contracts at issue. *Id.*

This deficiency alone merits dismissal of the Second Superseding Indictment.

2.      The Government's Case Is Contradicted by Undisputed or Indisputable Facts.

The Second Superseding Indictment lacks the allegations that form the basis for its new theory because those allegations would contradict undisputed or indisputable facts.



Hon. Valerie E. Caproni
October 18, 2017
Page 3

First, the Government's claim that negotiation rights were ceded to Dr. Kaloyeros is simply false. The relevant Board resolutions (attached hereto as Exhibits A–D), make clear that the RFP process would result in "recommendations regarding the RFP to the Board of Directors for its consideration and approval." Exs. A, B.[1] Later, when those recommendations were received by the Board, the Board authorized "the President of the Corporation"—not Dr. Kaloyeros—to negotiate potential development contracts. Exs. C, D.

Second, FSMC was not deprived of any opportunity to select a potentially more suitable developer. FSMC's board resolutions (Exs. A–D) and the terms of the RFPs themselves (Exs. E–F) make clear that the RFP process committed FSMC to, and guaranteed the developers, nothing. Moreover, there is no dispute that negotiations with the developers were at arms' length (Docket No. 334 at 6) and nothing limited FSMC's right to seek out other potential developers. (Docket No. 333 at 3). Even at this late stage, the Government is unable to identify any actual or potential impact on the price, quality, or terms of the separately negotiated development contracts at issue. (Docket No. 333 at 3).

Third, FSMC has not been subjected to any civil or criminal exposure as a result of the RFP process. The Government identifies no civil exposure for FSMC. (Docket No. 336 at 4). Indeed, there is none because there is no dispute that FSMC had the right to award contracts in any manner it wished. (Docket No. 333 at 3). And no criminal exposure is apparent aside from the fact that the Government has chosen to bring criminal charges in a meritless case.

3.    The Government's Case Fails as a Matter of Law.

Even if the Government had adequately pled its most recent theory, and even if this theory was supported by facts, the Government's claim would nonetheless fail as a matter of law.

---

[1]    The RFPs and Board resolutions attached to this letter were obtained from FSMC's publicly accessible website at www.ftsmc.org. The Court may consider these publicly available materials because their contents cannot be disputed. *United States v. Covington*, 395 U.S. 57, 60 (1969) (noting that, under Federal Rule of Criminal Procedure 12(b)(1), any defense capable of determination without a trial may be raised before trial by motion); *United States v. Flores*, 404 F.3d 320, 324 (5th Cir. 2005) (recognizing that it is permissible to look beyond the indictment to resolve issues of law on undisputed facts); *United States v. Frutos-Lopez*, 627 F. Supp. 2d 1164, 1166 (C.D. Cal. 2008) (recognizing that extrinsic evidence may be considered on a Rule 12(b) motion to dismiss) , *aff'd*, 390 F. App'x 745 (9th Cir. 2010). *See also United States v. Forrester*, No. 02 CR 302 WHP, 2002 WL 1610940, at *1 (S.D.N.Y. July 22, 2002) (recognizing authority to consider extrinsic materials); *United States v. Martino*, No. S1 00 CR 389 (RCC), 2000 WL 1843233, at *1 (S.D.N.Y. Dec. 14, 2000) (same).



Hon. Valerie E. Caproni
October 18, 2017
Page 4

First, the Government cannot demonstrate money or property as required under *Sekhar v. United States.* We have repeatedly explained that, under *Sekhar v. United States*, a "nonbinding internal recommendation" that "might lead eventually to an investment that would be beneficial to private parties," is not sufficient to establish money or property for wire fraud. *Sekhar v. United States*, 133 S. Ct. 2720, 2728 (2013) (concurring opinion by Justice Alito, joined by Justice Kennedy and Justice Sotomayor) (emphasis added). (Docket Nos. 177 at 11–13, 286 at 3–4, 314 at 2, 333 at 3–4).

So too here. The Second Superseding Indictment uses substantively identical language alleging fraud in the "bidding process[] leading to the award of certain significant taxpayer-funded development contracts." (Second Superseding Indictment ¶ 39) (emphasis added). The Government has never even attempted to reconcile its theory with *Sekhar.*

Second, the allegations conflict with established law on the right to control theory. We have previously explained that the right to control theory requires, and the Second Superseding Indictment lacks: (1) an intent to defraud, because there is no allegation of intended harm to the basis of the bargain; and (2) materiality, because there is no allegation that the RFP process had (or could have had) any impact on the price, quality, or other terms of the separately negotiated development contracts. (Docket No. 333 at 3–4).

The Government's position is that a cognizable scheme to defraud is alleged here based on:

1. A non-binding, but allegedly tailored[2], RFP designed to identify developers to recommend to the Board as potential partners. The RFPs identified no specific projects and offered no right to any specific compensable work.

2. Independent evaluation by FSMC staff of RFP respondents.

---

[2] The RFPs were not, in fact, tailored. The RFPs at issue were substantively identical and were drafted and reviewed by FSMC staff, inside and outside counsel, and at least one FSMC board member. (Docket No. 177 at 15–16). The Government's claim that the Buffalo RFP was tailored rests entirely on a RFP term that had no impact on the bidding process and another term that called for women and minority business enterprise participation in an amount consistent with prevailing state standards and the practices of FSMC's sister organization, FRMC. (*Id.* at 16–17). The Government's claim that the Syracuse RFP was tailored rests on a non-exclusionary term calling for developers to have sophisticated software tools and a provision regarding financials that expanded the field of eligible developers. (*Id.* at 15–16).



Hon. Valerie E. Caproni
October 18, 2017
Page 5

      3.     A recommendation by FSMC staff to the FSMC Board of qualified developers. There is no dispute that the recommended developers were qualified.

      4.     Board approval for the President of FSMC, not Dr. Kaloyeros, to negotiate with the recommended developers.

      5.     Arms' length negotiations between FSMC and the developers in which FSMC remained free to seek out other partners.

      6.     Contracts entered into with developers. There is no allegation of impact on the price, quality, or other terms of the contracts.

Essentially, the Government invites the Court to infer, without any specific allegations of harm, that a purportedly deficient RFP in Step 1 necessarily resulted in harm or potential harm to separately-negotiated, actual contracts in Step 6. The Second Circuit has repeatedly rejected this type of inference as improper. It has recognized that it is not enough to show: (1) a misrepresentation that precedes negotiation but does not impact the terms of the bargain; (2) "schemes that do no more than cause their victims to enter into transactions they would otherwise avoid"; or (3) the absence of "information that might have an impact on the decision regarding where . . . money is spent, without more." *United States v. Regent Office Supply*, 421 F.2d 1174, 1182 (2d Cir. 1970); *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007); *United States v. Mittelstaedt*, 31 F.3d 1208, 1217 (2d Cir. 1994). Rather, the Government must demonstrate a specific impact on the basis of the bargain and the terms of the contract at issue. *Id.*[3]

The Government's argument here would upend this long line of cases. It would permit an inference of economic harm to flow from almost any allegation of deceptive conduct, no matter how attenuated the connection between the conduct and any purported harm.

---

[3]     The Government heavily relies on *United States v. Yaron* to support its case. No. S2 10 Cr. 363, 2012 WL 2477646, at *2 (S.D.N.Y. June 28, 2012). *Yaron* should not be relied on here for three reasons. First, *Yaron* is wrong. *Yaron* incorrectly concluded that intent to harm could be found based on the fact that "contracts were awarded to the defendants even where it might have been otherwise awarded to a different company." *Id.* This conclusion contravenes *Mittelstaedt*, which recognized that "impact on the decision regarding where government money is spent, without more, is not" sufficient. *Mittelstaedt*, 31 F.3d at 1217. Second, *Yaron* involved direct bribes for specific contracts, not the separate and distinct processes alleged here. *Yaron*, 2012 WL 2477646, at *2. Third, *Yaron* only addressed the intent element of a right to control wire fraud theory, and not materiality or money or property. *Id.* As discussed above, the Government does not and cannot allege these elements.



Hon. Valerie E. Caproni
October 18, 2017
Page 6

Third, the Government's argument would similarly upset the Supreme Court's deliberate limiting of the honest services case law in *Skilling* and *McDonnell*. Permitting claims like this one would allow almost any deficient honest services fraud claim to be re-packaged as a "right to control" wire fraud. (Docket No. 333 at 3 n.1). The Government does not address this problem.

\*                              \*                              \*

While dismissal of an indictment is an extraordinary remedy, the extraordinary circumstances here warrant it. If the Government did not fully appreciate the legal and factual flaws in its case at the outset, it has now long been on notice of them and had substantial opportunities to address them. Its recent letter confirms that it cannot. The Government's case now rests on claims that are not alleged in the Second Superseding Indictment, that are contrary to undisputed facts, and that run contrary to *Sekhar*, right to control case law, and honest services jurisprudence.

We said at the outset of this case that the U.S. Attorney's transparent political goals produced a political prosecution without legal or factual basis. (Docket No. 177 at 1). Rather than confront that reality, that same political drive and inertia have lead the Government to press forward, repeatedly shifting its factual and legal theories. (Docket No. 332 (tracking the evolution of the Government's theory)). This Court should do what the Government refuses and what justice requires: dismiss this case now.

II.     The Court Should Grant Dr. Kaloyeros' *Brady* Motion.

These same improper motivations have also fueled the Government's *Brady* approach, with the Government's constitutional and ethical responsibilities giving way to its desire to win at all costs.

Prior to the Second Superseding Indictment, we raised numerous serious concerns with the Government's *Brady* obligations including: (1) the Government's absurd position on what constitutes *Brady* in this case; (2) the Government's repeated representation that it was unaware of *Brady* material, even as we demonstrated that the Government had withheld exculpatory witness interviews and attorney proffers; and (3) the Government's undisputed failure to memorialize its efforts to shape witness testimony. (Docket Nos. 201, 288, 308, 314).

More recently, following the Second Superseding Indictment, we raised the Government's failure to produce *Brady* material in connection with changes in the Second Superseding Indictment. (Docket No. 333 at 5).

The Government's letter fails to address any of the *Brady* issues we identified prior to the Second Superseding Indictment. And it provides no explanation for the language changes in the Second Superseding Indictment. Instead, it claims that the plainly changed language is actually consistent with prior language. (Docket No. 336 at 4, 6).



The Court is therefore left to rely on the Government's assurance that it "is aware of its *Brady* obligations, ha[s] made multiple disclosures in response to the defendants' *Brady* requests, and is unaware of any additional *Brady* material." (Docket No. 336 at 6). In essence, the Government asks the Court to rely on the Government's say-so in the face of compelling contradictory evidence. It should not.

Dr. Kaloyeros has raised serious constitutional and ethical concerns with the Government's failure to fulfill its *Brady* obligations. They merit examination by the Court.

## III. The Court Should Grant Dr. Kaloyeros' Suppression Motion.

Our letter explained that the Second Superseding Indictment strengthened Dr. Kaloyeros' motion to suppress in two respects. First, the new indictment's acknowledgment that the case is premised on the right to control theory reinforced the lack of probable cause in the warrants' supporting affidavits, which lacked support for that theory. (Docket No. 333 at 6–7). Second, the new indictment's concession that the RFP process and contract negotiations were separate further undercuts the Government's ability to rely in good faith on the affidavits, which misleadingly suggested otherwise. (*Id.* at 7). The Government's letter offers no response.

Our letter also explained how the Government's briefing in response to Dr. Kaloyeros' suppression motion strengthened the motion. It showed that, whatever the language of the warrants, they were treated as general warrants. (*Id.* at 6). Specifically, it explained how the Government failed to: (1) identify any search terms or other protocol used to cabin the universe of records it reviewed; (2) identify any protocol employed to ensure that any review of irrelevant documents was limited and that irrelevant documents were promptly segregated; or (3) return any non-seized documents to Dr. Kaloyeros despite his request that they do so. (*Id.*).

The Government's letter does not dispute any of this, and the Government still has not returned any non-seized documents. The Government's continued silence and failure to return any documents support only one conclusion: that it has improperly seized "the full contents" (Docket No. 264 at 128) of Dr. Kaloyeros' personal e-mail account (most of which have nothing to do with this case and all of which, save for privileged documents, were produced to all of the defendants in this case) and treated the warrants as general warrants. If this approach is endorsed, then the Fourth Amendment is dead letter in the electronic age.

Dr. Kaloyeros' motion to suppress should be granted.

## IV. The New Indictment Supports Disclosure of Grand Jury Materials.

Our letter explained that the changes to the Second Superseding Indictment supported the Buffalo Defendants' motion for the disclosure of grand jury materials. (Docket No. 333 at 8).



Hon. Valerie E. Caproni
October 18, 2017
Page 8

The Government again offers nothing more than its own say-so in response. (Docket No. 336 at 4). For the same reasons discussed above, this Court should not rely on the Government's conclusory denials.

V.     Conclusion

We respectfully request that the Court schedule hearings and oral argument as previously requested. We thank the Court for its attention to this matter and are available to the Court should it require any additional information.

Respectfully submitted,

Michael C. Miller

cc:     All Counsel (via ECF)