

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

December 1, 2017

**BY ECF**

The Honorable Valerie E. Caproni
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

      Re:    *United States* v. *Joseph Percoco, et al.*, S2 16 Cr. 776 (VEC)

Dear Judge Caproni:

      The Government respectfully writes to oppose the motions *in limine* filed by defendants Joseph Percoco (Dkt. Nos. 342, 343), Peter Galbraith Kelly, Jr. (Dkt. Nos. 346, 347, 348), and Steven Aiello and Joseph Gerardi (Dkt. Nos. 344, 345), respectively.

      *First*, the Government submits that its cooperator Todd Howe should be permitted to give focused and limited testimony about his prior corrupt agreement with Aiello and Gerardi to rig a bidding process relating to certain State-funded development projects. Such testimony is direct proof of the genesis of Aiello and Gerardi's subsequent agreement to bribe Percoco, and is also evidence of other acts admissible under Federal Rule of Evidence 404(b) ("Rule 404(b)"). A clear limiting instruction will protect Percoco and Kelly from the risk of unfair spillover prejudice.

      *Second*, the Government should be allowed to offer evidence that Percoco threatened to use his significant influence to retaliate against and control the decisions of certain State officials contemplating career changes. This evidence, which includes evidence of conduct by Percoco while he was Governor Andrew Cuomo's campaign manager in or about 2014, is properly admissible proof of Percoco's role as a State agent while working in the Governor's campaign, his intention to return to State service during that time period, and his power and control over State officials.

      *Third*, the Government should be permitted to present evidence that Kelly hired the daughter of a union leader to garner the labor leader's support for an Energy Company project. With regard to this evidence, a clear limiting instruction will be sufficient to protect the rights of Percoco, Aiello, and Gerardi, who did not engage in that conduct.

      *Fourth*, the Government does not plan to argue that the four defendants were engaged in a single conspiracy to bribe Percoco. However, the Government will properly argue that Percoco and Howe developed a plan to seek bribe payments from certain of Howe's clients when Percoco's

finances grew increasingly desperate, and the Government should not be precluded from using the terms "Percoco Bribery Scheme" or "Percoco Scheme."

*Fifth*, and finally, the Government should be permitted to offer evidence regarding Percoco's arrangement with the Engineering Consulting Firm (as defined below), as well as related, recently discovered evidence regarding omissions in Percoco's required financial disclosures for the year 2014.[1]

## I. Applicable Law

Evidence is admissible pursuant to Federal Rules of Evidence 401 and 402 ("Rule 401" and "Rule 402," respectively) when it is relevant, meaning that "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401; *see also* Fed. R. Evid. 402 ("Relevant evidence is admissible" absent contrary provision in the Constitution, federal statute, Federal Rules of Evidence, or other rules prescribed by the Supreme Court.). "To be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency." *United States* v. *Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997) (internal quotation marks and citation omitted); *see also Florez* v. *Cent. Intelligence Agency*, 829 F.3d 178, 184 (2d Cir. 2016) ("More briefly stated, evidence is relevant if it has 'appreciable probative value.'" (quoting *Relevant*, Black's Law Dictionary (10th ed. 2014))). Indeed, "the definition of relevance under Fed. R. Evid. 401 is very broad." *United States* v. *Certified Envtl. Servs., Inc.*, 753 F.3d 72, 90 (2d Cir. 2014). "To be relevant, evidence need not be sufficient by itself to prove a fact in issue, much less to prove it beyond a reasonable doubt." *United States* v. *Abu-Jihaad*, 630 F.3d 102, 132 (2d Cir. 2010).

Pursuant to Federal Rule of Evidence 404(b)(1), however, "[e]vidence of a crime, wrong, or other act"—even if relevant—"is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). Nevertheless, evidence of an uncharged criminal act is not considered a separate act and is properly admissible as "direct proof" of the charged crime "if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." *Gonzalez*, 110 F.3d at 942 (internal quotation marks and indicators of alterations from the original omitted); *see also United States* v. *Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (same).

Even if not admissible as so-called "direct proof," evidence of other bad acts is admissible under Rule 404(b)(2) and 403 if it (1) is advanced for a proper purpose; (2) is relevant to a material issue at trial; (3) has probative value that is not substantially outweighed by any unfair prejudicial effect; and (4) is admitted subject to a limiting instruction, if one is requested. *See, e.g.*, *Huddleston* v. *United States*, 485 U.S. 681, 691 (1988); *United States* v. *Brand*, 467 F.3d 179, 196 (2d Cir. 2006); *United States* v. *LaFlam*, 369 F.3d 153, 156 (2d Cir. 2004). Permissible purposes

---

[1] The Government obtained relevant witness statements and documents on or about November 30, 2017, and produced notes of the statements as well as the documents to the defendants on or about December 1, 2017.

for introducing evidence of other acts include "proving motive, opportunity, intent, . . . knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). In addition, other act evidence is admissible to establish "background information" to a charged conspiracy and to explain how a criminal relationship developed. *United States* v. *Pipola*, 83 F.3d 556, 565 (2d Cir. 1996). Other act evidence is also admissible to help the jury understand the basis for the relationship of mutual trust between co-conspirators. *See, e.g.*, *United States* v. *Rosa*, 11 F.3d 315 (2d Cir. 1993).

The Second Circuit follows "an 'inclusionary' approach to other act evidence under Rule 404(b), which allows such evidence to be admitted for any purpose other than to demonstrate criminal propensity." *LaFlam*, 369 F.3d at 156; *accord United States* v. *Thomas*, 54 F.3d 73, 82 (2d Cir. 1995) (allowing evidence of defendant's prior conviction on charge of transporting stolen money orders where it demonstrated knowledge and intent with respect to money orders at issue in case at bar); *United States* v. *Gelzer*, 50 F.3d 1133, 1139-40 (2d Cir. 1995) (allowing circumstantial evidence from prior unrelated and uncharged robbery where it established defendant's connection to a weapon used in the charged crime).

The admission of extrinsic evidence concerning a defendant's prior conduct is particularly appropriate where the defendant's state of mind is at issue:

> Federal Rule of Evidence 404(b) . . . generally prohibits the introduction of extrinsic acts that might adversely reflect on the actor's character, unless the evidence bears upon a relevant issue in the case such as motive, opportunity, or knowledge. Extrinsic acts evidence may be critical to the establishment of the truth as to a disputed issue, especially when that issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct.

*Huddleston*, 485 U.S. at 685. The Second Circuit has repeatedly held that "[w]here intent to commit the crime charged is clearly at issue, evidence of prior similar acts may be introduced to prove that intent." *United States* v. *Caputo*, 808 F.2d 963, 968 (2d Cir. 1987). The defendant's knowledge and intent is at issue unless the defendant unequivocally concedes that element of the offense. *See, e.g.*, *United States* v. *McCallum*, 584 F.3d 471, 475-76 (2d Cir. 2009) ("Because [the defendant's] counsel did not make a statement to the court of sufficient clarity to indicate that intent and knowledge would not be disputed, those issues remained sufficiently in dispute for the similar acts evidence to be relevant and hence admissible."); *United States* v. *Colon*, 880 F.2d 650, 656-57 (2d Cir. 1989) ("If a defendant does not wish to enter into a formal stipulation, he or she must at least 'express a decision' to restrict the defense case so as not to raise the issue of intent, and to accept a jury instruction that would keep that issue out of the case.").

Where evidence is offered for a proper purpose under Rule 404(b), the Court may only exclude the evidence under Rule 403 if the probative value of the evidence is "substantially outweighed" by the danger of unfair prejudice. *United States* v. *Zackson*, 12 F.3d 1178, 1182 (2d Cir. 1993). With regard to the prejudice prong, evidence is unfairly prejudicial "only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence." *United States* v. *Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980).

Moreover, Rule 403 does not bar evidence of other acts that "did not involve conduct any more sensational or disturbing than the crimes with which [the defendant] was charged." *United States* v. *Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990); *see also United States* v. *Barris*, 377 F. App'x 93, 96 (2d Cir. 2010) (stating that admission of evidence under Rule 404(b) is not contrary to Rule 403 where the "evidence was not inflammatory, pejorative, or otherwise unfairly prejudicial, and had obvious probative value"). All relevant evidence is to some degree prejudicial; *unfair* prejudice means, however, an "undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Rule 403, Advisory Comm. Note. Traditional examples of unfair prejudice include evidence that appeals to the jury's sympathies, evidence that arouses jurors' sense of horror, and evidence that provokes a jury's instinct to punish. *United States* v. *Herron*, No. 10 Cr. 615 (NGG), 2014 WL 1871909, at *4 (E.D.N.Y. May 8, 2014); *see also United States* v. *Peters*, 791 F.2d 1270, 1294 (7th Cir. 1986) (evidence is unfairly prejudicial under Rule 403 if it arouses a sense of horror or otherwise produces an emotional response that would cause the jury to base its decision on something other than the evidence). A "[d]efendant must show some undue prejudice, apart from the prejudice implicit in Rule 404(b) evidence." *United States* v. *Vargas*, 702 F. Supp. 70, 72-73 (S.D.N.Y. 1988).

Finally, with respect to the timing of the Government's presentation of the proffered evidence, the Second Circuit has made clear that where it is apparent that knowledge or intent will be in dispute, "evidence of prior or similar acts may be introduced during the government's case-in-chief, 'rather than waiting until the conclusion of the defendant's case.'" *United States* v. *Pitre*, 960 F.2d 1112, 1120 (2d Cir. 1992) (quoting *Caputo*, 808 F.2d at 968); *see also Zackson*, 12 F.3d at 1183 ("[T]he nature of [defendant's] defense was apparent from the outset of the trial; thus, there was no need to await [defendant's] testimony."); *United States* v. *Inserra*, 34 F.3d 83, 90 (2d Cir. 1994) ("[A]dmission of similar act evidence to prove intent or knowledge . . . is admissible during the Government's case-in-chief if it is apparent that the defendant will dispute that issue.").

## II. Argument

### A. The Court Should Admit Focused Testimony from Todd Howe Regarding His Prior Corrupt Bid-Rigging Agreement with Steven Aiello and Joseph Gerardi

Pursuant to Rules 401 and 402, and, in the alternative, Rule 404(b), the Government intends to elicit focused and limited testimony from Howe regarding his preexisting corrupt relationship with Aiello and Gerardi.

#### 1. Relevant Facts

When, in or about 2014, Howe decided to approach Aiello and Gerardi (the "Syracuse Defendants") on behalf of Percoco regarding paying Percoco for help with labor issues, Howe did not choose them randomly. Quite the opposite: Aiello and Gerardi were established clients who had paid Howe tens of thousands of dollars the year before to secretly rig a supposedly competitive request for proposals (the "Syracuse RFP") so that State contracts ultimately worth tens of millions of dollars would be awarded to their company (the "Syracuse Developer"). (S2 Indictment ¶ 22.) The Government expects that Howe will testify at trial, in substance and in part, that, given his prior corrupt dealings with the Syracuse Defendants, he felt comfortable asking Aiello and Gerardi to make bribe payments to Percoco, and that he did so because, based on his prior dealings with

the Syracuse Defendants on the Syracuse RFP, Howe believed they might be amenable to that illicit proposal.

The Government further anticipates that Howe's testimony about the conspiracy between Aiello, Gerardi, and himself to rig the Syracuse RFP will be narrow and focused. The Government expects that Howe will testify, in sum and substance, that the Syracuse Defendants hired him in large part to help the Syracuse Developer compete for State-funded construction contracts. With Howe's encouragement, the Syracuse Defendants made and directed significant contributions to the Governor's campaign in order to better position themselves to win future State-funded contracts. When another of Howe's clients, the State University of New York-affiliated College of Nanoscale Science and Engineering ("CNSE"), decided in or about 2013 to build a film hub in the Syracuse area, Howe conspired with Aiello, Gerardi, and Alain Kaloyeros, the then-head of CNSE, to rig the bidding process for the benefit of the Syracuse Developer. To accomplish their fraudulent scheme, Howe and Kaloyeros exchanged drafts of the RFP and worked with the Syracuse Defendants to add qualifications into the RFP that would favor the Syracuse Developer. (S2 Indictment ¶ 24.) During this Syracuse RFP conspiracy, the Syracuse Developer was paying Howe approximately $14,000 per month. Then, after the Syracuse Developer was selected as CNSE's preferred developer and entered into State-funded contracts, the company paid Howe bonuses totaling approximately $385,000 in or around August 2014, October 2014, November 2014, and June 2015. (Compl. ¶ 71 (a) and (b).) Notably, those payments from the Syracuse Developer occurred during the charged time period of the Syracuse Defendants' conspiracy to bribe Percoco.

In addition to Howe's testimony, the Government intends to offer a limited number of relevant emails through Howe, including an attachment to an email dated on or about September 13, 2013 in which Gerardi underlined one of the secretly tailored qualifications in the draft RFP and handwrote, "too telegraphed?? I would leave out these specific programs." (Compl. ¶ 78(i)(i).) The specific program flagged by Gerardi had been taken almost verbatim from a document listing the Syracuse Developer's qualifications and experience that Aiello and Gerardi had given to Howe, and that Howe in turn had sent to Kaloyeros as "vitals"—or, qualifications—specific to their "Syracuse friends." (Compl. ¶ 78(e) and (g).) The Government also expects to offer a limited set of bank records and documents showing the payments to Howe from the Syracuse Developer made between in or about 2011 and 2016, including cash bonuses deposited directly into Howe's personal bank account and into his shell company's bank account. The Government does not intend to call other witnesses to testify regarding Aiello and Gerardi's participation in a conspiracy to rig the Syracuse RFP.[2] (Collectively, this proposed evidence is

---

[2] As explained in more detail in the Government's motions *in limine* and in footnote 7, *infra*, Aiello and Gerardi separately met with the Government pursuant to proffer agreements on or about June 21, 2016. (Dkt. No. 349 at 2-4.) In the course of those meetings, Aiello made certain false statements denying involvement in paying Percoco. Aiello made additional false statements regarding, among other things, his involvement in tailoring the Syracuse RFP to benefit the Syracuse Developer. Similarly, Gerardi made certain false statements denying involvement in paying Percoco and made additional false statements regarding, among other things, his involvement in tailoring the Syracuse RFP to benefit the Syracuse Developer. If either Aiello or Gerardi testifies at trial, regardless of the outcome of this motion, the Government reserves the

referred to herein as the "Syracuse RFP Evidence.")

   2.   Discussion

      a.   **The Syracuse RFP Evidence Is Direct Evidence, or, in the Alternative, Admissible Evidence Under Rule 404(b) Against Aiello and Gerardi**

The defendants contend that evidence of the Syracuse RFP bid-rigging scheme is not relevant to the bribery, extortion, and honest services fraud charges at issue in the January trial. (Dkt. No. 342 at 2; Dkt. No. 348 at 8.) They are wrong. The Syracuse RFP Evidence is direct proof of the charged conspiracies because Aiello and Gerardi's willing participation in the bid-rigging scheme explains why Howe approached them the following year to solicit bribes on behalf of Percoco. Without this evidence, the jury will be under the mistaken impression that Howe asked, seemingly out-of-the-blue, two presumably law-abiding executives to pay illicit bribes. *See Gonzalez*, 110 F.3d at 942 (ruling that evidence of an uncharged attempted burglary was intrinsic proof of the firearm possession charge because the botched burglary "provide[d] crucial background evidence" as to why the defendants were running away with their firearms drawn when they were arrested); *see also Inserra*, 34 F.3d at 89 ("[E]vidence of other bad acts may be admitted to provide the jury with the complete story of the crimes charged by demonstrating the context of certain events relevant to the charged offense."). Howe and the Syracuse Defendants' prior course of dealing is critical background and context for understanding Aiello and Gerardi's decision to agree to make the corrupt payments to Percoco, and explains why Aiello and Gerardi trusted Howe as their go-between with the State official they were bribing. *Cf. United States* v. *Williams*, 585 F.3d 703, 705-07 (2d Cir. 2009) (where the defendant was arrested outside an apartment building after police saw a firearm on his person, evidence of contraband found inside the building the day after his arrest was not direct proof of the firearm possession charge because the contraband did not "explain why the police were at the building . . . [or] why [the defendant] was arrested"). Because the Syracuse RFP Evidence is "necessary to complete the story of the crime of trial," it is properly admitted as direct evidence. *Gonzalez*, 110 F.3d at 942.

Even assuming, for the sake of argument, that the Syracuse RFP Evidence were not an intrinsic part of the proof of the charges in the January trial, the evidence would nonetheless still be admissible pursuant to Rule 404(b) to prove Aiello and Gerardi's opportunity, intent, knowledge, and lack of mistake with respect to paying Percoco. *See* Fed. R. Evid. 404(b)(2). It is already clear that Aiello and Gerardi will argue at trial that they neither knew of nor authorized payments to Percoco in or about 2014. During their separate proffer sessions, Aiello and Gerardi each acknowledged that they sent payments totaling approximately $35,000 to Howe's shell company in or about August 2014 and October 2014, but they claimed, in substance and in part, that those payments were for a financing project unrelated to Percoco. They disclaimed any knowledge that Howe had, in turn, sent the money to Percoco, and denied entering into a corrupt agreement to bribe Percoco for official action. Based on those proffer statements, which the Government has alleged are false, the Government fully expects the Syracuse Defendants to

---

right to cross examine and confront the defendant about both his participation in the rigging of the Syracuse RFP and his subsequent false statements to the Government about the same conduct.

dispute their knowledge or intent to commit bribery.

In light of this anticipated defense, the Syracuse RFP Evidence—which shows that Aiello and Gerardi entered into a corrupt relationship with Howe in order to obtain lucrative State benefits—will be powerful proof of Aiello and Gerardi's intent to join in, knowledge of, and lack of mistake with respect to engaging in another conspiracy with Howe to secure favorable State action, this time through the official actions of Percoco, and will explain how Aiello and Gerardi came to the opportunity to do so. *See Caputo*, 808 F.2d at 968 (When "intent to commit the crime charged is clearly at issue, evidence of prior similar acts may be introduced to prove that intent."). Specifically, the Syracuse RFP Evidence will prove that Aiello and Gerardi knowingly and willingly conspired to secretly tailor the supposedly fair and competitive Syracuse RFP by inserting qualifications beneficial to their company in order to gain an advantage with respect to State-funded work. That corrupt desire to use illegal means to gain advantages with respect to State projects also motivated Aiello and Gerardi to bribe Percoco for his use of State action, including to reverse an unfavorable labor decision by a State authority, to secure the release of State funds, and to obtain a raise for Aiello's son. Evidence that Aiello and Gerardi had previously entered into a corrupt relationship with Howe thus is squarely relevant to these defendants' anticipated claim that they did not possess the necessary intent to commit the crimes at issue in the January trial.

Relatedly, the prior bad act evidence connected to the Syracuse RFP is important "background information" to the charged conspiracies involving Aiello and Gerardi. As noted, the Syracuse RFP evidence explains how Howe, Aiello, and Gerardi developed a criminal relationship in or about 2013, and why Howe trusted the two defendants enough to ask for illicit bribe payments on behalf of Percoco without fear that the defendants would report him to the authorities, and why Aiello and Gerardi trusted Howe as an intermediary in their illicit relationship with Percoco. These purposes are all proper grounds for admission of extrinsic evidence under Rule 404(b).[3] *See, e.g.*, *Pipola*, 83 F.3d at 565. Accordingly, Aiello and Gerardi are incorrect that the Government seeks to introduce the Syracuse RFP Evidence to show their propensity to commit crimes, or to suggest generally that bribery is a normal part of business in Albany. (Dkt. No. 344 at 5.)

Aiello, Gerardi, and Kelly contend that the Syracuse RFP Evidence nonetheless should be precluded under Rule 403. (Dkt. No. 344 at 6; Dkt. No. 348 at 8-9.) However, they fail to explain how that relevant and admissible evidence will increase the risk of unfair prejudice. Aiello and Gerardi's claim that the jury, curious about the lack of bid-rigging charges, will convict them of bribery "for fear that the Syracuse Defendants will get away with the other [. . .] misconduct" is pure, baseless speculation. (Dkt. No. 344 at 6.) As an initial matter, the jury will be charged that they are not to consider defendants or charges not included in the trial before them, and juries are presumed to follow the Court's instructions. *See Richardson* v. *Marsh*, 481 U.S. 200, 206 (1987) (recognizing "the almost invariable assumption of the law that jurors follow their instructions").

---

[3] The fact that Aiello and Gerardi will face charges related to the Syracuse RFP bid-rigging scheme in the June trial is wholly irrelevant to the question of whether the proposed Syracuse RFP Evidence is admissible in the January trial as either intrinsic proof or Rule 404(b) evidence. (*Cf.* Dkt. No. 344 at 6-7.)

In addition, the Syracuse RFP Evidence, while highly probative, is no more sensational or disturbing than charges relating to bribing a top State official with, among other things, a low-show job for the official's wife, and its probative value is therefore not outweighed by risk of unfair prejudice. *Roldan-Zapata*, 916 F.2d at 804.

The defendants also argue that the Government, in its opposition to their pretrial motions to dismiss, endorsed a severance of the bribery schemes involving Percoco from the bid-rigging charges centered around CNSE. (Dkt. No. 342 at 1; Dkt. No. 344 at 2-3; Dkt. No. 348 at 2-4.) The Government explained that a severance would result in two shorter, more streamlined trials and would largely eliminate the threat of spillover prejudice. The Government further noted that the remaining risk of prejudice could be effectively cured with limiting instructions. (*See* Dkt. No. 264 ("Gov. Opp'n") at 100-01.) The defendants argue that the Government is now backtracking from these statements in its opposition brief. The Government is doing no such thing. The limited and narrow presentation of the Syracuse RFP Evidence proposed here will not undermine the benefits of the severance ordered by the Court. As explained above, the Government anticipates that the Syracuse RFP Evidence will consist of Howe's testimony and a handful of particularly probative documents.[4] In addition, the Government will not offer any evidence regarding the crimes of executives at the Buffalo Developer. Nor will the Government seek to prove or introduce all evidence necessary to prove that the Syracuse Defendants defrauded Fort Schuyler Management Corporation of its right to control its assets—all that the Government will establish is that the Syracuse Defendants entered into an agreement with Howe to tailor the qualifications of the Syracuse RFP and paid Howe to use his position at CNSE to help them. Contrary to the defendants' claim, the Syracuse RFP Evidence will not significantly lengthen the January trial.[5]

---

[4] The defendants complain that they have not fully reviewed materials related to the CNSE bid-rigging schemes because they believed, based on their reading of the Government's opposition brief, that none of those facts would be offered at the January trial. (Dkt. No. 342 at 1; Dkt. No. 344 at 3; Dkt. No. 348 at 3.) As an initial matter, the Government provided its Rule 404(b) notice letters to the defendants on or about October 13, 2017, approximately 11 weeks in advance of trial. By the start of the January trial, the defendants will have had more than enough time to review the limited documents and Jencks Act/*Giglio* materials relevant to the Syracuse RFP. This is particularly true because most of the Syracuse RFP Evidence is described in detail in the criminal Complaint, which contains direct quotations from relevant documents. (Compl. ¶¶ 75-78.) Furthermore, the evidence will not include any crimes of the Buffalo Developer, which significantly reduces the number of relevant documents and witness statements.

[5] Aiello and Gerardi threaten that, if the Court allows the Syracuse RFP Evidence, they "will require dozens of defense witnesses," which will result in a trial within the January trial. (Dkt. No. 344 at 6.) That argument is disingenuous. The scope of the Syracuse RFP Evidence proposed by the Government will be narrow and limited, as described above, and, given that the Government will not seek to prove up wire fraud or bribery charges related to the Syracuse RFP, will not require more than Howe's testimony and certain documents to establish the agreement between Aiello, Gerardi, and Howe. As a result, it is difficult to imagine that Aiello and Gerardi will have a legitimate basis to call "dozens of defense witnesses" to testify about the Syracuse RFP.

(*Cf.* Dkt. No. 344 at 6; Dkt. No. 348 at 6-7.)

### b. The Limited and Narrow Presentation of the Syracuse RFP Evidence Will Not Lead to Unfair Spillover Prejudice Against Percoco and Kelly

Percoco and Kelly advance the additional argument that admission of the Syracuse RFP Evidence will substantially increase the risk of spillover prejudice to themselves. They move to preclude that evidence, and Kelly separately renews his pending motion to sever his charges.[6] Those motions should be denied.

As explained in the Government's brief in opposition to the defendants' pretrial motions, "[e]ven if prejudice is shown . . . severance is not necessarily required" under Federal Rule of Criminal Procedure 14 ("Rule 14") because, "even when the risk of prejudice is high, measures less drastic than severance, 'such as limiting instructions, often will suffice to cure any risk of prejudice.'" *United States* v. *Diaz*, 176 F.3d 52, 104 (2d Cir. 1999) (quoting *Zafiro* v. *United States*, 506 U.S. 534, 539 (1993)); *United States* v. *Bennett*, 485 F. Supp. 2d 508, 515 (S.D.N.Y. 2007) ("[T]o the extent that a category of evidence is irrelevant to [one particular defendant], a limiting instruction will suffice to remove any prejudice."); *see also United States* v. *Spinelli*, 352 F.3d 48, 56 (2d Cir. 2003) ("[E]ven the fact that evidence may be admissible against one defendant but not another does not necessarily require a severance."); *United States* v. *Taveras*, No. 95 Cr. 173 (AGS), 1995 WL 390167, at *7 (S.D.N.Y. June 30, 1995) ("Simply put, '[e]vidence of prior criminal offenses relating only to one defendant does not generate prejudice rising to the level that requires severance.'" (quoting *United States* v. *Salomon*, 609 F.2d 1172, 1175 (5th Cir. 1980))). Here, the elevated risk of prejudice can be successfully mitigated with a limiting instruction that, in sum and substance, informs the jury that the Syracuse RFP Evidence cannot be used against Percoco or Kelly. Courts regularly issue limiting instructions in multi-defendant trials that guide the jury as to what evidence can and should be considered against some defendants, but not others. *See, e.g.*, *United States* v. *Downing*, 297 F.3d 52, 59 (2d Cir. 2002) ("Absent evidence to the contrary, we must presume that juries understand and abide by a district court's limiting instructions."); *United States* v. *Griffin*, No. 94 Cr. 631 (AGS), 1996 WL 140073, at *13 (S.D.N.Y. Mar. 27, 1996) ("The Second Circuit has routinely found that juries will abide by limiting instructions in multi-defendant cases."). Such an instruction would effectively prevent the jury from finding Percoco and Kelly guilty by their association with Howe.

What is more, the limited nature of the proposed Syracuse RFP Evidence will also greatly reduce the risk of spillover prejudice. The Government is not proposing to introduce multiple witnesses and numerous documents related to the bid-rigging schemes; indeed the Government intends to introduce the evidence only through Howe. And the jury will not consider any criminal charges related to the Syracuse RFP, which will significantly reduce the possibility that the jury will become confused about the bribery scheme featuring Percoco and Kelly, as Kelly fears. (*Cf.* Dkt. No. 348 at 6.) Indeed, the Government will not seek to establish that a crime was committed

---

[6] The Government previously addressed Kelly's unpersuasive argument that he should be severed irrespective of whether the Court permits the Government to introduce the Syracuse RFP Evidence. (*See* Gov.'s Opp'n 96-98.)

with respect to the Syracuse RFP—only the fact of Aiello, Gerardi, and Howe's agreement to tailor the RFP (and Aiello and Gerardi's payments to Howe). The only charges in the January trial indictment will be ones related to the bribery scheme between Percoco, Aiello, and Gerardi, and the separate bribery scheme between Percoco and Kelly. Accordingly, the limited presentation of the Syracuse RFP Evidence, tempered with limiting instructions to protect Percoco and Kelly, will defuse the risk of unfair prejudice.

Kelly asserts that the Syracuse RFP Evidence will be confusing to the jury because the Government has alleged that Kelly bribed Percoco in part for official action with respect to the competitive selection process for a lucrative power purchase agreement ("PPA") with the State. (Dkt. No. 348 at 6; *see also* S2 Indictment ¶ 31(b).) Kelly also points to other "superficial" similarities between his bribery scheme and the Syracuse RFP bid-rigging, including Howe's use of his shell company to receive funds, that, in his view, might cause jurors to conflate his conduct with that of Aiello and Gerardi. (Dkt. No. 348 at 6.) But Kelly overstates the risk of jury confusion. The Syracuse RFP Evidence focuses on the Syracuse Defendants and Howe's secret tailoring of a RFP seeking construction companies and eventually resulting in the award of a State contract to build a film studio in Syracuse. In contrast, evidence related to the PPA concerns bids for a power contract that would have allowed the Energy Company—Kelly's employer—to more easily obtain financing to build a power plant in the Hudson Valley. Another key distinction is that the Government does not allege that Percoco, Howe, or Kelly secretly rigged the PPA process. These stark factual differences between the Syracuse RFP and the PPA will allow the jury to distinguish between evidence of the two schemes without much difficulty. *Cf., e.g.*, *Bennett*, 485 F. Supp. 2d at 515 ("[J]uries in this district and others routinely decide complex cases involving . . . fraud, and [the defendants] ha[ve] made no showing as to why this case is notably more difficult in any respect.").

In view of the foregoing, it is clear that the two cases cited by Kelly are factually inapposite. In *United States* v. *Villanueva Madrid*, the Court considered an indictment that charged the relevant defendant with participating in two schemes: one being an international narcotics money laundering conspiracy that involved millions of dollars and a corrupt governor of a Mexican state who allied with a "powerful, violent narcotics" cartel and helped protect "hundreds of tons in cocaine shipments," and the other being a bank and wire fraud conspiracy that did not "result[] in any actual losses to any of the victims." 302 F. Supp. 2d 187, 189, 191 (S.D.N.Y. 2003). Not surprisingly, the Court worried "about the prejudice that might result if certain narcotics laundering evidence was introduced into the bank and wire fraud trial." *Id.* at 191. The Court severed the two conspiracies on the ground that evidence connecting the defendant to violent drug trafficking and a politician complicit in the violent drug trade "may well arouse jury animus that could, in a joint trial, spill over into the jury's consideration of the fraud charges, which involve an alleged scheme which, fortunately, turned out not to have injured anyone." *Id.*

No such considerations or concerns exist here. The defendants in the January trial are charged with bribery and related offenses; the Syracuse RFP Evidence concerns bad acts of a similar nature, specifically that Aiello and Gerardi committed corruption crimes for financial gain. If anything, the evidence of bid-rigging is less salacious and inflammatory than the charges that Aiello and Gerardi bribed a senior State officer for official action. *Cf. United States* v. *Presley*, 24 F. App'x 12, 14 (2d Cir. 2001) (explaining that Rule 404(b) evidence of a prior drug sale was "no

more inflammatory or disturbing" than the drug offense for which the defendant was on trial); *United States* v. *Vilar*, No. 05 Cr. 621 (RJS), 2008 WL 4178117, at *4 (S.D.N.Y. Sept. 5, 2008) (Where "the conduct at issue is no more sensational or disturbing than the crimes charged, there is no prospect of unfair prejudice resulting from the introduction of the other act evidence." (internal quotation marks omitted)).

The other case that Kelly relies on, *United States* v. *Catapano*, also fails to support his preclusion and severance motions. There, the complex indictment, which contained thirty-one total counts, charged the defendant with conspiring to make unlawful labor payments over a period of eleven years and committing eight substantive counts of mail fraud. *United States* v. *Catapano*, No. 05 Cr. 229 (SJ, SMG), S3 Indictment ¶¶ 16-18 (E.D.N.Y. Jan. 22, 2008) (Dkt. No. 77). Unlike his co-defendants, the defendant participated in only one of the two frauds within the unlawful labor payments conspiracy, and he also was not charged in the additional money laundering conspiracy, conspiracy to defraud the United States, and tax crimes contained in the indictment. *See id.* ¶¶ 19-23, 27-37. The Court believed that the jury would have difficulty segregating the evidence of the conspiracies, which were "overlapping" and "closely related" but "nevertheless involve[d] different agreements, different time periods and even different participants," and thus might unfairly prejudice the defendant. *Catapano*, 2008 WL 2222013, at *17.

Citing *Catapano*, Kelly contends that the schemes at issue in the January trial are too complex for the jury to keep straight, but there is no basis for this assertion. (Dkt. No. 348 at 7.) On the one hand, Kelly bribed Percoco to take two official actions related to a state contract to buy power plant output and to purchase emissions credits, to benefit the Energy Company's construction of a major power plant in the Hudson Valley and another in New Jersey. On the other hand, Aiello and Gerardi bribed Percoco to take official actions related to commercial construction in Syracuse, as well as the State salary of Aiello's son. These bribery schemes are easy to understand and factually distinct. In addition, the 10 counts in the January trial indictment are tailored to the two schemes, the time periods of the conspiracies are short compared to those in *Catapano*, and the participants are limited. Meanwhile, the Syracuse RFP Evidence also will not confuse the jury. Because the Syracuse RFP Evidence also focuses on commercial construction in Syracuse, the risk that the jury will mistakenly weigh that evidence against Kelly and his energy-related scheme is minimal.

In sum, the Court should permit the Government to introduce the Syracuse RFP Evidence through Howe and a limited number of documents as either direct proof of the charged crimes, or, in the alternative, other bad acts under Rule 404(b) to prove Aiello and Gerardi's opportunity, intent, knowledge, lack of mistake, and/or criminal relationship with Howe.[7] The risk of spillover

---

[7] Irrespective of the admissibility of the Syracuse RFP Evidence in the Government's case-in-chief, the Government may properly cross-examine Aiello and/or Gerardi about their involvement in rigging the Syracuse RFP should either of them decide to testify. Federal Rule of Evidence 608 provides, in relevant part, that "the court may, on cross-examination, allow" specific instances of a witness's conduct "to be inquired into if they are probative of the character for truthfulness or untruthfulness of the witness[] or another witness whose character the witness being cross-examined has testified about." Fed. R. Evid. 608(b)(1)-(2). Aiello and Gerardi's participation in the secret tailoring of the Syracuse RFP, their intent to rig the bidding process so

prejudice to Percoco and Kelly as a result of that evidence can be effectively reduced with limiting instructions to the jury. Accordingly, the Court should deny the defendants' motions to preclude the Syracuse RFP Evidence or further sever the charges.[8]

### B. The Court Should Admit Testimony Regarding Percoco's Employment-Related Actions, Including Threats

#### 1. Relevant Facts

The Government expects to elicit testimony at trial regarding actions taken by Percoco to exercise control over the post-State-service employment of State employees, including threats to certain of those employees.

First, the Government intends to introduce testimony regarding the former Executive Deputy Commissioner of the Office of General Services ("OGS"). Specifically, that testimony will demonstrate that, in or around 2014, Percoco became aware that the Executive Deputy Commissioner of OGS intended to leave his employment with the Executive Chamber of the Governor. While Percoco was, in part, working for Governor Cuomo's reelection campaign, he asked Howe to attend a meeting during which Percoco threatened the Executive Deputy

---

that their company would receive millions of dollars of State contracts, and their related false statements to federal officers are directly relevant to their character for untruthfulness and deception, and thus is quintessential impeachment material. *See, e.g.*, *United States* v. *Sampson*, No. 13 Cr. 269 (DLI), 2015 WL 2066073, at *13 (E.D.N.Y. May 4, 2015) (permitting cross-examination with respect to certain deceitful acts because the "incidents clearly go to Defendant's character for truthfulness as they all involve incidents where Defendant may have lied or misrepresented facts in order to induce others to act"). This line of cross-examination is especially probative as to their credibility because the Government expects Aiello and Gerardi to argue that they did not know that Howe was passing their payments along to Percoco. *See United States* v. *Browne*, 621 F. App'x 44, 48 (2d Cir. 2015) (finding the District Court did not abuse its discretion in "permitting cross-examination about [the defendant's] alleged participation in a prior fraudulent real estate transaction" to probe her credibility where the defendant had testified on direct that "she was an unknowing participant in the mortgage fraud scheme at issue in the case"). Finally, as explained in more detail above, Rule 403 does not counsel the preclusion of questions about the Syracuse RFP because the bid-rigging conduct is not clearly more serious than the bribery charges.

Further, if Aiello or Gerardi testifies and denies that he helped to rig the Syracuse RFP, the Government will be "entitled to rebut by showing that the defendant has lied." *United States* v. *Beverly*, 5 F.3d 633, 639 (2d Cir. 1993). In fact, "[w]hen a defendant offers an exculpatory explanation for the government's evidence, he 'opens the door' to impeachment of his credibility, even by previously inadmissible evidence." *United States* v. *Desposito*, 704 F.3d 221, 234 (2d Cir. 2013).

[8] To the extent the Court grants the defense motion and precludes this evidence, the Government respectfully requests that the defense be precluded from cross-examining Howe and any other witnesses regarding the Syracuse RFP Evidence for the same reasons that the evidence may be precluded on direct examination.

Commissioner of OGS, indicating, in substance and in part, that if the Executive Deputy Commissioner of OGS left the Executive Chamber, Percoco would prevent the Executive Deputy Commissioner of OGS from finding other State employment. The Executive Deputy Commissioner of OGS did ultimately leave the Executive Chamber, in or around the winter of 2014-15.

Second, the Government intends to introduce testimony regarding the Deputy Commissioner for Public Affairs of the New York Division of Homeland Security and Emergency Services (the "Deputy Commissioner for Public Affairs"). Also in or around 2014, the Deputy Commissioner for Public Affairs was considering leaving state employment in order to obtain more compensation, but first went to Percoco and asked for a raise. Percoco denied the raise, after which the Deputy Commissioner for Public Affairs sent Percoco an email with a resignation letter. Percoco, who was, in part, working for Governor Cuomo's reelection campaign, then asked the Director of Operations for New York State and Howe to persuade the Deputy Commissioner for Public Affairs not to leave state employment. The Deputy Commissioner for Public Affairs met with Percoco during this period at Governor Cuomo's campaign office. Ultimately, the Deputy Commissioner for Public Affairs was persuaded not to leave State employment, and did not receive a raise.

Third, the Government intends to introduce testimony regarding the departure, in or about February 2015, from the Executive Chamber of a former Assistant Counsel to the Governor. The former Assistant Counsel was told by Howe and by his future employer, in substance and in part, that he had to receive Percoco's permission to leave the Executive Chamber, or that Percoco would use his influence to terminate the Assistant Counsel's offer of employment. The former Assistant Counsel did receive Percoco's permission and left State employment.[9]

  **2. Discussion**

Contrary to Percoco and Kelly's arguments, evidence regarding these employment-related actions is not barred by Rule 404(b)(1). Rule 404(b)(1) bars admission of evidence of "other acts" where the evidence is used "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). Relevant evidence of other acts is admissible, however, "for another purpose." Fed. R. Evid. 404(b)(2); *see also United States* v. *LaSanta*, 978 F.2d 1300, 1307 (2d Cir. 1992) (The Second Circuit "follows an 'inclusionary' approach to the admission of other act evidence, so that 'evidence of prior crimes, wrongs or acts is admissible for *any* purpose other than to show a defendant's criminal propensity.'" (emphasis in original, citations omitted)).

As Percoco has repeatedly asserted in his motion papers and various letters to the Court,

---

[9] The Government learned of this conduct on or about November 29, 2017, and produced notes of the relevant witness's statements to defense counsel on or about December 1, 2017. Further, the Government no longer intends to introduce evidence regarding employment-related threats made by Percoco to the Director of Operations for New York State or the Executive Chamber employee who sought to work at SUNY Poly, as set forth in the Government's 404(b) notice. (*See* Dkt. No. 343-1.)

including his letter of November 22, 2017 (Dkt. No. 363), whether Percoco acted as an agent of New York State and intended to return to State service during his time working on Governor Cuomo's 2014 reelection campaign form material and significant factual issues that will be contested at trial. Thus, evidence of these facts will form a part of the Government's proof of Percoco's, Aiello's, and Gerardi's guilt on bribery and honest services fraud charges. That, while working on the reelection campaign, Percoco involved himself in State employment decisions and even threatened State employees not to leave State service makes both facts—that Percoco acted as a State agent and intended to return to State employment—more probable. These actions, as well as testimony that Percoco required employees to obtain his permission to leave State employment and otherwise attempted to control their post-State-service employment, also demonstrate Percoco's control over State employees, making it more likely that Percoco directed State employees to take official action. Furthermore, this evidence demonstrates opportunity—that is, that Percoco had the ability to meet with State employees and give them directions while he was working at Governor Cuomo's reelection campaign, and was able to use his considerable influence in and out of the Executive Chamber to control the careers of Executive Chamber employees or at least made credible threats to do so. Thus, the evidence of Percoco's employment-related conduct will not be offered "to show that on a particular occasion the person acted in accordance with the character," but rather to demonstrate Percoco's role as an agent of the State, his intention to return to state service, and his opportunity and ability to direct other State actors. Accordingly, admission of this relevant evidence is not barred by Rule 404(b).[10]

Nor is evidence of Percoco's employment-related threats unfairly prejudicial and therefore subject to exclusion under Rule 403. Evidence is unfairly prejudicial "only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence," *Figueroa*, 618 F.2d at 943, and the Second Circuit has long made clear that other act evidence that is neither "more sensational" nor "more disturbing" than the charged crimes will not be deemed unfairly prejudicial, *United States* v. *Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990); *see also United States* v. *Smith*, 727 F.2d 214, 220 (2d Cir. 1984). Percoco's employment-related threats were not a crime; indeed, the most Percoco can say about them in his letter is that the threats may portray him as a "bully." (*See* Dkt. No. 363 at 2-4.) There is nothing unfairly prejudicial about this evidence, let alone anything that is remotely as "sensational" as the charged conduct of bribe-taking, honest services fraud, and extortion by one of the highest-ranking officials in State government. The evidence goes directly to key, disputed issues at trial, and therefore its probative value is not substantially outweighed by risk of unfair prejudice. Accordingly, Rule 403 does not preclude its admission.

---

[10] For these reasons, Percoco's arguments that Percoco did not use employment-related threats to accomplish the charged official actions and did not use the same individuals against whom he made the employment-related threats to accomplish those official actions are irrelevant.

### C. The Court Should Admit Evidence Regarding the Hiring of a Union President's Daughter

#### 1. Relevant Facts

The Government intends to introduce evidence in its case-in-chief regarding the hiring by Kelly of the daughter of a union president. Specifically, the Government expects to show that, at around the time that Percoco asked Kelly to find a job for his wife, an unemployed teacher, the union president also requested that Kelly find a job for his daughter, who was interested in pursuing a teaching degree. Shortly thereafter, Kelly proposed to others at the Energy Company that the Energy Company should launch an elementary education program. Kelly then decided to hire Percoco's wife and the union president's daughter for part-time jobs working on the education program, paying Percoco's wife $7,500 per month and the union leader's daughter $2,500 per month. Although the union president's daughter initially was paid directly by the Energy Company, Percoco's wife was paid surreptitiously, through a friend and confidant of Kelly, who served as a consultant to the Energy Company. Each month, this consultant would submit an invoice to the Energy Company, which included a request for payment of approximately $5,000 for his own consulting services as well as an additional $7,500, characterized as "expenses on subcontract for educational consulting," which he would then pay, by personal check, to Percoco's wife. The union president's daughter also was later removed from the Energy Company's official payroll and instead paid through the consultant. Percoco's wife and the union president's daughter were the only two people paid through this consultant. After Percoco left State employment, and his wife was thereafter terminated by the Energy Company, the union official's daughter returned to being paid directly by the Energy Company.

Further, at the same time that the Energy Company was paying Percoco's wife and the union president's daughter tens of thousands of dollars per year for low-show jobs, Kelly repeatedly sought Percoco's assistance in advocating on the Energy Company's behalf to various State officials, and the union president advocated directly to Percoco regarding the union's support for the Energy Company's proposed New York power plant and submitted a letter from his union, addressed to Governor Cuomo, setting forth the union's support for the plant.

#### 2. Discussion

The Syracuse Defendants contend that evidence regarding the hiring of the union president's daughter should not be offered against them, and should either be excluded from trial or trial should be severed to avoid the risk of unfair prejudice.[11] Although this evidence will not be introduced against the Syracuse Defendants, neither form of relief is warranted.

As an initial matter, the evidence regarding the hiring of the union president's daughter is direct evidence demonstrating the origins of the education program started by Kelly and his intent in doing so. Such evidence is plainly admissible under Rules 401 and 402. *See, e.g*, *Gonzalez*, 110 F.3d at 941 ("To be relevant, evidence need only tend to prove the government's case, and

---

[11] Kelly did not move *in limine* to preclude this evidence, and only argued that it should not be introduced in a letter dated November 26, 2017, regarding purported *Brady* violations.

evidence that adds context and dimension to the government's proof of the charges can have that tendency." (internal quotation marks omitted)); *Coonan*, 938 F.2d at 1561 ("Background evidence may be admitted to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed."). Although the Government does not contend that the arrangement between Kelly and the union president constituted a crime, even if it were considered criminal conduct or an other act, the evidence would still be admissible as direct proof of the charges because "it arose out of the same transaction or series of transactions as the charged offense, [was] inextricably intertwined with the evidence regarding the charged offense, [and] is necessary to complete the story of the crime on trial." *Carboni*, 204 F.3d at 44. Furthermore, even if it were to be considered other act evidence under Rule 404(b), evidence relating to the hiring of the union president's daughter would still be admissible to demonstrate, among other things, motive, opportunity, plan, knowledge, and lack of mistake. *See* Fed. R. Evid. 404(b); *Huddleston*, 485 U.S. at 691.

Furthermore, admission of evidence regarding the hiring of the union president's daughter would not be unfairly prejudicial within the meaning of Rule 403. The evidence is important to understanding the history and circumstances of the education program started by Kelly, and highly probative of Kelly's motive, opportunity, plan, knowledge, and lack of mistake. Conversely, the conduct is far less "sensational" than the hiring of Percoco's wife and does not risk conviction based on any improper basis. *See, e.g.*, *Roldan-Zapata*, 916 F.2d at 804.

Finally, there is no reason that the evidence cannot be introduced against some defendants and not others through a limiting instruction, as is common in multi-defendant cases. *See, e.g.*, *Spinelli*, 352 F.3d at 56 ("[E]ven the fact that evidence may be admissible against one defendant but not another does not necessarily require a severance."); *Bennett*, 485 F. Supp. 2d at 515 ("[T]o the extent that a category of evidence is irrelevant to [one particular defendant], a limiting instruction will suffice to remove any prejudice.").

> D. **The Government Should Not Be Precluded from Referring to a "Percoco Bribery Scheme" or "Percoco Scheme"**

Kelly moves for an order preventing the Government from making "any references to a single 'Percoco Bribery Scheme' or 'Percoco Scheme,' and to any argument or suggestion that such a scheme existed." (Dkt. No. 347 at 1.) As an initial matter, the Government has no intention to refer to a single conspiracy between Percoco, Kelly, and the Syracuse Defendants. To the extent that Kelly simply seeks to prevent the Government from arguing that a single conspiracy existed, the motion is moot.

The Government or witnesses called by the Government may, however, refer, in whatever language, to a scheme devised by Percoco along with his co-conspirator Howe to find sources of money from Howe's clients for Percoco by offering to exchange official action for bribe payments. There is nothing unfairly prejudicial to Kelly about references to such a scheme, whether called the "Percoco Bribery Scheme," "Percoco Scheme," or something else—indeed, the terms that Kelly is concerned prejudice him do not even mention his name. To the extent that Kelly seeks an order from the Court generally preventing the Government from referring to, in whatever fashion, a scheme of Percoco's to seek bribe payments from multiple sources, or to prevent the Government

from uttering the words "Percoco Bribery Scheme" or "Percoco Scheme," such a request should be denied.

### E. The Court Should Admit Evidence Regarding Percoco's Arrangement with the Engineering Consulting Firm

Percoco also moves *in limine* to preclude the Government from offering evidence related to payments of approximately $27,000 to him in or about November and December 2014 from an engineering consulting firm based in Albany, New York (the "Engineering Consulting Firm"). (Dkt. No. 343 at 4-5.) That motion should be denied. The Government expects to offer evidence at trial that will show, among other things, that Percoco received checks from the Engineering Consulting Firm, signed a contract with the firm, and facilitated meetings between the firm and local public officials and the New York State Department of Transportation ("DOT"). Importantly, Howe connected Percoco with the Engineering Consulting Firm, which was a client of Howe. Furthermore, Percoco's interactions with, and payments from, the Engineering Consulting Firm occurred at almost the same time he was accepting bribes from, and taking official action on behalf of, the Syracuse Developer. The evidence is therefore direct evidence of Percoco and Howe's concerted efforts to find sources of money for Percoco as well as Percoco's intent in doing so. Such evidence is relevant and clearly admissible pursuant to Federal Rules of Evidence 401 and 402. *See Gonzalez*, 110 F.3d at 941. Accordingly, the Government should be permitted to offer evidence related to the Engineering Consulting Firm in its case-in-chief. However, the Government clarifies that it will not argue at trial that Percoco's arrangement with the Engineering Consulting Firm was criminal or wrongful. Instead, the evidence will be offered and is admissible as "[b]ackground evidence . . . to show . . . the circumstances surrounding the events" of the critical time period when Percoco worked at the Governor's reelection campaign. *Coonan*, 938 F.2d at 1561.

Indeed, evidence related to the Engineering Consulting Firm will provide critical context for a wrong committed by Percoco when he omitted information from a financial disclosure statement for the year 2014 (the "Disclosure Statement") that he filed with the New York State Joint Commission on Public Ethics in or about May 2015, after he returned to State service. The Government first learned of this wrong from a potential witness on November 30, 2017, and has produced to defense counsel notes of that individual's statements. Specifically, Percoco did not provide any information in a section of his Disclosure Statement titled "Outside Employment" that required him to "[l]ist the name, address, and description of any . . . employment" and, if that employment activity "as a regular and significant part . . . did business with, or had matters . . . before, any state or local agency, list the name of any such agency." Notwithstanding the clear instructions in that section, Percoco did not disclose that he had taken official action on behalf of the Syracuse Developer on a matter before the Empire State Development Corporation, a State entity, or that he had organized meetings for the Engineering Consulting Firm with local public officials and the DOT.

Evidence of Percoco's omission in the Disclosure Statement is admissible as direct proof of Percoco's efforts to conceal that his activities for the Syracuse Developer had directly involved State matters, in violation of the law as well as ethics guidance from counsel in the Executive Chamber. In the alternative, this evidence is proper under Rule 404(b) as proof of Percoco's intent, knowledge, absence of mistake, lack of accident, and consciousness of guilt. *See* Fed. R. Evid.

404(b)(2); *see also United States* v. *Perez*, 387 F.3d 201, 209 (2d Cir. 2004) ("Evidence of a party's consciousness of guilt may be relevant if reasonable inferences can be drawn from it and if the evidence is probative of guilt.").

## III. Conclusion

For the reasons set forth above, the defendants' motions *in limine* should be denied, or dismissed as moot.

                          Respectfully submitted,

                          JOON H. KIM
                        Acting United States Attorney

                      By: /s/
                          Janis Echenberg/Robert Boone/
                          David Zhou/Matthew Podolsky
                          Assistant United States Attorneys
                          (212) 637-2597/2208/2438/1947

cc: Counsel for all defendants (via ECF)