USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: __12/11/2017__

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X
UNITED STATES OF AMERICA,                    :
                                             :          16-CR-776 (VEC)
            -against-                        :
                                             :          ORDER AND OPINION
                                             :
JOSEPH PERCOCO,                              :
         a/k/a "Herb,"                       :
ALAIN KALOYEROS,                             :
         a/k/a "Dr. K,"                      :
PETER GALBRAITH KELLY, JR.,                  :
         a/k/a "Braith,"                     :
STEVEN AIELLO,                               :
JOSEPH GERARDI,                              :
LOUIS CIMINELLI,                             :
MICHAEL LAIPPLE, and                         :
KEVIN SCHULER,                               :
                                             :
                         Defendants.         :
------------------------------------------------------------ X

VALERIE CAPRONI, United States District Judge:

The allegations in this matter, which are captured in a 79-page Complaint and a 41-page

Superseding Indictment, encompass a range of federal crimes including Hobbs Act extortion,

honest services wire fraud, federal funds bribery, and false statements. *See* Complaint

("Compl.") [Dkt. 1]; Second Superseding Indictment ("S2" or "the Indictment") [Dkt. 321].

Defendants include individuals who were high-ranking state officials as well as private citizens,

and collectively they have filed dozens of motions in advance of trial. These motions challenge,

*inter alia*, the sufficiency of the Indictment, the constitutionality of a criminal statute, the joinder

of the Defendants in their respective trials, the trials' venue in the Southern District of New

York, the prosecution's conduct and pre-indictment public statements, and the lawfulness of

certain searches.

These motions are largely without merit.  As discussed below, the Court grants only portions of one of the Defendants' motions, primarily to ensure that the Government complies with the pretrial obligations it has already acknowledged that it bears.  The balance of the motions misread or overstate the law, or are an unsuccessful attempt to evade the relatively low thresholds that apply at the pretrial stage of a prosecution.

## I.  BACKGROUND

The Indictment alleges an overlapping set of crimes involving eight Defendants: Joseph Percoco, formerly a senior aide to Andrew Cuomo, New York's Governor; Alain Kaloyeros, who formerly served as the head of SUNY Polytechnic Institute ("SUNY Poly") and as a board member of Fort Schuyler Management Corporation ("Fort Schuyler"), a SUNY Poly affiliate; Steven Aiello and Joseph Gerardi (the "Syracuse Defendants"), who founded a Syracuse-based real estate development company that received lucrative state contracts; Louis Ciminelli, Michael Laipple, and Kevin Schuler (the "Buffalo Defendants"), who were senior executives at a Buffalo-based real estate development company that also received lucrative state contracts; and Peter Kelly, an officer at an energy company, who was responsible for public and governmental affairs related to power plant development.  S2 ¶¶ 3–4, 8, 13–15, 16–19, 20–21.  The schemes also involved Todd Howe, a lobbyist and consultant who had connections to SUNY Poly and the Governor's office and who was a paid consultant for the Syracuse Defendants', Buffalo Defendants', and Kelly's companies.  S2 ¶¶ 5, 9–12.

According to the Indictment, Howe worked with the Syracuse Defendants, Buffalo Defendants, and Kaloyeros to manipulate and tailor Fort Schuyler's Request for Proposal ("RFP") process to select preferred developers for SUNY Poly development projects.  After providing the Syracuse and Buffalo Defendants with advance copies of the RFPs, Kaloyeros and

Howe inserted qualifications into the RFPs that were favorable to these Defendants.  That manipulation set up their companies for selection as preferred developers, which led to development contracts that were free from competitive bidding.  S2 ¶¶ 22–27.

Additionally, Howe worked with the Syracuse Defendants and Kelly to obtain illicit favors from Percoco.  Kelly allegedly gave Percoco's wife a low-show job in exchange for favorable action related to emissions credits and a power purchase agreement.  Howe also allegedly arranged for the Syracuse Defendants to bribe Percoco in exchange for favorable treatment, including actions related to a labor union agreement, the release of state development funding, and a raise for Aiello's son, who worked in Governor Cuomo's office.  S2 ¶¶ 28–36.

## II.   DISCUSSION

### A.  Motions to Dismiss the Indictment

The Defendants seek to dismiss the Indictment on various grounds.  They argue that: 18 U.S.C. § 666, one of the criminal statutes with which they are charged, is unconstitutional; the Indictment fails to sufficiently charge certain legal theories; and the Indictment fails to align the factual allegations with the elements of the respective criminal statutes.  Each argument is addressed in turn below.

A defendant challenging the sufficiency of an indictment on a motion to dismiss faces a high hurdle.  Pursuant to Federal Rule of Criminal Procedure 7, an indictment need only contain "a plain, concise, and definite written statement of the essential facts constituting the offense charged . . . ." "An indictment is sufficient if it 'first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'"  *United States v. Stringer*, 730 F.3d 120, 124 (2d Cir. 2013) (quoting *Hamling v.*

*United States*, 418 U.S. 87, 117 (1974)); *see also United States v. Resendiz-Ponce*, 549 U.S. 102, 108 (2007).  "[T]o satisfy the pleading requirements of Rule 7(c)(1), an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime."  *Stringer*, 730 F.3d at 124 (quoting *United States v. Pirro*, 212 F.3d 86, 92 (2d Cir. 2000)) (internal quotation marks omitted).

"'Unless the government has made what can fairly be described as a full proffer of the evidence it intends to present at trial[,] the sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment.'"  *United States v. Perez*, 575 F.3d 164, 166–67 (2d Cir. 2009) (quoting *United States v. Alfonso*, 143 F.3d 772, 776–77 (2d Cir. 1998)) (alteration omitted).  Instead, the indictment's allegations are taken as true, and the Court reads the indictment in its entirety.  *United States v. Hernandez*, 980 F.2d 868, 871 (2d Cir. 1992); *United States v. Goldberg*, 756 F.2d 949, 950 (2d Cir. 1985).

## 1.   18 U.S.C. § 666 Is Constitutional

Percoco and Kelly challenge the constitutionality of the federal funds bribery statute, 18 U.S.C. § 666, in light of the Supreme Court's decision in *United States v. McDonnell*, 136 S. Ct. 2355 (2016).  More specifically, they claim that the *McDonnell* Court's construction of the term "official act" in 18 U.S.C. § 201(a)(3) was motivated by constitutional concerns that implicitly require all federal bribery statutes to contain an "official act" element.  Because section 666 on its face does not require an "official act," they contend, it is unconstitutionally vague and overbroad and violates principles of federalism.[1]

---

[1]    *See* Memorandum of Law in Support of Joseph Percoco's Motion to Dismiss the Superseding Indictment ("Percoco Dismissal Mem.") [Dkt. 187] at 32–37; Memorandum of Law in Support of Defendant Peter Galbraith Kelly, Jr.'s Motion to Dismiss ("Kelly Dismissal Mem.") [Dkt. 230] at 12–42; Reply Memorandum of Law in Further Support of Defendant Peter Galbraith Kelly, Jr.'s Motion to Dismiss ("Kelly Dismissal Reply Mem.") [Dkt. 290] at 3–25; Reply Memorandum of Law in Support of Joseph Percoco's Motion to Dismiss the Superseding Indictment ("Percoco Dismissal Reply Mem.") [Dkt. 298] at 5–8.

A statute is unconstitutionally vague if it "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits [or] if it authorizes or even encourages arbitrary and discriminatory enforcement." *Farrell v. Burke*, 449 F.3d 470, 485 (2d Cir. 2006) (quoting *Hill v. Colorado*, 530 U.S. 703, 732 (2000)) (internal quotation marks omitted).

Relatedly, a statute is unconstitutionally overbroad if it prohibits constitutionally-protected conduct. *Farrell*, 449 F.3d. at 498–99 (quoting *Grayned v. City of Rockford,* 408 U.S. 104, 114 (1972)). "In order to prevail on an overbreadth challenge, the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Id*. at 499 (quoting *Broadrick v. Oklahoma,* 413 U.S. 601, 615 (1973)) (internal quotation marks omitted).

Section 666 criminalizes bribery relating to organizations that receive more than $10,000 annually in federal funds. *See* 18 U.S.C. § 666. In particular, it prohibits corruptly soliciting, accepting, or agreeing to accept, and corruptly giving, offering, or agreeing to give, "anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving any thing of value of $5,000 or more . . . ." *Id*. The statute is intended to "protect the integrity of the vast sums of money distributed through Federal programs from theft, fraud, and undue influence by bribery." *Sabri v. United States*, 541 U.S. 600, 606 (2004) (internal quotation marks and citation omitted).

Defendants' argument that *McDonnell* renders 18 U.S.C. § 666 unconstitutional is rooted in a misreading of *McDonnell*. The Court granted certiorari in *McDonnell* "to clarify the meaning of 'official act'" in the federal bribery statute, 18 U.S.C. § 201(a)(3). 136 S. Ct. at

5

2361, 2365.  During the trial of Virginia's Governor McDonnell and his wife, that statutory

definition had been used, per the parties' agreement, in the jury instructions for Hobbs Act

extortion and honest services fraud.  *Id*. at 2365–67.  Seeking to determine the proper

interpretation of "official act," the Court "adopt[ed] a more bounded interpretation [such that]

setting up a meeting, calling another public official, or hosting an event [would] not, standing

alone, qualify as an 'official act.'"  *Id*. at 2368.  The Court, considering the text of the statute and

its own precedents, as well as constitutional concerns related to constituent representation and

federalism, defined an "official act" as

> [A] decision or action on a "question, matter, cause, suit, proceeding or
> controversy."  The "question, matter, cause, suit, proceeding or controversy" must
> involve a formal exercise of governmental power that is similar in nature to a
> lawsuit before a court, a determination before an agency, or a hearing before a
> committee.  It must also be something specific and focused that is "pending" or
> "may by law be brought" before a public official.

*Id*. at 2371–72, 73.  The Court vacated the McDonnells' convictions and remanded the case in

light of the improper jury instructions that had defined "official act" too broadly.  The Court

rejected, however, the McDonnells' request to invalidate the honest services fraud and Hobbs

Act extortion statutes themselves because the Court's clarification of what constitutes an

"official act" obviated the constitutional vagueness concerns that the McDonnells had raised.  *Id*.

at 2373–75.

While the *McDonnell* opinion touches on constitutional concerns as to the outer bounds

of what might qualify as an "official act," it in no way states or implies that all federal bribery

statutes that implicate the conduct of government officials are *required* to have such an element

to be constitutional.  The Court clarified the definition in section 201(a)(3) because the parties

had elected to use that statutory definition in the instructions charging extortion and honest

services fraud (federal funds bribery was not charged in *McDonnell*).  Moreover, the Court

explicitly avoided broader constitutional questions surrounding those criminal statutes by, in

effect, supplying a more limited definition of what constitutes an "official act" that can serve as

the quid pro quo in honest services fraud or in color of official right extortion.

In any event, the Second Circuit has already held that *McDonnell* does not reach the

federal funds bribery statute.  In reviewing a challenge to the jury instructions given during the

trial of a New York State Assemblyman, the Court determined that the instructions given for

honest services fraud and Hobbs Act extortion were flawed in light of *McDonnell* but reached a

different "conclusion with respect to the instructions given for [the bribery counts under] 18

U.S.C. § 666."  *United States v. Boyland*, 862 F.3d 279, 290–91 (2d Cir. 2017).  Section 666, the

Court found, "is more expansive than § 201" because, rather than limiting potential criminality to

"official acts," section 666 "prohibits individuals from 'solicit[ing] . . . anything of value from

any person, *intending to be influenced* or rewarded *in connection with any* business, transaction,

or series of transactions of [an] organization, government, or agency.'"  *Id.* (citing 18 U.S.C. §

666(a)(1)(B)) (emphases in original).  The Second Circuit thus found that

the *McDonnell* standard did not apply to the section 666 counts.  *Id.*

For these reasons, the Defendants' motions to dismiss based on the alleged

unconstitutionality of section 666 are denied.[2]

---

[2]      Even if *McDonnell* did reach section 666, the cure for such a constitutional concern would be a jury
instruction that appropriately cabins the jury's considerations, rather than a ruling that the criminal statute is
unconstitutional.

### 2.  *McDonnell* Did Not Invalidate the Retainer Theory of Bribery

Percoco and Kelly next argue that the Indictment must be dismissed because, under

*McDonnell*, there must be a quid pro quo exchange related to a "specific" and "focused" matter

determined at the time of the exchange in order to violate section 666 or to constitute extortion or

honest services fraud.  *McDonnell*, they argue, thus overruled the "as-opportunities-arise" or

"retainer theory" of bribery, pursuant to which, for example, a public official accepts a bribe in

return for taking an unspecified action in the future that would benefit the payor.[3]

The Second Circuit has held that, with regards to federal bribery-related crimes

(including Hobbs Act extortion, honest services fraud, and federal funds bribery), "the requisite

quid pro quo for the crimes at issue may be satisfied upon a showing that a government official

received a benefit in exchange for his promise to perform official acts or to perform such acts as

the opportunities arise."  *United States v. Ganim*, 510 F.3d 134, 142 (2d Cir. 2007).  This type of

scheme is sometimes referred to as the "retainer theory" of bribery.  *See, e.g.*, *United States v.*

*Ring*, 628 F. Supp. 2d 195, 208 (D.D.C. 2009) (citing, *inter alia*, *Ganim*, 510 F.3d at 147–50).

The Court in *McDonnell* found that, under 18 U.S.C. § 201(a)(3), "an 'official act' is a

decision or action on a 'question, matter, cause, suit, proceeding or controversy' [that] must

involve a formal exercise of governmental power . . . [and] must also be something specific and

focused that is 'pending' or 'may by law be brought' before a public official."  136 S. Ct. at

2371–72.  More specifically, the Court found that an official action must relate to something

"more specific and focused than a broad policy objective," and contrasted "Virginia business and

economic development" with a properly-focused question on the initiation of research studies for

a specific chemical compound.  *Id*. at 2374.

---

[3]        *See* Percoco Dismissal Mem. at 29–32; Kelly Dismissal Mem. at 43–61; Kelly Dismissal Reply Mem. at
26–38; Percoco Dismissal Reply Mem. at 3.

Defendants again misread *McDonnell* in arguing that the Supreme Court found the "retainer theory" of bribery impermissible and that the acts to be performed must be specified at the time of the quid pro quo agreement.  The Court did no such thing.  *McDonnell* held only that the matter on which official action is *ultimately* taken must be specific and focused, as evidenced by the contrast the Court drew between acts taken to further "Virginia business and economic development" (too diffuse to be an "official act") and the decision to initiate research studies (sufficiently focused to be an "official act").  The Court acknowledged that, under its precedents, "a public official is not required to actually make a decision or take an action . . . ; it is enough that the official agree to do so."  136 S. Ct. at 2370–71 (citing *Evans v. United States,* 504 U.S. 255, 268 (1992)).  "A jury could, for example, conclude that an agreement was reached if the evidence shows that the public official received a thing of value knowing that it was given *with the expectation that the official would perform an 'official act' in return*."  *Id*. at 2371 (citing *Evans*, 504 U.S. at 268) (emphasis added).

In describing the background of the case, the Court noted that Governor McDonnell had been "indicted for accepting payments, loans, gifts, and other things of value . . . in exchange for performing official actions on an as-needed basis, as opportunities arose . . . ."  136 S. Ct. at 2364–65.  The Court made *no other mention* of the fact that McDonnell had been charged on a retainer theory, and it is apparent that the retainer theory was of no import to the Court's decision relative to the proper definition of "official act" under section 201.[4]

---

[4]     As a matter of public policy, it is incomprehensible that Congress would not have intended for bribes paid as "retainers" to be made unlawful.  The purpose of the anticorruption statutes is broadly to ensure honesty in government.  Whether a government official takes a bribe for a specific act known at the time the bribe is paid or takes a bribe to compromise the public good as the opportunity arises to assist the bribe-giver is of no moment—both are corrupt and both corrode the very foundation of good government.

Meanwhile, the Second Circuit has clearly held that a retainer theory of bribery is permissible. *See, e.g.*, *Ganim*, 510 F.3d at 142. Accordingly, the Defendants' motions to dismiss on the ground that the retainer theory is no longer permissible are denied.

### 3. The Indictment Sufficiently Alleges a Gratuity Theory

Percoco and Kelly contend that the Indictment insufficiently alleges a gratuity theory for their respective federal funds bribery counts. First, they contend that the Indictment uses the term "reward," understood to connote a gratuity theory, in the wrong places and an insufficient number of times. They also argue that the gratuities charge is invalid because a gratuity theory is incompatible with a retainer theory and with 18 U.S.C. § 666.[5]

An indictment's allegations are to be taken as true, and the Court reads the indictment as a whole. *Goldberg*, 756 F.2d at 950; *Hernandez*, 980 F.2d at 871. A court properly considers the "to wit" clauses in an indictment when assessing its sufficiency under Rule 7(c). *See, e.g.*, *United States v. Ashfaq*, No. 08 CR. 1240 (HB), 2009 WL 1787717, at *3 (S.D.N.Y. June 23, 2009) ("Moreover, both counts went beyond the statutory language to include clauses that further described the acts that Ashfaq was alleged to have committed. These 'to wit' clauses in both counts of the Indictment were sufficient to place Ashfaq on notice of the offenses with which he was charged and served the salutary purposes espoused by Rule 7(c)."").

The Second Circuit has held that section 666 applies to both bribes and gratuities, and has interpreted the word "reward" to connote a gratuity theory. *United States v. Bahel*, 662 F.3d 610, 636–37 (2d Cir. 2011). An indictment may properly charge both bribery and gratuity theories in a single count "if those acts could be characterized as part of a single continuing

---

[5]    *See* Percoco Dismissal Mem. at 37–39; Kelly Dismissal Mem. at 61–64; Kelly Dismissal Reply Mem. at 38–39; Percoco Dismissal Reply Mem. at 3.

scheme." *United States v. Olmeda*, 461 F.3d 271, 281 (2d Cir. 2006) (quoting *United States v. Tutino*, 883 F.2d 1125, 1141 (2d Cir. 1989)).

The Indictment properly alleges a violation of section 666 utilizing a gratuity theory. Under the headings for the respective section 666 counts are parenthetical descriptions that include the term "Gratuities." *See, e.g.*, S2 at 31 ("COUNT ELEVEN (Solicitation of Bribes and Gratuities from the Energy Company)"). The "to wit" clauses also include a form of the term "reward," which is understood to connote a gratuity theory. *See, e.g.*, S2 ¶ 61 ("[T]o wit, a senior official in the Office of the Governor . . . corruptly solicited and demanded for the benefit of a person, and accepted and agreed to accept, a thing of value from a person, intending to be influenced and *rewarded* . . . ." (emphasis added)).

Reading the Indictment in its entirety, Defendants are on sufficient notice that they are being charged on a gratuity theory, and it is legally permissible for those counts to charge both bribery and gratuity theories because they are alleged as part of a single scheme.[6] Accordingly, the Court denies the Defendants' motion to dismiss the gratuities charges.

### 4.  The Indictment Sufficiently Alleges Wire Fraud

The Buffalo Defendants and Kaloyeros assert that the Indictment fails sufficiently to allege wire fraud. They essentially attack each element of the crime, arguing that the Indictment fails sufficiently to allege a scheme to defraud because: the Defendants did not violate any

---

[6]     To the extent that the Defendants are relying on *United States v. Sun-Diamond Growers of California*, 526 U.S. 398 (1999), to argue that gratuity and retainer theories are incompatible, the Second Circuit in *Ganim* noted "that there is good reason to limit *Sun-Diamond*'s holding to the statute at issue in that case, as it was the very text of the illegal gratuity statute—'for or because of *any official act*'—that led the Court to its conclusion that a direct nexus was required to sustain a conviction under § 201(c)(1)(A)." 510 F.3d at 146. Section 666 does not require an official act at all, as discussed above. Therefore, the Court need not examine any tension that might exist between *Ganim*, which held that *Sun-Diamond* did not extend to extortion and bribery charges because "it is the requirement of an intent to perform an act in exchange for a benefit—*i.e.*, the quid pro quo agreement—that distinguishes those crimes from both legal and illegal gratuities," and *Bahel*, which held that section 666 applies to both bribes and gratuities. 510 F.3d 146–47; 662 F.3d at 636–37.

statute, rule, or guideline with regard to the process for selecting preferred developers; there are no allegations that the Buffalo Defendants knew of misrepresentations that bidding was fair and open; there is no evidence of an intent to harm Fort Schuyler, the entity that managed the RFP process; there are insufficient allegations of how the RFP was tailored to benefit the Buffalo developers; any misrepresentations made in the course of the RFP process were not material; the Indictment insufficiently alleges any property as the object of the scheme, arguing that the "right to control" theory is no longer tenable; and the Indictment insufficiently alleges the use of wires as part of the scheme.[7]

The elements of wire fraud are "(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme." *United States v. Binday*, 804 F.3d 558, 569 (2d Cir. 2015) (quoting *Fountain v. United States,* 357 F.3d 250, 255 (2d Cir. 2004)) (internal quotation marks omitted).  While the victims need not ultimately suffer harm, the defendants must contemplate actual harm or injury to them.  *Id*. (quoting *United States v. Novak,* 443 F.3d 150, 156 (2d Cir. 2006)).

In other words, the government must prove that the defendant acted "with specific intent to obtain money or property by means of a fraudulent scheme that contemplated harm to the property interests of the victim." *United States v. Carlo*, 507 F.3d 799, 801 (2d Cir. 2007) (citing *United States v. Walker,* 191 F.3d 326, 334–35 (2d Cir. 1999); *McNally v. United States,*

---

[7]        *See* Memorandum of Law in Support of Defendant Alain Kaloyeros's Motion to Dismiss Under Federal Rule of Criminal Procedure 12 ("Kaloyeros R. 12 Mem.") [Dkt. 177] at 11–20; Joint Memorandum of Law in Support of the Buffalo Defendants' Motion to Dismiss the Indictment Pursuant to Federal Rule of Criminal Procedure 12 ("Buffalo R. 12 Mem.") [Dkt. 220] at 11–43; Reply Memorandum of Law in Support of Defendant Alain Kaloyeros's Motion to Dismiss Under Federal Rule of Criminal Procedure 12 ("Kaloyeros R. 12 Reply Mem.") [Dkt. 286] at 2–9; Omnibus Reply Memorandum of Law in Further Support of Buffalo Defendants' Pretrial Motions ("Buffalo Omnibus Reply Mem.") [Dkt. 299] at 16–50; Kaloyeros Letter, October 6, 2017 ("Kaloyeros Letter") [Dkt. 333] at 2–4; Ciminelli Letter, October 6, 2017 ("Ciminelli Letter") [Dkt. 334] at 1–7; Schuler Letter, October 6, 2017 ("Schuler Letter") [Dkt. 335] at 1–4; Ciminelli Reply Letter, October 18, 2017 ("Ciminelli Reply Letter") [Dkt. 337] at 1–5; Kaloyeros Reply Letter, October 18, 2017 ("Kaloyeros Reply Letter") [Dkt. 338] at 1–6.

483 U.S. 350 (1987)).  Such property interests may include intangible interests, such as the

victim's right to control its own assets.  *Id*. at 801–02 (citing *Carpenter v. United States,* 484

U.S. 19, 25 (1987); *Walker,* 191 F.3d at 335; *United States v. Rossomando,* 144 F.3d 197, 201

n.5 (2d Cir. 1998)).  *See generally United States v. Finazzo*, 850 F.3d 94 (2d Cir. 2017).  In a

prosecution pursuant to the right to control theory, the victim must be deprived of material,

potentially valuable economic information that would have affected a decision relating to its

assets.  *See Finazzo*, 850 F.3d at 107–12 (citations omitted).  Materiality is a question for the

jury, and an indictment should only be dismissed on materiality grounds if it is facially

insufficient, meaning that no reasonable juror could find the alleged misstatement to be material.

*United States v. Forde*, 740 F. Supp. 2d 406, 412 (S.D.N.Y. 2010) (citing *United States v.*

*Gaudin*, 515 U.S. 506, 522–23 (1995); *United States v. Ferro,* 252 F.3d 964, 968 (8th Cir.

2001)).

     The sufficiency of the Government's evidence of intent cannot be considered on a motion

to dismiss the indictment, and the indictment need only track the language of the statute.  *United*

*States v. Martin*, 411 F. Supp. 2d 370, 373 (S.D.N.Y. 2006) (citing *United States v. Flaharty*,

295 F.3d 182, 198 (2d Cir. 2002)).

     The Indictment adequately alleges wire fraud as to the Buffalo Defendants and

Kaloyeros.  According to the Indictment, the Buffalo Defendants' development company was

selected as a preferred developer for SUNY Poly projects, which enabled it to be chosen for

development projects without further competitive bidding (and which ultimately yielded a high-

value contract).  S2 ¶¶ 16–19.  The company had allegedly been pre-selected by Kaloyeros and

Howe to become a preferred developer in exchange for payments and campaign contributions.

That pre-selection allegedly led the Buffalo Defendants, Kaloyeros, and Howe to tailor the RFP

to the Buffalo Defendants' company's qualifications.  Notwithstanding that tailoring of the process, Kaloyeros—who held influence over Fort Schuyler—allegedly falsely represented to Fort Schuyler's Board of Directors that the process was fair, open, and competitive, and the Buffalo Defendants' company allegedly falsely certified that no one had been retained, employed, or designated by or on behalf of their company to attempt to influence the RFP process.  S2 ¶¶ 8–12, 22–27.

Taking these allegations as true, the Indictment adequately alleges a scheme to defraud. Violation of any particular rule or practice is not an element of the charge, so any argument that no violation was alleged is misplaced.  Whether and how the RFP was tailored is a question for the jury, and it is sufficient that the Indictment alleges that Kaloyeros and Howe provided advance copies of the RFP to the Buffalo Defendants and tailored its specifications to benefit them.  The Indictment also need not specifically allege that the Buffalo Defendants knew of Kaloyeros's misrepresentations to Fort Schuyler, because it is apparent from the Indictment that his role in the scheme was understood to be facilitating what appeared to be a competitive RFP process that was, in fact, rigged to favor the Buffalo Defendants; making misrepresentations to Fort Schuyler was inherent in the scheme.

The intent element is sufficiently alleged, as the Indictment need only track the language of the statute.  The Indictment tracks the language of the statute, alleging that Defendants' actions were taken "willfully and knowingly."  *See* S2 ¶ 45.  Additionally, the Indictment sufficiently alleges money or property as an object of the scheme, alleging that the Defendants "devised a scheme to defraud Fort Schuyler of its right to control its assets, and thereby exposed Fort Schuyler to risk of economic harm. . . ."  *Id*.  The "right to control" theory is well-established in the Second Circuit, and is clearly invoked by this language.

The materiality of the misrepresentation in the context of the right to control is also sufficiently alleged.  The Court finds that a reasonable juror could determine that the Defendants' misrepresentations deprived Fort Schuyler of material, economically-valuable information when it made its decision to grant the Buffalo Defendants' company preferred developer status, as Fort Schuyler then proceeded to negotiate the ultimate development contract with the Buffalo Defendants' company, mistakenly believing that it had been selected as a preferred developer because it was the best-suited for Fort Schuyler's development projects.  *See* S2 ¶¶ 25, 25(a), 25(c).  Although winning the RFP process did not itself guarantee a contract for the Defendants, it put Fort Schuyler opposite a "preferred developer" that had paid for its designation (and therefore its seat at the negotiating table), rather than a preferred developer that, as Fort Schuyler's representatives were led to believe, had earned its designation based on its qualifications and fitness for the projects on which the RFP was premised.

Lastly, wire transmissions are sufficiently alleged:

> In the course of, and in furtherance of, the criminal scheme . . . the defendants, and Todd Howe, as well as others, including employees of SUNY Poly and Fort Schuyler, exchanged interstate emails and telephone calls with individuals located in Manhattan, New York, including (i) the then-assistant secretary for economic development for New York State (the "Assistant Secretary"), who worked part-time at the Governor's offices in Manhattan, New York; and (ii) Manhattan-based employees of the Empire State Development Corporation, which is the State's main economic development agency and was the administrator of funding for certain development projects awarded to the Syracuse Developer and to the Buffalo Developer.

S2 ¶ 26.  For purposes of deciding a pretrial motion to dismiss, the Court must accept the statements in the Indictment as true, and thus, the Indictment adequately alleges wire communications in furtherance of the criminal scheme.  Of course the Government will have to prove at trial that these wire transmissions occurred and their relevance to the alleged scheme, but for now the allegations in the Indictment are adequate.

15

For these reasons, the Defendants' motions to dismiss the wire fraud charges are denied.

### 5.   The Indictment Sufficiently Alleges Bribery

Percoco and Kelly move to dismiss the Indictment arguing that Percoco was not an official government actor for the purposes of the charged crimes during the time he stepped away from his official role in the Governor's office to run the Governor's reelection campaign.  As a private citizen during this several-month-long period, they argue, he could not take actions as an agent of the government, nor, as a matter of law, could he accept anything that would amount to a bribe of a government official.[8]

The Buffalo Defendants raise similar arguments with respect to Todd Howe, the lobbyist and consultant who facilitated the various schemes alleged in the Indictment.  *See generally* S2. Specifically, they argue that Howe was not a government official capable of taking official actions; that his affiliation with SUNY Poly would not allow him to take actions on behalf of Fort Schuyler, the non-profit corporation affiliated with SUNY Poly that managed the allegedly-rigged RFP process; that the allegations do not sufficiently allege a qualifying organization receiving federal funds under section 666 because of the legal separation between SUNY Poly and Fort Schuyler; and that the payments Howe allegedly received were proper payments made to a law firm that just happened to employ Howe.[9]

Section 666 criminalizes the solicitation and offering of bribes relating to organizations receiving more than $10,000 annually in federal funds, including solicitation by an "agent of . . . a State, local, or Indian tribal government, or any agency thereof."  18 U.S.C. § 666(a)(1),

---

[8]    *See* Percoco Dismissal Mem. at 9–28; Kelly Dismissal Mem. at 64–65; Kelly Dismissal Reply Mem. at 39–40; Percoco Dismissal Reply Mem. at 3–23.

[9]    *See* Buffalo R. 12 Mem. at 43–66; Buffalo Omnibus Reply Mem. at 50–70; Ciminelli Letter at 8–9.

(a)(1)(B), (a)(2).  For the purposes of this statute, an agent is someone "authorized to act on behalf of another person or a government and, in the case of an organization or government, includes a servant or employee, and a partner, director, officer, manager, and representative."  18 U.S.C. § 666(d)(1).  In *United States v. Sotomayor-Vasquez*, the Court of Appeals for the First Circuit interpreted this definition broadly, relying on the generally expansive approach the Supreme Court has taken in interpreting the statute.  249 F.3d 1, 8 (1st Cir. 2001) (citing *Salinas v. United States*, 522 U.S. 52, 55–61 (1997)).  The First Circuit found that an "agent" includes individuals acting as directors, managers, or representatives of an organization covered by the statute, even if they are not employed by the organization.[10]  *Id*.  The transaction at issue need not itself use federal funds, nor does the Government need to establish a nexus between the bribery and federal funds.  *Salinas*, 522 U.S. at 57; *Sabri*, 541 U.S. at 605.

The elements of wire fraud are described above.  Section 1346 provides that a scheme to defraud includes a scheme "to deprive another of the intangible right of honest services."  18 U.S.C. § 1346.  "[T]o violate the right to honest services, the charged conduct must involve a quid pro quo, *i.e.*, an intent to give or receive something of value in exchange for an act."  *United States v. Nouri*, 711 F.3d 129, 139 (2d Cir. 2013) (quoting *United States v. Bruno,* 661 F.3d 733, 743–44 (2d Cir. 2011)) (internal quotation marks and alteration omitted).

The Hobbs Act, in relevant part, criminalizes extortion, which it defines as "obtaining [] property from another, with his consent, . . . under color of official right."  18 U.S.C. § 1951(a), (b)(2).  Extortion under color of official right encompasses bribe-taking for which a prosecution "need only show that a public official has obtained a payment to which he was not entitled,

---

[10]    The Second Circuit does not appear to have had an opportunity to interpret this particular provision, although the District Court for the District of Vermont adopted the First Circuit's approach in *United States v. Roebuck*, No. 1:11-CR-127-JGM-1, 2012 WL 4955208, at *2 (D. Vt. Oct. 17, 2012).

knowing that the payment was made in return for official acts." *Ocasio v. United States*, 136 S.

Ct. 1423, 1428 (2016) (quoting *Evans*, 504 U.S. at 260, 268) (internal quotation marks omitted).

"[T]he government does not have to prove an explicit promise to perform a particular act made at

the time of payment, [as it is] sufficient if the public official understands that he or she is

expected as a result of the payment to exercise particular kinds of influence—*i.e.*, on behalf of

the payor—as specific opportunities arise." *United States v. Coyne*, 4 F.3d 100, 114 (2d Cir.

1993) (citing *United States v. Garcia*, 992 F.2d 409, 419 (2d Cir. 1993)).

Percoco's and Kelly's arguments that the Indictment is insufficient because it relies on

actions Percoco took while running Governor Cuomo's 2014 reelection campaign are without

merit.  First, Percoco qualifies as an "agent" under section 666, which includes non-employees

of covered organizations, because he allegedly "continued to function in a senior advisory and

supervisory role with regard to the Governor's Office, and continued to be involved in the hiring

of staff and the coordination of the Governor's official events and priorities . . .  among other

responsibilities."  S2 ¶ 4.  Percoco's alleged continued involvement with the Governor's office

suffices under all of the charged statutes.  Additionally, case law suggests that when the

Government pursues bribery charges based on a retainer theory, it can rely on conduct occurring

when the defendant is temporarily out of office if the scheme includes actions taken or to be

taken when the defendant returns to government.  *See United States v. Meyers*, 529 F.2d 1033,

1035–36 (7th Cir. 1976).  *See also* S2 ¶¶ 4, 35.

As for the Buffalo Defendants and Kaloyeros, their arguments are also without merit.

The Indictment sufficiently alleges that Howe was a government agent in that he was retained as

a consultant for SUNY Poly, maintained an office there, and served as an advisor to Kaloyeros,

the head of SUNY Poly.  S2 ¶ 11.  He allegedly took legally-sufficient acts: "Howe acted as an

agent of SUNY Poly with respect to, among other things, SUNY Poly's development projects,

including large, State-funded development projects in Syracuse and Buffalo, New York.  Howe

also served as a primary liaison between SUNY Poly and the Governor's senior staff."  *Id*.

Although the Defendants contend that the payments to the Albany law firm that had

retained Howe were part of a separate, innocent retainer agreement, the Government's allegation

that this arrangement facilitated illicit payments to Howe is sufficient at this stage.  *See* Compl.

¶ 72.  The Court must accept the allegations in the Indictment as true, although the Government

will obviously have to prove at trial that the arrangement was as nefarious as they allege it to

have been.

The remaining arguments rest on what the Buffalo Defendants and Kelly believe is a

legally-significant distinction between SUNY Poly and Fort Schuyler.  They argue that Howe, as

an agent of only SUNY Poly, could not take actions that bound Fort Schuyler, and that Fort

Schuyler is not a covered organization under section 666 because it did not receive qualifying

federal funds.

The Court finds this argument unconvincing at this stage.  To start, Kaloyeros was

allegedly both the head of SUNY Poly and a director of Fort Schuyler and able to act for both

entities, suggesting significant overlap between the two.  S2 ¶ 8.  Moreover, Fort Schuyler was

created as a SUNY Poly-affiliate for the express purpose of entering into contracts and carrying

out development projects on SUNY Poly's behalf.  *Id*. ¶ 7.  Accordingly, the Court finds that

Fort Schuyler's RFP process, initiated to facilitate development projects for SUNY Poly, which

received federal funds, could be found to constitute the business of both SUNY Poly and Fort

Schuyler.  Accordingly, a jury could find that Howe's and Kaloyeros's alleged bribery scheme

"related to" SUNY Poly, even if the actual contracting entity was Fort Schuyler.

For the reasons above, Defendants' motions to dismiss the bribery charges are denied.

**B. Defendants' Requests to Review Grand Jury Transcripts Are Denied**

The Buffalo Defendants request disclosure of the grand jury transcripts. They argue that the grand jury must have been improperly instructed on the law, relying on the same arguments they raised to challenge the Indictment's sufficiency.[11]

Grand jury proceedings "shall generally remain secret." *In re Petition of Craig*, 131 F.3d 99, 101 (2d Cir. 1997) (quoting *In re Biaggi*, 478 F.2d 489, 491 (2d Cir. 1973)). Courts may, however, direct the disclosure of information regarding the grand jury proceedings "at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii). A defendant seeking disclosure of grand jury materials must demonstrate a "particularized need that outweighs the presumption of secrecy." *United States v. Moten*, 582 F.2d 654, 662 (2d Cir. 1978) (citations omitted). "Speculation and surmise as to what occurred before the grand jury is not a substitute for fact." *United States v. Shaw*, No. S1 06–CR–41 (CM), 2007 WL 4208365, at *6 (S.D.N.Y. Nov. 20, 2007) (quoting *United States v. Wilson*, 565 F. Supp. 1416, 1436 (S.D.N.Y. 1983)). Where the proceedings have concluded, the public interest in maintaining the secrecy of grand jury records is reduced, but it is not eliminated. *See Douglas Oil Co. of California v. Petrol Stops Nw.*, 441 U.S. 211, 222 (1979); *United States v. Sobotka*, 623 F.2d 764, 767 (2d Cir. 1980) ("We conclude that while the necessity here be less compelling in view of the termination of the grand jury, nonetheless some necessity need be shown by the party seeking disclosure.").

---

[11]    *See* Joint Memorandum of Law in Support of the Buffalo Defendants' Motion for an Order Compelling Disclosure of the Grand Jury Transcripts ("Buffalo G.J. Mem.") [Dkt. 224] at 1–16; Buffalo Omnibus Reply Mem. at 71–73; Ciminelli Letter at 7–8.

The Buffalo Defendants have failed to make a sufficient showing to warrant the release of the grand jury's transcripts.  In essentially recycling the arguments already made with respect to the Indictment's sufficiency, the Defendants infer, without any other evidence, that the grand jury must not have been properly instructed on the law.  Just as the Court rejected those legal arguments above, it rejects them here.  The Defendants have not put forward a particularized need to review the minutes of the grand jury proceedings, and they point to no other information that might overcome the presumption of secrecy.  Accordingly, the Defendants' motion to disclose the grand jury transcripts is denied.

### C.  Count One is Not Duplicitous

The Buffalo Defendants and Kaloyeros contend that Count One of the Indictment is duplicitous because it combines multiple conspiracies, namely separate conspiracies related to each preferred developer RFP, into one count.  They contend that there is no evidence of mutual dependence or overlap between the two alleged RFP schemes aside from two common participants (Howe and Kaloyeros).  They also assert that the conspiracy charge must be duplicitous because the Indictment otherwise charges separate substantive counts for the Buffalo and Syracuse RFP allegations.[12]

"An indictment is impermissibly duplicitous where: 1) it combines two or more distinct crimes into one count in contravention of Fed. R. Crim. P. 8(a)'s requirement that there be a separate count for each offense, and 2) the defendant is prejudiced thereby."  *United States v. Sturdivant*, 244 F.3d 71, 75 (2d Cir. 2001) (citing *United States v. Murray,* 618 F.2d 892, 896

---

[12]     *See* Memorandum of Law in Support of Defendant Alain Kaloyeros's Motion to Dismiss Count One Due to Duplicity ("Kaloyeros Duplicity Mem.") [Dkt. 188] at 2–6; Joint Memorandum of Law in Support of the Buffalo Defendants' Motion to Dismiss Count One of the Superseding Indictment Due to Duplicity ("Buffalo Duplicity Mem.") [Dkt. 213] at 1–2; Reply Memorandum of Law in Support of Defendant Alain Kaloyeros's Motion to Dismiss Count One Due to Duplicity ("Kaloyeros Duplicity Reply Mem.") [Dkt. 293] at 2–4.  *See also* S2 ¶¶ 37–47.

(2d Cir. 1980); *United States v. Margiotta,* 646 F.2d 729, 733 (2d Cir. 1981)).  The policy

considerations underlying courts' wariness of duplicitous charges include:

> avoiding the uncertainty of whether a general verdict of guilty conceals a finding
> of guilty as to one crime and a finding of not guilty as to another, avoiding the
> risk that the jurors may not have been unanimous as to any one of the crimes
> charged, assuring the defendant adequate notice, providing the basis for
> appropriate sentencing, and protecting against double jeopardy in subsequent
> prosecutions.

*Margiotta,* 646 F.2d at 733.

Because a single conspiracy "may encompass multiple illegal objects," a count of

conspiracy to commit several crimes is not duplicitous because the conspiratorial agreement

*itself* is the crime.  *United States v. Aracri*, 968 F.2d 1512, 1518 (2d Cir. 1992) (quoting

*Murray,* 618 F.2d at 896).  "A single conspiracy may be found where there is mutual dependence

among the participants, a common aim or purpose[,] or a permissible inference, from the nature

and scope of the operation, that each actor was aware of his part in a larger organization where

others performed similar roles equally important to the success of the venture."  *United States v.*

*Vanwort,* 887 F.2d 375, 383 (2d Cir. 1989) (quoting *United States v. Bertolotti*, 529 F.2d 149,

154 (2d Cir. 1975)) (internal quotation marks omitted).  The members of a conspiracy are not

required to have conspired directly with every co-conspirator and need only be conscious of the

general nature and extent of the conspiracy.  *United States v. Ohle*, 678 F. Supp. 2d 215, 222

(S.D.N.Y. 2010) (quoting *United States v. Rooney,* 866 F.2d 28, 32 (2d Cir. 1989)).  "If the

Indictment on its face sufficiently alleges a single conspiracy, the question of whether a single

conspiracy or multiple conspiracies exists is a question of fact for the jury."  *Id*. (citing

*Vanwort,* 887 F.2d at 383).  In other words, "facially alleg[ing] a single conspiracy is enough to

warrant denial" of a motion to dismiss an indictment for duplicity.  *United States v. Rajaratnam*,

736 F. Supp. 2d 683, 689 (S.D.N.Y. 2010) (citing *Ohle*, 678 F. Supp. 2d at 222).

Count One of the Indictment is not duplicitous.  It alleges a conspiracy to rig the RFP processes by the Buffalo Defendants, the Syracuse Defendants, Kaloyeros, and Howe.  This alleged crime is separate and distinct from the substantive wire fraud counts, and includes allegations of cooperation between the Buffalo and Syracuse Defendants that must, at this stage, be taken as true.  S2 ¶ 24 (The defendants "collaborated in secretly tailoring the Syracuse and Buffalo RFPs by, among other things, exchanging through Howe ideas for potential qualifications to be included in the Syracuse and Buffalo RFPs.").  The fact that this conspiracy led to multiple separate wire fraud charges is irrelevant to assessing whether the conspiracy count is duplicitous.   In short, the Defendants' motions to dismiss Count One for duplicity are denied.

### D.  Defendants' Motions to Sever Are Denied

All of the Defendants have advocated for severance of the parties and claims at trial, and proposed an array of trial combinations that they believe would alleviate their concerns.  They raise concerns of improper joinder under Rule 8 based on insufficient overlap amongst participants, schemes, and evidence.  They also contend that joint trials would be inefficient and risk spillover prejudice and jury confusion, that Defendants' defenses could conflict, that they will have to prepare with regard to evidence against other Defendants in their trial, and that limiting instructions will be insufficient to cure their concerns.[13]

---

[13]     *See* Memorandum of Law in Support of Joseph Percoco's Motion for Severance ("Percoco Severance Mem.") [Dkt. 190] at 1–3; Memorandum of Law in Support of Defendant Alain Kaloyeros's Motion for Severance ("Kaloyeros Severance Mem.") [Dkt. 195] at 2–12; Joint Memorandum of Law in Support of the Buffalo Defendants' Motion for Severance Pursuant to Federal Rules of Criminal Procedure 8(B) and 14 ("Buffalo Severance Mem.") [Dkt. 222] at 1–33; Memorandum of Law in Support of Defendant Peter Galbraith Kelly, Jr.'s Motion for Severance and to Strike Prejudicial Surplusage ("Kelly Severance Mem.") [Dkt. 234] at 17–48; Memorandum of Law in Support of Defendants Joseph Gerardi's and Steven Aiello's Motion to Dismiss for Prosecutorial Misconduct, Sever, and for a Bill of Particulars ("Syracuse Joint Mem.") [Dkt. 237] at 27–39; Reply Memorandum of Law in Further Support of Defendants Joseph Gerardi's and Steven Aiello's Motion to Dismiss for Prosecutorial Misconduct, Sever, and for a Bill of Particulars ("Syracuse Joint Reply Mem.") [Dkt. 283] at 15–20; Reply Memorandum of Law in Further Support of Defendant Peter Galbraith Kelly, Jr.'s Motion for Severance and

In its discretion, the Court has already divided the Defendants into a January Trial Group (Percoco, Aiello, Gerardi, and Kelly) and a Second Trial Group (Kaloyeros, Aiello, Gerardi, Ciminelli, Laipple, and Schuler) [Dkt. 279].  That division for trial post-dated the Defendants' initial memoranda seeking severance.

Joinder of defendants is governed by Rule 8(b), which provides:

> The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses. The defendants may be charged in one or more counts together or separately. All defendants need not be charged in each count.

Fed. R. Crim. P. 8(b).  Under Rule 8(b), "multiple defendants cannot be tried together on two or more 'similar' but unrelated acts or transactions; multiple defendants may be tried together only if the charged acts are part of a series of acts or transactions constituting an offense or offenses." *United States v. Turoff*, 853 F.2d 1037, 1043 (2d Cir. 1988) (internal quotation marks and citation omitted).  In other words, "joinder is proper where two or more persons' criminal acts are unified by some substantial identity of facts or participants, or arise out of a common plan or scheme." *United States v. Cervone*, 907 F.2d 332, 341 (2d Cir. 1990) (quoting *United States v. Attanasio*, 870 F.2d 809, 815 (2d Cir. 1989)) (internal quotation marks omitted).

Even when a defendant is properly joined, he may seek to sever his case for trial if joinder is prejudicial:

> If the joinder of offenses or defendants in an indictment . . . or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires.

---

to Strike Prejudicial Surplusage ("Kelly Severance Reply Mem.") [Dkt. 291] at 3–17; Reply Memorandum of Law in Support of Defendant Alain Kaloyeros's Motion for Severance ("Kaloyeros Severance Reply Mem.") [Dkt. 295] at 2–5; Buffalo Omnibus Reply Mem. at 4–15.

Fed. R. Crim. P. 14(a).  "Whether to grant or deny a severance motion is 'committed to the

sound discretion of the trial judge.'"  *United States v. Salameh*, 152 F.3d 88, 115 (2d Cir. 1998)

(quoting *United States v. Casamento*, 887 F.2d 1141, 1149 (2d Cir. 1989)).  "There is a

preference in the federal system for joint trials of defendants who are indicted together."  *Zafiro*

*v. United States*, 506 U.S. 534, 537 (1993).  "This preference is particularly strong where . . . the

defendants are alleged to have participated in a common plan or scheme."  *Salameh*, 152 F.3d at

115.  The rationale, at least in part, for this preference is that:

> [i]t would impair both the efficiency and the fairness of the criminal justice
> system to require, in all these cases of joint crimes where incriminating statements
> exist, that prosecutors bring separate proceedings, presenting the same evidence
> again and again, requiring victims and witnesses to repeat the inconvenience (and
> sometimes trauma) of testifying, and randomly favoring the last-tried defendants
> who have the advantage of knowing the prosecution's case beforehand.

*Richardson v. Marsh*, 481 U.S. 200, 210 (1987).

Given this presumption, a "district court should grant a severance motion only if there is

a serious risk that a joint trial would compromise a specific trial right of the moving defendant or

prevent the jury from making a reliable judgment about guilt or innocence."  *United States v.*

*Rosa*, 11 F.3d 315, 341 (2d Cir. 1993) (citing *Zafiro*, 506 U.S. at 539).  "[D]efendants are not

entitled to severance merely because they may have a better chance of acquittal in separate

trials."  *Zafiro*, 506 U.S. at 540 (citations omitted).  Nor does "the fact that evidence may be

admissible against one defendant but not another . . . necessarily require a severance."  *United*

*States v. Rittweger*, 524 F.3d 171, 179 (2d Cir. 2008) (quoting *United States v. Carson,* 702 F.2d

351, 367 (2d Cir. 1983)) (internal quotation marks omitted).  Many such concerns can be

resolved through the use of limiting instructions.  *See United States v. Feyrer*, 333 F.3d 110, 114

(2d Cir. 2003) (citing *Zafiro*, 506 U.S. at 539) ("[L]ess drastic measures—such as limiting

instructions—often suffice as an alternative to granting a Rule 14 severance motion.");  *United*

*States v. DeVillio*, 983 F.2d 1185, 1192–93 (2d Cir. 1993) (finding that limiting instruction addressed the risk of prejudicial spillover).

Because the Court has already ordered a discretionary severance, it will consider the arguments underlying the motions to sever in the context of each trial.

As to the Second Trial Group (Kaloyeros, Aiello, Gerardi, Ciminelli, Laipple, and Schuler), whose claims revolve around their respective RFPs, it is abundantly clear that these Defendants should be tried together.  The Indictment alleges a conspiracy involving all six defendants who are in the Second Trial Group, and litigating the allegations related to each RFP will involve a substantial overlap of testimony and evidence at trial.  To the extent that there might be spillover prejudice from evidence against some but not all of these Defendants, limiting instructions will guide the jury in its consideration of the charges and evidence thereof.  The joinder of the Second Trial Group is appropriate under Rule 8, and the Defendants have not made a showing that a joint trial will be so prejudicial that further severance is warranted under Rule 14.

The joinder of the January Trial Group Defendants (Percoco, Kelly, Aiello, and Gerardi) presents a closer question.  The crimes alleged against those Defendants are not as similar to each other as the RFP charges are in the Second Trial Group, as they contemplate different types of action from Howe and Percoco for those actions' respective beneficiaries.[14]  Proving the charges at trial will, however, involve overlapping evidence as to facts and participants.  Moreover, it would be highly inefficient for the Court to order a *third* trial by splitting the January Trial Group into one trial based on the charges involving Kelly and another for those

---

[14]     *See, e.g.*, S2 at ¶¶ 31(a), 35(a) (securing emissions credits for Kelly's energy company and averting a costly labor agreement for the Syracuse Defendants).

involving the Syracuse Defendants (with Percoco being a defendant in both).  Such a division

would require the Court to preside over an additional trial with redundant facts and would force

Percoco to stand trial twice.  The Court is confident that it can properly instruct the jury as to

each Defendant's respective charges and evidence to eliminate the risk of unfair prejudice.   The

joinder of the January Trial Group is appropriate under Rule 8, and Defendants have not made a

showing that a joint trial will be so prejudicial that further severance is warranted under Rule 14.

      In short, Defendants' motions to sever are denied.[15]

### E.  Defendants' Motions to Strike Surplusage Are Denied

      Several Defendants ask the Court to strike various phrases and paragraphs of the

Indictment as prejudicial surplusage.  Kelly asks the Court to strike portions of the Indictment

that he believes improperly reassert and reallege earlier allegations in the document, as well as

the phrase "Percoco Bribery Scheme."  He also objects to the use of summary paragraphs, which,

he asserts, unfairly associate the allegations against him with those against other Defendants.[16]

The Buffalo Defendants similarly contend that paragraphs discussing the allegations against

them as well as allegations against other Defendants should be stricken as prejudicial, and also

challenge the incorporation by reference of paragraphs that refer to other Defendants.[17]  The

Syracuse Defendants ask the Court to strike references to campaign contributions, as they

---

[15]     While Kelly presents his November 1, 2017, letter as a supplemental brief on his motion to sever, the letter raises the same arguments explored in motions in limine from his fellow Defendants.  The Court finds it more appropriate to address these arguments together at a later time, and thus declines to examine Kelly's letter in this opinion.  *See* Kelly Motion to Sever Letter, November 1, 2017 ("Kelly Letter") [Dkt. 348].

[16]     *See* Kelly Severance Mem. at 48–59; Kelly Severance Reply Mem. at 17–18.

[17]     *See* Joint Memorandum of Law in Support of the Buffalo Defendants' Motion to Strike Surplusage ("Buffalo Surplusage Mem.") [Dkt. 217] at 1–5

contend the contributions are a proper exercise of First Amendment rights, and their inclusion in the Indictment is irrelevant and prejudicial.[18]

"Motions to strike surplusage from an indictment will be granted only where the challenged allegations are not relevant to the crime charged and are inflammatory and prejudicial." *United States v. Mulder*, 273 F.3d 91, 99–100 (2d Cir. 2001) (quoting *United States v. Scarpa,* 913 F.2d 993, 1013 (2d Cir. 1990)) (internal quotation marks omitted).  Factual allegations that could either be innocent conduct or evidence of the charged malfeasance need not be stricken.  *United States v. Montour,* 944 F.2d 1019, 1027 (2d Cir. 1991) ("While the jury may have been free to characterize these events [innocently], it could also readily conclude that [Defendant's] acts showed the existence of a conspiracy among [Defendant] and others to interfere with the police.  It was thus not error for the trial court to refuse to strike [the contested language] from the indictment.").

The Court finds that the portions of the Indictment raised by the Defendants are not so inflammatory or prejudicial to warrant being stricken as surplusage.  The Court does not believe that the jury will confuse the separate criminal allegations against each Defendant on the basis of incorporated statements, summary paragraphs, or labels in the Indictment.  To the extent that any evidence presented at trial might prejudice other Defendants at the same trial, upon request, the Court will consider appropriate limiting instructions to ensure that only the evidence pertinent to each Defendant is considered against him.

As for the Syracuse Defendants' complaints about references to campaign contributions, allegations that could be either innocent or incriminating do not need to be stricken.  The Indictment alleges that the Syracuse Defendants' company was preselected to become the

---

[18]     *See* Syracuse Joint Mem. at 39–42; Syracuse Joint Reply Mem. at 20–21.

preferred developer for Syracuse "*after* [they had] made sizeable contributions to the Governor's reelection campaign," implying that their selection as the preferred developer for Syracuse was illicitly connected to their campaign contributions.  S2 ¶ 23 (emphasis added).  It remains to be seen whether the Government can prove that there was a nefarious purpose behind the contributions, but Defendants have not provided a basis on which to strike the allegation.

Accordingly, the Defendants' motions to strike surplusage are denied.

### F.  Defendants' Motion to Dismiss for Lack of Venue or To Transfer Are Denied

The Buffalo Defendants and Kaloyeros seek to dismiss the Indictment for lack of venue, or, in the alternative, to transfer the charges against them to the Western District of New York ("WDNY").  The Buffalo Defendants argue that the emails and calls with individuals in Manhattan alleged in the Indictment[19] are remote, tangential, and preparatory relative to the crimes alleged, and thus insufficient to support venue in the Southern District of New York ("SDNY").  In moving for transfer, they argue that Buffalo is the center of gravity of the case against them, that they live with their families (whom they cannot support from New York, nor from whom they can receive familial support at trial in Manhattan) and work in Buffalo, that witnesses are in Buffalo, and that it is more expensive for them to stand trial in Manhattan than it would be in Buffalo.  Kaloyeros echoes the Buffalo Defendants' arguments.[20]

---

[19]     "In the course of, and in furtherance of, the criminal scheme, ALAIN KALOYEROS, a/k/a "Dr. K," STEVEN AIELLO, JOSEPH GERARDI, LOUIS CIMINELLI, MICHAEL LAIPPLE, and KEVIN SCHULER, the defendants, and Todd Howe, as well as others, including employees of SUNY Poly and Fort Schuyler, exchanged interstate emails and telephone calls with individuals located in Manhattan, New York, including (i) the then-assistant secretary for economic development for New York State (the "Assistant Secretary"), who worked part-time at the Governor's offices in Manhattan, New York; and (ii) Manhattan-based employees of the Empire State Development Corporation, which is the State's main economic development agency and was the administrator of funding for certain development projects awarded to the Syracuse Developer and to the Buffalo Developer." S2 ¶ 26.

[20]     *See* Joint Memorandum of Law in Support of the Buffalo Defendants' Motion to Dismiss and Motion to Transfer ("Buffalo Venue Mem.") [Dkt. 94] at 1–43; Memorandum of Law in Support of Kevin Schuler's Motion to Transfer Venue ("Schuler Venue Mem.") [Dkt. 97] at 2–10; Memorandum of Law in Support of Defendant Alain Kaloyeros's Motion to Dismiss for Lack of Venue or, Alternatively, Transfer ("Kaloyeros Venue Mem.") [Dkt. 206]

Federal law requires defendants to be tried in the district in which their crime was "committed." *United States v. Ramirez*, 420 F.3d 134, 138 (2d Cir. 2005) (citing Fed. R. Cr. P. 18; U.S. Const. art iii, § 2, cl. 3). When a statute does not provide specifically for venue, the Supreme Court has instructed courts to determine the "'*locus delicti*' of the charged offense . . . from the nature of the crime alleged and the location of the act or acts constituting it." *United States v. Rodriguez-Moreno*, 526 U.S. 275, 279 (1999) (quoting *United States v. Cabrales*, 524 U.S. 1, 6–7 (1998)). In performing this inquiry, the court must "identify the conduct constituting the offense, and then discern the location of the commission" of those acts. *Ramirez*, 420 F.3d at 138 (quoting *Rodriguez-Moreno*, 526 U.S. at 279) (internal quotation marks omitted). The Second Circuit has emphasized that the focus is on the physical conduct—or "essential conduct elements"—criminalized by Congress.[21] *Id.* at 144 (noting that the Supreme Court used the phrase "conduct element" three times in the relevant paragraph of *Rodriguez-Moreno*, 526 U.S. at 280).

The Government bears the burden of proving venue, but it need only do so by a preponderance of the evidence. *Ramirez*, 420 F.3d at 139 (citations omitted). At this stage in the proceedings, the Government need only "allege with specificity that the charged acts support venue in this district," *United States v. Long*, 697 F. Supp. 651, 655 (S.D.N.Y. 1988), and the Court assumes as true the allegations in the Indictment. *Goldberg*, 756 F.2d at 950. Exchanging

---

at 2–5; Joint Supplemental Memorandum of Law in Support of the Buffalo Defendants' Motion to Dismiss and Motion to Transfer ("Buffalo Supp. Venue Mem.") [Dkt. 208] at 1–9; Joint Reply Memorandum of Law in Further Support of the Buffalo Defendants' Motion to Dismiss and Motion to Transfer ("Buffalo Venue Reply Mem.") [Dkt. 285] at 1–11; Reply Memorandum of Law in Support of Defendant Alain Kaloyeros's Motion to Dismiss for Lack of Venue or, Alternatively, Transfer ("Kaloyeros Venue Reply Mem.") [Dkt. 294] at 1–5; Ciminelli Letter at 9–10.

[21]     In this Circuit, courts must also apply the "substantial contacts" test to ensure that "the application of a venue provision in a given prosecution comports with constitutional safeguards . . . ." *United States v. Saavedra*, 223 F.3d 85, 92–93 (2d Cir. 2000) (citing *United States v. Reed*, 773 F.2d 477, 481 (2d Cir. 1985)). The Defendants have not argued that trial in the Southern District of New York would be unconstitutional.

emails and placing telephone calls in furtherance of the crime with someone located in the district where the crime is charged is sufficient to establish venue for wire fraud and bribery, respectively.  *See*, *e.g*., *United States* v. *Kim*, 246 F.3d 186, 191–92 (2d Cir. 2001); *United States* v. *Stephenson*, 895 F.2d 867, 874–75 (2d Cir. 1990).

Rule 21(b) provides: "Upon the defendant's motion, the court may transfer the proceeding, or one or more counts, against that defendant to another district for the convenience of the parties, any victim, and the witnesses, and in the interest of justice."  Fed. R. Cr. P. 21(b). "Disposition of a Rule 21(b) motion is vested in the sound discretion of the district court."  *United States v. Maldonado-Rivera,* 922 F.2d 934, 966 (2d Cir. 1990) (citations omitted).  To decide such a motion, a district court is required to consider the factors enumerated in *Platt v. Minnesota Mining & Manufacturing Co.*, none of which is dispositive:

> (a) location of the defendants; (b) location of the possible witnesses; (c) location of the events likely to be at issue; (d) location of relevant documents and records; (e) potential for disruption of the defendants' businesses if transfer is denied; (f) expenses to be incurred by the parties if transfer is denied; (g) location of defense counsel; (h) relative accessibility of the place of trial; (i) docket conditions of each potential district; and (j) any other special circumstance that might bear on the desirability of transfer.

*Id*. (citing *Platt v. Minnesota Mining & Manufacturing Co.*, 376 U.S. 240, 243–44 (1964)). Generally, courts presume that a criminal prosecution should stay in the district in which the indictment was returned.  *United States v. Spy Factory, Inc.*, 951 F. Supp. 450, 464 (S.D.N.Y. 1997) (quoting *United States v. Posner,* 549 F. Supp. 475, 477 (S.D.N.Y. 1982)).

The Indictment sufficiently alleges venue in this District, stating that

> [i]n the course of, and in furtherance of, the criminal scheme, . . . the [moving Defendants] . . . as well as others, including employees of SUNY Poly and Fort Schuyler, exchanged interstate emails and telephone calls with individuals located in Manhattan, New York, including (i) the then-assistant secretary for economic development for New York State (the "Assistant Secretary"), who worked part-time at the Governor's offices in Manhattan, New York; and (ii) Manhattan-based

employees of the Empire State Development Corporation, which is the State's main economic development agency and was the administrator of funding for certain development projects awarded to the Syracuse Developer and to the Buffalo Developer.

S2 ¶ 26.  While these purported contacts appear to be minimal, they sufficiently allege venue for purposes of a pretrial motion to dismiss: the Defendants and others allegedly exchanged emails with, and spoke over the phone to, individuals in this District in furtherance of the crimes.  The allegations provide sufficiently specific detail and comport with Circuit precedent on venue.  It bears repeating that the Government will have to prove venue at trial and must actually prove that the emails and calls they point to did, in fact, further the alleged crimes.

As for transfer, the Court finds that transfer is not warranted, and the Court's consideration of the *Platt* factors does not overcome the presumption that the prosecution remain in this district.  While the moving Defendants live with their families in Buffalo, and some witnesses reside in Buffalo, there are also important witnesses elsewhere.  And while certain relevant events allegedly took place in Buffalo, other events relevant to the allegations against the moving Defendants took place outside of Buffalo.  The electronic discovery in this case will be accessible from anywhere, and disruption of the moving Defendants' business is a moot point because they have since resigned.  *See* Government's Omnibus Memorandum of Law in Opposition to Defendants' Pretrial Motions ("Omnibus Opp. Mem.") [Dkt. 264] at 110.  It is true that trial will be expensive in Manhattan, but it will also be protracted and expensive in Buffalo.  At least some of the moving Defendants have counsel in New York City in addition to or in lieu of Buffalo counsel.  New York City is clearly an accessible transportation hub, and because trial is already scheduled, docket concerns are not significant.

As to the final catch-all factor, the Defendants emphasize their family obligations in Buffalo, and that their families will be unable to provide emotional support for them while they

are on trial in Manhattan.  While the Court is sympathetic to the Defendants' position, it finds these concerns ultimately unpersuasive.  If the moving Defendants' case were transferred, the non-moving Defendants would still need to be tried in Manhattan, and this "possibility of dual prosecution is a special factor courts have considered in assessing the balance of inconveniences."  *United States v. Coriaty*, No. 99CR1251(DAB), 2000 WL 1099920, at *4 (S.D.N.Y. Aug. 7, 2000) (citations omitted).  Not only would such a transfer contravene the Court's determination above as to joinder and severance, but it would also "result in substantial additional government expense and place a double burden on the judiciary [such that this factor] weighs strongly against transfer."  *Id.* (citing *United States v. Aronoff*, 463 F. Supp. 454, 458 (S.D.N.Y. 1978)).

For the reasons discussed above, Defendants' motions to dismiss for lack of venue or to transfer to the Western District of New York are denied.

### G. Defendants' Motions to Suppress Are Denied

The Buffalo Defendants, and Ciminelli in particular, seek to suppress evidence from two sources.  The first relates to the collection of Ciminelli's cell phone location, which is moot,[22] and the second relates to a search of his personal email account.  Defendants claim that the December 2015 warrant for the search of Ciminelli's email lacked probable cause, lacked particularity, was overbroad, and that the search is not subject to the good faith exception.  The details of their arguments mirror Kaloyeros's challenges described below.[23]

---

[22]      "Ciminelli also moves to suppress certain cellphone location information obtained pursuant to a judicially authorized search warrant.  The Government does not intend to introduce such evidence at trial . . . ."  Omnibus Opp. Mem. at 112 n.38.

[23]      *See* Memorandum of Law in Support of Defendant Louis Ciminelli's Motion to Suppress Cellphone Location Information ("Ciminelli Cell Mem.") [Dkt. 211] at 1–10; Memorandum of Law in Support of Defendant Louis Ciminelli's Motion to Suppress the Email Search ("Ciminelli Email Mem.") [Dkt. 226] at 1–11; Buffalo Omnibus Reply Mem. at 73–76.

Kaloyeros moves to suppress evidence gathered from his email account based on warrants issued in December 2015 and May 2016.  He argues that the initial warrant (which also covered the Ciminelli email search) lacked probable cause by, *inter alia*, not articulating why pre-RFP communications he may have had with other Defendants were prohibited, how the tailored RFPs favored other Defendants, and why his use of a personal e-mail account was improper, and because the RFP itself was not attached.  He argues that the second warrant lacked probable cause for the same reasons.  He raises overbreadth and particularity challenges to the warrants as well, claiming that the warrants do not link to the alleged crimes or describe what areas are to be searched.  He also challenges the approximately three-year time period (beginning in December 2012) for which the email accounts' contents could be reviewed.[24]

"The Fourth Amendment to the Constitution provides that 'no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.'"  *United States v. Canfield*, 212 F.3d 713, 718 (2d Cir. 2000) (quoting U.S. Const. amend. IV).  Probable cause exists if the information in the warrant's supporting affidavit supplies "a fair probability that contraband or evidence of a crime will be found in a particular place."  *Canfield*, 212 F.3d at 718 (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

---

[24]    *See* Memorandum of Law in Support of Defendant Alain Kaloyeros's Motion for Suppression of Search Warrant Evidence ("Kaloyeros Suppress Mem.") [Dkt. 172] at 2–21; Declaration of Michael C. Miller in Support of Motion for Suppression of Search Warrant Evidence ("Miller Decl.") [Dkt. 173], Exs. A–F (attaching the warrants at issue); Reply Memorandum of Law in Support of Defendant Alain Kaloyeros's Motion for Suppression of Search Warrant Evidence ("Kaloyeros Suppression Reply Mem.") [Dkt. 287] at 2–13; Kaloyeros Letter at 68; Kaloyeros Reply Letter at 7; Federal Kaloyeros Cell Phone Warrant, November 7, 2017 ("Cell Warrant") [Dkt. 353-1]; Federal Kaloyeros Cell Phone Warrant Application, November 7, 2017 ("Cell Warrant App.") [Dkt. 353-2]; Kaloyeros Suppression Letter, November 17, 2017 ("Kaloyeros Suppression Letter") [Dkt. 356] at 1–3.

Kaloyeros also seeks to suppress evidence recovered from a search of his cell phone.  *See* Kaloyeros Suppress Mem. at 14-22.  The Court has permitted supplementary briefing on the motion to suppress the search of the cell phone and therefore does not resolve that motion in this Order.  The Government has represented that it will not introduce evidence recovered from the search of Kaloyeros's cell phone at the January Trial.  *See* Oral Argument Transcript, Dec. 6, 2017, Dkt. 386, at 36:20-22.

A warrant is sufficiently particular if it identifies the specific offenses for which probable cause has been established, the place to be searched, and the items to be seized in relation to the designated crimes. *United States v. Ulbricht*, 858 F.3d 71, 99 (2d Cir. 2017) (quoting *United States v. Galpin*, 720 F.3d 436, 445–46 (2d Cir. 2013)). "[A] warrant is overbroad if its description of the objects to be seized is broader than can be justified by the probable cause upon which the warrant is based." *United States v. Lustyik*, 57 F. Supp. 3d 213, 228 (S.D.N.Y. 2014) (quoting *Galpin,* 720 F.3d at 446) (internal quotation marks omitted).

A defendant may challenge a search warrant when the supporting affidavit contains deliberately or recklessly false or misleading information. *Canfield*, 212 F.3d at 717 (citing *Franks v. Delaware,* 438 U.S. 154, 164–72 (1978)). But "[e]very statement in a warrant affidavit does not have to be true." *United States v. Trzaska*, 111 F.3d 1019, 1027 (2d Cir. 1997) (citing *Franks*, 438 U.S. at 165). "To suppress evidence obtained pursuant to an affidavit containing erroneous information, the defendant must show that: (1) the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth; and (2) the alleged falsehoods or omissions were necessary to the [issuing] judge's probable cause finding." *Canfield*, 212 F.3d at 717–18 (quoting *Salameh,* 152 F.3d at 113) (internal quotation marks omitted).

To assess whether alleged misstatements were material to the probable cause determination, a reviewing court must set aside the falsehoods in the supporting affidavit and examine whether the untainted remainder supports a finding of probable cause. *United States v. Rajaratnam*, 719 F.3d 139, 146 (2d Cir. 2013) (citing *United States v. Coreas*, 419 F.3d 151, 155 (2d Cir. 2005); *United States v. Nanni*, 59 F.3d 1425, 1433 (2d Cir. 1995)). The reviewing court should also supplement the affidavit with any facts that were omitted from the affidavit, without

which the statements in the affidavit were misleading.  *Id.* (citing *United States v. Ippolito,* 774 F.2d 1482, 1487 n.1 (9th Cir. 1985)).

If the corrected warrant application supports a finding of probable cause, "then the misstatements are not 'material' and suppression is not required."  *Rajaratnam*, 719 F.3d at 146; *see also Canfield*, 212 F.3d at 718 ("The ultimate inquiry is whether, after putting aside erroneous information and material omissions, there remains a residue of independent and lawful information sufficient to support probable cause.") (citing *United States v. Ferguson,* 758 F.2d 843, 849 (2d Cir. 1985)) (internal quotation marks omitted).  A court reviews this "corrected" affidavit *de novo*.  *Canfield*, 212 F.3d at 718.

Even if a court deems a warrant invalid, "[w]hen an officer genuinely believes that he has obtained a valid warrant from a magistrate and executes that warrant in good faith, there is no conscious violation of the Fourth Amendment, and thus [no future violation] to deter" by excluding the evidence.  *United States v. Raymonda*, 780 F.3d 105, 118 (2d Cir. 2015) (quoting *United States v. Leon,* 468 U.S. 897, 920–21 (1984)) (internal quotation marks omitted), *cert. denied*, 136 S. Ct. 433 (2015).  To warrant admission of seized evidence under this so-called "good faith exception," the officer's reliance on the warrant must be objectively reasonable.  *Id.* (quoting *Leon*, 468 U.S. at 922).  But this good faith exception is inapplicable "(1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable."  *Id.* (quoting *United States v. Clark,* 638 F.3d 89, 100 (2d Cir. 2011)) (internal quotation marks omitted).

36

The Defendants' motions to suppress with regard to the email searches fail as a matter of law.  The warrants for the two email accounts were supported by probable cause.  The applications for these warrants contain extensive detail regarding questionable communications among the Defendants and tailoring of the Buffalo RFP prior to its public issuance, as well as background information on the individuals involved, their use of these email accounts, and additional content related to other criminal schemes.  Based on this information, it was probable that the email accounts contained evidence of the crimes referenced in the warrants (federal funds bribery, honest services wire fraud, and related conspiracy).  The Court finds that failing to attach the full RFPs was not a material omission because the applications would have demonstrated probable cause even if the RFPs had been attached.

Further, the email warrants were properly bounded so as not to be overbroad or to lack particularity.  The time period over which emails were seized and searched corresponded to the initiation of the Buffalo Billion initiative until the time of each warrant's execution, as the relevant development projects for the warrants were ongoing at the time of the applications. *See* Omnibus Opp. Mem. at 127.  It was therefore appropriate for the warrants to allow a search of emails for evidence throughout this period.  Additionally, the warrants guided agents in their searches by instructing them to review the emails for evidence, fruits, and instrumentalities of specifically enumerated criminal charges, and provided examples of what to look for, such as evidence related to transmitting, drafting, and modifying the RFP.

Accordingly, the Defendants' motions to suppress, with the exception of Kaloyeros's motion regarding his cellular phone, are denied.

**H. The Motion for a Bill of Particulars Is Denied**

All Defendants move for bills of particulars with regard to the charges against them. Percoco seeks particulars to the extent that the Indictment does not identify whom he pressured or advised, insufficiently limits the time period of allegations by using the phrase "from at least in or about," does not detail Percoco's duties and authority during different time periods, and fails to name unindicted co-conspirators. He also argues that the volume of discovery is so great that it puts him in an unfair position to make his defense. Kelly's requests are similar, asserting that the Indictment fails to name which officials were pressured, when, and how; does not detail the payments constituting the alleged gratuity; and fails to name unindicted co-conspirators. He also claims that the massive discovery produced by the Government is unhelpful in refining the allegations, as he does not know what to search for, and argues that the guidance from the Government features excessively broad page ranges.[25]

The Buffalo Defendants seek particulars essentially aligning with the elements of the charges against them, requesting detail regarding the offending wire transmissions, the scheme to defraud, the types of actions they sought from Howe, the actions Howe took or agreed to take, and the means of improper payments.[26]

---

[25]     *See* Memorandum of Law in Support of Joseph Percoco's Motion for a Bill of Particulars ("Percoco Particulars Mem.") [Dkt. 199] at 1–18; Memorandum of Law in Support of Defendant Peter Galbraith Kelly, Jr.'s Motion for a Bill of Particulars, Motion for Brady Material, and Joinder in His Codefendants' Applications ("Kelly Joint Mem.") [Dkt. 232] at 3–26; Reply Memorandum of Law in Further Support of Defendant Peter Galbraith Kelly, Jr.'s Motion for a Bill of Particulars and Brady Material, and Joinder in His Codefendants' Applications ("Kelly Joint Reply Mem.") [Dkt. 289] at 2–11; Reply Memorandum of Law in Support of Joseph Percoco's Motion for a Bill of Particulars ("Percoco Particulars Reply Mem.") [Dkt. 297] at 1–8.

[26]     *See* Buffalo R. 12 Mem. at 66–70; Buffalo Omnibus Reply Mem. at 70 n.28.

Kaloyeros requests the identification of unindicted co-conspirators, additional details of the alleged fraudulent scheme, and identification of particular wire transmissions.  He also complains about the volume of the Government's discovery production.[27]

Lastly, the Syracuse Defendants also seek the identification of unindicted co-conspirators, particulars regarding the wire transmissions underlying the alleged crimes, and their alleged false, fictitious, or fraudulent statements.  They also seek particulars as to the property of which they deprived their alleged victim and the official acts taken for their benefit, raising arguments similar to those made by other Defendants in motions to dismiss under Rules 7 and 12.[28]

A defendant may seek a bill of particulars pursuant to Federal Rule of Criminal Procedure 7(f) in order to obtain sufficient information about the charged conduct to prepare for trial, to avoid surprise, and to prevent double jeopardy.  *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987) (citations omitted).  "A bill of particulars is not meant to be a tool to compel disclosure of the Government's case before trial."  *United States v. Fruchter*, 104 F. Supp. 2d 289, 311 (S.D.N.Y. 2000) (citing *United States v. Gottlieb*, 493 F.2d 987, 994 (2d Cir. 1974)).  "A bill of particulars is required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused."  *United States v. Ojeda*, 412 F. App'x 410, 411 (2d Cir. 2011) (quoting *United States v. Chen*, 378 F.3d 151, 163 (2d Cir. 2004)) (internal quotation marks omitted).  "The ultimate test is whether the information sought is necessary, not whether it is helpful."  *United States v. Morgan*, 690 F.

---

[27]     *See* Memorandum of Law in Support of Defendant Alain Kaloyeros's Motion for a Bill of Particulars ("Kaloyeros Particulars Mem.") [Dkt. 181] at 2–15; Reply Memorandum of Law in Support of Defendant Alain Kaloyeros's Motion for a Bill of Particulars ("Kaloyeros Particulars Reply Mem.") [Dkt. 292] at 2–7.

[28]     *See* Syracuse Joint Mem. at 6–27; Syracuse Joint Reply Mem. at 3–15.  The Syracuse Defendants also move to dismiss the charges against them to the extent that their requests for particulars are not granted.  *See* Syracuse Joint Reply Mem. at 6–27; Syracuse Joint Reply Mem. at 3–15.

Supp. 2d 274, 285 (S.D.N.Y. 2010) (citing *United States v. Trippe,* 171 F. Supp. 2d 230, 240

(S.D.N.Y.2001)).  It is within the Court's discretion to make that determination and order a bill

of particulars if appropriate.  *Bortnovsky*, 820 F.2d at 574 (citing *United States v. Panza,* 750

F.2d 1141, 1148 (2d Cir. 1984)).

    Defendants' requests for particulars are without merit.  The Government has provided

them with an Indictment and Complaint with more than sufficient detail to enable them to

adequately prepare for trial.  Moreover, the Government's discovery production, although

voluminous, has been accompanied by additional guidance that, in conjunction with the detail in

the Indictment and Complaint, allows the Defendants to conduct a focused review of the

production.  *See* Omnibus Opp. Mem., Ex. A.

    The Court, however, does believe that the Government should identify the specific wires

on which it bases its wire fraud allegations.  The Government committed to producing a list of

wire transmissions in advance of trial.  Omnibus Opp. Mem. at 60, 145 n.43.[29]  To the extent the

Government has not yet disclosed the wires on which its wire fraud claims rely, it must do so for

the January Trial by **December 18, 2017** and for the Second Trial by **May 25, 2018**.

    Accordingly, the Defendants' motions for a Bill of Particulars are denied.[30]

**I.  The Motion to Compel Disclosure of *Brady* Material Is Granted in Part**

    Kelly moves to compel disclosure of three categories of *Brady* material.  First, he seeks

material regarding Howe's alterations of documents, which Kelly contends was done to deceive

him.  While the Government has turned over all such instances of Howe's alterations, and asserts

---

[29]    The Government also committed to providing trial exhibits, a witness list, and 3500 material to Defendants reasonably in advance of trial, offering additional clarity on the charges, which further militates against ordering bills of particulars.  Omnibus Opp. Mem. at 136 & n.40.

[30]    The Court also denies the Syracuse Defendants' related motions to dismiss**.**  *See* Syracuse Joint Reply Mem. at 6–27; Syracuse Joint Reply Mem. at 3–15.

that Howe was, in part, motivated to convey greater enthusiasm for and progress in their scheme than actually existed, Kelly seeks information regarding any other motive Howe had to alter the documents.  Next, Kelly seeks material regarding an ethics opinion that allegedly authorized Kelly to hire Percoco's wife.  While the Government contends that it has provided any information it has regarding the existence of such an opinion, Kelly, parsing the Government's statement, seeks additional information in the Government's possession as to *what Kelly believed* or *was told* regarding such an ethics opinion.  Third, Kelly—as does Percoco, by his own motion—seeks material showing that officials whom the Government contends Percoco pressured or advised in the course of the alleged schemes denied receiving such advice or having felt such pressure.[31]

Kaloyeros, joined by the Buffalo Defendants, seeks the disclosure of various categories of alleged *Brady* materials.  First, he seeks material from Howe and other witnesses, inferring generally from the scope of the charges against him and to what he presumes those individuals testified that additional *Brady* material must exist.  He also broadly requests, for the reasons stated above, and because he believes the Government failed to properly memorialize its interviews with the Syracuse Defendants, that the Government: (1) articulate its criteria for identifying *Brady* material, (2) produce all statements by witnesses or their attorneys, (3) memorialize and disclose any unrecorded statements by witnesses or attorneys, and (4) produce a disclosure containing all communications it has had with counsel and witnesses. Lastly, because the most recent Indictment alleges that Kaloyeros and Howe "designed" the RFP

---

[31]     *See* Memorandum of Law in Support of Defendant Joseph Percoco's Motion to Compel Production of Brady Materials ("Percoco Brady Mem.") [Dkt. 193] at 1–5; Kelly Joint Mem. at 26–39; Omnibus Opp. Mem. at 152–53; Kelly Joint Reply Mem. at 11–17; Reply Memorandum of Law in Support of Defendant Joseph Percoco's Motion to Compel Production of Brady Materials ("Percoco Brady Reply Mem.") [Dkt. 296] at 1–2.

process to lead to the awarding of contracts to the Buffalo and Syracuse Defendants, while the previous Indictment alleged that Kaloyeros and Howe had "predetermined" the outcome of the RFP process, Kaloyeros seeks information explaining that change in word choice.[32]

Under *Brady v. Maryland*, "[t]he prosecution has a constitutional duty to disclose evidence favorable to an accused when such evidence is material to guilt or punishment." *United States v. Coppa*, 267 F.3d 132, 135 (2d Cir. 2001) (citing *Brady v. Maryland,* 373 U.S. 83, 87 (1963)). The Government must disclose such material when it is reasonably probable that the outcome of a trial in which the evidence had been disclosed would differ from one in which it had not been. *Id*. at 142. "[A]s long as a defendant possesses *Brady* evidence in time for its effective use, the government has not deprived the defendant of due process of law simply because it did not produce the evidence sooner." *Id*. at 144.

To start, the Court notes that the Government has explicitly acknowledged the *Brady* obligations it owes the Defendants. *See* Omnibus Opp. Mem. at 147. Should it identify exculpatory material, the Government has committed to producing it.

Looking to Kelly's first request regarding Howe's document alterations, the Court appreciates his argument, but finds that it cannot assess whether any other reasons Howe may have had to alter documents should be disclosed without knowing whether each reason is itself exculpatory. Accordingly, the Court orders the Government to review and assess any other

---

[32]     *See* Memorandum of Law in Support of Defendant Alain Kaloyeros's Motion to Compel Production of Brady Materials ("Kaloyeros Brady Mem.") [Dkt. 201] at 2–10; Declaration of Timothy W. Hoover in Support of the Buffalo Defendants' Motion to Compel the Production of *Brady* Material ("Hoover Decl.") [Dkt. 215] at 1–3; Reply Memorandum of Law in Support of Defendant Alain Kaloyeros's Motion to Compel Production of Brady Materials ("Kaloyeros Brady Reply Mem.") [Dkt. 288] at 2–6; Kaloyeros Letter at 4–6; Kaloyeros Reply Letter at 6–7. In addition to the materials discussed above, Kaloyeros also sought the Syracuse Defendants' statements denying having tailored the RFPs. That material has been produced, thus mooting this request. *See* Kaloyeros Brady Reply Mem. at 3.

reason Howe has provided, and, no later than **December 18, 2017**, disclose any other reason if that reason would tend to exculpate Kelly.

Next, regarding evidence of an ethics opinion related to hiring Percoco's wife, the Court believes Kelly may be over-reading the Government's response when it argues that the Government has disclosed only evidence relating to the "existence" of the alleged ethics opinion. It appears to the Court that the Government understands the request and has provided any such information that it possesses. *See* Omnibus Opp. Mem. at 152–53. Nonetheless, out of an abundance of caution, the Court orders the Government to produce any other evidence it has that speaks to Kelly's belief or understanding that hiring Percoco's wife had been authorized by an ethics opinion, to the extent that such evidence exists and has not been turned over already. The Government must do so no later than **December 18, 2017**.

Third, as to Kelly's and Percoco's requests for material that shows officials whom Percoco allegedly pressured or advised deny having felt such pressure or having received such advice, it appears to the Court that the Defendants and Government agree that such information would constitute *Brady* material.[33] The Government has committed to providing any such evidence that it has, satisfying its *Brady* obligation. Once again, the Government must produce this information no later than **December 18, 2017**, to the extent it has not done so already.

Kaloyeros's *Brady* requests, in contrast, largely rely on unreasonable inferences he has gleaned from the Indictment and the testimony he surmises that others have given. Aside from his request for the Syracuse Defendants' statements, which has been mooted, Kaloyeros's demands are extreme and excessive, and go beyond the Government's obligations under *Brady*. Those requests are denied.

---

[33]   *See* Omnibus Opp. Mem. at 153–54; Kelly Joint Reply Mem. at 14–16; Percoco Brady Reply Mem. at 1–2.

For the reasons stated above, Defendants' motions to compel disclosure of *Brady* material are granted in part and denied in part.[34]

### J.   The Motion to Dismiss Due to Preindictment Publicity Is Denied

The Syracuse Defendants move to dismiss the Indictment based on preindictment publicity.  They claim that statements made by the Government prejudiced the grand jury's determination to indict them.  In particular, they point to comments and tweets from the then-U.S. Attorney that people should "stay tuned" with regard to anti-corruption enforcement; the arrest of the Syracuse Defendants at their homes in lieu of being given the opportunity to surrender themselves; a press conference by the then-U.S. Attorney on the day of the arrests in which he discussed shining a light on corruption in Albany; a speech by the then-U.S. Attorney at St. Rose College, during which he spoke broadly about his office's anti-corruption efforts; and a television appearance by the then-U.S. Attorney on *New York Now*, during which he spoke broadly about corruption.[35]

Courts presume that a grand jury has acted within the legitimate scope of its authority absent a strong showing to the contrary.  *United States v. R. Enterprises, Inc.*, 498 U.S. 292, 300 (1991) (citing *United States v. Mechanik,* 475 U.S. 66, 75 (1986)) (O'Connor, J., concurring in judgment) ("The grand jury proceeding is accorded a presumption of regularity, which generally

---

[34]     Percoco and Kelly recently submitted letters alleging that the Government failed to timely disclose certain *Brady* materials related to Percoco's time away from the Governor's office and his intentions to return, and to Kelly's hiring of a union leader's daughter.  *See* Percoco Brady Letter, November 22, 2017 ("Percoco Brady Letter") [Dkt. 363], Kelly Brady Letter, November 26, 2017 ("Kelly Brady Letter") [Dkt. 365].  As to the Percoco materials, the Court finds that this information does not constitute *Brady* material for the reasons described in its discussion of the bribery charges and Percoco's time as campaign manager in Section II.A.5.  And as to Kelly's hiring the union leader's daughter, the Court finds that the union leader's statements do not exculpate Kelly as they do not undercut the argument that Kelly intended to curry favor with the union leader by hiring his daughter in exchange for support for a power plant project.  Moreover, to the extent that these materials might constitute *Brady* material, the Government has disclosed them sufficiently in advance of trial.  The relief requested by the Defendants is extraordinary and unwarranted.  Accordingly, Percoco's and Kelly's requests are denied.

[35]     *See* Syracuse Joint Mem. at 42–48; Syracuse Joint Reply Mem. at 21.

may be dispelled only upon particularized proof of irregularities in the grand jury process."). *See also United States v. Gibson*, 175 F. Supp. 2d 532, 534 (S.D.N.Y. 2001) ("In order to overcome such presumption, a defendant must demonstrate some grossly prejudicial irregularity or some other particularized need or compelling necessity.") (citing *United States v. Ramirez,* 602 F. Supp. 783, 787 (S.D.N.Y.1985)).

Dismissal of an indictment because of a defect in the grand jury proceedings is a drastic remedy that is rarely used. *United States v. Dyman,* 739 F.2d 762, 768 (2d Cir. 1984) (quoting *United States v. Romano*, 706 F.2d 370, 374 (2d Cir. 1983)). Dismissal is only appropriate if the violations "substantially influenced the grand jury's decision to indict, or if there is grave doubt that that decision was free from such substantial influence . . . ." *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1988) (quoting *Mechanik*, 475 U.S. at 78) (O'Connor, J., concurring in judgment) (internal quotation marks omitted). As this Court has noted previously, it is unaware of any case in which a court dismissed an indictment solely on the basis of pre-indictment publicity. *United States v. Silver*, 103 F. Supp. 3d 370, 380 (S.D.N.Y. 2015) (citations omitted).

The statements and actions highlighted by the Syracuse Defendants do not constitute evidence of prejudicial preindictment publicity. The public statements from the then-U.S. Attorney were properly qualified as allegations the Government intended to prove, did not express opinions of guilt, and were couched in generalities. *See* Omnibus Opp. Mem. at 164–66. The Defendants' arrest and alleged "perp walk" did not violate any rule, let alone constitute irremediable prejudice, particularly because those events took place in or near Syracuse, and the grand jury was impaneled in Manhattan. And most importantly, the Syracuse Defendants have not presented any particularized proof that suggests irregularity in the grand jury process.

Accordingly, their motion to dismiss on the basis of prejudicial preindictment publicity is

denied.[36]

### K. Defendants' Motion to Dismiss for Prosecutorial Misconduct Is Denied

The Syracuse Defendants move to dismiss the Indictment on the grounds of prosecutorial

misconduct.  In particular, they claim that, prior to attending a proffer session with the

Government, at which they allegedly made the false statements for which they were

subsequently indicted,[37] they were informed that they were "subjects" of the investigation.  They

assert that, after the interview, an Assistant United States Attorney ("AUSA") informed counsel

that they were in fact "targets," and claimed to have told them as much in advance of the proffer

session.[38]  They were later formally notified by letter that they were "targets" of the

investigation.  The Syracuse Defendants assert that they would not have attended the proffer

session had they known they were targets, and that the Government's deceit was egregious,

warranting dismissal of the Indictment.[39]

To dismiss an indictment for prosecutorial misconduct, a prosecutor must knowingly or

recklessly mislead a grand jury as to an essential fact, or, as would be relevant here, must engage

---

[36]     The January Trial Group Defendants, through Kelly, submitted a request for the Court to remove or cover
an exhibit in the courthouse featuring historical corruption cases, which, they argue could prejudice jurors who may
come across and view the exhibit.  *See* Kelly Exhibit Letter, October 26, 2017 ("Kelly Exhibit Letter") [Dkt. 340].
When the Court last checked, the objected-to exhibit had been replaced by a different exhibit that does not mention
corruption cases.  Even if the objected-to exhibit returns, the Court will charge the jury that it may not read about
this case or any other corruption case.  In short, Defendants' request for the Court to take action with reference to the
exhibit is denied.

[37]     Federal law criminalizes knowingly and willfully making a materially false statement or representation in
any matter within the jurisdiction of the United States government.  18 U.S.C. § 1001.

[38]     According to the U.S. Attorneys' Manual, a subject is "a person whose conduct is within the scope of the
grand jury's investigation," while a target is "a person as to whom the prosecutor or the grand jury has substantial
evidence linking him or her to the commission of a crime and who, in the judgment of the prosecutor, is a putative
defendant."  USAM § 9-11.151.

[39]     *See* Syracuse Joint Mem. at 2–6; Syracuse Joint Reply Mem. at 1–3.

in a systematic and pervasive pattern of misconduct that undermines the fundamental fairness of the process that generated the indictment.  *United States v. Restrepo*, 547 F. App'x 34, 44 (2d Cir. 2013) (quoting *United States v. Lombardozzi,* 491 F.3d 61, 79 (2d Cir. 2007); *United States v. Brito*, 907 F.2d 392, 395 (2d Cir. 1990)).

The Syracuse Defendants' argument that the Government committed prosecutorial misconduct fails.  The Government asserts that the Defendants were told that they were subjects of the investigation prior to attending their proffer sessions.  The Government contends that the misrepresentations the Defendants made at the proffer session contributed to the decision to change their status to "targets."  Omnibus Opp. Mem. at 174.  Put differently, according to the Government, the Syracuse Defendants became "targets" of the investigation *after* their proffer session and had been properly informed of their "subject" status prior to the proffer.

It would be of grave concern if a representative of the prosecution intentionally misled targets of an investigation into believing that they were mere subjects in order to lure them into making proffers, and the Government provided no sworn evidence to refute the Defendants' sworn allegation regarding who said what to whom before and after the proffers.  Nonetheless, even if a misrepresentation had been made, and even if that misrepresentation had been made *deceitfully* (as the Syracuse Defendants imply), such conduct would not rise to the level of prosecutorial misconduct warranting dismissal of the Indictment, as it would not constitute a "systematic and pervasive pattern of misconduct that undermines the fundamental fairness of the process that generated the indictment."  *Restrepo*, 547 F. App'x at 44.  Nor would the fact that the Defendants believed they were subjects, rather than targets, of the investigation permit them to lie at their proffer session.  Accordingly, the Defendants' motion to dismiss for prosecutorial misconduct is denied.

### III.     CONCLUSION

For the reasons stated above, the Defendants' Motions to Compel Disclosure of *Brady*

Evidence are granted in part and denied in part.  The remainder of Defendants' motions, except

for Kaloyeros's motion to suppress the search of his cell phone, which is still being briefed, are

denied.

The Clerk of Court is instructed to terminate Docket Entries 91, 176, 180, 185, 186, 189,

192, 194, 198, 200, 205, 209, 212, 214, 216, 219, 221, 223, 225, 229, 231, 233, 236, 340, 363,

and 365.


**SO ORDERED.**

Date:  **December 11, 2017**                                          **VALERIE CAPRONI**
      **New York, New York**                                   **United States District Judge**